### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
**Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone:  212-857-8500**

#### MOTION INFORMATION STATEMENT

**Docket Number(s):** 14-3599-cr                                  Caption [use short title]

**Motion for:** Emergency Motion for Bail Pending
Appeal, or in the Alternative to Extend
Defendant-Appellant's Surrender Date

United States of America, Appellee
v.
Mathew Martoma, Defendant-Appellant

Set forth below precise, complete statement of relief sought:

Defendant-Appellant Mathew Martoma seeks
an order granting bail pending his appeal
of his criminal conviction, or in the alternative
a brief extension of his November 10, 2014
surrender date so his motion for bail can be
heard and decided before he must surrender.

**MOVING PARTY:** Mathew Martoma                **OPPOSING PARTY:** United States of America
[ ] Plaintiff  [✓] Defendant
[✓] Appellant/Petitioner  [ ] Appellee/Respondent

**MOVING ATTORNEY:** Paul D. Clement            **OPPOSING ATTORNEY:** Michael Alexander Levy
[name of attorney, with firm, address, phone number and e-mail]

Bancroft PLLC                                   U.S. Attorney's Office for the Southern District of New York

1919 M St. NW, Suite 470, Washington, DC 20036  1 St. Andrew's Plaza, New York, NY 10007

202-234-0090; pclement@bancroftpllc.com         212-637-2346; michael.levy@usdoj.gov

Court-Judge/Agency appealed from: United States District Court for the Southern District of New York, Hon. Paul G. Gardephe

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
[✓] Yes  [ ] No (explain):_____

Opposing counsel's position on motion:
[ ] Unopposed  [✓] Opposed  [ ] Don't Know
Does opposing counsel intend to file a response:
[✓] Yes  [ ] No  [ ] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**
Has request for relief been made below?  [✓] Yes  [ ] No
Has this relief been previously sought in this Court?  [ ] Yes  [✓] No
Requested return date and explanation of emergency:

Defendant-Appellant Mathew Martoma will be

taken into custody on November 10, 2014

if this Court does not act before that date.

Is oral argument on motion requested?  [✓] Yes  [ ] No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  [ ] Yes  [✓] No  If yes, enter date:_____

**Signature of Moving Attorney:**
s/Paul D. Clement          **Date:** October 29, 2014      Service by:  [✓] CM/ECF  [ ] Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# 14-3599-cr

## In The United States Court Of Appeals
## For The Second Circuit

UNITED STATES OF AMERICA,

*Appellee*,

v.

MATHEW MARTOMA,

*Defendant – Appellant*.

On Appeal from the United States District Court for the
Southern District of New York, No. 12 Cr. 973

**EMERGENCY MOTION OF DEFENDANT-APPELLANT
FOR BAIL PENDING APPEAL OR IN THE ALTERNATIVE TO EXTEND
HIS SURRENDER DATE**

ALEXANDRA A.E. SHAPIRO
ERIC S. OLNEY
SHAPIRO, ARATO &
ISSERLES LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
HARKER RHODES*
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Application for admission pending

*Counsel for Defendant – Appellant*

October 29, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

ARGUMENT ................................................................................................................. 5

I.     There Is A Substantial Question Whether The District Court Erred By Excluding Prof. Gompers' Expert Opinion That Publicly Available Information Showed That Elan Was Overvalued In July 2008. ....................................................................................................... 7

II.    There Is A Substantial Question Whether The District Court Erred By Excluding Cohen's Former Testimony About His Elan And Wyeth Trades. ................................................................................................11

III.   There Is A Substantial Question Whether The Government Failed To Prove That The Purported Tipper Received A Personal Benefit. ................. 18

CONCLUSION ............................................................................................................ 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010) ...................................................................7

*Chambers v. Mississippi*,
410 U.S. 284 (1973) ............................................................................7

*Chiarella v. United States*,
445 U.S. 222 (1980) ..........................................................................18

*Crane v. Kentucky*,
476 U.S. 683 (1986) ............................................................................1

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579 (1993) ............................................................................7

*Dirks v. SEC*,
463 U.S. 646 (1983) ................................................................... 18, 19

*SEC v. Maio*,
51 F.3d 623 (7th Cir. 1995) ...............................................................20

*SEC v. Obus*,
693 F.3d 276 (2d Cir. 2012) ..............................................................19

*SEC v. Rocklage*,
470 F.3d 1 (1st Cir. 2006) ..................................................................19

*SEC v. Sargent*,
229 F.3d 68 (1st Cir. 2000) ................................................................20

*SEC v. Warde*,
151 F.3d 42 (2d Cir. 1998) ................................................................19

*SEC v. Yun*,
327 F.3d 1263 (11th Cir. 2003) .........................................................20

*United States v. Abuhamra*,
389 F.3d 309 (2d Cir. 2004) ................................................................6

*United States v. DiNapoli*,
8 F.3d 909 (2d Cir. 1993) ..................................................................15

*United States v. Jiau*,
734 F.3d 147 (2d Cir. 2013) ..............................................................18

*United States v. Kaiser*,
    609 F.3d 556 (2d Cir. 2010) ...................................................... 10, 17

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ...................................................................18

*United States v. Randell*,
    761 F.2d 122 (2d Cir. 1985) ..........................................................6

*United States v. Sklena*,
    692 F.3d 725 (7th Cir. 2012) ........................................ 13, 14, 15, 16

*United States v. Stout*,
    509 F.3d 796 (6th Cir. 2007) ........................................................10

*United States v. White*,
    692 F.3d 235 (2d Cir. 2012) ......................................................1, 11

*United States v. Whitman*,
    555 F. App'x 98 (2d Cir. 2014) ............................................... 10, 16

*United States v. Whitman*,
    No. 12-CR-125 (S.D.N.Y. Aug. 14, 2012) ......................................16

*Washington v. Texas*,
    388 U.S. 14 (1967) ...................................................................18

## Statutes

18 U.S.C. § 3141 .............................................................................1

18 U.S.C. § 3143 .........................................................................1, 6

## Rules

Fed. R. Evid. 401 ...........................................................................7

Fed. R. Evid. 804 ..........................................................................13

Pursuant to Federal Rules of Appellate Procedure 9(b) and 27, Second Circuit Local Rule 27.1(d), and 18 U.S.C. §§ 3141(b) and 3143(b), Mathew Martoma submits this emergency motion for bail pending his appeal from his criminal conviction. After a jury trial before the Honorable Paul G. Gardephe, Martoma was convicted of two counts of insider trading and one count of conspiracy to commit insider trading. The court entered judgment on September 9, 2014, imposing concurrent sentences of nine years of imprisonment on each substantive count and five years of imprisonment on the conspiracy count.[1] Martoma filed a notice of appeal to this Court on September 18, 2014.

On October 21, 2014, Judge Gardephe denied Martoma's motion for bail pending appeal and refused to extend his scheduled surrender date of November 10, 2014. Martoma therefore requests that this Court decide the motion before that date, or alternatively extend the surrender date for a brief period and set a schedule that will ensure that the motion is heard and decided before he must surrender.

## PRELIMINARY STATEMENT

Our criminal justice system "guarantees criminal defendants a meaningful opportunity to present a complete defense." *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). That

---

[1] The sentence also included a three-year term of supervised release, a $300 special assessment, and an order of forfeiture of $9,380,322 plus all of Martoma's interest in certain specified properties.

fundamental guarantee was abandoned here. In a series of erroneous rulings, the district court prevented Martoma from presenting evidence that would have seriously undermined the government's allegations of insider trading. The court simultaneously diluted the government's burden by expansively interpreting the elements of that crime. Individually and collectively, these errors deprived Martoma of a fair trial and allowed the government to obtain a conviction unsupported by law or fact.

Martoma now seeks bail pending his appeal of the district court's errors. As the Probation Office recognized, and as Martoma's exemplary behavior on pre-trial and post-trial release demonstrates, he presents no risk of flight and no danger to the community. And as discussed in more detail below, his appeal raises a number of substantial issues that are likely to result in a new trial or the reversal of his convictions. This emergency motion for bail therefore should be granted.

## FACTUAL BACKGROUND

This prosecution arises out of events that occurred while Martoma was employed as a portfolio manager at the hedge fund S.A.C. Capital Advisors, LLC ("SAC Capital"). As part of his job, Martoma frequently consulted with experts to obtain as much information as possible about the companies in which he considered investing. Among those consultants were Dr. Joel Ross and Dr. Sidney Gilman, two medical experts involved in a clinical trial for the experimental drug bapineuzumab.

That trial was sponsored by the pharmaceutical companies Elan Corporation, plc ("Elan") and Wyeth, which hoped bapineuzumab would provide a breakthrough treatment for Alzheimer's disease.

According to the government, during their consultations, Dr. Ross and Dr. Gilman provided Martoma with nonpublic, material information regarding the bapineuzumab trial. Ex. D (trial transcript) at 62.[2] The government further alleged that in July 2008, Martoma used that information to cause SAC Capital to sell its shares of Elan and Wyeth just before those companies announced negative results from the drug trial. *Id.* at 32-33. It relied not only on trades made openly by Martoma in his own accounts, but also on trades made by Steven Cohen—the owner of SAC Capital—through trading mechanisms that included "dark pools" (anonymous markets), "algos" (algorithmic trading platforms), and limited-access accounts (accounts whose transactions were only visible to certain employees). *See id.* at 2976, 2981-82. The government charged Martoma with one count of conspiracy to commit insider trading, naming Dr. Ross and Dr. Gilman as co-conspirators, and two substantive counts of insider trading (one for trading in Elan, and one for trading in Wyeth). Ex. E (superseding indictment).[3]

---

[2] All exhibits cited ("Ex.") are drawn from the record below and attached to the accompanying Declaration of Paul D. Clement.

[3] The government's primary witness was the 81-year-old Dr. Gilman, who purportedly recalled just two weeks before trial that he had personally walked

At trial, Martoma vigorously contested the government's allegations that he obtained inside information or caused SAC Capital to sell Elan and Wyeth shares based on such information. He instead advanced an innocent alternative explanation: that public information showed Elan and Wyeth shares were substantially overvalued in July 2008, and that SAC Capital sold based on that public information. Ex. D at 82-90, 3099-3107. Martoma also made the related argument that the information at issue was neither nonpublic nor material because its substance already was revealed through a press release issued by Elan and Wyeth a few weeks before the negative results were announced. And Martoma argued that he was not involved in Cohen's decision to use "dark pools," "algos," and limited-access accounts, and that Cohen had independently decided to sell Wyeth in July 2008 based on the opinion of his former employee Wayne Holman. *Id.* at 77-78, 3027-28.

Martoma's ability to present those arguments was deeply undermined, however, by a number of the district court's evidentiary rulings. First, the district court barred Martoma from presenting the expert opinion of Paul Gompers, a professor of finance at Harvard Business School who would have testified, based on public information available in July 2008, that Elan's shares were overvalued at that time. The district court excluded that testimony on the ground that Prof. Gompers'

---

Martoma through a confidential slideshow containing the allegedly inside information. Ex. D at 1162, 1843-44, 1929.

opinion was not relevant because it was "not probative of Martoma's state of mind" or of "materiality." Ex. F (Jan. 28, 2014 Order) at 4-5, 9-10. Second, the district court prohibited Martoma from introducing testimony given by Cohen during a parallel investigation by the Securities and Exchange Commission ("SEC") in which Cohen testified about his decision to sell SAC Capital's Elan and Wyeth holdings in July 2008. Ex. G (Jan. 7, 2014 Order) at 6-11.

Deprived of this exculpatory evidence, the jury convicted Martoma on all three counts after three days of deliberations. The district court denied Martoma's motion for acquittal or a new trial, adopting an expansive reading of the elements of insider trading, including the required element of personal benefit to the insider, an issue currently pending before this Court. Judge Gardephe subsequently imposed concurrent sentences of nine years of imprisonment on each of the substantive counts and five years of imprisonment on the conspiracy count, making Martoma's sentence one of the longest ever imposed for insider trading.[4]

## ARGUMENT

A court "shall order" bail pending appeal if it finds (1) "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community," and (2) "that the appeal is not for the purpose of

---

[4] Dr. Ross and Dr. Gilman, the alleged co-conspirators, received nonprosecution agreements and remain free. Presentence Report ("PSR") ¶ 8. Cohen and Holman were never named as co-conspirators or charged, and they also remain free.

delay and raises a substantial question of law or fact likely to result in … reversal [or] an order for a new trial." 18 U.S.C. § 3143(b). When a defendant meets that standard, "the statute establishes a right to liberty that is not simply discretionary but mandatory." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

As the Probation Office recognized, there can be no serious dispute that Martoma "is not … a flight risk or a danger to the community." Presentence Report ("PSR") at 29. Indeed, the district court already necessarily reached that conclusion when it granted Martoma release pending sentencing, *see* 18 U.S.C. § 3143(a)(1), and again when it declined to revisit that issue in its order denying bail pending appeal, *see* Ex. C (Oct. 21, 2014 Order). And rightly so. Martoma was born in the United States and has lived here his entire life; his parents, wife, and three young children also live here. PSR ¶¶ 47-48, 50-51, 57. He has scrupulously observed the terms of his pre-trial and post-trial release, has kept all required court appearances, and has no criminal history other than this case. PSR ¶¶ 7, 41-46; *see id.* at 29.

Because Martoma is neither a flight risk nor a danger to the community, he is entitled to bail if he raises a "substantial question of law or fact" that is likely to result in reversal or an order for a new trial. To qualify as "substantial," a question need only be "one of more substance than would be necessary to a finding that it was not frivolous"—in other words, "a 'close' question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).

6

A defendant need not prove that he is likely to succeed on the substantial questions he raises; instead, he must show only that if he does succeed, the likely result will be reversal or a new trial.  *Id.* at 124-25.

## I.    There Is A Substantial Question Whether The District Court Erred By Excluding Prof. Gompers' Expert Opinion That Publicly Available Information Showed That Elan Was Overvalued In July 2008.

The district court committed clear legal error by excluding on relevance grounds Prof. Gompers' expert opinion that Elan was overvalued in July 2008.  Like all testimony, expert testimony is relevant so long as it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 587 (1993) (quoting Fed. R. Evid. 401).  This "basic standard of relevance … is a liberal one," *id.*, and produces a "presumption of admissibility," *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010).  That presumption is particularly critical in a criminal trial, where the exclusion of relevant evidence could deny the defendant his constitutional "right to a fair opportunity to defend against the [government's] accusations."  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

The excluded testimony plainly was relevant to Martoma's defense.  Prof. Gompers planned to provide his expert opinion that publicly available materials demonstrated that Elan was overvalued and poised to drop.  That evidence is directly probative of multiple issues at the core of this case, including, *inter alia*, whether the

7

information at issue was even nonpublic or material in the first place; whether the mere fact that the trades avoided a large loss suggests that Martoma possessed inside information; and whether inside information affected Martoma's trading decisions if he did possess it. In short, evidence that Elan was overvalued certainly has at least *some* tendency to make the government's allegations less probable, which is all that the law requires.

The district court nonetheless excluded Prof. Gompers' opinion on the theory that it had no bearing whatsoever on whether the information at issue was material. Ex. F at 9-10. In so ruling, the district court simply ignored the import of this testimony. As Martoma explained in a letter brief to the district court, a significant part of his defense was that the purportedly inside information concerning the drug trial results "had already been disclosed in [a] June 17, 2008, press release." Ex. H (letter brief) at 2. Prof. Gompers would have testified that despite this disclosure, the Elan stock price remained artificially inflated until after SAC Capital sold its shares. Prof. Gompers could thus have shown the jury why, contrary to the government's claim, the stock price decline on July 30, 2011 did not result from previously undisclosed material information. Rather, the stock price declined at that time because the market had been overheated, and so when SAC Capital sold its shares the stock price was higher than the underlying value of Elan and Wyeth could support.

The district court failed to address this argument, let alone explain why Professor Gompers' testimony was not relevant for these reasons. Indeed, the district court completely overlooked the nonpublic element of the analysis. *See, e.g.*, Ex. F at 10 ("Professor Gompers's proposed testimony … is not probative on the central question of materiality."). That was significant legal error, and the district court's narrow and cramped view of relevance cannot be squared with the governing law.

For largely the same reasons, the district court also plainly erred in concluding that Prof. Gompers' expert opinion was irrelevant to Martoma's state of mind. According to the court, Prof. Gompers' testimony was not relevant on that question because "it would not assist the jury in understanding what Martoma was thinking at that time." Ex. F at 4-5. That reasoning is fundamentally flawed. It erroneously regards only *direct* evidence of Martoma's state of mind as relevant, when in fact Martoma was equally entitled to present *circumstantial* evidence of his state of mind. Evidence substantiating the view that someone in Martoma's shoes would have taken the same actions for innocent reasons certainly has at least some tendency to show that Martoma did so as well—either because he did not possess inside information in the first place, or because any such information he possessed was not a substantial factor in his trading decisions.[5] Just like testimony that it was raining

---

[5] Although this Circuit has held that insider trading occurs if a defendant trades while in "knowing possession" of inside information, it stands alone in doing so. Every other circuit to address the question has held that to prove insider trading, the

makes it more likely that someone believed it was raining, testimony that the stock was overvalued makes it more likely that someone believed it was overvalued. Put simply, Prof. Gompers would have shown why Martoma's innocent explanation *made sense*. The exclusion of Prof. Gompers' testimony prevented Martoma from making that showing.[6]

Because Martoma properly objected to the exclusion of his expert's opinion, "the government has the burden to prove that the error was harmless," which it can do only by demonstrating that it is "'highly probable' that [the error] did not contribute to the verdict." *United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010). The government cannot come close to meeting that burden here. By excluding Prof. Gompers's expert opinion regarding the overvaluation of Elan, the district court critically undermined Martoma's ability to explain to the jury why the information

---

government must show the inside information was a substantial factor in the trade. Martoma has preserved a challenge to this Court's minority standard, which is one subject of a petition for certiorari currently pending before the Supreme Court. *See United States v. Whitman*, 555 F. App'x 98, 107 (2d Cir. 2014), *petition for certiorari filed*, No. 14-29 (U.S. July 8, 2014).

[6] The district court alternatively concluded that Prof. Gompers' testimony was more prejudicial than probative because it risked confusing the jury by focusing them on whether the stocks were *actually* overvalued rather than on whether Martoma sold them because he believed they were overvalued. Ex. F at 5-6. But that Rule 403 analysis suffered from the same problem as the court's other conclusions—namely, it rested on a flawed conception of the probative value of Prof. Gompers' testimony. *See United States v. Stout*, 509 F.3d 796, 805 (6th Cir. 2007) (in conducting Rule 403 balancing, a district court "abuse[s] its discretion by devaluing the evidence's probative value").

he allegedly received was neither nonpublic nor material. It also critically undermined Martoma's innocent alternative explanation for his actions. In short, Prof. Gompers' testimony "spoke directly to a critical element of the Government's case and its exclusion prevented [Martoma] from presenting a complete defense." *White*, 692 F.3d at 239. That kind of error is anything but harmless.

## II. There Is A Substantial Question Whether The District Court Erred By Excluding Cohen's Former Testimony About His Elan And Wyeth Trades.

The district court also committed clear legal error by excluding Cohen's former testimony during a parallel SEC investigation regarding the motivation and circumstances behind certain trades at issue here. At trial, the government sought to hold Martoma responsible not only for trades in the portfolio that he managed at SAC Capital, but also for trades made by Cohen in the firm's other accounts. It alleged that Martoma had passed on his inside information to Cohen, who then relied on that information to sell SAC Capital's Elan and Wyeth holdings through "dark pools," "algos," and limited-access accounts—that is, accounts whose transactions were visible only to certain employees. The government relied heavily on Cohen's use of limited-access accounts to imply that these trades must have been based on inside information, calling it "unprecedented" for Cohen to sell these positions "in a way that was completely secret to everyone else at the firm." Ex. D at 2981-82; *see also id.* at 60.

11

Martoma argued in response that Cohen's decision to sell the firm's Elan and Wyeth holdings was based not on inside information from Martoma, but on advice from other expert healthcare investors.  In particular, he introduced evidence of a contract between SAC Capital and its former employee Wayne Holman under which Holman agreed to advise SAC Capital on its Wyeth holdings.  Ex. D at 507-10, 2446-51; Ex. I (contract).  Martoma argued that Cohen's decision to sell Wyeth should raise no inference of insider trading because Cohen "primarily took direction about the Wyeth investment from Mr. Holman."  Ex. D at 77.

Cohen's testimony during the parallel SEC investigation confirmed as much:

| [SEC Attorney]: | What prompted you to [sell] your investment in Wyeth the week of July 21st [2008]? |
|---|---|
| [Cohen]: | I spoke to Wayne [Holman] at some point and he was telling me he was selling his Wyeth. |

Ex. J (Cohen deposition) at 186.  Cohen's testimony also confirmed that the "completely secret" manner in which his trades were made was at the direction of Cohen, not Martoma:

| [SEC Attorney]: | In your instructions to [the employee who executed the SAC Capital trades] did you communicate to him that you wanted the sales of Elan to be done in a quiet way? |
|---|---|
| [Cohen]: | I gave the order to him and told him I didn't want anybody to know. |

. . .

| [SEC Attorney]: | So you communicated to [him] that you didn't want anybody else within the firm to know about the sales of the Elan securities? |
|---|---|
| [Cohen]: | That's correct. |

Ex. J at 196-97.  The district court nonetheless refused to allow Martoma to introduce Cohen's testimony, concluding that it was hearsay outside the scope of Rule 804(b)(1) because the SEC and the prosecution were not the "same party" and did not have a "similar motive" to develop Cohen's testimony.  Ex. G at 6-11.  That holding was another legal error.

Former testimony is not excluded by the hearsay rule if (1) "the declarant is unavailable as a witness," (2) the testimony was given "at a trial, hearing, or lawful deposition," and (3) the testimony "is now offered against a party who had … an opportunity and similar motive to develop it."  Fed. R. Evid. 804(b)(1).  There is no dispute that Cohen was unavailable and that his testimony came from a lawful deposition.  *See* Ex. G at 6 & n.4.  The only questions were whether the SEC and the prosecution are the same "party," and whether they had a "similar motive" to develop Cohen's testimony.  As shown by the Seventh Circuit's decision in *United States v. Sklena*, 692 F.3d 725 (7th Cir. 2012), the answer to both questions is yes.

In *Sklena*, the CFTC and the DOJ simultaneously were investigating allegations of commodities fraud by traders named Sarvey and Sklena.  The CFTC filed a civil enforcement action and took lengthy depositions from both traders.

13

Meanwhile, the DOJ commenced criminal proceedings. 692 F.3d at 727-28. At trial, Sklena sought to introduce Sarvey's prior deposition testimony under Rule 804(b)(1). He asserted that the CFTC and the DOJ were the same "party," and that both agencies had a similar motive to develop Sarvey's testimony. *Id.* at 730. The Seventh Circuit agreed.

As that court explained, where two government agencies "play closely coordinated roles on behalf of the United States in the overall enforcement of a single statutory scheme," the two agencies "are in substance the same party" for purposes of Rule 804(b)(1). *Id.* at 732. On whether the agencies had a similar motive in each proceeding, the court considered "a number of factors, including the substantive law that each is enforcing, the factual overlap between the two proceedings, the type of proceeding, the potential associated penalties, and any differences in the number of issues and parties." *Id.* It concluded that the two agencies did have a similar motive to develop Sarvey's testimony because "[b]oth were investigating the same underlying conduct with an eye to taking enforcement action" and so "shared the same motive to find out what went on." *Id.*

The same conclusion follows from the same analysis here. First, like *Sklena*, this case involves two agencies (the SEC and the DOJ) that play closely coordinated roles in the overall enforcement of a single statutory scheme (the federal securities laws). Indeed, the two agencies worked together so closely on this case that the

14

district court deemed their efforts a "joint investigation," and so held that the government's *Brady*/*Giglio* obligations extended to evidence in the hands of the SEC. Ex. K (Jan. 5, 2014 Order) at 7. That cooperation was particularly evident in the very deposition at issue here. Although that deposition was conducted by the SEC, its attorneys consulted before, during, and after the deposition with the prosecutor investigating Martoma. *Id.* at 6. Under these circumstances, treating the two agencies as separate parties exalts form over substance.

Second, under both *Sklena* and this Court's precedent, the government had a similar motive to develop Cohen's testimony in both proceedings. As this Court explained in *United States v. DiNapoli*, the similar motive inquiry turns on whether a party had "an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." 8 F.3d 909, 914-15 (2d Cir. 1993) (en banc). Here, the SEC had every motive to develop Cohen's testimony about why he decided to sell Elan and Wyeth and why he decided to use limited-access accounts, just as the prosecutor would have had every motive to develop that same testimony at trial. As in *Sklena*, both proceedings sought to enforce the same statute in relation to the same underlying conduct. *See Sklena*, 692 F.3d at 732 ("in order to enforce the laws regulating commodities markets, the CFTC and the [DOJ] had essentially the same incentive to develop Sarvey's factual testimony"). On these facts, the

15

government's motive in both proceedings plainly was sufficiently similar to satisfy Rule 804(b)(1).

Instead of following these precedents, the district court relied on a recent oral decision by Judge Jed S. Rakoff in *United States v. Whitman*, No. 12-CR-125 (S.D.N.Y. Aug. 14, 2012), that was subsequently affirmed by this Court in an unpublished summary order, *United States v. Whitman*, 555 F. App'x 98, 103 (2d Cir. 2014), *petition for certiorari filed*, No. 14-29 (U.S. July 8, 2014). *Whitman* is readily distinguishable on its facts, as that case did not involve nearly the same level of close coordination between the prosecutor and the SEC as in this case. But to the extent *Whitman* conflicts with the Seventh Circuit's analysis in *Sklena*, that only underscores that the district court's exclusion of Cohen's deposition testimony presents a substantial question of law.[7]

Once again, this error was anything but harmless. If the jury had heard Cohen's prior testimony about how and why he sold Elan and Wyeth in July 2008, it not only would have substantially altered the scope of the wrongdoing for which Martoma purportedly was responsible, but also would have counteracted the

---

[7] The district court sought to distinguish *Sklena* on the ground that the CFTC is required by statute to report its litigation activities to the DOJ, while the SEC is not. Ex. G at 10 n.5. But *Sklena* explicitly "decline[d] to hold that [unified litigating authority] is the *sine qua non* for finding that the United States and one of its agencies are in substance the same party." 692 F.3d at 732.

government's repeated efforts to draw an inculpatory inference from the "secret" manner in which Cohen made those trades. The importance of that inference to the government's case is underscored by the government's repeated contentions, in both its opening and closing arguments, that Cohen's use of limited-access accounts showed the trades were made on inside information from Martoma. Ex. D at 60, 2935, 2973-74, 2981-83.

Because Cohen's testimony would have undermined a key part of the government's case, the government cannot show that it is "highly probable" the district court's error "did not contribute to the verdict." *Kaiser*, 609 F.3d at 573.[8] Just like the exclusion of Prof. Gompers' expert opinion, the exclusion of Cohen's testimony fundamentally undermined Martoma's attempt to provide an innocent alternative explanation for the alleged insider trading. In both instances, the district court erroneously deprived Martoma of evidence "relevant and material to [his]

_____

[8] In an extensive footnote to its decision excluding Cohen's testimony, the district court recounted portions of that testimony that it considered inculpatory, including passages in which Cohen stated that Martoma initially advised him to invest in Elan and Wyeth, and that in July 2008 Martoma advised him to sell Elan. Ex. G at 3 n.1. But whether admitting Cohen's testimony would have benefitted his case was a judgment for Martoma, not the district court, to make. In any event, the passages the court cited hardly would have bolstered the government's case. As for the early advice to invest in Elan and Wyeth, those early investments were not at issue; the superseding indictment charged Martoma with insider trading only with respect to the trades in July 2008. Ex. E. As for the advice to sell Elan in July 2008, Cohen testified that the reasons Martoma gave for that advice were "normal, typical reasons," not inside information. Ex. G at 4 n.1. The exculpatory value of Cohen's testimony thus far outweighed any negative aspects.

defense," *Washington v. Texas*, 388 U.S. 14, 23 (1967), and both errors are likely to necessitate a new trial.

## III. There Is A Substantial Question Whether The Government Failed To Prove That The Purported Tipper Received A Personal Benefit.

There is "no 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information.'" *United States v. O'Hagan*, 521 U.S. 642, 661 (1997) (quoting *Chiarella v. United States*, 445 U.S. 222, 233 (1980)). The Supreme Court has long held that knowingly receiving and trading on material nonpublic information from an insider is not securities fraud unless the insider breached his fiduciary duty to shareholders in order to obtain a "personal gain." *Dirks v. SEC*, 463 U.S. 646, 662 (1983). Accordingly, "[t]o hold [a tippee] criminally liable for insider trading," the government must prove beyond a reasonable doubt that "the insider-tippers benefited in some way from their disclosure" to the tippee. *United States v. Jiau*, 734 F.3d 147, 152-53 (2d Cir. 2013) (citing *Dirks*, 463 U.S. at 659-64).

Here, the crux of the Government's case against Martoma—and the basis for the district court's denial of his motion for acquittal under Rule 29—was "the final [bapineuzumab] efficacy data Martoma [allegedly] obtained from Dr. Gilman" during a phone call on July 17, 2008 and a purported meeting on July 19, 2008. Ex. L (Sept. 4, 2014 Opinion) at 4, 9. Indeed, the district court made clear in denying Martoma's postverdict motions that it was relying *only* on Dr. Gilman, not any other

purported tipper. *Id.* at 9. No reasonable jury could have concluded that Dr. Gilman benefited from these disclosures.

In denying Martoma's motion to set aside the verdict, the district court erroneously concluded that Dr. Gilman was compensated financially for the July 17 call and the alleged July 19 meeting, and received non-pecuniary benefits based on his supposed friendship with Martoma. *See* Ex. L at 13-15. In fact, the government readily concedes that Dr. Gilman was not paid for these communications. Ex. D at 1917-18, 2967. And while Dr. Gilman did testify that he "thought [h]e [and Martoma] were friends," *id.* at 1488, 1893, he did not claim to have disclosed the bapineuzumab efficacy data for this reason. Nor could he have, as the two hardly had the kind of relationship in which any decision by Dr. Gilman to share information would have been akin to "trading by himself followed by a gift of the profits to" Martoma. *Dirks*, 463 U.S. at 664.

In fact, there was only a single even plausibly social encounter (a "chat" over "coffee") between Dr. Gilman and Martoma. *See* Ex. D at 1237-38. That is nothing like the kinds of "close friendship" this Court and other Courts of Appeals have found sufficient to satisfy the benefit requirement. *SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998); *see, e.g.*, *SEC v. Obus*, 693 F.3d 276, 291 (2d Cir. 2012) (disclosure to a college friend); *SEC v. Rocklage*, 470 F.3d 1, 4, 7 n.4 (1st Cir. 2006) ("By tipping her brother, Mrs. Rocklage was providing a gift of confidential information to a

relative, and so she personally benefitted."); *SEC v. Yun*, 327 F.3d 1263, 1280-81 (11th Cir. 2003) (evidence sufficient to show that tipper "expected to benefit from her tip to [the tippee] by maintaining a good relationship between a friend and frequent partner in real estate deals"); *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) (evidence sufficient to show that tipper tried "to effect a reconciliation with his friend" where his "sister-in-law owed [the tippee] money," and also tried to "maintain a useful networking contact"); *SEC v. Maio*, 51 F.3d 623, 627, 632-33 (7th Cir. 1995) ("close friendship" between tipper and tippee).[9]

No Court of Appeals has found a "benefit" based on a relationship as casual as the one alleged here. And for good reason. Doing so would effectively relieve the government of its burden of proving that the tipper acted to obtain a personal benefit—the very fact that separates legal trading from fraud. There is at least a substantial question as to whether the government failed to prove that critical element here, which would require a judgment of acquittal.

## CONCLUSION

For the foregoing reasons, Martoma should be granted bail pending appeal. Alternatively, his surrender date should be extended until this motion can be heard and decided.

---

[9] This Court is currently considering the scope of the personal benefit requirement in *United States v. Newman*, No. 13-1837 (argued Apr. 22, 2014). This Court granted bail to the defendants in that case.

Respectfully submitted,

s/Paul D. Clement

ALEXANDRA A.E. SHAPIRO
ERIC S. OLNEY
SHAPIRO, ARATO &
ISSERLES LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
HARKER RHODES*
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Application for admission *pro hac
vice* pending

Counsel for Defendant – Appellant

October 29, 2014

21

# CERTIFICATE OF COMPLIANCE
# WITH PAGE LIMITATION

I hereby certify that:

1. This motion complies with the page limitation of Fed. R. App. P. 27(d)(2) because it does not exceed 20 pages, excluding the accompanying documents authorized by Fed. R. App. P. 27(a)(2)(B).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

October 29, 2014

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 29, 2014, an electronic copy of this motion was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.


s/Paul D. Clement_____
Paul D. Clement

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Appellee,* | No.   14-3599-cr |
| v. | |
| MATHEW MARTOMA, | DECLARATION OF |
| | PAUL D. CLEMENT IN |
| *Defendant-Appellant.* | SUPPORT OF THE MOTION |
| | OF MATHEW MARTOMA |
| | FOR RELEASE |
| | <u>PENDING APPEAL</u> |

**PAUL D. CLEMENT**, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am an attorney duly admitted to practice law before this Court. I am a member of the law firm Bancroft PLLC, co-counsel for Defendant-Appellant Mathew Martoma in this appeal.  I make this declaration in support of Martoma's motion for release on bail pending the resolution of his appeal to this Court from a judgment of conviction entered in the United States District Court for the Southern District of New York by the Honorable Paul G. Gardephe, United States District Judge.

2.      On September 8, 2014, Judge Gardephe sentenced Martoma to concurrent sentences of nine years' imprisonment on each of the substantive counts in the indictment and five years' imprisonment on the conspiracy count, to be followed by a three-year term of supervised release, a $300 special assessment and

1

forfeiture of $9,380,322 plus all of Martoma's right, title and interest in certain specified properties. Martoma was ordered to surrender for service of sentence on November 10, 2014. The judgment of conviction was entered on September 9, 2014, and is attached hereto as Exhibit A.

3. Martoma filed his Notice of Appeal in the District Court on September 18, 2014. A copy is attached hereto as Exhibit B. I certify that this appeal is not taken for the purpose of delay.

4. On October 3, 2014, Martoma moved for a stay of his November 10, 2014 surrender date and for bail pending appeal. In an Order dated October 21, 2014, attached hereto as Exhibit C, Judge Gardephe denied Martoma's motion.

5. As set forth more fully in the accompanying memorandum of law, Martoma's appeal presents substantial legal questions, and his continued release pending appeal is amply warranted. The following are documents cited in the accompanying memorandum.

6. Attached hereto as Exhibit D are copies of the pages of the trial transcript that are referenced in the memorandum of law.

7. Attached hereto as Exhibit E is a copy of the superseding Indictment, dated August 22, 2013.

8.      Attached hereto as Exhibit F is a copy of the district court's Order dated January 28, 2014.

9.      Attached hereto as Exhibit G is a copy of the district court's Order dated January 7, 2014.

10.      Attached hereto as Exhibit H is a copy of a letter from Richard M. Strassberg, counsel to Martoma, to the Hon. Paul G. Gardephe, dated January 26, 2014.

11.      Attached hereto as Exhibit I is a copy of Defendant's Trial Exhibit 285.

12.      Attached hereto as Exhibit J is a copy of excerpts from the transcript of the deposition of Steven A. Cohen, dated May 3, 2012.

13.      Attached hereto as Exhibit K is a copy of the district court's Order dated January 5, 2014.

14.      Attached hereto as Exhibit L is a copy of the district court's Memorandum Opinion & Order dated September 4, 2014.

15.      Pursuant to Local Rule 27.1, I have notified opposing counsel, Assistant U.S. Attorney Michael Alexander Levy, of Martoma's motion for release on bail pending his appeal, and I understand that the government opposes the motion and intends to file a response to the motion.

I declare under penalty of perjury that the foregoing is true and correct.

3

Dated:    October 29, 2014
          Washington, DC


                              s/Paul D. Clement
                              Paul D. Clement

# Exhibit A

AO 245B   (Rev. 09/11) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| MATHEW MARTOMA | Case Number:  (S1)12 CR 00973-01 (PGG) |
| | USM Number: 01138-104 |
| | Richard Strassberg |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 2, and 3
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 371 | Conspiracy to Commit Securities Fraud | 7/29/2008 | 1 |
| 15 U.S.C. 78j(b) & 78ff | Securities Fraud | 7/29/2008 | 2, 3 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   The underlying indictment   ☑ is   ☐ are  dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/8/2014
Date of Imposition of Judgment

_Paul S Gardephe_
Signature of Judge

Hon. Paul G. Gardephe          U.S.D.J.
Name and Title of Judge

_Sept. 9, 2014_
Date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/9/14

AO 245B    (Rev. 09/11) Judgment in Criminal Case
           Sheet 2 — Imprisonment

| | Judgment — Page | 2 | of | 6 |
|---|---|---|---|---|

DEFENDANT:  MATHEW MARTOMA
CASE NUMBER:  (S1)12 CR 00973-01 (PGG)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

5 years' imprisonment on Count One and 9 years' imprisonment on each of Counts Two and Three, all to run concurrently.

☑  The court makes the following recommendations to the Bureau of Prisons:

It is recommended that the defendant be housed at the Federal Prison Camp in Miami, Florida.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .

    ☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑  before 2 p.m. on    11/10/2014 _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 3 — Supervised Release

Judgment—Page __3__ of __6__

DEFENDANT:  MATHEW MARTOMA
CASE NUMBER:  (S1)12 CR 00973-01 (PGG)

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

3 years of supervised release on each of Counts One, Two and Three to run concurrently.

     The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑   The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 3A — Supervised Release

Judgment—Page __4__ of __6__

DEFENDANT:  MATHEW MARTOMA
CASE NUMBER:  (S1)12 CR 00973-01 (PGG)

# ADDITIONAL SUPERVISED RELEASE TERMS

i. The defendant shall provide the Probation Officer with access to any requested financial information.

ii. The defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may include testing via breathalyzer at the direction and discretion of the Probation Officer.

iii. The defendant is to report to the nearest Probation Office within 72 hours of release from custody.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page | 5 | of | 6 |

DEFENDANT:  MATHEW MARTOMA
CASE NUMBER:  (S1)12 CR 00973-01 (PGG)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 300.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case Case 1:12-cr-00973-PGG    Document 315    Filed 09/09/14    Page 6 of 6
           Sheet 6 — Schedule of Payments

Judgment — Page    6    of    6

DEFENDANT:  MATHEW MARTOMA
CASE NUMBER:  (S1)12 CR 00973-01 (PGG)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A    ☑    Lump sum payment of $   300.00   due immediately, balance due

         ☐   not later than _____ , or
         ☐   in accordance     ☐  C,    ☐  D,    ☐   E, or    ☐  F below; or

B    ☐    Payment to begin immediately (may be combined with    ☐ C,        ☐ D, or        ☐ F below); or

C    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
         _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
         _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
         term of supervision; or

E    ☐    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
         imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☐    Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
     and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☑    The defendant shall forfeit the defendant's interest in the following property to the United States:

     See September 8, 2014 Order of Forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# Exhibit B

Criminal Notice of Appeal - Form A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 1 8 2014

## NOTICE OF APPEAL

### United States District Court

Southern _____ District of New York

Caption:

United States of America _v._

Mathew Martoma

Docket No.: (S1) 12 Cr. 973 (PGG)

Hon. Paul G. Gardephe

(District Court Judge)

Notice is hereby given that Mathew Martoma _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ✔ , other |  _____

(specify)

entered in this action on September 9, 2014 _____

(date)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence |✔| Other |___|

Defendant found guilty by plea | | trial |✔| N/A | .

Offense occurred after November 1, 1987? Yes |✔| No |   N/A [

Date of sentence: September 8, 2014 _____ N/A |___|

Bail/Jail Disposition: Committed |✔| Not committed |   N/A |

## Surrender Date set for November 10, 2014.

Appellant is represented by counsel? Yes ✔ | No |   | If yes, provide the following information:

Defendant's Counsel: Richard M. Strassberg

Counsel's Address: Goodwin Procter LLP, The New York Times Building

620 Eighth Avenue, New York, NY 10018-1405

Counsel's Phone: 212-813-8859

Assistant U.S. Attorney: Arlo Devlin-Brown

AUSA's Address: One Saint Andrew's Plaza

New York, NY 10007

AUSA's Phone: 212-637-2527

Signature

## CERTIFICATE OF SERVICE

I hereby certify that, on September 18, 2014, I caused a true and correct copy of the

foregoing Notice of Appeal to be served by hand on counsel for the Government at the address

listed below:

> Arlo Devlin-Brown
> United States Attorney's Office
> One Saint Andrew's Plaza
> New York, NY 10007

_____
Richard M. Strassberg

Court Name: District Court
Division: 1
Receipt Number: 465401105454
Cashier ID: Lcurtis
Transaction Date: 09/18/2014
Payer Name: GOODWIN PROCTER LLP

---

NOTICE OF APPEAL/DOCKETING FEE
For: GOODWIN PROCTER LLP
Amount: $505.00

---

CHECK
Check/Money Order Num: 1499
Amt Tendered: $505.00

---

Total Due: $505.00
Total Tendered: $505.00
Change Amt: $0.00

12CR973

# Exhibit C

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/21/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MATHEW MARTOMA,

Defendant.

**ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On February 6, 2014 – after a month-long trial – a jury convicted Defendant

Mathew Martoma of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and

of two substantive counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17

C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2.  The Superseding Indictment charges

that between summer 2006 and July 29, 2008, Martoma caused his employer, the hedge fund

S.A.C. Capital Advisors, LLC ("SAC Capital"), to trade on the basis of material non-public

information.  (Superseding Indictment (Dkt. No. 61) ¶¶ 1, 8, 14)  The evidence at trial showed

that Martoma obtained material, non-public information from two doctors – Sidney Gilman and

Joel Ross – about the Phase II clinical trial of bapineuzumab, a drug it was thought might be

useful in treating Alzheimer's disease.  Elan Corporation, plc and Wyeth owned rights to the

drug and were responsible for the clinical trial.  The charges against Martoma relate to trading in

the securities of these companies.

On September 8, 2014, this Court sentenced Martoma to, inter alia, 9 years'

imprisonment.  (Dkt. No. 315)  Martoma was ordered to surrender on November 10, 2014.  (Id.)

In an October 3, 2014 letter, Martoma moves for bail pending appeal.  (Dkt. No.

321)  Martoma argues that bail pending appeal is warranted based on the "grounds for reversal

[raised] in his post-trial motions pursuant to Federal Rules of Criminal Procedure 29 and 33" and because his appeal "will raise several other close questions . . . including, among other things, that evidence was improperly excluded and his sentence was both procedurally and substantively unreasonable." (Id. at 2-3)  In the event that this Court denies his application, Martoma requests that this Court extend his surrender date to December 2, 2014, to allow him to file a motion for bail pending appeal in the Court of Appeals.  (Id. at 3)

Under 18 U.S.C. § 3143(b)(1),

[a] judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds –

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in –

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person [pending appeal] . . .

18 U.S.C. § 3143(b)(1) (emphasis added).

Accordingly,

before a district court may grant bail pending appeal, it must find:

"(1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;

(2) that the appeal is not for purpose of delay;

(3) that the appeal raises a substantial question of law or fact; and

(4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed."

United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985) (quoting United States v. Miller, 753 F.2d 19, 24 (3d Cir. 1985)). "[A] substantial question 'is one of more substance than would be necessary to a finding that it was not frivolous. It is a "close" question or one that very well could be decided the other way.'" Id. (quoting United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985)).

The statute thus creates a "presumption that a defendant who has received a sentence of imprisonment will be detained pending appeal," United States v. Ciccone, No. 07 Cr. 399 (DLC), 2008 WL 2498242, at *1 (S.D.N.Y. June 19, 2008), and "[t]he defendant bears the burden of establishing that he is entitled to release pending appeal." United States v. Archer, 813 F. Supp. 2d 339, 343 (E.D.N.Y. 2010); see Randell, 761 F.2d at 125 ("[O]n all the criteria set out in subsection (b), the burden of persuasion rests on the defendant.").

As set forth in this Court's (1) September 4, 2014 order denying Martoma's Rule 29 and Rule 33 motions (Dkt. No. 303); (2) September 5, 2014 order addressing Martoma's objections to the Probation Department's calculation of gain under the Sentencing Guidelines (Dkt. No. 306); and (3) remarks at sentencing, the evidence of Martoma's guilt at trial was overwhelming. None of Martoma's arguments regarding the sufficiency of the evidence or legal error at trial are persuasive. Nor has Martoma articulated any basis for finding that his sentence was procedurally or substantively unreasonable.

Because Martoma has not demonstrated that his appeal is likely to raise a

substantial question of law or fact, his motion for bail pending appeal, or alternatively for an

extension of his surrender date, is denied.

Dated:  New York, New York
        October 20, 2014

SO ORDERED.

_Paul S Gardephe_

Paul G. Gardephe
United States District Judge

# Exhibit D

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

Page 29

1 present some rebuttal to that evidence. Of course, the
2 defendant never has to testify or present any evidence at all.
3 The burden of proof is always on the government.
4       After all the evidence has been received, each side
5 will have an opportunity to make closing arguments to you. The
6 lawyers will review the evidence with you and make arguments as
7 to what conclusions they think you should or should not draw
8 from the evidence. These arguments also are not themselves
9 evidence, but they may be helpful to you in reviewing the
10 evidence during your deliberations.
11      After these closing arguments or summations, as they
12 are called, I will give you some detailed instructions as to
13 the law that applies and controls in this case, and you must
14 follow my instructions. Then you will go into the jury room to
15 deliberate and discuss the evidence in order to decide the
16 facts and render a verdict.
17      From time to time during the trial, it may be
18 necessary for me to talk with the lawyers out of the hearing of
19 the jury either by having a conference up here at the bench
20 when the jury is present in the courtroom or by calling a
21 recess. The lawyers and I will do this as little as possible.
22 Please understand that while you are waiting, we are working.
23 The purpose of any conference outside your hearing is not to
24 keep relevant information from you, but, rather, for me to
25 decide procedural issues or how proposed evidence should be

Page 30

1 treated under the rules of evidence.
2       Our trial days will begin at 9:30 a.m. Our days will
3 end at 5:00. We will sit five days a week. We will take a
4 break for lunch approximately 12:45 or so and a short recess in
5 the morning and in the afternoon. If anyone needs a recess at
6 any other time, just raise your hand. I would ask you to be on
7 time after breaks and in the morning because if you are late,
8 you will be keeping everyone waiting.
9       We will now begin with the government's opening
10 statement.
11      MR. DEVLIN-BROWN: May I proceed, your Honor?
12      THE COURT: You may.
13      MR. DEVLIN-BROWN: It was July of 2008, Mathew
14 Martoma, the defendant, the gentleman sitting over there, was
15 one of about a thousand people packed into a crowded Chicago
16 convention hall waiting for an expert on Alzheimer's disease to
17 take the stage. That expert's name was Dr. Sidney Gilman, and
18 he was there that day to announce the results of a three-year
19 study of an experimental medicine that two pharmaceutical
20 companies had developed and that they hoped, and many other
21 people hoped, would be the first effective treatment for
22 Alzheimer's disease.
23      Alzheimer's disease is a really horrific disease. It
24 steadily and irreversibly destroys the mind. It affects
25 millions of people and it has no cure. So if these two

Page 31

1 pharmaceutical companies had come up with the first effective
2 treatment for the disease, it would mean a medical
3 breakthrough, and it would also mean a medical breakthrough
4 that could make a fortune for these companies, because they
5 created the medicine, and they would be the ones selling it.
6 It could also make a fortune for people who own stock in those
7 companies.
8       If, on the other hand, the news was bad, if it didn't
9 look like this drug was ever going to be brought to market or
10 work, that would be bad news for the companies and bad news for
11 people who owned stock in those companies.
12      So, the audience that night in the convention hall in
13 Chicago, it wasn't just science types or doctors who were
14 interested in the medicine part of it; it was investors like
15 Mathew Martoma who were interested in the money part of it.
16 And the results of this medical study that Dr. Gilman was about
17 to present, they had been kept secret, this three-year study.
18 So everyone in that convention hall was waiting there to listen
19 and find out what Dr. Gilman would say, almost everyone anyway.
20      You see, Mathew Martoma, he already knew what
21 Dr. Gilman was going to say. He knew what Dr. Gilman was going
22 to say because he had corrupted Dr. Gilman. He'd corrupted him
23 through real money and through phony promises of friendship.
24 Through that corruption, Dr. Gilman had shared the secret
25 results. The very presentation he was about to give to that

Page 32

1 crowd, he'd shared that with Mathew Martoma approximately two
2 weeks before.
3       So Dr. Gilman took the stage and he presented the
4 results. The results were not good. Certainly not if the
5 stock market saw it. The stock of one of the two
6 pharmaceutical companies that developed this drug, a company
7 called Elan, it fell over 40 percent in the next 24 hours after
8 the announcement. And Elan's partner making this drug, a
9 company called Wyeth, that stock fell too. A lot of investors
10 in Elan and Wyeth had been blindsided by Dr. Gilman's news, and
11 so a lot of those investors lost a lot of money, but, again,
12 not Matthew Martoma.
13      Because when Dr. Gilman had shared that presentation
14 with Martoma approximately two weeks before, Mathew Martoma
15 knew that those results were not going to be good for the stock
16 prices of Elan and Wyeth, and the hedge fund, the company where
17 Mathew Martoma worked, owned approximately $700 million worth
18 of Elan and Wyeth two weeks before Dr. Gilman would take the
19 stage, and they owned this stock largely because Mathew Martoma
20 had been recommending it, recommending it largely on the basis
21 that he believed the drug trial results were going to be
22 positive.
23      So now that Dr. Gilman had presented the results to
24 Mathew Martoma two weeks earlier, Mathew Martoma knew what he
25 had to do, and he sold, he caused his hedge fund to sell the

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

Page 33

1 whole 700 million worth of Elan and Wyeth stock before the rest
2 of the world could find out and before the stock prices could
3 take a nose dive. What Mathew Martoma did, ladies and
4 gentlemen, it's called insider trading. He got important
5 confidential information from someone who had a duty to keep it
6 secret, and he used that information to buy and sell stock or
7 securities.
8      Insider trading is illegal. It's a kind of securities
9 fraud. It's a crime. And in this case it was a crime that
10 paid. The hedge fund where Mathew Martoma worked made profits
11 and avoided losses of $270 million through these trades, and
12 Mathew Martoma himself, he received a bonus of $9.3 million.
13      So, ladies and gentlemen, good morning. This is the
14 government's opening statement, as Judge Gardephe said. What
15 an opening statement is, is an opportunity for us to give you
16 an overview of what we expect the evidence is going to show
17 during this trial. So what I am going to do during this
18 opening statement is two things:
19      First, I am going to give you sort of a largely
20 chronological highlight of what the evidence will show in this
21 case.
22      And, second, what I'd like to do is tell you a little
23 bit about the types of evidence we are going to put before you
24 to prove the case.
25      So, we should start at the beginning with what Mathew

Page 34

1 Martoma did for a living. You will learn that Mathew Martoma
2 worked at a hedge fund called SAC Capital where he was trading
3 stocks. Now, a hedge fund, for those of you who don't know,
4 it's basically just an entity that takes money from various
5 investors and puts that money into the stock market or into
6 other investments. Mathew Martoma was what's called a
7 portfolio manager for this hedge fund. That means he was given
8 a large amount of money, approximately $400 million or so by
9 the hedge fund, and he was given authority to buy and sell
10 stocks with that money. You will learn that Mathew Martoma's
11 specialty is the focus of his portfolio, that's what they call
12 it, the money that he's given to buy and sell; but the focus of
13 his portfolio was healthcare stocks. You will learn that if
14 Mathew Martoma's portfolio of healthcare stocks made profits,
15 then Mathew Martoma was entitled to keep a large share of those
16 profits for himself.
17      That was the basic business model of the hedge fund
18 and of the portfolio Mathew Martoma was running. So Mathew
19 Martoma started at SAC Capital. He was in a division of it
20 called CR Intrinsic, if that name comes up, but I'll refer to
21 it as SAC Capital. He started there in July of 2006 and right
22 away when he started, he took an interest in drug companies
23 that were working on experimental medicine for Alzheimer's
24 disease.
25      Two of these companies were Elan Pharmaceuticals and

Page 35

1 Wyeth. They were working together. They were competing
2 companies, but they had partnered together because drug trials
3 are very -- it's expensive to develop a drug. The drug they
4 were working on was this experimental medicine for Alzheimer's
5 disease, and I'm not sure who decides what the names of these
6 drugs are, ladies and gentlemen, but the name was bapineuzumab.
7 That's the name of the Alzheimer's disease drug. Some people
8 refer to it for short as bapi or bap. But you're going to hear
9 the name bapineuzumab a lot during this trial.
10      What was the idea behind bapineuzumab? What was it
11 supposed to do? You will learn that people with Alzheimer's
12 disease have this substance in their brains, it's sometimes
13 referred to as a plaque. The idea behind this drug
14 bapineuzumab was, it was supposed to get rid of the plaque. It
15 was going to be injected into the body and get rid of the
16 plaque in the brain. The theory of this, and what Elan and
17 Wyeth hoped, was if you could get rid of the plaque that was in
18 people's brains, maybe you could stop, or at least slow down,
19 the steady worsening progression of Alzheimer's disease.
20      So that was the theory. But theory, of course, is one
21 thing and proving it is something else. You will learn that in
22 order to sell a drug in the United States, you can't just
23 create it and then just have it at Duane Reade. You need
24 approval from a government agency. It's called the FDA, the
25 Food and Drug Administration.

Page 36

1      To get that approval, you basically need to be able to
2 demonstrate two things: Number one, that the drug that you've
3 created is safe; and, number two, that it's effective; that it
4 does help cure whatever it is you're trying to cure.
5      So, there is an established way for drug companies to
6 try to make that case to the FDA that their product is going to
7 be safe and effective. They run what's called a clinical
8 trial, which is basically a scientific experiment with rigorous
9 scientific rules to make sure you have a fair test as to
10 whether the drug is safe and whether the drug works.
11      So you will hear that's what Elan and Wyeth did with
12 this drug bapineuzumab; they ran a clinical trial. Starting in
13 2005, after they had done an initial small safety test, Elan
14 and Wyeth began recruiting approximately 250 people who had
15 Alzheimer's disease and they joined up in this clinical trial,
16 and it injected these people with the drug bapineuzumab, and it
17 monitored them, and it ran all kinds of tests on them. They
18 got multiple injections over 18 months.
19      The idea was at the end, after everyone had been
20 tested, you could compare and see how these people did and make
21 a judgment as to whether this drug was safe and effective. The
22 results of this were all to be kept secret while it was ongoing
23 and to be published to the public at large to and investors
24 altogether at once in the summer of 2008 when the trial was
25 over. When I say the trial, I'm referring to the drug trial or

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

 1  when Mathew Martoma heard about the PowerPoint presentation on
 2  the phone from Dr. Gilman and then got a chance to see it in
 3  person, the evidence will show that he knew these results would
 4  not be good. And you'll hear a lot of evidence about reasons
 5  why it would not be good during this trial. I'll give you an
 6  overview or preview of just one of them now.
 7          You'll learn that one thing that people look for when
 8  they're trying to evaluate whether a drug trial is successful
 9  or not, whether a drug is likely to work or not, is called a
10  dose effect, or dose response. All that means is if you see
11  that there's some relationship between how much of the stuff
12  you take and what it does for you, that tends to show that what
13  you're taking is doing something.
14          I'll give you a simple example. If you take a half of
15  a -- if you have a headache and you take half a Tylenol, it may
16  do nothing for you. If you take one Tylenol, it does a little
17  bit more for you. You take two, it does even better. At some
18  point, you know, maybe you are taking three or four, it doesn't
19  make you any better than two, and at some point you take too
20  many and it can cause actually serious damage. So that's a
21  dose effect, a dose response.
22          You will see that the evidence for bapineuzumab, it
23  didn't show anything like that. It showed essentially random
24  information as to people, how much of this bapineuzumab they
25  took and how much better, if at all, they got with Alzheimer's

 1  disease. And you'll hear evidence that that was a red flag
 2  that perhaps even the positive stuff that Elan and Wyeth had
 3  found, maybe that was just random because people didn't exhibit
 4  this dose response. You will hear a lot more about that later
 5  but that was just a preview.
 6          So I want to be clear about one other thing, ladies
 7  and gentlemen. When I say that Mathew Martoma knew the results
 8  would not be good, I don't mean to say that the results would
 9  not be good from the perspective of a scientist. Scientists, I
10  think you'll hear, because some of them will testify, tend to
11  be optimistic people, and they will tell you that the drug had
12  some promising things that made people think that perhaps
13  people were on the right track and maybe it wouldn't be Elan
14  and Wyeth, but some day some company was going to figure this
15  out and be able to bring the drug to market. So that is maybe
16  a scientific perspective on optimism, that maybe someday you
17  are on the right track and you will get there.
18          I don't mean to say the results are bad that way, but
19  from an investors perspective, ladies and gentlemen, that some
20  company someday will come up with something, that is not the
21  investor perspective. The investors want to know, you'll
22  learn, whether this drug is likely to be sold by the companies
23  that they own stock in and make money for those companies, and
24  from that perspective Mathew Martoma knew that these results
25  were bad for the stock prices of Elan and Wyeth, that the

 1  results were nowhere near what investors were expecting them to
 2  be.
 3          So as Mathew Martoma flew home from Michigan, SAC, as
 4  I mentioned, owned approximately $700 million worth of Elan and
 5  Wyeth stock. Mathew Martoma owned $100 million, about, in his
 6  own portfolio, the pot of money he got to manage. And the rest
 7  of it was owned by SAC Capital's -- was controlled by SAC
 8  Capital's owner, Steve Cohen, who had bought Elan and Wyeth
 9  largely based on Mathew Martoma's positive recommendation and
10  Mathew Martoma's positive statements about the drug trial
11  results in the past. So if the stock price of Elan and Wyeth
12  fell once investors heard the same news that Dr. Gilman had
13  provided Mathew Martoma before the public announcement, well,
14  Mathew Martoma could lose millions and his boss could lose
15  millions. Millions on a stock that Mathew Martoma had been
16  recommending for years that his boss buy.
17          So, ladies and gentlemen, Mathew Martoma had a phone
18  call to make, and you'll learn that he made that call. On
19  Sunday, July 20th, the next day, before 8 a.m., Mathew Martoma
20  sent an e-mail to Steve Cohen, which you'll see. It said just
21  what's on the screen there. Is there a good time to catch up
22  with you this morning? It's important.
23          Less than an hour later, the phone records show, the
24  two men spoke for about 20 minute; Mathew Martoma and Steve
25  Cohen spoke for about 20 minutes. And a little later Mathew

 1  Martoma emailed Steve Cohen a list of Elan and Wyeth stock that
 2  was in two portfolios Mathew Martoma often traded in.
 3          Well, the next day was Monday, the stock market was
 4  open, and Mathew Martoma went to work. And Mathew Martoma and
 5  SAC Capital started selling Elan and Wyeth. In the seven
 6  trading days before the results would be announced to the
 7  world, Mathew Martoma sold all of the $100 million of Elan and
 8  Wyeth that was in his portfolio. And Mr. Cohen sold all of the
 9  Elan and Wyeth stock that Mathew Martoma had been recommending
10  that he buy.
11          SAC Capital also shorted Elan and Wyeth stock, which
12  is basically a stock trade that will profit if the price of the
13  stock falls. And they bought what are called some options that
14  essentially are other things you can buy and trade in to bet
15  that a stock price will go up or go down, and they bought
16  options predicting the prices to go down.
17          You will also learn that while SAC Capital, of course,
18  is a large hedge fund and they buy and sell positions all the
19  time, you'll learn that this position was sold in a very
20  peculiar way. It was sold in a way to keep it secret not just
21  from other hedge funds but even within the hedge fund so only a
22  few people knew about it. They used special accounts to mask
23  what they were doing, and you'll hear more detail about that.
24          And so that takes us back to where I started the
25  opening, that packed convention hall where Dr. Gilman was about

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

E1admar2    Opening - Mr. Devlin-Brown    Page 61

1 to take the stage and tell the rest of the world what Mathew
2 Martoma had already known from talking to Dr. Gilman earlier.
3      So after he did that, after Dr. Gilman made that
4 public announcement, the prices of Elan and Wyeth shares
5 started falling immediately. And by the end of the next day
6 Elan shares had fallen some 42 percent. Wyeth's shares had
7 also fallen 11 percent. And you'll learn that Wyeth was a much
8 bigger, much more diverse company that had many other drugs so
9 it wasn't impacted as much by one drug trial, but it fell
10 11 percent nonetheless. SAC Capital's combined profit and
11 losses from this was $275 million, and Mathew Martoma got his
12 $9.3 million bonus at the end of the year for trading in Elan
13 and Wyeth.
14      So that's a summary of what the government expects to
15 prove at trial. And I just want to spend not too much longer
16 now but a little bit of time telling you how it is the
17 government expects to prove it, what evidence we expect to
18 present to you.
19      So there is basically two types of evidence. You will
20 hear witnesses and you will see documents and other sort of
21 physical evidence. And let's talk first about the witnesses.
22      You will hear from a number of witnesses. Some of
23 these witnesses are people from Elan and Wyeth who will tell
24 you about the confidentiality agreements and the
25 confidentiality restrictions in which they prevent or they are

E1admar2    Opening - Mr. Devlin-Brown    Page 62

1 supposed to prevent doctors who are working on the drug trial
2 from sharing any information in advance.
3      You'll also hear from current and former SAC Capital
4 employees who will tell you about how Martoma recommended
5 buying Elan and Wyeth shares and bought Elan and Wyeth shares
6 in his own portfolio based on what Martoma was saying back
7 before he got the secret results from Dr. Gilman based on what
8 were Mathew Martoma's positive views about the drug trial.
9      You are also going to hear from both of the doctors I
10 mentioned, Dr. Ross and Dr. Gilman.
11      Now, there is no question, ladies and gentlemen, that
12 these doctors, they broke the law and they disgraced themselves
13 in their profession. They took data that was entrusted to them
14 in the noble work of actually trying to cure a disease and they
15 turned it over to Mathew Martoma so that he could make enormous
16 financial profits.
17      But it is precisely because they had this corrupt
18 relationship with Mathew Martoma, ladies and gentlemen, that
19 that's what makes them valuable witnesses, and it is important
20 and valuable, potentially -- you will decide that, but it is
21 important potentially for you to hear from them.
22      Now, you'll hear the government has agreed not to
23 prosecute these doctors if they testify truthfully. And you
24 will want to, of course, examine carefully what these doctors
25 are telling you. And you're going to learn that the memory of

E1admar2    Opening - Mr. Devlin-Brown    Page 63

1 these doctors on details is far from perfect, particularly with
2 Dr. Gilman, who is now 81 years old. But you'll also hear from
3 them that whatever confusion they may have on the details, they
4 both will tell you, without any hesitancy, that they shared
5 confidential information with Mathew Martoma about this drug
6 trial. And you will be able to test what they say because you
7 will be able to compare it against other evidence to see if the
8 other evidence supports or corroborates what they are telling
9 you.
10      So that's the witnesses. The second category of
11 evidence will be documents.
12      Now, you're going to learn that neither the University
13 of Michigan, where Dr. Gilman taught, nor SAC Capital have now
14 anything like a full record of all their e-mails from 2006 to
15 2008. There are some but nothing like a full record. And what
16 does still exist and what the SAC Capital and the University of
17 Michigan have, you will find some vivid examples of Dr. Gilman
18 and Mathew Martoma speaking about the confidential safety
19 monitoring committee proceedings.
20      You will also see trading records that show SAC
21 Capital's trades, how it sold $700 million of Elan and Wyeth
22 stock after Martoma got the drug trial results from Dr. Gilman
23 on the 17th. And you will see phone records showing how
24 Dr. Gilman and Mathew Martoma would speak after these Safety
25 Monitoring Committee meetings regularly, and you'll see a

E1admar2    Opening - Mr. Devlin-Brown    Page 64

1 record of that 1-hour-45-minute call on July 17th.
2      And, finally, you'll see evidence of a series of
3 things that Mathew Martoma did to try to avoid detection,
4 things that he did to try to hide his interactions with
5 Dr. Gilman after Dr. Gilman was unblinded and got the full data
6 on July 15th so that it would appear that the only time Mathew
7 Martoma talked to him about the drug trial was after Dr. Gilman
8 made the announcement, rather than before.
9      So, ladies and gentlemen, I won't speak -- or my
10 colleague won't speak again to you until all the evidence is in
11 and the case is ready to be presented to you. So before I sit
12 down, I would like to leave you with three thoughts.
13      First, please listen carefully to the evidence that's
14 presented to you. As you may know already, trials are not the
15 glamorous affairs as depicted on television. Each witness only
16 knows a piece of the story, and each witness can only testify
17 about that. Things won't always happen in chronological order.
18 But it is important that you pay attention for the same reason
19 that Judge Gardephe identified. Because nothing that I say or
20 any lawyer says is evidence. I'm saying what I expect the
21 evidence to show, and it will be for you to listen to the
22 witnesses and see the documents and decide for yourself what
23 the evidence shows.
24      The second thing, ladies and gentlemen, is to please
25 listen carefully to Judge Gardephe's instructions on the law.

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

1  as a portfolio manager.

2       But you're also going to learn that any trading
3  decision that impacted the firm as a whole, such as the
4  decision to sell all of the Elan and Wyeth stock that happened
5  in the summer of 2008, that still had to be run by Steven
6  Cohen, the head of SAC Capital. And you'll learn that Steven
7  Cohen was a tremendously experienced investor with his own
8  definite and definitive views about when to buy and especially
9  when to sell different stocks.

10       And you're also going to learn that Mr. Cohen
11  surrounded himself with smart analysts and portfolio managers
12  who gave him advice about what investments to make and what
13  investments to get out of. And you're going to hear that
14  decisions impacting the firm as a whole, SAC Capital as a
15  whole, were Steven Cohen's decision to make.

16       In fact, you're also going to hear that Mr. Cohen had
17  an agreement with a former SAC healthcare specialist -- and
18  there were many SAC healthcare specialists, people who
19  specialized in healthcare investments at the firm. And you're
20  going to hear that Mr. Cohen, he had an agreement with one of
21  them, the one that he thought was the best healthcare investor
22  he had ever met, and this person's name was Wayne Holman,
23  H-o-l-m-a-n.

24       And you're going to hear that Mr. Holman, who had
25  recently -- who had left SAC Capital and set up his own firm,

1  had a special agreement with Mr. Cohen to advise him on one
2  healthcare stock in particular -- Wyeth -- one of the two
3  stocks that is at issue in this case, and that Mr. Cohen
4  primarily took direction about the Wyeth investment from
5  Mr. Holman. Something you never heard of in the prosecutors'
6  opening statement.

7       Now, let me take a moment to talk about what research
8  analysts and portfolio managers do. In some ways the words
9  sort of define themselves. As a research analyst or a
10  portfolio manager, your job is to research the investments that
11  you are thinking about recommending and to analyze is this
12  investment going to be a good one, is this going to be one that
13  we think will make money. But make money not just for us and
14  for our firm, because the firm actually has money from other
15  people that is being invested. And so the job of a portfolio
16  manager and research analyst is to do all the hard work
17  necessary to leave no stone unturned to try and understand
18  whether an investment is going to be a good investment, an
19  investment that's worthwhile to recommend for someone else's
20  money. And no one would want some investment professional to
21  recommend that your money gets put into an investment that they
22  haven't done the full research on, that they haven't fully
23  vetted, that they're guessing about.

24       So it's very important that research analysts and
25  portfolio managers do incredibly deep research about the

1  investments that they are considering. And you will hear that
2  that is exactly what Mathew did throughout his time at SAC
3  Capital and his time at Sirios, too. And what you're also
4  going to learn, that speaking to experts, doctors in the field
5  who understand the science behind the drugs, who understand the
6  nuances of what is being tested in the drug trials themselves,
7  that is what is expected of research analysts and portfolio
8  managers. That is what happens throughout the industry. There
9  were companies -- they mentioned this company, GOG. There are
10  companies, many of them, that are set up just to allow that to
11  happen. And it happened all the time. It was standard
12  practice. It was, in fact, demanded of people who were going
13  to be research analysts or portfolio managers in the healthcare
14  space. That was their job. That wasn't a crime.

15       So when the prosecutor talks to you about edge or
16  illegal edge, what they say there, that is just not something
17  sinister. You're going to hear that the term "edge" was a term
18  that was used all the time at SAC Capital. And the term meant
19  trying to work harder and do your job better than the next guy.
20  Trying to understand the investment as best as you can possibly
21  understand it. What you were supposed to do -- what, frankly,
22  anyone who is responsible for investing someone else's money
23  should be doing -- in order to do their job correctly.

24       Nothing wrong with it. Nothing sinister about it.
25  Nothing criminal about it.

1       Here, again, the proof is not going to support the
2  allegations that you've just heard from the prosecutor.

3       Now, what kind of information do research analysts and
4  portfolio managers seek? Well, as I mentioned, they really
5  want as much data as they can get about whether the potential
6  investment may work. And you are going to hear a lot in this
7  trial about supposed confidential information. But don't be
8  confused. Just because something is labeled as confidential
9  doesn't mean that it is important to investors. It doesn't
10  mean that it matters, and it doesn't mean that it's material.

11       Now, the Judge, Judge Gardephe, is going to instruct
12  you on the law at the end of the case. For now, what's
13  important to remember is to keep in mind that just because
14  someone says the information is confidential, it doesn't mean
15  that it can support an insider trading charge. In fact, it
16  doesn't even mean that it's not nonpublic. It doesn't even
17  mean that it actually is confidential information. Because
18  information that could have a label "confidential" at one point
19  in time, if it is then disclosed to the public is no longer
20  confidential information and can no longer support a charge of
21  insider trading. We are going to come back to this as we go
22  through the timeline about this case.

23       You're also going to learn that information can be
24  public when it's made available to the public even if everyone
25  doesn't know about it.

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

1    So now let's turn to July of 2008, when the
2 prosecution claims that the actual insider trading occurred in
3 this case. Let's talk about what the evidence will show
4 happened then.
5    So on July 18th, SAC Capital's total position in Elan
6 was about 10 million shares. That included the one portfolio
7 that Mathew managed and all the other portfolios in the firm.
8    Now, the prosecutor wants you to think that there's
9 something wrong with the fact that SAC Capital sold its entire
10 position before the ICAD conference at the end of July. But
11 what the evidence is going to show to you is that that is what
12 hedge funds do. They take big positions to sell big positions,
13 often around events.
14    This is not like you or I or perhaps even a mutual
15 fund that might invest in a stock, might invest in IBM, and
16 then hold it, pass it on to our children, our grandchildren.
17 This is a hedge fund that they make money by taking big
18 positions and by selling big positions.
19    So when you see that they sold the big position around
20 the July timeframe, that is simply what it is that they do.
21 That's their business model.
22    And let's just take a look in the same July -- excuse
23 me, the same 2008 timeframe at a number of other instances
24 where they had taken large positions only to reverse course and
25 sell off those positions in a very short period of time. So

1 you can see, this is about a position in GE stock. GE stock.
2 Over $500 million worth of GE stock sold off in a very brief
3 period of time in the fall of 2008.
4    Let's take a look at the next example. Similarly,
5 Yahoo! stock. This is in the spring of 2008. Almost $400
6 million sold off again in a very brief period of time.
7    Let's look at another example. Anheuser-Busch, over
8 $600 million of stock sold off in a very brief period of time.
9 In fact, the same period of time as what we will see for Elan.
10    Let's put Elan up on the board, too.
11    So the point here is only that the fact that they had
12 a large position and they sold a large position is not proof of
13 anything other than the fact that that's what a hedge fund
14 does. It takes large positions and it sells large positions.
15    And the evidence is going to show you that there were
16 so many reasons to sell Elan and Wyeth stock in the summer --
17 in July particularly -- of 2008 that it was really only -- the
18 only sensible decision for SAC Capital to make. So let's take
19 a look at some of those decisions -- some of those reasons.
20 Excuse me.
21    First you'll see that, as we just talked about, SAC's
22 business model was to take and sell large positions, just as
23 we've seen they were doing throughout 2008.
24    But, second, do you remember back five-and-a-half
25 years ago now? The summer of 2008, the United States was

1 facing the beginning of that global economic crisis that
2 resulted in the biggest recession we've had really since the
3 Great Depression. And you're going to learn that in the spring
4 and summer of 2008, SAC was deeply concerned about the economy.
5 Bear Stearns, a big well known firm, had just collapsed and
6 failed. Lehman Brothers was to follow in the fall. And the
7 senior management of SAC Capital was very concerned about the
8 risks that the firm had at that time. And they met with Mathew
9 in May and June to discuss those concerns.
10    And you'll hear that Mathew was also spoken to by
11 people at Risk Management, the people who are really kind of
12 the firm's auditors, and they were also concerned about the
13 risk with these large positions.
14    The Elan investment had been very profitable. If SAC
15 sold Elan, Mathew would be one of the few portfolio managers
16 who was going to be successful in 2008, at least as it stood in
17 that midyear timeframe. But if they rolled the dice and held
18 onto the investment and Elan crashed like the rest of the
19 market was starting to, they could lose all of that profit.
20    So let's take a look at the next reason why it made
21 sense to sell. Elan's stock had increased in price. The
22 evidence is going to show you that the market for Elan was in
23 fact overheated. Now, what does it mean to say that the market
24 was overheated? You're going to hear that during this time
25 period, when the market for all stocks was cratering, was

1 starting to collapse, Elan was the one bright spot. It was
2 rising against the trend. And because it was rising, too many
3 investors were getting involved in it and the price was getting
4 too hot; it was started to overvalue the company.
5    In fact, you're going to see that the S&P 500 during
6 this period of time declined close to 8 percent, and that's the
7 period of time from May to July. And you're going to learn
8 that in June of 2008, Elan released the preliminary results of
9 this Phase II trial of bapineuzumab.
10    Now, the prosecutor referenced this issue as a teaser.
11 But you are going to learn, the evidence will show you, that
12 the actual results, the results they claim were this big
13 secret, were released in a press release to the world on
14 June 17th of 2008. And they didn't just talk about one small
15 group of people; they talked about the whole trial. They
16 actually announced the results, that they hadn't found
17 statistical significance with the trial that they had been
18 hoping to find. But because their trial was really about
19 safety, they had done subgroup analysis. I won't get into
20 details too much on the opening. But what they had announced
21 to the public was that they had statistically significant
22 findings that for people, for big groups of people who didn't
23 have a particular gene, bapineuzumab showed positive results on
24 treating Alzheimer's. And those results were all disclosed to
25 the public. And they also disclosed safety results, safety

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

1 findings, to the public. All of that happened in June.
2 You'll hear that they also said, we'll give you more
3 details about these results in July. But it will be a part of
4 the story -- really a central part of the story about the
5 disclosures that they made on June 17th of 2008.
6 And if we take a look at the entire chronology of the
7 investment in Elan and not just a few days at the end but just
8 look at the whole story, we are going to see why it makes so
9 much sense to sell Elan in July of 2008, before that
10 conference, that ICAD conference, because let's look what
11 happened to the price.
12 So we start in January of 2007, and you'll see then
13 the price is trading below $15. Earlier it had been trading
14 even lower.
15 What are you going to see from the evidence happens in
16 July of 2007? You're going to see that Elan announces
17 publicly, to the world, that it believes it will proceed with
18 Phase III. In other words, to move from the Phase II trial,
19 which is really about does the drug hurt people, to a Phase III
20 trial, where you will have thousands of people taking the drug
21 to see will the drug actually work and help cure and treat
22 Alzheimer's disease. And they announce in January, as the
23 safety trial, the Phase II trial is going on, that we will move
24 to the Phase III trial, the big, big trial, only if the Phase
25 II results are spectacular, strong, very meaningful.

1 So then we'll go ahead and we'll see the price stays
2 around that $15 area until May of 2007, when they announce they
3 are moving to Phase III, publicly announced, known to anyone
4 who is following the news about the company. And then you see
5 the price starts to rise. The price starts to go up. The
6 price starts to go up.
7 And then you are going to see what happens, which is
8 that they announce those results on June 17th of 2008, the
9 results that Mathew was suggesting made Elan a good investment,
10 hoping that those results would actually be positive. And they
11 announce, while they didn't find statistical significance
12 overall, they found really positive news about a lot of people
13 who could be helped by this drug, and, in response, the price
14 of the stocks soared. So from June 17th to the beginning of
15 July, July 10th, you'll see that Elan's stock price rose more
16 than 36 percent.
17 It rose more than 36 percent in the face of all of the
18 economic problems the whole country was facing. At the same
19 type the S & P was diving down 8 percent, at the same time
20 investors were starting to flee from investments, elan was
21 shooting up.
22 SAC's plan was always to sell Elan. It was never to
23 hold Elan forever. It was always to sell it once the price got
24 to a point where it made sense to do so. And the runup in
25 price from January of '07 to July '08 made this time the

1 perfect time to sell.
2 You'll also hear that outside analysts were advising
3 that Elan's stock should be sold at this time.
4 Now, for the reasons I talked about with respect to
5 the price movement and the economic concerns and other reasons,
6 analysts who had a different opinion about all sorts of
7 investments, including Elan and Wyeth, had different opinions
8 that they were expressing throughout this timeframe that we're
9 looking at. But in July of 2008, a number of analysts started
10 to come out with strong recommendations to sell Elan. We'll
11 see some of these. They were worried about uncertainty about
12 the final results, but also about little immediate upside, even
13 if the results were good, and potential downside, given the
14 economic uncertainties.
15 So you'll see, on July 11th, Brean Murray, an analyst
16 available to the public, initiated coverage about Elan with a
17 new recommendation to sell. You'll see that they talked about
18 the risks outweighing the benefits. And that they thought the
19 stock runup was unwarranted, that stock runup we just looked
20 at.
21 And also on July 11th, Piper Jaffray, another analyst
22 company, they downgraded this stock. They had been neutral,
23 saying hold. And now they said sell. And you'll see that.
24 They are discouraged by a laundry list of concerns. And they
25 viewed the recent stock appreciation as unwarranted; in other

1 words, time to sell now.
2 You'll also hear another report -- this is one from
3 Canaccord Adams -- on July 17th of 2008, again reiterating
4 their sell recommendation right in the middle of July 2008.
5 You will also hear about the next reason that I made
6 sense to sell, which is that SAC's own healthcare specialists
7 were recommending to Mr. Cohen that he sell the stock, that he
8 get out now. They feared that the stock price would begin to
9 come down after that ICAD conference, and they thought the
10 prudent move was to get out of the stock now. And they were
11 making their views known throughout SAC Capital and to
12 Mr. Cohen.
13 Sixth, you'll hear that scientists were publicly
14 questioning the science behind bapineuzumab. In June and July,
15 you will learn that there had been a substantial discussion in
16 the investor community about whether the science behind bappy,
17 this drug, actually worked, because there had been another drug
18 that was based on similar science that had just failed. And
19 then, on July 17th, this day that seems to keep coming back
20 into this case, you'll learn that a prestigious medical journal
21 called the Lancet -- L-a-n-c-e-t -- published an article that
22 questioned whether the theory -- the scientific theory behind
23 bapineuzumab -- actually would help patients with Alzheimer's
24 at all.
25 And you're going to learn about another reason why it

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

1 made sense to sell in July of 2008, and that's that Elan's only
2 other drug was in jeopardy. Now, Elan was developing
3 bapineuzumab, but it really only had one other drug that it was
4 selling to patients and to the market, and that was a drug
5 called Tysabri, T-y-s-a-b-r-i. And Tysabri was a drug to treat
6 multiple sclerosis, not Alzheimer's. But the thing is Tysabri
7 had a known side effect; it was called PML. And, in essence,
8 it was like a virus that would attack the brain and, it could
9 be very, very serious. It could even be fatal.
10      And so in 2005 there had been some cases of PML
11 connected to Tysabri, and the Food and Drug Administration, the
12 FDA, had taken Tysabri off the market. And when they did that,
13 Elan's stock plummeted. It fell 75 -- close to 75 percent.
14 And then in 2006 the FDA allowed Tysabri to go back on the
15 market, and there had been no cases of PML from that point
16 forward. But what was happening in June and July of 2008 was
17 that the rumors were starting to circulate that there may be
18 cases of Tysabri PML connected to Elan's only drug that was
19 being sold, and investors were worried that if those rumors
20 proved to be true, Elan's stock would crater, it would fall
21 tremendously, just like it had in 2005.
22      And so, finally, you'll see that there was simply way
23 more risk than upside to holding the stock and the sale would
24 lock in profits.
25      So in July 2008, when the rest of the market was

1 beginning to crash in this worst economic crisis that we've had
2 in our lifetime, the sale of Elan allowed SAC Capital to lock
3 in profits, to make sure that they eliminated risk. In a bad
4 year, it was a tremendous success. And personally, for a young
5 father with three young kids, locking in profits was the
6 opportunity to secure his and his family's future. It was the
7 smart, conservative things to do.
8      The point here is the evidence is going to show you
9 that there was all of these factors all coming together in a
10 perfect storm against holding Elan through that conference,
11 that it was now time to sell that investment, just as they had
12 always contemplated doing.
13      Now, let's turn to the prosecutor's case.
14      Now, the prosecution alleges that Mathew recommended
15 that SAC sell Elan and Wyeth based on inside information that
16 he had gotten from Dr. Gilman and Dr. Ross. But you will not
17 see any hard evidence -- again, there will be no wiretaps,
18 there will be no taped conversation, there will be no emails
19 saying sell the stock -- nothing, no hard evidence at all. And
20 you are going to see that the testimony of Dr. Gilman will give
21 you many, many reasons to doubt the story that he is telling.
22      The prosecution seeks you -- seeks to have you convict
23 based simply on the testimony, testimony that is based on
24 faulty memory, testimony that is based on inconsistencies, and
25 testimony that won't add up with the evidence that you're going

1 to see at this trial. Because the fact that Dr. Gilman has a
2 memory that's faulty and has changed his story again and again
3 is going to give you ample reasonable doubt about the story the
4 prosecution wants you to find beyond a reasonable doubt.
5      Now, you've heard me talk about reasonable doubt a few
6 times. So let me take a moment and talk about what that term
7 means. Judge Gardephe referenced it earlier and will explain
8 it to you in detail, and he is the -- he is the only law on
9 what the law means. But let's take a moment to talk about this
10 because it is a vitally important principle.
11      The burden of proof "beyond a reasonable doubt," it is
12 the highest burden that exists in the law. As to each and
13 every one of the charges, the prosecution must prove the
14 elements -- every element -- beyond a reasonable doubt. And
15 that highest burden, the highest one we have, it exists to
16 prevent innocent people from being convicted based on
17 speculation, based on conjecture, based on a rush to judgment.
18 With the consequences so great in a criminal case, the law
19 demands that each and every element be proven beyond a
20 reasonable doubt.
21      Now, as Judge Gardephe explained to you earlier, the
22 defendant has no burden to prove anything to you. We have no
23 burden to makes any objections, to make any arguments, to call
24 any witnesses, to do anything, and that's because in our law we
25 have a presumption of innocence. Mathew is presumed innocent

1 unless and until the government can prove beyond a reasonable
2 doubt that he committed these crimes. And the burden of proof
3 and the presumption of innocence are really the bedrock
4 principles of our system of government, our system of justice.
5 They protect all of us -- you and me and Mr. Martoma and
6 everyone in this courtroom and, frankly, everyone in this
7 country -- from unjust prosecutions.
8      Ladies and gentlemen, they are the principles that
9 will determine Mathew Martoma's life, because the stakes here
10 could not be higher. And the evidence will show, when you look
11 at the testimony from these witnesses, that there is reasonable
12 doubt everywhere that you turn. So let's look closely at what
13 the evidence will show you about Dr. Gilman's story.
14      Now, first, as I mentioned, you're going to see that
15 you can't trust his story broadly because of the deal that he's
16 gotten and the bias that that deal gives him. But you'll also
17 learn that the story is at odds with what he told at the time,
18 and it's at odds with what he said when he was first approached
19 by the prosecutors.
20      But you'll hear also that this deal ensures that he
21 never has to face any jail, any consequences with the criminal
22 justice system as a result of his own misconduct, as a result
23 of the things that he did that he should not have done.
24      And you'll learn that he's the one -- he's the one --
25 who had the obligation to keep information confidential, not

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 14, 2014

E1edmar2          Berkowitz - cross          Page 505

1   designed or intended to hold on to stocks forever, are they?
2   A.  It is a shorter term holding period at certain hedge funds.
3   Q.  It is not one of those situations where -- we keep talking
4   about IBM, but it is not one of those situations where they are
5   going to buy IBM and hold onto it for 30 years to hand down to
6   the grandchildren?
7   A.  It is a shorter term focus at many hedge funds.
8   Q.  The idea is when a hedge fund goes and invests or buys a
9   stock, it is immediately looking to exit that stock to make the
10  greatest profit?
11  A.  Yes, for the most part.
12  Q.  And it's true that SAC would invest in some companies in
13  large amounts and sometimes hold onto those shares for a while,
14  correct?
15  A.  Sure.
16  Q.  But it was also routine practice for SAC to build very
17  large positions, hundreds of millions of dollars, and then exit
18  or sell those positions very rapidly, wasn't it?
19  A.  Yes.
20  Q.  That was routine at SAC?
21  A.  It happens.
22  Q.  I think you mentioned in July of 2008 SAC was managing
23  perhaps more than $8 billion of outside money, correct?
24  A.  Yes.
25  Q.  And that would be money of high net worth investors but

E1edmar2          Berkowitz - cross          Page 506

1   also institutional money?
2   A.  Yes.
3   Q.  And you would agree with me, Mr. Berkowitz, that the job of
4   a portfolio manager was to do the hard work, the research
5   necessary to find the best investments for those investors?
6   A.  The portfolio managers and the research analysts.
7   Q.  And the portfolio managers and the research analysts were,
8   as we saw, paid a lot of money in part to do all of the deep
9   research to find the best investments for the investors, isn't
10  that right?
11  A.  Yes.
12  Q.  And you were aware at SAC that part of the research
13  involved contacting experts, correct?
14  A.  Yes.
15  Q.  In fact, SAC had a contract with a firm called GLG, isn't
16  that right?
17  A.  Yes.
18  Q.  And the purpose of GLG was to facilitate your research
19  analysts and portfolio managers to contact experts that could
20  help advise them on investments for the investors?
21  A.  Yes.
22  Q.  And you maintained contracts with that expert network and
23  facilitated its portfolio managers and research analysts to
24  take advantage of those expert networks, didn't it?
25  A.  We maintained contracts, yes.

E1edmar2          Berkowitz - cross          Page 507

1   Q.  I believe during your direct examination you were asked
2   several questions about the Holman account, correct?
3   A.  Could you repeat that?
4   Q.  During your direct examination you were asked several
5   questions about the Holman account.
6   A.  Yes.
7   Q.  You understood that Wayne Holman wasn't an employee of the
8   company, correct?
9   A.  He used to be an employee.  He was an employee until, I
10  think, March of 2006.
11  Q.  But he still had a relationship with SAC, didn't he?
12  A.  Yes.
13         MR. BRACERAS:  Mr. McLeod, if we could pull up Defense
14  285, please?
15  Q.  Mr. Berkowitz, we're showing you what's been marked as
16  Defense 285, for identification.
17         Could you tell us what Defense 285 is, please?
18  A.  Yes.  This was an agreement between SAC and Ridgeback
19  Capital Management regarding the investment advice on a single
20  security in 2007 and 2008.
21  Q.  And if you flip to the last page of Defense 285,
22  Mr. Berkowitz, you will see that Mr. Holman signed on behalf of
23  Ridgeback Capital?
24  A.  Yes.
25  Q.  And SAC's general counsel signed on behalf of SAC?

E1edmar2          Berkowitz - cross          Page 508

1   A.  Yes.
2   Q.  And this contract is dated November 9, 2007?
3   A.  Yes.
4   Q.  And the single stock as to which Ridgeback was giving
5   advice was Wyeth?
6   A.  Correct.
7   Q.  And this is a contract that you reviewed before coming to
8   court today?
9   A.  Yes.
10  Q.  And this is a contract that's kept in the ordinary course
11  of business at SAC?
12  A.  Yes.
13         MR. BRACERAS:  Your Honor, the defense offers 285.
14         MR. INGOGLIA:  No objection.
15         THE COURT:  285 is received.
16         (Defendant's Exhibit 285 received in evidence)
17         MR. BRACERAS:  It we can publish that, your Honor?
18         THE COURT:  You may.
19  BY MR. BRACERAS:
20  Q.  Mr. Berkowitz, I think you said that this was a contract
21  with Mr. Holman's firm Ridgeback Capital and SAC concerning
22  advice in a single stock, correct?
23  A.  Yes.
24  Q.  And that stock was Wyeth?
25  A.  Correct.

UNITED STATES OF AMERICA v
MATHEW MARTOMA
January 14, 2014

E1edmar2          Berkowitz - cross          Page 509

1  Q. And could you -- you see Wyeth is highlighted in that first
2  paragraph there?
3  A. Yes.
4  Q. And just the line above, Mr. McLeod, if you could see up to
5  how many shares of Wyeth would be involved?  That's 20 million
6  shares?
7  A. Yes.
8  Q. And down in the "Compensation" section, if you could review
9  that compensation paragraph?
10      And you see under 1, 20 percent of the cumulative net
11  profit as of the determination date attributable to the
12  investment in, again, the common stock -- that would be Wyeth,
13  Mr. Berkowitz?
14  A. Yes.
15  Q. Of the issuer -- that's Wyeth -- by account if the rate of
16  return is less than 30 percent.
17      You understood that Ridgeback Capital was getting
18  compensated for this agreement to provide advice on Wyeth?
19  A. Yes.
20  Q. You also understand that in August of 2008, after
21  Mr. Holman sold his position, after SAC sold its position in
22  Wyeth, that SAC terminated its relationship with Ridgeback
23  back, correct?
24  A. Terminated this specific agreement.
25  Q. Right.  So that wasn't a great question so let me try it

E1edmar2          Berkowitz - cross          Page 510

1  again.
2      You understand that after SAC sold out its entire
3  position of Wyeth in July of 2008, that SAC terminated this
4  contract with Ridgeback Capital and Mr. Holman?
5  A. Correct.
6  Q. You agree, Mr. Berkowitz, that portfolio managers at SAC
7  often would want to keep their information and their investment
8  ideas confidential from other portfolio managers at SAC?
9  A. Sometimes.
10  Q. And that was because portfolio managers manage their own
11  account and wouldn't be compensated for profits in someone
12  else's account other than Mr. Cohen, correct?
13  A. That's one of the reasons, yes.
14  Q. And it's also one of the reasons that because the portfolio
15  managers were managing different accounts that it's possible
16  for them to take contrary positions on the same stock, isn't
17  that right?
18  A. That's right.
19  Q. And it was normal for portfolio managers and research
20  analysts to disagree about a specific stock?
21  A. Yes.
22  Q. Do you recall in 2008 Bear Stearns collapsed in March of
23  2008?
24  A. Yes.
25  Q. And is it fair to say that there were concerns within SAC

E1edmar2          Berkowitz - cross          Page 511

1  about the volatility of the market in late spring/early summer,
2  after Bear Stearns' collapse?
3  A. Yes.
4  Q. Now, we spent quite a bit of time with Mr. Martoma's bonus,
5  and we'll look at some of those documents in a minute.  But you
6  will agree that it was completely common for portfolio managers
7  to get tagged by Mr. Cohen in the COHE account?
8  A. Yes.
9  Q. And not only the COHE account, but other firm accounts,
10  correct?
11  A. At the time, yes.
12  Q. And it wasn't just Mr. Martoma, other research analysts and
13  other portfolio managers were getting tagged by Mr. Cohen?
14  A. In the COHE account, yes.
15  Q. And the point here is that Mr. Cohen decided who to tag
16  ultimately, isn't that right?
17  A. Or someone who worked for him.
18  Q. Yes.  Mr. Cohen or someone that worked with Mr. Cohen would
19  decide who would get tagged as to a particular stock?
20  A. Yes.
21      (Continued on next page)
22
23
24
25

E1eQmar3          Berkowitz - cross          Page 512

1  BY MR. BRACERAS: (Continued)
2  Q. Now, the amount that portfolio managers are getting paid,
3  the percentages are paid at SAC that's consistent with other
4  hedge funds, isn't it?
5  A. Certain hedge funds.
6  Q. Isn't it true that one of the reasons why you need to pay
7  that amount is to keep the people at the firm?
8  A. Yes.
9  Q. Because it's very easy if a person is managing a fund, it's
10  very easy for that person to leave and start his own fund and
11  make an even larger percentage; is that right?
12  A. Yes, or go to a competitor.
13  Q. Or go to a competitor.  In fact, SAC has had many
14  experiences with portfolio managers leaving and starting their
15  own funds; isn't that right?
16  A. Yes.
17  Q. In fact, we talked about Mr. Holman.  He left and started
18  his own fund, didn't he?
19  A. Yes.
20  Q. And Mr. Grossman left and he started his own fund, didn't
21  he?
22  A. Yes.
23  Q. Mr. Grossman was Mr. Martoma's boss; isn't that right?
24  A. Yes.
25  Q. So, one of the reasons why SAC obviously pays a high

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

*January 17, 2014*

| E1hdmar2 | Page 1160 |
| --- | --- |

1 government knows is incorrect and which this witness in fact
2 has told us both immediately outside of the trial courtroom
3 that he had no personal knowledge of. So we had agreed we
4 would not ask him specifics about the backdrop because he
5 didn't know it but we would allow it to go in because both
6 sides wanted that information and so we had an agreement.
7     And my -- you know, my proposal, your Honor, is simply
8 that that question and answer be struck from the record. I
9 don't think there is a need to advise the jury about it and
10 bring more attention to it, but I think it should be struck. I
11 don't know if it was an inadvertent or whatever, but it was
12 certainly not what we had agreed the questions would be as to
13 this witness and I think it was therefor improper. And, also,
14 it was not accurate, which I think both sides know, and so it
15 should not be in the record when we simply agreed to the
16 leading questions phrased by the government.
17       MR. INGOGLIA: I think if we consult we are going to
18 be able to resolve this.
19       MR. STRASSBERG: We are happy to do that, your Honor.
20 I just wanted to address it, and I acknowledge we haven't had a
21 chance to consult yet since it just happened.
22       THE COURT: All right. So you will talk. Maybe it
23 will be the subject of a stipulation. Maybe the evidence will
24 be struck. You will talk and see if you can reach agreement
25 and then raise it with me again.

| E1hdmar2 | Page 1161 |
| --- | --- |

1       MR. STRASSBERG: Thank you.
2       THE COURT: Anything else?
3       MR. DEVLIN-BROWN: It could be, your Honor, that there
4 are some issues with respect to particular documents for
5 Dr. Gilman. They are not going to come up this morning, for
6 sure. They are probably unlikely to come up today, but we will
7 confer further and address it with your Honor before that
8 happens.
9       THE COURT: All right. So we will take ten minutes.
10       THE CLERK: All rise.
11     (Recess)
12     (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

| E1hQmar3 | Gilman - direct | Page 1162 |
| --- | --- | --- |

1     (In open court; jury present)
2       THE COURT: The government will call its next witness.
3       MR. DEVLIN-BROWN: The government calls Sidney Gilman,
4 your Honor.
5   SIDNEY GILMAN,
6     called as a witness by the Government,
7     having been duly sworn, testified as follows:
8 DIRECT EXAMINATION
9 BY MR. DEVLIN-BROWN:
10 Q. Good morning, Dr. Gilman. Where do you live?
11 A. Good morning, sir. I live in Ann Arbor, Michigan.
12 Q. How old are you?
13 A. I'm 81 years of age.
14 Q. How long have you been living in Ann Arbor?
15 A. Since 1977, sir.
16 Q. Who do you live with?
17 A. I live with my wife.
18 Q. How long have you been married?
19 A. For almost 30 years.
20 Q. Did you work in Ann Arbor?
21 A. Yes, I did.
22 Q. Where did you work there?
23 A. I worked at the University of Michigan Medical Center.
24 Q. What's the University of Michigan Medical Center?
25 A. It is a component of the University of Michigan.

| E1hQmar3 | Gilman - direct | Page 1163 |
| --- | --- | --- |

1 Q. What do you mean by a component?
2 A. It is one school of several schools of the university.
3 Q. Are there any hospitals associated with the University of
4   Michigan Medical Center?
5 A. Yes, sir, there are schools -- there are hospitals, excuse
6   me, associated with the University of Michigan Medical Center.
7 Q. Do they teach medical students there as well?
8 A. Yes, they teach medical students there.
9 Q. Is the university of Michigan a public or private school?
10 A. It is a public school.
11 Q. How long have you been working there or how long did you
12   work there?
13 A. I've worked there since 1977, but I'm now retired from the
14   institution.
15 Q. How big is the university of Michigan?
16 A. The University of Michigan has a faculty of approximately
17   1200 or so.
18 Q. What about the student body there?
19 A. The student body is about 1500 or so.
20 Q. How big is Ann Arbor?
21 A. Ann Arbor without the students is approximately 1,500
22   people.
23 Q. One thousand 500 people in Ann Arbor, did you say?
24 A. I'm sorry?
25 Q. I'm not sure I heard your response. Is it 1,500 people?

**UNITED STATES OF AMERICA v.**
**MATHEW MARTOMA**

E1hdmar4      Gilman - direct      Page 1236

1  A. I think he was the person I consulted with the most, yes.
2  Q. Did you enjoy consulting with him more than other hedge
3    fund clients?
4  A. I enjoyed other consultations as well, but I enjoyed
5    speaking with him, yes.
6  Q. At about the same level as other hedge funds' clients?
7        MR. STRASSBERG: Objection, your Honor.
8        THE COURT: Sustained.
9  Q. Was there anything that stood out in your consultations
10   with Mr. Martoma?
11 A. Well, yes. He wanted, as I got -- as I had more and more
12   interactions with him, he said he wanted to be friends. He
13   seemed to want to be closer than I thought a client should be
14   to a consultant. He said that to me several times. And
15   initially I resisted that overture.
16 Q. Do you know what he -- did you know what he did for a
17   living while you were consulting with him?
18 A. Yes, I did.
19 Q. What did he do?
20 A. Well, he said, he told me he was a fund manager for his
21   company.
22       (Continued on next page)
23
24
25

E1hQmar5      Gilman - direct      Page 1237

1  Q. Did you understand at that time what the role of a fund
2    manager for his company was?
3  A. Well, I'm an academic person. I don't know much about
4    finance, frankly, but, yes, I understand these people buy and
5    sell securities.
6  Q. What did you understand securities to mean?
7  A. Security means stocks and bonds.
8  Q. Did you have any understanding about the reason he was
9    consulting with you?
10 A. Yes, I assume that it was to understand more about the
11   pharmaceuticals he was talking to me about so that he could
12   make decisions about purchasing or selling.
13 Q. You testified a moment ago that you believed he wanted to
14   become your friend; is that right?
15 A. That's what he told me.
16 Q. Well, did your relationship change at all from a purely
17   business relationship?
18 A. Well, he wanted to meet at national meetings; for example,
19   the American Academy of Neurology. I think that was the main
20   one. I don't remember whether he ever went to the American
21   Neurological Association meeting. Those were the two main ones
22   where there were clinical topics discussed. But he did want to
23   meet there, have a cup of coffee and chat, and we did. I did
24   succumbed to that request. He told me about his family, about
25   his wife, about having children in fairly rapid succession, and

E1hQmar5      Gilman - direct      Page 1238

1    told me about his parents emigrating from India.
2  Q. What did you talk to him about in your own life?
3  A. Not much.
4  Q. Let me show you what's been marked for identification as
5    Government Exhibit 207, please. If you could take a look at
6    that and let us know if you recognize it?
7  A. Yes.
8  Q. What is it generally?
9  A. It is an email from me to Mr. Martoma's secretary.
10       MR. DEVLIN-BROWN: The government offers 207.
11       MR. STRASSBERG: No objection, your Honor.
12       THE COURT: Government Exhibit 207 is received.
13       (Government's Exhibit 207 received in evidence)
14       MR. DEVLIN-BROWN: May we publish it, your Honor?
15       THE COURT: Yes.
16 Q. If we could start at the bottom of the page, Ms. Hernandez,
17   with the bottom email.
18       Dr. Gilman, this appears to be from someone name
19   Stephanie Reisenman. Do you know who she is?
20 A. She was Mr. Martoma's secretary at the time.
21 Q. The email reads: "I am writing to confirm the Gerson
22   Lehrman Group consultation that you have scheduled with Mathew
23   Martoma for August 22 at 1:00 p.m. eastern. The topic of the
24   call is an overview of novel therapies for Parkinson's
25   disease."

E1hQmar5      Gilman - direct      Page 1239

1        My first question, Dr. Gilman, is did you consult with
2    him on diseases other than Alzheimer's disease?
3  A. Oh, yes.
4  Q. If we could zoom out now, please, and look at the response
5    at the top of the email.
6        Now, my first question, actually, is the email below
7    it looked like it was from Stephanie Reisenman and your
8    response is to Stephanie Zalazny. Is that the same person?
9  A. I think so, yes.
10 Q. And you write: "Thanks for this. The call is on my
11   calendar, and I promise that I will not re-duplicate my
12   behavior when I was in Istanbul and completely overlooked the
13   commitment. I want to commend you again on your persistence in
14   finding me then. I still have a red face."
15       What are you referring to there about not
16   re-duplicating your behavior when you were in Istanbul?
17 A. Mr. Martoma had set up a telephone consultation for a time
18   when I was abroad attending a movement sort of meeting. I had
19   gone to Istanbul with my wife for a week. It's a fascinating
20   city where we'd never been before. She stayed -- she seldom
21   travels with me because of her work. She stayed a week and
22   then departed, and I was left to attend my meeting. I totally
23   forgot the meeting with Mr. Martoma, and he called me
24   persistently in the hotel. They initially denied that I was
25   there. He finally located me in a -- in an area of the hotel,

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 22, 2014

E1mQmar1          Gilman - direct          Page 1487

1  you receive other documents from Elan that were password
2  protected?
3  A. Yes.
4  Q. How certain are you that the document you remember emailing
5  him was the ICAD presentation?
6  A. I'm not absolutely certain.
7  Q. What is your best recollection as to when you sent him the
8  ICAD presentation?
9  A. I'm not certain of the time I sent him the document.
10 Q. What is your best recollection?
11      MR. STRASSBERG: Objection, your Honor.
12      THE COURT: Overruled.
13      MR. STRASSBERG: Asked and answered.
14 A. My best recollection was the 17th of July.
15 Q. How confident -- are you confident that it was the 17th of
16 July?
17 A. I'm not.
18      MR. STRASSBERG: Objection, your Honor.  I'll withdraw
19 the objection.
20      THE COURT: You may answer.
21 A. I'm not very confident of that.
22 Q. Are you confident it was before the ICAD presentation?
23 A. I'm reasonably confident but not certain.
24 Q. So, Dr. Gilman, after the lunch with Mr. Martoma on July 30
25 of 2008, did you hear from him again the rest of the summer?

E1mQmar1          Gilman - direct          Page 1488

1  A. I don't recall hearing from him again for the rest of the
2  summer.
3  Q. Were you surprised by that at the time?
4  A. Yes, I was surprised by that.
5  Q. Why?
6  A. Well, I thought we were friends, and I thought he would be
7  in touch just to say hello.
8  Q. Did there come a point where you reached out to him?
9  A. Yes.
10 Q. I'd like to show what's been marked for identification as
11 Government Exhibit 235.  Do you recognize this document,
12 Dr. Gilman?
13 A. Yes, sir.
14 Q. What is it generally?
15 A. It's a message from me to him saying I haven't heard from
16 you for awhile.
17 Q. Doctor, don't read it.  Do you recognize it generally?
18 A. Yes, I do.
19      MR. DEVLIN-BROWN: The government offers 235.
20      MR. STRASSBERG: No objection.
21      THE COURT: Government Exhibit 235 is received.
22      (Government's Exhibit 235 received in evidence)
23      MR. DEVLIN-BROWN: May we publish it with the Court's
24 permission?
25      THE COURT: You may.

E1mQmar1          Gilman - direct          Page 1489

1  Q. So, Dr. Gilman, what's the date of this email from yourself
2  to Mr. Martoma?
3  A. September 26, 2008.
4  Q. Do you want to look a little more closely at the date line
5  or we could make it bigger?
6  A. September 28, 2008, 12:02 p.m.
7  Q. And the subject?
8  A. "How are you?"
9  Q. So the email reads, "Hi Mat. I haven't heard from you in
10 awhile and hope that is all well with you and your family.  I
11 hope that you have not been too terribly set back by the great
12 turmoil in the markets."
13      Let me stop there.  What's the great turmoil in the
14 markets you're referring to?
15 A. Well, 2008 was a very difficult time for investment people.
16 The market was roiling.  I think that's the right word.
17 Q. Was what-ing?
18 A. Roiling.  Roiling.  Is that right?
19 Q. I don't know.
20 A. That's not what I do.  I have my own way of roiling in
21 government grants, but it was a tough time for the economy.
22 Q. Then you write, "Plus the disappointing drop in Elan stock
23 after the combined effect of investor disappointment, short
24 selling of the stock and the two additional cases of PML on
25 Tysabri."

E1mQmar1          Gilman - direct          Page 1490

1      What are you referring to by two additional cases of
2  PML on Tysabri?
3  A. Tysabri is a medication for the treatment of multiple
4  sclerosis, and Tysabri was the most -- was and is the most
5  effective medication to treat multiple sclerosis.  Tysabri
6  prevents the development of new lesions of multiple sclerosis
7  by stopping the inflammatory response.  However, it is so
8  effective in preventing certain kinds of cells from entering
9  the brain; namely, T-cells, that it allows viruses to enter the
10 brain and that allows certain viruses, the JC virus to enter
11 the brain and cause a terrible disease, an incurable disease,
12 at that time incurable.
13      (Continued on next page)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

1　meeting though, OK?
2　A. All right.
3　Q. That was only about three months ago, right?
4　A. Yes.
5　Q. So, Mr. McLeod, if you could put up for Dr. Gilman -- well,
6　let me ask you first, Dr. Gilman, and then see if we need to
7　help at all with anything.
8　　　Isn't it a fact, Dr. Gilman, that in this October 22,
9　2013 meeting in response to the prosecutors' questions, you
10　told them again that you didn't remember reviewing the
11　PowerPoint slide with Mathew at your office, but you presumed
12　that you had reviewed them? Do you recall saying that?
13　A. That I presumed what?
14　Q. You presumed that you had reviewed them with Mathew at your
15　office. Do you remember saying that?
16　A. I -- I don't recall saying that, no.
17　Q. OK. I understand. So, Mr. McLeod, if you could put up for
18　Dr. Gilman, Defense Exhibit 3501-33 at pages 5 to 6. If you
19　can just get the part that we are talking about here. If you
20　can highlight that part, Mr. McLeod, so we can direct
21　Dr. Gilman to the right part. It's the last sentence in what
22　you've highlighted.
23　　　Does that help you recall, Dr. Gilman, that you told
24　the prosecutors you presumed that you and Mr. Martoma had
25　reviewed the PowerPoint slide deck for ICAD at this meeting?

1　A. Yes. However, this also contains information that had come
2　back to me in the interim between the two meetings in which I
3　recalled more specific details about his visit which are
4　documented here. These memories came back slowly.
5　　　THE COURT: Dr. Gilman.
6　　　THE WITNESS: Yes, sir.
7　　　THE COURT: No question pending.
8　　　Go ahead, Mr. Strassberg.
9　　　THE WITNESS: Yes, sir.
10　　　MR. STRASSBERG: Thank you, Judge.
11　Q. You testified on direct with the prosecutor asking you
12　questions that the memories that you shared with this jury on
13　direct about that meeting in Michigan had come back to you only
14　as recently as about two weeks ago, right, the full memories?
15　A. Sir, if that's a question for me, I was responding to the
16　question from Mr. Devlin-Brown, and his question permitted me
17　only a single answer quickly, and I could not give him the
18　detail that I should have been able to give him. It was not as
19　if everything appeared all at once. It occurred slowly, the
20　memory returned very slowly. I hope that clarifies the
21　situation.
22　Q. But would it be fair to say this, Dr. Gilman, that however
23　it developed slowly over time, some of what you testified to in
24　response to Mr. Devlin-Brown's questions were things that you
25　remembered only two weeks ago, right?

1　A. The most recent piece of the memory was a couple of weeks
2　ago.
3　Q. OK.
4　A. But it was an evolutionary process.
5　Q. Now, it's fair to say, Dr. Gilman, that the things you have
6　said -- well, let me frame it this way: You have had other
7　changes in the things you've told the prosecutors from what
8　you've testified about at trial. Isn't that right?
9　A. Excuse me? I don't understand your question.
10　Q. Well, putting aside the Michigan trip which we have been
11　talking about now for the better part of an hour --
12　A. Yes.
13　Q. -- isn't it right that you have changed other things about
14　what you've testified to to this jury during your sessions with
15　the prosecutors?
16　A. I'm not sure what you're talking about, sir.
17　Q. Well, let's look at Government Exhibit 224-A that's been
18　admitted into evidence. You discussed this exhibit on you
19　direct examination. Do you remember that? The question is
20　only if you remember this document?
21　A. Yes.
22　Q. Mr. McLeod, you can go to the part that Mr. Martoma -- the
23　email that starts at the bottom of the page, please.
24　　　In this email, Dr. Gilman, Mr. Martoma asks you if you
25　know of any Phase III trials in Alzheimer's that have had

1　multiple dose groups aside from the ongoing trial of
2　bapineuzumab. Do you see that?
3　A. Yes.
4　Q. So, it's fair to say he's asking you for information about
5　trials that do not involve bapineuzumab in this question,
6　right?
7　A. Yes.
8　Q. If we go to the first paragraph of your response, you
9　respond to him by providing him information about a number of
10　different other drugs, right?
11　A. Yes.
12　Q. And you didn't have confidential information -- well, you
13　were not part of an SMC for any of these other drugs, right,
14　Dr. Gilman?
15　A. That's right.
16　Q. So you were providing him information here that you
17　understood was proper to provide, right?
18　A. It was public information.
19　Q. Now, in the second paragraph of this email, you provided
20　Mr. Martoma with information about dropout rates. Do you
21　recall that?
22　A. Yes, sir, I do.
23　Q. And you recall we had a lot of testimony in your
24　questioning by the prosecutors about how the dropout numbers,
25　there'd been an error and that it was fixed. Remember that?

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

| E1oQmar3 | Gilman - redirect | Page 1890 |

1      Gupta, Dr. Gilman?
2    A. One consultation, sir.
3    Q. Do you remember being asked about someone named Ajay?
4    A. Yes.
5    Q. And let's filter Government Exhibit 600 for Ajay. How many
6      consultations are there for Ajay?
7    A. I see one here, sir.
8    Q. Is there an Ajay Mantha as well, Ms. Hernandez?
9        How many consultations are on the screen for Ajay
10     Mantha?
11   A. Looks like six or so.
12   Q. How many of those relate to Alzheimer's -- do they all
13     relate to Alzheimer's disease?
14       MR. STRASSBERG: Objection, your Honor. To the extent
15     he is asking for his memory, I have no objection. But as that
16     appears to be the question, I think he was reading the
17     document.
18       THE COURT: Are you asking him how many are on
19     Government Exhibit 600 or are you asking him for his
20     recollection?
21       MR. DEVLIN-BROWN: How many are on Government Exhibit
22     600, your Honor.
23       THE COURT: That's in evidence.
24   Q. We don't need to go through every single one. Let's do one
25     more. Do you remember being asked about someone named Guha?

| E1oQmar3 | Gilman - redirect | Page 1891 |

1    A. Yes.
2    Q. How many consults do you see with Guha on Government
3      Exhibit 600?
4    A. I see one.
5    Q. Now, do you recall that when Mr. Strassberg was asking you
6      questions about people you consulted with yesterday, there were
7      some people that you had a memory of besides Mat Martoma?
8    A. I think there were some, yes.
9    Q. Let me ask you about someone named Tom Brown of Millennium?
10   A. Yes.
11   Q. Do you remember being asked questions about him?
12   A. Yes, I remember Tom Brown very well.
13   Q. What do you remember about Tom Brown?
14   A. I remember Tom Brown as being in London at a -- at a firm,
15     and I remember him being a delightful gentleman, very
16     talkative, a former chess champion player, and the
17     consultations were delightful, but he was extremely talkative.
18   Q. If we could filter Government Exhibit 600, Ms. Hernandez,
19     by Tom Brown, please. Let's look down the screen. How many
20     consultations do you have with Tom Brown?
21       THE COURT: Let me speak with my deputy for a moment.
22       (Pause)
23   Q. So we've shrunk Government Exhibit 600 on the screen
24     Dr. Gilman, but am I right that there is one, two, three, four,
25     five, six, seven, eight, nine, ten consults for Tom Brown?

| E1oQmar3 | Gilman - redirect | Page 1892 |

1    A. Yes, ten or 11.
2    Q. Dr. Gilman, I believe you were asked on cross-examination
3      about how many consultations you had with Mat Martoma. Do you
4      remember that?
5    A. Yes.
6    Q. How many consultations would you estimate you had with Mat
7      Martoma?
8        THE COURT: Do you mean in total over the entire time
9      period?
10   Q. In total, let's say between -- yes, over the entire time
11     period, over the entire time period you dealt with GLG.
12   A. I think it was about 60 or thereabouts.
13   Q. Six-zero did you say?
14   A. Six-zero, yes.
15   Q. Could we filter client contact Mat Martoma. I don't think
16     we need to or are able to count all of these, but you haven't
17     counted them up yourself, have you, Dr. Gilman?
18   A. No, sir.
19   Q. Do you think anyone came close to Mr. Martoma in terms of
20     the number of consults you had?
21   A. No, I don't believe so.
22   Q. We could take that off the screen, Ms. Hernandez.
23       Other than having more consultations with Mr. Martoma
24     than other clients with GLG, was your relationship with him
25     different than with other clients?

| E1oQmar3 | Gilman - redirect | Page 1893 |

1    A. Yes, it was different from my relationship with other
2      clients.
3    Q. In what way?
4    A. In the very beginning, he was personable and seeking
5      friendship with me initially; and then as time went on, he was
6      persistently seeking non-public information. That was true
7      from the time of perhaps our sixth or seventh meeting,
8      conversation, that is.
9    Q. Was your personal relationship different with Mr. Martoma
10     than any of your other clients?
11   A. Yes, it was.
12   Q. How was it different?
13   A. He wanted for us to get together at the public meetings at
14     the American Academy of Neurology, for example, and have coffee
15     or to meet. I was very wary of this at first because I thought
16     we were going beyond the client/advisor relationship, but with
17     time, I began to like him. He was personable, and he,
18     unfortunately, reminded me of my first son in his
19     inquisitiveness, his brightness; and, sadly, my first son was
20     very bright also and committed suicide.
21   Q. In terms of science, did Mr. Martoma's knowledge of science
22     stand out in any way?
23   A. Yes.
24   Q. From the other people that had been mentioned?
25   A. Yes, he seemed much brighter and more versed in science

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

E1odmar4          Gilman - redirect          Page 1914

1 Q. And the "to" line is to Allison Hulme?
2 A. Yes.
3 Q. And what is the date of this email?
4 A. August 26, 2008.
5 Q. And you write: "Dear Allison, I am writing to request
6   permission to show the slides I presented at the ICAD meeting
7   to a neuroscience interest group at the annual meeting of the
8   Institute of Medicine (IOM), National Academy of Sciences."
9 Q. Dr. Gilman, by the time of this email, had you already
10   presented the slides at ICAD?
11 A. Yes, sir.
12 Q. Why were you asking for permission to distribute them at
13   this other conference?
14 A. I remember the Institute of Medicine, National Academy of
15   Sciences, there is a subgroup of neurosciences in that
16   institute, and I thought that this presentation would be of
17   interest to them.
18 Q. Did you feel you needed to ask for permission?
19 A. Yes, I did feel I needed to ask permission.
20 Q. Why?
21 A. Because this was material that had not yet been published.
22        MR. DEVLIN-BROWN: We could take that off the screen,
23   please.
24 Q. Could I show you Government Exhibit 59, for identification,
25   please.

E1odmar4          Gilman - redirect          Page 1915

1        (Pause)
2        MR. DEVLIN-BROWN: And if we could zoom maybe from the
3   header about two-thirds of the way down the document, that
4   would be great.
5 Q. Do you recognize Government Exhibit 59, Dr. Gilman?
6 A. Yes, sir.
7 Q. What is it, just generally?
8 A. This is an email from me to Anita Kawatra.
9        MR. DEVLIN-BROWN: The government offers 59.
10        MR. STRASSBERG: No objection, your Honor.
11        THE COURT: Government Exhibit 59 is received.
12        (Government's Exhibit 59 received in evidence)
13        MR. DEVLIN-BROWN: May we publish it, your Honor?
14        THE COURT: Yes.
15        MR. DEVLIN-BROWN: So perhaps we could just zoom on
16   the bottom email.
17 Q. So, Dr. Gilman, is this from yourself to Anita Kawatra and
18   Dale Schenk and Martin Koller?
19 A. Yes.
20 Q. So you write: "Tomorrow I will give the Distinguished
21   University Professor lecture, and I had originally considered
22   going into depth about both AN1792 and AAB-001. To this end, I
23   was considering asking you all what I can say publicly."
24        Why were you sending this message relating to what you
25   can say publicly to Anita Kawatra, Dale Schenk and Martin

E1odmar4          Gilman - redirect          Page 1916

1   Koller?
2 A. I was asking their permission because the material had not
3   yet been published.
4 Q. Did you ever ask anyone from Elan, Dr. Gilman, whether you
5   could have permission to share the ICAD presentation in advance
6   with Mr. Martoma?
7 A. No. I had not.
8        MR. DEVLIN-BROWN: We could take those off the screen,
9   please.
10 Q. Dr. Gilman, do you recall having some questions on
11   cross-examination about consultations you did with other
12   individuals in the period between when you were unblinded to
13   the results and the announcement of the results at ICAD?
14 A. Yes.
15 Q. I believe you testified -- do you recall when you were
16   unblinded?
17 A. Yes.
18 Q. When?
19 A. Well, I was unblinded on the 15th and 16th of July 2008.
20        MR. DEVLIN-BROWN: Ms. Hernandez, with the Court's
21   permission, could we publish Government Exhibit 600?
22        THE COURT: Yes.
23        MR. DEVLIN-BROWN: And is this sorted by consultation
24   date, Ms. Hernandez?
25        And could we scroll down until we find July 15, 2008.

E1odmar4          Gilman - redirect          Page 1917

1 Q. So let me ask you, Dr. Gilman, how many consultations you
2   see on Exhibit 600 between July 15 of 2008 and July 29th?
3        So far on the screen, there is a July 17, 2008, with
4   Rod Wong; a July 18, 2008 with Kumar Husam Nazer; July 21, 2008
5   with Rene Shen; and July 24, 2008 with Rod Wong; and a July 25,
6   2008 with Rod Wong; and a July 25, 2008 with Brian Grossman.
7        Dr. Gilman, as you were -- we could take that off the
8   screen for a moment.
9        Dr. Gilman, as you were preparing to deliver your
10   presentation at ICAD, did you know whether there was much
11   investor interest in the drug?
12 A. Yes. I suspected there was a great deal of investor
13   interest in the drug.
14 Q. Well, did you know that one way or the other based on
15   consultations?
16 A. Not based on consultations, but I suspected there was a
17   great deal of interest in the drug because it had been widely
18   known as an exciting potential drug for Alzheimer's Disease.
19 Q. Did you see Mr. Martoma's name anywhere on the list for
20   consultations between July 15, 2008 and July 29, 2008?
21 A. No.
22 Q. Did you talk to Mat Martoma between that period about the
23   drug?
24 A. Yes.
25 Q. Did you report to GLG any phone calls with Mr. Martoma on

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

**January 24, 2014**

E1odmar4          Gilman - redirect          Page 1918

1    July 17, 2008?
2  A.  I didn't.  No, I did not.
3  Q.  What about the meeting you testified to on July 19, 2008,
4    in your office?
5  A.  I did not report that to GLG.
6  Q.  Did you ask Mr. Martoma to report it to GLG?
7  A.  I did not.
8  Q.  Why not?
9  A.  Because it would be tantamount to confessing that I was
10   feeding -- giving him inside information.
11 Q.  Now, you did have some consultations, we just saw, with
12   Mr. Wong and Mr. Shen.  Did you see those?
13 A.  Yes.
14 Q.  Do you recall on cross-examination being asked questions
15   about various articles you had sent, or slides from AN1792 you
16   had sent to Mr. Shen and Mr. Wong?
17 A.  Yes.
18 Q.  Was -- and you remember -- do you remember, it was like
19   several different articles and slides that were shown to you on
20   cross-examination?
21 A.  Yes.
22 Q.  Were any of those confidential materials?
23 A.  No.
24 Q.  Can you describe -- well, let me show you, if we could,
25   what is Defense Exhibit 874, please.

E1odmar4          Gilman - redirect          Page 1919

1         And if we could just zoom in on the text,
2    Ms. Hernandez.
3         (Pause)
4         Do you recall, Dr. Gilman, seeing this article, dated
5    on the bottom July 19, 2008, from the Lancet and I think the
6    second article from the Lancet as well?
7  A.  Yes, sir.
8  Q.  Do you remember what these articles were about, or would
9    you like to look at them a little bit?  I just wanted to ask
10   you a general question about them.
11 A.  Well, I remember them reasonably well.
12 Q.  Were those articles in your view useful for someone who did
13   not know the results of the Phase II trial but was trying to
14   look at what was reported to make a best assessment?
15 A.  I felt they were useful -- did give a useful perspective.
16 Q.  And Mr. Strassberg didn't show you any emails of you
17   sending these articles to Mr. Martoma, did he?
18        MR. STRASSBERG:  Objection, your Honor.
19 A.  No, I don't believe so.
20        THE COURT:  Overruled.
21 Q.  Did these articles affect your view at all?
22 A.  I'm sorry.  Did they what?
23 Q.  Did they affect your view at all as to the prospects for
24   bapineuzumab?
25 A.  No, they did not.

E1odmar4          Gilman - redirect          Page 1920

1  Q.  I think you were asked -- well, were you asked on
2    cross-examination whether you had provided this Lancet
3    article -- sorry, talked about the Lancet article with
4    Mr. Martoma?
5  A.  I was asked about whether I had discussed the Lancet
6    article with Mr. Martoma.
7  Q.  And do you recall answering that you had?
8  A.  Now we're talking about the Lancet article of the 17th of
9    April, or are we talking about -- there are several Lancet
10   articles.
11 Q.  The Lancet article in July 2008.
12 A.  In July?  I'm sorry, I am not sure whether that was the one
13   discussed with Mr. Martoma or not.
14 Q.  That was actually going to be my question.  Do you
15   recall -- do you recall any particular occasion or meeting
16   where you were discussing Lancet articles with Mr. Martoma?
17 A.  I'm sorry, I don't.
18        MR. DEVLIN-BROWN:  OK.  We can take that off the
19   screen, then, Ms. Hernandez.
20 Q.  Do you recall being asked on cross-examination some
21   questions about whether it was Mr. Martoma or whether it was
22   Mr. Martoma's secretary who tracked you down in Istanbul?
23 A.  Yes, I remember the question.
24 Q.  And do you recall being asked whether your testimony that
25   Mr. Martoma told you that he had tracked you down was

E1odmar4          Gilman - redirect          Page 1921

1    consistent with the emails that showed you were in touch with
2    his secretary?
3  A.  Yes, I remember the question.
4  Q.  Did you have any understanding as to who Mr. Martoma's
5    secretary took actions on behalf of -- on whose behalf
6    Mr. Martoma's secretary took actions?
7  A.  Mr. Martoma's secretary took action on behalf of
8    Mr. Martoma.
9  Q.  And did you in fact speak to Mr. Martoma himself at some
10   point then?
11 A.  I did.
12 Q.  And what did he tell you when he spoke to you?
13 A.  He told me he tracked me down.
14 Q.  Do you recall on cross-examination being asked some
15   questions about an ICAD abstract for a study that Dr. Lon
16   Schneider did about placebos?
17 A.  Yes.
18 Q.  On direct examination -- well, on direct examination, you
19   had testified that at the ICAD conference there was a Q & A
20   session in which people asked questions about whether the
21   placebo group was a concern?
22        MR. STRASSBERG:  Objection, your Honor.
23        THE COURT:  Just give me a moment.
24        MR. STRASSBERG:  It is a scope objection.
25        MR. DEVLIN-BROWN:  I can ask it a different way to

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

---

E1odmar4     Gilman - redirect     Page 1926

1  Q. In September 2012 -- do you recall being asked questions
2  about your next proffer in September 2012 by Mr. Strassberg?
3  A. I still didn't recall it, sir.
4  Q. OK. Do you recall being asked questions about a meeting
5  after you had received your nonprosecution agreement, on
6  March 1, 2013, when you were asked again about this calendar
7  entry?
8  A. Yes.
9  Q. And do you recall testifying that you said something at the
10  end of the meeting about recalling opening a door and letting
11  Mr. Martoma in?
12  A. Yes.
13       MR. STRASSBERG: Objection, your Honor. That is not
14  the testimony.
15       THE COURT: Just give me a moment.
16       MR. STRASSBERG: I am happy to share it at the sidebar
17  because I remember what his testimony was.
18       MR. DEVLIN-BROWN: I am also happy to ask an
19  open-ended question.
20       THE COURT: Just give me a moment.
21       (Pause)
22       All right. I will speak to counsel at the sidebar.
23       (Continued on next page)
24
25

---

E1odmar4     Gilman - redirect     Page 1927

1       (At the sidebar)
2       THE COURT: My notes indicate that in discussing the
3  March 1, 2013 proffer session, he said that he recollected at
4  that meeting that he had a mental image of seeing Mathew
5  Martoma out on the street but that he recalled no other details
6  at that time.
7       MR. STRASSBERG: Your Honor's notes are very accurate.
8  He actually said, consistent with the 302, that he had a vague
9  recollection of seeing him out on the street. There was no
10  testimony about opening a door or holding a door, or whatever
11  else Mr. Devlin-Brown just put in his question.
12       MR. DEVLIN-BROWN: I apologize. I will ask it using
13  those terms.
14       MR. STRASSBERG: Yes. I believe the quote, because I
15  believe what I said to him was you said you had a vague
16  recollection of seeing Mr. Martoma out on the street. I
17  believe he said yes. That is what he said at the time.
18       MR. DEVLIN-BROWN: That is fine.
19       (Continued on next page)
20
21
22
23
24
25

---

E1odmar4     Gilman - redirect     Page 1928

1       (In open court)
2  BY MR. DEVLIN-BROWN:
3  Q. Dr. Gilman, let me withdraw that and ask you a different
4  question.
5       Do you recall on cross-examination testifying that on
6  March 1, 2013, you told the government, in substance, that you
7  had a vague recollection of seeing Mr. Martoma on the street
8  outside your office?
9  A. Yes.
10  Q. Why didn't you tell the government at that meeting that you
11  remembered meeting him in the office that day?
12  A. It was too vague a memory for me to recount, sir. I wasn't
13  that sure. It was very faint.
14  Q. Do you recall Mr. Strassberg asking you whether the
15  government had asked you the question repeatedly of whether you
16  had had this meeting in your office?
17  A. Yes.
18  Q. Given the repeating questions by the government, why didn't
19  you simply say, yes, I met with him in the office?
20  A. I needed to be sure. I did not want to make a guess
21  because I was in jeopardy if I lied. I wanted to be sure I had
22  a solid memory in my mind.
23  Q. Has anyone from the government, Dr. Gilman, ever encouraged
24  you in any way to provide more details than you actually
25  remember?

---

E1odmar4     Gilman - redirect     Page 1929

1  A. No.
2  Q. Sitting here today, right now, what can you remember with
3  confidence occurring on July 19, 2008?
4  A. I can recall a telephone call coming into my office from a
5  news room saying that Mr. Martoma is about to arrive. I can
6  recall opening the front door to the North Ingalls Building to
7  allow him to come in without my going out.
8       I can recall asking him if he had lunch already, or if
9  he wanted to go out for lunch, and of him declining, and
10  offering him coffee or a soft drink and him declining.
11       I have a visual memory of letting him into my office
12  and asking him if he wanted to just chat, and of his requesting
13  to see the slides, the ICAD slides.
14       I then have a visual memory of going to the slide set
15  but not a very clear or detailed memory of that.
16  Q. And you had testified, I believe, that details -- the final
17  details came back to you approximately two weeks ago?
18  A. This going through the slides came back roughly two weeks
19  or three weeks ago.
20  Q. What part came back?
21  A. Going through the slides came back about two or three weeks
22  ago.
23  Q. Do you have doubt as to whether that happened or not,
24  Dr. Gilman?
25  A. I do not have doubt. I revealed that memory to you early

---

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 28, 2014

E1sdmar6     Nussbaum - direct     Page 2445

1  SAC's funds. We didn't have an interest in his management
2  company but we had a significant interest in his funds.
3  Q. And so just so its clear, SAC Capital invested money in the
4  funds that Mr. Holman set up upon leaving SAC Capital?
5  A. Correct.
6  Q. And do you recall the amount of money that SAC Capital
7  ultimately invested in Mr. Holman's fund Ridgeback?
8  A. Well, it varied over time. My general recollection was we
9  probably started with around $400 million of capital invested.
10  It probably got up at its peak to over 800 million, but I can't
11  swear that it didn't even go higher than that.
12  Q. And how did that compare to the kinds of investments that
13  SAC Capital would make in other funds started by former
14  employees of SAC Capital?
15  A. Well, I would say it was different in two respects. One,
16  I'd say it was probably the biggest of actual capital, actual
17  money. And, secondly, more often than not when we invested
18  with an outside manager, we like to invest in a managed account
19  because it was more flexible from a financial point of view for
20  us. And with Wayne we invested in his fund, which meant that
21  we didn't see what he was doing every day. And so it was a
22  less flexible arrangement for us, and it was somewhat unusual.
23  I wouldn't say unprecedented but a little bit unusual.
24  Q. Fair to say, Mr. Nussbaum, that SAC would make money on its
25  investment if Mr. Holman's fund did well and, likewise, they

E1sdmar6     Nussbaum - direct     Page 2446

1  would not make money if Mr. Holman's fund did not do well?
2  A. Correct.
3  Q. Now, were you involved in drafting any agreements with
4  respect to the investment in Mr. Holman's fund?
5  A. So I would say, from a legal point of view I oversaw it. I
6  didn't actually do the heavy drafting; we had outside counsel
7  doing that. But I was the lead legal person inside SAC, and
8  so, yes, I was very involved in that transaction.
9  Q. Now, in addition -- and am I right that there is a series
10  of agreements that establish the relationship where SAC is
11  going to become an investor in Ridgeback Capital, Mr. Holman's
12  fund?
13  A. Correct.
14  Q. And in addition to those agreements, are you familiar with
15  a separate agreement where Mr. Holman contracted to provide
16  advice to SAC Capital about one particular stock?
17  A. I am.
18  MR. STRASSBERG: And, Mr. McLeod, if you could help us
19  to put up on the screen what's in evidence as Defense Exhibit
20  285.
21  Q. And, Mr. Nussbaum, does Defense Exhibit 285 reflect that
22  agreement where Mr. Holman contracted to provide advice to SAC
23  Capital about a particular investment?
24  A. Yes. The contracting party was his management company but
25  yes.

E1sdmar6     Nussbaum - direct     Page 2447

1  Q. And what was the company that Mr. Holman was providing
2  advice to SAC Capital about?
3  A. Wyeth.
4  Q. And, again, at the time that -- you see the agreement
5  itself is dated November 9th of 2007; do you see that?
6  A. Yes, I do.
7  Q. And were you involved in overseeing this agreement before
8  SAC Capital signed it?
9  A. Yes.
10  Q. And if we look to the signature page, if we have the
11  signature page, is it fair to say that that's you who signed it
12  on behalf of SAC Capital Advisors?
13  A. Yeah. I can't recognize the signature because it is
14  obscured, but I can't read my signature half the time anyway.
15  Yes.
16  Q. And could you explain, in general, for us what this
17  agreement provided that Mr. Holman would do?
18  A. So he would give us investment advice about Wyeth. And we
19  would -- we would make the buy/sell decision as to whether or
20  not we wanted to put that position on in our funds. And the
21  agreement specifies a certain maximum amount of shares that we
22  would put on and compensate him with respect to. And the
23  compensation arrangements were that we would pay him a
24  percentage of the profits, if any, on that position and the
25  trading that was done in the account that we established for --

E1sdmar6     Nussbaum - direct     Page 2448

1  to house the position.
2  Q. And do you recall what that account was or how it was
3  referred to at SAC Capital?
4  A. Yeah. I think over time it ended up being sort of three
5  accounts. So I think the master account, if my memory is
6  correct, had a four-letter acronym called FSAC, and the two
7  other accounts rolled up into that that, were sort of
8  aggregated with that, one was FSAB, as in baseball, and the
9  other FSAE is my memory.
10  Q. And those accounts reflected that any investments in Wyeth
11  in those accounts were part of this agreement, Defense Exhibit
12  285, that SAC Capital had with Ridgeback Capital and
13  Mr. Holman, right?
14  A. Can you restate the question?
15  Q. Sure. Let me try that again.
16  Just so -- I want to make sure that we all understand.
17  So pursuant to this agreement with Mr. Holman and Ridgeback
18  Capital, certain accounts were set up where investments in
19  Wyeth were placed that would be credited or tracked pursuant to
20  this agreement, correct?
21  A. Yeah. I mean, the one thing I might disagree with is I
22  don't know whether those accounts preexisted. But for purposes
23  of computing his gain and loss, we would look at the securities
24  in those accounts, but whether those existed three years
25  earlier I don't know.

**UNITED STATES OF AMERICA v.**
**MATHEW MARTOMA**

**January 28, 2014**

| E1sdmar6 | Nussbaum - direct | Page 2449 |

1 Q. Right. And Wyeth that might be in other firm accounts was
2 not subject to the provisions of this agreement, right?
3 A. That's correct.
4 Q. And have you had an opportunity to review the SAC records
5 with respect to the profit and loss position for Wyeth in the
6 Holman account at the end of the day?
7 A. At the end of the relationship, yes.
8 Q. Yes. At the end of the relationship?
9 A. At the end of the relationship, that was established
10 pursuant to that agreement.
11 Q. Can you share with us what the profit or loss was for that
12 position?
13 A. So my general approximate recollection is that we made --
14 let me back up.
15 So in 2007 we lost about $40 million in the shares.
16 In 2008 we lost about $44 million in the shares, but we had an
17 offsetting gain and swap -- and which I can explain if it is
18 necessary -- I think we had an offsetting gain of about
19 $15 million. So on the Wyeth positions in the account, we --
20 for the period of the agreement, we lost about 69 or
21 $70 million, excluding things like interest charges and things
22 of that nature.
23 Q. OK. And you mentioned at the termination of the
24 relationship. Let me show you what's also in evidence as
25 Defense Exhibit 500. And see if you -- do you recognize this

| E1sdmar6 | Nussbaum - direct | Page 2450 |

1 letter? It's from you, as you can see, to Mr. Holman at
2 Ridgeback Capital.
3 A. Yes, I recognize this.
4 Q. And could you explain to us what this letter reflects?
5 A. So the agreement contemplated that when we were done --
6 when we had exited the position in Wyeth for which Wayne was
7 being potentially compensated, that we would terminate, give
8 him a notice within 15 days. So this was the notice that we
9 delivered -- that we delivered pursuant to that agreement.
10 Q. Now, just so we're clear, the investment decisions as to
11 whether to invest in Wyeth or to sell Wyeth were always
12 decisions that were in the control of SAC Capital and
13 Mr. Cohen, right?
14 A. Correct.
15 Q. But what Mr. Holman was obligated to do pursuant to the
16 agreement was to provide his expert advice about those
17 investment decisions as it related to Wyeth in particular,
18 right?
19 MR. DEVLIN-BROWN: Objection.
20 THE COURT: Grounds?
21 MR. DEVLIN-BROWN: Leading.
22 THE COURT: Sustained.
23 BY MR. STRASSBERG:
24 Q. Well, Mr. Nussbaum, I know we are about at the end of the
25 day. Let me frame it in an open way.

| E1sdmar6 | Nussbaum - direct | Page 2451 |

1 What were Mr. Holman's obligations under the agreement
2 with respect to providing investment advice?
3 A. So he was expected to provide his advice regarding Wyeth to
4 Steve, and it was -- the agreement spoke very generally, only
5 at that level, and it wasn't more specific.
6 Q. Now, Mr. Nussbaum, does Mr. Holman currently have an
7 agreement with SAC Capital to provide investment advice?
8 MR. DEVLIN-BROWN: Objection.
9 THE COURT: Yes. What is the relevance?
10 MR. STRASSBERG: Simply the ongoing reliance on
11 Mr. Holman's advice.
12 THE COURT: Sustained.
13 MR. STRASSBERG: Your Honor, unfortunately we are --
14 you know, we have just a little bit more, not very much, but I
15 think more than it will take us in the two minutes or so before
16 5. So it may be a good time to break.
17 THE COURT: All right. So, ladies and gentlemen, we
18 will break for the evening. Don't discuss the case. Keep an
19 open mind. There is more evidence to hear. Don't read, look
20 at, listen to anything about the case.
21 Have a very pleasant evening. We'll resume at 9:30
22 tomorrow morning. I thank all of you very much.
23 THE CLERK: All rise.
24 (Jury not present)
25 THE COURT: You can step down, Mr. Nussbaum.

| E1sdmar6 | | Page 2452 |

1 (Witness not present)
2 THE COURT: Please be seated.
3 Is there anything we need to take up before we break
4 for the evening?
5 MR. DEVLIN-BROWN: Your Honor, nothing from the
6 government. We will speak to the defense about what their
7 schedule is tomorrow, and if it involves the experts, I guess
8 there may be still some potentially open issues there. But
9 that's all we have.
10 MR. STRASSBERG: Your Honor, there is nothing from the
11 defense other than this question to your Honor, which is, you
12 know, scheduling is always hard to predict. We anticipate that
13 our case, as we stand right now, will take us through tomorrow
14 and into Thursday. You know, a little bit of guesswork but I
15 think that seems to be the most likely scenario.
16 I am just interested in your Honor's thoughts about
17 closings. Obviously, it impacts all of us. And would we
18 attempt to try to close on Friday, would we attempt to try to
19 do the jury charge then and close on Monday? If your Honor has
20 a sense, it would be helpful for us to understand.
21 THE COURT: Well, if -- so I guess your question is if
22 we get into Thursday -- if the proof takes us into Thursday,
23 will you have to sum up on Friday? That's what it boils down
24 to.
25 MR. STRASSBERG: You are right, your Honor. Yes,

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,          New York, N.Y.
 4            v.                        12 CR 0973 (PGG)
 5   MATHEW MARTOMA,
 6              Defendant.
 7   ------------------------------x
 8
                              February 3, 2014
 9                                10:00 a.m.
10
     Before:
11
                  HON. PAUL G. GARDEPHE,
12
                                 District Judge
13
14               APPEARANCES
15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  ARLO DEVLIN-BROWN
17        EUGENE INGOGLIA
          Assistant United States Attorneys
18
     GOODWIN PROCTER, LLP
19        Attorneys for Defendant
     BY:  RICHARD M. STRASSBERG
20        ROBERTO M. BRACERAS
          LARKIN M. MORTON
21        MEGHAN K. SPILLANE
22        - also present -
23   Matthew Callahan, FBI Special Agent
     Ruby B. Hernandez, Government Paralegal Specialist
24   Spencer Hattendorf, Government Paralegal
     Stephen Paterson, Defense Consultant
25   Ray McLeod, Defense Consultant
```

1    (In open court jury not present.)

2    THE COURT: Mr. Ingoglia, how long do you think you

3 will be?

4    MR. INGOGLIA: I think an hour and 45.

5    THE COURT: All right.

6    (Jury present)

7    THE COURT: Please be seated.

8    Good morning, ladies and gentlemen. I am very glad to

9 see you all here safely this morning. We will now hear the

10 government's closing argument.

11    Mr. Ingoglia

12    MR. INGOGLIA: Thank you, Judge.

13    It was July 17, 2008, and Mathew Martoma realized he

14 had a problem. Mr. Martoma had just hung up the phone after

15 completing a long hour and 45 minute phone call with Dr. Sid

16 Gilman. Dr. Gilman had just read to Mr. Martoma the secret

17 PowerPoint slides that laid out the efficacy results of the

18 Phase II clinical drug trial of bapineuzumab being conducted by

19 Elan and Wyeth, and Mr. Martoma knew that when investors heard

20 that same data on July 29, 2008, they were going to be

21 disappointed, badly disappointed.

22    Elan's press release in June, about one month earlier,

23 had gotten investors excited about the prospects of

24 bapineuzumab, about the prospects that the drug would bring

25 Elan and Wyeth substantial profits in the not-too-distant

1 future. It had whetted the appetites of investors for the

2 details behind Elan's claim in the headline of the press

3 release that the results had been encouraging. But the data

4 that Dr. Gilman had just read to Mr. Martoma over the phone was

5 far from encouraging. Not to investors. It did not show that

6 the drug was going to be a blockbuster or even that it would

7 necessarily succeed at all. Investors had had their hopes

8 raised. Now those hopes were about to be dashed, and that

9 meant many investors would sell their stock when they heard the

10 data, and the price of Elan and Wyeth shares would fall.

11    That was a problem for Mr. Martoma. He had long been

12 buying shares of Elan and Wyeth while getting secret safety

13 information about the drug, and he had been recommending to his

14 firm that the hedge fund buy shares of Elan and Wyeth, and they

15 had; taking his advice, the hedge fund had bought millions of

16 shares, over $700 million worth. In fact, even after the June

17 press release, Martoma had urged the fund to buy more, and it

18 did.

19    In fact, as recently as the previous Sunday, July 13,

20 2008, Martoma had repeated to the owner of the hedge fund

21 Martoma's strong conviction that owning Elan and Wyeth stock

22 was the right thing to do. These stocks were his top

23 recommendations, just as they had been for years. Indeed, he

24 rated how strongly he felt about it, about those Elan and Wyeth

25 long positions, as a nine out of a possible ten. This was

1 about as high a rating as anyone at SAC Capital gave any

2 recommendation.

3    So, on that day July 17, 2008, after Dr. Gilman gave

4 him the secret results over the phone, Martoma had 1.7 million

5 shares of Elan and a million shares of Wyeth in his own

6 account, the GEHC account, and the hedge fund overall had more

7 than ten million shares of Elan and over 6.8 million shares of

8 Wyeth. If the price of those shares dropped when investors

9 learned the final news, the final results, he and the hedge

10 fund would lose millions of dollars.

11    What Martoma did have was time. The full results were

12 not going to be announced publicly for 12 more days.

13 Dr. Gilman had already given Martoma an illegal sneak preview

14 of the final confidential data. Now Martoma needed to take

15 steps, take steps to get out of his position, sell the stock

16 and make sure that the hedge fund did as well.

17    So, the first step Martoma took that same day was to

18 arrange to see the data for himself. He knew that some of the

19 data was shown in graphs and charts and it was more difficult

20 to appreciate that over the phone than it would be in person.

21 So, that same day Martoma booked a round trip flight to Detroit

22 for Saturday morning, not even two days later; and then he let

23 Dr. Gilman know. He called him again, that he'd be in town on

24 Saturday and set up a meeting at the University of Michigan,

25 the campus where Dr. Gilman worked, for Saturday afternoon.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

 1  Early Saturday morning, Martoma flew to Detroit and he took a
 2  cab to the University of Michigan campus where he met with
 3  Dr. Gilman and they went over the PowerPoint slides of the
 4  secret results in person.  He flew back to New York the same
 5  day.
 6      The very next day, Sunday, he reached out to the hedge
 7  fund owner, Steven Cohen, to set up a time to speak with him
 8  about something Martoma described as important.  And the very
 9  next morning, July 21, Monday, on the basis of the information
10  that Martoma had learned from Dr. Gilman, the hedge fund began
11  quietly liquidating its positions in Elan ahead of the public
12  announcement of the results, secretly.
13      Hardly anyone at SAC had any idea that the Elan
14  position was being sold off -- not Martoma's execution trader,
15  not Martoma's research analyst, not even Steven Cohen's close
16  associate at the fund, Chandler Bocklage.  The fund sold off
17  the shares, and then they shorted the shares doubling down on
18  the bet in a secret manner that you heard no one at SAC could
19  remember ever being employed for any other transaction using
20  firm accounts to do the sales, and then only after the public
21  announcement was made, then transferring the sales back into
22  the accounts where the purchases had been made including Mathew
23  Martoma's account.
24      For Mr. Martoma, that was more than $50 million in
25  profits and losses avoided for Elan and more than another ten

 1  million for Wyeth, just in that GEHC account, the account that
 2  he alone was responsible for in 2008.  For the hedge fund,
 3  those sales, short sales, options trading led, to profits and
 4  avoided losses of more than $218 million related to Elan and
 5  more than another $56 million related to Wyeth, roughly
 6  $275 million in all.
 7      And Mathew Martoma back then at the time wasn't shy
 8  about taking credit for his role.  He wasn't saying back then
 9  that he was merely an idea generator; not at the time.  If you
10  look at Government Exhibit 550, in September 2008 after the
11  events of this case, you saw that Mr. Martoma emailed Steven
12  Cohen, and he sent what Mr. Martoma called his best estimate of
13  his own performance that year and said he looked forward to
14  hearing what Mr. Cohen thought was an appropriate payout range
15  for Mr. Martoma.  And Mr. Martoma attached to his email a
16  little chart showing his own estimate at the time of his
17  performance for 2008.  Mr. Martoma's estimate totals
18  $212.6 million.  He takes credit for performance in the GEHC
19  account, the GGEN account, the COHE account, and other accounts
20  in which the Elan short sales took place.  That's Mr. Martoma
21  in his own words at the time taking full credit for the profits
22  not just in his own account, but in GGEN, in COHE, as well as
23  the others in which they sold Elan shares short.  And Martoma
24  did get compensated, well compensated, to the tune of
25  $9.3 million bonus which credited Martoma for his profitable

 1  trades and his profitable recommended trades related both to
 2  Elan and the Wyeth positions.
 3      Ladies and gentlemen of the jury, the evidence is now
 4  in, and we submit that what you have seen and heard is an
 5  avalanche of evidence that shows beyond a doubt that Martoma
 6  intentionally agreed with others to get secret valuable
 7  information from doctors who were strictly forbidden from
 8  sharing those secrets about the ongoing drug trial; and that
 9  Martoma then used this information for his financial benefit
10  and caused trades to be made upon that important secret
11  information.  The evidence in this case leads to one, and only
12  one conclusion:  That Mathew Martoma is guilty as charged.
13      This summation is my chance to discuss the evidence
14  that you've heard, that you've been so carefully following
15  during the three weeks or so that we have been here.  You may
16  recall that my colleague, Mr. Devlin-Brown, told you in his
17  opening that the evidence would come in in bits and pieces, and
18  it did.  It didn't come in chronologically.  So this is my
19  chance to go over the evidence with you together and talk with
20  you about how the pieces fit together.
21      So, to start, let me give you an overview of what I am
22  planning to do in this summation.  First, I am going to talk to
23  you about the evidence of how Martoma hatched this scheme back
24  in 2006, and how over time, he corrupted Dr. Ross and
25  Dr. Gilman and got them to agree to give him secret inside

 1  information.
 2      Second, I am going to talk about the critical six
 3  weeks between the June 17, 2008 press release that Elan issued,
 4  that top-line summary press release, and the July 29, 2008
 5  public announcement of the full detailed results at ICAD in
 6  Chicago.  I'm going to talk to you about how you know that
 7  Mr. Martoma was acting on inside information about the drug
 8  trial when he and his hedge fund in that week leading up to the
 9  public announcement sold all of their more than ten million
10  shares of Elan stock and sold about 8 million shares of Wyeth
11  stock and then sold short Elan and Wyeth shares right before
12  the public announcement.
13      Third, I'm going to talk about a couple issues that
14  the defense has raised during this trial, and why in the end
15  those issues are nothing more than a distraction from the
16  central issues of the case.
17      And, finally, I am going to talk very briefly about
18  the charges and touch on some of the legal requirements.  So
19  let's talk first about the conspiracy between Martoma and
20  Dr. Ross and Dr. Gilman, and how it developed.  Let's start at
21  the beginning.
22      You may recall that at the beginning of the trial, you
23  heard from representatives of Elan, Ms. Hulme and Ms. Liu, and
24  later you heard from Dr. McRae of Pfizer, which now owns Wyeth,
25  and they told you how Elan and Wyeth had partnered to conduct

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

E23Qmar1          Summation - Mr. Ingoglia          Page 2967

1    That same day, Thursday, July 17, Mr. Martoma spoke
2 with Dr. Gilman for an hour and 45 minutes in the late
3 afternoon starting at 4:15; an hour and 45 minutes.  What did
4 Martoma and Dr. Gilman talk about for an hour and 45 minutes?
5 Well, just like they did after each SMC meeting, Dr. Gilman
6 read the PowerPoint slides to Martoma over the phone.
7 Dr. Gilman told you this, right?  He told you that they
8 discussed the secret results.  He told you some details.  He
9 told you during the call, Dr. Gilman identified some weaknesses
10 in the results that had not appeared in the press release, such
11 as a lack of dose effect.  And you can see here in the
12 transcript at page 1424 where Dr. Gilman testified about that.
13    How else do you know that the two men discussed the
14 secret results during this call, this hour and 45 minute call?
15 Well, Martoma didn't arrange this call through GLG.  Dr. Gilman
16 did not bill this call to GLG.  They both knew they were doing
17 something wrong.  And, ladies and gentlemen, you actually have
18 some unique insight into what Martoma and Gilman discussed
19 during that phone call.  Why did that phone call last so long?
20 Why did it last an hour and 45 minutes?  Because they're going
21 through the PowerPoint in detail, and you know how long that
22 can take.  And that is what Dr. Gilman and Martoma were doing
23 during that long hour and 45 minute phone call.
24    So, just to recap because this is important, this is
25 devastating evidence of Martoma's guilt in this case.  The day

E23Qmar1          Summation - Mr. Ingoglia          Page 2968

1 after Dr. Gilman returned from getting the secret detailed
2 efficacy results from Elan in San Francisco, the same day that
3 Elan emailed Dr. Gilman the PowerPoint slide deck showing those
4 results, Dr. Gilman and Mathew Martoma indisputably spoke on
5 the telephone for an hour and 45 minutes.  And Dr. Gilman told
6 you what they talked about.  Just like he'd been doing with the
7 SMC presentations, Dr. Gilman read the slides to Mathew
8 Martoma.
9    Let's talk about what happened next.  That same day,
10 still that same day, Martoma books a round-trip, same-day
11 flight to Detroit, and you see in Government Exhibit 1170-A,
12 the credit card statement of the purchase of the ticket in
13 Mathew Martoma's name for JFK to Detroit round trip.  And that
14 night, still the same day, still July 17, Martoma calls
15 Dr. Gilman again.  This is not the hour and 45 minute call;
16 this is a different call, a shorter call, to tell Dr. Gilman
17 that Martoma will be coming to Detroit on Saturday.
18    Remember, Martoma had made a note to ask Dr. Gilman to
19 visit, to ask to visit on the 17th.  Well, here he is, he's
20 asking.  Dr. Gilman makes a note in his calendar, and you see
21 what the note says, "Mat Martoma will visit me in my office on
22 Saturday."  That's the date that Martoma bought the tickets
23 for.
24    So, let's go to Saturday, July 19.  That morning,
25 Saturday, July 19, Martoma did travel to Detroit on Delta

E23Qmar1          Summation - Mr. Ingoglia          Page 2969

1 Flight 6213.  You can remember the Delta witness who came to
2 speak to you, Mark Manhan who said the ticket was
3 non-transferable, and that the record reflected that the ticket
4 was lifted.  That's the L in that usage column on the left,
5 meaning Martoma boarded the flight at JFK Airport.  The flight
6 arrived in Detroit close to its scheduled arrival time of
7 11:06 a.m.
8    So, let's take a minute, recap and acknowledge the
9 obvious.  On Thursday, the 17th, Dr. Gilman and Martoma speak
10 for an hour and 45 minutes.  Dr. Gilman indisputably had the
11 secret results in his possession at that time.  That same day,
12 Martoma books a one-day, round-trip flight to Detroit for
13 Saturday, the 19th.  Dr. Gilman works at the University of
14 Michigan.  Detroit Airport is about half hour away from the
15 university.  Martoma got on the plane the morning of the 19th
16 and he flew to Detroit, arriving at airport around 11:05, 11:10
17 in the morning.  Martoma is flying to Detroit to see Dr. Gilman
18 and see the PowerPoint for himself.  There is more evidence to
19 come, but you know this already.  The sequence of events tells
20 you exactly what happened.
21    But there is more.  You will see that Martoma has a
22 cell phone with him.  He uses it to make plenty of calls that
23 day with his wife and others.  But the phone that calls
24 Dr. Gilman at around noon belongs to taxi driver Ranjit Singh
25 Government Exhibit 1120 and you'll remember Mr. Singh came here

E23Qmar1          Summation - Mr. Ingoglia          Page 2970

1 and testified, and he didn't know Dr. Gilman, but he did say
2 he's a cab driver who did that run; he did that run between the
3 airport and the University of Michigan.  The only explanation
4 for the call to Dr. Gilman's office and then a little bit later
5 to his cell is that someone in Mr. Singh's cab is calling
6 Dr. Gilman using Mr. Singh's phone.  Mr. Singh is not calling
7 him on his own.  So who is calling?  The very person Dr. Gilman
8 scheduled a meeting with two days earlier for that day --
9 Mr. Martoma.
10    So, the meeting lasts about an hour and a half.  Then
11 Martoma has to leave.  His return flight is at 4:00.  So,
12 Dr. Gilman or Martoma uses a university of Michigan phone to
13 call the cabby again, Mr. Singh, at 1:56 p.m.  Dr. Gilman walks
14 Martoma out.  And then he comes back in.  Dr. Gilman comes back
15 in, and he uses his access card to swipe to get back in at
16 2:05.  That is Government Exhibit 795.
17    Mr. Martoma gets back to the airport in time to check
18 in for his 4:00 p.m. flight back to New York City.  Then
19 starting at 2:59 Martoma starts using his cell phone, and he
20 makes several calls with the phone that he decided he could not
21 risk using to call Dr. Gilman; and the signal from his phone
22 hits off several cell towers at and near the Detroit Airport.
23 Government Exhibit 1400 shows you the cell tower locations.  It
24 makes sense Martoma is at the airport.  He has a scheduled
25 return flight to New York at 4:00 p.m.  Martoma gets on the

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2971 |
|---|---|---|

1 flight, the Delta record confirms this, that he got on, and
2 Mr. Manhan told you, remember he said it left a little late,
3 and he flies back to New York.
4     Then, if you look at Government Exhibit 1401 and 1402,
5 you will see that Mathew Martoma's phone starts hitting off
6 cell towers near JFK Airport around 6:20, 6:30, including one
7 at 6:38 and Rosemary Martoma's phone hits off cell towers
8 moving south toward the JFK Airport vicinity from 6:15-ish to
9 about 6:38.  So she's picking him up at the airport.
10     Now, ask yourself this:  Why would Mathew Martoma fly
11 round trip in a single day to visit Dr. Gilman in person at a
12 time when Dr. Gilman had the secret efficacy results; when
13 Mr. Martoma had dinner plans in New York that night with
14 someone named Nick Savone at restaurant Polpo.  What
15 explanation is there for why Mr. Martoma so urgently flew to
16 Detroit that Saturday to meet with Dr. Gilman?  There is only
17 one explanation:  Martoma flew to Michigan to see the final
18 secret slides with Dr. Gilman again in person, and he wanted to
19 see them badly.  That's the only explanation that fits with the
20 evidence and with your common sense.
21     Now, you've seen the slides that Dr. Gilman had in
22 Government Exhibit 11-A.  Take a look.
23     (Continued on next page)
24
25

| E23dmar2 | Summation - Mr. Ingoglia | Page 2972 |
|---|---|---|

1     MR. INGOGLIA:  Martoma knew that those slides, or
2 something very similar, would be delivered to a crowd of
3 anxious investors in ten day's time.  Stock market analysts had
4 been feverishly speculating as to just how good the data would
5 be.  Mr. Martoma had to make a decision involving millions of
6 dollars -- hundreds of millions of dollars worth of stock and
7 millions of shares of stock.  Some of it in his own account,
8 but even more of it in the account of his boss.  Of course he
9 wanted to take another look.  Of course he wanted to make sure
10 that he had understood everything, that everything he had
11 jotted down on his notes he had gotten right.  Of course.
12     You know how else you know that Martoma went over the
13 secret results with Dr. Gilman that Saturday in Ann Arbor?
14 Because of what Martoma does when he gets back.  So let's go to
15 Sunday, July 20th.
16     The next day, Sunday, July 20th, Mathew Martoma
17 reaches out to the owner of the firm, Steve Cohen -- this is
18 Government Exhibit 459 -- "Is there a good time to catch up
19 with you this morning?  It's important."  Steve Cohen, to whom
20 Martoma had been recommending Elan and Wyeth for well more than
21 a year, to whom he had recently repeated his enthusiasm for
22 holding the Elan position: Government Exhibit 291; that's less
23 than a week earlier.  Government Exhibit 451.  Government
24 Exhibit 452.  June and July emails where he's reiterating his
25 conviction that Elan is a winner.

| E23dmar2 | Summation - Mr. Ingoglia | Page 2973 |
|---|---|---|

1     In fact, in Government Exhibit 451 he says, "I think
2 the stock breaks $40 on the ICAD data."  So Steve Cohen, who
3 had been following Martoma's advice and purchased millions of
4 shares of Elan and Wyeth in his own and other firm accounts, he
5 gets this message from Martoma on a Sunday.  And you see in
6 Government Exhibit 459 Mr. Cohen gives Martoma his phone number
7 to call him.
8     And then you see, in Government Exhibit 1215, that
9 Martoma and Steve Cohen then talk for 20 minutes on July 20,
10 2008.
11     What do they talk about?  Well, they talked about Elan
12 and Wyeth.  How do you know that's what they talked about?
13 Because of Government Exhibit 460.  Right after the phone call
14 Martoma emails Cohen and he lists the total number of Elan and
15 Wyeth shares in his GEHC account and in the GGEN account.
16     Let's go to July 21, 2008.  This is Monday.  And you
17 remember -- you all remember now what happened on Monday.  A
18 select group of people at the firm, a handful, knew that the
19 firm began to sell its entire 10-and-a-half million position,
20 share position, in Elan.  And over four days they sold it all.
21 Not using Martoma's regular trader Tim Jandovitz, and not even
22 selling out of the accounts that held the giant Elan positions.
23 Instead, as you heard, Steve Cohen directed Phil Villhauer, the
24 execution trader, to sell everything quietly, through dark
25 pools and algorithmic trading, in firm accounts that Villhauer

| E23dmar2 | Summation - Mr. Ingoglia | Page 2974 |
|---|---|---|

1 had to call down to operations to have someone dust off
2 secretly.  That Martoma, of course, was in on the secret.  Let's
3 see it happens.
4     Government Exhibit 461, early in the morning Monday
5 Martoma reaches out to Steve Cohen.  Government Exhibit 492,
6 Phil Villhauer, the execution trader -- remember, he told you
7 that he had identified those firm accounts that they were going
8 to do the sales in.  And he also told you -- in this email he's
9 communicating with Doug Schiff, who works for him, and you
10 recall that Villhauer told you he was in Manhattan that day and
11 Schiff is covering for him in the office.  And so this email
12 back and forth about Elan and about Mr. Cohen is Government
13 Exhibit 492.
14     So they start to sell.  On the 21st they sell
15 one-and-a-half million shares of Elan.  And Martoma's checking
16 in on the progress.  In Government Exhibit 438A, Martoma
17 reaches out after the trading day to Mr. Villhauer saying he
18 wants to chat briefly.  And in Government Exhibit 431, about an
19 hour later, Villhauer responds by email.
20     So let's look at Government Exhibit 431.  He lists in
21 the email how much Elan they sold that day.  And if you add it
22 up, it adds up to about one-and-a-half million shares.  And he
23 lists the accounts with which the sale is associated.  Right?
24 So you recognize those four letter codes:  COHE is Steve
25 Cohen's account.  SELC is that SELC account, GGEN and GEHC.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

**February 3, 2014**

E23dmar2      Summation - Mr. Ingoglia      Page 2975

1 GEHC is Mr. Martoma's account. And, of course, the sales
2 aren't actually happening in those accounts. Mr. Villhauer
3 told you that. The sales are happening in some firm accounts
4 that nobody can see. But they are associated with these
5 accounts, and that's how you know that the sales tie back.
6 Right? So he's saying here's what we sold and here's what
7 ultimately we are going to attribute it to.
8      What else does he say in this email? After he gives
9 him the average price, Mr. Villhauer says, "Obviously, no one
10 knows except me, you and Steve." Steve Cohen, Phil Villhauer,
11 and Mathew Martoma.
12      Is there any question that Mathew Martoma is
13 involved -- intimately involved in the sale of Elan at this
14 point? Of course not.
15      Let's go to July 22nd. So the selling continues on
16 July 22nd. And if we look at Government Exhibit 431, we look
17 at the rest of this email, here the next day is Mr. Martoma
18 responding to Mr. Villhauer. And he asks, "Thanks -- are you
19 handling both or just one for us?" And we asked Mr. Villhauer
20 about this and he didn't remember what the reference was to,
21 the "both," right. Although you could infer that the "both"
22 refers to Elan and Wyeth. But whatever that refers to, how
23 about the "us"? Who is the us? He's selling for us. He's
24 selling for Mr. Martoma and Mr. Cohen.
25      Let's go to Government Exhibit 432. And you recall

E23dmar2      Summation - Mr. Ingoglia      Page 2976

1 there is a series of emails like this in which Mr. Villhauer --
2 I'm sorry chats, IM exchanges in which Mr. Villhauer updates
3 Mr. Cohen on the sales of Elan through the dark pools. So
4 Government Exhibit 462, the selling continues. And Government
5 Exhibit 434, Mr. Martoma checks in in the afternoon with
6 Mr. Villhauer.
7      And at this point in time Mr. Villhauer says to
8 Mr. Martoma you might want to give Mr. Cohen a push because
9 he's temporarily stopped selling. And we don't know whether
10 Mr. Martoma gives Mr. Cohen a push or not but we know they keep
11 selling.
12      So if we continue to the 23rd and we look at
13 Government Exhibit 464, we see that Mr. Martoma and Mr. Cohen
14 are still coordinating. And we know from Mr. Villhauer's
15 testimony that the selling of Elan in the firm accounts is
16 continuing.
17      So let's skip ahead to Sunday, July 27th, and on that
18 day, in Government Exhibit 436, Mr. Villhauer, looking back on
19 the week, gives an update to Mr. Cohen about what they did.
20 And you see with respect to Elan, he says we executed a sale of
21 over 10.5 million Elan for COHE, GGEN, GEHC, SELC at an average
22 price of 34.21. "This was executed quietly and efficiently
23 over a four-day period thousand algos and dark pools and booked
24 into two firm accounts that have very limited viewing access."
25      By the end of the week the firm had liquidated all of

E23dmar2      Summation - Mr. Ingoglia      Page 2977

1 its Elan shares that it had accumulated over the previous year
2 and a half.
3      The next Monday is July 28th, so the next day.
4 Monday, July 28th is the night that Elan is revealing the final
5 results of the study of bapineuzumab to the principal
6 investigators. Dr. Ross attended the presentation. Before it
7 started Dr. Ross signed yet another confidentiality agreement
8 from Elan, Government Exhibit 21. This one's about the final
9 efficacy results that are about to be presented to the
10 principal investigators. And so let's take a quick moment and
11 think about that for a second.
12      Elan clearly thought there was a difference between
13 the press release and the ICAD presentation. Otherwise why are
14 they reminding -- after the press release why are they
15 reminding the principal investigators about their
16 confidentiality obligations? Right? If these two things are
17 the same, then there is no need for a reminder. But,
18 obviously, Elan thinks they are different.
19      So Dr. Ross listened to the results, and he described
20 the reaction in the room as somber. He asks Reisa Sperling, he
21 told you, another principal investigator, to clarify for him
22 some of the statistics that they were hearing, and she told him
23 it meant that the drug was a failure.
24      Ross left the meeting, went down to the lobby where he
25 and Martoma had agreed to meet, and Martoma did meet Dr. Ross

E23dmar2      Summation - Mr. Ingoglia      Page 2978

1 as planned in the lobby of the McCormick Hotel. And Ross told
2 him the bad news and also told him that Ross himself still felt
3 optimistic about the drug itself. And recall Martoma asked
4 Ross a bunch of questions about that. How could you think
5 that, given the results? Martoma mentioned the P values. And
6 he asked detailed questions that left Dr. Ross feeling like
7 Martoma had been in Elan's presentation with him. "It was like
8 he was in the room with me." And that's because Martoma
9 already knew the answers from Dr. Gilman.
10      So let's go to July 29th.
11      The next day during market hours SAC shorts Elan and
12 Wyeth even more. They double down on their bet that Elan-Wyeth
13 shares are going to fall in price. And later that day
14 Dr. Gilman takes the stage around the scheduled time of 4:15
15 Central time, 5:15 Eastern Time. And as Dr. Gilman began
16 giving his presentation, different audience members had
17 different reactions. Keith Lyndon, Martoma's research analyst,
18 thinking they still had a huge long position in Elan, was
19 worried. Jandovitz, the trader for Martoma, similarly
20 deceived, back in Connecticut, was worried, too.
21      But the reaction of investors was swift and it was
22 decidedly negative. Look at the after-market trading data, and
23 that's Government Exhibit 1263. So after-market trading is
24 exactly what it sounds like, trading after the market has
25 closed for the day. And this is trading in Elan for July 29.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

1 And the times going across the bottom are in military time, but
2 if you turn your head you can see that around the time -- we
3 don't know exactly when Dr. Gilman begins to speak, it is
4 scheduled for 5:15 Eastern, but around that time the stock
5 starts going down dramatically it continues into the evening
6 and it just tanks.
7        Whatever doctors might have thought about their hopes
8 for the drug's long-term prospects, investors were having a
9 very different reaction. They were dumping Elan in droves, and
10 the stock price was tanking. Elan is no longer a bet that
11 investors are willing to make, not at $35 a share, and so they
12 sold.
13        In fact, if you look at Government Exhibits 1262 and
14 1264, you'll see how sharply the price of both Elan and Wyeth
15 fell in the day immediately following the announcement. So
16 this is tracking the -- from the 29th, if you look all the way
17 at the right, sort of the point on the top, to the 30th, close
18 on the 30th, it drops about 42 percent for Elan. And if you
19 look at Wyeth, which is 1262, that drop is about 11 percent for
20 Wyeth. And this is on a day when the stock market, as measured
21 by the S&P 500 index, was up, and that's Government Exhibit
22 1265. The stock market is up; elan and Wyeth are down
23 dramatically.
24        So let's take a minute and look back at what the firm
25 did with respect to the Elan and Wyeth shares net. Let's look

1 at Government Exhibit 1258. All right. So this is SAC's daily
2 net closing positions in Elan for that week starting on the
3 17th and leading up to the 30th. All right? And you can see,
4 this is combining all the different accounts, just so you get a
5 sense of what their overall position looks like. And you can
6 see it starts out more than 10 million shares on the 17th, and
7 it works its way down during the week until by the 24th -- this
8 is the day, you remember, Agent Barnacle told you there is a
9 small green line there, they are not quite flat -- it is about
10 1100 shares on the 24th. On the 25th they are flat, they are
11 out. And then they short it on the 28th on the 29th, which are
12 that Monday and Tuesday, the following Monday and Tuesday.
13        And if you look at 1261, this shows the same thing for
14 Wyeth. This includes the swap. OK? So the swap adds another
15 12 million or so shares. And on the 17th, the 18th, the 21st,
16 it starts to work its way down until by the time you get to the
17 30th you see they've sold more than 8 million shares that week.
18        If you had been working at SAC at the time you
19 wouldn't have seen this, right, because all those sales are
20 happening in firm accounts that people who log into Panorama
21 can't see, but this is what's actually happening.
22        As we showed you in the beginning, this massive
23 selloff before the announcement on the 29th at ICAD led to
24 profits and avoided losses of roughly 275 million for the hedge
25 fund, and that includes about 60 million in Martoma's personal

1 GEHC account, the one that he has sole responsibility for
2 trading.
3        And on July 30th, so after the ICAD announcement, the
4 firm transfers those sales that are in the firm accounts back
5 to the original accounts where the purchases had been made.
6 And you recall Katie Lyndon talking about that when she was
7 looking at her Panorama screen and it was confusing to her.
8 She saw what looked like losses flowing out of the account and
9 she couldn't make sense of it. That's what's happening. They
10 are transferring the sales from the firm accounts back into the
11 accounts where the purchases had been made.
12        It's worth talking about for a minute how
13 extraordinary all this was. It wasn't just the massive and
14 sudden about-face by Martoma changing his position on stocks he
15 had championed -- he had long championed, over the opposition
16 of others, and which he had been championing during that very
17 week of July 13th until he had his long call with Dr. Gilman.
18 And it wasn't just a massive sell-off, although the timing of
19 the sell-off was notable. As Mr. Jandovitz once described it,
20 that was the stuff, he said, that legends of made of. And it
21 wasn't just the use of dark pools and algorithmic trading, most
22 of the SAC witnesses who testified told you that itself wasn't
23 so unusual. What was unprecedented was the selling off of the
24 position in a way that was completely secret to everyone else
25 at the firm.

1        Mr. Villhauer told you maybe 15 people out of the
2 900-some-odd employees had any idea of any aspect of it.
3 Mr. Bocklage,, a 12-year SAC veteran who worked very closely
4 with Mr. Cohen, said even he didn't know they were selling off
5 the position. He had no idea, even though he and Mr. Cohen
6 consult regularly. And Mr. Bocklage and Mr. Villhauer, they
7 each said they had never seen anything like it in the history
8 of SAC, cannot remember ever seeing another occasion in which a
9 large position accumulated in certain accounts was then
10 liquidated by sales in firm accounts and hidden from everyone
11 else in the firm. Mr. Bocklage couldn't recall another time
12 when something significant happened with the COHE account that
13 he didn't know about. And you could see that at his transcript
14 on 2566.
15        So let's take a step back and talk about that. Why
16 the secrecy? What you've heard is that the firm is worried
17 about slippage, that is, they were worried that if people
18 noticed they were selling a large amount of Elan stock, others
19 would try and sell in front of them and that would hurt the
20 price, the price would go down. And the witnesses, like
21 Mr. Villhauer, said that slippage was a concern that day and
22 it's also a concern every day. But that explanation only takes
23 you so far because they are always worried about slippage, and
24 they are, as the defense pointed out, sometimes selling large
25 quantities of stock. So what other reason might they have?

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

| E23dmar2 | Summation - Mr. Ingoglia | Page 2983 |
|---|---|---|

1      Well, it was widely known that Elan was going to be
2  presenting the full results on July 29th. What would people
3  think outside the firm if they saw SAC unloading a massive
4  position of Elan in the days leading up to the conference?
5  Might that have caused some people to ask questions that they
6  didn't want asked? How about the completely unprecedented
7  secrecy within the firm itself? The trader for Martoma doesn't
8  know they are doing it. The research analyst for Martoma
9  doesn't know they are doing it. They each come to work the day
10  after ICAD thinking they are going to be fired because, as
11  Mr. Jandovitz told you, Steve Cohen doesn't like to lose money.
12      So hardly anyone within the firm knows. What's the
13  explanation for that? And don't tell me it's competition among
14  portfolio managers. Competition among portfolio managers
15  didn't just emerge this week. Right? That's something that
16  was not uncommon at SAC. So why just this one trade done so
17  secretly? Doesn't it seem that the select few who knew about
18  it really didn't want to have to answer any questions about the
19  reasons for the sudden change?
20      In fact, Mathew Martoma himself showed a curious
21  reluctance to explain why he had suddenly reversed his position
22  on Elan and Wyeth. Remember, Tim Jandovitz and Kate Lyndon
23  separately asked Martoma later, after the fact -- the secret
24  trading is all done and revealed -- they asked him, why did you
25  change your mind? Why did you do a 180-degree turn and abandon

| E23dmar2 | Summation - Mr. Ingoglia | Page 2984 |
|---|---|---|

1  that position that you championed for more than a year and a
2  half?
3      Well, Mathew Martoma didn't give any explanation of
4  the sort you heard from Mr. Strassberg in his opening. Mathew
5  Martoma didn't say, oh, you know, turbulent market conditions;
6  I decided to sell. He didn't say I read that bad analyst
7  report you sent me. Martoma just said, I looked over my notes.
8      So think about that. If Mr. Martoma had decided to
9  change his mind for some of the reasonable sounding
10  explanations that Mr. Strassberg has offered after the fact,
11  wouldn't it have been perfectly natural for Mr. Martoma to
12  mention such a reason to Ms. Lyndon or to Mr. Jandovitz, when
13  they asked him. There's no secret anymore. The sales were
14  done. The positions were transferred back to Mr. Martoma's
15  account and the other accounts in which they were made. So if
16  one of those reasonable sounding explanations you heard from
17  Mr. Strassberg really was the reason Mr. Martoma decided to
18  suddenly change his mind, and it wasn't that he just had spoken
19  to Dr. Gilman who had the secret results, why wouldn't he have
20  just said so? Wouldn't that have been the natural thing for
21  him to do if he didn't have something to hide?
22      What you saw during this case, ladies and gentlemen,
23  what the evidence showed, was insider trading, pure and simple.
24  Martoma and SAC benefited from secret information that other
25  investors had no access to and that Martoma never should have

| E23dmar2 | Summation - Mr. Ingoglia | Page 2985 |
|---|---|---|

1  had or saw in the first place. It's called insider trading.
2  It's a serious crime.
3      In a little while, in a very little while,
4  Mr. Strassberg is going to get a chance to talk with you. And
5  I expect it will be the kind of well-prepared, eloquent
6  presentation that you have heard from the defense throughout
7  this trial. So just like you have been paying attention
8  throughout this trial and to what the government said this
9  morning, pay close attention to the arguments you hear and
10  whether they match up with the facts that you have seen and as
11  you know them to have taken place. And think about whether
12  those arguments go to the heart of the case or are simply
13  distractions. Look at the evidence carefully, and weigh those
14  arguments in light of what you know happened here.
15      I want to address very briefly just two of the
16  arguments you might hear before I finish, and one has to do
17  with Tysabri.
18      So you heard some information about a different Elan
19  drug called Tysabri, and at some point there were serious side
20  effects related to Tysabri and it was called PML and it was a
21  very serious side effect. This Tysabri issue is a distraction.
22  The issue with Tysabri happened after the stock drop on
23  July 29th, after the public announcement about bapineuzumab.
24  So I want to quickly look at the evidence now so you are not
25  confused by any arguments about this.

| E23dmar2 | Summation - Mr. Ingoglia | Page 2986 |
|---|---|---|

1      So the ICAD presentation about bapineuzumab is
2  July 29, 2008. By the end of the 30th, the price of Elan has
3  tanked and dropped 42 percent. And, remember, it started
4  falling in the late afternoon the day before, while Dr. Gilman
5  was talking.
6      So Elan makes an announcement about a problem with
7  Tysabri later, on July 31st. And here's the announcement, it's
8  Government Exhibit 99. After the Elan announcement about
9  Tysabri and the problems that had with Tysabri -- this is
10  after Elan's price, stock price falls again. And if you look
11  at Government Exhibit 1270, you can see, this is an expanded
12  chart, similar to the one you saw before, and you can see the
13  first big drop. That's the one right after the ICAD
14  presentation on the 29th, and then there is relatively no news
15  the next day and so it's mostly flat. And then on the 31st
16  there's the announcement about Tysabri and it drops again.
17      All right? So that first circle, that's where it ends
18  up after the bapi bad news, and the second circle, that's where
19  it ends up after the Tysabri news. So what does that tell you
20  about this whole Tysabri argument? It's a mirage. It's a
21  smokescreen. It is an after-the-fact excuse. It doesn't stand
22  up to scrutiny.
23      By the way, this bad news about Tysabri is actually an
24  example of the kind of bad news Mat Martoma was worried about
25  concerning bapineuzumab. That's why he was talking to

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

E23Qmar3          Summation - Mr. Strassberg          Page 3027

1 stock being bought, not just randomly, but connected to the SMC
2 meetings? You're not because it's not true. You don't see
3 purchases because what they were discussing, what Dr. Gilman
4 was discussing was what was public and allowed to be discussed.
5 Gosh, we're going to talk about it. You know, it's coming.
6 Vasogenic edema. We spent a lot of time with it, but we're
7 going to talk about that again. It was OK to discuss. It was
8 public. It was not material, non-public information.
9         So what else is undisputed? It's undisputed that
10 Mathew worked under Matt Grossman, that portfolio manager who
11 ran CR Intrinsic until he left at the end of '07. And that he
12 only became a portfolio manager in charge of his own account,
13 that GEHC, account at the start of 2008.
14         Now, this is going to get interesting here, I think.
15 What we are going to see is that all the evidence that we have
16 all sat through that the prosecution put into this trial about
17 the other accounts -- the COHE account, the SELC account, the
18 GGEN account, the FSAC account, the FSAB account, FSAE account,
19 the FINT account, it goes on. Right? all that evidence about
20 how the stock was sold in the firm accounts, all of that is
21 irrelevant to Mathew. It's only about Mr. Cohen. But
22 Mr. Cohen is not here. Mr. Cohen is not on trial. Steven
23 Cohen is not even alleged to be a co-conspirator; not alleged
24 to be part of the case at all by the prosecutors.
25         And the facts were undisputed that Cohen was the boss.

E23Qmar3          Summation - Mr. Strassberg          Page 3028

1 He was the boss; he ran the show. He controlled what happened
2 at the firm, but, more specifically, he controlled what
3 happened in the firm accounts. Everyone who testified, every
4 one of the SAC witnesses told you the same thing. And it's
5 undisputed that Cohen wanted to make sure the trades got the
6 best price and that SAC was not hurt by slippage. Do you
7 recall slippage? All the trading witnesses talked about it.
8 It's when people hear you are selling a big position over a
9 number of days, and they try to sell in front of you before you
10 could finish, and that drives the price down and makes you lose
11 money or not make as much money.
12         But we know a few additional things about Mr. Cohen,
13 and these are not in dispute either: That he surrounded
14 himself with very bright analysts including a whole bunch of
15 healthcare analysts; and that he solicited advice from all of
16 them; that on Wyeth he even had a special contract with Wayne
17 Holman, that healthcare specialist, to get Holman's advice
18 about where to invest and when to invest and when to sell Wyeth
19 securities. And he had people like his healthcare trading
20 specialist, Mr. Bocklage, told you, that this was a guy named
21 Edmund Debler telling him he should sell Elan stock right
22 before ICAD -- you are going to see this in Defense Exhibit
23 1424 -- thinking there is going to be a selloff after ICAD.
24         Let's take a moment and talk about what I think is
25 interesting about the testimony that some of the Elan and Wyeth

E23Qmar3          Summation - Mr. Strassberg          Page 3029

1 sales were done through some of the firm accounts.
2 Mr. Ingoglia highlighted this a couple times in the closing.
3 Remember, the idea that only 15 or so people had visibility
4 into what happened? Not including compliance and all the back
5 office people, but much smaller than was normal, right? And
6 the prosecution wants you to think, hey, that means something
7 fishy is going on with Mathew; that he would know something
8 fishy is up about these trades. But, again, the proof is
9 undisputed that Mr. Cohen is the one who decided how the
10 trading was going to be done in the firm accounts, right? It
11 was Mr. Villhauer, one of the main traders, that was his
12 testimony. Then it was Mr. Miller, the other trader, who did
13 the Wyeth, and you'll see some of this on the screen. Then it
14 was Mr. Cohen's instant messages with the traders,
15 Mr. Villhauer, Mr. Schiff, another trader. Again, these are
16 all Mr. Cohen's personal traders, the ones that work for him,
17 and they're the ones that do all the trading in the firm
18 accounts.
19         But here is what we haven't reviewed in really detail
20 before, although we've touched on it, but we haven't reviewed
21 it in detail until now. That's what happened in the GEHC
22 account that Mathew controlled. Because when you look at that,
23 you're going to see that the trades were done openly, visibly,
24 just in the routine course of business. No attempt to hide it.
25 No hiding it from anybody. Mathew is not Steven Cohen. Steven

E23Qmar3          Summation - Mr. Strassberg          Page 3030

1 Cohen is not here. What did Mathew do? He just did the
2 trades. Just as he would have done any other trades. Let's
3 look at the trading positions.
4         Before ICAD, Mathew had sold more than half of his
5 Elan position, a million shares. He starts out with one
6 million 730 some odd, and on the 28th he sells a million openly
7 in the GEHC account. It's Government Exhibit 560. That's the
8 position run, and then 564 shows you the trades. Just done
9 right out there in the open. Nothing hidden about it. And
10 when you look at Wyeth, we see the same thing. He sold
11 1,050,000 shares, every share of stock he had in Wyeth, he sold
12 openly through the GEHC account. Nothing about firm accounts,
13 nothing about limited visibility; completely open and routine.
14 If you add those numbers up, people that can do math quickly,
15 you'll see it comes to exactly 1,050,000 shares.
16         Now, Mr. Jandovitz, Mathew's trader, he didn't recall
17 all of these sales. He said he might have done them, but he
18 didn't remember, but he does thousands of sales all the time.
19 And the records show you, the trading records show you, that he
20 did it as well as other traders executing these sales. And
21 there were other documents that showed this too. This is
22 Defense Exhibit 378 where you see a particular day where a
23 bunch of Wyeth and Elan are being sold, openly in the GEHC
24 account shared among risk people, among Katie Lyndon and the
25 like.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

1    Remember, SAC's business model was to take and sell
2    large positions. The evidence has established this really,
3    again, is not in dispute. Recall the testimony of almost every
4    SAC witness; they were in the business of taking large
5    positions to sell large positions. We're going to put up some
6    of the testimony. This is Mr. Berkowitz. We have the same
7    from Mr. Bocklage. We have the same from Mr. Villhauer. You
8    also heard it was very common for them to trade around
9    catalysts, around events like the ICAD conference. That was
10   the nature of their business. They took large positions to
11   sell large positions. They didn't want to hold them forever.
12   It was all about getting out at the right time.
13       So, again, the fact that SAC sold a lot of Elan and
14   Wyeth stock around the time of the ICAD conference is not
15   unusual, it's not suspicious. It's how they did business.
16   It's not proof of insider trading. It's not proof of what
17   Gilman said.
18       So, number two, the U.S. was facing a global economic
19   crisis. Now, we've seen this through the evidence as well,
20   right? Bear Stearns had just gone out of business. Lehman
21   Brothers was about to follow. There were rumors right at the
22   time that Lehman Brothers might fold right then; that might
23   have precipitated the collapse right then in mid-July.
24   Remember, the general counsel of SAC, Mr. Nussbaum, he
25   testified it was a period of extreme anxiety July 2008; that it

1    was unprecedented.
2        The prosecutor mentions, well, Bear Stearns failed in
3    March, maybe should have been concerned about this in March.
4    We're not saying you weren't concerned in March, but we will
5    get to the price movement, about how the price move only
6    happens in June and July. There are some other things that
7    only happen in June and July too, actually only in July, which
8    is this emergency SEC order; remember that? Unprecedented.
9    July 15th, the Securities and Exchange Commission, the
10   regulator of the securities market issues this emergency order.
11   It talks about panic selling. It talks about the prices of
12   securities may artificially and unnecessarily may decline well
13   below the price level that would have resulted from normal
14   price discovery. Pretty scary stuff here if you're an
15   investment professional if you have a large investment on the
16   line.
17       Recall what Mr. Nussbaum said. This order came out on
18   July 15, but he and the legal people at SAC, they worked
19   through it and they tried to understand what it meant for SAC.
20   Then, on the evening after the close of business on Friday, the
21   18th, they sent that memo explaining this order and what it
22   means and all of these dire consequences to the portfolio
23   managers, to Mathew. He would have gotten that. He would have
24   seen that issue of the SEC order and the concern about panic
25   and prices collapsing on the 18th of July. It doesn't take a

1    lot to imagine that that could be a substantial reason you'd
2    think I'd better reduce the position I have. Let me get out.
3    Let me not take the risk that -- the risk that exactly what
4    happened, Lehman Brothers collapses and then the market falls.
5    Remember, Mr. Nussbaum says there's a rumor right at this time,
6    and it's why the SEC put the order out; that SAC is no longer
7    going to do business with Lehman and Lehman might fail. All
8    happening right at this time.
9        You know, at the same time though, in addition to the
10   SEC, Mr. Cohen is sending around emails to his portfolio
11   managers noting how volatile and risky the market is and how he
12   believed the markets were likely to go down farther. You can see
13   this again on an email in July 15. And you can see him
14   forwarding -- Mat forwards this to his -- a different email, he
15   forwards this to his trader Jandovitz and talks about Steven
16   Cohen's concerns about the market this time in July. We can
17   see, if you remember, some emails from Mr. Jandovitz, the
18   trader, who would provide advice to Mathew about the market
19   again suggesting that the market was in turmoil then,
20   referencing Bear Stearns, one more shoe to drop. The market
21   may go lower.
22       Take a look at Government Exhibit 504, a big puke is
23   coming. This is a crash bet. Stocks are down. All of this
24   happening in the days leading up to the beginning of the sales.
25   All of it proof to support independent reasons for why you

1    would sell the stock. Email from Ben Dunn, the risk guy, again
2    advising about the risk. A tough environment. Institutions
3    most likely going to cash, now, meaning they're going to take
4    their stock positions, sell them and hold the money in cash.
5        But let's go to a point that we've alluded to a couple
6    times already because it's a crucial point here as to what
7    happens in July. And that's that Elan stock had increased in
8    price. We've talked to you and you've seen now how the
9    evidence is in the record that the market for Elan stock was
10   overheated.
11       As Professor Gompers testified, many analysts at the
12   time were writing reports saying they believed the stock price
13   of Elan was too high regardless of what happened at ICAD. He
14   reviewed two reports with you: 9-A and 20-A. You can see this
15   9-A is from July 11. 20-A is from later in July. They talk
16   about these exact things. Professor Gompers explained the
17   report showed you the market was already valuing Elan as if
18   bapineuzumab was a blockbuster drug like the drug Lipitor, just
19   below the drug Lipitor, the best-selling drug in the whole
20   world. And that suggested that really there was only one way
21   for Elan stock price to go, and that's down. That's because
22   the market is overheated. The expectations are too high. That
23   has nothing to do with material, non-public information.
24       The evidence confirmed that that's what Mat believed
25   too. Because, remember, his analyst Katie Lyndon's email from

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

 1  July 30? The expectations are really high to the point where
 2  they were pretty impossible to meet. And Mathew responds to
 3  that and says, yes, yup, he agrees. Mr. McLeod, jumped ahead
 4  and showing you the slide where the S&P is declining. Yes,
 5  there are little bumps up. The government focuses on that last
 6  day when it goes up, but look at the trend throughout this time
 7  period, it goes down and continues to go down. Again, let's
 8  look at that slide we saw on opening about what's happening to
 9  the price.
10      Do you remember this? The price is below 15. Then
11  they announce we'll go to Phase III if the Phase II results are
12  spectacular. So the price moves up. It's in the low 20s and
13  it like stays around that area 25 maybe to June 17. Then after
14  those top-line results here comes the hype, here comes the
15  overheating, 36 percent going up. It peaks on July 10.
16  July 10. Now, it starts to come back down. What does that
17  suggest to someone who's worried about the market, who's
18  worried about the SEC order, who's worried about all of these
19  potential risks? That it's time to get out now.
20      Recall Katie Lyndon's testimony, his research analyst,
21  when she was being examined by the prosecutor, she explained
22  that Mathew had told her in the spring at this time, right,
23  that he was thinking about selling the position just before
24  ICAD if the price increased enough in order to limit the risk.
25  Right? He liked the position. He liked bapineuzumab, yes.

 1  And he especially liked it when it was down at 20 or down at
 2  15, but it had just soared up, soared up almost to $40, just
 3  below that. And now it was already starting to come down.
 4  That would be the time to sell. That testimony right there
 5  establishes reasonable doubt.
 6      So, let's go through our other points quickly.
 7  Outside analysts were advising investors to sell. It's true,
 8  there were a lot of analysts' reports. We've seen a lot of
 9  them saying sell,, sell all in this late June, early July
10  period. There were some analysts who thought the opposite;
11  thought you should buy. But what did Professor Gompers tell
12  us, remember? He reviewed all of these analyst reports, and
13  the typical cases, you'd have about two-thirds saying buy and
14  about one saying sell on any stock that people were covering,
15  but here it was the opposite. Two-thirds were saying sell at
16  this time. Sell. The stock is too hot. It's too overheated.
17  Again, makes sense you would sell. And SAC healthcare
18  specialists were recommending that Mr. Cohen sell.
19      Again, we saw this briefly earlier. If we can get to
20  that, Mr. McLeod. You can just take your time and look at
21  analyst reports that are up on the screen. These are all
22  instances they're saying sell. Talked about some of them in
23  opening. We looked at them together through the presentation.
24  July, sell. OK.
25      Now, let's go to our next bullet point, Mr. McLeod,

 1  which is that healthcare specialists were recommending that
 2  Mr. Cohen sell. We saw this briefly earlier in our testimony,
 3  so we don't have to spend too much time on it, but if you could
 4  put up DX-1424, you will see the counterpart to Bocklage,
 5  Mr. Debler was saying, sell, I think the price is going to come
 6  down after of ICAD regardless of the results. Sell. We also
 7  heard about Munno and Slate, these other healthcare
 8  specialists, and they were saying very vocally to Mr. Cohen,
 9  sell. Don't be in that Elan position.
10      If we turn to our next point, number six, the
11  scientists were publicly questioning the science behind
12  bapineuzumab. Do you remember that there was that Lancet
13  article, the question that came out July 17 right at this time
14  frame? Dr. Gilman even talked to you about how interesting
15  this article was and how it was the subject of discussion with
16  all of his clients. He said how he talked about it with
17  Mr. Martoma, with Mathew. Later, he says "I'm not sure I
18  talked about that one as opposed to another one." But you can
19  see as he talked about it, this was a key article that people
20  were talking about because it suggested that maybe that
21  beta-amyloid theory was not going to work to help actually be a
22  cure for Alzheimer's. It also referred to that other drug,
23  that Flurizan drug, and you'll see documents in evidence that
24  showed Flurizan trial had just failed, and that was a trial
25  again based on the beta-amyloid theory. So right at this time

 1  we're seeing drugs based on this science not working, another
 2  reason to sell. Elan's other drug was in jeopardy. That's
 3  number seven.
 4      Now, the prosecutor in their closing say, well, that
 5  risk of PML didn't come out until the 31st. That's right, we
 6  put that evidence in before you, if you remember. We put in
 7  the document that showed it came out on the 31st, the Biogen
 8  public announcement. That's not the point. The point is that
 9  the rumors existed at the time that it was likely to happen.
10  And these rumors were reflected in analyst's report after
11  analyst's report saying that, hey, we think there are a likely
12  unconfirmed cases of PML. You will see it here in the Summer
13  Street research report. They are in a number of research
14  reports that were out there at the time. PML keeps us
15  cautious. We have found two cases of PML and seven cases of
16  death of patients who are on Tysabri. Again, speculation has
17  been swirling. We all know what happened. In fact, the
18  government showed you the chart. When the PML was confirmed,
19  the price dropped. The point is that you knew this might be a
20  danger and you knew it then at this time another reason to
21  sell.
22      So, the final point, a sale would lock in profits,
23  right? When the rest of the market was in all this turmoil,
24  why take the risk of holding on to that position? When you
25  know a sale is going to lock in your profits, it's going to

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

| E23Qmar5 | Summation - Mr. Strassberg | Page 3107 |
|---|---|---|

1 protect you as a young portfolio manager with three small kids,
2 it's going to ensure that you're having a good year, why would
3 you take that risk? All of these reasons are all independent
4 of anything having to do with inside information. They all
5 point together to a perfect storm of reasons why you would
6 sell. It makes sense.
7          Now, when the Judge gives you his charge, he will
8 describe for you the burden of proof beyond a reasonable doubt
9 that the prosecution must satisfy, and, of course, his words
10 and his charge govern on everything that is the law as always.
11 We talked about it a little bit in our opening. I've been
12 talking about it throughout the closing. The burden of proof
13 beyond a reasonable doubt is the highest standard imposed by
14 law. As to each and every one of the charges the prosecution
15 must prove each element beyond a reasonable doubt. The highest
16 burden exists to ensure that a conviction is not based on
17 coincidence or speculation or guesswork or a rush to judgment.
18 With the consequences so grave, the law demands that the
19 prosecution put in proof to satisfy you beyond a reasonable
20 doubt.
21          When you think of suspicions as being down here, and
22 then this preponderance standard to think for venue, you know,
23 kind of more likely than not; but beyond a reasonable doubt is
24 up here. Now, it's not no doubt; that would be up there
25 somewhere. And the law doesn't require no doubt, but no doubt

| E23Qmar5 | Summation - Mr. Strassberg | Page 3108 |
|---|---|---|

1 means that you saw it yourself. How else would you have no
2 doubt, right? The law requires beyond a reasonable doubt.
3          Now, so what is beyond a reasonable doubt? Judge
4 Gardephe will define it for you. And, of course, as I
5 mentioned before, his instruction will govern, but I believe he
6 will explain it to you that simply it is a doubt founded in
7 reason, as opposed to a doubt based on speculation, emotion,
8 sympathy or prejudice.
9          Every one of the inconsistencies that we have now
10 discussed with you in our closing from Dr. Gilman gives you a
11 reasonable doubt. All you need is one. All you need is one
12 and your duty under your oath as jurors says you must acquit.
13 You must find the prosecution has not met its burden. Here you
14 have dozens and dozens. Here, everywhere you turn, you have
15 another one. I submit to you, you cannot find that this
16 standard has been met by the prosecution in this case. There
17 is no way we have proof beyond a reasonable doubt.
18          So, listen, I know you've heard quite a bit of
19 argument from me. The prosecution gets to go again at the end,
20 and I appreciate your attention throughout, and I'm coming to
21 the end now.
22          I know that we -- Mr. Braceras and I -- have tried to
23 do our best in presenting Mr. Martoma's defense to you.
24 Listen, I like to believe that we are good lawyers. And I know
25 that we work hard, as hard as we can to do our best to make

| E23Qmar5 | Summation - Mr. Strassberg | Page 3109 |
|---|---|---|

1 sure you see the full context of the evidence. Listen, nothing
2 less would be fair to Mathew and nothing less would be fair to
3 you because so much is at stake. Mathew's life is on the line.
4 The outcome of a conviction in terms of punishment is not for
5 you. It's for the judge, but we all know that a conviction of
6 a federal offense of insider trading is deadly, deadly serious.
7 And we submit that no one, least of all Mathew, should be
8 convicted based on the evidence that we have seen presented to
9 you in this courtroom, based on the evolving memory, the
10 inconsistent memory of Dr. Gilman. The prosecution has asked
11 you to do just that. But I ask you to stand up and to do
12 justice. I ask you to tell them no, not in this courtroom, not
13 while you are the jurors.
14          Now, I have been with Mathew helping to defend against
15 these unfair charges for the last year, and the responsibility
16 that I have is great because his life has been in my hand. But
17 when I'm done speaking, I'm going to put his life in your
18 hands. You are jurors who are charged with making sure the
19 system works, who are charged with making sure the prosecution
20 proves the case beyond a reasonable doubt; that the prosecution
21 carries its burden, that highest burden we have before anyone,
22 anyone is convicted of a crime. You are all selected by us
23 because we believe in you, in your ability to do that, to do
24 what is so vital, to hold the government to its burden of
25 proof.

| E23Qmar5 | Summation - Mr. Strassberg | Page 3110 |
|---|---|---|

1          The prosecution gets to speak to you because they have
2 that burden of proof again. I don't. But I ask you to
3 remember what I said and what I might say in response to the
4 arguments that they are going to make to you. Keep in mind the
5 inconsistencies that we have seen at the beginning, the end and
6 the middle about everything that matters relating to
7 Dr. Gilman's testimony. Keep in mind how his evolving memory
8 means you can't have confidence. You can't have proof beyond a
9 reasonable doubt found here. And nothing in the evidence,
10 aside from his uncorroborated testimony, sheds any light on
11 what was said on the 17th or the 19th. Ask yourself, aren't
12 they just asking you to speculate? And, please remember,
13 speculation is not allowed under your oaths as jurors.
14          And please, please, keep this in mind: Dr. Gilman
15 admits his memory is evolving. He just came up with the story
16 about reviewing the slides with Mathew two weeks before he
17 testified. If two weeks from now he comes up and his memory
18 evolves again in a different way, and he says, oh, I reviewed
19 the slides -- maybe he says this, I reviewed the slides on
20 July 30 in that meeting I had with Mathew on the GLG log after
21 ICAD, after anything mattered. If he says that because his
22 memory evolves to that, and you convict today, then you will
23 have committed an injustice. Mathew's life, his family's hopes
24 will be forever altered. I submit that you cannot do that and
25 be consistent with your oaths as jurors.

# Exhibit E

DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: AUG 2 2 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA        :        INDICTMENT

        - v. -                  :

MATHEW MARTOMA,                  :        S1 12 Cr. 973 (PGG)

        Defendant.              :

- - - - - - - - - - - - - - - - X

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Entities and Individuals

1.   At all relevant times, MATHEW MARTOMA, the
defendant, was a portfolio manager specializing in health care
sector investments for a division of a privately held group of
affiliated hedge funds and associated fund advisers referred to
herein as the SAC Hedge Fund.  The SAC Hedge Fund's written
policy forbade MARTOMA from trading securities based on material
non-public information ("Inside Information"), and specifically
warned against obtaining Inside Information from "doctors
conducting clinical trials."

2.   At all relevant times, Elan Corporation, plc
("Elan") was a corporation headquartered in Dublin, Ireland.
Elan's stock traded on the New York Stock Exchange ("NYSE")

through the issuance of American Depository Receipts (or "ADRs") under the ticker symbol "ELN."

3.    At all relevant times, Wyeth was a Delaware corporation headquartered in New Jersey.  Wyeth's common stock was registered with the U.S. Securities and Exchange Commission ("SEC") and listed on the NYSE under the ticker symbol "WYE."

4.    At all relevant times, Elan and Wyeth were partners in connection with the phase II clinical trial of an experimental Alzheimer's disease drug known as bapineuzumab (the "Drug Trial").

5.    At all relevant times, an individual referred to as Doctor-1, a co-conspirator not named as a defendant herein, was an Alzheimer's disease expert who served as a professor of neurology at a leading medical school.  Doctor-1 also worked as a paid consultant to Elan and served as the chair of the Safety Monitoring Committee ("SMC") in connection with the Drug Trial. Elan expressly forbade members of the SMC from disclosing "any and all data, safety, efficacy, or otherwise" about the Drug Trial before the data was released to the public.

6.    At all relevant times, an individual referred to as Doctor-2, a co-conspirator not named as a defendant herein, was a medical doctor engaged by Elan as a clinical investigator for the Drug Trial.  In this capacity, Doctor-2 treated

2

Alzheimer's disease patients with bapineuzumab pursuant to a
confidential protocol developed by Elan.  Doctor-2 then provided
medical data to Elan relating to the mental and physical
condition of the patients after treatment.  At all relevant
times, Elan expressly forbade its clinical investigators from
disclosing information about their work on the Drug Trial to
third parties including, specifically, "hedge fund employees"
and "investors."

   7. At all relevant times, the "Expert Networking
Firm" was a Manhattan-based business that arranged paid
consultations between financial industry clients and experts in
various fields.  The SAC Hedge Fund paid the Expert Networking
Firm substantial fees for access to certain health care experts,
including Doctor-1.  The Expert Networking Firm expressly
advised its experts, including Doctor-1, and employees of its
financial industry clients, including MATHEW MARTOMA, the
defendant, that experts "participating in clinical trials may
not discuss the patient experience or trial results not yet in
the public domain."

<div align="center">

**The Insider Trading Scheme**

</div>

   8. From in or about the summer of 2006 through on or
about July 29, 2008, MATHEW MARTOMA, the defendant, participated

<div align="center">

3

</div>

in an insider trading scheme centered around obtaining and trading on confidential data about the Drug Trial before it was made public at an Alzheimer's disease conference on July 29, 2008 at approximately 4:00 p.m. (the "Public Announcement").

9. To effectuate the scheme, MATHEW MARTOMA, the defendant, sought out doctors involved in the Drug Trial in order to obtain confidential information about the ongoing trial. For example, on or about August 30, 2006, shortly after beginning his employment with the SAC Hedge Fund, Martoma e-mailed the Expert Networking Firm a list of over 20 doctors serving as clinical investigators on the Drug Trial and asked the Expert Networking Firm to attempt to arrange consultations with all of the identified doctors. An employee of the Expert Networking Firm replied to MARTOMA the next day that the nine clinical investigators who had responded to the Expert Networking Firm's inquiry had all declined the proposed consultation due to a "conflict of interest." Notwithstanding this impediment, Martoma was ultimately able to arrange – both through the Expert Networking Firm and other channels – paid consultations with multiple doctors with access to confidential information about the Drug Trial, including Doctor-1 and Doctor-2.

10. In particular, between approximately August 2006

4

and July 2008, MATHEW MARTOMA, the defendant, arranged for approximately 42 consultations with Doctor-1 through the Expert Networking Firm.  During these paid consultations, through an exploitation of MARTOMA's personal and financial relationship with Doctor-1, MARTOMA sought and obtained from Doctor-1 Inside Information about the Drug Trial.  In particular, MARTOMA and Doctor-1 arranged for consultations through the Expert Networking Firm to take place shortly after Elan had presented confidential data to Doctor-1 at SMC meetings.  During the consultations following SMC meetings, Doctor-1 provided MARTOMA with confidential safety data that had been disclosed to members of the SMC by Elan.  Based in part on this Inside Information, MARTOMA bought shares of Elan and Wyeth stock for his own portfolio and recommended that the founder and principal owner of the SAC Hedge Fund (the "SAC Owner") buy additional shares for the SAC Hedge Fund, which the SAC Owner did.

11.   In addition, MATHEW MARTOMA, the defendant, arranged for several paid consultations with Doctor-2 through a financial services firm that provided expert networking services to the SAC Hedge Fund.  In connection with certain of these consultations, Doctor-2 provided confidential information about the Drug Trial and other Alzheimer's disease drug trials to MARTOMA with the expectation that Martoma would assist Doctor-2

in obtaining additional clinical trial business.

12.   In or around early July 2008, Elan and Wyeth
formally selected Doctor-1 to present publicly the final results
of the Drug Trial.  The final results of the Drug Trial were
negative, raising significant questions about whether the drug
had any meaningful effect on the treatment of Alzheimer's
disease.  In order to prepare Doctor-1 to make the presentation,
during meetings on or about July 15, 2008 and July 16, 2008,
Elan provided Doctor-1 with detailed confidential data about the
closely-guarded and still-secret results of the Drug Trial.

13.   Doctor-1 first provided the final results of the
Drug Trial to MATHEW MARTOMA, the defendant, shortly after
receiving the confidential data from Elan.  On the afternoon of
July 17, 2008, Doctor-1 received an e-mail from Elan labeled
"Confidential, Do Not Distribute," which attached a 24-slide
PowerPoint presentation for Doctor-1 to display during the
Public Announcement.  Doctor-1 and MARTOMA spoke by telephone
that same afternoon for approximately one hour and 45 minutes
about the confidential data that Doctor-1 had just received from
Elan.  Later that evening, MARTOMA spoke to Doctor-1 again and
arranged to travel to Doctor-1's office in Ann Arbor, Michigan
for an in-person meeting.  On or about Saturday, July 19, 2008,
MARTOMA traveled round-trip by plane from New York City to

Detroit to meet personally with Doctor-1 in his office.

14.   On the morning of Sunday, July 20, 2008, after receiving the negative confidential information about the Drug Trial results from Doctor-1, MATHEW MARTOMA, the defendant, spoke to the SAC Owner and recommended the sale of Elan and Wyeth stock prior to the Public Announcement.  Beginning on or about Monday, July 21, 2008, the SAC Hedge Fund sold virtually all of its approximately $700 million worth of Elan and Wyeth stock prior to the Public Announcement.  In addition, the SAC Hedge Fund engaged in "short sales" and various options trades designed to profit if the price of Elan and Wyeth securities were to fall after the Public Announcement.

15.   Following the Public Announcement, shares of Elan stock lost approximately 42% of their value and shares of Wyeth stock fell approximately 12%.  The SAC Hedge Fund's combined profits and avoided losses through its sale of Elan and Wyeth stock and related options activity between July 21, 2008 and the Public Announcement is estimated to be approximately $276 million.  As a consequence of this illegal scheme, MATHEW MARTOMA, the defendant, received a bonus of approximately $9.3 million.

## Statutory Allegations

16.   From in or about the summer of 2006 through on or

about July 29, 2008, in the Southern District of New York and
elsewhere, MATHEW MARTOMA, the defendant, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate and agree together and with each other to commit an
offense against the United States, to wit, securities fraud, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, and Title 17, Code of Federal Regulations, Sections
240.10b-5 and 240.10b5-2.

17. It was a part and object of the conspiracy that
MATHEW MARTOMA, the defendant, and others known and unknown,
willfully and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, and of the
mails, and of facilities of national securities exchanges, would
and did use and employ, in connection with the purchase and sale
of securities, manipulative and deceptive devices and
contrivances in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5 by: (a) employing devices,
schemes and artifices to defraud; (b) making untrue statements
of material fact and omitting to state material facts necessary
in order to make the statements made, in light of the
circumstances under which they were made, not misleading; and
(c) engaging in acts, practices and courses of business which
operated and would operate as a fraud and deceit upon the

purchaser and seller, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means And Methods Of The Conspiracy

18.   Among the means and methods by which the conspirators, including MATHEW MARTOMA, the defendant, would and did carry out the conspiracy were the following:

a.   Doctor-1 and Doctor-2 misappropriated and disclosed Inside Information about the Drug Trial in violation of (a) fiduciary and other duties of trust and confidence owed by Doctor-1 and Doctor-2 to Elan, (b) expectations of confidentiality regarding Elan information, and (c) policies of Elan regarding the use and safekeeping of Inside Information.

b.   MARTOMA obtained the Inside Information about the Drug Trial from Doctor-1 and Doctor-2 through an exploitation of his personal and financial relationships with Doctor-1 and Doctor-2.

c.   MARTOMA used the Inside Information about the Drug Trial to engage in securities transactions, and thereby profited and caused the SAC Hedge Fund to profit from the Inside Information.

## Overt Acts

19.   In furtherance of the conspiracy and to effect

the illegal object thereof, the following overt acts, among others, were committed by MATHEW MARTOMA, the defendant, among others, in the Southern District of New York and elsewhere:

a.   On or about August 30, 2006, MARTOMA e-mailed the Manhattan-based Expert Networking Firm to request consultations with over 20 Drug Trial clinical investigators.

b.   On or about October 9, 2007, MARTOMA spoke with Doctor-1 through a consultation arranged by the Expert Networking Firm and obtained confidential safety data about the Drug Trial.

c.   On or about May 29, 2008, MARTOMA arranged a future meeting to occur with Doctor-2 on the evening of July 28, 2008, immediately after Doctor-2 was scheduled to be briefed about the final Drug Trial results and one day in advance of the Public Announcement.

d.   On or about July 17, 2008, MARTOMA obtained confidential final results of the Drug Trial from Doctor-1.

e.   On or about July 20, 2008, MARTOMA spoke by telephone with the SAC Hedge Fund Owner and recommended selling Elan and Wyeth securities before the Public Announcement.

f.   On or about July 21, 2008, MARTOMA and the SAC Hedge Fund Owner instructed a SAC Hedge Fund trader to begin selling the SAC Hedge Fund's entire position in Elan securities,

which are traded on the NYSE in Manhattan, New York.

(Title 18, United States Code, Section 371.)

### COUNT TWO

(Securities Fraud - Elan)

The Grand Jury further charges:

20.   The allegations contained in paragraphs 1 through
15, 18, and 19 are repeated and realleged as though fully set
forth herein.

21.   In or about July 2008, in the Southern District
of New York and elsewhere, MATHEW MARTOMA, the defendant,
willfully and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, the mails
and the facilities of national securities exchanges, in
connection with the purchase and sale of securities, did use and
employ manipulative and deceptive devices and contrivances, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by (a) employing devices, schemes and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices
and courses of business which operated and would operate as a
fraud and deceit upon persons, to wit, before Elan and Wyeth

11

publicly disclosed the final results of an Alzheimer's disease
drug trial on July 29, 2008, MARTOMA obtained material,
nonpublic information about the results and, based in whole or
in part on that information, caused the SAC Hedge Fund to sell
common stock of Elan, short Elan stock, and enter into options
transactions relating to Elan.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2 and Title 18, United States Code, Section 2.)

## COUNT THREE

(Securities Fraud - Wyeth)

The Grand Jury further charges:

22.   The allegations contained in paragraphs 1 through
15, 18, and 19 are repeated and realleged as though fully set
forth herein.

23.   In or about July 2008, in the Southern District
of New York and elsewhere, MATHEW MARTOMA, the defendant,
willfully and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, the mails
and the facilities of national securities exchanges, in
connection with the purchase and sale of securities, did use and
employ manipulative and deceptive devices and contrivances, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by (a) employing devices, schemes and artifices to

12

defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, before Elan and Wyeth publicly disclosed the final results of an Alzheimer's disease drug trial on July 29, 2008, MARTOMA obtained material, nonpublic information about the results, and based in whole or in part on that information, caused the SAC Hedge Fund to sell common stock of Wyeth and short Wyeth stock.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 & 240.10b5-2; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

24.   As a result of committing one or more of the foregoing conspiracy and securities fraud offenses alleged in Counts One, Two and Three of this Indictment, MATHEW MARTOMA, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses, including

but not limited to a sum of money of at least $9,300,000 in
United States currency representing the proceeds obtained as a
result of the charged offenses alleged in this Indictment, and
all right, title and interest in the following specific
property:

        a.    the real property and appurtenances, with
all improvements and attachments thereon, located at 2464 W.
Maya Palm Drive, Boca Raton, Florida, more particularly
described as Parcel ID 06-43-47-29-10-005-0020;

        b.    up to $3,246,320.62 in funds on deposit in
account number 1512369446 at American Express Bank, held in the
name of Mathew C. Martoma;

        c.    up to $245,000 in funds on deposit in
account number 146674626 at ING Direct, held in the name of
Rosemary Martoma; and

        d.    up to $934,897.77 in funds or other assets
in account number 88047594915 at Vanguard, held in the name of
Mathew and Rosemary Martoma Foundation.

## Substitute Assets Provision

        25.  If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

        a.  cannot be located upon the exercise of due

14

diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

      (Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 & 10b5-2.)

_____
Foreperson

_____
PREET BHARARA
United States Attorney

15

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### MATHEW MARTOMA,

Defendant.

### INDICTMENT

(18 U.S.C. §§ 2, 371; Title 15, United
States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations,
Section 240.10b-5)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

# Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/28/2014
```

UNITED STATES OF AMERICA,

-against-

MATHEW MARTOMA,

Defendant.

**ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) Trial began on January 7, 2014.

The Government alleges, inter alia, that between 2006 and July 2008, Martoma caused his employer, S.A.C. Capital Advisors, L.P. ("SAC"), to trade on the basis of material non-public information. The non-public information was allegedly supplied to Martoma by two doctors – Sidney Gilman and Joel Ross – who were participants in a clinical trial of bapineuzumab, a drug that was thought to be of possible use in treating Alzheimer's disease. Bapineuzumab was being developed by Wyeth and Elan Corporation, plc ("Elan"), and the alleged insider trading involves the shares of these companies. (Id.) Martoma allegedly received and traded upon information regarding the final results of the clinical trial before these results were announced at the International Conference on Alzheimer's Disease (the "ICAD conference") on July 29, 2008. (Id.)

Shortly before trial – on December 27, 2013 – Martoma notified the Government that he intended to offer expert testimony from, inter alia, Paul A. Gompers – a professor at the Harvard Business School – and Dr. Thomas Wisniewski, a professor of neurology at New York University School of Medicine.  (Jan. 4, 2014 Govt. Br. (Dkt. No. 178) at Ex. 1; see also Jan. 6, 2014 Def. Br. (Dkt. No. 189), Exs. A, B)

The Government moved in limine to exclude portions of each expert's testimony. (Jan. 4, 2014 Govt. Br. (Dkt. No. 178))  Since the motion was filed, the areas of dispute have narrowed significantly, (see Jan. 20, 2014 Govt. Ltr. (Dkt. Nos. 215, 216); Jan. 23, 2014 Def. Ltr. (Dkt. No. 222); Jan. 26, 2014 Govt. Ltr (Dkt. No. 223); Jan. 26, 2014 Def. Ltr. (Dkt. No. 224)), and only two issues now remain.

Martoma argues that he is entitled to offer "alternative explanations for sales of Elan and Wyeth [stock] and to put SAC's sales into context by proffering evidence concerning the then-current state of the market for the relevant securities."  (Jan. 23, 2014 Def. Ltr. (Dkt. No. 222) at 9)  In this regard, Martoma seeks to offer Professor Gompers's opinion that the "market for Elan securities was 'overheated' in June and July 2008."  (Jan. 26, 2014 Def. Ltr. (Dkt. No. 224) at 1)  The defense expects Professor Gompers to testify that "most of the potential value of bapi[neuzumab] as a blockbuster drug was already incorporated into the price of Elan securities[,] [and] [a]s a result, there was little additional upside for Elan securities and considerable downside risk if the market's blockbuster expectations were not met."[1]  (Jan. 23, 2014 Def. Ltr. (Dkt. No. 222) at 5)

---

[1]  The precise contours of Professor Gompers's proposed testimony are not entirely clear. Defendant has not provided the Court with a report from Professor Gompers or a summary of his proposed testimony.

The Government argues that Professor Gompers's proposed testimony regarding

the "overheated" nature of Elan securities and the lack of a significant "upside" for the stock in

June and July 2008 is irrelevant:

> [W]hether or not Elan stock had captured all of the "upside" of bapineuzumab is a
> question of fact that itself only is relevant to the extent it goes to the defendant's state of
> mind at the time. Whether Prof. Gompers now thinks it had captured all of the upside
> prior to the announcement [of the final results of the Phase II bapineuzumab clinical trial
> on July 29, 2008], or that people at the time may have thought that it did, is irrelevant.
>
> The issue at trial is what Martoma thought of the Elan and Wyeth stocks, and what
> information . . . he had [that] informed that opinion. Whether some un-named third-party
> might or might not have thought that the Elan and Wyeth stocks were overheated,
> overvalued, or had little upside, is not relevant.

(Jan. 20, 2014 Govt. Ltr. (Dkt. No. 216) at 7)

The second remaining issue concerns the scope of Dr. Wisniewski's testimony.

Martoma intends to elicit from Dr. Wisniewski that there is no "meaningful difference" between

the description of the bapineuzumab clinical trial results set forth in a June 17, 2008 Elan press

release and the final results presented at the ICAD conference. (Jan. 26, 2014 Govt. Ltr. (Dkt.

No. 223) at 1, Ex. A) The Government asserts that Dr. Wisniewski's opinion concerning this

issue is irrelevant and "beyond the purview of a medical expert." (Id. at 2)

## DISCUSSION

## I. PROFESSOR GOMPERS'S OPINION THAT ELAN STOCK WAS OVERHEATED IN JUNE AND JULY 2008

Martoma argues that Professor Gompers's opinion that the market for Elan stock

was "overheated" is relevant (1) as "circumstantial evidence of Mr. Martoma's state of mind in

June and July 2008," and (2) "[to] support[ ] Mr. Martoma's defense that there was no material,

non-public information about the Phase II bapi trial results disclosed at ICAD." (Jan. 26, 2014

Def. Ltr. (Dkt. No. 224) at 1) Both arguments are without merit.

3

**A.    State of Mind**

      The Court ruled during trial that the Defendant would be permitted to introduce materials that he reviewed in 2008 that shed light on his state of mind concerning the Elan and Wyeth positions that were sold at the end of July 2008.  (Trial Tr. 1989-94)  During the Government's direct case, the Defendant – in cross-examining a Government witness – introduced into evidence numerous analyst reports – reviewed by Martoma and/or his research analyst in July 2008 – discussing the merits of Elan stock.  Many of these reports assert that Elan stock is overpriced and recommend that it be sold.  (See Trial Tr. 2147-51, 2155-59; DX 9 (July 11, 2008 Brean Murray analyst report predicting drop in price of Elan stock, finding the stock overvalued, and containing "sell" recommendation); DX 1114 (July 17, 2008 Canaccord Adams analyst report asserting that market had overvalued Elan stock); DX 1117 (July 8, 2008 Cowen analyst report stating that Elan stock had "limited near-term upside potential"); DX 1127A (July 11, 2008 Piper Jaffray analyst report asserting that Elan stock is inflated and recommending "sell"); DX-1144A (July 21, 2008 Cowen analyst report stating that Elan stock had "little near-term upside potential"; see also DX 1143A (May 15, 2008 Caris & Company analyst report stating that any "major success [in bapineuzumab] is priced in [Elan stock]").  In sum, the record already contains numerous analyst reports – purportedly reviewed by Martoma and/or his analyst in July 2008 – addressing the proper valuation of Elan stock in July 2008.  Undoubtedly, more evidence of this sort as to both Elan and Wyeth stock will be admitted during the defense case.

      The question remains, however, whether Professor Gompers's opinion – in January 2014 – that Elan and Wyeth stock was "overheated" or inflated in July 2008 is probative of Martoma's state of mind.  I conclude that it is not.  Professor Gompers's post hoc conclusion that the market for Elan and Wyeth stock was in fact "overheated" in July 2008 is not probative

of Martoma's state of mind because it would not assist the jury in understanding what Martoma

was thinking at that time. Professor Gompers would tell the jury why investors should have

regarded Elan and Wyeth stock as overheated in July 2008, but that testimony would not assist

the jury in determining whether Martoma himself believed that the stock was overheated at that

time.

Evidence that Martoma conducted an analysis in July 2008 similar to what

Professor Gompers has done in 2014, or that Martoma was reading analyses in 2008 similar to

what Professor Gompers has done in 2014, would be probative of Martoma's state of mind. But

Gompers's opinion in 2014 standing alone tells us nothing about Martoma's state of mind in July

2008.[2] In addition to not being probative of Martoma's state of mind, Professor Gompers's

---

[2]  None of the cases cited by Defendant (Jan. 26, 2014 Def. Ltr. (Dkt. No. 224) at 2) are to the contrary. In S.E.C. v. Snyder, Civ. Action No. H-03-04658, 2006 WL 1806164, at *3-7 (S.D. Tex. June 29, 2006) – the only insider trading case cited by Defendant – the court permitted the Government to offer expert testimony from a certified accountant and fraud examiner that – based upon generally accepted accounting principles and "specific information that Defendant had" – it would have been obvious to the defendant that his filings with the Securities and Exchange Commission were materially misleading. Such testimony went directly to the defendant's state of mind because it was based upon the same materials that the defendant had before him (many of which he had created) in preparing the SEC filings. Id. Here, Professor Gompers proposes to rely on materials that in large part were never seen by Martoma. (See Jan. 23, 2014 Def. Ltr. (Dkt. No. 222) at 5, 9)

Serricchio v. Wachovia Sec. LLC, 658 F.3d 169, 173, 185 (2d Cir. 2011), involves the question of whether a member of the armed forces was "constructively discharged" after returning from active duty, in violation of the Uniformed Services Employment and Reemployment Rights Act. In affirming the denial of defendant's motion for judgment as a matter of law, the court held that there was ample circumstantial evidence of the employer's wrongful intent to deny opportunities to the plaintiff, including testimony from the employer's "expert on its [employee] leave policy" that the employer maintained a generous leave policy. Id. at 186-87. It is unclear whether this witness actually offered "expert" testimony at trial. In any event, the employer in Serricchio was aware of its own leave policies. This case does not support Defendant's argument that a post hoc analysis conducted in 2014 – based in large part on material Martoma never saw – can shed light on Martoma's state of mind in July 2008.

In Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523, 537-58 (E.D.N.Y. 2012), the court held that

proposed testimony on this point presents a significant risk of confusing the jury. Were

Gompers's testimony on this point to be admitted, the jury might well conclude that what matters

here is whether – in January 2014 – it can be determined that the price of Elan and Wyeth stock

was inflated in July 2008. The issue as to state of mind, however, is whether Martoma caused

Elan and Wyeth stock to be sold based on the information he allegedly obtained from Dr. Gilman

or Dr. Ross, or whether he sold it based on his own research, on others' analyses that the stock

was overpriced, or for some other reason.

Because Gompers's opinion that Elan stock was overheated in July 2008 is not

probative of Martoma's state of mind and, in any event, is more prejudicial than probative under

Fed. R. Evid. 403, he will not be permitted to offer this opinion at trial.

### B. **Materiality**

Defendant contends that Professor Gompers's testimony is also relevant to the

issue of materiality. (Jan. 26, 2014 Def. Ltr. (Dkt. No. 224) at 2-3)

---

expert testimony concerning Palestinian money-laundering regulations was admissible on the
issue of whether the Bank "recklessly, knowingly, or intentionally provided material support to
[the terrorist group] Hamas." The court found that the Bank was aware of the regulations –
because they were "the regulations under which the Bank operated" – and accordingly the
regulations were relevant to show the Bank's state of mind. Id. at 538. This case provides no
support for Martoma's position.

United States v. Duncan, 42 F.3d 97, 101-03 (2d Cir. 1994), stands for the proposition that an
expert witness may not offer a legal conclusion. This principle is not in dispute here.

The remaining cases cited by Defendant stand merely for the general proposition that
circumstantial evidence provided by an expert can, in certain circumstances, bear on a
defendant's state of mind. For example, in United States v. Thao Bee Yang, No. 07-CR-324,
2008 WL 4560633, at *1 (E.D. Wis. Oct. 8, 2008), an odometer-tampering case, the Government
was permitted to introduce expert evidence that odometer failure rates are low to rebut the
defendant's explanation that he re-set odometers because they frequently malfunction. Similarly,
in Lewis v. Booz-Allen & Hamilton, Inc., 150 F. Supp. 2d 81, 95 (D.D.C. 2001), an employment
discrimination case, the court held that an expert's statistical evidence of the employer's hiring
practices constituted circumstantial evidence of the employer's discriminatory intent. Neither
case has any bearing on the issues presented here.

6

Expert testimony concerning materiality is often introduced in cases involving allegations that a company misrepresented or wrongfully withheld information from investors. See United States v. Schiff, 602 F.3d 152, 156, 171-72 (3d Cir. 2010); Unger v. Amedisys Inc., 401 F.3d 316, 319, 324-25 (5th Cir. 2005); United States v. Bilzerian, 926 F.2d 1285, 1296-98 (2d Cir. 1991) (noting that stock movements could be relevant in determining whether a company's misrepresentations were material).  In this context, "[m]ateriality centers about the significance of the misstatement or omission of the fact under consideration to a reasonable investor's judgment in deciding to buy or sell. . . . The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event." Spielman v. Gen. Host Corp., 402 F. Supp. 190, 192-94 (S.D.N.Y. 1975), aff'd, 538 F.2d 39 (2d Cir. 1976).

Expert testimony concerning materiality often takes the form of an "event study," which "'refers to a regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price.'" In re Xerox Corp. Sec. Litig., Civ. Action No. 3:99CV02374 (AWT), 2009 WL 8556135, at *4 (D. Conn. Apr. 22, 2009) (quoting RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587 PKL RLE, 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000), aff'd, No. 94 Civ. 5587 PKL RLE, 2000 WL 420548 (S.D.N.Y. Apr. 18, 2000)).

The theory behind the admission of such expert testimony is "that in an open and developed securities market like the New York Stock Exchange, the price of a company's stock is determined by all available material information regarding the company and its business.  In such an efficient market, 'information important to reasonable investors . . . is immediately incorporated into the stock price.'" Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (quoting

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997)) (alteration in

original).

> As a result, when a stock is traded in an efficient market, the materiality of
> disclosed information may be measured post hoc by looking to the movement, in
> the period immediately following disclosure, of the price of the firm's stock.
> Because in an efficient market "the concept of materiality translates into
> information that alters the price of the firm's stock," if a company's disclosure of
> information has no effect on stock prices, "it follows that the information
> disclosed . . . was immaterial. . . ."

Id. (quoting Burlington, 114 F.3d at 1425). Similarly, in the context of an insider trading

case, "indication[s] of the [materiality or] lack of materiality may be found in the reaction

of those who were exposed to the inside information." Elkind v. Liggett & Myers, Inc.,

635 F.2d 156, 166 (2d Cir. 1980).

   Event studies are used to determine whether "the price changes at issue in [a] case

were [related or] unrelated to the representations in dispute" by eliminating other factors, such as

"the effects on stock price of market and industry information." In re N. Telecom Ltd. Sec.

Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000); see also United States v. Ferguson, 676 F.3d

260, 275 n.11 (2d Cir. 2011) (noting that expert testimony regarding the allegedly fraudulent

transaction's effect on stock price would "reinforce[ ] [the probative value of the materiality

evidence] because confounding factors could be excluded"). In other words, event studies seek

to "disentangle[ ] . . . the stock price movement (if any) attributable to the release of new,

allegation-related information from the movement attributable to the release of other, non-

allegation-related news." In re Xerox Corp. Sec. Litig., 2009 WL 8556135, at *4; cf. In re

Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 356-57 (S.D.N.Y. 2009) (noting that

event study methodology was used "'to disentangle the effects of company-specific information

from market and industry information' by associating 'day-to-day information releases from the

company with the daily residual returns on company stock'") (internal citation omitted).  Event studies, therefore, focus on individual events and analyze whether those events can be linked in a statistically significant way to variations in stock price.  See In re Xerox Corp. Sec. Litig., 2009 WL 8556135, at * 4.

Here, the materiality issue turns on whether the information Martoma allegedly received from Dr. Gilman and Dr. Ross in July 2008 would have been important to a reasonable investor.  To show that it would have been, the Government is entitled to offer evidence of the significant decline in the price of Elan and Wyeth stock when the information allegedly provided by Dr. Gilman and Dr. Ross to Martoma was publicly disclosed at the ICAD conference. Defendant, in turn, is entitled to attempt to refute that argument by demonstrating that there is no correlation between the decline in share price and the public disclosure at the ICAD conference.

Professor Gompers's proposed testimony that Elan stock was "overheated" in June and July 2008 does not address this issue, however.  While Professor Gompers may be of the opinion that Elan "stock had only one way to go [in June and July 2008]" (Jan. 26, 2014 Def. Ltr. (Dkt. No. 224) at 2), the materiality issue here is more narrow than that.  The focus of the materiality inquiry is on the effect of an event – the public disclosure of the Phase II bapineuzumab clinical trial results at the ICAD conference – on Elan stock.  Testimony that Elan stock was generally overheated in the two months prior to the public disclosure of the clinical trial results does not make it any more or less likely that the announcement of those results at the ICAD conference triggered the sudden decline in the stock price.  Nor does Professor Gompers's testimony – as proffered by Defendant – attempt to connect the sudden decline in stock price to any other particular event.  Cf. Liberty Media Corp. v. Vivendi Universal, S.A., 923 F. Supp. 2d

511, 518-19 (S.D.N.Y. 2013) (discussing expert's event study that sought to determine whether specific events were linked in statistically significant ways to movements in stock prices).

In sum, Professor Gompers's proposed testimony that Elan stock was overheated in June and July 2008 is not probative on the central question of materiality – whether the alleged inside information provided to Martoma would have been important to a reasonable investor at the time. See Bilzerian, 926 F.2d at 1298. Accordingly, Professor Gompers will not be permitted to offer this opinion at trial.[3]

---

[3] The cases Defendant cites in support of his materiality argument, (Jan. 26, 2014 Def. Ltr. (Dkt. No. 224) at 3), are not persuasive. United States v. Levis, 488 F. App'x 481, 483-84 (2d Cir. 2012) is an unpublished decision that carries no precedential value. In any event, the nature of the expert testimony at issue in that case is not comparable to that at issue here. In Levis, the defendant – the senior executive vice president and treasurer of a financial institution – had represented to investors that certain investment risks were capped. Id. at 483. However, rather than using contractual caps – which would have offered the greatest protection against risk – the company used hedges. Id. The defendant sought to introduce evidence that transactions involving hedging afforded the same assurance for investment as contractual caps, or at least he reasonably thought so. Id. The Second Circuit held that the district court abused its discretion in precluding the defendant from raising this defense, because evidence that the hedges functioned as a cap was relevant to the issue of the materiality of the defendant's misrepresentations. Id. at 484-84. The court found that the defendant should have been permitted to present evidence "including lay and expert testimony involving the existence of hedges and their effectiveness." Id. at 484. Unlike Levis – where the proposed expert testimony went directly to the materiality of the defendant's alleged misrepresentations – Professor Gompers's proposed testimony does not address the materiality of the alleged inside information, but instead addresses the proper valuation of a specific stock over a two-month period more than five years ago.

United States v. Nacchio, 519 F.3d 1140, 1155 (10th Cir. 2008), vacated in part on reh'g en banc, 555 F.3d 1234 (10th Cir. 2009) (en banc), likewise does not support Defendant's materiality argument. Defendant cites this case for the undisputed proposition that, in certain circumstances, expert testimony has been admitted on the issue of materiality. In any event, the panel's holding concerning expert testimony was vacated on rehearing, because the en banc panel found that the Daubert requirements of reliability were not satisfied. Nacchio, 555 F.3d at 1257-59 (10th Cir. 2009) (en banc).

II.     **DR. WISNIEWSKI'S OPINION THAT THERE IS NO MEANINGFUL
        DIFFERENCE BETWEEN THE JUNE 17, 2008 ELAN PRESS RELEASE AND
        THE CLINICAL TRIAL DATA PRESENTED AT THE ICAD CONFERENCE**

        Martoma seeks to introduce testimony from Dr. Thomas Wisniewski that there is

no "meaningful difference" between the information disclosed in the June 17, 2008 Elan press

release and the clinical trial data disclosed at the July 29, 2008 ICAD presentation.  (Jan. 26,

2014 Govt. Ltr. (Dkt. No. 223); Jan. 23, 2014 Def. Ltr. (Dkt. No. 222) at 17-18)  The

Government argues that Dr. Wisniewski's testimony on this point is irrelevant because "the real

question is whether the information [disclosed] was meaningful to investors."  (Jan. 20, 2014

Govt. Ltr. (Dkt. No. 216) at 10; see Jan. 26, 2014 Govt. Ltr. (Dkt. No. 223) at 2)  The

Government further asserts that this type of analysis is "beyond the purview of a medical

expert."  (Jan. 26, 2014 Govt. Ltr. (Dkt. No. 223) at 2)

        It is true that the issues in this case do not turn on whether the medical community

viewed the data disclosed at the ICAD conference as "meaningfully different" from the

information disclosed in the June 17, 2008 Elan press release.  There is ample evidence before

the jury, however, that numerous members of the investor community – including Martoma –

were consulting members of the medical community about aspects of the bapineuzumab Phase II

clinical trial.  Accordingly, the views of the medical community about this clinical trial are not

irrelevant in this case.

        Moreover, during their direct examinations, Dr. Gilman and Dr. Ross each

identified differences between the June 17, 2008 Elan press release and the final results disclosed

at the ICAD conference.  (See Trial Tr. 680-82, 706-707, 1415-18)  The clear inference from

their testimony is that the press release did not disclose important data that was disclosed at the

ICAD conference.  While the Government argues that it did not elicit testimony from Dr. Gilman

11

and Dr. Ross as to the significance of the differences (Jan. 26, 2014 Govt. Ltr. (Dkt. No. 223) at

2), it did not have to do so in order to make the point.  The entire import of the Government's

line of questioning in this regard is that the differences between the information disclosed in the

press release and at the ICAD conference are significant.  In this context, it is only fair for the

defense to have an opportunity to demonstrate – through its own medical expert – that the

differences the Government suggests are significant are actually not significant at all.[4]

Accordingly, the Government's motion to exclude Dr. Wisniewski's testimony on this point will

be denied.

## CONCLUSION

The Government's motion in limine to exclude Professor Gompers's testimony

that Elan stock was overheated in June and July 2008 is granted.  The Government's motion to

exclude Dr. Wisniewski's opinion that there is no meaningful difference between the information

disclosed in the June 17, 2008 Elan press release and the final ICAD presentation is denied.

All issues with respect to the Government's motion in limine having now been

resolved, the Clerk of the Court is directed to terminate the motion and related motions (Dkt.

Nos. 178, 215, 216, 219, 224).

Dated:  New York, New York
        January 28, 2014

                          SO ORDERED.

                          _Paul A. Gardephe_
                          Paul G. Gardephe
                          United States District Judge

---

[4] To the extent that the Government believes that the jury may become confused as to whether it
should look to the medical community or the investor community in determining materiality, it
may seek a limiting instruction or submit an appropriate request to charge.

# Exhibit G

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____                   │
│ DATE FILED: 1/8/2014                 │
└─────────────────────────────────────┘
```

UNITED STATES OF AMERICA,

    -against-

MATHEW MARTOMA,

                  Defendant.

**ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2.  (Superseding Indictment (Dkt. No. 61))  The Government alleges, inter alia, that between 2006 and July 2008, Martoma caused S.A.C. Capital Advisors, LLC ("SAC") to trade on the basis of material non-public information.  The non-public information was allegedly supplied to Martoma by two doctors – Sidney Gilman and Joel Ross – who were participants in a clinical trial of bapineuzumab, a drug that was thought to be of possible use in treating Alzheimer's disease.  Bapineuzumab was being developed by Wyeth and Elan Corporation, plc ("Elan"), and the alleged insider trading involves the shares of these companies.  (Id.)

        This order addresses the Defendant's motions in limine to (1) exclude certain evidence of SAC's trading activity in Wyeth and Elan stock; (2) introduce excerpts from an investigative deposition of Steven A. Cohen taken by Securities and Exchange Commission staff on May 3, 2012; and (3) exclude evidence of SAC's involvement in related civil and criminal litigation.  (See Dkt. Nos. 106, 109, 112)

## DISCUSSION

**I.    MOTION TO EXCLUDE EVIDENCE OF SAC'S
          TRADING ACTIVITY IN WYETH AND ELAN STOCK**

The Defendant argues that evidence of SAC's sales of Wyeth securities should be

excluded.  In the alternative, the Defendant contends that he should be permitted to introduce

portions of Steven A. Cohen's testimony before the SEC in which – according to Defendant –

Cohen allegedly states that his decision to sell the Wyeth stock was made "in consultation with

Wayne Holman" and not in consultation with the Defendant.  (See Def. Br. (Dkt. No. 107) at 1)

The essence of Defendant's argument on this point is as follows:

> Mr. Martoma indisputably was not involved in SAC's decision to sell Wyeth securities.
> The unrebutted sworn testimony of Mr. Cohen, SAC's owner, makes clear that Mr.
> Martoma had nothing to do with that decision.  Specifically, Mr. Cohen has testified that
> he made the decision to sell Wyeth securities in consultation with Mr. Holman (not Mr.
> Martoma), a former SAC healthcare portfolio manager whom Mr. Cohen described as a
> "great healthcare investor [whose] recommendations are very important to me."

(Id. (emphasis in original) (alteration in original)).  Defendant goes on to argue that "the

Government cannot ignore [Cohen's] sworn, unrebutted testimony that exculpates Mr. Martoma

by establishing that he had nothing to do with SAC's decision to sell Wyeth securities."  (Def.

Br. (Dkt. No. 107) at 3).

The Defendant similarly argues that evidence of SAC's decisions to (1) short Elan

and Wyeth securities, and (2) use algorithmic trading platforms, "dark pools," and accounts with

"limited viewing access" to sell Elan and Wyeth securities should be excluded.  (Def. Br. (Dkt.

No. 110) at 1)  In the alternative, the Defendant argues that he should be permitted to introduce

portions of Cohen's SEC testimony in which he allegedly states that he "and Phillipp Villhauer

(not Mr. Martoma) made those decisions."  (Id.)

2

Defendant's argument on this point reads the same as his argument concerning the sale of Wyeth stock:

> Mr. Martoma indisputably was <u>not</u> involved in either SAC's decision to short Elan and Wyeth securities or its decisions about the manner in which Elan and Wyeth securities were sold. The unrebutted sworn testimony of Mr. Cohen (SAC's founder) and Mr. Villhauer (SAC's senior trader) unequivocally establishes that Mr. Martoma had <u>nothing</u> to do with deciding which trading strategies to use. Indeed, Mr. Cohen has testified that he (not Mr. Martoma) made the decision to short Elan and Wyeth securities; and Mr. Cohen and Mr. Villhauer have both testified that they (not Mr. Martoma) made the decisions about the process for selling SAC's holdings in Elan and Wyeth.

(<u>Id.</u> (emphasis in original))  Defendant goes on to assert that "the Government cannot ignore [Cohen's] sworn, unrebutted testimony that exculpates Mr. Martoma by establishing that he had nothing to do with SAC's decisions to (1) short Elan and Wyeth securities or (2) use 'algos' or algorithmic trading platforms, 'dark pools,' and accounts with 'limited viewing access' to sell Elan and Wyeth securities." (Def. Br. (Dkt. No. 110) at 4)

Even if Cohen had testified that Martoma played no role in SAC's decision to sell its Wyeth and Elan stock and to sell short these securities – an assertion that is not supported by a review of Cohen's deposition transcript[1] -- this Court would, of course, not be required to accept Cohen's account.

---

[1] The Defendant's repeated assertions that Cohen's testimony is completely exculpatory of him are not accurate. Given that Cohen testified that Martoma played an important role in Cohen's decision to accumulate Elan and Wyeth stock, and in Cohen's decision to sell the Elan position in July 2008, much in Cohen's deposition is <u>inculpatory</u> of Martoma.

As to SAC's accumulation of Elan and Wyeth stock, Cohen testified that Martoma had told him that bapineuzumab – a drug being developed by Elan and Wyeth – was going to be a "good drug" and "could be potentially a major impact to Elan's bottom line" in 2008. (Govt. Br. (Dkt. No. 140), Ex. A (Cohen Dep. Tr.) at 28, 77)  Cohen further testified that his decision to take a "bullish" position in Elan stock "was [based] on the recommendation of Mat Martoma," and his decision to take a "bullish" position in Wyeth stock was "based on the recommendation of Mat Martoma and Wayne Holman." (<u>Id.</u> at 27-29; <u>see also id.</u> at 66 ("Mat Martoma's view on Bap contributed to having a position in Wyeth."); <u>id.</u> at 67 (Martoma and Holman "recommended a position in Wyeth")).

3

As to SAC's sale of the Elan and Wyeth stock, Cohen testified that his decision to sell Elan and Wyeth stock was made after consultation with his "two experts" on Elan and Wyeth: Martoma and Holman. (Id. at 163, 178)  Cohen testified that on Sunday morning, July 20, 2008, Martoma called him and said that "he was getting uncomfortable with the Elan position." (Id. at 161-62)  Cohen testified that he asked Martoma why he was "getting uncomfortable," but cannot recall what Martoma said. (Id. at 162)  Indeed, Cohen cannot recall anything else about the conversation, including whether the Wyeth position was discussed. (Id. at 162, 173-74)  Cohen recalls that he wanted to arrange a conference call with Martoma and Holman to discuss Martoma's concerns, "[b]ecause they were the experts in Elan and Wyeth and [he] wanted to hear them discuss it." (Id. at 163)  To Cohen's knowledge, Holman's views on Elan and Wyeth had not changed up to that point. (Id.)

Cohen was not able to arrange a conference call among himself, Martoma, and Holman, so he asked Holman to speak directly with Martoma. (Id. at 163-64, 175-76)  Holman "reported back to [Cohen] on the conversation," and told Cohen that "Martoma had reasons why he didn't want to be in Elan anymore." (Id. at 176-77)  Cohen cannot recall what Holman said Martoma's reasons were for wanting to sell the Elan position, but testified that "[t]hey were, you know, reasons that were normal, typical reasons.  I am sort of summarizing because I don't remember exactly what Wayne [Holman] said to me." (Id. at 177, 179-80)

After his conversation with Holman, Cohen "decided to sell the Elan position" and "started selling Elan." (Id. at 177, 182)  Cohen further testified that Martoma "wanted to be out of the [Elan] position before the [Phase II trial results] came out." (Id. at 183)  When asked why he started selling the Elan position, Cohen testified that his "two experts sounded very different than the way I – the way they sounded previous.  Mat sounded – said he was very – he was uncomfortable.  Then when talking to Wayne [Holman], he described the Bap [Phase] 2 data as a coin flip, which I was a little surprised at. . . . I was surprised when he said it was 50/50. . . . That's not what I signed up for." (Id. at 178)  Holman had not referred to the bapineuzumab data as a "coin flip" before July 21, 2008. (Id. at 180)

As is clear from this summary, much in Cohen's testimony is inculpatory of Martoma and consistent with the Government's theory in this case.  According to Cohen, Martoma played a significant role in his decision to buy Elan and Wyeth stock, and it was Martoma's discomfort with the Elan position on July 20, 2008 that was the impetus for selling the position.  While Cohen testified that he was also influenced by Holman's view that the outcome of the bapineuzumab trial was "50/50," it is a fair inference that Holman's views about Elan and Wyeth changed after speaking with Martoma on July 21. (Id. at 163)  While the Defendant asserts that Cohen testified that Martoma had "nothing to do with" Cohen's decision to sell the Wyeth position (Def. Br. (Dkt. No. 107) at 1), Cohen actually said no such thing.  Instead, he testified that he did not recall whether, in his July 20 call with Martoma, the two discussed both Elan and Wyeth. (Cohen Dep. Tr. at 173-74, 189)  In any event, a reasonable jury could find that the outcome of the bapineuzumab trial was likely to affect the stock of both companies.

Although the Defendant asserts that he played no role in these decisions, the

Government has alleged the opposite. As to the sale of Wyeth and Elan stock, Count One of the

Indictment states:

> [o]n the morning of Sunday, July 20, 2008, after receiving the negative
> confidential information about the Drug Trial results from Doctor-1, MATHEW
> MARTOMA, the defendant, spoke to the SAC Owner and recommended the sale
> of Elan and Wyeth stock prior to the Public Announcement. Beginning on or
> about Monday, July 21, 2008, the SAC Hedge Fund sold virtually all of its
> approximately $700 million worth of Elan and Wyeth stock prior to the Public
> Announcement. In addition, the SAC Hedge Fund engaged in "short sales" and
> various options trades designed to profit if the price of Elan and Wyeth securities
> were to fall after the Public Announcement.

(Superseding Indictment (Dkt. No. 61) ¶ 14) Similarly, Counts Two and Three allege that –

based on the material, non-public information Martoma had obtained – he caused SAC to (1)

"sell common stock of Elan, short Elan stock, and enter into options transactions relating to

Elan" and (2) "sell common stock of Wyeth and short Wyeth stock."[2] (Id. at ¶¶ 21, 23)

Martoma's role in SAC's sale of Wyeth and Elan stock, and short sales of these

securities, presents questions of fact that the jury will resolve. The motion to exclude evidence

of SAC's trading activity in Wyeth and Elan stock will be denied.[3]

---

With respect to Martoma's involvement in the decision to short Elan and Wyeth securities, and
the manner in which Elan and Wyeth securities were sold, Cohen's testimony likewise does not
demonstrate that Martoma played no role in these matters. When asked at his deposition how
Martoma had gone about selling his position in Elan – in the SAC accounts Martoma controlled
– Cohen testified: "I think what we did was instruct Phil Villhauer to liquidate all the stock that
was owned by – in the firm account, in my account, and in Mat Martoma's account and let him
handle it." (Id. at 184) (emphasis added) With respect to shorting Elan stock, Cohen was asked
whether he discussed his shorting strategy with Martoma. Cohen testified: "I could have. . . . I
don't remember." (Id. at 204)

[2] The Government also asserts that the evidence will show "that Elan and Wyeth positions were
sold from Martoma's own portfolio [at SAC]" and that Martoma likewise "shorted Elan in his
own portfolio [at SAC]." (Govt. Br. (Dkt. No. 140) at 16-19 (emphasis in original))

[3] The Defendant's motion to exclude reference to SAC's use of "algos," "dark pools," and
"limited viewing access" accounts to execute the Elan and Wyeth trades (Def. Br. (Dkt. No.
110) at 11-12) will likewise be denied. These terms are not inherently prejudicial. According to

## II.   **MOTION TO INTRODUCE COHEN'S SEC TESTIMONY**

In the event that evidence regarding SAC's trading in Wyeth and Elan stock is introduced at trial, the Defendant argues that excerpts from Steven A. Cohen's SEC testimony should be admitted to demonstrate that he was not involved in SAC's decisions concerning these matters.

Cohen's May 3, 2012 testimony was taken in connection with an SEC investigation of whether SAC's trading in Elan securities had violated federal securities laws. (See Strassberg Decl. (Dkt. No. 111), Ex. A (Cohen Dep. Tr.) at 3; Devlin-Brown Decl. (Dkt. No. 177) ¶ 2)

The Defendant argues that Cohen's testimony is admissible under Fed. R. Evid. 804(b)(1) and 807. Rule 804(b) states:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> **(1) Former Testimony**. Testimony that:
>
> **(A)** was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> **(B)** is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b)(1).[4]

Fed. R. Evid. 807 – the residual hearsay exception – provides that

---

Defendant, these terms refer to "processes . . . used by traders to avoid displaying the source, price, and size of trading orders until the trades actually take place. They are routinely used by many institutional investors (including SAC) to prevent other investors, both inside and outside of a firm, from trading ahead of large changes in position." (Id. at 12) All of this will undoubtedly be explained by one or more witnesses at trial.

[4] The parties here do not contest that Cohen is unavailable as a witness. (See Govt. Br. (Dkt. No. 140) at 12-14; Def. Br. (Dkt. No. 110) at 13)

a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 [where]

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807.

## A.    Admissibility under Fed. R. Evid. 804(b)(1)

To determine admissibility under Rule 804(b)(1), the Court must determine whether (1) the U.S. Attorney's Office ("USAO") and the SEC should be regarded as the "same party" for purposes of this rule; and (2) the SEC had a similar motive to develop Cohen's testimony at the May 3, 2012 hearing as the USAO does here. In order for Cohen's testimony to be admissible under Rule 804(b)(1), both requirements must be met. See United States v. Peterson, 100 F.3d 7, 12-13 (2d Cir. 1996).

On May 3, 2012, when the SEC took investigative testimony from Cohen, the USAO was pursuing a criminal investigation concerning SAC's transactions in Elan and Wyeth securities. (Devlin-Brown Decl. (Dkt. No. 177) at ¶¶ 2-4) The USAO conferred periodically with SEC investigators about the SEC's parallel civil investigation, and learned that the SEC would be taking Cohen's testimony. (Id. ¶¶ 3-4) On April 30, 2012, Arlo Devlin-Brown – who was then the sole prosecutor assigned to the SAC investigation at the USAO – met with SEC investigators to discuss evidence obtained through the parallel investigations, including evidence relating to Cohen. (Id. ¶ 4) The USAO did not, however, "provide the SEC with direction on questions to ask Cohen . . . or topics to cover." (Id. ¶ 5) Nor did the SEC provide the USAO

with a "a preview of questions that the SEC planned to ask Mr. Cohen, an outline of the topics

for testimony, or a request for instructions on topics to cover." (Id.) No representative of the

USAO attended the Cohen deposition, nor did any representative of the USAO participate in any

fashion in that deposition. (Id. ¶ 6) At a break during the deposition, Devlin-Brown received a

five-minute call from the SEC staff taking the deposition, and was given a "short update as to the

testimony thus far." (Id.) Devlin-Brown "did not provide guidance on questions that should be

asked during the remainder of the deposition or provide any other feedback." (Id.) After the

deposition concluded, Devlin-Brown received a further update on the deposition, and the USAO

later received a transcript of Cohen's testimony. (Id.)

Under these circumstances, the USAO and the SEC cannot be regarded as the

"same party" for purposes of Fed. R. Evid. 804(b)(1). See United States v. Whitman, 12 Cr. 125

(JSR) (S.D.N.Y. 2012) (Transcript of Proceedings on Aug. 14, 2012 ("Whitman Tr.") at 2305-

07) (concluding that SEC and USAO could not be regarded as the "same party" under Rule

804(b)(1) for purposes of SEC deposition where USAO had played no role in conducting the

deposition and no USAO representative had attended the deposition).

As to assessing similarity of motive under Fed. R. Evid. 804(b)(1), the Second

Circuit has instructed that courts

> must consider whether the party resisting the offered testimony at a pending
> proceeding had at a prior proceeding an interest of substantially similar intensity
> to prove (or disprove) the same side of a substantially similar issue. The nature of
> the two proceedings – both what is at stake and the applicable burden of proof –
> and, to a lesser extent, the cross-examination at the prior proceeding – both what
> was undertaken and what was available but forgone – will be relevant though not
> conclusive on the ultimate issue of similarity of motive.

United States v. DiNapoli, 8 F.3d 909, 914-15 (2d Cir. 1993).

Application of DiNapoli here indicates that the SEC's motive to cross-examine Cohen at the investigative deposition is not comparable to the motive that the USAO would have to cross-examine him at Martoma's trial. As Judge Rakoff pointed out in Whitman, the purpose of a deposition in a civil case or an administrative investigation is to develop investigative leads and to "freeze the witness['s] . . . story." (Whitman Tr. at 2307) The SEC lawyers taking Cohen's deposition were not attempting to persuade a jury to convict, or even attempting to persuade a grand jury to indict. Instead, the Cohen deposition was part of an effort to "develop the facts to determine if an [enforcement action] was warranted." DiNapoli, 8 F.3d at 913.

The SEC's questioning at Cohen's deposition – the relevant portions of which this Court has reviewed (see Govt. Br. (Dkt. No. 140), Ex. A (Cohen Dep. Tr.); Strassberg Decl. (Dkt. No. 111), Ex. A) – is exploratory and investigatory in nature, consisting primarily of non-leading questions. (See id.) It is "a very different . . . kind of examination tha[n] one would undertake if either it were a trial or if one had reason to believe that it might be used at a trial." (Whitman Tr. at 2307) Moreover, a lower standard of proof is applicable in a civil enforcement proceeding, and given that the vast majority of SEC enforcement actions end in settlements, the SEC's "motivation and intensity of the examination is wholly different from what would be the case in [a prosecution brought by] the U.S. Attorney's Office." (Id.) Finally, and most importantly, Cohen's deposition was taken before much of the evidence to be introduced at Martoma's trial was developed, including Dr. Gilman's admission that he had provided the final results of the bapineuzumab trial to Martoma before those results were publicly announced. (See 3501-16) For all these reasons, the necessary "similarity of motive" does not exist.[5]

---

[5] United States v. Sklena, 692 F.3d 725, 730-33 (7th Cir. 2012), relied on by Defendant (see Def. Br. (Dkt. No. 110) at 13-15), is not to the contrary. In Sklena, the Commodity Futures Trading Commission ("CFTC") had filed a civil enforcement action against Sklena and Sarvey,

alleging that the two had engaged in a series of non-competitive trades on April 2, 2004, that defrauded their customers out of more than $2 million. Sklena, 692 F.3d at 727. After filing the civil complaint, "the CFTC took lengthy depositions from both Sarvey and Sklena regarding these trades." Id. at 727-28. Sklena and Sarvey were later indicted for the same conduct, and the civil action was stayed pending resolution of the criminal charges. Id. at 728. Sarvey died prior to the criminal trial, however, and Sklena sought to introduce Sarvey's deposition at trial. Id. at 728, 730. The district court held that the deposition was not admissible under Rule 804(b)(1), because the CFTC and the Justice Department "may not be considered the same party," and the two agencies "did not share 'similar motive[s]' to develop Sarvey's testimony." Id. at 730 (alteration in original). The Seventh Circuit disagreed on both points, and reversed Sklena's conviction. Id. at 730-33.

As to the similar motive inquiry, there are aspects of Sklena that distinguish it from the scenario here. In Sklena, the CFTC had already brought an action against Sarvey at the time it took his deposition. Id. at 727. It was thus obvious when Sarvey's deposition was taken that portions of his testimony might be admitted at trial. This was not an investigatory deposition of the sort at issue here, but a deposition of a defendant in an action already brought. It was in this context that the Seventh Circuit found that the CFTC and the Justice Department "needed to prove the same allegations, as a comparison of the CFTC's civil complaint and the indictment demonstrates." Id. at 732. And it was in this context that the court concluded that "the CFTC and the [Justice Department] had essentially the same incentive to develop Sarvey's factual testimony about the events of April 2, 2004." Id. Because the deposition of Sarvey was taken when he was already a defendant in an action, the CFTC had every motive to conduct an extremely thorough examination. The SEC did not have a comparable motive here in conducting the investigatory deposition of Cohen. As the Second Circuit has stated, "the inquiry as to similar motive must be fact specific," DiNapoli, 8 F.3d at 914, and the facts surrounding the motive inquiry here demonstrate, for the reasons discussed above, that the SEC's motive to examine Cohen at his investigatory deposition is not comparable to the motive of the USAO to examine him at Martoma's trial.

As to whether the CFTC and the Justice Department are the same party for purposes of Rule 804(b)(1), the Sklena court noted that the CFTC "is required by statute to report on its litigation activities directly to the Justice Department," and that accordingly, "had the [Justice Department] wished, it could have ensured that the CFTC lawyers included questions of interest to the United States when they deposed Sarvey." Sklena, 692 F.3d at 731. Here, in contrast, the SEC has "complete autonomy in civil prosecutions" and is not required to report on its activities to the USAO. See S.E.C. v. Robert Collier & Co. Inc., 76 F.2d 939, 940 (2d Cir. 1935); see also 15 U.S.C. § 77t.

In sum, Sklena does not persuade this Court either that the SEC and the USAO are the "same party" for purposes of the Rule 804(b)(1) analysis here, or that similarity of motive has been established.

The Defendant has not demonstrated either that the SEC and the USAO are the "same party" for purposes of Rule 804(b)(1) or that similarity of motive exists. Accordingly, the Cohen deposition is not admissible under Rule 804(b)(1).

**B.** **Admissibility Under Fed. R. Evid. 807**

"The traditional exceptions to the hearsay rule . . . provide the benchmark against which the trustworthiness of evidence must be compared in a residual hearsay analysis." Schering Corp. v. Pfizer Inc., 189 F.3d 218, 232 (2d Cir. 1999) (citing Fed. R. Evid. 807). "[T]he trustworthiness of the[] [hearsay] exceptions is a function of their ability to minimize some of the four classic hearsay dangers": "(1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." Id. at 232, 233. Hearsay evidence is generally excluded "on the theory that cross-examination can help test for these four classes of error, thus allowing the fact-finder to weigh the evidence properly and to discount any that is too unreliable." Id. at 232.

Cohen's testimony does not bear circumstantial guarantees of trustworthiness comparable to evidence admitted pursuant to a hearsay exception. To the contrary, when Cohen's deposition was taken, SAC Capital – his company – was under investigation by the SEC for insider trading. Accordingly, Cohen had a strong motive to offer an exculpatory version of events at SAC. Allowing such self-serving testimony to be admitted, without any opportunity for cross-examination, would clearly undermine the purposes of the hearsay rule. See Kirk v. Raymark Indus., Inc., 61 F.3d 147, 167-68 (3d Cir. 1995) (finding that interrogatory response of a co-defendant "who [was] seeking to avoid liability lack[ed] . . . 'circumstantial guarantees of trustworthiness'" because the co-defendant "had every incentive to set forth the facts in a light most favorable to itself"; admitting such statements "without the opportunity for cross-examination [would] implicate[ ] many of the dangers the hearsay rule is designed to prevent");

Broga v. Ne. Utils., 315 F. Supp. 2d 212, 217-18 (D. Conn. 2004) (finding that plaintiffs'

affidavits prepared prior to trial did not have circumstantial guarantees of trustworthiness

because they were "self-interested statements"; even "[t]he most truthful of discovery or trial

declarations still cannot escape the reality that they are prepared with the 'incentive to set forth

the facts in a light most favorable to [the declarant]'") (quoting Kirk, 61 F.3d at 167); In re

Alder, Coleman Clearing Corp., No. 95-08203 (JLG), 97/8423A, 1998 WL 160039, at *11

(Bankr. S.D.N.Y. Apr. 3, 1998) ("The self-serving nature of a statement does not support a

finding of trustworthiness."). Cohen's deposition testimony will not be admitted under the

residual hearsay exception.

## III.    MOTION TO EXCLUDE EVIDENCE OF SAC-RELATED SETTLEMENTS AND GUILTY PLEAS

The Defendant has moved in limine (Dkt. No. 112) to exclude evidence of all

civil or criminal actions, settlements, and plea agreements involving SAC or individuals related

to SAC.

The Government does not seek to introduce any guilty pleas of SAC-related

entities or individuals in its case-in-chief. (Govt. Br. (Dkt. No. 141) at 1) The Government has

not addressed whether it will seek to admit evidence of SAC-related actions and settlements.

At this stage of the proceedings, the Court cannot predict whether any such

evidence could be admissible, whether for purposes of impeachment or otherwise. Therefore,

the Court reserves decision on this motion. There is to be no reference to any such evidence

unless and until the matter is raised with the Court, outside the presence of the jury.

## CONCLUSION

The Defendant's motions in limine to exclude evidence of SAC's sales of Wyeth stock and the manner in which SAC sold Elan and Wyeth securities or, in the alternative, to admit portions of Steven A. Cohen's SEC deposition testimony, are denied.  The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 106, 109).

Dated: New York, New York
      January 7, 2014

                    SO ORDERED.

                    Paul G. Gardephe
                    United States District Judge

# Exhibit H

GOODWIN │ PROCTER

Richard M. Strassberg
212.813.8859
rstrassberg@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
The New York Times Building
620 Eighth Avenue
New York, NY 10018
T: 212.813.8800
F: 212.355.3333

January 26, 2014

**VIA ECF AND FACSIMILE**

Honorable Paul G. Gardephe
United States District Court for the
    Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 1007

Re:    *United States v. Martoma, No. 12 Cr. 973 (PGG) (S.D.N.Y.)*

Dear Judge Gardephe:

　　We write on behalf of Mathew Martoma in further response to this Court's questions concerning Professor Gompers's expert opinion that the market for Elan securities was "overheated" in June and July 2008. Professor Gompers's testimony both  (1) provides circumstantial evidence of Mr. Martoma's state of mind in June and July 2008, and (2) supports Mr. Martoma's defense that there was no material, non-public information about the Phase II bapi trial results disclosed at ICAD (*i.e.*, all such information had already been disclosed in the June 17, 2008, press release).[1]  Professor Gompers's analysis would be helpful to the jury, and he should be allowed to testify about his expert opinion.

**I.     Professor Gompers's Testimony Provides Circumstantial Evidence of Mr. Martoma's State of Mind in June and July 2008.**

　　Although the Government has questioned the utility of expert testimony to reflect upon Mr. Martoma's state of mind, Professor Gompers's analysis would, in fact, be helpful to the jury.  As Professor Gompers will explain, the market for Elan securities was overheated in June and July 2008. That fact is circumstantial evidence from which the jury may infer Mr. Martoma's state of mind when SAC sold its Elan (and Wyeth) securities and the reason for those sales.  Indeed, such circumstantial evidence is especially persuasive in this case because Professor Gompers based his determination on materials that ***Mr. Martoma himself was in fact analyzing*** in making investment decisions about Elan

---

[1]    As this Court recognized, Professor Gompers's testimony may also be necessary to explain to the jury the terms in the analyst reports that Mr. Martoma received and reviewed.  (Tr. 1994:15-17.)

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 26, 2014
Page 2

(and Wyeth) securities, including (1) analysts' forecasts for bapi from analyst reports concerning Elan; (2) market and industry data; and (3) stock price data for Elan and industry competitors. Professor Gompers's testimony will put all of those materials into context for the jury and "provid[e] the groundwork in the form of an opinion to enable the jury to make its own informed determination" about the facts in the case, including the reasons for SAC's sales of Elan (and Wyeth) securities. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

That Professor Gompers conducted his analysis after the fact – as is true of all expert analyses – is no reason to exclude it. Courts have allowed expert testimony based on such retrospective analyses as circumstantial evidence of state of mind in many different contexts. *See, e.g., Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 186-87 (2d Cir. 2011) (expert testimony on a company's leave policy was circumstantial evidence of "an employer's wrongful intent"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 539 (E.D.N.Y. 2012) (admitting expert testimony on foreign banking laws and practices as "probative, but not determinative of the Bank's state of mind" and "relevant to what the Bank was aware of and could be expected to believe during the relevant time period").[2] This Court should allow Professor Gompers to testify that the market was overheated because it is circumstantial evidence of Mr. Martoma's state of mind.

**II.     Professor Gompers's Testimony Supports Mr. Martoma's Defense That There Was No Material, Non-public Information about the Phase II Bapi Trial Results Disclosed at ICAD.**

In its opening, the Government argued: "So Dr. Gilman took the stage and he presented the results [of the Phase II bapi trial]. The results were not good. Certainly not [as] the stock market saw it. The stock of one of the two pharmaceutical companies that developed this drug, a company called Elan, it fell over 40 percent in the next 24 hours after the announcement." (Tr. 32:3-8.) The Government assumes that the information disclosed at ICAD was material because the price of Elan securities declined by over 40 percent. Professor Gompers's analysis is directly relevant to that issue because it shows that the price of Elan securities was inflated by about 40 percent *prior to ICAD* – *i.e.*, approximately the same amount that it declined – after incorporating most of the potential value of bapi as a blockbuster drug. Put another way, the price pre-ICAD already had captured all the potential of a "blockbuster" drug; as many analysts had come to determine, the stock had only one way to go. This analysis supports Mr. Martoma's defense that there was no material, non-public information about the Phase II bapi trial results disclosed at ICAD (*i.e.*, all such information had already been disclosed in the June 17, 2008, press release) but rather that the price of Elan securities declined because the market for

---

[2]     *Accord United States v. Thao Bee Yang*, No. 08-CR-324, 2008 WL 4560633, at *1 (E.D. Wis. Oct. 8, 2008) (expert testimony on the failure rate of automobile accessories was circumstantial evidence of a defendant's intent to commit the crime of odometer tampering); *S.E.C. v. Snyder*, No. H-03-046658, 2006 WL 1806164, at *3, *7 (S.D. Tex. June 29, 2006) (expert testimony from a certified public accountant and certified fraud examiner was circumstantial evidence of the defendant's scienter in submitting materially misleading SEC filings); *Lewis v. Booz-Allen & Hamilton, Inc.*, 150 F. Supp. 2d 81, 95 (D.D.C. 2001) ("[C]ircumstantial evidence, including the statistical evidence provided by the plaintiff's expert, . . . would allow an inference of discriminatory intent on the defendant's part.").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 26, 2014
Page 3


Elan had been overheated and the securities price had been far higher than the value of Elan could support.

As this Court recognized, it is "common" for experts to testify about issues that are related to materiality (Tr. 1990:25-1991:9.)  *Accord United States v. Levis*, 488 F. App'x 481, 484 (2d Cir. 2012) (holding that the district court committed reversible error by excluding "lay and expert testimony" that "could have raised doubts as to materiality"); *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("stock movement is a factor the jury may consider relevant" in determining materiality); *accord United States v. Nacchio*, 519 F.3d 1140, 1155 (10th Cir. 2008) ("An economic expert is permitted not only to tell the jury that an economic concept is an issue but to analyze the concept and offer informed opinions.  In other words, expert testimony may assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context.  That is why expert economic testimony is routine when a materiality determination requires the jury to decide the effect of information on the market."  (citation and internal quotation marks omitted)), *vacated in part on other grounds on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009).  Professor Gompers's analysis about the market for Elan securities relates to issues of materiality, and this Court should allow him to offer his expert opinion to the jury.

\*        \*        \*

For the foregoing reasons and those offered previously, Mr. Martoma respectfully requests that this Court allow Professor Gompers to offer his expert opinion that the market for Elan securities was overheated in June and July 2008.


Respectfully submitted,


Richard M. Strassberg



cc:   Arlo Devlin-Brown (by e-mail)
      Eugene Ingoglia (by e-mail)
      Roberto Braceras (by e-mail)

# Exhibit I

**RIDGEBACK CAPITAL MANAGEMENT LLC**
430 Park Avenue, 12th floor
New York, NY 10022

November 9, 2007

S.A.C. Capital Advisors, LLC
72 Cummings Point Road
Stamford, CT 06902

Gentlemen:

S.A.C. Capital Advisors, LLC, a Delaware limited liability company ("SAC Advisors"), and the undersigned, Ridgeback Capital Management LLC ("Ridgeback"), are entering into this letter agreement in connection with the potential investment by S.A.C. Capital Associates, LLC, an Anguilla limited liability company ("SAC Associates"), in up to 20 million shares of the common stock of Wyeth [NYSE: WYE] (the "Issuer").

1.   Investment Advice.  Ridgeback shall provide SAC Advisors with investment advice regarding the Issuer, as and when requested by SAC Advisors.

2.   Investment Discretion.  SAC Advisors shall maintain complete investment discretion over the purchase and sale of, and full voting discretion over, all securities of the Issuer by SAC Associates and other funds managed by SAC Advisors.  Ridgeback shall have no authority to direct the purchase or sale of, or the voting of, any securities of the Issuer held by SAC Associates or any other fund managed by SAC Advisors or by any other affiliate of SAC Advisors (an "Affiliate Fund").  For the avoidance of doubt, SAC Advisors shall not be required to follow the investment advice provided by Ridgeback hereunder and disregarding Ridgeback's investment advice shall not result in a violation or termination of this letter agreement.  Ridgeback shall not pursuant to the terms of this letter agreement, have or be deemed to have "beneficial ownership" within the meaning of Rule 13d-3 ("Beneficial Ownership") promulgated under the Securities Exchange Act of 1934, as amended, over any securities held by SAC Associates or an Affiliate Fund.

3.   Account.  SAC Associates shall establish a memorandum account on its books (the "Account") and Steven A. Cohen ("Cohen") shall conduct (i) all his direct purchases of the securities of the Issuer through the Account during the Applicable Period and (ii) as and if determined by SAC Advisors, any hedging of such purchases utilizing individual stock positions of Issuers whose individual market capitalization is equal to $10 billion or more ("Hedging Positions") through the Account.  "Applicable Period" means the period from the date hereof through April 30, 2008.

4.   Compensation.  Within 60 days after the Determination Date (as defined below), Ridgeback shall be paid by SAC Advisors a fee equal to (i) 20% of the cumulative Net Profit (as defined below) as of the Determination Date attributable to the investment in the

SAC_ELAN0726049

**DEFENSE EXHIBIT**

285

1:12 Cr. 00973

285-1

common stock of the Issuer by the Account during the Applicable Period if the Rate of Return (as defined below) is less than 30% or (ii) 30% of the cumulative Net Profit as of the Determination Date attributable to the investment in the common stock of the Issuer by the Account during the Applicable Period if the Rate of Return is equal to or greater than 30%.

(a) "Determination Date" means the final day of the Term (as defined below).

(b) "Net Profit" means the realized net profit of the Account attributable to the common stock of the Issuer purchased by SAC Associates for the Account pursuant to this letter agreement during the Applicable Period as contemplated hereby; provided, that if the Account contains common stock of the Issuer upon the expiration of the Term, the Net Profit shall be calculated based upon the unrealized Net Profit of the common stock of the Issuer in the Account, valuing such securities in accordance with SAC Advisors' customary accounting practices; provided further, that the Net Profit shall be calculated in accordance with SAC Advisors' customary accounting practices and including dividends, brokerage charges and/or commissions, ticket charges and other costs incidental to trading activities and include deductions for expenses (such as legal, consulting or other professional fees) associated with the common stock of the Issuer in the Account and SAC Advisors will charge interest on long balances in the Account and SAC Advisors shall credit short rebates in accordance with its customary practices. In either case, "Net Profit" will include any profit, loss or cost of any Hedging Positions, as determined by SAC.

(c) "Rate of Return" means the quotient obtained by dividing (A) the Net Profit of the Account during the Term by (B) 50% of the average gross market value of the Account during the Term, determined in accordance with SAC Advisors' customary accounting practices.

5. Investment Restriction. Ridgeback, Wayne Holman ("Holman") and any entity managed by Ridgeback or by any other entity controlled by Holman shall not, in the aggregate, obtain Beneficial Ownership of more than 10 million shares of common stock of the Issuer.

6. Transferability. Ridgeback hereby irrevocably agrees that SAC Advisors may assign its rights and interest under this letter agreement to another entity controlled by Cohen or his heirs or legal representatives.

7. Affiliates Excluded. For the avoidance of doubt, if any investment fund managed by SAC Advisors or any affiliate invests in the securities of the Issuer (an "Affiliated Fund Investment"), other than the investments in common stock by SAC Associates in the Account managed by Cohen pursuant to the Account during the Applicable Period as contemplated hereby, this letter agreement, including the compensation provisions, shall not apply to any such Affiliated Fund Investment. Furthermore, the provisions of this letter agreement, including the compensation provisions, shall not apply to any investment in the securities of the Issuer by SAC Associates, other than those investments held in the Account and made during the Applicable Period as contemplated hereby.

2

SAC_ELAN0726050

8.    Information Restrictions.  Holman, Ridgeback and SAC Advisors each agree to continue to comply with the restrictions as to sharing of information set forth on **Exhibit B** to the letter agreement, dated April 3, 2006, among SAC Advisors, Ridgeback, Holman, Ridgeback Management, LLC and Ridgeback Capital Partners LLC.

9.    Term.  This letter agreement shall continue and remain in force and effect until the earlier of (a) September 30, 2008, unless SAC Advisors elects, in its sole discretion, upon written notice to Ridgeback, to extend the term for an additional six months, and (b) such earlier date as of which all equity securities of the Issuer in the Account are sold (the "Term"). In the event of a termination pursuant to clause (b), SAC Advisors shall notify Ridgeback by delivery of written notice not less than 15 days after the date thereof.

10.    Confidentiality.  Each party shall keep the terms of this letter agreement and the actions contemplated herein confidential and neither this letter agreement nor any of its terms shall be copied, reproduced or otherwise disclosed to any person other than an employee, affiliate or professional advisor engaged by either party or their respective affiliates (it being understood that the disclosing party will require such person to keep such information confidential and that such party shall be responsible for any violation of this Section 10 by such person), without the prior written permission of the other party or unless any language in this letter that would reasonably lead to the disclosure of such party's identity is redacted from the letter, or unless the party is required by applicable law or regulation, or by a court of competent jurisdiction, to disclose this letter agreement.

11.    Miscellaneous.

(a)    Each party acknowledges that the other party would be irreparably harmed by any breach of this letter agreement by it and that there may be no adequate remedy at law or in damages to compensate the other party for any such breach.  Accordingly, in addition to the remedies available under applicable law, each party agrees that the other party shall be entitled to seek specific performance by such party of its obligations under this letter agreement (including by means of an injunction).

(b)    This letter agreement shall be governed by, and construed in accordance with, the law of the State of New York without regard to the laws that might otherwise apply under applicable principles of conflicts of laws.

(c)    The parties agree that any dispute or controversy arising out of or relating to this Agreement or the interpretation hereof, or the employment relationship, will be settled by arbitration, to be held in the Borough of Manhattan, City of New York in the State of New York, in accordance with the Commercial Arbitration Rules, then in effect, of the American Arbitration Association.  The powers of the Arbitrator shall be limited to interpreting this Agreement as written.  The award of the Arbitrator will be final, and judgment upon the award may be confirmed and entered in any court, state or federal, having jurisdiction.  Each party agrees that it waives any objection, and specifically consents to, venue in the United States Federal or State Courts located in the Borough of Manhattan, City of New York in the State of New York so that any action at law or in equity may be brought to enforce an arbitration award or in equity to bring an injunctive action or seek other equitable relief under Section 10.

3

SAC_ELAN0726051

This letter agreement may be executed in two or more counterparts (including by facsimile), each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

RIDGEBACK CAPITAL MANAGEMENT LLC

By: _____

Name: Wayne Holman

Title    Sole Member

For Purposes of Section 5

WAYNE HOLMAN

_____

Accepted and Agreed:

S.A.C. CAPITAL ADVISORS, LLC

By: _____

Name: Peter Nussbaum

Title:   General Counsel

4

SAC_ELAN0726052

285-4

# Exhibit J

Page 1

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

```
                              )
In the Matter of:             )
                              )
Elan Corporation, plc         )    File No. NY-8152
                              )
                              )
```

WITNESS:     STEVEN COHEN

PAGES:       1-253

PLACE:       Room 425
             Securities and Exchange Commission
             3 World Financial Center
             New York, New York

Date:        May 3, 2012


             The above-entitled matter come on for

investigation at 10:10 a.m.

Steven Cohen                                                    May 3, 2012

| Page 185 | Page 187 |
|---|---|

**Page 185**

1  given to Mr. Villhauer concerning Wyeth?
2      A    I don't believe so at that point.
3      Q    Is Mr. Villhauer Mr. Martoma's trader?
4      A    No. He is the firm trader. He is in charge
5  of the trading desk.
6      Q    Why was the trades for Mr. Martoma's account
7  placed through Mr. Villhauer?
8      A    Because we wanted it executed all -- so he
9  could allocate and -- so he could handle it so we weren't
10  competing with each other in trying to get out of the
11  name.
12          MR. KLOTZ: I don't want to interrupt you in
13  the middle of key events but at some point I think it
14  would be time for a break. We have been going for well
15  over an hour.
16      Q    On July 21, 2008 did you make any decisions
17  concerning your investment in Wyeth?
18      A    What was the date?
19      Q    July 21st.
20      A    I don't remember.
21      Q    At some point prior to July 29, 2008, did you
22  make a decision concerning your investment in Wyeth?
23      A    Yes.
24      Q    When was that?
25      A    At some point during that week.

**Page 187**

1          THE WITNESS: I don't believe so, but he
2  might have.
3          MS. COTTRELL: Do you have a recollection of
4  him telling you?
5          THE WITNESS: I know he told me that he was
6  selling Wyeth, so I am not sure if he told me to sell it
7  or I took it on my own volition based on that he was
8  selling it.
9          MS. COTTRELL: Aside from kind of the macro
10  concerns, did Mr. Holman say anything else about why he
11  was selling Wyeth?
12          THE WITNESS: I don't believe so.
13          MS. COTTRELL: Since Mr. Holman had macro
14  concerns, his macro concerns might not have been your
15  macro concerns. Isn't that correct?
16          THE WITNESS: I can't speak for what his
17  macro concerns were.
18          MS. COTTRELL: So did he give you any reason
19  relating to the investment in Wyeth why he was selling
20  Wyeth as opposed to kind of macro concerns about the
21  economy in general?
22          THE WITNESS: He -- I don't remember him
23  telling me specifically why he was selling Wyeth.
24          MS. COTTRELL: When we were both talking
25  about macro concerns, can you say what you meant by macro

| Page 186 | Page 188 |
|---|---|

**Page 186**

1      Q    What prompted you to make a decision
2  concerning your investment in Wyeth the week of July 21st?
3      A    I spoke to Wayne at some point and he was
4  telling me he was selling his Wyeth.
5      Q    You referenced before a conversation on the
6  21st. Was that the same conversation in which he said he
7  was selling Wyeth?
8      A    I don't believe so.
9      Q    In the conversation where Mr. Holman
10  referenced that he was selling Wyeth, what do you recall
11  about that conversation?
12      A    I don't recall much other than he was telling
13  me he is selling his -- he is selling some Wyeth.
14          MS. COTTRELL: Did he say why?
15          THE WITNESS: I don't remember. I know he
16  was nervous about the world, the macro picture, but he
17  didn't give me any specifics.
18          MS. COTTRELL: Did he say anything else to
19  you in that conversation?
20          THE WITNESS: I don't remember.
21          MS. COTTRELL: Did he recommend that you sell
22  Wyeth?
23          THE WITNESS: I don't believe so.
24          MS. COTTRELL: Did Mr. Holman ever recommend
25  that you sell your Wyeth position?

**Page 188**

1  concerns?
2          THE WITNESS: Yeah. It was 2008. The
3  markets were under pressure. The stocks had outperformed
4  a lot and the markets were under pressure.
5          MS. COTTRELL: So Mr. Holman didn't tell you
6  anything specific about his views on Wyeth as to why he
7  sold Wyeth?
8          THE WITNESS: I know we spoke. I just don't
9  remember the specifics.
10          MS. COTTRELL: you don't remember him saying
11  anything specifically concerning Wyeth?
12          THE WITNESS: I don't remember that, no.
13          MR. RIELY: Off the record at 4:08.
14          (Recess.)
15          MR. RIELY: Back on the record at 4:20.
16      Q    Mr. Cohen, while we were off the record we
17  had no conversations about the substance of this
18  investigation. Correct?
19      A    That's correct.
20      Q    You referenced before that Mr. Martoma wanted
21  to get out of his position in Elan. Is that correct?
22      A    That's correct.
23      Q    When did he first express that view to you?
24      A    I don't remember. It was definitely after
25  the first conversation we had that Sunday.

47 (Pages 185 to 188)

Steven Cohen                                                          May 3, 2012

Page 193

1   you have an understanding as to what he meant by that?
2   A     No, I didn't.
3   Q     Did you ask him what he meant by that?
4   A     I definitely asked him because he repeated
5   back to me.
6   Q     And you said part of the reason you
7   established a position in your accounts in the first place
8   was because of advice from Mr. Martoma. Correct?
9   A     That's correct.
10   Q     When he switched his advise and told you
11   nothing more than he was uncomfortable, did you seek
12   additional information from him?
13   A     I might have.
14   Q     Do you remember doing that?
15   A     I don't remember but I might have.
16   Q     Do you remember getting any additional
17   information?
18   A     It's certainly possible but I just don't
19   remember.
20         (Plaintiff's Exhibit 36, E-mail chain,SAC
21         ELAN 733567 through 569, was marked for
22         identification as of this date.)
23   Q     Mr. Cohen, I am handing you what has been
24   marked Exhibit 36, a document Bates stamped SAC ELAN
25   733567 through 569, an e-mail chain starting with an

Page 194

1   e-mail from Phillip Villhauer to you and others on Sunday,
2   July 27, 2008 at 8:44 a.m.
3         Do you see that?
4   A     Yes, I do.
5   Q     Mr. Villhauer was the head trader that you
6   gave your instructions to about getting out of the Elan
7   position; correct?
8   A     That's correct.
9   Q     If you look at the bottom of the page there
10   is a reference to ELN?
11   A     I see that.
12   Q     Take a moment to review it.
13         (Pause.)
14   A     I see it.
15   Q     The first sentence reads, "We executed a sale
16   of over 10.5 million ELN for COHE, GGEN, GEHC, SELC at an
17   avg price of 34.21."
18         Do you see that first sentence?
19   A     "We executed a sale --" is that the first
20   sentence?
21   Q     Yes.
22   A     Okay.
23   Q     Were these sales done in compliance with an
24   instruction that you gave Mr. Villhauer?
25   A     I believe so.

Page 195

1   Q     Were you aware that SAC, through these
2   accounts, had sold 10.5 million Elan the week of
3   July 21st?
4   A     I don't remember the exact amount but that's
5   what it says.
6   Q     And you believe it's accurate?
7   A     It probably is accurate.
8   Q     Then the next clause says, "This was executed
9   quietly and efficiently over a four day period."
10         Do you know what he is referring to when he
11   says "quietly and efficiently"?
12   A     Yes. We executed quietly so that as few
13   people as possible knew that we were selling the stock.
14   Q     Why was that important?
15   A     Well, it was a big position. Ten and a half
16   million shares is a lot of stock to sell. The more people
17   you tell, the more they talk; the more they talk, the more
18   it gets out that you are selling Elan.
19         We were probably a first page holder. Market
20   loves information like that. So, we wanted to do it
21   quietly so we would, you know, execute as efficiently as
22   we could so it didn't get out and people run in front of
23   us or -- so we'd get out at a decent price.
24   Q     When you say "first page holder" what do you
25   mean by that?

Page 196

1   A     On Bloomberg it shows up that you might be a
2   holder of Elan. And so if the marketplace finds out, you
3   try to sell it through a broker or sell it through
4   somebody, they might tell somebody, "Hey, Connecticut
5   seller of Elan" and people might surmise who it might be
6   and that cause people to run in front -- they might see
7   our position and say "Oh, they are selling" and create
8   what I call slippage in the execution of the transaction.
9   Q     It refers to the executions being done
10   quietly. What steps did you take to keep the execution of
11   the Elan sales the week of July 21st quiet?
12   A     I didn't do anything.
13   Q     In your instructions to Mr. Villhauer did you
14   communicate to him that you wanted the sales of Elan to be
15   done in a quiet way?
16   A     I gave the order to him and told him I didn't
17   want anybody to know.
18   Q     Why did you tell him you did not want anybody
19   to know?
20   A     Just for the reason I gave you; that I was
21   afraid that it would leak out either in the firm or
22   outside the firm or on Wall Street brokerage desks,
23   trading desks, and that people might run in front of our
24   order, they might tell other people we're selling and, you
25   know, that might create a dislocation in the stock.

49 (Pages 193 to 196)

Steven Cohen                                               May 3, 2012

| Page 197 |
|---|

1    Q    So you communicated to Mr. Villhauer that you
2  didn't want anybody else within the firm to know about the
3  sales of the Elan securities?
4    A    That's correct.
5         MS. COTTRELL:  How often do you give such a
6  communication to a trader executing an order?
7         THE WITNESS:  Sometimes.  Not very often.
8         MS. COTTRELL:  Under what circumstances do
9  you do it?
10        THE WITNESS:  Could be any time there is a
11 large position or it could be if I don't want other people
12 to know what I am doing.
13        MS. COTTRELL:  As a general course, do other
14 employees at S.A.C. Capital know when the firm account is
15 trading in or out of a position?
16        THE WITNESS:  They could.
17        MS. COTTRELL:  How could they?
18        THE WITNESS:  Through other traders on the
19 trading desk.  We have systems.  Sometimes they watch what
20 I do.  I have a board that people can see.  There is many
21 ways that people can see what I am doing.
22        MS. COTTRELL:  As to the general course,
23 people aren't prohibited from looking at what you are
24 doing in your accounts?
25        THE WITNESS:  Generally, but not always.

| Page 198 |
|---|

1    Q    In the e-mail it refers to sales being done
2  in a four-day period through algos and dark pools.
3         Did you have an understanding what he was
4  referring to when he referred to dark pools?
5    A    I believe, yes; those are electronic places
6  where people transact.
7    Q    Transact securities?
8    A    Transact securities, yes.
9    Q    In executing the securities in a dark pool,
10 in your understanding did that help SAC reduce the
11 visibility of the trade?
12   A    The point of a dark pool is anonymity.
13   Q    It also refers to trades being done through
14 algos.  Do you know what that refers to?
15   A    That is an electronic trade.
16   Q    What were the algos that made executions in
17 Elan the week of July 21st?
18   A    What was the question?
19   Q    What were the algos that did executions of
20 Elan securities sales for SAC the week of July 21st?
21   A    Well, the way I understand algos, that is a
22 term for algorithms.  Those are electronic trading
23 software that allows you to break up your order and
24 transact it any which way you want.
25   Q    During the week of July 21st, did you have

| Page 199 |
|---|

1  communications with Mr. Villhauer about the sales of Elan?
2    A    I don't remember but I am sure he kept me up
3  on the sales.
4    Q    How did he keep you up on the sales?
5    A    He could have told me, he could have done it
6  by IM.  Either one.
7    Q    By the end of the week of the 21st, did SAC
8  or CR Intrinsic still hold any position in Elan?
9    A    I don't remember.
10   Q    Who is Edmund Debler?
11   A    He was my healthcare conduit, helped me trade
12 my healthcare portfolio in my account.
13   Q    In 2008 what was Mr. Debler's title?
14   A    I don't know what the title was.
15   Q    During the week of July 21st did you talk to
16 Mr. Debler about Elan?
17   A    I might have.  I don't remember.
18   Q    You discussed earlier that you didn't want
19 people within SAC to know about the sales of Elan.
20 Correct?
21   A    That's correct.
22   Q    Was Mr. Debler one of the people that knew
23 about the sales of Elan?
24   A    He might have been.  He might have.  I don't
25 remember.

| Page 200 |
|---|

1         MS. COTTRELL:  Other than Martoma and
2  Villhauer and maybe another trader, who else within SAC
3  knew that you were selling your Elan position that week of
4  July 21st?
5         THE WITNESS:  Could have been risk, could
6  have been management.
7         MS. COTTRELL:  When you say "could have
8  been," do you have a recollection of informing risk or
9  informing management?
10        THE WITNESS:  We have -- they see -- we have
11 minute to minute realtime -- they have access to
12 positions, and certainly if they look at it minute by
13 minute they'd see that perhaps at the end of the day.  So
14 it is very conceivable they would have known.
15        MS. COTTRELL:  Did you have any conversations
16 with anyone from risk or management the week of the 21st
17 about selling your Elan position?
18        THE WITNESS:  I might have.
19        MS. COTTRELL:  Do you recall it?
20        THE WITNESS:  I don't recall.
21        (Plaintiff's Exhibit 37, E-mail, SAC 3349531
22        through 32, was marked for identification as
23        of this date.)
24   Q    I am handing the witness Exhibit 37.  A copy
25 has also been provided to his counsel.  For the record

                                    50 (Pages 197 to 200)

# Exhibit K

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/6/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MATHEW MARTOMA,

Defendant.

**ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The Government alleges, inter alia, that between 2006 and July 2008, Martoma traded on the basis of material, non-public information, and caused his hedge fund employer – SAC Capital – to trade on the basis of material non-public information. The material non-public information was allegedly supplied by two doctors – Dr. Sidney Gilman and Dr. Joel Ross – who were participants in a clinical trial of a drug for possible use in treating Alzheimer's disease. Both doctors have entered into cooperation agreements with the Government and are expected testify at trial.

This Order resolves the last outstanding issue with respect to the Defendant's motion to compel the production of any Brady and Giglio material that might be contained in communications between the United States Attorney's Office ("USAO") or the Securities and Exchange Commission ("SEC") and counsel for Dr. Gilman or counsel for Dr. Ross (Dkt. No. 149) – namely, whether the USAO's Brady and Giglio obligations extend to communications

between the SEC and Dr. Gilman's counsel, or the SEC and Dr. Ross's counsel, that are in the sole possession of the SEC.

## BACKGROUND[1]

On December 26, 2013, the Defendant – alleging that the USAO's "<u>Brady</u> and <u>Giglio</u> disclosures remain incomplete" – moved to compel the USAO to produce any such material that might be contained in communications between the USAO or the SEC and counsel for Dr. Gilman or counsel for Dr. Ross. (Dkt. No. 149; Def. Br. (Dkt. No. 150) at 3) The Defendant contended that he is entitled to "statements reflecting discussions [between the USAO or the SEC and] counsel for Drs. Gilman or Ross (i) concerning their clients' and/or Mr. Martoma's innocence, (ii) that are inconsistent with [the doctors'] current statements, or (iii) concerning potential criminal charges." (Def. Br. (Dkt. No. 150) at 2)

In opposing this motion, the USAO argued, <u>inter alia</u>, that it does not have "an obligation to produce [any communications] in the SEC's custody that are not in the possession of the USAO." (Govt. Br. (Dkt. No. 174) at 6)

In a January 4, 2014 Order, this Court found that the Defendant had not demonstrated that the Government had withheld <u>Brady</u> or <u>Giglio</u> material contained in communications from the doctors' counsel to the USAO:

> Here, the Defendant is already aware that Dr. Gilman and Dr. Ross previously provided exculpatory statements that are inconsistent with their anticipated testimony at trial. The USAO has disclosed FBI 302 reports and notes reflecting these prior statements, as well as its own statements to Dr. Gilman's counsel that it did not believe Dr. Gilman's denials. The USAO has represented that it is "not aware of any statements made by the attorneys for Dr. Gilman and Dr. Ross that are materially different than the statements reflecting initial denials already produced to the defense." (Govt. Br. (Dkt. No. 174) at 5) The fact that Dr. Gilman's or Dr. Ross's attorneys may have reiterated their clients' denials at the time that they were made does not add anything meaningful to the cross-examination material already available to the defense on this point. Accordingly, the Defendant has

---

[1] Familiarity with this Court's prior orders is presumed.

2

not demonstrated that the Government has withheld <u>Brady</u> or <u>Giglio</u> material contained in communications from the doctors' counsel to the USAO, and the Defendant's motion to compel will be denied to the extent that it is addressed to such material.

(January 4, 2014 Order at 6)  The Court made no finding as to communications between the SEC and counsel for the doctors.

In the January 4, 2014 Order, the Court also ruled that the Defendant was entitled to disclosure of any statements by the USAO to the doctors or their counsel that either (1) threatened criminal prosecution of the doctors if they did not implicate Martoma; or (2) promised a non-prosecution agreement to the doctors if they implicated Martoma, and ordered such statements – to the extent they exist – to be produced forthwith.  (<u>Id.</u> at 7)

This Court's January 4, 2014 Order does not resolve the issue of whether the USAO's <u>Brady</u> and <u>Giglio</u> obligations extend to communications between the SEC and the doctors' counsel that are in the sole possession of the SEC.  Finding that resolution of this issue turns on whether the USAO and the SEC were engaged in a joint investigation of Martoma, <u>see</u> <u>United States v. Gupta</u>, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012), and that the Court lacked sufficient information to determine whether the two agencies had conducted a joint investigation, this Court directed the parties to submit affidavits addressing this issue by 5:00 p.m. on January 5, 2014.

The Court has reviewed both parties' submissions, and concludes for the reasons stated below that the USAO and the SEC conducted a joint investigation of the Defendant.

## DISCUSSION

"<u>Brady</u> and its progeny require the Government to disclose material information that is 'favorable to the accused, either because it is exculpatory, or because it is impeaching.'"

3

United States v. Rodriguez, 496 F.3d 221, 225 (2d Cir. 2007) (quoting Strickler v. Greene, 527

U.S. 263, 281-82 (1999)).

   The USAO's obligation to produce Brady and Giglio material that is in the sole

possession of the SEC turns on whether the USAO and the SEC were engaged in a joint

investigation of Martoma.  See Gupta, 848 F. Supp. 2d at 493 ("[A]ny argument that the

Government's duty [under Brady and its progeny] does not extend [to certain

materials] . . . merely because another agency, not the USAO, is in actual possession of the

documents created or obtained as part of the joint investigation is both 'hypertechnical and

unrealistic.'") (quoting United States v. Shakur, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982)).

"The inquiry is not whether the United States Attorney's Office physically possesses the

discovery material; the inquiry is the extent to which there was a 'joint investigation' with

another agency." United States v. Upton, 856 F. Supp. 727, 750 (E.D.N.Y. 1994); see Gupta,

848 F. Supp. 2d at 493 ("Where the USAO conducts a 'joint investigation' with another state or

federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing

the materials in the possession of that other agency for Brady evidence.") (citing Upton, 856 F.

Supp. at 749-50).

   Courts in this District apply this "joint investigation" analysis in assessing the

USAO's obligations with respect to Brady and Giglio material held by the SEC.  See Gupta, 848

F. Supp. 2d at 493-95 (finding that the Government had an obligation to review SEC interview

notes and memoranda for Brady material, where the SEC and USAO conducted a "joint

investigation" by jointly conducting 44 witness interviews); United States v. Rigas, No. 02-CR-

1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), aff'd, 583 F.3d 108 (2d Cir.

2009) (finding that the USAO was not obligated to produce interview notes held by the SEC

where there was no joint investigation between the USAO and the SEC).[2]  In particular, courts

look to whether "the agencies are engaged in joint fact-gathering, even if they are making

separate investigatory or charging decisions." Gupta, 848 F. Supp. 2d at 494.  "Assessing

whether a joint investigation occurred is a fact-specific inquiry that is best approached on a case-

by-case basis," United States v. Ferguson, 478 F. Supp. 2d 220, 238 (D. Conn. 2007), and

involves consideration of the "degree of cooperation between agencies," id., such as their

coordination in conducting witness interviews and otherwise investigating the facts of the case.

See Gupta, 848 F. Supp. 2d at 495.

   The record now before the Court demonstrates that the USAO and the SEC did, in

fact, conduct a joint investigation of the Defendant.  "At various times in connection [with] the

criminal investigation into SAC Capital transactions in Elan and Wyeth securities,

representatives of the U.S. Attorney's Office conferred with the SEC about the SEC's parallel

investigation." (Jan. 3, 2014 Devlin-Brown Decl. (Dkt. No. 177) ¶ 4)  These communications

began shortly after the USAO commenced its investigation of potential insider trading in Elan

and Wyeth securities at SAC Capital in July 2011.  (Jan. 5, 2014 Devlin-Brown Decl. (Dkt. No.

179) ¶ 2)   At that time, the USAO and SEC were both conducting "parallel investigations" of

"Martoma's potential involvement in insider trading in Elan and Wyeth." (Id. ¶ 3)  During the

investigation of Martoma's conduct, the SEC and the USAO jointly conducted twenty interviews

---

[2]  Relying on United States v. Rigas, 583 F.3d 108, 126 (2d Cir. 2009), the USAO asserts that
"the Second Circuit has rejected the contention that the USAO has an obligation to produce
documents in the SEC's custody that are not in the possession of the USAO."  (Govt. Br. (Dkt.
No. 174) at 6)  This argument mischaracterizes the holding of Rigas.  In Rigas, the Second
Circuit affirmed the district court's finding that "the United States Attorney's Office was not in
possession of notes from SEC interviews . . . and did not have an obligation to disclose what they
did not possess." Rigas, 583 F.3d at 126.  That ruling was premised, however, on the district
court's finding that the notes were not in the USAO's "possession, custody, or control" because
"there was no joint investigation with the SEC." United States v. Rigas, No. 02-CR-1236 (LBS),
2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008).

of twelve witnesses. (See Strassberg Decl. (Dkt. No. 180) ¶ 12; see also 3501-11; 3501-16;

3501-19; 3501-25; 3501-27; 3501-29; 3502-3; 3502-5; 3502-8; 3503-9; 3503-1; 3504-1; 3505-2;

3510-5; 3512-1; 3514-3; 3510-10)  Six of these interviews were of Dr. Gilman, and three were of

Dr. Ross. (See Strassberg Decl. (Dkt. No. 180) ¶¶ 13, 16; see also 3501-11; 3501-16; 3501-19;

3501-25; 3501-27; 3501-29; 3502-3; 3502-5; 3502-8)  The SEC also provided the USAO with

documents it obtained during its investigation (Jan. 5, 2014 Devlin-Brown Decl. (Dkt. No. 179)

¶ 3), including all documents that it received from SAC.  (Strassberg Decl. (Dkt. No. 180) ¶ 34)

   The SEC and the USAO also coordinated their efforts in conducting depositions

of SAC Capital and its employees.  In particular, the SEC informed the USAO in advance that it

would be deposing Steven A. Cohen – the founder and principal of SAC Capital – on May 3,

2012.  (Jan. 3, 2014 Devlin-Brown Decl. (Dkt. No. 177) ¶ 3)  Four days prior to the Cohen

deposition – on April 30, 2012 – the Assistant U.S. Attorney ("AUSA") handling the Martoma

investigation met with SEC representatives "to discuss evidence obtained through [their] parallel

investigations, including evidence relating to Steve Cohen and others."  (Id. ¶ 4)  Although no

employee of the USAO was present for Cohen's deposition, the AUSA received a phone call

during a break in the deposition with an "update as to the testimony thus far," and "received a

further update after the deposition concluded and prior to an interview that the U.S. Attorney's

Office conducted the following day (without SEC participation) of a former SAC Capital

employee for which knowledge of Mr. Cohen's testimony was relevant."  (Id. ¶ 6)

   Clearly, "the agencies [were] engaged in joint fact-gathering, even if they [were]

making separate investigatory or charging decisions." Gupta, 848 F. Supp. 2d at 494.  Indeed,

the criminal complaint against Martoma expressly acknowledges the SEC's participation in this

fact-gathering, stating that it is based, in part, on "information received from the Securities &

6

Exchange Commission." (Cmplt. (12 Mag. 2985) ¶¶ 7, 36) Accordingly, the Court finds that the USAO and the SEC conducted a joint investigation of the Defendant, and therefore the USAO's obligation to produce communications in accordance with this Court's January 4, 2014 order extends to documents in the sole possession of the SEC.

## CONCLUSION

The USAO will produce to Defendant any communication between the SEC and counsel for Dr. Gilman or counsel for Dr. Ross in which a doctor's counsel makes statements that are materially different from the denials of culpability already produced to Defendant. The USAO's obligation to produce such communications is extended to communications that are in the sole possession of the SEC.

The USAO will also produce to Defendant communications from the SEC to the doctors' counsel, or to Dr. Gilman or Dr. Ross directly, that (1) threaten criminal prosecution of either doctor if he does not implicate Martoma; or (2) promise a non-prosecution agreement to either doctor if he implicates Martoma. The USAO's obligation to produce such communications is extended to communications that are in the sole possession of the SEC.

Dated: New York, New York
       January 5, 2014

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

# Exhibit L

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/4/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MATHEW MARTOMA,

Defendant.

**MEMORANDUM
OPINION & ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On February 6, 2014 – after a month-long trial – a jury convicted Defendant

Mathew Martoma of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and

of two substantive counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17

C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2.  The Superseding Indictment charges

that between summer 2006 and July 29, 2008, Martoma caused his employer, the hedge fund

S.A.C. Capital Advisors, LLC ("SAC Capital"), to trade on the basis of material non-public

information.  (Superseding Indictment (Dkt. No. 61) ¶¶ 1, 8, 14)  The evidence at trial showed

that Martoma obtained material, non-public information from two doctors – Sidney Gilman and

Joel Ross – about the Phase II clinical trial of bapineuzumab, a drug it was thought might be

useful in treating Alzheimer's disease.  Elan Corporation, plc ("Elan") and Wyeth owned rights

to the drug and were responsible for the clinical trial.  The charges against Martoma relate to

trading in the securities of these companies.

Martoma has moved for a judgment of acquittal under Federal Rule of Criminal

Procedure 29 or, alternatively, for a new trial under Federal Rule of Criminal Procedure 33.

(Dkt. No. 270)  For the reasons stated below, Martoma's motions will be denied.

## I.    THE EVIDENCE AT TRIAL

The evidence at trial overwhelmingly demonstrated Martoma's guilt on all three counts in the Superseding Indictment.

During the summer 2006 to July 29, 2008 time period cited in the Superseding Indictment, Martoma served as a portfolio manager at SAC Capital.  (Trial Transcript ("Tr.") 112-17, 434-35)  Both of Martoma's alleged co-conspirators – Dr. Sidney Gilman and Dr. Joel Ross – testified that during this period they disclosed material, non-public information concerning the Phase II clinical trial of bapineuzumab to Martoma.  Dr. Gilman and Dr. Ross's improper disclosures to Martoma included the clinical trial's final results on efficacy, which were not publicly disclosed until the International Conference on Alzheimer's Disease (the "ICAD conference") on July 29, 2008.  Pursuant to confidentiality agreements, both doctors had been given access to confidential information about the study because of their roles in the clinical trial.  Dr. Gilman was the chair of the study's Safety Monitoring Committee (the "SMC"), while Dr. Ross was one of the study's principal clinical investigators.  (Tr. 568, 1168)

The evidence showed that, over a two-year period, Martoma cultivated relationships with Dr. Gilman and Dr. Ross through expert networking agencies.  (Tr. 557, 588, 1231-32)  Dr. Gilman was paid approximately $1000 an hour to speak with Martoma about treatments for Alzheimer's disease through the Gerson Lehrman Group ("GLG").  (Tr. 1228, 1543)  He had at least 43 consulting sessions with Martoma, most of which took place by telephone.  (GX 601)  The evidence showed that Dr. Gilman regularly shared the confidential safety data disclosed at the SMC meetings with Martoma, generally on the day of the meeting or the following day.  (Trial Tr. 1272-76; GX 209; GX 210; GX 211; GX 212; GX 213; GX 601)  Throughout this period, Martoma and SAC Capital amassed large positions in Elan and Wyeth

securities.[1]  (Tr. 124-25, 130, 472-83, 2267; GX 431; GX 436; GX 565-C; GX 1256; GX 1260)

The Government's theory at trial was that Dr. Gilman's improper disclosure of the safety data

permitted Martoma and SAC Capital to build and maintain these positions, secure in the

knowledge that no serious adverse reaction would derail the study (as had happened with a

precursor drug to bapineuzumab).  (Tr. 2941-43, 2950-60, 3134-35)

   At the conclusion of the 18-month bapineuzumab Phase II clinical trial, Elan

asked Dr. Gilman to present the final results at ICAD, in Chicago, on July 29, 2008.  (Tr. 1396)

Dr. Gilman was not unblinded to this data until July 15 and 16, 2008.  (Tr. 1413)  Analysis of the

final results showed that the drug had not met the study's efficacy endpoints – i.e., the study's

results did not indicate that bapineuzumab was efficacious for the treatment of Alzheimer's

disease.  (Tr. 692, 703, 1420-23)  The data also showed no dose effect (i.e., administering more

of the drug did not yield better results for patients), suggesting a lack of efficacy.  Finally, the

mental condition of the placebo group in the non-gene carrier cohort[2] had – for reasons that are

not clear – deteriorated much more quickly than the placebo group in the carrier cohort,

suggesting some type of flaw in the study or in the data. (Tr. 1420-24)

   Elan provided the data to Dr. Gilman in the form of a draft PowerPoint

presentation for the ICAD conference.  Dr. Gilman testified that on July 17, 2008, he went

through the data in the PowerPoint slides with Martoma by telephone.  (Tr. 1424, 1439)  The

Government introduced telephone records showing that Dr. Gilman and Martoma had a one-hour

and forty-five minute call that evening.  (GX 1211)

---

[1]  Martoma managed his own portfolio at SAC Capital – the "GEHC" portfolio – and purchased Elan and Wyeth stock for that portfolio.  (Tr. 118-19, 124-25, 130)
[2]  Individuals who carry a particular gene – the ApoE4 gene – have a greater chance of contracting Alzheimer's disease.  (Tr. 1417)

The evidence further showed that that same day – July 17, 2008 – Martoma

bought a round-trip ticket on Delta Air Lines for travel between JFK airport in New York and

Detroit, Michigan, on Saturday, July 19, 2008. (Tr. 1950, 1952; GX 1307; GX 1308)  The

testimony of Dr. Gilman and a Detroit cab driver, University of Michigan access card logs, and

cell phone tower records show that on Saturday, July 19, 2008, Martoma flew to Detroit, and

took a cab from the Detroit airport to the University of Michigan's campus in Ann Arbor.  (Tr.

1453-56, 1968-69; GX 1210; GX 1307; GX 1400; GX 1401; GX 1402)  There, he met with Dr.

Gilman, at lunchtime, in Dr. Gilman's office.  (Trial Tr. 1453-56)  During this meeting, Dr.

Gilman showed Martoma the PowerPoint slides containing the efficacy results, and discussed the

data with him in detail.  Given that Martoma had studied potential treatments for Alzhemier's

disease for more than two years, and had had countless consultations with medical experts,

including Dr. Gilman, Dr. Ross, and others (Tr. 177, 588, 591, 601-16, 613, 626, 1235, 1390,

GX 601, DX 791, DX 800), a reasonable jury could have concluded that Martoma had – by that

time – a highly sophisticated understanding of the science behind bapineuzumab and was well-

equipped to understand the practical significance of the clinical trial results.  A reasonable jury

could likewise have concluded that Martoma recognized that, in light of the bapineuzumab

study's final results, it was highly unlikely that the drug would receive U.S. Food & Drug

Administration ("FDA") approval at any point in the foreseeable future.

After his lunchtime meeting with Dr. Gilman, Martoma flew back to JFK airport

that same afternoon.  (Tr. 1952-53; GX 1307)  The next morning, Sunday, July 20, 2008, he sent

an email to the principal of SAC Capital, Steven A. Cohen, asking whether the two could speak

by telephone that morning.  (GX 459)  In the subject line of the email Martoma wrote, "It's

important."  Telephone records introduced at trial show that the two men had a 20-minute

4

conversation on Sunday, July 20, 2008.  (GX 1215)  The next day, Monday, July 21, 2008, SAC

Capital began selling the approximately $700 million in Elan and Wyeth securities that it was

then holding.[3]  (Tr. 151-52, 520-22, 2266-67, 2272-75, 2279-80, 2282-93, 2490; GX 431; GX

432; GX 436; GX 554-C; GX 1256; GX 1260)  SAC also entered into significant short

transactions involving Elan and Wyeth securities.  (Tr. 2385, 2387)

   The evidence at trial showed that the sale of Elan and Wyeth securities was kept

secret at SAC Capital.  Martoma did not tell the research analyst (Kathryn Lyndon) and

execution trader (Tim Jandovitz) who worked for him that the positions were being sold.  Indeed,

their computer monitors showed that Martoma's portfolio – the "GEHC" portfolio – was still

holding these securities long after they had been sold.  (Tr. 150-54, 2068-69, 2075-77)  Only

Martoma, Cohen, and Cohen's head trader – Phillip Villhauer – knew that these huge positions

were being sold.  (Tr. 2279-80)  Longtime employees of SAC, including Chandler Bockledge –

Cohen's "right-hand man" – testified that SAC had never sold positions in such a secret fashion

before.  (Tr. 2537, 2562-63, 2566)

   On July 28, 2008, during an evening dinner for Dr. Joel Ross and others who had

served as principal investigators for the bapineuzumab Phase II clinical trial, Elan disclosed the

study's efficacy results.  The evidence showed that Martoma had arranged to meet with Dr. Ross

immediately after the presentation, in the lobby of the hotel where the presentation was to take

place.  (Tr. 714; GX 375)  Dr. Ross told Martoma that bapineuzumab had not shown efficacy in

treating Alzheimer's disease, and the two men discussed some of the data that had just been

---

[3]  During the week of July 21, 2008, Martoma also liquidated the Elan and Wyeth positions in
the "GEHC" portfolio, the portfolio he managed for SAC Capital.  (Tr. 2384-88; GX 431; GX
436; GX 1266)

disclosed at the principal investigators' dinner. Dr. Ross testified, however, that Martoma appeared to already know all the details of the data; Dr. Ross commented that it was almost as if Martoma had been "in the room" when the data were disclosed. (Tr. 715-17)

The next day – July 29, 2008 – Dr. Gilman presented the bapineuzumab efficacy results to the attendees of the ICAD conference. (Tr. 2381, 2395-96) Elan's stock price began dropping even before Dr. Gilman had completed his fifteen minute presentation. (Tr. 2381, 2396; GX 1263) Ultimately, the stock dropped 42% over that day. (Tr. 2379) Wyeth stock suffered a decline of about 12% that day. (Tr. 2383)

After July 29, 2008, when Martoma's research assistant (Lyndon) and execution trader (Jandovitz) discovered that SAC's holdings in Elan and Wyeth stock had been liquidated – including the shares held in Martoma's "GEHC" portfolio – they asked Martoma what had led him to sell. Martoma said merely that he had reviewed his notes and decided that he was no longer comfortable holding the stock. (Tr. 151-54, 2076-77)

As a result of the trades in Elan and Wyeth securities during the week leading up to the ICAD conference, SAC Capital made profits from the short sales and avoided losses totaling $275 million. (Tr. 2391; GX 1268)

## II.   MOTION FOR A JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29

### A.   Legal Standard

Under Fed. R. Crim. P. 29, a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

To prove Martoma guilty of the substantive securities fraud counts at trial, the Government was required to demonstrate, by proof beyond a reasonable doubt, that Martoma (1) in connection with the purchase or sale of the security specified in each count, had employed a

6

device, scheme or artifice to defraud, or engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller of the specified security; (2) acted willfully, knowingly, and with the intent to defraud; and (3) knowingly used, or caused to be used, any means or instrument of transportation or communication in interstate commerce or the mails, or any facility of any national securities exchange, in furtherance of the fraudulent conduct.  (Tr. 3181)  To prove Martoma guilty of the charged conspiracy, the Government was required to demonstrate, by proof beyond a reasonable doubt, that (1) between the summer of 2006 and July 29, 2008, an agreement or understanding between two or more people existed to commit securities fraud; (2) Martoma intentionally and knowingly joined and participated in that conspiracy during the applicable time period; and (3) during the life of the conspiracy, one of the conspirators knowingly committed at least one overt act in furtherance of the conspiracy in the Southern District of New York.  (Tr. 3201-02)

   "In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government," and "[a]ll permissible inferences must be drawn in the government's favor."  United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).  "[U]pon a motion for judgment of acquittal, 'the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'"  Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (internal quotations omitted)).  "The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  Mariani, 725 F.2d at 865.  This is because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing

court." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001).  "The Second Circuit has

observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'"

United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug.

5, 2005) (quoting Mariani, 725 F.2d at 865) (alterations in DiPietro).  Given this standard, "[a]

defendant bears a 'very heavy burden' in challenging a conviction based on insufficient

evidence." United States v. Goldstein, No. S2 01 Cr. 880 (WHP), 2003 WL 1961577, at *1

(S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994)).

**B.    Insufficiency Arguments as to Substantive Securities Fraud Counts**

Martoma argues that the evidence was insufficient to convict him of the

substantive securities fraud counts because the Government did not establish that he received

material, non-public information concerning:  (1) a side effect of bapineuzumab known as

vasogenic edema; (2) enrollment of participants in the clinical trial; (3) dropout rates for study

participants; (4) the lack of a dose response to the drug; (5) the rate of decline in mental

condition of a particular subset of study participants (those who were receiving placebo and who

were carriers of the ApoE4 gene); and (6) the Phase II results to be presented at the ICAD

conference.  (Def. Br. (Dkt. No. 271) at 5-14; see also Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at

3-10)  Martoma further argues that the Government did not show that he received material, non-

public information from Dr. Ross.  (Def. Br. (Dkt. No. 271) at 14-15)

The Government was not required, of course, to show that all of the information

Martoma obtained from Dr. Gilman and Dr. Ross was material, non-public information, or that

Martoma obtained and traded on material, non-public information from both Dr. Gilman and Dr.

Ross.  It is sufficient to support Martoma's securities fraud convictions that the evidence shows

beyond a reasonable doubt that he traded on some material, non-public information he obtained

from at least one of the doctors.  (See Tr. 3185-86 ("[I]n order to find that the Government has

established the first element of the crime of insider trading . . . the Government must prove the

following beyond a reasonable doubt . . . that Dr. Gilman or Dr. Ross breached th[eir] duty of

trust and confidence by disclosing material, non-public information about the bapineuzumab

Phase II clinical trial to Martoma") (emphasis added)))

    Here, a reasonable jury could have found – at the very least – that the final

efficacy data Martoma obtained from Dr. Gilman prior to the ICAD conference was material,

non-public information that Martoma considered when deciding to sell the Elan and Wyeth

positions he was responsible for at SAC Capital, and in advising Cohen to do the same.

Martoma's argument that Elan's June 17, 2008 press release about the bapineuzumab study is

not materially different from the data disclosed at the ICAD conference (see Def. Br. (Dkt. No.

271) at 13-14) was not persuasive to the jury and is not persuasive to this Court.  Even assuming

that Dr. Thomas Wisniewski – an expert in Alzheimer's disease who testified for the defense at

trial – had the knowledge necessary to "read between the lines" of the June 2008 Elan press

release, there is overwhelming evidence that the investor community – from the June press

release – had a more positive impression of the results of the bapineuzumab clinical study than

appeared warranted after the data was disclosed at the late July ICAD conference.  The investor

community reacted with extreme disappointment to the data disclosed at the ICAD conference,

and that reaction was as swift as it was pronounced:  Elan's stock price fell 42% in one day.  The

reaction of the investor community is reflected in a contemporaneous report prepared by a stock

analyst who had followed the bapineuzumab clinical trial and who was a defense witness at trial:

"[the] [d]ata is a disaster."  (GX 1353)

Whatever reaction medical experts may have had to the efficacy data disclosed at the ICAD conference, the reaction of the investor community was that bapineuzumab was not headed for FDA approval anytime soon, if ever.  The evidence the Government offered at trial on this point is sufficient to support a conclusion that a "reasonable investor" would have found the efficacy data disclosed at the ICAD conference "material" – i.e., "significant in deciding whether to buy, sell, or hold securities, and at what price to buy or sell securities." (Tr. 3189)

Emphasizing that the Government did not introduce at trial any email from Dr. Gilman to Martoma containing the ICAD presentation slides, Martoma argues that the Government offered only speculation as to whether he received the final efficacy data from Dr. Gilman prior to the ICAD conference.  (Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 8-10)  This argument provides no basis to disturb the jury's verdict, however.  Whether or not Dr. Gilman emailed the draft ICAD PowerPoint presentation slides to Martoma, there was abundant evidence that Martoma received the final efficacy data from Dr. Gilman.  This evidence included Dr. Gilman's testimony that he discussed the data with Martoma by telephone on July 17, 2008, and discussed the results with him again in a July 19, 2008 meeting that took place in Dr. Gilman's University office in Ann Arbor, Michigan.  Dr. Gilman's testimony on this point was corroborated by a wealth of independent evidence including (1) telephone records showing a one-hour and forty-five minute telephone call between Dr. Gilman and Martoma on July 17, 2008; (2) testimony and airline records showing that on July 17, 2008 – the same day Martoma spoke with Dr. Gilman – Martoma purchased a round-trip ticket from JFK airport to Detroit for travel on July 19; (3) cell phone tower records showing that Martoma traveled from New York to Michigan and back on July 19; (4) records concerning a Detroit cab driver's cellphone, which reflected calls to Dr. Gilman's office number and cell phone number on July 19; (5) access card

records at the University of Michigan; (6) email and telephone records reflecting a conversation

between Martoma and Cohen about something that Martoma described as "important" on the

morning of July 20; and (7) Martoma and SAC Capital's secret sale of Elan and Wyeth

securities, which began on the morning of July 21.  No plausible innocent explanation for this

sequence of events was offered at trial.[4]  In sum, the jury heard ample evidence from which it

could have reasonably concluded that Martoma obtained – a week before the ICAD conference –

the final results of the bapineuzumab Phase II study.

Martoma also argues that the Government did not show that he used material,

non-public information in connection with a sale or purchase of securities.  (Def. Br. (Dkt. No.

271) at 15-19)  As set forth in the jury charge, to satisfy this element the Government was

required to show, by proof beyond a reasonable doubt, that the "information [at issue was] a

factor, however small, in his decision to purchase or sell the stock, or cause the purchase or sale

of stock."  (Tr. 3192)  Martoma now repeats his jury argument that, for a variety of reasons –

including the general state of the stock market and the economy in July 2008; the appreciation of

Elan stock between 2006 and 2008; and analyst recommendations in June and July 2008 –

"every input and factor made [the sale of Elan and Wyeth securities] the only reasonable

decision."  (Def. Br. (Dkt. No. 271) at 15-16 (emphasis in original); see also Tr. 3002, 3024,

3072, 3098-107)  It is a question of fact – and therefore a jury question – what motivated

Martoma's actions, however.  Moreover, the Government was not required to prove at trial that

the material, non-public information Martoma had obtained was the only factor that affected his

---

[4]  The only contrary evidence as to the purpose of Martoma's trip to Ann Arbor came in through
Dr. Gilman, who testified that Martoma had told him that he was in the area in order to pay
respects to an uncle who had died several months earlier.  (Tr. 1440)  The jury heard no evidence
corroborating that claim.

decision – just that it was "a factor, however small." (Tr. 3192)  Finally, to prevail against a Rule 29 motion, "the government need not negate every theory of innocence." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000).

In any event, Martoma offered no persuasive argument at trial, and offers no persuasive argument now, against the overwhelming circumstantial evidence demonstrating that it was the information that Dr. Gilman provided to Martoma that led to the decision to sell and short the Elan and Wyeth securities.  The sequence of events described above – Dr. Gilman's telephone disclosure to Martoma on July 17; Martoma's purchase of a plane ticket to Detroit on July 17; the one-day roundtrip to Detroit on July 19 to meet with Dr. Gilman at his University office; the email to Cohen the next day requesting a telephone conference to discuss something "important"; the call with Cohen later that day; and the secret sale of Elan and Wyeth securities beginning on Monday, July 21, the next business day – points to only one reasonable conclusion: that the material, non-public information Martoma had just received from Dr. Gilman – the final efficacy results of the bapineuzumab Phase II clinical trial – contributed to his decision to sell his positions in Elan and Wyeth, and to advise Cohen to do the same in the firm's accounts.

Martoma's argument that he did not "use" the inside information – because it was ultimately Cohen's decision to liquidate the Elan and Wyeth positions in SAC Capital's firm accounts (see Def. Reply Br. (Dkt. No. 283) at 9) – is unpersuasive for the same reason.  The sequence of events described above – including the proximity between the Martoma/Cohen telephone call on July 20, 2008, and the sale of the Elan and Wyeth positions in Martoma's portfolio and the firm's accounts on July 21, 2008, the next business day – support the conclusion that Martoma "cause[d] the purchase or sale of stock" based on the material, non-public information he had recently obtained from Dr. Gilman.

In his reply brief, Martoma argues – for the first time – that the Government has not demonstrated that his charged conduct was "in connection with" the purchase or sale of Elan or Wyeth securities, because there are "no victims" of his crime. (Id. at 10)  This argument ignores the purpose of this Nation's insider trading laws.

As the Supreme Court explained in Chadbourne & Parke LLP v. Troice, 134 S. Ct. 1058, 1067 (2014) – the case that Martoma misconstrues in making this argument – "victims [in securities fraud cases include] 'members of the investing public' harmed by the defendant's 'gain[ing of an] advantageous market position' through insider trading." Id. (quoting United States v. O'Hagan, 521 U.S. 642, 656 (1997)).  "The basic purpose of the 1934 and 1933 regulatory statutes is 'to insure honest securities markets and thereby promote investor confidence.'" Id. at 1067 (quoting O'Hagan, 521 U.S. at 658).  While Martoma and SAC Capital were able to make profits and avoid losses totaling $275 million because of the inside information Martoma had wrongfully obtained, countless other investors who were not privy to this information were forced to bear the full brunt of the steep declines in Elan and Wyeth stock prices, once the final efficacy data from the bapineuzumab clinical study was made publicly available.  The assertion that there are no victims of Martoma's crimes is as astounding as it is meritless.

Also meritless is Martoma's argument that (1) Dr. Gilman and Dr. Ross did not receive any personal benefit as a result of breaching the duties of confidentiality they owed to Elan and Wyeth; and (2) that he was not aware of any personal benefit Dr. Gilman and Dr. Ross received as a result of breaching their duties of confidentiality.[5] (Def. Br. (Dkt. No. 271) at 20-

---

[5] The jury was charged that – in order to find Martoma guilty – it had to conclude, inter alia, "that Dr. Gilman or Dr. Ross personally benefited in some way, directly or indirectly, from the disclosure of the allegedly inside information to Mr. Martoma," and "that Mr. Martoma knew that

23; Def. Aug. 14, 2014 Ltr. (Dkt. No. 299) at 11-15)  The evidence at trial demonstrated that

both doctors received substantial consulting fees every time they spoke or met with Martoma.

(Tr. 613, 1543)  Even assuming that SAC Capital paid a flat fee to GLG for consulting services

(see Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 12), it is undisputed that both doctors received

consulting fees on a session-by-session basis.  The more consulting sessions Martoma arranged

with the doctors, the more consulting fees they received.

       Martoma was also aware that the doctors were paid for each consulting session

with him, in part because he was required to obtain prior approval from GLG for each consulting

session with Dr. Gilman or Dr. Ross, which was a prerequisite for the doctors to be paid for

those sessions.  (Tr. 1031, 1540, 1545; GX 200; GX 202; GX 234; GX 852)  GLG also asked

Martoma to confirm the amount of time that Gilman represented he had spent on consultations

with Martoma.  (See, e.g., DX 729)  Martoma was also aware of SAC's agreement with GLG

and related pricing, because the cost of consulting services provided by GLG experts was

charged to the portfolio that Martoma managed.  (Tr. 2106)  In short, Martoma was aware that,

in providing consulting services to him on 43 occasions, Dr. Gilman was not acting out of the

goodness of his heart.

       In addition to the financial benefits Dr. Gilman and Dr. Ross realized as a result

of their breach of the duties they owed Elan and Wyeth, both men testified to non-pecuniary

benefits they received as a result of their misconduct.  Dr. Gilman testified that – as a result of

his numerous sessions with Martoma – the two men had developed a real friendship.  (Tr. 1237-

---

the information he obtained had been disclosed in breach of a duty owed by Dr. Gilman or Dr.
Ross to Elan or Wyeth and in exchange for a personal benefit to Dr. Gilman or Dr. Ross."  (Tr.
3186)

40, 1488; GX 235)  Dr. Ross testified that he had obtained pharmaceutical industry business

contacts from Martoma that he hoped would be useful in helping him attract Phase I clinical

study work to a new clinical research center with which Ross had become affiliated.  (Tr. 555-

56, 626-27, 630, 684; GX 375)

From this evidence, a reasonable jury could have concluded that Dr. Gilman and

Dr. Ross received both pecuniary and non-pecuniary benefits as a result of breaching the duties

of confidentiality they owed to Elan and Wyeth, and that Martoma was aware of the personal

benefits the doctors received in exchange for breaching the duties of confidentiality they owed to

Elan and Wyeth.

Finally – with respect to the substantive securities fraud counts – Martoma argues

that the Government did not introduce sufficient evidence to demonstrate that he had the

requisite criminal intent.  More specifically, Martoma argues that the Government did not prove

that he knew that (1) Dr. Gilman and Dr. Ross had breached duties they owed to Elan and Wyeth

in disclosing information to him about the Phase II bapineuzumab trial; or (2) he was receiving

material, non-public information from the two doctors in violation of the duties they owed to

Elan and Wyeth.  (Def. Br. (Dkt. No. 271) at 21-23)  The evidence at trial showed, however, that

Martoma frequently communicated with doctors regarding clinical trials and knew – both from

his training at SAC Capital and his agreements with GLG – that Dr. Gilman and Dr. Ross were

not permitted to disclose confidential, non-public information about the Phase II bapineuzumab

trial, including the not yet publicly released final results of the trial.  (Tr. 127-29, 1071-81; GX

585; GX 587; GX 588; GX 589; GX 590; DX 729; DX 800)  In sum, the evidence was sufficient

to demonstrate that Martoma knew that he had received material, non-public information from

the two doctors in violation of the duties they owed to Elan and Wyeth.

### C.    Defendant's Insufficiency Arguments as to the Conspiracy Count

As to the conspiracy charge, Martoma argues that the Government did not introduce sufficient evidence to prove that (1) he possessed the requisite criminal intent to commit this crime, or (2) there was an agreement between Martoma and Dr. Gilman or Dr. Ross to commit securities fraud.  (Def. Br. (Dkt. No. 271) at 23-25)  Martoma's argument regarding criminal intent is addressed above, and fails for the same reasons here.

With respect to the existence of an agreement between Martoma and Dr. Gilman or Dr. Ross to commit insider trading, Martoma argues that no reasonable jury could have found such an agreement, because neither doctor ever discussed the sale of Elan or Wyeth stock with him.  As stated in the jury charge, however,

> [i]t is enough if two or more people, in some way or manner, impliedly or tacitly, come to an understanding to violate the law.  Express language or specific words are not required to indicate assent or agreement to the conspiracy. . . . What the Government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to violate the law and to accomplish an unlawful act.

(Tr. 3203)  Accordingly, it was not necessary for the Government to prove that Martoma and the doctors had expressly entered into an agreement to trade Elan and Wyeth securities based on inside information.  The evidence showed that the doctors knew that (1) Martoma traded securities for a living; (2) the reason he was speaking with them was to obtain information that would be useful in making investment decisions; and (3) they were providing him with material, non-public information about the Phase II bapineuzumab clinical trial in breach of the duties they owed to Elan and Wyeth.  A reasonable jury could conclude from this evidence that Martoma

and Dr. Gilman or Dr. Ross had entered into an agreement to commit securities fraud through

insider trading.[6]

<p style="text-align:center">*     *     *     *</p>

Because the Government offered sufficient evidence as to each element of the

charges against Martoma, his motion for a judgment of acquittal under Fed. R. Crim. P. 29 will

be denied.

## III.   MOTION FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33

Martoma argues, in the alternative, that this Court should order a new trial under

Fed. R. Crim. P. 33 because (1) the jury was "tainted" by evidence unrelated to the charged

offenses – namely, Dr. Ross's testimony and evidence that Dr. Gilman provided Martoma with

confidential information disclosed at SMC meetings; (2) the Government's case depended on Dr.

Gilman's testimony, which was unreliable and inconsistent; (3) the jury was "presumptively

biased" by the unsealing of motions in limine relating to Martoma's expulsion from Harvard

Law School; and (4) Martoma was prejudiced by certain press releases issued by the U.S.

Attorney's Office and the FBI at the time of his arrest.  (Def. Br. (Dkt. No. 271) at 25-37)

Under Fed. R. Crim. P. 33, "[u]pon the defendant's motion, the court may vacate

any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.

> The rule by its terms gives the trial court "broad discretion . . . to set aside a jury
> verdict and order a new trial to avert a perceived miscarriage of justice." . . .
> Because the courts generally must defer to the jury's resolution of conflicting
> evidence and assessment of witness credibility, "[i]t is only where exceptional
> circumstances can be demonstrated that the trial judge may intrude upon the jury
> function of credibility assessment."  An example of exceptional circumstances is

---

[6] Contrary to Martoma's argument, Dr. Gilman's statement – in a September 28, 2008 email –
that he hoped that Martoma "ha[d] not been too terribly set back by the great turmoil in the
markets plus the disappointing drop in Elan stock" (Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 15-
16), sheds no light on whether the two had agreed to violate the securities laws between 2006
and July 29, 2008, as charged in the superseding indictment.

where testimony is "patently incredible or defies physical realities," although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. "There must be a real concern that an innocent person may have been convicted." Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority "sparingly" and in "the most extraordinary circumstances."

United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413-14 (2d Cir. 1992)) (internal citations omitted).

A.   **Evidence Allegedly "Unrelated" to Charged Conduct**

Martoma argues that he is entitled to a new trial because the Government introduced certain evidence "unrelated to the charged offenses," which "tainted the jury." (Def. Br. (Dkt. No. 271) at 26-30; see also Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 26-28) Martoma cites Dr. Ross's testimony, and Dr. Gilman's testimony about his disclosures to Martoma after SMC meetings, as evidence "unrelated to the charged offenses." (Id.) The crux of Martoma's argument is that the Government ultimately did not rely on this evidence to prove its case, and that introduction of this proof confused the jury and prejudiced Martoma. This argument is not persuasive.

As to Dr. Gilman's disclosures to Martoma regarding the SMC meetings, this proof was not "unrelated" to the charged conduct. It is well-established in this Circuit that evidence of uncharged acts "may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed." United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); see also United States v. Pipola, 83 F.3d 556, 566 (2d Cir.

1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) ("[I]t is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.").

Here, the SMC evidence demonstrated an ongoing conspiratorial relationship between Martoma and Dr. Gilman, in which Dr. Gilman disclosed confidential information concerning the Phase II bapineuzumab clinical trial to Martoma with knowledge that Martoma would use this information in making investment decisions. The evidence showed that over the course of two years Dr. Gilman repeatedly and consistently shared information with Martoma about the Phase II trial following SMC meetings. (Tr. 1275-76; GX 209; GX 210; GX 211; GX 212; GX 213) Indeed, Dr. Gilman even rescheduled consultations with Martoma on multiple occasions so that they would take place after rescheduled SMC meetings. (GX 209, 212, 213) It was through this relationship that Dr. Gilman and Martoma formed their conspiracy to trade on inside information, and it was this relationship that ultimately made it possible for Martoma to learn the final efficacy results of the Phase II trial – and to trade on this information – before the results were publicly announced. In sum, the Government's introduction of the SMC evidence was proper because it constituted background to the charged conspiracy and showed the development of the illegal relationship between Dr. Gilman and Martoma.

Moreover, and contrary to Martoma's arguments (see Aug. 14, 2014 Ltr. (Dkt. No. 299) at 27), in presenting this evidence the Government did not confuse the jury by conflating "confidential" information with "material, non-public information." The Government

made clear to the jury that it did not contend that the SMC information was the basis for

Martoma's trading in July 2008.  (See Tr. 3134-35)  The Court also instructed the jury that

> confidential information is not necessarily the same as material, non-public
> information.  Information may be confidential that is neither material nor non-public.
> Evidence that Dr. Gilman and Dr. Ross violated confidentiality agreements does not
> alone establish that they disclosed material, non-public information.  The
> Government must prove beyond a reasonable doubt that Dr. Gilman and Dr. Ross
> disclosed material, non-public information – not simply confidential information.

(Tr. 3190-91)  Under these circumstances, there is no basis to conclude that the jury believed that

merely confidential information could support a conviction.

As to Dr. Ross's testimony, the Government told the jury in its opening that the

information Dr. Ross provided to Martoma "was confidential . . . [and] was useful to Mathew

Martoma, but it certainly wasn't the end-all and be-all."  (Tr. 40)  Dr. Ross's testimony was far

from irrelevant, however.  At the very least, Martoma's contemporaneous efforts to obtain

confidential information from Dr. Ross about the same Phase II bapinuezumab study shed light

on Martoma's intent in his dealings with Dr. Gilman.

To the extent that Martoma argues that the Government improperly focused on

Cohen and SAC Capital's trading in Elan and Wyeth securities at trial (see Aug. 14, 2014 Def.

Ltr. (Dkt. No. 299) at 27-28), this argument is likewise without merit.  As discussed above, the

evidence at trial was sufficient for a reasonable jury to find that Martoma had relayed material,

non-public information about the final efficacy results of the Phase II trial to Cohen, and that

Cohen and Martoma then orchestrated secret trades in those securities on the basis of that

information during the week leading up to the ICAD conference.  Cohen and SAC Capital also

compensated Martoma on the basis of these trades.  Under these circumstances, the evidence

concerning Cohen and SAC Capital's trades in Elan and Wyeth stock was properly admitted to

demonstrate Martoma's motivation for engaging in insider trading, his fraudulent scheme, and his criminal intent.

**B.     Dr. Gilman's Testimony**

Martoma next argues that he is entitled to a new trial because Dr. Gilman's testimony should be rejected in its entirety.  (Def. Br. (Dkt. No. 271) at 30-36)  Martoma contends that Dr. Gilman's testimony should be ignored because (1) it contained certain inaccuracies and inconsistencies; (2) Dr. Gilman testified under a non-prosecution agreement; (3) Dr. Gilman reviewed documents before his testimony; and (4) Dr. Gilman's demeanor on cross-examination was different than his demeanor on direct examination.  (Id.; see also Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 2-3, 17-20)

"In deciding [a Rule 33] motion, the Court may weigh the evidence and the credibility of witnesses, but cannot 'wholly usurp' the role of the jury."  United States v. Lloyd, 947 F. Supp. 2d 259, 265 (E.D.N.Y. 2013) (quoting Autuori, 212 F.3d at 120).  "'It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment,'" Autuori, 212 F.3d at 120 (quoting Sanchez, 969 F.2d at 1414), such as "[w]here testimony is patently incredible or defies physical realities."  Sanchez, 969 F.2d at 1414.  Even if a "trial judge[ ] reject[s ] all or part of the testimony of a witness or witnesses[, that] does not automatically entitle a defendant to a new trial."  Id.  Instead, "[t]he test is whether 'it would be a manifest injustice to let the guilty verdict stand.'"  Id. (quoting United States v. Reed, 875 F.2d 107, 114 (7th Cir. 1989)).

Here, all of the issues raised by Martoma relate to Dr. Gilman's credibility as a witness, and defense counsel explored all of these matters at length on cross-examination.  For example, the jury was well-aware that Dr. Gilman was testifying under a non-prosecution

agreement; that fact was raised in opening statements and addressed repeatedly throughout the trial. Defense counsel cross-examined Dr. Gilman extensively about his cooperation with the Government, including the circumstances under which he obtained a non-prosecution agreement. Moreover, the jury was instructed that because Dr. Gilman was a cooperating witness, his testimony "must be scrutinized with special care and caution." (See Tr. 3167-68)

As is often the case with witnesses testifying about events that took place five or more years before trial, Dr. Gilman sometimes had a failure of recollection, and at times his testimony was confused and inconsistent with earlier statements. His testimony on the key points – his involvement in the Phase II bapineuzumab study, the complex science associated with bapineuzumab, the significance of the study data, his relationship with Martoma, and the confidential information he provided to Martoma – was clear, however.[7] Moreover, as discussed

---

[7] As evidence of the alleged unreliability of Dr. Gilman's testimony, Martoma repeatedly cites the following colloquy during Dr. Gilman's re-direct examination:

> Q. Dr. Gilman, sitting here today, are you at all confused about whether you provided Martoma with information about the ICAD presentation in advance?
>
> A. No, sir. I'm not confused.
>
> Q. Did you decide to end your career for something you had never done?
>
> A. No, I didn't say that I would end my career that way. It was an unfortunate result of internal conflicts within my unconscious brain that did it.

(Tr. 1943; see Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 3, 19)  Because neither side explored what Dr. Gilman meant in referring to "internal conflicts within [his] unconscious brain," it is not clear what Dr. Gilman intended to communicate in making this remark about the end of his long and distinguished career at the University of Michigan. In any event, this isolated statement is not sufficient to cast doubt on hours of testimony in which Dr. Gilman explained the nature of the information he disclosed to Martoma and the circumstances under which that disclosure was made.

above, Dr. Gilman's account was supported by strong circumstantial evidence.[8]

Martoma's other complaints about Dr. Gilman's testimony are likewise unpersuasive. It is not unusual for a witness to review documents prior to testifying, particularly where – as here – the events at issue occurred five or more years before trial. It is also not uncommon for a witness's demeanor to change somewhat during cross-examination, particularly where – as here – the cross-examination is hostile and adversarial.

In sum, Dr. Gilman's testimony was not "patently incredible," nor did it "def[y] physical realities." Sanchez, 969 F.2d 1414. To the contrary, Dr. Gilman's account was – as to the key issues – supported by strong circumstantial evidence. There is no basis for rejecting Dr. Gilman's testimony, nor does it provide any basis for granting Martoma's motion for a new trial.

### C. Unsealing of Motions Referencing Martoma's Expulsion from Harvard Law School and Government Press Releases

Martoma argues that the jury was "presumptively biased" by the unsealing of motions in limine that had been filed by the Government and Martoma regarding his expulsion from Harvard Law School. (Def. Br. (Dkt. No. 271) at 36-37) Martoma further contends that he was prejudiced by pre-trial publicity. (Id.; Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 20-25)

Prior to trial, the Government moved in limine to introduce evidence concerning Martoma's expulsion from Harvard Law School. The Government represented that this evidence indicated that Martoma

---

[8] For example, although Dr. Gilman testified that he did not recall the critical July 19, 2008 meeting with Martoma in Ann Arbor, Michigan, until very late in his cooperation with the Government, the fact that that meeting took place was confirmed by a great deal of circumstantial evidence, including, inter alia, the same-day roundtrip plane tickets Martoma booked after his telephone call with Dr. Gilman about the final efficacy results; telephone records; University of Michigan access card records; the cell phone records of the cab driver who drove Martoma to the meeting with Dr. Gilman; and cell phone tower records.

(1) used computer software to generate a forged law school transcript, and then submitted the falsified transcript to Federal judges in connection with his application for a clerkship;

(2) was then interviewed by several judges, on the basis of the falsified law school transcript;

(3) during disciplinary proceedings at Harvard Law School, altered the date of an e-mail he submitted as mitigating evidence; and

(4) during the disciplinary proceedings, submitted a computer forensic report concerning the date on which the email had been sent, without disclosing to the disciplinary committee that he had formed the company that had prepared the forensic report.

(Govt. Motion in Limine (Dkt. No. 200) at 1, 3-5)  The Government argued that Martoma's sophisticated computer skills might become relevant at trial, given the absence – on Martoma's laptop – of any email from Dr. Gilman attaching the draft PowerPoint presentation for the ICAD conference.  (Id. at 1-2)  In his own motion in limine (Dkt. Nos. 197, 198), Martoma moved to preclude any mention of his expulsion from law school.  Martoma also argued that the motions in limine and supporting documents should be sealed, because the law school expulsion was a "source of great embarrassment to Martoma" and "would risk tainting prospective jurors and biasing them against [him]."  (Dec. 6, 2013 Def. Ltr. (Dkt. No. 195) at 1)

On December 28, 2013, this Court denied Martoma's request to seal the motions in limine and the supporting documents, finding that he had not overcome the strong presumption of public access that applied to these materials.  (Dkt. No. 196)  The Court stayed its order, however, to permit Martoma to seek appellate review.  (Id.)

Martoma filed an appeal, and on January 8, 2014, the Second Circuit dismissed Martoma's appeal for want of jurisdiction, finding that the exercise of appellate jurisdiction under the collateral order doctrine would not be appropriate.  United States v. Martoma, No. 13-4807, 2014 WL 68119, at *1-2 (2d Cir. Jan. 8, 2014) (summary order).  The Second Circuit also

24

ruled that, to the extent the appeal could be treated as a petition for a writ of <u>mandamus</u>, the court saw "no adequate basis in fact or in law for concluding that the district court exceeded the bounds of its power or clearly abused its discretion in denying Martoma's motion to seal." <u>Id.</u> at *2.  Accordingly, to the extent that the appeal could be construed as a petition for a writ of <u>mandamus</u>, the petition was denied.  (<u>Id.</u>)

That same day, Martoma asked this Court to again stay its decision while he sought <u>en banc</u> review.  This Court denied that request, finding that it was highly unlikely that a petition for <u>en banc</u> rehearing would be granted.  (Dkt. No. 191)  Martoma did not seek further appellate review, and accordingly the motions <u>in limine</u> were unsealed on January 9, 2014.  (Dkt. No. 192)

Jury selection began on January 7, 2014.  At the outset of the jury selection process, repeatedly throughout that process, and repeatedly once a jury was selected, this Court instructed the jurors not to read, look at, or listen to anything about the case outside of the courtroom.  (<u>Voir Dire</u> Tr. 6-7, 338-39, 371; Trial Tr. 20, 222, 337, 550, 656, 764, 862, 974-75, 1084, 1202, 1286-87, 1443, 1618, 1705, 1795, 1908, 1982, 2128, 2224, 2345, 2451, 2572, 2668, 2759, 2858)  On January 10, 2014, the morning after the motions <u>in limine</u> were unsealed, the Court polled the jury – which by that time had been empanelled – to determine whether any juror had read, seen, or heard anything about the case before arriving at court.  (Tr. 22)  The jurors responded that they had not.

At trial, no evidence concerning Martoma's expulsion from Harvard Law School was introduced.

Martoma now contends that he is entitled to a new trial based on the unsealing of the motions <u>in limine</u>, arguing that the jury was "presumptively biased" against him.  Martoma

offers no factual or legal support for this argument, however. There is no evidence that any juror was ever exposed to these materials. Moreover, the two cases Martoma cites in support of this argument – Estes v. State of Texas, 381 U.S. 532 (1965) and Bruton v. United States, 391 U.S. 123 (1968) – are not on point. Estes concerns the use of cameras in the courtroom. In that case,

> [i]nitial [pretrial] hearings were carried live by both radio and television, and news photography was permitted throughout. . . . [A]t least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table.

Estes, 381 U.S. at 536. When a "jury was empaneled at the trial[,] four of the jurors selected had seen and heard all or part of the broadcasts of the earlier proceedings." Id. at 538. No such circumstances are present here. Bruton, or course, concerns the question of whether the conviction of a defendant at a joint trial should be set aside where the jury heard a co-defendant's confession that inculpated the first defendant. Bruton, 391 U.S. at 123-24. Neither Estes nor Bruton suggests that this Court should assume that the jurors in this case disregarded the Court's instructions, misrepresented what they had seen, heard, or read, or were somehow biased against Martoma based on materials that they were never exposed to.

Martoma also argues that he was unfairly prejudiced by press releases issued by the U.S. Attorney's Office and the FBI on November 20, 2012, after his arrest. (Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 20-25) Martoma asserts that these press releases disclosed that he had been terminated by SAC Capital, and contained factual inaccuracies and "statements that were beyond inflammatory." (Id. at 23-24) Martoma further claims that potential defense witnesses were thereby intimidated from testifying, and that the fairness of potential jurors was compromised. (Id. at 24-25) Martoma provides no factual support for any of these arguments, however. He does not cite a single witness who refused to testify or to cooperate with the

defense, asserting only in general terms that "the Government's intimidation of potential defense witnesses rendered testimony from other investors and members of the financial industry largely unavailable." (Id. at 25)  Martoma likewise does not explain how statements made in two press releases issued fourteen months before trial unfairly prejudiced him.  Venire members were asked – in both a written questionnaire and in oral voir dire – whether they had read, seen, or heard anything about Martoma, Steven A. Cohen, or SAC Capital.  (Voir Dire Tr. 5, 99)  The vast majority of venire members responded in the negative.  Those panel members who indicated any familiarity with Martoma, Cohen, SAC Capital, or the subject matter of the charges were carefully questioned and, where appropriate, excused.

Neither the unsealing of the motions in limine concerning Martoma's expulsion from Harvard Law School nor the press releases issued by the U.S. Attorney's Office and the FBI provide any basis for granting Martoma a new trial.

## CONCLUSION

For the reasons stated above, Martoma's motion for a judgment of acquittal or, alternatively, for a new trial, is denied.  Sentencing will proceed as scheduled on September 8, 2014, at 3:00 p.m.

Dated: New York, New York
        September 4, 2014

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge