# No. 14-3599

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**
———————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

MATHEW MARTOMA,

*Defendant-Appellant*.

———————————

On Appeal from the United States District Court for the
Southern District of New York, No. 1:12-cr-973-1
———————————

**BRIEF FOR APPELLANT**
———————————

ALEXANDRA A.E. SHAPIRO
ERIC S. OLNEY
JEREMY LICHT
SHAPIRO ARATO LLP
500 Fifth Avenue
40th Floor
New York, New York 10110

CHARLES J. OGLETREE, JR.
54 Pemberton Street
Cambridge, MA 02140

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
HARKER RHODES
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Defendant-Appellant*

February 2, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

INTRODUCTION .......................................................................... 1

JURISDICTION............................................................................. 3

STATEMENT OF THE ISSUES ...................................................... 3

STATEMENT OF THE CASE AND FACTS ...................................... 4

    A.    Background ............................................................. 4

    B.    Investigation and Trial........................................... 9

    C.    Sentencing ........................................................... 14

SUMMARY OF ARGUMENT......................................................... 15

STANDARDS OF REVIEW ........................................................... 18

ARGUMENT .............................................................................. 19

I.    Martoma's Conviction Should Be Reversed Because The Government Failed To Prove Any Personal Benefit Under *United States v. Newman*. ................................................... 19

    A.    The Government Must Prove that the Tipper Disclosed Inside Information to Obtain a Personal Benefit of Consequence. .............. 19

    B.    The Government Failed to Prove the Requisite Personal Benefit. ........................................................... 20

    C.    At a Minimum, Martoma Is Entitled to a New Trial with a Proper Instruction on Personal Benefit. ............................................. 25

II.    Martoma's Conviction Should Be Vacated Because Of The District Court's Serious Evidentiary Errors............................................. 28

    A.    The District Court Incorrectly Excluded Cohen's Prior Testimony About His Elan and Wyeth Trades in July 2008.............. 28

B.     The District Court Incorrectly Excluded Gompers' Expert Opinion that Public Information Showed that Elan Had Little Upside in July 2008. ............................................................... 38

III.    Martoma's Conviction Should Be Vacated Under *Batson*. ......................... 44

IV.    Martoma's Sentence Should Be Vacated As Procedurally Unreasonable. ........................................................................... 48

A.     The District Court Should Not Have Included Gains of Innocent Investors in Its Gain Calculation. ........................................ 49

B.     The District Court Should Not Have Included Cohen's Trades. ................................................................................ 53

C.     The District Court's Erroneous Gain Calculation Requires Resentencing. .......................................................................... 55

D.     The District Court's Forfeiture Order Was Erroneous. ..................... 56

CONCLUSION ......................................................................... 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Fulminante,*
  499 U.S. 279 (1991)..........................................................................44

*Batson v. Kentucky,*
  476 U.S. 79 (1986)............................................................................44

*Cameron v. City of New York,*
  598 F.3d 50 (2d Cir. 2010) ...............................................................39

*Chambers v. Mississippi,*
  410 U.S. 284 (1973)..........................................................................39

*Daubert v. Merrell Dow Pharm.,*
  509 U.S. 579 (1993)..........................................................................39

*Dirks v. SEC,*
  463 U.S. 646 (1983)............................................................... 19, 20

*Dolphy v. Mantello,*
  552 F.3d 236 (2d Cir. 2009) .............................................................46

*Koon v. United States,*
  518 U.S. 81 (1996).............................................................................18

*Miller-El v. Cockrell,*
  537 U.S. 322 (2003)..........................................................................44

*Miller-El v. Dretke,*
  545 U.S. 231 (2005)................................................................ 46, 47

*Snyder v. Louisiana,*
  552 U.S. 472 (2008)........................................................... 18, 46, 47

*Tankleff v. Senkowski,*
  135 F.3d 235 (2d Cir. 1998) .............................................................44

*United States v. Byors,*
  586 F.3d 222 (2d Cir. 2009) .............................................................50

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005)...................................................................18

*United States v. Cavera*,
   550 F.3d 180 (2nd Cir. 2008)..............................................................55

*United States v. Contorinis*,
   692 F.3d 136 (2d Cir. 2012)................................................................56

*United States v. Coppola*,
   671 F.3d 220 (2d Cir. 2012)................................................................55

*United States v. DiNapoli*,
   8 F.3d 909 (2d Cir. 1993)................................................... 30, 34, 35

*United States v. Dokich*,
   614 F.3d 314 (7th Cir. 2010)..............................................................50

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...............................................51

*United States v. Kaiser*,
   609 F.3d 556 (2d Cir. 2010)................................................................35

*United States v. Kellerman*,
   729 F.2d 281 (4th Cir. 1984) ..............................................................23

*United States v. Komasa*,
   767 F.3d 151 (2d Cir. 2014)................................................................18

*United States v. Kozeny*,
   667 F.3d 122 (2d Cir. 2011)................................................................28

*United States v. Mahaffy*,
   693 F.3d 113 (2d Cir. 2012) ...................................................... 25, 27

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991)................................................................22

*United States v. Nacchio*,
   No. 1:05-cr-545 (D. Colo. Aug. 2, 2007)...........................................49

iv

*United States v. Newman*,
    773 F.3d 438 (2d Cir. 2014) .................................................................... *passim*

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ............................................................................ 20, 51

*United States v. Perez*,
    43 F.3d 1131 (7th Cir. 1994) .............................................................. 25

*United States v. Peters*,
    732 F.3d 9 (2d Cir. 2013) .................................................................... 19

*United States v. Potes-Castillo*,
    638 F.3d 106 (2d Cir. 2011) ................................................................ 52

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008) ................................................................ 43

*United States v. Simpson*,
    319 F.3d 81 (2d Cir. 2002) .................................................................. 53

*United States v. Sklena*,
    692 F.3d 725 (7th Cir. 2012) ............................................................ 31, 32

*United States v. Smith*,
    155 F.3d 1051 (9th Cir. 1998) ............................................................ 43

*United States v. Stout*,
    509 F.3d 796 (6th Cir. 2007) .............................................................. 42

United States v. Whitman,
    555 F. App'x 98 (2d Cir. 2014) ........................................................ 33, 34

*United States v. Whitman*,
    No. 12-CR-125 (S.D.N.Y. Aug. 14, 2012) ........................................ 33

*Whitman v. United States*,
    135 S. Ct. 352 (2014) .......................................................................... 43

*Wood v. Ercole*,
    644 F.3d 83 (2d Cir. 2011) .................................................................. 27

*Zapulla v. New York*,
    391 F.3d 462 (2d Cir. 2004) ...............................................................27

**Statutes**

18 U.S.C. §981 ....................................................................................56

18 U.S.C. §3231 ....................................................................................3

28 U.S.C. §1291 ....................................................................................3

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ...................................................................3

Fed. R. Evid. 804(b)(1) .........................................................................29

**Other Authorities**

Pet. of the United States of America for Rehearing and Rehearing En
    Banc, *United States v. Newman,* 773 F.3d 438 (2d Cir. 2014) (Nos.
    13-1837, 13-1917) ........................................................................25

U.S.S.G. §2B1.1 ............................................................................ 15, 50

U.S.S.G. §2B1.4 .................................................................... *passim*

U.S.S.G. ch. 5, pt. A ..........................................................................15

**INTRODUCTION**

This case is just the latest example of the government's persistent efforts to create an insider trading jurisprudence that is divorced from Supreme Court precedent and the culpability of the individuals that it has targeted. As the Supreme Court has made crystal clear, the tipper who violates fiduciary duties by disclosing inside information is the primary wrongdoer, and professional traders do not face criminal liability simply for trading while in possession of inside information. Instead, to hold an alleged tippee liable, the government must prove, among other things, that the tipper disclosed the inside information in exchange for a personal benefit of some real consequence. There is no evidence from which a rational jury could have found that standard satisfied here. The alleged tipper here, the government's star witness, conceded on the stand that he neither sought nor received any financial compensation for purportedly providing the inside information. And any "friendship" between that tipper and Martoma pales in comparison even to the relationships that this Court recently found wanting in *United States v. Newman*. Accordingly, Martoma's conviction cannot stand. At a minimum, the government should be required to prove its case without relying on the exceedingly lax "friendship" standard that this Court has now rejected.

But the flaws in the proceedings below do not end there. Martoma was twice deprived of the opportunity to present testimony critical to his defense to the jury.

First, the district court erroneously excluded the deposition testimony of Steven Cohen, thus depriving the jury of its only opportunity to hear from the man who actually made the bulk of the trades for which Martoma was charged and sentenced. That testimony makes clear that Martoma played little or no role in Cohen's decision to make those trades or to make them in the particular manner that he did.

Second, the court erroneously excluded expert testimony material to Martoma's principal defense—that he sold shares not because he had nonpublic information about impending bad news, but because the prospect of any good news was already priced into the stock, such that maintaining his large position was a no-win proposition. Remarkably, the district court excluded that key expert evidence on the theory that it was not even *relevant* to Martoma's defense. Errors likewise permeated the voir dire proceedings, where the government improperly struck the sole Indian-American prospective juror on the basis of race, and the sentencing proceedings, where Martoma was improperly held accountable for hundreds of millions of dollars in gain realized by unrelated third parties who were not complicit in, not charged with, and not even aware of any purportedly criminal activity.

In short, as this Court has recently reminded the government, bedrock principles of criminal law and basic fairness demand a clear line between the standard practices of professional traders and felonies. One important barrier that separates the two is the need for a real benefit to the tipper before any tippee is held

liable. Another is the ability of a defendant to put on a full defense explaining why a professional without access to inside information would have made the same trade. Because the judgment below violates both of those principles, it cannot stand.

## JURISDICTION

The district court had jurisdiction over this criminal prosecution under 18 U.S.C. §3231. The final judgment of conviction was entered on September 9, 2014. SPA78 (judgment). Martoma filed a timely notice of appeal on September 18, 2014. JA507 (notice of appeal); *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.  Whether Martoma's conviction should be reversed or vacated because the government failed to prove, and the jury was not required to find, that the alleged inside information was disclosed in exchange for a meaningful personal benefit.

2.  Whether Martoma's conviction should be vacated because the district court erroneously excluded prior testimony by Steven A. Cohen, the owner of SAC and manager of the largest portfolio at the firm, about his decision to sell SAC's Elan and Wyeth holdings in July 2008.

3.  Whether Martoma's conviction should be vacated because the district court erroneously excluded on relevance grounds the expert opinion of Paul Gompers, a finance professor at Harvard Business School, who would have testified

3

that public information available in July 2008 showed that the upside for Elan shares of any positive news from the drug trial was already priced into the shares.

4.     Whether Martoma's conviction should be vacated because the government excluded the sole Indian-American venireperson from the jury on the basis of race.

5.     Whether Martoma's nine-year sentence, one of the longest ever imposed in an insider trading case, should be vacated as procedurally unreasonable because the district court erroneously calculated the Guidelines range.

## STATEMENT OF THE CASE AND FACTS

Martoma appeals from a judgment of conviction and sentence entered by the United States District Court for the Southern District of New York (Gardephe, J.) after a jury trial.  The rulings at issue are unreported, except for the court's order excluding Gompers' expert opinion, which is reported at 993 F. Supp. 2d 452.

### A.     Background

Mathew Martoma was hired in 2006 as a portfolio manager at S.A.C. Capital Advisors, LLC ("SAC"), a hedge fund owned and managed by Steven Cohen. JA164, 165.  Martoma's role as a portfolio manager was to find profitable investments for the funds he controlled, which he did by researching companies in detail to predict their future stock performance.  JA165.  He was also expected to recommend investment opportunities to Cohen, who personally managed the firm's

4

largest portfolio. JA165, 168. As is typical of professional traders, Martoma frequently spoke with paid expert consultants to learn as much as possible about the fields in which he was interested. JA167.

Martoma's portfolio, known as GEHC, was focused on pharmaceuticals and healthcare companies. JA165. Among the pharmaceutical companies in which he invested were Elan Corporation, plc ("Elan") and Wyeth, which were jointly developing the experimental drug bapineuzumab as a potential treatment for Alzheimer's disease. JA166-67. From when he first invested in these companies in 2006 through when he ultimately sold his shares in July 2008, Martoma frequently consulted with many experts, including Dr. Joel Ross and Dr. Sidney Gilman, about Alzheimer's disease in general and bapineuzumab in particular. Tr. 588-591, 1232-24. Ross and Gilman both were involved in a clinical trial for the drug—Ross as a principal investigator, administering the drug to a small group of patients, and Gilman as the chair of the safety monitoring committee, reviewing the trial results. Tr. 566-70; Tr. 1174-77. Martoma never paid either doctor directly for these consultations; instead, following industry custom, SAC contracted with expert networks to obtain access to Ross and Gilman, and those expert networks then paid the doctors for their time. *See* JA167, 171, 173, 179-80.

On June 17, 2008, Elan and Wyeth issued a press release explaining the results of Phase II of the bapineuzumab trial. JA547-50. That press release gave an

5

overview of both the safety results (on possible side effects) and the efficacy results (on whether the drug would actually treat Alzheimer's).  Although the press release described the results as "encouraging," it explained that the study "did not attain statistical significance on the primary efficacy endpoints in the overall study population"—*i.e.*, there was no statistically significant difference (on average) between taking bapineuzumab and taking a placebo.  JA547.  The press release reported significant efficacy results only among the subgroup of patients lacking the Apolipoprotein E4 allele, a group estimated at 40% to 70% of the total Alzheimer's population; and even within that subgroup, the results were not significant on all cognitive tests used.  JA547.  The press release noted that more detailed results would be presented on July 29, 2008, at the International Conference on Alzheimer's Disease (ICAD).  JA547-48.

In the days following that press release, the price of Elan shares actually increased substantially, apparently reflecting the expectation that bapineuzumab would prove a "blockbuster" drug.  JA250, 546; *see* JA244-45, 510, 536-37.  Over the next few weeks, several analyst reports responded by advising that, based on the profitability of other highly successful new drugs, Elan's new share price left "little near-term upside potential" even if the results released at ICAD were very positive; by contrast, the significantly increased price now created substantial downside potential if those results were disappointing.  *See, e.g.*, JA245, 510-27, 528-44;

6

JA247-48 (about two-thirds of analyst reports from July 2008 gave Elan a "neutral" or "sell" recommendation).  In other words, the upside from any positive news on July 29 was already priced into the stock, so the ICAD presentation carried only downside risk.  This was particularly true for an early investor like Martoma, who purchased Elan long before the June 17 press release or ensuing price increase.  JA166-67.  Martoma's choice therefore was between locking in more than $27 million in profits earned over the two-year life of his Elan investment, *see* GX 560, or risking those gains should the ICAD presentation reveal bad news.

On Sunday, July 20, approximately a week before the conference, Martoma spoke with Cohen by telephone for about 20 minutes.  He then e-mailed Cohen a summary of the Elan and Wyeth holdings in his GEHC portfolio, as well the holdings in another SAC portfolio.  It was common for portfolio managers at SAC (including Martoma) to communicate with Cohen on the weekends about their investment ideas.  JA168-69; *see* DX 1508.

Over the next week and a half, both Martoma and Cohen traded in Elan and Wyeth.  Between July 21 and July 29, Martoma sold 750,000 Elan shares (worth about $33 million) from his GEHC portfolio and sold or shorted about two million Wyeth shares (worth about $94 million).  *See* GX 560.  Cohen's trading was much more dramatic:  over the same time period, he sold or shorted more than 14.2 million Elan shares (worth about $483 million) and more than 8.4 million Wyeth shares

(worth about $390 million). *See id.* All told, Cohen's trades were worth about seven times the trades made by Martoma. The two also differed in how they executed the trades: While Martoma made trades in the GEHC account openly, Cohen made his transactions through "dark pools" (anonymous markets), "algos" (algorithmic trading platforms), and limited-access accounts (accounts whose transactions were only visible to certain employees). JA236-39.

Even after all these trades, SAC still held a substantial net long position in Wyeth on July 29. *See* JA553. That net long position resulted from an equity swap contract that SAC entered in early 2008, by which it acquired the equivalent of 12 million shares of Wyeth—a position worth over $540 million when trading closed on July 29. JA242, 246, 545, 552.

On the evening of July 29, Gilman presented the final results from the bapineuzumab trial at the ICAD. Although his presentation covered the same safety and efficacy results and reached the same conclusions as the June 17 press release, it provided more specific data from the trial. *See* GX 19-A. By the following day, Elan's price had declined by about 42%, and Wyeth's by 12%. Tr. 2379, 2382-83. Accordingly, as a result of their trades leading up to the ICAD, Martoma and Cohen made approximately $80.3 million and averted approximately $194.6 million in losses, mostly in Cohen's accounts. GX 1267. Over the same period, however, SAC lost approximately $75.6 million on the Wyeth swap. JA307-08.

8

### B.   Investigation and Trial

Martoma consistently has maintained that he made his Elan and Wyeth trades based on the wealth of publicly available information strongly suggesting that the impending ICAD presentation posed more potential for risk than reward.  But the government suspected that those trades were instead the product of inside information—specifically, advance news of the drug trial results that Martoma allegedly received from Gilman and then proceeded to share with Cohen before the ICAD presentation.  Accordingly, the Securities and Exchange Commission (SEC) and the Department of Justice (DOJ) opened parallel civil and criminal investigations into the trades by Martoma and Cohen.

During their investigations, the SEC and DOJ routinely shared evidence and conducted 20 joint interviews of 12 witnesses.  They also coordinated closely on other depositions, including an SEC-led deposition of Cohen on May 3, 2012, that featured calls to the U.S. Attorney's Office before, during, and after the deposition. JA113-14.  During that deposition, Cohen explained that he made his trades based primarily on information from Wayne Holman, a former employee who had a special contract to advise SAC on Wyeth securities and was described by Cohen as "one of the great healthcare investors I have ever met."  JA79, 81, 82.  Cohen also explained that he gave the order to make his trades discreetly because he "was afraid that it would leak out either in the firm or outside the firm … and that people might run in

front of our order, they might tell other people we're selling and, you know, that might create a dislocation in the stock." JA86-87.

Unconvinced by these innocent explanations, the government charged Martoma with one count of conspiracy to commit insider trading, naming Ross and Gilman as coconspirators, and two substantive counts of insider trading for causing SAC to trade in Elan and Wyeth in July 2008 based on the results of the bapineuzumab trial. JA60-75 (superseding indictment). The government subsequently agreed not to prosecute Ross or Gilman in exchange for their testimony against Martoma. GX 740, 971.

Although both men ultimately testified against Martoma, the government's case centered around Gilman's testimony. According to Gilman, after receiving the full efficacy data from Phase II of the bapineuzumab trial on July 15-16, 2008, he promptly called Martoma on July 17 and told him the results. Tr. 1424. Gilman also vaguely recalled e-mailing Martoma a draft of the slideshow that would be presented at ICAD. Tr. 1485-87. When corroborating evidence of any such e-mails failed to materialize, Gilman testified that he met with Martoma on July 19 and walked him through the draft slideshow. Tr. 1453-57, 1830-44.[1] The government sought to substantiate this account with evidence that Martoma traveled to Ann Arbor, where

---

[1] That recollection purportedly came to the 81-year-old Gilman only two weeks before trial. JA220-26.

10

Gilman was located, on July 19. *See* Tr. 1946-60. Gilman testified that he did not seek payment from his expert network for speaking with Martoma on July 17 or 19, and received no financial benefit of any sort from Martoma in exchange for purportedly revealing the critical efficacy data. JA179-80, 227.[2]

Martoma vigorously contested the government's allegations and advanced an innocent alternative explanation for the trades: He and Cohen decided to trade based on publicly available information confirming that any upside potential was already priced into the shares, such that selling in advance of the July 29 presentation was the only reasonable thing to do. JA161-63, 260-62. Martoma also contended that Cohen had reached his decision to sell based largely on Holman's opinion, not any advice or information from Martoma. JA160, 259. As for the manner in which Cohen's trades were made, Martoma argued that he was not involved in Cohen's decision to use "dark pools," "algos," and limited-access accounts, but that, in any case, those mechanisms were simply an innocent way for Cohen to keep others from profiting off of his trading strategy. JA259; *see* JA240.

---

[2] Although both Ross and Gilman testified that they provided Martoma with other confidential information about the bapineuzumab trial on other occasions, the government emphasized at trial that any such information was "totally irrelevant" to its insider trading charges, which were based solely on the allegation that Martoma received the trial results before the ICAD presentation. JA263-64. According to the government, it presented the other testimony only as background information to try to demonstrate that Martoma had a "corrupt relationship" with the two men. JA263-64.

To support those contentions, Martoma sought to introduce the deposition testimony of Cohen himself, who was unavailable because he intended to invoke the Fifth Amendment if called to testify. But the district court denied Martoma's motion, holding that Cohen's testimony was inadmissible hearsay. SPA6-11. The court rejected the argument that Cohen's testimony was admissible under the Rule 804(b)(1) exception for prior testimony, holding that exception inapplicable because the SEC and the United States were not the same party and did not have a similar motive to develop Cohen's testimony. SPA6-11. The court reached that result despite previously recognizing (for *Brady*/*Giglio* purposes) that the SEC and DOJ had conducted a "joint investigation." JA109-115.

Martoma also sought to substantiate his innocent explanation for the trades by introducing the expert opinion of Paul Gompers, a finance professor at Harvard Business School who would have testified that public information available in July 2008 showed that the market for Elan was "overheated"—that is, that the market price already had incorporated the full potential of bapineuzumab becoming a "blockbuster" drug. SPA15. The district court excluded that testimony as well, holding that Gompers' opinion was not relevant. SPA17-23. While the court allowed Gompers to explain analyst reports from July 2008 that indicated Elan had "little near-term upside potential," *see* JA245, it barred him from giving his own

opinion that these reports—and not more optimistic analyst reports on which the government relied—reflected the true state of the market. SPA17-23.

The jury was selected during a three-day voir dire, at which only one prospective juror in the original venire—a retired 64-year-old accountant named Ittan James—appeared to be of Indian-American descent. JA133-34, 154. The government challenged James for cause, claiming that he was dishonest in his responses and that he would not comprehend the evidence. JA151-52. When the court rejected that challenge, the government then used its first peremptory challenge to strike James. JA153. Martoma, who is also Indian-American, challenged that strike as motivated by racial bias. JA154. The government responded by repeating the same reasons that the court already had rejected in denying its for-cause challenge, and by claiming that James appeared particularly unwilling to serve. JA154-55. Despite its previous skepticism, the court denied Martoma's challenge, seating a jury without any members of apparent Indian-American descent. JA155-56.

Racially skewed, and deprived of the testimony described above, the jury convicted Martoma on all counts after three days of deliberations. JA268. Martoma moved for acquittal or a new trial, arguing, *inter alia*, that the government failed to prove that the inside information at issue was disclosed in exchange for a personal benefit. SPA38. The district court denied that motion, holding that the personal

13

benefit element was satisfied by the consulting fees paid to Gilman before July 2008 and by the "real friendship" between Gilman and Martoma. SPA39-40. The court made that ruling without the benefit of this Court's recent decision in *United States v. Newman*, which clarified that the government must prove a personal benefit "of some consequence" and that a mere "casual or social" friendship is not sufficient. *United States v. Newman*, 773 F.3d 438, 452 (2d Cir. 2014).

### C.  Sentencing

Under Sentencing Guideline 2B1.4, the Guidelines range for an insider trading offense depends largely on the "gain resulting from the offense." U.S.S.G. §2B1.4(b)(1). In this case, the only gain actually received by Martoma as a result of his alleged offense was an after-tax bonus of $6.5 million from SAC. But the presentence report (PSR) calculated the gain as $285.4 million—a figure that included Martoma's pre-tax bonus, the gains and avoided losses to SAC on Martoma's trades, and the gains and avoided losses to SAC on Cohen's trades. SPA59; PSR ¶ 33. The district court adopted the PSR's Guidelines calculation, rejecting Martoma's argument that his gain should be limited to the amount he actually received, or at most the amount attributable to his own trades. SPA62-77. Thus, instead of using a $6.5 million gain to reach a Guidelines range of 63 to 78 months, the district court used a gain of over $200 million to reach a range of 188 to

235 months. SPA59; U.S.S.G. §§2B1.1(b)(1)(O), 2B1.4; U.S.S.G. ch. 5, pt. A (sentencing table).

In light of the "extraordinary acts of kindness [Martoma] has shown to family and friends over the years" and his complete lack of criminal history, the district court concluded that the Guidelines range was "far more than is necessary to accomplish all the objectives of sentencing." JA500-01. The court sentenced Martoma to nine years of imprisonment on each substantive insider trading count and five years on the conspiracy count, all running concurrently. JA503, SPA78-83. While below the Guidelines range, that sentence was nevertheless one of the longest ever imposed in an insider trading case. The court also ordered Martoma to forfeit $9,380,322—the pre-tax amount of his 2008 bonus—plus all his interest in certain properties. SPA84-90.[3]

## SUMMARY OF ARGUMENT

As this Court recently made clear in its landmark *Newman* decision, a tippee, unlike a tipper, does not violate any fiduciary duty by trading on material inside information. Instead, the tippee's liability depends on whether the tipper provides the information in exchange for a personal benefit of some real consequence. There is no evidence from which a rational jury could have concluded that the government

---

[3] The sentence also included three years of supervised release and a $300 special assessment.

satisfied its burden to prove such a benefit here. The government's star witness openly conceded at trial that he neither sought nor received financial compensation for the drug trial results that he purportedly supplied to Martoma. And the government's contention that he supplied those results in exchange for an illusory "friendship" that consisted of a cup of coffee and some pleasantries over e-mail repeats—indeed, exacerbates—the same error that the government made in *Newman*. In short, just as in *Newman*, to find a personal benefit on this record would vitiate that critical limitation on the scope of insider trading law.

The district court not only took an unduly broad view of insider trading liability; it also took an unduly narrow view of Martoma's right to defend against the government's allegations. It is critical for a defendant accused of insider trading based on profitable and well-timed trades to provide an alternative explanation for the trades based on publicly available information. Martoma had just such an explanation here: Any potential upside from the revelation of positive trial results for bapineuzumab in July 2008 was already priced into the stock, making the revelation of the information a no-win proposition—especially for investors like Martoma and SAC that had already achieved significant gains from their early investments. But even though this alternative explanation was critical to Martoma's defense, two evidentiary rulings severely undermined his ability to present this innocent alternative to the jury.

16

First, the district court prevented Martoma from presenting prior testimony by Cohen—the man actually responsible for the bulk of the trading—about his decision to sell Elan and Wyeth in July 2008.  That ruling kept the jury from hearing Cohen's testimony that he sold because that was what his leading healthcare investment strategist was advising, not because he received any inside information from Martoma.  It also kept the jury from hearing Cohen's innocent explanation for the decision—a decision that was his, and his alone—to sell SAC's shares in a secretive manner.  Second, the district court prevented Martoma from presenting the jury with Gompers' expert opinion that, based on public information available in 2008, Elan was overheated, in the sense that it was already priced on the assumption that bapineuzumab would be a blockbuster drug.  Despite the obvious importance of Gompers' expert opinion to Martoma's principal defense, the court excluded it as not even relevant.  Separately and jointly, these errors warrant a new trial.

A new trial is also warranted by the government's egregious strike of the only member of the original jury venire who appeared to be of Indian descent.  The government's proffered reasons for that strike were wholly unpersuasive—indeed, the district court itself rejected most of them when the government attempted to strike that same juror for cause.  The only plausible reason for the government to strike that juror was racial bias—a structural error that invalidates the entire verdict.

17

Finally, the district court erred at sentencing. Over Martoma's objection, it calculated the Guidelines range by considering not only the gain that Martoma realized as a result of the trades—about $6.5 million—but also the gain to SAC and its investors, including gain both on the trades by Martoma and on the much larger trades by Cohen. By including SAC's gain—about $275 million—the court more than tripled the Guidelines range. That erroneous calculation led the court to impose a sentence of nine years, one of the longest ever handed down in an insider trading case. The court then added insult to injury by requiring Martoma to forfeit his pre-tax gains, thus ordering forfeiture of nearly $3 million that Martoma never actually received. That sentence and forfeiture order, like the underlying conviction, should not stand.

## STANDARDS OF REVIEW

This Court reviews the sufficiency of the evidence *de novo*, and the conviction cannot stand if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt," based on the current state of the law. *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). It reviews evidentiary rulings for abuse of discretion, *United States v. Komasa*, 767 F.3d 151, 155 (2d Cir. 2014), mindful that "a district court by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996). It reviews a ruling on a *Batson* challenge for clear error. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). Finally, in reviewing

18

sentences and forfeiture orders, this Court examines issues of law *de novo* and factual findings for clear error. *United States v. Peters*, 732 F.3d 93, 98 (2d Cir. 2013).

## ARGUMENT

**I.** **Martoma's Conviction Should Be Reversed Because The Government Failed To Prove Any Personal Benefit Under *United States v. Newman*.**

**A.** **The Government Must Prove that the Tipper Disclosed Inside Information to Obtain a Personal Benefit of Consequence.**

Professional securities traders are "necessary to the preservation of a healthy market." *Dirks v. SEC*, 463 U.S. 646, 658 (1983). As the Supreme Court recognized decades ago, "market efficiency in pricing is significantly enhanced by [traders'] initiatives to ferret out and analyze information" about different securities. *Id.* at 658 n.17. By actively researching companies and investing based on the information that they learn, professional traders ensure that the price of each stock accurately reflects its underlying value. As a necessary corollary of the critical and useful functions that traders perform, there must be a clear divide between standard practices, like consulting industry experts, and federal felonies. One key component of maintaining that divide is the rule, recently reaffirmed by this Court, that a professional trader is not liable for trading on a tip unless he knows that an insider has provided that information in exchange for a meaningful personal benefit.

There is "no 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information.'" *United States v. O'Hagan*,

521 U.S. 642, 661 (1997). Instead, knowingly receiving and trading on material nonpublic information from an insider is unlawful only if the insider breached his fiduciary duty to shareholders in order to obtain a "personal gain." *Dirks*, 463 U.S. at 662. This requirement reflects the reality that the tipper, not the tippee, violates a fiduciary duty and must receive a tangible benefit from the disclosure akin to an insider trading on his own account.

As this Court recently made clear, "the personal benefit received in exchange for confidential information must be of some consequence" to the tipper. *Newman*, 773 F.3d at 452 (holding that benefit must be "consequential"). Accordingly, "the mere fact of a friendship, particularly of a casual or social nature," will not suffice. *Id*. Indeed, if that were enough, then "practically anything would qualify," and "the personal benefit requirement would be a nullity." *Id*. The government instead must show "a *meaningfully close* personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Id*. (emphasis added). If the government "fail[s] to reach that threshold," acquittal must follow. *Id*. at 451.

## B. The Government Failed to Prove the Requisite Personal Benefit.

The government offered no proof from which a rational juror could find that Gilman divulged the efficacy results in exchange for the kind of personal benefit *Newman* requires. It showed no actual or expected financial benefit to Gilman. To

the contrary, Gilman, the alleged tipper and star government witness, expressly denied seeking or receiving any financial recompense for the information that he purportedly provided. While that testimony should have been devastating to the government's case, it simply shifted gears and emphasized the friendship that had developed between Gilman and Martoma. But after *Newman*, the government cannot plausibly continue to claim that Gilman and Martoma had the requisite "meaningfully close personal relationship," as the evidence at trial confirmed that the two were not friends at all, much less "meaningful" or "close" ones.

### 1.    There was no financial benefit.

There is no evidence from which a rational juror could have found that Gilman received a financial benefit for purportedly releasing the efficacy data to Martoma in advance of the ICAD presentation. The district court's contrary conclusion ignored the specifics of the government's actual allegations against Martoma and of Gilman's testimony. According to the court, the jury could have found that Gilman received a personal benefit because he was paid for consulting with Martoma. But it is undisputed that Gilman was *not* paid for either of the July 2008 meetings in which he allegedly gave Martoma the efficacy data. Indeed, Gilman himself testified that he did not seek or receive financial compensation for speaking with Martoma on July 17 or 19 or in exchange for allegedly revealing the data. JA179, 227-28.

Instead, Gilman expressly "disavowed that any … *quid pro quo* existed" for the July 2008 disclosures. *Newman*, 773 F.3d at 435.

That is no minor detail, as those purported disclosures were *the sole basis* for the government's insider trading allegations against Martoma. JA70-72. Even assuming Gilman or Ross provided any inside information to Martoma before those alleged July 2008 meetings, the government expressly emphasized that any information provided at those paid consultations was "totally irrelevant" to the insider trading charges. JA263-64. Accordingly, any compensation the two men received for those earlier consultations is beside the point, as that compensation plainly was not "in exchange for" efficacy results that, by the government's own telling, were released only at subsequent, unpaid meetings. *Newman*, 773 F.3d at 450.

Tellingly, at trial, the government never even asked Gilman—its star witness—to explain *why* he disclosed the efficacy data to Martoma. The government met with Gilman dozens of times to prepare him for the trial. Tr. 1519-20. If he was financially motivated in any way to make the July 2008 disclosures, surely the government would have elicited that before the jury. Its failure to do so confirms what Gilman himself made clear: there was no financial motivation for his purported disclosures. *Cf. United States v. Mulheren*, 938 F.2d 364, 369 (2d Cir. 1991) (reversing denial of acquittal where "the greatest puzzle in th[e] record is why th[e]

22

critical question was never directly put to" a witness by government); *United States v. Kellerman*, 729 F.2d 281, 284 n.6 (4th Cir. 1984).

### 2.    There was no meaningfully close personal relationship.

Gilman's testimony about the absence of a financial benefit from the alleged efficacy disclosure should have been devastating for the government's case. Instead, the government brushed it aside and doubled down on the supposed friendship between Gilman and Martoma. But however strained that argument may have been before *Newman*, it is a non-starter in the wake of that landmark decision. The two men had only one even plausibly social encounter—a "chat" over "coffee" during which Martoma supposedly told Gilman "about his family" and Gilman offered "[n]ot much" about himself. JA175. Martoma once had his assistant try to locate Gilman after he missed a scheduled phone consultation, and Gilman once stated in an e-mail that he "hope[d] all is well with [Martoma] and [his] family" and asked how Martoma was "faring" in the market "turmoil" of 2008. JA75-76, 551. Gilman testified that Martoma said he "wanted [them] to be friends" and, after a period of time, "thought [h]e [and Martoma] were friends." JA175-76, 178. And that is the sum total of the government's evidence that Martoma and Gilman had any kind of personal relationship whatsoever.

Those commonplace professional courtesies plainly do not come close to the kind of "meaningful" or "close" relationship that *Newman* demands. 773 F.3d at

23

452.  Indeed, they are miles away even from the relationships that this Court found wanting in *Newman*.  One *Newman* tipper "had known [the tippee] for years, having both attended business school and worked at Dell together."  *Id.*  The tipper routinely "sought career advice and assistance" from the tippee, who "advised [the tipper] on a range of topics, from discussing the qualifying examination in order to become a financial analyst to editing [the tipper's] resume and sending it to a Wall Street recruiter."  *Id.*  The other *Newman* tipper was a "family friend[]" of his tippee, and the two attended the same church and socialized together.  *Id.*  This Court held such "scant" evidence "simply too thin to warrant the inference that the corporate insiders received any personal benefit in exchange for their tips."  *Id.* at 451-53.

The evidence of a personal relationship is far thinner here.  No rational juror could characterize a cup of coffee and a handful of pleasantries as a "meaningfully close personal relationship."  Even more so than in *Newman*, finding a benefit based on this "friendship" would effectively vitiate the government's burden to prove a personal benefit to the tipper—the very fact that separates legal trading from fraud.  This is just another example of the government attempting to rely on an untenably broad conception of "friendship" rather than actually *proving* that a tipper obtained some meaningful personal benefit.  As in *Newman*, the government has created a record on which "it would not be possible ... for a jury in a criminal trial to find

24

beyond a reasonable doubt that [the tippee] received a personal benefit in exchange for" the only disclosures that matter, and the conviction cannot stand. *Id.* at 453.[4]

### C. At a Minimum, Martoma Is Entitled to a New Trial with a Proper Instruction on Personal Benefit.

Even if this evidence were somehow deemed sufficient, a new trial would be required because the district court's jury instruction on personal benefit cannot be reconciled with *Newman*. Martoma did not object to the instruction, but that was because any objection would have been futile under pre-*Newman* caselaw.[5] "Where ... the source of an alleged jury instruction error is a supervening decision," this court reviews for plain error, and "'the government ... bears the burden to demonstrate that the error ... was harmless'" by showing beyond a reasonable doubt that it did not affect the verdict. *United States v. Mahaffy*, 693 F.3d 113, 136 (2d Cir. 2012). "The gravity" of erroneously instructing the jury on an element of the offense "makes reversal the usual outcome." *United States v. Perez*, 43 F.3d 1131, 1139 (7th Cir. 1994).

---

[4] The government also failed to prove that Martoma "kn[ew] of the personal benefit received by the insider in exchange for the disclosure." *Newman*, 773 F.3d at 448. Even if Gilman viewed the exchange of pleasantries as a close and meaningful friendship, there was no evidence that Martoma knew of that idiosyncratic view.

[5] *Cf.* Pet. of the United States of America for Rehearing and Rehearing En Banc at 1-2, 14-15, *Newman*, 773 F.3d 438 (Nos. 13-1837, 13-1917) (recognizing that *Newman* changed the governing standard).

The jury instructions in this case, which predated *Newman*, enabled the government to bypass the meaningful benefit requirement that *Newman* established. The court instructed the jury that the necessary personal benefit "could include obtaining some future advantage, developing or maintaining a business contact or a friendship, or enhancing the tipper's reputation," and that it could find a personal benefit if Gilman or Ross gave Martoma information "with the intention of benefiting themselves in some manner, or with the intention of conferring a benefit on Mr. Martoma, or as a gift with the goal of maintaining or developing a personal friendship or a useful networking contact." JA266.

That instruction plainly misstated the law under *Newman*, as it instructed that merely "developing or maintaining a ... friendship" qualifies as a benefit. JA266. *Newman* expressly rejected that standard as so utterly devoid of content as to render "the personal benefit requirement ... a nullity." 733 F.3d at 452. Under *Newman*, the government instead must show "a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Id*. The instruction also left the jury with the understanding that *any* benefit, no matter how inconsequential, in relation to a disclosure could satisfy the personal benefit requirement. In fact, the benefit must be "of some consequence" and "in exchange for" the information provided. *Id.*

That instructional error cannot conceivably be described as harmless. The government repeatedly relied on its erroneous "friendship" theory throughout the trial—and the district court did as well in denying Martoma's motion for acquittal. *See, e.g.*, JA158, SPA39-40. Indeed, Gilman's testimony about the gratuitous nature of the efficacy disclosure left the government with little choice. And the record confirms that the jury focused on the benefit issue as the weak link in the government's case; in fact, it expressly sought the court's guidance on whether a consulting fee could qualify as a "personal benefit." JA267. In response, the court simply re-read its prior erroneous instruction, under which *any* conceivable type of benefit, including a mere friendship, sufficed. Tr. 3223-24. The jury nevertheless agonized over its decision, deliberating for nearly three days, another indication that the case was a close one. *See, e.g.*, *Wood v. Ercole*, 644 F.3d 83, 96 (2d Cir. 2011) (error not harmless where jury deliberated into a third day, indicating "a difference among them as to ... guilt"); *Zapulla v. New York*, 391 F.3d 462, 471 (2d Cir. 2004) ("length and deliberative conduct" contributed to finding that "prosecution's case was weak").

In short, the government simply cannot show that it is "clear beyond a reasonable doubt" that the jury would have returned a guilty verdict regardless of the erroneous instruction. *Mahaffy*, 693 F.3d at 136. Accordingly, if this Court does

not reverse for insufficient evidence, it should grant a new trial. *See, e.g.*, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011).

## II. Martoma's Conviction Should Be Vacated Because Of The District Court's Serious Evidentiary Errors.

The district court not only impermissibly blurred the dividing line between lawful trading and trading on an unlawful tip; it also fatally hamstrung Martoma's ability to demonstrate an innocent explanation for his profitable trades by erroneous evidentiary rulings that demand a new trial.

### A. The District Court Incorrectly Excluded Cohen's Prior Testimony About His Elan and Wyeth Trades in July 2008.

Chief among the vital but excluded evidence was the prior deposition testimony of Cohen: a first-hand account by the head of SAC himself, the man who ordered most of the trades at issue, explaining how and why he made those trades. The district court excluded that testimony on the legally erroneous ground that the Rule 804(b)(1) hearsay exception for prior testimony was inapplicable because the SEC and the prosecution were not the same party with the same motive in examining Cohen. That reasoning ignores the court's own conclusion that these two government components conducted a joint investigation for *Brady*/*Giglio* purposes, as well as the fact that the SEC consulted with DOJ before, after, and even during the Cohen deposition. And the deposition transcript itself defeats any suggestion that the SEC was insufficiently motivated to develop incriminating evidence.

### 1. Cohen's prior testimony was admissible under Rule 804(b)(1).

Under Rule 804(b)(1), prior testimony is admissible if (1) "the declarant is unavailable as a witness," (2) the testimony was given "at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one," and (3) the testimony "is now offered against a party who had … an opportunity and similar motive to develop it." Fed. R. Evid. 804(b)(1). There is no dispute that Cohen was unavailable and that his prior testimony was given at a lawful deposition. The dispositive questions are whether the SEC was the same "party" as the United States when it deposed Cohen, and whether it had a "similar motive" to develop Cohen's testimony. The answer to both questions is yes.

Indeed, the district court largely answered both questions affirmatively when it concluded that the SEC and DOJ conducted a "joint investigation" here for *Brady*/*Giglio* purposes. JA115. As the court explained, "[d]uring the investigation of Martoma's conduct, the SEC and [DOJ] jointly conducted twenty interviews of twelve witnesses" and shared numerous documents. JA113-14. The court specifically highlighted the Cohen deposition as a prime example of the extensive coordination between the two offices, noting that the SEC conferred with DOJ before, after, and even *during* the deposition. JA114. Whatever hard questions may exist about when two components of the federal government are considered the same party, they are not posed by the kind of joint investigation at issue here.

29

The close coordination between the agencies likewise confirms that the SEC had a "similar motive" to develop Cohen's testimony at his deposition. The similar motive inquiry turns on whether a party had "an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." *United States v. DiNapoli*, 8 F.3d 909, 914-15 (2d Cir. 1993) (en banc). Here, the SEC had every motive to develop testimony from Cohen that would confirm the SEC's and DOJ's shared theory that the Elan and Wyeth trades were the product of inside information obtained by Martoma and shared with Cohen. The SEC, like DOJ, was looking to bring an enforcement action against the same parties based on the same facts. And the SEC had a particularly intense motive to develop Cohen's testimony because it was considering enforcement action not only against Martoma, but against Cohen or SAC. *See* SPA6 (explaining that the SEC was investigating "whether SAC's trading in Elan securities had violated federal securities laws").

That motive is borne out in the deposition transcript, which reveals that the SEC came armed with all sorts of evidence that it believed supported its theory, and confronted Cohen with that evidence in repeated attempts to elicit damaging testimony about why and how the Elan and Wyeth trades were made. *See, e.g.*, JA86-88, 96. This was no open-ended discussion; the SEC came loaded for bear, seeking *incriminating* information.

30

That makes this case materially indistinguishable from *United States v. Sklena*, 692 F.3d 725 (7th Cir. 2012), in which the Seventh Circuit held that a deposition taken by the CFTC during a civil investigation was admissible under Rule 804(b)(1) in a subsequent criminal prosecution. As that court explained, when two government agencies "play closely coordinated roles on behalf of the United States in the overall enforcement of a single statutory scheme," they "are in substance the same party" for purposes of Rule 804(b)(1). *Id.* at 732. And the Seventh Circuit concluded that the two agencies had a similar motive to develop the relevant testimony because "[b]oth were investigating the same underlying conduct with an eye to taking enforcement action" and thus "shared the same motive to find out what went on." *Id.*

So too here. The SEC and DOJ were "play[ing] closely coordinated roles on behalf of the United States in the overall enforcement of" the exact same substantive insider trading rules. *Id.* And they were doing so "with an eye to taking enforcement action" against the exact same parties based on the same facts. *Id.* The two agencies coordinated their efforts on a regular basis, including before, during, and after the Cohen deposition. And the criminal complaint against Martoma expressly acknowledged the SEC's role in DOJ's investigation, confirming that the allegations were based in part on "information received from the [SEC]." JA114-15. In short,

31

it could hardly be clearer that the agencies were both acting on behalf of United States and doing so with a similar motive.

The district court's contrary conclusion conflicts with both *Sklena* and common sense. The court's lone footnote addressing *Sklena* emphasized that the CFTC is required by statute to report its litigation activities to the DOJ while the SEC is not. But *Sklena* explicitly "decline[d] to hold that [unified litigating authority] is the *sine qua non* for finding that the United States and one of its agencies are in substance the same party," instead choosing to rest its decision on a "[f]unctional[]" analysis. 692 F.3d at 732. Here, that functional analysis readily confirms that the SEC did *in fact* coordinate with and report to DOJ on its investigation, even if it had no obligation to do so.

The district court fared no better with its attempt to distinguish *Sklena*'s "similar motive" analysis on the ground that the deposition at issue there was taken after the CFTC had initiated a civil enforcement action. SPA10. That fact played no role whatsoever in the Seventh Circuit's analysis; to the contrary, the court emphasized that the CFTC and DOJ had the same motive because "both were investigating the same underlying conduct *with an eye to taking* enforcement action," 692 F.3d at 732 (emphasis added)—a factor that plainly is present here as

32

well. Likewise, the court emphasized that each agency would "need[] to prove the same allegations," which, once again, is true here too.[6]

The district court invoked the unpublished district court decision in *United States v. Whitman*, No. 12-CR-125 (S.D.N.Y. Aug. 14, 2012), which was subsequently summarily affirmed by this Court, 555 F. App'x 98, 103 (2d Cir. 2014). But that decision doubly undermines the district court's holding here, as it emphasized that "there *are* occasions when [the SEC and the U.S. Attorney's office] are properly treated as the same party or as joint agents of one another," but that *Whitman* was not such a case, because, *inter alia*, there was no "joint investigation" and "no suggestion that the U.S. Attorney's Office had any role in the conduct of [the] deposition." JA107 (emphasis added). Here, of course, precisely the opposite is true, as there was a joint investigation and DOJ helped the SEC prepare for its deposition of Cohen before, during, and after the deposition.

The district court alternatively relied on *Whitman* for the proposition that "the purpose of a deposition in a civil case or an administrative investigation is to develop investigative leads," not testimony to be used at trial. SPA9. But that categorical

---

[6] Although the court noted that "a lower standard of proof is applicable in a civil enforcement proceeding," SPA9, that does not change the fact that the same ultimate facts must be proven. And it strains credulity to suggest that the SEC would have been less than fully focused on developing favorable testimony from Cohen simply because it did not need to prove its case beyond a reasonable doubt.

33

approach proves too much. Moreover, it is flatly inconsistent both with this Court's decision in *DiNapoli* and with its subsequent summary affirmance in *Whitman*. The Court could not have been clearer in *DiNapoli* that it was *rejecting* blanket rules about what kinds of prior testimony can and cannot be admitted, in favor of a rule "that the inquiry into similar motive *must be fact specific*." 8 F.3d at 914 (emphasis added). That approach is in keeping with Rule 804(b)(1) itself, which does not draw any line between "investigatory" and "adversarial" motives, but rather asks simply whether the motive was "similar."

Consistent with that understanding, this Court in *Whitman* was at pains to identify specific indicia that the deposition testimony there was not developed with a "similar motive," emphasizing that the relevant excerpt consisted of "only two leading questions," and that the rest of the transcript "consisted of general inquiries ..., many of which elicited long, descriptive answers." 555 F. App'x at 103. That is a far cry from this case, where even the brief excerpts Martoma sought to introduce contain dozens of pointed questions designed to push back when Cohen did not provide the answers the SEC appeared to be seeking. *See, e.g.*, JA81, 88, 95-96, 99-100.

Finally, there is no merit to the district court's suggestion that the SEC lacked a "similar motive" because it deposed Cohen "before much of the evidence to be introduced at Martoma's trial was developed." SPA9. As this Court recognized in

rejecting a similar argument in *DiNapoli*, "[i]n virtually all subsequent proceedings, examiners will be able to suggest lines of questioning that were not pursued at a prior proceeding." 8 F.3d at 914. If that were enough to show a lack of similar motive, Rule 804(b)(1) would be a nullity.

### 2. The district court's error materially undermined Martoma's ability to present his defense.

Because Martoma properly objected to the exclusion of Cohen's testimony, "the government has the burden to prove that the error was harmless," which it can do only by demonstrating that it is "highly probable that [the error] did not contribute to the verdict." *United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010). It cannot come close to meeting that burden here.

The government's first problem is that the excluded deposition was not the testimony of some bit player. Cohen not only was the owner of SAC and manager of the largest portfolio at the firm, JA165; he also personally ordered the vast majority of the trades that formed the basis of the government's charges against Martoma. The total amount of Elan and Wyeth shares traded in July 2008 in SAC accounts controlled by Cohen was some seven times the amount traded in the account controlled by Martoma. GX 1256, 1259. And more than three-quarters of the total alleged gain to SAC—$212 million out of $275 million—came from Cohen's accounts. GX 1266, 1267, 1268. Cohen's testimony as to why he made those trades was enormously relevant, and his testimony that he was motivated by

35

advice from someone other than Martoma—a long-time trusted advisor, rather than a recent hire—is powerfully exculpatory.

That is particularly true because the government presented no direct evidence that Martoma or Cohen decided to sell Elan and Wyeth based on inside information. Instead, it relied on circumstantial evidence, such as the profitable timing of the trades and the manner in which they were executed. *See, e.g.*, JA254-56. Cohen's testimony would have given the jury its only direct evidence about his decision to sell—and it would have told them that decision was based primarily on advice from his former employee Holman, JA99. The jury could well have reached a different verdict had it heard Cohen's own statement, under oath, that he sold based on the recommendation of Holman—whom Cohen considered "one of the great healthcare investors I have ever met"—rather than inside information from Martoma. JA79, 81, 82.

Cohen's deposition not only provided the sole direct evidence on this issue; it also undermined a key part of the government's circumstantial evidence. To prove that Martoma and Cohen traded on inside information, the government relied heavily on the seemingly sinister manner in which the trades were executed, emphasizing that the positions were sold "in a way that was completely secret to everyone else at the firm" by using "dark pools," "algos," and limited-access accounts. JA254-56. Both in its opening and closing arguments, the government repeatedly urged the jury

36

to infer that the "unprecedented" secrecy surrounding these trades could only be because they were based on inside information. *See, e.g.*, JA159, 252, 254, 256-57.

Cohen's testimony would have revealed two flaws in that argument. First, Cohen made clear at his deposition that only he, not Martoma, was responsible for the decision to sell from his portfolios without alerting others. JA99. That testimony would have distanced Martoma from any suspicion that might have attached to the manner in which Cohen made his trades—especially since Martoma himself openly sold both Elan and Wyeth shares from his own portfolio. Second, Cohen explained that he used those mechanisms for perfectly legitimate reasons having nothing to do with inside information, but having everything to do with the size of the position and concerns that news of his trading might "leak out" and cause the stock price to drop before he finished selling. JA86-87. Hearing that innocent explanation for these trading mechanisms from Cohen himself would have dispelled the inculpatory inference the government sought to draw.

While Martoma sought to present similar arguments through other witnesses, *see, e.g.*, JA240, their testimony obviously could not substitute for Cohen's own. Given the critical role Cohen played in the underlying events, and the probative

value of his testimony on key issues, the government cannot meet its burden of proving that the erroneous exclusion of that testimony was harmless.[7]

### B. The District Court Incorrectly Excluded Gompers' Expert Opinion that Public Information Showed that Elan Had Little Upside in July 2008.

The district court also committed clear legal error by excluding expert evidence critical to Martoma's defense as irrelevant.  Few things are more relevant to a defendant in an insider trading case than the ability to offer the jury an innocent explanation for highly profitable trades.  Here, that explanation was that by July 2008, the upside of any positive news from the efficacy data was already priced into the stock.  In other words, Elan's stock was "overheated" in that the price reflected the assumption that bapineuzumab would be a "blockbuster."  In that environment, a decision to lock in gains before a news event that could either confirm what the

---

[7] In an extensive footnote to its decision excluding Cohen's testimony, the court recounted portions of that testimony that it considered inculpatory, including passages in which Cohen stated that Martoma initially advised him to invest in Elan and Wyeth, and that in July 2008 Martoma advised him to sell Elan.  SPA3.  That analysis is both legally and factually flawed.  First, whether admitting Cohen's testimony would have benefitted his case was a call for Martoma, not the district court, to make, and there is no question Martoma wanted the evidence admitted.  Second, the district court misunderstood the thrust of the government's case and Martoma's defense.  The early investments through which Martoma and Cohen built their holdings were not at issue.  And Martoma's defense was not that he and Cohen did not speak, but that there were normal, typical reasons to sell an overheated stock with the upside from an impending announcement already priced in.  Cohen's testimony that Martoma's sell recommendation was based on "normal, typical reasons" thus was hardly inculpatory.  SPA4.

price already reflected or dash those expectations makes eminent sense wholly apart from any inside information.  Gompers, a noted finance professor at Harvard, was prepared to offer his expert opinion corroborating that the price for Elan shares was indeed overheated in July 2008.  The court's decision to exclude that evidence as not even relevant was legally erroneous and highly prejudicial.

### 1. Professor Gompers' opinion is plainly relevant.

The bar for relevance, especially for a criminal defendant attempting to preserve his liberty, is not high.  The "basic standard of relevance … is a liberal one," *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 587 (1993), and produces a "presumption of admissibility," *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010).  That presumption takes on a constitutional dimension in a criminal case because it safeguards the defendant's constitutional right to "a fair opportunity to defend against the [government's] accusations."  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

The liberal standard of Rule 401 appears nowhere in the district court's order excluding Gompers' expert opinion that Elan was "overheated."  Instead, the court simply determined that Gompers' opinion "would not assist the jury" in resolving the relevant issues.  SPA18.  That determination is baffling.  There was no dispute that the trades at issue here were well-timed and averted substantial losses.  Thus, the key to Martoma's defense was providing an alternative and innocent explanation

39

for those trades and their timing. Gompers' expert opinion that Elan was "overheated" was a core part of that explanation.[8]

Gompers would have testified that, in the weeks following the June 17 press release announcing the initial Phase II trial results, the market price of Elan securities incorporated nearly all the potential value of bapineuzumab becoming a blockbuster drug. JA187. That led to a rapid increase in the stock price by approximately 40%—almost a mirror image of the rapid decrease that followed the ICAD presentation. JA250, 231, 510, 546. As Gompers would have explained, that made the presentation a no-win proposition and left a savvy Elan investor with an easy decision to make—stay in, with little prospect of additional gain should the results announced at the presentation confirm the positive assumptions already priced into the stock, and with the prospect of substantial losses if expectations were dashed; or lock in gains before the no-win announcement on July 29th. *See* JA187 (proffering Gompers' opinion that "there was little additional upside for Elan securities and considerable downside risk if the market's blockbuster expectations were not met").

The notion that expert testimony from a Harvard economist corroborating this critical view of Elan's share price was not even relevant is remarkable and clearly

---

[8] And this would have been further bolstered by Cohen's deposition testimony on the same subject, which likewise explained that he traded his shares of Elan and Wyeth because he was not interested in retaining an investment that by July 2008 had, at best, a 50/50 chance of any significant further gains. *See* JA97-98.

rested on an erroneous view of the law. The district court seemed to think because Gompers' expert opinion was not contemporaneously available to Martoma and Cohen at the time of the trades, it was just a "post hoc conclusion" that "would not assist the jury in understanding what Martoma was thinking [in July 2008]." SPA17-18. But that reasoning misunderstands the nature of the testimony proposed. Gompers was not offered as a fact witness with contemporaneous knowledge of what Martoma was thinking in July 2008; he was offered as an expert whose testimony would substantiate Martoma's contention that his trades were fully explicable by publicly available market conditions and did not depend on advance access to the information released during the ICAD presentation. That Gompers arrived at his opinion by reviewing that publicly available information after the fact is hardly a reason for excluding his testimony; if it were, then expert testimony would rarely (if ever) be admissible.

The district court also suggested that Gompers' testimony was irrelevant because it did "not make it any more or less likely that the announcement of th[e] results at the ICAD conference triggered the sudden decline in the stock price." SPA22. Once again, the court missed the point entirely. Gompers' opinion was designed not to offer an alternative theory for what "triggered" the decline in the stock price on July 29, 2008, but to offer an alternative explanation for why Martoma and Cohen would have sold Elan and Wyeth before the July 29 presentation, without

41

regard to any advance knowledge of the trial results, because the "stock had only one way to go." JA230. Of course, if the results released at the conference had been more promising, the stock price would not have fallen; but if the upside was priced in, Martoma and Cohen could re-establish their holding at a comparable price after that positive news. That just underscores the importance of Gompers' expert testimony, which helped explain not why the stock dropped, but why selling in advance of the July 29 presentation made sense, whether the news was good or bad.

Finally, the court's alternative holding that Gompers' proffered opinion failed to meet Rule 403's balancing test suffers the same flaw. SPA18-19. Indeed, the court's balancing was premised on—and thus infected by—its mistaken view that Gompers' testimony had little (if any) probative value. The court's Rule 403 analysis therefore must fall with its fatally flawed Rule 401 analysis. *See United States v. Stout*, 509 F.3d 796, 805 (6th Cir. 2007) (in conducting Rule 403 balancing, a court "abuse[s] its discretion by devaluing the evidence's probative value").

### 2. The district court's error materially undermined Martoma's ability to present his defense.

Like the exclusion of Cohen's testimony, the exclusion of Gompers' expert opinion was anything but harmless. Although the district court allowed Gompers to explain certain analyst reports from July 2008 reflecting a contemporaneous view that the market for Elan was overheated, it barred him from offering his own opinion on the issue. SPA19, 23. Thus, when the government pointed to other analyst reports

42

asserting that Elan was *not* overvalued, *see, e.g.*, JA233-34, 247-48; GX 494-A, 495-A, 1370, 1378, the jury was left to view the reports as a wash—a point that the government highlighted in its closing argument. *See* JA258 ("[S]ome of the analyst reports were good and some of the analyst reports were bad …."). Allowing a flesh and blood expert like Gompers to offer his own opinion about the share price would have been critical to helping the jury understand which analysts had the sounder view and could easily have broken the tie on this critical issue. By excluding that evidence, the district court fatally undermined Martoma's argument that public information alone explained the trades.[9]

For largely the same reasons, Gompers' proffered testimony was not merely cumulative of the analyst reports. His testimony was not just another analyst report. He was prepared to offer his own expert financial analysis of pricing, based on established methodologies and subject to cross-examination before the jury. He

---

[9] Prof. Gompers' opinion also would have supported Martoma's alternative argument that any inside information was not a substantial factor in his trading decisions. Every other circuit to address the question has held that to prove insider trading, the government must show the inside information was a significant factor in the trade. *See, e.g.*, *United States v. Smith*, 155 F.3d 1051, 1066-70 & n.28 (9th Cir. 1998). This circuit, however, requires only "knowing possession" of inside information. *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008). The Second Circuit adopted its solitary position by deferring to the SEC's interpretation of Section 10(b), a doubtful exercise of judicial deference. *Id.*; *see Whitman v. United States*, 135 S. Ct. 352, 353-54 (2014) (opinion of Scalia, J., respecting denial of certiorari). Although this panel cannot overrule Second Circuit precedent, Martoma raises these issues here to preserve them.

would have "reinforced and corroborated" the analyst reports opining about overvaluation, *Arizona v. Fulminante*, 499 U.S. 279, 299 (1991), undermined the reports with a rosier perspective, and provided an answer to the government's argument that the reports cancelled each other out. And all this on perhaps the most critical point in the case—whether the trading of Martoma and Cohen was consistent with a lack of knowledge about the July 29 announcement. The mistaken exclusion of a criminal defendant's expert on the key issue in the case is anything but harmless.

## III. Martoma's Conviction Should Be Vacated Under *Batson*.

Under *Batson v. Kentucky*, 476 U.S. 79 (1986), the use of racially motivated peremptory challenges during jury selection is prohibited by the Constitution. *Batson* adopted a three-pronged approach for determining whether peremptory challenges have been used in a racially discriminatory manner:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 328-29 (2003) (citations omitted). An erroneous *Batson* ruling "is a structural error that is not subject to harmless error review." *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998).

The government here prevented "the only [prospective juror] of Indian extraction" in the venire, a 64-year old accountant named Ittan James, from serving

44

on the jury.  JA155.  James gave the court no reason to question his impartiality.  Nevertheless, the government lodged its only for-cause challenge against him.  It offered two pretextual justifications for the challenge, claiming that James made conflicting statements during voir dire and lacked sufficient comprehension of the English language to sit on the jury.  JA151-52.  The district court rejected both contentions and denied the for-cause challenge.  JA152.   The government then exercised its first peremptory strike on James.  JA153.

When Martoma objected on *Batson* grounds, the government responded by repeating its prior justifications and adding a professed concern about James' willingness to serve on the jury.  JA154-55.  The district court did not agree that James was dishonest, obviously unable to understand the proceedings, or more unwilling to serve than other jurors. It nevertheless denied the *Batson* objection.  JA155-56.  Because the government in fact had no legitimate reason for striking James—leaving race as the only explanation—that ruling was clearly erroneous.

According to the government, its "most serious" concern was that James "ha[d] been dishonest with the Court" during voir dire.  JA151-52.  But the district court unequivocally rejected this contention.  JA152 ("I don't believe that he was misrepresenting."); JA155 ("I did not believe that Mr. James was lying to me.").  Moreover, the government failed to challenge the other venirepersons whose voir dire testimony was clearly inconsistent.  *See, e.g.*, JA136 (juror Raisa Guerra initially

45

claiming that she "d[oes]n't … watch TV," but later identifying two sitcoms that she "commonly watch[es]").

The "plausibility [of a stated rationale] is severely undercut by the prosecution's failure to object to other panel members" to whom that rationale applies. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 248 (2005); *accord Snyder*, 552 U.S. at 483-85. Thus, even if James had given inconsistent voir dire testimony, the government's failure to challenge similar venirepersons "supports a conclusion that race was significant in determining who was challenged and who was not." *Miller-El II*, 545 U.S. at 252; *accord Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009).

The government's purported concern about James' request to be excused from jury service was equally pretextual. JA154. James presented several hardships, including his own health and the failing health of his parents in India, whom he would need to visit in the event of a medical emergency. JA127-30. But after the court explained the stringent standard that must be satisfied to excuse a prospective juror, James indicated that he understood, and expressed no reservations about serving. JA130-32.

Critically, many of the prospective jurors and alternates also sought to be excused based on a hardship. Some were ordered to serve after they vociferously objected and refused to sit voluntarily. *See, e.g.*, JA136-149. Unlike James, these

prospective jurors indicated they would not do their duty if selected because their

outside commitments would prevent them from focusing on the evidence.  Examples

include:

- Kathleen Kaswell, CEO of a large company, stated that she "d[id] not feel after 3 weeks away from the office that I can give my 100% attention to the case."  JA119, JA147-49.

- Ronald Bohr, the "supervisor of fiscal services for a school district," complained that he "stopped in the office yesterday after I got out of here and had like 800 e-mails, maybe several phone calls to answer." He stated that "quite frankly, I would worry about the job more than the ability to concentrate on the case."  JA144-46.

- Thomas Gill, a student, griped that in light of his heavy course load, "I'm not sure how I can keep up with" the trial, and that "I just don't think I can do it."  JA140-43.

"If the prosecution had been sincerely concerned that" James might be too distracted

to sit on the jury, "it is hard to see why the prosecution would not have had at least

as much concern regarding" Kaswell, Bohr, Gill, and others.  *Snyder*, 552 U.S. at

483-85; *see also Miller-El II*, 545 U.S. at 241-52.

Nor was James' level of comprehension a legitimate concern.  Indeed, the

district court rejected the government's comprehension argument in ruling on the

for-cause challenge.  It held without qualification that James "understood [the Court]

when [the Court] was communicating with him," had no "trouble understanding" the

Court, and had "recognition in his eyes" when he was "face-to-face" with the judge.

JA152.  Yet in rejecting the *Batson* challenge, the court suddenly and inexplicably

47

credited the government's purported fear that James would not understand the proceeding. JA155-56. Once again, that ignores the treatment of non-Indian-American jurors. For example, alternate juror Alice Mitchell—unlike James—actually conceded that she would have difficulty comprehending the case. JA125.

In short, the inconsistencies that permeate the government's justification for striking James leave only one plausible explanation: The only Indian-American juror was struck on the basis of race. Martoma's conviction therefore must be vacated.

## IV.    Martoma's Sentence Should Be Vacated As Procedurally Unreasonable.

Martoma's 108-month sentence—one of the longest ever in an insider trading case—is vastly out of proportion to the criminal conduct alleged. The driving factor behind this exceedingly harsh sentence was the district court's erroneous decision to tag Martoma with $275 million in gain, even though Martoma's personal gain was a small fraction of that figure and the court's number was inflated by trades that Martoma himself did not make. In other words, most of the gain that resulted in one of the longest insider trading sentences in history not only was not realized by Martoma, but resulted from trades by *another person not found to have committed any crime*. That erroneous gain calculation tripled Martoma's guidelines range, a significant procedural error that requires vacatur of his sentence.

## A. The District Court Should Not Have Included Gains of Innocent Investors in Its Gain Calculation.

In insider trading cases, "victims and their losses are difficult if not impossible to identify." U.S.S.G. §2B1.4 cmt. Accordingly, the insider trading sentencing guideline provides a base offense level of 8 and an enhancement corresponding to "the gain resulting from the offense." *Id.* §2B1.4. Because Martoma did not own any of the shares traded—the SAC funds did—his sole pecuniary gain was his bonus from the fund performance, which minus tax and other withholdings was approximately $6.5 million. JA457; *see* JA299.[10] That gain would have resulted in a Guidelines range of 63 to 78 months—significantly below his 108-month sentence. JA299.

The district court instead concluded, at the government's urging, that Martoma should be charged with all the gains that *anyone* made from the trades underlying the government's allegations—including third parties who were wholly unaware of any purportedly illegal conduct. The court proceeded to measure those purported gains by reference to the losses avoided as a result of the trades made not only by Martoma, but by Cohen as well, even though neither Cohen nor SAC was ever

---

[10] For the reasons explained in Part IV.D, Martoma's personal gain must be limited to the approximately $6.5 million of the $9.3 million bonus that he actually received. Martoma did not "realize" the $2.8 million in taxes and other adjustments withheld from his bonus because that amount was "not converted into money, cash or the equivalent." *United States v. Nacchio*, No. 1:05-cr-545, slip op. at 3 (D. Colo. Aug. 2, 2007), *rev'd on other grounds*, 573 F.3d 1062 (10th Cir. 2009).

charged. That resulted in a gain figure of $275 million—more than *40 times* Martoma's gain—and a whopping 10-year increase in the Guidelines range. SPA77. The court justified that extraordinary result by deeming the guidelines "indifferent to who took home the increase in value" from insider trading. SPA64 (quotation marks, brackets, and ellipses omitted). In fact, they are anything but.

"[G]ain resulting from the offense" under section 2B1.4(b)(1) means the gain to the *offender*, not to people uninvolved in the offense. Indeed, in construing the provision permitting courts to use "the gain that resulted from the offense as an alternative measure of loss," U.S.S.G. §2B1.1 cmt. n.3(B), courts repeatedly have recognized that the appropriate alternative measure is "the *defendant's* gain." *United States v. Dokich*, 614 F.3d 314, 320 (7th Cir. 2010) (emphasis added); *see also, e.g., United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009) (looking to "the gain *realized by the wrongdoer*" (emphasis added)). The commentary to the insider trading guideline likewise recognizes this unremarkable proposition in noting that other offenses "that involve misuse of inside information *for personal gain* also appropriately may be covered by this guideline." U.S.S.G. §2B1.4 cmt. (emphasis added).

That understanding not only is more consistent with the plain text of the insider trading guideline, but also is compelled by the criminal prohibition underlying it. The gains of third party investors in SAC funds are not illicit gains

under the insider trader laws.  There is "no 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information,'" *O'Hagan*, 521 U.S. at 661, and there is no suggestion that SAC's investors did anything wrong.

Moreover, the gains of third parties are not an appropriate proxy for the impact of insider trading because "in the eye of the law," the company that owns the information, "not the marketplace, [is] the victim" of insider trading.  *United States v. Gupta*, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *see also Newman*, 773 F.3d at 447-48.  Although gain may be "a product of that breach, [it] is not even part of the legal theory under which" the government prosecutes the crime; someone who trades on the basis of material, nonpublic information provided in breach of an insider's breach of fiduciary duty for a personal benefit is guilty even if he never "made a cent."  *Gupta*, 904 F. Supp. 2d at 351-52. Gain thus is relevant not as a defining feature of the offense or its severity, but as a measure of the defendant's motivation and the need for deterrence.  That being so, the only even arguably rational way to use "gain" is to focus on the gains that the defendant himself realized as a result of the insider trading.

That much is clear from the explanatory commentary on which the district court erroneously relied, *see* SPA64, which states that the gain is "the total increase in value realized through trading in securities by the defendant and persons *acting*

51

*in concert* with the defendant or to whom the defendant provided inside information." U.S.S.G. §2B1.4 cmt. (emphasis added). Of course, the plain language of the guideline must control over mere explanatory commentary. *See United States v. Potes-Castillo*, 638 F.3d 106, 111 (2d Cir. 2011). But that commentary does not even support the district court's analysis. Third parties that have done nothing more than entrust their funds to an investment firm to invest as it sees fit are not "acting in concert" with someone who, unbeknownst to them, proceeds to use those funds to engage in unlawful insider trading. And that the defendant happens to engage in insider trading that inures to the benefit of those innocent third parties hardly renders them complicit in his crimes. To the contrary, those third parties are benefitted only incidentally and their benefits are relevant only to the extent they inform the amount of the trader's compensation. The defendant's direct compensation is the only proper measure of the gain, and including the incidental gains to the third parties is worse than double counting, as it adds to the relevant number (Martoma's bonus) a much larger number (customer gains) that is relevant only to the extent it was used to generate the first number.

In sum, the plain language of the insider trading guideline and the well-settled law underlying it require gain to be calculated using profit to the defendant, not to unrelated third parties. To the extent there is any ambiguity about that, the rule of

lenity compels the interpretation that narrows, not expands, the guideline's definition of gain. *See United States v. Simpson*, 319 F.3d 81, 86 (2d Cir. 2002).

### B. The District Court Should Not Have Included Cohen's Trades.

At a minimum, the gain calculation should have been limited to gains to the fund that Martoma managed, which would have yielded a gain of $49.4 million. JA300-07.[11] Instead, the district court included more than $212 million in gains that resulted from trades executed not by Martoma, but by Cohen.

The government has never charged Cohen with any crime; to the contrary, it disclaimed any need to prove that he was a co-conspirator or otherwise complicit in criminal conduct. JA363-64. And Cohen's unequivocal and unrebutted deposition testimony under oath was that his trades were *not* based on inside information from Martoma. Instead, he testified that his Wyeth trades were based on a conversation with Holman, "one of the great healthcare investors [Cohen] ha[d] ever met," who was engaged for the specific purpose of providing recommendations on Wyeth—recommendations that Cohen considered "very important to" his trading decisions. JA79, 81, 82. As Cohen explained, it was Holman's counsel, not information from Martoma, that led him to sell his shares of Wyeth.

---

[11] The parties disputed the proper methodology for calculating this gain, but the district court did not resolve that dispute. SPA76-77.

Cohen also testified that his Elan trades were not based on inside information from Martoma. Although Martoma did advise selling Elan, Cohen testified that Martoma did so for "normal, typical reasons." JA97. Moreover, Cohen testified that he decided to sell Elan only after confirming that Holman shared Martoma's view, a step that would have been wholly unnecessary had Martoma given him inside information about the drug trial results. JA97. Accordingly, even assuming Martoma did possess inside information, there is no evidence that he shared that information with Cohen—let alone that Cohen proceeded to trade on that information with the requisite knowledge that it was inside information disclosed in breach of a fiduciary duty for personal benefit.

The district court nonetheless found that "Martoma provided inside information to Cohen, and that this information was the basis for Cohen and SAC Capital's subsequent trades in Elan and Wyeth securities." JA69. But its sole basis for those findings was the telephone conversation between Cohen and Martoma on July 20, 2008—a conversation that Cohen's testimony establishes did *not* involve any discussion of the drug trial results. SPA67. Accordingly, not only is there a complete absence of evidence that Martoma discussed the drug trial results with Cohen on this call (or at any other time prior to their public release); the only evidence relating to the content of the call proves otherwise. Even under a

54

preponderance standard, the district court may not simply assume conclusions that find no support in the factual record.

### C.    The District Court's Erroneous Gain Calculation Requires Resentencing.

But for the district court's clearly erroneous gain calculation, Martoma's guidelines range would have been significantly less. Without the gains to innocent investors, it would have been 63 to 78 months—30 months below the 108-month sentence imposed. Without Cohen's trades, it would have been 97 to 121 months, converting Martoma's below-guidelines sentence into a within-guidelines sentence. Either way, the error requires resentencing, as a "mistaken Guidelines calculation is a procedural error that can render even a non-Guidelines sentence unreasonable." *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012).

Indeed, even apart from the error in calculating the Guidelines, the district court "err[ed] procedurally" because it "rest[ed] its sentence on a clearly erroneous finding of fact." *United States v. Cavera*, 550 F.3d 180, 190 (2nd Cir. 2008). The court's principal justification for giving Martoma a sentence more than three times longer than that of comparable insider trading defendants was that the purported $275 million "gain here is hundreds of millions of dollars more than has ever been seen in an insider trading prosecution." JA495-96. Because that dispositive figure was based on the erroneous conclusions detailed above, the court's reliance on it was error magnified. Accordingly, the sentence should be vacated, and the case

55

remanded with instructions to calculate the guidelines range using only the $6.5 million gain to Martoma himself.

### D. The District Court's Forfeiture Order Was Erroneous.

At a bare minimum, the $9.3 million forfeiture order must be vacated. By statute, the "proceeds" subject to forfeiture in insider trading cases are "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C. §981(a)(2)(B). Although section 981 states that the "direct costs" excluded from the forfeiture proceeds "shall not include ... any part of the income taxes paid by the entity," it also provides that "proceeds" is defined as "the amount of money *acquired* through the illegal transactions resulting in the forfeiture." *United States v. Contorinis*, 692 F.3d 136, 145 & n.3 (2d Cir. 2012) (emphasis added).

While Martoma's 2008 bonus was $9.3 million, it is undisputed that he received only approximately $6.5 million, on account of the $2.8 million in taxes and adjustments that were withheld. Since Martoma did not "acquire" the amounts withheld from his bonus—indeed, the tax portion went straight to the government itself, JA450—these amounts are not subject to forfeiture. *See Contorinis*, 692 F.3d at 147 (defendant may not be ordered to forfeit "funds never acquired by him or someone working in concert with him"). The district court's contrary conclusion was erroneous as a matter of law.

56

## CONCLUSION

For the reasons set forth above, this Court should reverse the conviction and remand with instructions to enter a judgment of acquittal. Alternatively, this Court should vacate the judgment and remand for a new trial or resentencing.

Respectfully submitted,

ALEXANDRA A.E. SHAPIRO
ERIC S. OLNEY
JEREMY LICHT
SHAPIRO ARATO LLP
500 Fifth Avenue
40th Floor
New York, New York 10110
(212) 257-4880

CHARLES J. OGLETREE, JR.
54 Pemberton Street
Cambridge, MA 02140

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
HARKER RHODES
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Defendant-Appellant*

February 2, 2015

57

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 13,672 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

February 2, 2015

s/Harker Rhodes
Harker Rhodes

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2015, an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement