# No. 14-3599

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

―――――――――

UNITED STATES OF AMERICA,

*Appellee,*

v.

MATHEW MARTOMA,

*Defendant-Appellant.*

―――――――――

On Appeal from the United States District Court for the
Southern District of New York, No. 1:12-cr-973-1

―――――――――

## JOINT APPENDIX
## VOLUME I: JA1-268

―――――――――

ARLO DEVLIN-BROWN
BRIAN A. JACOBS
MICHAEL A. LEVY
UNITED STATES ATTORNEY'S
OFFICE FOR THE SOUTHERN
DISTRICT OF NEW YORK
1 St. Andrew's Plaza
New York, NY 10007
(212) 637-2506
arlo.devlin-brown@usdoj.gov

PAUL D. CLEMENT
ERIN E. MURPHY
HARKER RHODES
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for United States of America*

*Counsel for Defendant-Appellant*

February 2, 2015

# TABLE OF CONTENTS

**Page**

## VOLUME I

Docket Sheet, No. 1:12-cr-00973-PGG-1 (S.D.N.Y) ........................................... JA1

Superseding Indictment (August 22, 2013) (D.E. 61) ........................................ JA60

Cohen Deposition Excerpts (filed December 6, 2013) (D.E. 108-1) ................ JA76

Cohen Deposition Excerpts (filed December 6, 2013) (D.E. 111-1) ................ JA84

Cohen Deposition Excerpts (filed December 20, 2013) (D.E. 140-1) .............. JA89

Oral Decision by Judge Rakoff in *Whitman* (filed December 20, 2013) (D.E. 140-2) ................................................................................................................ JA104

Order (January 6, 2014) (D.E. 186) ................................................................ JA109

Jury Questionnaire for Juror 45 (January 7, 2014) ......................................... JA116

Voir Dire Transcript Excerpts (January 8, 2014) (92, 96, 149-54, 158-59, 173-74, 242-48, 259-61, 274-76) ................................................................ JA124

Voir Dire Transcript Excerpts (January 9, 2014) (343-47, 350, 353-61) ......... JA150

Transcript Excerpts (January 10, 2014) (42-43, 60, 77-78, 82-90, 109, 113-14, 116, 123-26, 133, 138) ................ JA157

Transcript Excerpts (January 14, 2014) (506) ................................................. JA170

Transcript Excerpts (January 15, 2014) (778-79) ............................................ JA172

Transcript Excerpts (January 17, 2014) (1236-40) .......................................... JA174

Transcript Excerpts (January 22, 2014) (1488, 1537-39) ................................ JA177

Transcript Excerpts (January 23, 2014) (1770-71) .......................................... JA181

Defense Letter Motion (January 23, 2014) (D.E. 222) ..................................... JA183

Transcript Excerpts (January 24, 2014) (1818-44, 1917-18) ........................... JA219

i

Defense Letter Motion (January 26, 2014) (D.E. 224)....................................JA229

Transcript Excerpts (January 27, 2014) (2186-89)..........................................JA231

Transcript Excerpts (January 28, 2014) (2272-74, 2286-88, 2290-91,
  2310-12, 2344-45) ...................................................................................JA235

Transcript Excerpts (January 29, 2014) (2587-91, 2609, 2639-40) ................JA243

Transcript Excerpts (January 30, 2014) (2842) ..............................................JA249

Transcript Excerpts (February 3, 2014) (2935, 2950, 2973-74, 2976,
  2981-83, 2989, 3027-29, 3099-3107, 3134-35)..........................................JA251

Transcript Excerpts (February 4, 2014) (3191, 3220) ....................................JA265

Verdict Form (February 6, 2014) (D.E. 230)..................................................JA268

## VOLUME II

Defense Sentencing Brief (May 28, 2014) (D.E. 287) ....................................JA269

Government Sentencing Memorandum (June 27, 2014) (D.E. 293)...............JA355

Coleman Declaration (August 11, 2014) (D.E. 297-3)....................................JA444

Defense Letter Motion (September 5, 2014) (D.E. 304) .................................JA457

Sentencing Transcript (September 17, 2014) (D.E. 318) ................................JA459

Notice of Appeal (September 18, 2014) (D.E. 320) ........................................JA507

## VOLUME III

DX 9 (Brean Murray Carret & Co. Analyst Report, July 11, 2008) ...............JA510

DX 1144-A (Cowen and Company Analyst Report, July 21, 2008)...............JA528

DX 1404 (Chart Showing SAC Holdings in Wyeth and Elan) ........................JA545

DX 1513 (Chart Showing Elan Share Price) ...................................................JA546

GX 10 (Elan Press Release, June 17, 2008) ...................................................JA547

GX 235 (E-mail from Dr. Sid Gilman to Mathew Martoma, Sept. 28, 2008) . JA551

GX 1253 (Chart Showing SAC Monthly Closing Positions in Wyeth) ...........JA552

GX 1261 (Chart Showing SAC Daily Net Closing Positions in Wyeth) .........JA553

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:12-cr-00973-PGG-1

Case title: USA v. Martoma                         Date Filed: 12/21/2012
Magistrate judge case number: 1:12-mj-02985-UA     Date Terminated: 09/09/2014

Assigned to: Judge Paul G. Gardephe

### Defendant (1)

**Mathew Martoma**                    represented by   **Charles A. Stillman**
*TERMINATED: 09/09/2014*                               Ballard Spahr LLP
*also known as*                                        425 Park Avenue
Sealed Defendant 1                                     New York, NY 10022
*TERMINATED: 09/09/2014*                               212 223 0200
                                                       Fax: 212 223 1942
                                                       Email: stillmanc@bssfny.com
                                                       *TERMINATED: 04/04/2013*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Retained*

                                                       **James Alfred Mitchell**
                                                       Ballard Spahr LLP
                                                       425 Park Avenue
                                                       New York, NY 10022
                                                       212-223-0200
                                                       Fax: 212-223-1942
                                                       Email: mitchellj@bssfny.com
                                                       *TERMINATED: 04/04/2013*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Retained*

                                                       **Daniel Prugh Roeser**
                                                       Goodwin Procter, LLP(NYC)
                                                       The New York Times Building, 620
                                                       Eighth Avenue
                                                       New York, NY 10018-1405
                                                       (212)-813-8800
                                                       Fax: (212)-355-3333
                                                       Email: droeser@goodwinprocter.com
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Retained*

**Derek A. Cohen**
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
212-735-0771
Fax: (212) 953-7201
Email: dcohen@goodwinprocter.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**John Owen Farley**
Goodwin Procter, LLP (Boston)
53 State Street,Exchange Place
Boston, MA 02109
(617) 570-1983
Fax: (617)-523-1231
Email: jfarley@goodwinprocter.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Larkin M Morton**
Goodwin Procter, LLP(NYC)
The New York Times Building, 620
Eighth Avenue
New York, NY 10018-1405
(212)-459-7257
Fax: (212)-355-3333
Email: lmorton@goodwinprocter.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Richard Mark Strassberg**
Goodwin Procter, LLP(NYC)
The New York Times Building, 620
Eighth Avenue
New York, NY 10018-1405
2128138859
Fax: 2123553333
Email: rstrassberg@goodwinprocter.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Roberto M. Braceras**
Goodwin Procter, LLP (Boston)
53 State Street,Exchange Place
Boston, MA 02109
(617) 570-1000
Fax: (617)-523-1251
Email: rbraceras@goodwinprocter.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:371.F CONSPIRACY TO COMMIT SECURITIES FRAUD (1s) | Imprisonment 5 Years. Supervised Release 3 Years. |
| 15:78J.F MANIPULATIVE AND DECEPTIVE DEVICES (SECURITIES FRAUD) (2s-3s) | Imprisonment 9 Years. Supervised Release 3 Years. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:371.F CONSPIRACY TO COMMIT SECURITIES FRAUD (1) | Dismissed |
| 15:78J.F MANIPULATIVE AND DECEPTIVE DEVICES (SECURITIES FRAUD) (2-3) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:371:CONSPIRACY TO DEFRAUD THE UNITED STATES;, 15:78; 17 C.F.R. 240.10b-5:SECURITIES FRAUD. | |

---

**Intervenor Plaintiff**
**Rosemary Martoma**          represented by   **Richard Mark Strassberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

---

**Interested Party**
**M.D. Sidney Gilman**          represented by   **Jonathan Nassau Halpern**
Bracewell & Giuliani, LLP

**JA3**

1251 Avenue of the Americas
49th Floor
New York, NY 10020
(212)506-6153
Fax: (212)938-3853
Email: jhalpern@foley.com
*ATTORNEY TO BE NOTICED*

**Marc Lee Mukasey**
Bracewell & Giuliani, LLP
1251 Avenue of the Americas
49th Floor
New York, NY 10020
(212)-508-6134
Fax: (212)-938-3833
Email: marc.mukasey@bgllp.com
*ATTORNEY TO BE NOTICED*

**Shannon B. Wolf**
Bracewell & Giuliani LLP(Hartford)
CityPlace I, 34th fl.,
185 Asylum St
Hartford, CT 06103
(860)-256-8558
Fax: (860)-404-3970
Email: shannon.wolf@bgllp.com
*ATTORNEY TO BE NOTICED*

**Interested Party**
**David E. Kaplan**                          represented by    **Ethan David Wohl**
Wohl & Fruchter LLP
570 Lexington Avenue, 16th Floor
New York, NY 10022
(212) 758-4000
Fax: (212) 758-4004
Email: ewohl@wohlfruchter.com
*ATTORNEY TO BE NOTICED*

**Interested Party**
**Roxy D. Sullivan**                         represented by    **Ethan David Wohl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Interested Party**

JA4

**Lindsey Rankin**                          represented by  **Ethan David Wohl**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

---

**Interested Party**

**Michael S. Allen**                        represented by  **Ethan David Wohl**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

---

**Interested Party**

**Chi-Pin Hsu**                             represented by  **Ethan David Wohl**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

---

**Interested Party**

**University of Michigan**                  represented by  **Anthony Scott Barkow**
                                                            Jenner & Block LLP (NYC )
                                                            919 Third Avenue, 37th Floor
                                                            New York, NY 10022
                                                            (212)-891-1662
                                                            Fax: (212)-909-0860
                                                            Email: abarkow@jenner.com
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Retained*

---

**Plaintiff**

**USA**                                     represented by  **Eugene Edward Ingoglia**
                                                            United States Attorney's Office, SDNY
                                                            One Saint Andrew's Plaza
                                                            New York, NY 10007
                                                            (212)-673-1113
                                                            Fax: (212)-973-1113
                                                            Email: eugene.ingoglia@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Arlo Devlin-Brown**
                                                            U.S. Attorney's Office, SDNY
                                                            (Chambers Street)
                                                            1 St Andrews Plaza
                                                            New York, NY 10007
                                                            (212)-637-2506

**JA5**

Fax: (212)-637-2527
Email: arlo.devlin-brown@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Christine Ingrid Magdo**
United States Attorney Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
212-637-2200
Fax: (212) 637-2937
Email: christine.magdo@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/19/2012 | | Oral Order to Seal Case as to Sealed Defendant 1. (Signed by Magistrate Judge Debra C. Freeman on 11/19/2012)(gq). [1:12-mj-02985-UA] (Entered: 11/20/2012) |
| 11/19/2012 | 1 | SEALED COMPLAINT as to Sealed Defendant 1 (1) in violation of 18 U.S.C. 371; 15 U.S.C. 78j(b), 78ff; 17 C.F.R. 240.10b-5. (Signed by Magistrate Judge Debra C. Freeman) (gq) [1:12-mj-02985-UA] (Entered: 11/20/2012) |
| 11/19/2012 | | Attorney update in case as to Mathew Martoma. Attorney Arlo Devlin-Brown for USA added. (gq). [1:12-mj-02985-UA] (Entered: 11/20/2012) |
| 11/20/2012 | | Arrest of Mathew Martoma in the United States District Court - Southern District of Florida. (gq) [1:12-mj-02985-UA] (Entered: 11/26/2012) |
| 11/20/2012 | | Arrest Warrant Returned Executed on 11/20/2012 as to Mathew Martoma. (gq) [1:12-mj-02985-UA] (Entered: 11/26/2012) |
| 11/20/2012 | 3 | Order to Unseal Case as to Mathew Martoma...that the Complaint in the above-captioned action be unsealed and remain unsealed, pending further order of the Court. (Signed by Magistrate Judge Debra C. Freeman on 11/20/2012)(gq) [1:12-mj-02985-UA] (Entered: 11/20/2012) |
| 11/20/2012 | | Arrest of Mathew Martoma in the United States District Court - Southern District of Florida, West Palm Beach. (gq) [1:12-mj-02985-UA] (Entered: 12/13/2012) |
| 11/26/2012 | | Arrest of Mathew Martoma. (gq) [1:12-mj-02985-UA] (Entered: 11/26/2012) |
| 11/26/2012 | 4 | NOTICE OF ATTORNEY APPEARANCE: Charles A. Stillman, James Alfred Mitchell appearing for Mathew Martoma. (gq) [1:12-mj-02985-UA] (Entered: 11/26/2012) |
| 11/26/2012 | | Minute Entry for proceedings held before Magistrate Judge James L. Cott:Initial Appearance as to Mathew Martoma held on 11/26/2012. Deft appears with atty's Charles Stillman/James Mitchell. AUSA Arlos Devlin-Brown present for the gov't. Agreed conditions of release: $5,000,000 PRB. 3 FRP. Secured by $2,000,000 cash or property. Travel restricted to SDNY, EDNY, Florida (All Districts), District of Massachusetts, District of New Jersey. Surrender travel documents (& no new applications), as well as those of his minor children. |

| | | |
|---|---|---|
| | | Regular pretrial supervision. Deft to be released on own signature as well as his wife's; Remaining conditions to be met by 12/3/12 for 2 other FRP's; 12/10/12 to post cash or property security for bond. ( Preliminary Hearing set for 12/26/2012 at 10:00 AM before Judge Unassigned.) (gq) [1:12-mj-02985-UA] (Entered: 11/26/2012) |
| 11/26/2012 | 5 | PRB APPEARANCE Bond Entered as to Mathew Martoma in amount of $5,000,000. Co-signed by 3 financially responisble person. Secured by $2,000,000 cash or property. Travel restricted to SDNY, EDNY, Florida (All Districts), District of Massachusetts, District of New Jersey. Surrender travel documents (& no new applications), as well as those of his minor children. Regular pretrial supervision. Deft to be released on own signature as well as his wife's; Remaining conditions to be met by 12/3/12 for 2 other FRP's; 12/10/12 to post cash or property security for bond.(gq) [1:12-mj-02985-UA] (Entered: 11/26/2012) |
| 12/13/2012 | 6 | Rule 5(c)(3) Documents Received as to Mathew Martoma from the United States District Court - Southern District of Florida, (West Palm Beach). (gq) [1:12-mj-02985-UA] (Entered: 12/13/2012) |
| 12/21/2012 | 7 | INDICTMENT FILED as to Mathew Martoma (1) count(s) 1, 2-3. (jm) (Entered: 12/26/2012) |
| 12/21/2012 | | Case Designated ECF as to Mathew Martoma. (jm) (Entered: 12/26/2012) |
| 12/21/2012 | 8 | ORDER as to Mathew Martoma. Upon the joint application of Mathew Martoma, by and through Charles Stillman, Esq., and the Government, by and through AUSA Arlo Devlin-Brown, it is hereby ORDERED that the arraignment on the charges contained in the above-captioned indictment returned today occur on January 3, 2013 at 11:30 a.m.... Accordingly, it ORDERED that the time between today's date and January 3, 2013 is hereby excluded under the Speedy Trial Act, 18 U.S.C. Section 3161(h)(7)(A), in the interests of justice. (Signed by Judge Paul G. Gardephe on 12/21/2012)(bw) (Entered: 12/27/2012) |
| 01/03/2013 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Arraignment as to Mathew Martoma (1) Counts 1,2-3. Defendant Mathew Martoma present with attorneys Charles Stillman and Nathaniel Marmur. AUSA Arlo Devlin-Brown present. Court reporters Bill Richards present. Defendant enters a plea of not guilty to the indictment. Next conference set for 3/5/2013 at 12:30 pm. Speedy trial time is excluded from 1/3/13 until 3/5/2013. Bail continued. (dnd) (Entered: 01/03/2013) |
| 01/03/2013 | 9 | STIPULATED PROTECTIVE ORDER as to Mathew Martoma...regarding procedures to be followed that shall govern the handling of confidential material.... SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/3/2013) (dnd) (Entered: 01/03/2013) |
| 01/31/2013 | 10 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Arraignment held on 1/3/13 before Judge Paul G. Gardephe. Court Reporter/Transcriber: William Richards, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/25/2013. Redacted Transcript Deadline set for 3/7/2013. Release of Transcript Restriction set for 5/6/2013. (Rodriguez, Somari) (Entered: 01/31/2013) |

**JA7**

| | | |
|---|---|---|
| 01/31/2013 | 11 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Arraignment proceeding held on 1/3/13 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Rodriguez, Somari) (Entered: 01/31/2013) |
| 02/22/2013 | 12 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Kimba M. Wood from Nathaniel Z. Marmur dated 2/22/2013 re: to travel with his family to Chicago, Illinois, on February 23 through February 26, 2013, to attend his uncle's funeral on Monday...ENDORSEMENT...SO ORDERED. (Signed by Judge Kimba M. Wood on 2/22/2013)(jw) (Entered: 02/22/2013) |
| 03/05/2013 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Pretrial Conference as to Mathew Martoma held on 3/5/2013. Government by: Arlo Devlin- Brown present; Defendant: Mathew Martoma present with counsel Charles Stillman & Nathaniel Marmur; Court Reporter: Jennifer Thun and Ann Hairston. Defense motion to be filed by 4/13/2013, Government responses due by 4/27/2013 and Defenses reply to be filed by 5/4/2013. Subsequent conference is set for Wednesday, June 5, 2013 at 12:30pm. Time is excluded from today until 6/5/2013. Bail continued. (jbo) (Entered: 03/05/2013) |
| 03/08/2013 | 13 | ORDER as to Mathew Martoma ( Motions due by 4/15/2013., Defendant Replies due by 5/6/2013., Government Responses due by 4/29/2013, Status Conference set for 6/5/2013 at 12:30 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) Time excluded from 3/8/13 until 6/5/2013. It is hereby ORDERED that the Government shall produce a bill of particulars in the above captioned matter on March 15, 2013. The following schedule shall apply to any motions regarding the bill of particulars. It is further ORDERED that the parties shall submit a joint letter to the Court on April 5, 2013, providing an update on the status of the production of the hard drive as discussed at the March 5, 2013 status conference. Upon the application of the United States of America, by and through Assistant United States Attorney Arlo Devlin-Brown, and with the consent of Mathew Martoma, by and through his counsel, Charles Stillman, it is hereby ORDERED that the time until June 5, 2013, is excluded under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A), in the interests of justice.. (Signed by Judge Paul G. Gardephe on 3/8/2013)(jw) (Entered: 03/11/2013) |
| 03/18/2013 | 28 | Letter by USA as to Mathew Martoma addressed to Dear Mr. Marmur from Arlo Devlin-Brown dated 3/15/2013 re: The Government writes in response to your letter of February 22, 2013 (the "February 22 Letter") requesting a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. Without conceding that the defense is entitled to additional particulars, the Government voluntarily provides at this time the following information in response to the February 22 Letter. With respect to Count Three, the Government intends to prove that the following trades in Wyeth securities were based in whole or in part on Inside Information. (jw) (Entered: 05/31/2013) |
| 03/22/2013 | 14 | SEALED DOCUMENT placed in vault. (mps) (Entered: 03/22/2013) |

JA8

| | | |
|---|---|---|
| 04/04/2013 | 15 | AFFIDAVIT OF ATTORNEY RICHARD M. STRASSBERG PURSUANT TO LOCAL RULE 1.4 by Mathew Martoma. I am an attorney duly admitted to practice law before the District Court of the Southern District of New York. I am a partner with the law firm of Goodwin Procter LLP, attorneys for defendant Mathew Martoma in the above-captioned action. This case is in currently in its preliminary stages. The United States of America ("USA") filed a complaint on November 19, 2012 and an indictment on December 21, 2012. On January 3, 2013 Mr. Martoma was arraigned, and entered a plea of not guilty to the indictment. Thereafter, a pretrial conference was held on March 5, 2013, and the next conference is scheduled for June 5, 2013. Mr. Martoma has not moved as to the complaint or the indictment, nor has he filed any motions to date. (jw) (Entered: 04/04/2013) |
| 04/04/2013 | 16 | CONSENT ORDER GRANTING SUBSTITUTION OF A ATTORNEY as to Mathew Martoma. Notice is hereby given that subject to approval by the court, Mathew Martoma substitutes Richard M. Strassberg. The substitution of attorney is hereby approved and SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/4/2013)(jw) (Entered: 04/04/2013) |
| 04/04/2013 | | Attorney update in case as to Mathew Martoma. Attorney Richard Mark Strassberg for Mathew Martoma added. Attorney James Alfred Mitchell and Charles A. Stillman terminated (jw) (Entered: 04/04/2013) |
| 04/04/2013 | 17 | NOTICE OF ATTORNEY APPEARANCE: Richard Mark Strassberg appearing for Mathew Martoma. Appearance Type: Retained. (Strassberg, Richard) (Entered: 04/04/2013) |
| 04/04/2013 | 18 | NOTICE OF ATTORNEY APPEARANCE: John Owen Farley appearing for Mathew Martoma. Appearance Type: Retained. (Farley, John) (Entered: 04/04/2013) |
| 04/04/2013 | 19 | NOTICE OF ATTORNEY APPEARANCE: Roberto M. Braceras appearing for Mathew Martoma. Appearance Type: Retained. (Braceras, Roberto) (Entered: 04/04/2013) |
| 04/04/2013 | 20 | NOTICE OF ATTORNEY APPEARANCE: Daniel Prugh Roeser appearing for Mathew Martoma. Appearance Type: Retained. (Roeser, Daniel) (Entered: 04/04/2013) |
| 04/04/2013 | 21 | NOTICE OF ATTORNEY APPEARANCE: Larkin M Morton appearing for Mathew Martoma. Appearance Type: Retained. (Morton, Larkin) (Entered: 04/04/2013) |
| 04/09/2013 | 22 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated 4/5/2013 re: The Government writes with respect to the Court's order dated March 8, 2013 (the "March 8 Order"), which (i) directed the parties to update the Court by April 5, 2013 as to the status of the hard drive issue and (ii) set forth a briefing schedule with respect to any defense motions regarding a bill of particulars. This letter provides an update with respect to the hard drive and proposes a modified schedule (agreed to by the defense) with respect to the matters addressed in the March 8 Order in light of the substitution of defense counsel....ENDORSEMENT...The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/9/2013)(jw) (Entered: |

JA9

| | | |
|---|---|---|
| | | 04/10/2013) |
| 04/29/2013 | 23 | MOTION for Bill of Particulars. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 04/29/2013) |
| 04/29/2013 | 24 | MEMORANDUM in Support by Mathew Martoma re 23 MOTION for Bill of Particulars.. (Strassberg, Richard) (Entered: 04/29/2013) |
| 04/29/2013 | 25 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 23 MOTION for Bill of Particulars.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Strassberg, Richard) (Entered: 04/29/2013) |
| 05/13/2013 | 26 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 23 MOTION for Bill of Particulars.. (Attachments: # 1 Exhibit A)(Devlin-Brown, Arlo) (Entered: 05/13/2013) |
| 05/20/2013 | 27 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma re: 23 MOTION for Bill of Particulars.. (Strassberg, Richard) (Entered: 05/20/2013) |
| 06/05/2013 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference as to Mathew Martoma held on 6/5/2013. Defendant Martoma present with attorneys Richard M. Strassberg and Roberto Braceras. AUSA Arlo Devlin-Brown present. Court reporter Alena Lynch present. Hearing set for 6/18/13 at 11:00 am. Jury trial set for 11/4/13 at 9:00 am. Speedy trial clock is excluded from 6/5/13 until 11/4/13. Bail continued. (jbo) (Entered: 06/05/2013) |
| 06/05/2013 | 29 | MEMORANDUM OPINION & ORDER: #103280 As to Mathew Martoma re: 23 MOTION for Bill of Particulars filed by Mathew Martoma. Defendant Mathew Martoma is charged with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. The gravamen of the Indictment is that from about 2006 through July 2008, Defendant directed trading activity for his hedge fund employer on the basis of material non-public information supplied by a doctor participating in a clinical trial of a drug for use in treating Alzheimers disease. On April 29, 2013, Defendant filed a motion for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). Defendant seeks information regarding the nature and timing of his alleged receipt of, and trades on, inside information, and the identities of all known co-conspirators. (Dkt. No. 23) For the reasons stated below, Defendant's motion for a bill of particulars is granted to the extent that the Government is ordered to identify, by July 31, 2013, all known co-conspirators. No later than thirty days before trial, the Government will identify any co-conspirators that it identified in good faith after July 31,2013. Defendant's motion for a bill of particulars is otherwise denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 23). (Signed by Judge Paul G. Gardephe on 6/5/2013)(dnd) Modified on 6/12/2013 (jab). (Entered: 06/05/2013) |
| 06/05/2013 | 30 | Letter by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo-Devlin-Brown dated 5/28/2013 re: The Government writes to propose a course of action with respect to the decryption of a hard drive provided to the Government by the cooperating witnesses referred to the Indictment (the "CW") |

| | | |
|---|---|---|
| | | previously employed by the University of Michigan. In sum, the parties both respectfully request that the Court set a hearing date on the hard drive issue - either on June 5, 2013, when a pretrial conference in this matter is already scheduled, or some later date convenient for the Court and that the University of Michigan be subpoenaed to appear on that date to provide the decryption key to the hard drive... (dnd) (Entered: 06/06/2013) |
| 06/05/2013 | 31 | ORDER: As to Mathew Martoma. As discussed in open court on June 5, 2013, it is hereby ORDERED that there shall be a hearing regarding the decryption of the Cooperating Witness's hard drive on June 18, 2013 at 11:00 a.m. Any submissions related to the hearing must be filed with the Court and served on all parties by June 14, 2013 at 5:00 p.m. It is further ORDERED that the Government shall produce to Defendant an index of the file names on the Cooperating Witness's hard drive by June 12, 2013. It is further ORDERED that the following schedule shall apply to Defendant's motion to dismiss: 1.Defendant's motion is due June 28, 2013. 2. The Government's response is due July 19,2013. 3. Defendant's reply, if any, is due July 26, 2013. It is further hereby ORDERED that trial will commence on November 4, 2013 at 9:30 a.m. in Courtroom 705 at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. Any motions in limine, requested voir dire, and requests to charge are due on October 4, 2013. Responsive papers, if any, are due on October 14, 2013. (Signed by Judge Paul G. Gardephe on 6/5/2013)(dnd) (Entered: 06/06/2013) |
| 06/06/2013 | | Set/Reset Deadlines as to Mathew Martoma. Motions in limine due by 10/4/2013. Responses due by 10/14/2013. (dnd) (Entered: 06/06/2013) |
| 06/13/2013 | 32 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Conference held on 6/5/13 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/11/2013. Redacted Transcript Deadline set for 7/18/2013. Release of Transcript Restriction set for 9/16/2013. (Rodriguez, Somari) (Entered: 06/13/2013) |
| 06/13/2013 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Conference proceeding held on 6/5/13 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Rodriguez, Somari) (Entered: 06/13/2013) |
| 06/17/2013 | 34 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated June 13, 2013 re: Mr. Martoma and the United States Attorney's Office seek an opportunity to brief the issues and hereby request a hearing on them. The parties have agreed that the United States of Michigan need not produce any documents subject to such a claim of privilege until that issue is decided. The parties propose the following briefing scheduled: -Mr. Martoma will submit his opening brief by June 21, 2013. -The United States Attorney's Office will submit its opposition brief by July 3, 2013. - Mr. Martoma will submit his reply brief by July 12, 2013. Mr. Martoma |

| | | |
|---|---|---|
| | | and the United States Attorney's Office will be prepared for a hearing thereafter at the Court's convenice and respectfully request a hearing during the last two weeks of July. ENDORSEMENT: The June 18 Conference and hearing are cancelled. The briefing schedule proposed by the parties is adopted by the Court. Oral argument on Defendant's motion to dismiss and any motion concerning privilege will take place on August 23, 2013 at 10:00 A.M. So Ordered. (Signed by Judge Paul G. Gardephe on 6/14/2013)(bw) (Entered: 06/17/2013) |
| 06/17/2013 | | Terminate Deadlines and Hearings as to Mathew Martoma: Terminated Pretrial Conference / Evidentiary Hearing set for 06/18/2013 before Judge Paul G. Gardephe. (bw) (Entered: 06/17/2013) |
| 06/21/2013 | 35 | MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan*. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 06/21/2013) |
| 06/21/2013 | 36 | MEMORANDUM in Support by Mathew Martoma re 35 MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan.*. (Strassberg, Richard) (Entered: 06/21/2013) |
| 06/21/2013 | 37 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 35 MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan.*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Strassberg, Richard) (Entered: 06/21/2013) |
| 06/28/2013 | 38 | MOTION to Dismiss *COUNT TWO AND THE CORRESPONDING ALLEGATIONS IN COUNT ONE OF THE INDICTMENT*. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 06/28/2013) |
| 06/28/2013 | 39 | MEMORANDUM in Support by Mathew Martoma re 38 MOTION to Dismiss *COUNT TWO AND THE CORRESPONDING ALLEGATIONS IN COUNT ONE OF THE INDICTMENT.*. (Strassberg, Richard) (Entered: 06/28/2013) |
| 06/28/2013 | 40 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 38 MOTION to Dismiss *COUNT TWO AND THE CORRESPONDING ALLEGATIONS IN COUNT ONE OF THE INDICTMENT.*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Strassberg, Richard) (Entered: 06/28/2013) |
| 07/02/2013 | 41 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated 7/2/2013 re: Reschedule Briefing as to Mathew Martoma( Defendant Replies due by 7/31/2013., Government Responses due by 7/12/2013) Any submission on behalf of Dr. Sid Gilman due on July 17, 2013. Under the revised proposed schedule, briefing would be complete four weeks prior to the August 23 hearing date. (Signed by Judge Paul G. Gardephe on 7/2/2013)(jw) (Entered: 07/03/2013) |
| 07/08/2013 | 42 | Letter by Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated July 3, 2013 re: We write with the consent of the Government and counsel for the University of Michigan to update the Court on the agreement that Mr. Martoma, the United States Attorney's Office, and the University of Michigan have reached concerning the production of electronic |

| | | documents by the University of Michigan. (bw) (Entered: 07/08/2013) |
|---|---|---|
| 07/10/2013 | 43 | Letter by Mathew Martoma addressed to Judge Paul G. Gardephe from Anthony S. Barkow dated 7/10/2013 re: We write with the consent of the government and counsel for Mr. Martoma to notify the Court of an agreement counsel have reached with respect to the protections that will apply to materials produced by the University of Michigan to Mr. Martoma pursuant to the terms of the July 3, 2013 letter to the Court from counsel for Mr. Martoma ("Dr. Gilman's Electronic Media"). (jw) (Entered: 07/11/2013) |
| 07/12/2013 | 44 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 35 MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan..* (Devlin-Brown, Arlo) (Entered: 07/12/2013) |
| 07/12/2013 | 45 | DECLARATION of Arlo Devlin-Brown in Opposition by USA as to Mathew Martoma re: 35 MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan..* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Devlin-Brown, Arlo) (Entered: 07/12/2013) |
| 07/17/2013 | 46 | MOTION to Intervene., MOTION for Protective Order. Document filed by Sidney Gilman as to Mathew Martoma. (Mukasey, Marc) (Entered: 07/17/2013) |
| 07/17/2013 | 47 | MEMORANDUM in Support by Sidney Gilman as to Mathew Martoma re 46 MOTION to Intervene. MOTION for Protective Order.. (Mukasey, Marc) (Entered: 07/17/2013) |
| 07/17/2013 | 48 | DECLARATION of Sidney Gilman in Support by Sidney Gilman as to Mathew Martoma re: 46 MOTION to Intervene. MOTION for Protective Order.. (Mukasey, Marc) (Entered: 07/17/2013) |
| 07/17/2013 | 49 | DECLARATION of Marc L. Mukasey in Support by Sidney Gilman as to Mathew Martoma re: 46 MOTION to Intervene. MOTION for Protective Order.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Mukasey, Marc) (Entered: 07/18/2013) |
| 07/19/2013 | 50 | NOTICE OF ATTORNEY APPEARANCE Eugene Edward Ingoglia appearing for USA. (Ingoglia, Eugene) (Entered: 07/19/2013) |
| 07/19/2013 | 51 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 38 MOTION to Dismiss *COUNT TWO AND THE CORRESPONDING ALLEGATIONS IN COUNT ONE OF THE INDICTMENT..* (Ingoglia, Eugene) (Entered: 07/19/2013) |
| 07/22/2013 | 52 | MOTION to File Amicus Brief by Ethan D Wohl. Document filed by Chi-Pin Hsu, Michael S. Allen, Lindsey Rankin, Roxy D. Sullivan, David E. Kaplan as to Mathew Martoma. (Attachments: # 1 Exhibit Proposed Amici Curiae Brief) (Wohl, Ethan) (Entered: 07/22/2013) |
| 07/22/2013 | 53 | MEMORANDUM in Support by Chi-Pin Hsu, Michael S. Allen, Lindsey Rankin, Roxy D. Sullivan, David E. Kaplan as to Mathew Martoma re 52 MOTION to File Amicus Brief by Ethan D Wohl.. (Wohl, Ethan) (Entered: 07/22/2013) |
| 07/22/2013 | 54 | DECLARATION of Ethan D. Wohl in Support by Chi-Pin Hsu, Michael S. Allen, Lindsey Rankin, Roxy D. Sullivan, David E. Kaplan as to Mathew Martoma re: |

| | | |
|---|---|---|
| | | 52 MOTION to File Amicus Brief by Ethan D Wohl.. (Attachments: # 1 Exhibit A)(Wohl, Ethan) (Entered: 07/22/2013) |
| 07/26/2013 | 55 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma re: 38 MOTION to Dismiss *COUNT TWO AND THE CORRESPONDING ALLEGATIONS IN COUNT ONE OF THE INDICTMENT*.. (Strassberg, Richard) (Entered: 07/26/2013) |
| 07/31/2013 | 56 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma re: 35 MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan*.. (Strassberg, Richard) (Entered: 07/31/2013) |
| 07/31/2013 | 57 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 35 MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Strassberg, Richard) (Entered: 07/31/2013) |
| 08/16/2013 | 58 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated August 14, 2013 re: The defense requests that the Court modify Mr. Mathew Martoma's conditions of release to permit him to travel on August 30, 2013 from Florida to Denver, Colorado by air, then by automobile from Denver to Pennington County, South Dakota to visit Mount Rushmore, returning to Florida by air on or before September 8, 2013. ENDORSEMENT: SO ORDERED this 16th day of August 2013. (Signed by Judge Paul G. Gardephe on 8/16/2013)(bw) (Entered: 08/16/2013) |
| 08/21/2013 | 59 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 8/15/2013 re: We write with the consent of the United States Attorney's Office for the Southern District of New York to seek the Court's leave to make a production of documents covered by the Protective Order in this case. Accordingly, pursuant to Paragraph 1 of the Protective Order, Mr. Martoma, with the consent of the USAO, seeks relief to allow the production set forth in the Kaplan Stipulation. It is understood that any such relief would be limited and that the Kaplan plaintiffs would be strictly bound to the terms of the Protective Order, consistent with paragraph 3 which provides that recipients of confidential information "shall be subject to the terms of this Order." (Signed by Judge Paul G. Gardephe on 8/21/2013)(jw) (Entered: 08/22/2013) |
| 08/21/2013 | 60 | ORDER GRANTING MOTION OF DAVID E. KAPLAN, ROXY D. SULLIVAN, LINDSEY RANKIN, MICHAEL S. ALLEN, AND CHI-PIN HSU FOR LEAVE TO FILE A BRIEF AS AMICI CURIAE as to Mathew Martoma re: 52 MOTION to File Amicus Brief by Ethan D Wohl. filed by Roxy D. Sullivan, David E. Kaplan, Chi-Pin Hsu, Lindsey Rankin, Michael S. Allen. Upon consideration of the Motion of David E. Kaplan, Roxy D. Sullivan, Lindsey Rankin, Michael S. Allen, and Chi-Pin Hsu for Leave to File a Brief as Amici Curiae, dated July 22, 2013 [ECF No. 52], the motion is hereby GRANTED. The proposed amici curiae brief, annexed to the Motion, shall hereby be deemed FILED. The CLerk of Court is directed to terminate the motion (Dkt. No. 52). SO |

| | | |
|---|---|---|
| | | ORDERED. (Signed by Judge Paul G. Gardephe on 8/21/2013)(bw) (Entered: 08/22/2013) |
| 08/22/2013 | 61 | (S1) SUPERSEDING INDICTMENT FILED as to Mathew Martoma (1) count(s) 1s, 2s-3s. (jm) (Entered: 08/22/2013) |
| 08/23/2013 | 62 | MEMORANDUM OPINION & ORDER: As to Mathew Martoma re: 46 MOTION to Intervene. Defendant Mathew Martoma has moved to compel the Government and/or the University of Michigan to produce certain documents associated with Dr. Sidney Gilman, a cooperating witness. (Dkt. No. 35) These materials have been withheld on the basis of a claim of attorney-client privilege. The Government has opposed Defendants motion. (Dkt. No. 44) Dr. Gilman has moved to intervene to oppose Defendants motion, and he seeks a protective order barring the production of the allegedly privileged materials. (Dkt. No. 46)... For the reasons stated above, the Government lacks standing to oppose Defendant's motion to compel. Dr. Gilman's motion to intervene to oppose Defendant's motion to compel is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 8/23/2013)(dnd) (Entered: 08/23/2013) |
| 08/23/2013 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Arraignment as to Mathew Martoma (1) Count 1s,2s-3s. Defendant present with attorneys Richard Strassberg and Roberto Braceras. AUSAs Arlo Devlin Born and Eugene Ingoglia present. Marc Mukaey and Johnathan Halpern present for Intervenor Sidney Gilman. Ethan Wohl present for Amici. Court reporter Ann Hairston present Defendant is arraigned and pleads not guilty to S1 indictment. Bail continued. (dnd) (Entered: 08/27/2013) |
| 08/26/2013 | 63 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from AUSA Arlo Devlin-Brown dated August 15, 2013 re: In order to satisfy its discovery obligations in the above-referenced matter, the Government respectfully requests leave to provide the defendant with sealed applications and orders relating to historical cell site data because the data obtained pursuant to these orders may be offered as evidence at trial. These cell site applications -- which were sealed by United States magistrate judges and remain sealed due to ongoing investigations -- are captioned 13 Mag. 0260 and 13 Mag. 362. If approved, the Government would produce these otherwise sealed materials pursuant to the protective order entered in this case. ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 8/23/2013)(bw) (Entered: 08/26/2013) |
| 09/06/2013 | 64 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Roberto M. Braceras dated 9/5/2013 re: We respectfully request one week to respond to Dr. Gilman's letter, which would set Mr. Martoma's response due on Wednesday, September 11, 2013..ENDORSEMENT: The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/5/2013)(jw) (Entered: 09/06/2013) |
| 09/20/2013 | 65 | ORDER as to Mathew Martoma ( Status Conference set for 9/24/2013 at 12:30 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) It is hereby ORDERED that there shall be a conference in this matter on September 24, 2013 at 12:30 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York |

JA15

| | | |
|---|---|---|
| | | 10007. (Signed by Judge Paul G. Gardephe on 9/20/2013)(jw) (Entered: 09/20/2013) |
| 09/23/2013 | 66 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated August 29, 2013 re: We write on behalf of Mathew Martoma to provide the Court with an update on scheduling matters discussed during the June 5, 2013 and August 23, 2013 court conferences and to request an adjournment of the November 4, 2013 trial date. We respectfully request that this Court order an adjournment of the trial date to February 2014. (bw) (Entered: 09/24/2013) |
| 09/23/2013 | 67 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from AUSAs Arlo Devlin-Brown, Eugene Ingoglia, dated August 30, 2013 re: The Government writes with respect to the adjournment request submitted yesterday, August 29, 2013, by the defendant. The Government requests, for the reasons set forth herein, that the Court defer ruling on the adjournment request until there is a greater degree of certainty that the trial in United States v. Countrywide Financial Corp. et al., 12 Civ. 1422 (S.D.N.Y.)(JSR)(hereinafter, Countrywide) will proceed on September 23, 2013 as planned. If the Countrywide case does proceed to trial as scheduled, the Government would not object to a short adjournment, but submits that the three-month adjournment requested by the defendant is unwarranted. Document filed by USA. (bw) (Entered: 09/24/2013) |
| 09/23/2013 | 68 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated September 10, 2013 re: I write to update the Court on a minor change in schedule in the Countrywide matter before Judge Rakoff, and to respond to certain points made by the Government in opposition to Mr. Martoma's request for an adjournment of his November 4, 2013, trial date. Judge Rakoff has ordered the Countrywide trial to begin on September 24, 2013, as opposed to the original date of September 23, 2013. (bw) (Entered: 09/24/2013) |
| 09/23/2013 | 69 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated September 18, 2013 re: I write again to update the Court on the status of the Countrywide matter before Judge Rakoff, and to renew Mr. Martoma's request for an adjournment of his November 4, 2013 trial date. We continue to request an adjournment of the trial date until February 2014. (bw) (Entered: 09/24/2013) |
| 09/24/2013 | 70 | POST-INDICTMENT CONSENSUAL PROTECTIVE ORDER PURSUANT TO 18 U.S.C. SECTION 981, 28 U.S.C. SECTION 2461, AND 21 U.S.C. SECTION 853 as to (S1-12-Cr-973-01) Mathew Martoma. WHEREAS, on August 22, 2013, a Grand Jury sitting in the Southern District of New York returned a superseding indictment, Sl 12 Cr. 973, in which, inter alia, the following specific assets are identified as forfeitable: (i) the real property and appurtenances, with all improvements and attachments thereon, located at 2464 W. Maya Palm Drive, Boca Raton, Florida, more particularly described as Parcel ID 06-43-47-29-10-005-0020; (ii) up to $3,246,320.62 in funds on deposit in account number 1512369446 at American Express Bank, held in the name of Mathew C. Martoma; (iii) up to $245,000 in funds on deposit in account number 146674626 at ING Direct, held in the name of Rosemary Martoma; and (iv) up to $934,897.77 in funds or other assets in account number 88047594915 at Vanguard, held in the name of Mathew and Rosemary Martoma Foundation (the "Subject Assets");... |

[See Protective Order]... NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, PURSUANT TO 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(e), THAT: 1. The Defendant, and his attorneys, agents, spouse and other family members, and anyone on his behalf, and all persons or entities acting in concert or in participation with any of the above, and all persons and entities having actual knowledge of this Order, shall not take any action prohibited by this Order. 2. The Defendant, his attorneys, agents, spouse and other family members, and anyone acting on his behalf, and all persons or entities acting in concert or in participation with any of the above, all relevant financial institutions, and all persons and entities having actual knowledge of this Order, shall not directly or indirectly transfer, sell, assign, pledge, distribute, hypothecate, encumber, attach, or dispose of in any manner; cause to be transferred, sold, assigned, pledged, distributed, hypothecated, encumbered, attached, or disposed of in any manner; or take, or cause to be taken, any action that would have the effect of depreciating, damaging, or in any way diminishing the value of the Subject Assets; or use or permit the Subject Assets to be used for any illegal activities. 3. The Defendant and any other owners of the Subject Assets shall maintain the present condition of the properties included in the Subject Assets, including timely payment of all mortgages, insurance, utilities, taxes, and assessments until further notice of this Court. 4. Upon request by the Government, the above identified financial institutions will identify the account name, account number, and signatories for the bank accounts included in the Subject Assets and provide the Government with monthly statements of the bank accounts and the balance in those accounts. 5. This Order shall be binding upon the Defendant, his attorneys, agents, spouse and other family members, and anyone acting on his behalf, and all persons or entities acting in concert or in participation with any of the above, and all persons and entities having actual knowledge of this Order, and that this Order shall remain in effect until further order of this Court. SO ORDERED: Signed by Judge Paul G. Gardephe on 9/24/2013)(bw) (Entered: 09/24/2013)

| 09/24/2013 | 71 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated August 27, 2013 re: United States v. Martoma No. 12 CR. 973 (Strassberg, Richard) (Entered: 09/24/2013) |
| 09/24/2013 | | Minute Entry for proceedings held before Judge Paul G. Gardephe:Status Conference as to Mathew Martoma held on 9/24/2013. Status conference held. Defendant Mathew Martoma present with attorneys Richard Strassberg and Roberto Braceras. AUSAs Arlo Devlin-Brown and Eugene Ingoglia present. Court reporter Alena Lynch present. Jury Trial adjourned to 1/6/14 at 9:30 am. Speedy trial time is excluded from 9/24/13 until 1/6/2014. Bail continued. (ajc) (Entered: 09/24/2013) |
| 09/24/2013 | | ORAL ORDER as to Mathew Martoma: Time excluded from 9/24/2013 until 1/6/2014. As to Mathew Martoma( Jury Trial set for 1/6/2014 at 09:30 AM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 9/24/2013)(ajc) (Entered: 09/24/2013) |
| 09/24/2013 | 72 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Marc L. Mukasey dated 8/26/2013 re: We respectfully submit this letter to the Court on behalf of Sidney Gilman, M.D., third-party intervenor, to, provide the information that the Court requested at the conference on August 23rd, in connection with Dr. |

| | | |
|---|---|---|
| | | Gilman's motion for a protective order for privileged and protected communications. We respectfully request that Your Honor's Order to the University of Michigan encompass the time period of May 15, 2002 to November 2012, when Dr. Gilman retired from the University and returned its electronic devices to the University in accordance with its demand. We also understand that in approximately 2008 and perhaps as late as 2010 and at other times since then - the University issued different electronic devices to Dr. Gilman and other University faculty. (jw) (Entered: 09/24/2013) |
| 09/24/2013 | 73 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Marc L. Mukasey dated 9/4/2013 re: We respectfully submit this letter to the Court on behalf of Sidney Gilman, M.D" third-party intervenor, to supplement our previous submission and inform the Court of additional facts relevant to Dr. Gilman's Motion for a Protective Order [Dkt. No. 46]. In accordance with honoring and adhering to those principles, Justice Department policy mandates that "prosecutors should not ask for such waivers and are directed not to do so." Id Similarly; the SEC Enforcement Manual makes clear the SEC's recognition of and adherence to the principles that shield attorney-client communications and attorney work product. See SEC Enf. Man. 3.2.1,4.1.1,4.1.2,4.3 (jw) (Entered: 09/24/2013) |
| 09/24/2013 | 74 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 9/11/2013 re: We write on behalf of Mathew Martoma in response to the letter that Dr. Sidney Gilman sent on September 4, 2013, "to supplement [his] previous submission and inform the Court of additional facts relevant to Dr. Gilman's Motion for a Protective Order" (the "September 4 Letter"). In an attempt to save his arguments that he (1) had a reasonable expectation of privacy when he turned over his Electronic Medial both to the Government and to the University of Michigan in the summer and fall of 2012, respectively, and (2) did not waive any privileges by doing so, Dr. Gilman presents additional "facts" to this Court for the very first time. Those facts, however, are entirely irrelevant to the Motion to Compel. This Court should reject Dr. Gilman's last-ditch attempt to save his privilege claims for the following separate and independent reasons (jw) (Entered: 09/24/2013) |
| 09/24/2013 | 75 | ORDER as to Mathew Martoma. Defendant Mathew Martoma is charged with one count of conspiracy to commit securities fraud and two substantive counts of securities fraud. (Superseding Indictment (Dkt. No. 61)) The Superseding Indictment alleges that Martoma traded securities on the basis of inside information received from, inter alia, Sidney Gilman, M.D. (See Superseding Indictment 10-11,13-14,18-19; Gilman Br. (Dkt. No. 47) at 1) Dr. Gilman has entered into a cooperation agreement with the Government and is expected to be a critical witness at trial. Accordingly, the University of Michigan is hereby ORDERED to produce any and all University policies that govern or relate to: (I) the ownership of the electronic devices issued by the University to Dr. Gilman, and emails transmitted by Dr. Gilman via the University system or stored on University-issued electronic devices; (2) permissible uses for Dr. Gilman's University-issued electronic devices and the University email system; (3) the University's policies regarding monitoring use of University-issued electronic devices and the University email system; (4) any third-party right of access to Dr. Gilman's University-issued electronic devices and the University email system; and (5) Dr. Gilman's privacy rights in connection with communications stored on University-issued devices and/or sent over the University email system. The |

| | | |
|---|---|---|
| | | University of Michigan is further ORDERED to produce any and all notices provided or made available in any form to Dr. Gilman about the foregoing policies, and any acknowledgment he made of these polices. The University's production shall include, but is not limited to, relevant portions of: (1) any written agreement between the University and Dr. Gilman; (2) University codes of conduct; (3) University employee handbooks; (4) University privacy policies; and (5) instructions and guidance issued along with or in connection with Dr. Gilman's use of University-issued electronic devices, or in connection with his use of the University's email system. The University's production to the Court and the parties shall be completed by October 10, 2013. The production shall be made in the form of an affidavit with the relevant documents attached as exhibits. The affidavit and exhibits should be filed on ECF, and one courtesy copy should be delivered to Chambers in accordance with the Court's Individual Rules of Practice. (Signed by Judge Paul G. Gardephe on 9/24/2013)(jw) (Entered: 09/24/2013) |
| 09/25/2013 | 76 | ORDER as to Mathew Martoma (Responsive due by 12/20/2013) It is hereby ORDERED that jury selection in this matter will commence on January 6, 2014 at 9:30 a.m. in Courtroom 705 at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. Opening statements will commence on January 13, 2014 at 9:30 a.m. Any motions in limine, requested voir dire, and requests to charge are due on December 6, 2013. Responsive papers, if any, are due on December 20, 2013. (Signed by Judge Paul G. Gardephe on 9/25/2013)(jw) (Entered: 09/25/2013) |
| 10/03/2013 | 77 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Conference held on 9/24/13 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/28/2013. Redacted Transcript Deadline set for 11/7/2013. Release of Transcript Restriction set for 1/4/2014. (Rodriguez, Somari) (Entered: 10/03/2013) |
| 10/03/2013 | 78 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Conference proceeding held on 9/24/13 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Rodriguez, Somari) (Entered: 10/03/2013) |
| 10/04/2013 | 79 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Anthony S. Barkow dated 10/2/2013 re: Accordingly, I hereby respectfully request that the University be granted an extension of two weeks, until October 24, 2013, to comply with the September 24 Order..ENDORSEMENT: The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/3/2013)(jw) (Entered: 10/04/2013) |
| 10/04/2013 | 80 | MOTION for Roberto M. Braceras to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-8942941. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Mathew Martoma. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit 1, # 2 Text of Proposed Order)(Braceras, Roberto) (Entered: 10/04/2013) |
| 10/04/2013 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 80 MOTION for Roberto M. Braceras to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-8942941. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 10/04/2013) |
| 10/10/2013 | 81 | ORDER Admitting Counsel Pro Hac Vicegranting 80 Motion for Roberto M. Braceras to Appear Pro Hac Vice as to Mathew Martoma (1). The motion of Roberto M. Braceras, for admission to practice pro hac vice in the above-captioned action is granted. IT IS HEREBY ORDERED that Roberto M. Braceras is admitted to practice pro hac vice in the above-captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Paul G. Gardephe on 10/10/2013) (jw) (Entered: 10/10/2013) |
| 10/10/2013 | | Attorney update in case as to Mathew Martoma. (jw) (Entered: 10/10/2013) |
| 10/24/2013 | 82 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Anthony S. Barkow dated 10/24/2013 re: Pursuant to the Court's September 24, 2013 Order, and the extension that your Honor subsequently granted the University, the University is required to electronically file certain documents by today... Accordingly, we hereby respectfully request that the Court add the University as a party to the above-referenced matter on ECF, so that the University may comply with the Court's Order. ENDORSEMENT: The University Of Michigan is hereby added to this case as an interested party. SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/24/2013)(dnd) (Entered: 10/24/2013) |
| 10/24/2013 | 83 | DECLARATION of Anthony S. Barkow by University of Michigan as to Mathew Martoma re: 75 Order,,,,,,,,,,,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W) (Barkow, Anthony) (Entered: 10/24/2013) |
| 10/24/2013 | 84 | DECLARATION of Kara Morgenstern by University of Michigan as to Mathew Martoma re: 75 Order,,,,,,,,,,,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W) (Barkow, Anthony) (Entered: 10/24/2013) |
| 10/24/2013 | 85 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** DECLARATION of Kara Morgenstern by University of Michigan as to Mathew Martoma re: 75 Order,,,,,,,,,,,. / *Exhibit X to the Declaration of Kara Morgenstern* (Attachments: # 1 Exhibit X - Pt. 1, # 2 Exhibit X - Part 2A, # 3 Exhibit X - Part 2B, # 4 Exhibit X - Part 3, # 5 Exhibit X - Part 4, # 6 Exhibit X - Part 5, # 7 Exhibit X - Part 6)(Barkow, Anthony) Modified on 10/25/2013 (ka). (Entered: 10/24/2013) |

| | | |
|---|---|---|
| 10/24/2013 | <u>86</u> | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** DECLARATION of Kara Morgenstern by University of Michigan as to Mathew Martoma re: <u>75</u> Order,,,,,,,,,,,. / *Exhibit Y to the Declaration of Kara Morgenstern* (Attachments: # <u>1</u> Exhibit Y - Part 1, # <u>2</u> Exhibit Y - Part 2, # <u>3</u> Exhibit Y - Part 3, # <u>4</u> Exhibit Y - Part 4, # <u>5</u> Exhibit Y - Part 5)(Barkow, Anthony) Modified on 10/25/2013 (ka). (Entered: 10/24/2013) |
| 10/24/2013 | <u>87</u> | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** DECLARATION of Kara Morgenstern by University of Michigan as to Mathew Martoma re: <u>75</u> Order. / *Exhibit Z to the Declaration of Kara Morgenstern* (Attachments: # <u>1</u> Exhibit Z - Part 1, # <u>2</u> Exhibit Z - Part 2, # <u>3</u> Exhibit Z - Part 3, # <u>4</u> Exhibit Z - Part 4, # <u>5</u> Exhibit Z - Part 5)(Barkow, Anthony) Modified on 10/25/2013 (ka). (Entered: 10/24/2013) |
| 10/24/2013 | <u>88</u> | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** DECLARATION of Kara Morgenstern by University of Michigan as to Mathew Martoma re: <u>75</u> Order. / *Exhibits AA through KK of the Declaration of Kara Morgenstern* (Attachments: # <u>1</u> Exhibit AA, # <u>2</u> Exhibit BB, # <u>3</u> Exhibit CC - Part 1, # <u>4</u> Exhibit CC - Part 2, # <u>5</u> Exhibit CC - Part 3, # <u>6</u> Exhibit CC - Part 4, # <u>7</u> Exhibit CC - Part 5, # <u>8</u> Exhibit CC - Part 6, # <u>9</u> Exhibit CC - Part 7, # <u>10</u> Exhibit CC - Part 8, # <u>11</u> Exhibit CC - Part 9, # <u>12</u> Exhibit DD, # <u>13</u> Exhibit EE, # <u>14</u> Exhibit FF, # <u>15</u> Exhibit GG, # <u>16</u> Exhibit HH, # <u>17</u> Exhibit II, # <u>18</u> Exhibit JJ, # <u>19</u> Exhibit KK)(Barkow, Anthony) Modified on 10/25/2013 (ka). (Entered: 10/24/2013) |
| 10/25/2013 | | **NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Anthony Scott Barkow as to Mathew Martoma: to RE-FILE Document <u>87</u> Declaration, <u>88</u> Declaration, <u>86</u> Declaration, <u>85</u> Declaration. Use the document type Exhibit List found under the document list Trial Documents. (ka)** (Entered: 10/25/2013) |
| 10/25/2013 | <u>89</u> | EXHIBIT LIST by University of Michigan as to Mathew Martoma. (Attachments: # <u>1</u> Exhibit X - Part 2, # <u>2</u> Exhibit X - Part 3, # <u>3</u> Exhibit X - Part 4, # <u>4</u> Exhibit Y - Part 1, # <u>5</u> Exhibit Y - Part 2, # <u>6</u> Exhibit Y - Part 3, # <u>7</u> Exhibit Y - Part 4, # <u>8</u> Exhibit Y - Part 5, # <u>9</u> Exhibit Z - Part 1, # <u>10</u> Exhibit Z - Part 2, # <u>11</u> Exhibit Z - Part 3, # <u>12</u> Exhibit Z - Part 4, # <u>13</u> Exhibit Z - Part 5, # <u>14</u> Exhibit AA, # <u>15</u> Exhibit BB, # <u>16</u> Exhibit CC - Part 1, # <u>17</u> Exhibit CC - Part 2, # <u>18</u> Exhibit CC - Part 3, # <u>19</u> Exhibit CC - Part 4, # <u>20</u> Exhibit CC - Part 5, # <u>21</u> Exhibit CC - Part 6, # <u>22</u> Exhibit CC - Part 7, # <u>23</u> Exhibit CC - Part 8, # <u>24</u> Exhibit CC - Part 9, # <u>25</u> Exhibit DD, # <u>26</u> Exhibit EE, # <u>27</u> Exhibit FF, # <u>28</u> Exhibit GG, # <u>29</u> Exhibit HH, # <u>30</u> Exhibit II, # <u>31</u> Exhibit JJ, # <u>32</u> Exhibit KK)(Barkow, Anthony) (Entered: 10/25/2013) |
| 10/30/2013 | <u>90</u> | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated October 30, 2013 re: October 24, 2013 University of Michigan Production (Strassberg, Richard) (Entered: 10/30/2013) |
| 10/31/2013 | <u>91</u> | LETTER by Sidney Gilman as to Mathew Martoma addressed to Judge Paul G. Gardephe from Jonathan N. Halpern dated October 31, 2013 re: scheduling Sidney Gilman's response. Document filed by Sidney Gilman. (Halpern, Jonathan) (Entered: 10/31/2013) |
| 10/31/2013 | <u>92</u> | MEMO ENDORSEMENT As to Mathew Martoma. We respectfully submit this |

| | | |
|---|---|---|
| | | letter to the Court on behalf of Sidney Gilman, M.D., third-party intervenor, in the above-referenced action to respectfully respect the opportunity until one week from today, November 7, 2013, to submit a response to the Court on behalf of Dr. Gilman. ENDORSEMENT:The application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/31/2013)(dnd) (Entered: 11/01/2013) |
| 11/07/2013 | 93 | LETTER by Sidney Gilman as to Mathew Martoma addressed to Judge Paul G. Gardephe from Jonathan Halpern dated 11/07/2013 re: In response to Defendant Mathew Martoma's October 30, 2013 letter. Document filed by Sidney Gilman. (Attachments: # 1 Affidavit Declaration of Robert S. Frenchman.)(Halpern, Jonathan) (Entered: 11/07/2013) |
| 11/13/2013 | 94 | ORDER: As to Mathew Martoma It is hereby ORDERED that jury selection will begin on January 6, 2014 at 9:30 a.m. in Courtroom 705 at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. Opening statements and the presentation of evidence previously scheduled to begin on January 13,2014 will now commence immediately after the completion of jury selection. SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/12/2013)(dnd) (Entered: 11/13/2013) |
| 11/14/2013 | 95 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated November 14, 2013 re: Sidney Gilman's letter dated November 7, 2013 (Strassberg, Richard) (Entered: 11/14/2013) |
| 11/15/2013 | 96 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated November 15, 2013 re: request that the trial be adjourned to January 21, 2014 (or any date thereafter convenient for this Court). Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 11/15/2013) |
| 11/18/2013 | 97 | ORDER denying 96 LETTER MOTION for Adjournment of Trial as to Mathew Martoma (1). The application is denied. The Clerk of Court will terminate the motion. (Signed by Judge Paul G. Gardephe on 11/15/2013) (dnd) (Entered: 11/18/2013) |
| 11/18/2013 | 98 | LETTER by University of Michigan as to Mathew Martoma addressed to Judge Paul G. Gardephe from Anthony S. Barkow dated November 14, 2013 re: the letter to the Court submitted by Dr. Sidney Gilman on November 7, 2013 Document filed by University of Michigan. (Barkow, Anthony) (Entered: 11/18/2013) |
| 11/26/2013 | 99 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated November 26, 2013 re: Stipulated Protective Order (Attachments: # 1 Proposed Order)(Strassberg, Richard) (Entered: 11/26/2013) |
| 12/06/2013 | 100 | FIRST MOTION in Limine. Document filed by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 12/06/2013) |
| 12/06/2013 | 101 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** Proposed Jury Instructions by USA as to Mathew Martoma. (Ingoglia, Eugene) Modified on 12/9/2013 (ka). (Entered: 12/06/2013) |
| 12/06/2013 | 102 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** Proposed Voir Dire Questions by USA as to Mathew Martoma. (Ingoglia, Eugene) Modified on 12/9/2013 (ka). (Entered: 12/06/2013) |

| | | |
|---|---|---|
| 12/06/2013 | 103 | FIRST MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion for a Written Juror Questionnaire in Advance of Voir Dire (Mr. Martoma's Motion in Limine No. 1).* Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | 104 | MEMORANDUM in Support by Mathew Martoma re 103 FIRST MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion for a Written Juror Questionnaire in Advance of Voir Dire (Mr. Martoma's Motion in Limine No. 1)..* (Attachments: # 1 Appendix A - Proposed Jury Questionnaire)(Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | 105 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 103 FIRST MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion for a Written Juror Questionnaire in Advance of Voir Dire (Mr. Martoma's Motion in Limine No. 1)..* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47)(Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | 106 | SECOND MOTION in Limine - *Defendant Mathew Martoma's Notice of his Motion to Exclude Evidence of SAC's Sales of Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's SEC Testimony (Mr. Martoma's Motion in Limine No, 2)..* Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | 107 | MEMORANDUM in Support by Mathew Martoma re *106 Second Motion in Limine- Defendant Mathew Martoma's Notice of his Motion to Exclude Evidence of SAC's Sales of Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's SEC Testimony (Mr. Martoma's Motion in Limiine No. 2)* (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | 108 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 106 Second Motion in Limine- Defendant Mathew Martoma's Notice of his Motion to Exclude Evidence of SAC's Sales of Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's SEC Testimony (Mr. Martoma's Motion in Limiine No. 2): in Support as to Mathew Martoma (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | 109 | THIRD MOTION in Limine - *Defendant Mathew Martoma's Notice of his Motion to Exclude Evidence of the Manner in which SAC Sold Elan and Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's SEC Testimony (Mr. Martoma's Motion in Limiine No. 3):.* Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | 110 | MEMORANDUM in Support by Mathew Martoma re: *109 Third Motion in* |

| | | |
|---|---|---|
| | | *Limine - Defendant Mathew Martoma's Notice of his Motion to Exclude Evidence of the Manner in which SAC Sold Elan and Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's SEC Testimony (Mr. Martoma's Motion in Limiine No. 3):* (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [111] | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: [109] Third Motion in Limine - Defendant Mathew Martoma's Notice of his Motion to Exclude Evidence of the Manner in which SAC Sold Elan and Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's SEC Testimony (Mr. Martoma's Motion in Limiine No. 3): in Support as to Mathew Martoma (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C)(Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [112] | FOURTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of Other SAC Actions, Settlements, and Plea Agreements (Mr. Martoma's Motion In Limine No. 4).* Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [113] | MEMORANDUM in Support by Mathew Martoma re [112] FOURTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of Other SAC Actions, Settlements, and Plea Agreements (Mr. Martoma's Motion In Limine No. 4).*FOURTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of Other SAC Actions, Settlements, and Plea Agreements (Mr. Martoma's Motion In Limine No. 4)..* (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [114] | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: [112] FOURTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of Other SAC Actions, Settlements, and Plea Agreements (Mr. Martoma's Motion In Limine No. 4).*FOURTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of Other SAC Actions, Settlements, and Plea Agreements (Mr. Martoma's Motion In Limine No. 4)..* (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C, # [4] Exhibit D, # [5] Exhibit E, # [6] Exhibit F, # [7] Exhibit G)(Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [115] | FIFTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5).* Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [116] | MEMORANDUM in Support by Mathew Martoma re [115] FIFTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5).*FIFTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5)..* (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [117] | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: [115] FIFTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5).*FIFTH MOTION in Limine - *Defendant* |

| | | |
|---|---|---|
| | | *Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5)..* (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D) (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [118](#) | SIXTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Termination from SAC (Mr. Martoma's Motion In Limine No. 6).* Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [119](#) | MEMORANDUM in Support by Mathew Martoma re [118](#) SIXTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Termination from SAC (Mr. Martoma's Motion In Limine No. 6)..* (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [120](#) | Proposed Voir Dire Questions by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/06/2013 | [121](#) | Request To Charge by Mathew Martoma. (Strassberg, Richard) (Entered: 12/06/2013) |
| 12/09/2013 | | **NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Eugene Edward Ingoglia as to Mathew Martoma: to RE-FILE Document [101](#) Proposed Jury Instructions. Use the document type Request to Charge found under the document list Trial Documents. (ka)** (Entered: 12/09/2013) |
| 12/09/2013 | | **NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Eugene Edward Ingoglia as to Mathew Martoma: to RE-FILE Document [102](#) Proposed Voir Dire Questions. Use the document type Proposed Examination of Jurors found under the document list Trial Documents. (ka)** (Entered: 12/09/2013) |
| 12/09/2013 | [122](#) | PROPOSED EXAMINATION OF JURORS by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 12/09/2013) |
| 12/09/2013 | [123](#) | Request To Charge by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 12/09/2013) |
| 12/12/2013 | [124](#) | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 12/10/2013 re: Accordingly, we request that Mr. Martoma's conditional release be modified to permit travel to the Districts of Wyoming, Montana, Idaho, Georgia and Illinois from December 20,2013 to January 3, 2014..ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/11/2013)(jw) (Entered: 12/12/2013) |
| 12/13/2013 | [125](#) | SECOND MOTION in Limine. Document filed by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 12/13/2013) |
| 12/16/2013 | [126](#) | ORDER: As to Mathew Martoma. Pending before the Court are Defendant's motion to compel (Dkt. No. 35) and Intervenor Dr. Sidney Gilman's motion for a protective order (Dkt. No. 46). The Court requires additional information from the parties before these motions can be addressed. Accordingly, it is hereby ORDERED that the parties and Intervenor Dr. Gilman shall provide written submissions to the Court addressing the following issues: (1) the specific material |

| | | |
|---|---|---|
| | | that the Defendant has requested, from what party the material was requested, and when the request was made; (2) the manner in which the request was made, whether by subpoena, letter request, or some other means; (3)the legal basis for the request, whether Federal Rule of Criminal Procedure 16, 18 U.S.C. § 3500, Giglio, Brady, or some other rule, doctrine, or case; (4) a list of the documents and/or communications that Dr. Gilman argues are properly withheld as privileged, the nature of the privilege asserted for each document and/or communication withheld whether attorney-client privilege, the work product doctrine, or some other privilege -and a log setting forth the nature and date of the documents and/or communications, and the participants to withheld communications; and (5) as to documents and communications withheld on privilege grounds, a statement by the Defendant as to whether he seeks production of this material and, if so, the relevance of the material sought.The Government is further directed to submit an affidavit concerning what agreement or agreements it entered into with Dr. Gilman concerning the confidentiality of the materials Dr. Gilman provided to the Government, including any agreement or agreements addressing the attorney-client and marital privileges, the work product doctrine, or any other legal privilege.Submissions addressing these issues, supported by appropriate evidence, are due by 5:00 p.m. on December 18, 2013. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/16/2013)(dnd) (Entered: 12/16/2013) |
| 12/16/2013 | | ***DELETED DOCUMENT. Deleted document number 127 Endorsed Letter, as to Mathew Martoma. The document was incorrectly filed in this case. (dnd)** (Entered: 12/16/2013) |
| 12/17/2013 | 127 | MEMORANDUM OPINION & ORDER as to Mathew Martoma re: 38 MOTION to Dismiss *COUNT TWO AND THE CORRESPONDING ALLEGATIONS IN COUNT ONE OF THE INDICTMENT* filed by Mathew Martoma. Defendant's motion to dismiss Count Two and the corresponding allegations in Count One is denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 38). (Signed by Judge Paul G. Gardephe on 12/16/2013)(jw) (Entered: 12/17/2013) |
| 12/18/2013 | 128 | LETTER by Sidney Gilman as to Mathew Martoma addressed to Judge Paul G. Gardephe from Jonathan N. Halpern dated 12/18/2013 re: Response to the Court's 12/16/13 Order Document filed by Sidney Gilman. (Halpern, Jonathan) (Entered: 12/18/2013) |
| 12/18/2013 | 129 | DECLARATION of Arlo Devlin-Brown in Opposition by USA as to Mathew Martoma re: 35 MOTION to Compel *the Production of Certain Documents Withheld by the Government or the University of Michigan..* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Devlin-Brown, Arlo) (Entered: 12/18/2013) |
| 12/18/2013 | 130 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated December 18, 2013 re: Court's Order dated December 16, 2013 (Dkt. No. 126) (Strassberg, Richard) (Entered: 12/18/2013) |
| 12/18/2013 | 131 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown & Eugene Ingoglia dated 12/18/2013 re: Court's Order Dated December 16, 2013 Document filed by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Devlin-Brown, Arlo) (Entered: 12/18/2013) |

| 12/19/2013 | 132 | LETTER by University of Michigan as to Mathew Martoma addressed to Judge Paul G. Gardephe from Anthony S. Barkow dated December 19, 2013 re: a question raised in a telephone conference with the parties, counsel for Dr. Sidney Gilman, and counsel for the University. Document filed by University of Michigan. (Barkow, Anthony) (Entered: 12/19/2013) |
|---|---|---|
| 12/20/2013 | 133 | LETTER by Sidney Gilman as to Mathew Martoma addressed to Judge Paul G. Gardephe from Jonathan Halpern dated 12/20/2013 re: Court Request Document filed by Sidney Gilman. (Halpern, Jonathan) (Entered: 12/20/2013) |
| 12/20/2013 | 134 | NOTICE OF ATTORNEY APPEARANCE: Shannon B. Wolf appearing for Mathew Martoma. Appearance Type: Retained. *Notice of Appearance of Shannon B. Wolf on behalf of Third-Party Movant M.D. Sidney Gilman.* (Wolf, Shannon) (Entered: 12/20/2013) |
| 12/20/2013 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference as to Mathew Martoma held on 12/20/2013. Status conference held. Defendant M. Martoma not present, attorneys Richard Strassberg and Roberto Braceras present. AUSAs Arlo Devlin-Brown and Eugene Ingoglia present. Court reporter Michael McDaniel present. Final pre-tial conference set for 1/3/2014 at 9:00 am. Bail continued. (ajc) (Entered: 12/20/2013) |
| 12/20/2013 | | As to Mathew Martoma: Pretrial Conference set for 1/3/2014 at 09:00 AM before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 12/20/2013) (ajc) (Entered: 12/20/2013) |
| 12/20/2013 | 135 | MEMORANDUM in Opposition by Mathew Martoma re 100 FIRST MOTION in Limine.. *(Defendant Mathew Martoma's Memorandum of Law in Opposition to the Government's Motion Seeking Notice of an "Alibi Defense")* (Strassberg, Richard) (Entered: 12/20/2013) |
| 12/20/2013 | 136 | MEMORANDUM OF LAW in Opposition by Mathew Martoma re: 100 FIRST MOTION in Limine. filed by USA *(Defendant Mathew Martoma's Memorandum of Law in Opposition to the Government's Motion in Limine to Admit Non-Bapi Information).* (Strassberg, Richard) (Entered: 12/20/2013) |
| 12/20/2013 | 137 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 118 SIXTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Termination from SAC (Mr. Martoma's Motion In Limine No. 6)..* (Ingoglia, Eugene) (Entered: 12/20/2013) |
| 12/20/2013 | 138 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 115 FIFTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5).FIFTH MOTION in Limine - Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5)..* (Ingoglia, Eugene) (Entered: 12/20/2013) |
| 12/20/2013 | 139 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 103 FIRST MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion for a Written Juror Questionnaire in Advance of Voir Dire (Mr. Martoma's Motion in* |

JA27

| | | |
|---|---|---|
| | | *Limine No. 1)..* (Attachments: # 1 Exhibit A)(Devlin-Brown, Arlo) (Entered: 12/20/2013) |
| 12/20/2013 | 140 | MEMORANDUM in Opposition by USA as to Mathew Martoma *Second and Third In Limine Motions* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Devlin-Brown, Arlo) (Entered: 12/20/2013) |
| 12/20/2013 | 141 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 112 FOURTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of Other SAC Actions, Settlements, and Plea Agreements (Mr. Martoma's Motion In Limine No. 4).*FOURTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of Other SAC Actions, Settlements, and Plea Agreements (Mr. Martoma's Motion In Limine No. 4)..* (Devlin-Brown, Arlo) (Entered: 12/20/2013) |
| 12/20/2013 | 142 | MEMORANDUM in Opposition by Mathew Martoma re 125 SECOND MOTION in Limine.. *(Defendant Mathew Martoma's Memorandum of Law in Opposition to the Government's Motion In Limine to Admit The Research Analyst 404(b) Material)* (Strassberg, Richard) (Entered: 12/20/2013) |
| 12/20/2013 | 143 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 142 Memorandum in Opposition to Motion,. (Attachments: # 1 Exhibit A) (Strassberg, Richard) (Entered: 12/20/2013) |
| 12/23/2013 | 144 | NOTICE OF ATTORNEY APPEARANCE: Derek A. Cohen appearing for Mathew Martoma. Appearance Type: Retained. (Cohen, Derek) (Entered: 12/23/2013) |
| 12/23/2013 | 145 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma *Motion to Exclude Evidence of SAC's Sales of Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's Testimony*. (Strassberg, Richard) (Entered: 12/23/2013) |
| 12/23/2013 | 146 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma *Motion to Exclude Evidence of the Manner in which SAC Sold Elan and Wyeth Securities or, Alternatively, to Admit Selected Portions of Steven Cohen's SEC Testimony*. (Strassberg, Richard) (Entered: 12/23/2013) |
| 12/23/2013 | 147 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma re: 115 FIFTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5)*.FIFTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Fainting When Approached By Government Agents (Mr. Martoma's Motion In Limine No. 5)..* (Strassberg, Richard) (Entered: 12/23/2013) |
| 12/23/2013 | 148 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma re: 118 SIXTH MOTION in Limine - *Defendant Mathew Martoma's Notice of Motion to Exclude Evidence of His Termination from SAC (Mr. Martoma's Motion In Limine No. 6)..* (Strassberg, Richard) (Entered: 12/23/2013) |
| 12/26/2013 | 149 | MOTION to Compel *THE PRODUCTION OF BRADY AND GIGLIO MATERIAL*. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 12/26/2013) |

| 12/26/2013 | 150 | MEMORANDUM in Support by Mathew Martoma re 149 MOTION to Compel *THE PRODUCTION OF BRADY AND GIGLIO MATERIAL..* (Strassberg, Richard) (Entered: 12/26/2013) |
| 12/26/2013 | 151 | DECLARATION of Richard M. Strassberg in Support as to Mathew Martoma re: 149 MOTION to Compel *THE PRODUCTION OF BRADY AND GIGLIO MATERIAL..* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Strassberg, Richard) (Entered: 12/26/2013) |
| 12/27/2013 | 152 | REPLY MEMORANDUM OF LAW in Support by USA as to Mathew Martoma re: 100 FIRST MOTION in Limine.. (Ingoglia, Eugene) (Entered: 12/27/2013) |
| 12/30/2013 | 153 | SEALED DOCUMENT placed in vault. December 6, 2013 Defendant Letter regarding request to seal Motion in Limine. (mps) (Entered: 12/30/2013) |
| 12/30/2013 | 154 | SEALED DOCUMENT placed in vault. Memorandum Opinion and Order denying application for sealing. (mps) (Entered: 12/30/2013) |
| 12/30/2013 | 155 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 156 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 157 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 158 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 159 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 160 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 161 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 162 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 163 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 164 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/30/2013) |
| 12/30/2013 | 165 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 12/26/2013 re: We represent the defendant Mathew Martoma in the above-referenced action. We are aware that your courtroom is equipped with a permanent technology installation and have retained DOAR Litigation Consulting to manage its use during the trial. As you may be aware, DOAR is a federally-approved provider of courtroom technology to the federal courts under the Administrative Office of the Courts' contract. We have performed fl site inspection or Courtroom 110 and are aware that the courtroom contains certain technology for use during tria1. We respectfully request permission to access the courtroom on Friday, January 3, 2014 to install additional equipment that we will use during the trial beginning on January 6, 2014... ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/28/2013)(dnd) (Entered: 12/30/2013) |
| 12/30/2013 | 166 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 12/26/2013 re: We represent Defendant Mathew Martoma in the above referenced action. We write to request the Court's permission to make use of an on-site trial preparation room during the pendency of the criminal trial beginning January 6, 2014... ENDORSEMENT: SO |

| | | |
|---|---|---|
| | | ORDERED. (Signed by Judge Paul G. Gardephe on 12/28/2013)(dnd) (Entered: 12/30/2013) |
| 12/30/2013 | 167 | SEALED DOCUMENT placed in vault. (nm) (Entered: 12/31/2013) |
| 12/31/2013 | 168 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated 12/31/2013 re: Proposed Jury Questions Document filed by USA. (Devlin-Brown, Arlo) (Entered: 12/31/2013) |
| 12/31/2013 | 169 | AMENDED LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated 12/31/2013 re: Jury Questions (Date Corrected) Document filed by USA. (Devlin-Brown, Arlo) (Entered: 12/31/2013) |
| 12/31/2013 | 170 | ORDER: As to Mathew Martoma. I hereby authorize the following attorney(s) to bring the General Purpose Computing Device(s) ("GPCD") listed below into the Courthouse for use in a trial proceeding in the action entitled United States v. Mathew Martoma, Case No. 1:12 Cr.00973, which is anticipated to begin on January 6, 2014, and conclude on a date to be determined... This order does not authorize any attorney or law firm to bring more than three GPCDs into the Courthouse unless its receipt has been acknowledged below by the Chair of the Court's Technology Committee. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/31/2013)(dnd) (Entered: 12/31/2013) |
| 01/02/2014 | 171 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 2, 2014 re: confirmation of delivery and installation of electronic equipment on January 3, 2014 (Strassberg, Richard) (Entered: 01/02/2014) |
| 01/02/2014 | 172 | ORDER granting 35 Motion to Compel as to Mathew Martoma (1); denying 46 Motion for Protective Order as to Mathew Martoma (1). Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.l0b-5 and 240.l0b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The gravamen of the Indictment is that from about 2006 through July 2008, the Defendant directed trading activity for his hedge fund employer on the basis of material non-public information. The non-public information was allegedly supplied by doctors participating in a clinical trial of a drug for possible use in treating Alzheimer's disease. One of these doctors -Sidney Gilman has entered into a cooperation agreement with the Government and is expected to be a critical witness at trial... Dr. Gilman will produce to the Defendant and to the Government all eleven documents that he provided to the Court for in camera review. Defendant's motion to compel isgranted as set forth in this Order and in the Court's December 20, 2013 bench ruling. Dr. Gilman's motion for a protective order is denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 35,46). SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/1/2014) (dnd) (Entered: 01/02/2014) |
| 01/02/2014 | 173 | ORDER: As to Mathew Martoma. It is hereby ORDERED that the conference in this matter presently scheduled for January 3, 2014 is adjourned to January 6, 2014 at 9:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. It is further ORDERED that jury selection will begin on January 7, 2014 at 9:30 a.m. in Courtroom 110 at the |

| | | |
|---|---|---|
| | | Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. Opening statements and the presentation of evidence will commence immediately after the completion of jury selection. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/2/2014)(dnd) (Entered: 01/02/2014) |
| 01/02/2014 | 174 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 149 MOTION to Compel *THE PRODUCTION OF BRADY AND GIGLIO MATERIAL..* (Devlin-Brown, Arlo) (Entered: 01/02/2014) |
| 01/03/2014 | 175 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 01/03/2014 re: United States v. Martoma, No. 12 Cr. 973 (PGG) (Attachments: # 1 Proposed Revisions to Jury Questionnaire and Voir Dire)(Strassberg, Richard) (Entered: 01/03/2014) |
| 01/03/2014 | 176 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 01/03/2014 re: United States v. Martoma, No. 12 Cr. 973 (PGG) (Strassberg, Richard) (Entered: 01/03/2014) |
| 01/03/2014 | 177 | DECLARATION of Arlo Devlin-Brown in Opposition by USA as to Mathew Martoma (Devlin-Brown, Arlo) (Entered: 01/03/2014) |
| 01/04/2014 | 178 | MOTION in Limine., MOTION to Compel *Additional Expert Disclosures & Preclude Certain Expert Testimony*. Document filed by USA as to Mathew Martoma. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Devlin-Brown, Arlo) (Entered: 01/04/2014) |
| 01/05/2014 | 179 | DECLARATION of Arlo Devlin-Brown in Opposition by USA as to Mathew Martoma re: 149 MOTION to Compel *THE PRODUCTION OF BRADY AND GIGLIO MATERIAL..* (Devlin-Brown, Arlo) (Entered: 01/05/2014) |
| 01/05/2014 | 180 | DECLARATION of Richard M. Strassberg by Mathew Martoma. *REGARDING THE JOINT INVESTIGATION OF DEFENDANT MATHEW MARTOMA BY THE UNITED STATES ATTORNEYS OFFICE FOR THE SOUTHERN DISTRICT OF NEW YORK AND THE SECURITIES AND EXCHANGE COMMISSION* (Strassberg, Richard) (Entered: 01/05/2014) |
| 01/05/2014 | 181 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 5, 2014 (Strassberg, Richard) (Entered: 01/05/2014) |
| 01/05/2014 | 291 | INTERNET CITATION NOTE as to Mathew Martoma: Material from decision with Internet citation re: 184 Order, 186 Order, 185 Order on Motion in Limine. (fk) (Entered: 06/10/2014) |
| 01/06/2014 | 182 | ORDER granting 100 Motion in Limine as to Mathew Martoma (1); granting 115 Motion in Limine as to Mathew Martoma (1); granting 118 Motion in Limine as to Mathew Martoma (1). The Defendant's motions in limine to exclude evidence of fainting (Dkt. No. 115) and evidence of his termination from SAC Capital (Dkt. No. 118) are granted. The Government's motion in limine to require the Defendant to give notice of alibi (Dkt. No.100) is likewise granted. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 115, 118, 100) (Signed by Judge Paul G. Gardephe on 1/3/2014) (jw) (Entered: 01/06/2014) |
| 01/06/2014 | 183 | ORDER as to Mathew Martoma. In this insider trading case, Defendant Mathew |

Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.c. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.l0b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The Government alleges, inter alia, that between 2006 and July 2008, Martoma traded on the basis of material, non-public information, and caused his hedge fund employer to trade on the basis of material non-public information. To the extent that the Defendant has moved to compel the production of Brady and Giglio material in communications in the USAO's possession from Dr. Gilman's counselor Dr. Ross's counsel, the motion is denied. To the extent that the Defendant has moved to compel the production of such material in communications from the USAO to Dr. Gilman's counselor Dr. Ross's counsel or to the doctors directly, the motion is granted to the extent of requiring the USAO to disclose any statements by the USAO to the doctors or their counsel that either (1) threaten criminal prosecution of the doctors if they do not implicate Martoma; or (2) promise a non-prosecution agreement to the doctors if they implicate Martoma. To the extent that Defendant's motion to compel implicates material that is in the sole possession of the SEC, the Court reserves decision, pending submission of the affidavits referenced above. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/4/2014)(jw) (Entered: 01/06/2014)

| 01/06/2014 | 184 | ORDER as to Mathew Martoma. In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.l0b-5 and 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The Government alleges, inter alia, that between 2006 and July 2008, Martoma caused his hedge fund employer to trade on the basis of material non-public information. The non-public information was allegedly supplied to Martoma by two doctors -Sidney Gilman and Joel Ross who were participants in a clinical trial of bapineuzurnab, a drug that was thought to be of possible use in treating Alzheimer's disease. Both doctors have entered into cooperation agreements with the Government and are expected to be critical witnesses at trial. The Government's motion in limine to introduce evidence that the Defendant obtained from Dr. Gilman and Dr. Ross confidential information pertaining to drugs other than bapineuzumab is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 100). (Signed by Judge Paul G. Gardephe on 1/5/2014)(jw) (Entered: 01/06/2014) |
| 01/06/2014 | 185 | ORDER denying 125 Motion in Limine as to Mathew Martoma (1). The Government's motion in limine to introduce evidence concerning a research analyst's meeting with a doctor about a clinical trial is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 125). (Signed by Judge Paul G. Gardephe on 1/5/2014) (jw) (Entered: 01/06/2014) |
| 01/06/2014 | 186 | ORDER as to Mathew Martoma. The USAO will produce to Defendant any communication between the SEC and counsel for Dr. Gilman or counsel for Dr. Ross in which a doctor's counsel makes statements that are materially different from the denials of culpability already produced to Defendant. The USAO's obligation to produce such communications is extended to communications that are in the sole possession of the SEC. The USAO will also produce to Defendant communications from the SEC to the doctors' counsel, or to Dr. Gilman or Dr. Ross directly, that (1) threaten criminal prosecution of either doctor if he does not implicate Martoma; or (2) promise a non-prosecution agreement to either doctor if |

| | | |
|---|---|---|
| | | he implicates Martoma. The USAO's obligation to produce such communications is extended to communications that are in the sole possession of the SEC. SO ORDERED (Signed by Judge Paul G. Gardephe on 1/5/2014)(jw) (Entered: 01/06/2014) |
| 01/06/2014 | 187 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 1/3/2014 re: We write on behalf of Mathew Martoma to request relief with respect to two prospective Government witnesses, Ranjit Singh and John Casey, disclosed two weeks late. Although the Government has added Mr. Singh and Mr. Casey to its witness list, it has not explained whether and under what circumstances it intends to call either of them. The Government should be allowed to call those witnesses (if at all) only in response to specific testimony elicited by Mr. Martoma in his own case. The Government should not be permitted to disregard the agreed-upon pretrial schedule for its own tactical advantage. ENDORSEMENT: The application is denied. Mr. Singh's proposed testimony relates to the alibi issue. In an order issued yesterday, the Court concluded that the Defendant -- under Fed. R. Crim. P. 12.1 -- should have responded to the Government's request for notice of alibi with respect to the July 19, 2008 Gilman/Martoma meeting in Ann Arbor. Undoubtedly, if the Defendant had responded -- and stated that he intended to raise an alibi defense -- Mr. Singh would have been listed as a Government witness. In any event, the Defendant has not demonstrated prejudice flowing from Mr. Singh's name being added now. The same is true as to Mr. Casey, who testified at a prior trial about the same matters, and whose testimony is available to the Defendant... (Signed by Judge Paul G. Gardephe on 1/4/2014)(jw) (Entered: 01/06/2014) |
| 01/06/2014 | 188 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 1/6/2014 re: To request the Court's permission to arrange for the provision of secure high-speed Internet access as well as Remote Real Time transcript feed in the on-site trial preparation room that we will be using during the pendency of the criminal trial beginning January 7, 2014..ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/6/2014)(jw) (Entered: 01/06/2014) |
| 01/06/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Pretrial Conference as to Mathew Martoma held on 1/6/2014. Final Pretrial Conference held. Defendant M. Martoma present with attorneys Richard Strassberg and Roberto Braceras. AUSAs Arlo Devlin-Brown and Eugene Ingoglia present. Court reporter Rose Prater present. Bail continued. (ajc) (Entered: 01/06/2014) |
| 01/06/2014 | 189 | MEMORANDUM in Opposition by Mathew Martoma re 178 MOTION in Limine. MOTION to Compel *Additional Expert Disclosures & Preclude Certain Expert Testimony*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Strassberg, Richard) (Entered: 01/06/2014) |
| 01/06/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Pretrial Conference as to Mathew Martoma held on 1/6/2014. Defendant M. Martoma present with attorneys Richard Strassberg and Roberto Braceras. AUSAs Arlo Devlin-Brown and Eugene Ingoglia present. Court reporter present. Bail continued. (jbo) (Entered: 01/14/2014) |

| | | |
|---|---|---|
| 01/07/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Voir Dire held on 1/7/2014 as to Mathew Martoma. (jbo) (Entered: 01/14/2014) |
| 01/07/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Selection as to Mathew Martoma held on 1/7/2014. (jbo) (Entered: 01/14/2014) |
| 01/07/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/7/2014. Trial began, continued to 1/8/14 at 9:30 am. (jbo) (Entered: 01/14/2014) |
| 01/08/2014 | 190 | ORDER as to Mathew Martoma. In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 7Sj(b) and 78ff, 17 C.F.R. §§ 240.l0b-5 and 240.l0b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The Government alleges, inter alia, that between 2006 and July 2008, Martoma caused S.A.C. Capital Advisors, LLC ("SAC") to trade on the basis of material non-public information. The non-public information was allegedly supplied to Martoma by two doctors -- Sidney Gilman and Joel Ross -- who were participants in a clinical trial of bapineuzumab, a drug that was thought to be of possible use in treating Alzheimer's disease. Bapineuzumab was being developed by Wyeth and Elan Corporation, plc ("Elan"), and the alleged insider trading involves the shares of these companies. (Id.) This order addresses the Defendant's motions in limine to (1) exclude certain evidence of SAC's trading activity in Wyeth and Elan stock; (2) introduce excerpts from an investigative deposition of Steven A. Cohen by Securities and Exchange Commission staff on May 3, 2012; and (3) exclude evidence of SAC's involvement in related civil and criminal litigation. (See Dkt. Nos. 106, 109, 112)....[See this Order]... CONCLUSION: The Defendant's motions in limine to exclude evidence of SAC's sales of Wyeth stock and the manner in which SAC sold Elan and Wyeth securities or, in the alternative, to admit portions of Steven A. Cohen's SEC deposition testimony, are denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 106, 109). SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/7/2014)(bw) (Entered: 01/08/2014) |
| 01/08/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/8/2014. Trial continued, continued to 1/9/14 at 9:30 am. (jbo) (Entered: 01/14/2014) |
| 01/09/2014 | 191 | ORDER as to (S1-12-Cr-973-01) Mathew Martoma. Defendant Mathew Martoma is charged with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and with two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) Jury selection in this matter began on January 7, 2014. On January 8, 2014 at 10:35 p.m., Martoma informed this Court that he intended to file a petition for rehearing en banc concerning the Second Circuit's January 8, 2014 order dismissing his appeal of this Court's December 28, 2013 order, arguing that the Second Circuit's Order is inconsistent with the prior binding precedent of S.E.C. v. TheStreet.Com, 273 F.3d 222 (2d Cir. 2001). The Second Circuit found the collateral order doctrine to be inapplicable to Martoma's appeal and dismissed the appeal for want of jurisdiction. United States v. Martoma, No. 13-4807 (2d Cir. January 8, 2014). Martoma requests that this Court hold its January 8, 2014 order in abeyance pending the Second Circuit's |

| | | |
|---|---|---|
| | | ruling on his petition for en banc review....[See this Order]... S.E.C. v. TheStreet.Com, 273 F.3d 222 (2d Cir. 2001), cited by Martoma, is distinguishable on several grounds, including that it is a civil case. In any event, this Court does not read TheStreet.Com to announce that the Circuit will invariably exercise jurisdiction over every appeal involving a district judge's unsealing order. Given the "leeway" that the panel enjoyed under Kensington Int'l in weighing the competing interests here, this Court concludes that a petition for en banc rehearing would likely be denied. Accordingly, the Defendant's application for a stay is denied. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/8/2014)(bw) (Entered: 01/09/2014) |
| 01/09/2014 | 192 | ORDER as to (S1-12-Cr-973-01) Mathew Martoma. Defendant Mathew Martoma is charged with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and with two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) Jury selection in this matter began on January 7, 2014. On December 6, 2013, Martoma and the Government filed cross-motions in limine concerning certain evidence related to disciplinary proceedings brought against Martoma in 1999, when he was a student at Harvard Law School (the "Law School Evidence"). When Martoma filed his motion, he asked this Court to seal all papers concerning the cross-motions, and to "close from the public any hearing on either t[he] Request to Seal or the motion[ s] in limine and related papers." (Dkt. No. 153) In a December 28, 2013 order, this Court denied Martoma's application for sealing and closure. (Dkt. No. 154) The Court stayed immediate disclosure of the material and the Order, however, to permit Martoma to seek a stay from the U.S. Court of Appeals for the Second Circuit. (Id.) On December 30, 2013, Martoma filed a notice of appeal, and a motion for a stay in the Second Circuit. In a January 8, 2014 order, the Court of Appeals dismissed Martoma's appeal for lack of jurisdiction, and denied the motion to stay as moot. The Court of Appeals having dismissed Martoma's appeal from this Court's December 28, 2013 order, this Court's stay of that order is hereby lifted. The Clerk of the Court is respectfully directed to unseal the motions in limine and related submissions concerning the Law School Evidence (Dkt. Nos. 153-164). SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/8/2014)(bw) (Entered: 01/09/2014) |
| 01/09/2014 | | Transmission to Sealed Records Clerk: as to (S1-12-Cr-973-01) Mathew Martoma. Transmitted re: 192 Order, to the Sealed Records Clerk for the unsealing of documents. (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 193 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Oral Argument held on 12/20/13 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Michael McDaniel, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/3/2014. Redacted Transcript Deadline set for 2/13/2014. Release of Transcript Restriction set for 4/14/2014. (Rodriguez, Somari) (Entered: 01/09/2014) |
| 01/09/2014 | 194 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Oral Argument proceeding held on 12/20/13 has been filed by the court reporter/transcriber in the above- |

| | | |
|---|---|---|
| | | captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Rodriguez, Somari) (Entered: 01/09/2014) |
| 01/09/2014 | 195 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated December 6, 2013 re: Mr. Martoma requests that the Court (i) seal this Request to Seal and the motion in limine and related papers; (ii) close any public hearings on these motions; and (iii) return this Request to Seal and the motion in limine and related papers to Mr. Martoma upon disposition of the motion or other proceeding for which they were submitted. [*** NOTE: Previously filed under seal in Seal Envelope #153 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 196 | MEMORANDUM OPINION & ORDER as to (S1-12-Cr-973) Mathew Martoma. Defendant Mathew Martoma is charged with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and with two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5.:md 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) This memorandum opinion and order addresses Defendant's request that certain motions in limine be filed under seal, and that the courtroom be closed when these motions in limine are discussed....[See this Memorandum Opinion & Order]... CONCLUSION: Defendant's application for sealing and closure regarding the motions in limine and related submissions concerning the Law School Evidence is denied. The docket will reflect the filing of this memorandum opinion and order, the Government's motion in limine, the Defendant's motion in limine, the Defendant's opposition to the Government's motion in limine, the Government's opposition to the Defendant's motion in limine, the Defendant's December 6, 2013 letter, the Government's December 6, 2013 letter, the Defendant's December 9, 2013 letter, the Government's December 14, 2013 letter, and the Defendant's December 20, 2013 letter as sealed matters, and all of these documents will remain under seal until 9:30a.m. on December 31, 2013. See In re The Herald Co., 734 F.2d at 1 02 ("[T]he publicly maintained docket entries should ref1ect the fact that the motion was filed, the fact that the motion and any supporting or opposing papers were filed under seal,... the disposition of the motion, and the fact of [sealing], whether ordered upon motion of a party or by the Court sua sponte."); Haller, 837 F.2d at 87 ("In re The Herald requires... that except in extraordinary circumstances the public have a means of learning that a closure or sealing order has been proposed or issued."). The Court stays immediate disclosure of these materials to permit Defendant to make application to the U.S. Court of Appeals for the Second Circuit for a more extended stay. See United States v. Huntley, 943 F. Supp. 2d 383, 388 (E.D.N.Y. 2013) (staying an order to unseal a sentencing memorandum for twenty-four hours to permit application to the Second Circuit for an extended stay); United States v. Amodeo, No. 92 Civ. 7744 (RPP), 1994 WL 389172, * 1 (S.D.N.Y. 1994) (staying an order unsealing documents to allow a party to seek an extended stay from the Second Circuit). If no extension of the stay is sought by 9:30 a.m. on December 31, 2013, all materials referenced above will be unsealed. If Defendant seeks a stay in the Second Circuit, the above-referenced materials will remain under seal pending determination of the motion by the Second Circuit. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/28/2013) [*** NOTE: Previously filed under seal in Seal Envelope #154; Unsealed by Order, Doc.#192, |

|  |  | filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
|---|---|---|
| 01/09/2014 | 197 | DEFENDANT MATHEW MARTOMA'S NOTICE OF MOTION TO EXCLUDE EVIDENCE CONCERNING EVENTS UNRELATED TO THE CHARGED OFFENSES AND PRECEDING MR. MARTOMA'S EMPLOYMENT AT SAC. Oral Argument Requested. Document filed by Mathew Martoma, dated December 6, 2013. [*** NOTE: Previously filed under seal in Seal Envelope #155 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 198 | DEFENDANT MATHEW MARTOMA'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO EXCLUDE EVIDENCE CONCERNING EVENTS UNRELATED TO THE CHARGED OFFENSES AND PRECEDING MR. MARTOMA'S EMPLOYMENT AT SAC. Oral Argument Requested. Document filed by Mathew Martoma, dated December 6, 2013. [*** NOTE: Previously filed under seal in Seal Envelope #156 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 199 | LETTER by USA as to (S1-12-Cr-973) Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown, Eugene Ingoglia, Assistant United States Attorneys, dated December 6, 2013 re: Enclosed please find copies of the Government's request to charge, proposed voir dire, and in limine motions. One of the Government's motions, entitled "Government's Motion In Limine To Admit Evidence Concerning The Defendant's Expulsion From Harvard Law School In Response To Potential Defense" has not been electronically filed because the defendant intends to file a request that it be maintained under seal. Document filed by USA. [*** NOTE: Previously filed under seal in Seal Envelope #157 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 200 | GOVERNMENT'S MOTION IN LIMINE TO ADMIT EVIDENCE CONCERNING THE DEFENDANT'S EXPULSION FROM HARVARD LAW SCHOOL IN RESPONSE TO POTENTIAL DEFENSES. Document filed by USA as to Mathew Martoma, dated December 6, 2013. [*** NOTE: Previously filed under seal in Seal Envelope #158 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 201 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated December 9, 2013 re: We write to clarify a statement made in the Request to File Under Seal ("Request to Seal") that we filed on Friday, December 6. In particular, we indicated that the Government did not oppose the Request to Seal. After further discussions with the Government today, however, we understand that the Government's position is only that they agreed not to file any papers on this matter publicly until the Court rules on Mr. Martoma's Request to Seal. [*** NOTE: Previously filed under seal in Seal Envelope #159 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 202 | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EVIDENCE CONCERNING EVENTS UNRELATED TO THE CHARGED OFFENSES AND PRECEDING MR. MARTOMA'S EMPLOYMENT AT SAC. Document filed by USA as to Mathew Martoma, dated December 20, 2013. [*** NOTE: Previously filed under seal in Seal |

| | | |
|---|---|---|
| | | Envelope #160 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 203 | DECLARATION of RICHARD M. STRASSBERG IN SUPPORT OF DEFENDANT MATHEW MARTOMA'S OPPOSITION TO THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE CONCERNING EVENTS UNRELATED TO THE CHARGED OFFENSES AND PRECEDING MR. MARTOMA'S EMPLOYMENT AT SAC. Document filed by Mathew Martoma, dated December 20, 2013. [*** NOTE: Previously filed under seal in Seal Envelope #161 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 204 | DEFENDANT MATHEW MARTOMA'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE CONCERNING EVENTS UNRELATED TO THE CHARGED OFFENSES AND PRECEDING MR. MARTOMA'S EMPLOYMENT AT SAC. Document filed by Mathew Martoma, dated December 20, 2013. [*** NOTE: Previously filed under seal in Seal Envelope #162 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 205 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown, Eugene Ingoglia, Assistant United States Attorneys, dated December 14, 2013 re: The Government writes in response to defendant Mathew Martoma's December 6, 2013 letter (the "Sealing Request") seeking an order sealing the Government and defendant's respective in limine motions relating to the circumstances of the defendant's dismissal from Harvard Law School ("HLS")(collectively, the "HLS in limine motions"); and (2) closing from the public any hearing on either the request to seal or the substantive HLS in limine motions. The Government respectfully requests that the Court deny the defendant's motion to seal the HLS in limine motions and related papers and close from the public any hearing on either the request to seal or the substantive HLS in limine motion. The Government would not oppose a more narrowly tailored limitation deemed necessary by the Court. [*** NOTE: Previously filed under seal in Seal Envelope #163 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | 206 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Attorney Richard M. Strassberg dated December 20, 2013 re: We write on behalf of Mathew Martoma in response to the letter from the Government dated December 14, 2013 (the "Government Letter"), and in support of Mr. Martoma's Request to Seal. [*** NOTE: Previously filed under seal in Seal Envelope #164 on 12/30/2013; Unsealed by Order, Doc.#192, filed on 1/9/2014. ***] (bw) (Entered: 01/09/2014) |
| 01/09/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/9/2014. Trial continued, continued to 1/10/14 at 9:30 a.m. (jbo) (Entered: 01/14/2014) |
| 01/10/2014 | 207 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Roberto M. Braceras dated 1/10/2014 re: To request permission to bring iPhone into court for the duration of the trial.ENDORSEMENT: The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on |

| | | |
|---|---|---|
| | | 1/10/2014)(jw) (Entered: 01/10/2014) |
| 01/10/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/10/2014. Trial continued, continued to 1/13/14 at 9:30 a.m. (jbo) (Entered: 01/14/2014) |
| 01/13/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/13/2014. Trial held, continued to 1/14/14 at 9:30 am. (jbo) (Entered: 01/17/2014) |
| 01/14/2014 | 208 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 1/13/14 re: We respectfully request permission to bring the following equipment into the on-site trial preparation room for use during Mr. Martoma's criminal trial: All in one printer, Router, Computer Monitor, Set of small speakers, Cabling (VGA, HDMI, Switchers), Tables, Chairs. ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/13/14)(jw) (Entered: 01/14/2014) |
| 01/14/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/14/2014. Trial held, continued to 1/15/14 at 9:30 am. (jbo) (Entered: 01/17/2014) |
| 01/15/2014 | 209 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 15, 2014 re: To Exclude Certain Compliance and Training Materials as Irrelevant and Unfairly Prejudicial. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 01/15/2014) |
| 01/15/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/15/2014. Trial held, continued to 1/16/14 at 9:30 a.m. (jbo) (Entered: 01/17/2014) |
| 01/16/2014 | 210 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Conference held on 1/6/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Rose Prater, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/10/2014. Redacted Transcript Deadline set for 2/21/2014. Release of Transcript Restriction set for 4/21/2014. (Rodriguez, Somari) (Entered: 01/16/2014) |
| 01/16/2014 | 211 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Conference proceeding held on 1/6/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Rodriguez, Somari) (Entered: 01/16/2014) |
| 01/16/2014 | 212 | LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated January 16, 2014 re: redaction. Document filed by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 01/16/2014) |
| 01/16/2014 | 213 | LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated January 16, 2014 re: Opposition to defense motion re character evidence. |

| | | |
|---|---|---|
| | | Document filed by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 01/16/2014) |
| 01/16/2014 | 214 | LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated January 13, 2014 re: Opposition re Beyond the Scope and Irrelevant (Berkowitz testimony). Document filed by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 01/16/2014) |
| 01/16/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/16/2014. 1/16/14, Trial held, continued to 1/17/14 at 9:30 am. (ajc) (Entered: 01/22/2014) |
| 01/17/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/17/2014. 1/17/14, Trial held, continued to 1/20/14 at 9:30 am. (ajc) (Entered: 01/22/2014) |
| 01/20/2014 | 215 | LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated January 20, 2014 re: Preclude Certain Expert Testimony. Document filed by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 01/20/2014) |
| 01/20/2014 | 216 | LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated January 20, 2014 re: Preclude Certain Expert Testimony *(attaching exhibits)*. Document filed by USA as to Mathew Martoma. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Ingoglia, Eugene) (Entered: 01/20/2014) |
| 01/20/2014 | 217 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated 1/20/2014 re: use of prior consistent statements Document filed by USA. (Devlin-Brown, Arlo) (Entered: 01/20/2014) |
| 01/20/2014 | 218 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated 01/20/2014 re: unpublished placebo data Document filed by USA. (Devlin-Brown, Arlo) (Entered: 01/20/2014) |
| 01/20/2014 | 219 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 20, 2014 re: Request Until 9:00 a.m. Thursday, January 23, 2014 to Respond to the Government's Submission. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 01/20/2014) |
| 01/20/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/20/2014. 1/20/14, Trial held, continued to 1/21/14 at 9:30 a.m. (ajc) (Entered: 01/22/2014) |
| 01/21/2014 | 220 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 21, 2014 re: unpublished placebo data. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 01/21/2014) |
| 01/21/2014 | 221 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 21, 2014 re: use of prior consistent statements. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 01/21/2014) |
| 01/21/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/21/2014. 1/21/14, Trial held, continued to 1/22/14 at 10:00 a.m. (ajc) (Entered: 01/22/2014) |
| 01/22/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as |

| | | |
|---|---|---|
| | | to Mathew Martoma held on 1/22/2014. Trial held, continued to 1/23/14 at 9:30 am. (ajc) (Entered: 01/29/2014) |
| 01/23/2014 | 222 | LETTER RESPONSE in Opposition by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 23, 2014 re: 216 LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated January 20, 2014 re: Preclude Certain Expert Testimony *(attaching exhibits)*. LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated January 20, 2014 re: Preclude Certain Expert Testimony *(attaching exhibits)*.. (Attachments: # 1 Exhibit A)(Strassberg, Richard) (Entered: 01/23/2014) |
| 01/23/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/23/2014. Trial held, continued to 1/24/14 at 9:30 am. (ajc) (Entered: 01/29/2014) |
| 01/24/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/24/2014. Trial held, continued to 1/27/14 at 9:30 a.m. (ajc) (Entered: 01/29/2014) |
| 01/26/2014 | 223 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated 1/26/2014 re: Contours of Expert Testimony Document filed by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Devlin-Brown, Arlo) (Entered: 01/26/2014) |
| 01/26/2014 | 224 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 26, 2014 re: to Allow Professor Gompers to Offer His Expert Opinion that the Market for Elan Securities was Overheated in June and July 2008. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 01/26/2014) |
| 01/27/2014 | 225 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 27, 2014 re: Letter Requesting that the Government Disclose the Methodology Underlying Three Government Summary Exhibits (Strassberg, Richard) (Entered: 01/27/2014) |
| 01/27/2014 | 226 | LETTER MOTION addressed to Judge Paul G. Gardephe from USA dated Jan. 27, 2014 re: Opposition to Defense Letter Re Summary Witness. Document filed by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 01/27/2014) |
| 01/27/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/27/2014. Trial held, continued to 1/28/14 at 9:30 a.m. (ajc) (Entered: 01/29/2014) |
| 01/28/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/28/2014. Trial held, continued to 1/29/14 at 9:30 am. (ajc) (Entered: 01/29/2014) |
| 01/29/2014 | 227 | ORDER: As to Mathew Martoma. In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.c. §§ 78j(b) and 78ff, 17 C.P.R. §§ 240.10b-5 and 240.l0b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) Trial began on January 7,2014... For the reasons as set forth in this Order, the Government's motion in limine to exclude Professor Gompers's testimony that Elan stock was overheated in June and July |

| | | |
|---|---|---|
| | | 2008 is granted. The Government's motion to exclude Dr. Wisniewski's opinion that there is no meaningful difference between the information disclosed in the June 17, 2008 Elan press release and the final ICAD presentation is denied. All issues with respect to the Government's motion in limine having now been resolved, the Clerk of the Court is directed to terminate the motion and related motions (Dkt. Nos. 178,215,216,219,224). SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/28/2014)(dnd) (Entered: 01/29/2014) |
| 01/29/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/29/2014. Continued to 1/30/2014 at 9:30 a.m. (dnd) (Entered: 02/04/2014) |
| 01/30/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/30/2014. Trial held, continued to 1/31/14 at 12:00 pm. (dnd) (Entered: 02/04/2014) |
| 01/31/2014 | 228 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated January 31, 2014 re: Requested Instructions with this Court's Draft Jury Charge. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 01/31/2014) |
| 01/31/2014 | 229 | JURY CHARGE in USA v. Mathew Martoma. Dated: February 4, 2014. (bw) (Entered: 02/03/2014) |
| 01/31/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 1/31/2014. Trial held, Charge conference held. Continued to 2/3/14 at 9:30 a.m. (dnd) (Entered: 02/04/2014) |
| 02/03/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 2/3/2014. Trial held, continued to 2/4/14 at 9:30 am. (jbo) (Entered: 02/11/2014) |
| 02/04/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 2/4/2014. Trial held, continued to 2/5/14 at 9:30 pm. (jbo) (Entered: 02/11/2014) |
| 02/05/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 2/5/2014. Trial held, 2/6/14 at 9:30 am. (jbo) (Entered: 02/11/2014) |
| 02/06/2014 | 230 | VERDICT FORM in USA v. Mathew Martoma, 12-Cr-973(PGG). Dated: February 6, 2014. (bw) (Entered: 02/06/2014) |
| 02/06/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Jury Trial as to Mathew Martoma held on 2/6/2014. Trial held. The Jury returned a verdict of Guilty to counts 1, 2 and 3 of the indictment. (jbo) (Entered: 02/11/2014) |
| 02/06/2014 | | JURY VERDICT as to Mathew Martoma (1) Guilty on Count 1s,2s-3s, Mathew Martoma (1) Not Guilty on Count 1,2-3. (jbo) (Entered: 02/11/2014) |
| 02/07/2014 | 231 | ORDER as to Mathew Martoma. It is hereby ORDERED that briefing on any post-trial motion will proceed based on the following schedule: 1. Moving briefs will be submitted by February 27, 2014. 2. Opposition papers will be submitted by March 13, 2014. 3. Reply briefs, if any, will be submitted by March 20, 2014. It is further ORDERED that sentencing in this matter will take place on June 10, 2014 |

| | | |
|---|---|---|
| | | at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. Any submission on behalf of the Defendant is due May 13, 2014, and any response by the Government is due May 27, 2014. It is further ORDERED that the Probation Department prepare a presentence investigation report in this matter. SO ORDERED. (Signed by Judge Paul G. Gardephe on 2/7/2014)(bw) (Entered: 02/07/2014) |
| 02/19/2014 | 232 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/10/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 233 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/10/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 234 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/13/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 235 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/13/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 236 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/14/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 237 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/14/14 has been filed by the court reporter/transcriber in the above-captioned |

| | | |
|---|---|---|
| | | matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 238 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/15/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 239 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/15/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 240 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/16/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 241 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/16/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 242 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/17/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 243 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/17/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of |

| | | Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
|---|---|---|
| 02/19/2014 | 244 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/21/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 245 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/21/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 246 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/22/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 247 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/22/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 248 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/23/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 249 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/23/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the |

| | | |
|---|---|---|
| | | transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 250 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/24/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 251 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/24/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 252 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/24/14 corrected trial before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 253 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/24/14 corrected trial has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 254 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/27/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 255 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/27/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the |

| | | transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
|---|---|---|
| 02/19/2014 | 256 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/28/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 257 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/28/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 258 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/29/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 259 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/29/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 260 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/30/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 261 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/30/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without |

| | | redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
|---|---|---|
| 02/19/2014 | 262 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 1/31/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 263 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 1/31/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | | **\*\*\*DELETED DOCUMENT. Deleted document number 264. "NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 2/3/2014 has been filed by the court reporter/transcriber in the above-captioned matter." The document was incorrectly filed in this case. [\*\*\* NOTE: This document was originally docketed on 2/19/2014 by (McGuirk, Kelly). Southern District Court Reporters Office requested the deletion of this docket entry on 2/19/2014. \*\*\*] (bw)** (Entered: 02/19/2014) |
| 02/19/2014 | 264 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 2/3/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 265 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 2/3/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 266 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 2/4/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |

**JA48**

| 02/19/2014 | 267 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 2/4/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
|---|---|---|
| 02/19/2014 | 268 | TRANSCRIPT of Proceedings as to Mathew Martoma re: Trial held on 2/5/14 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/17/2014. Redacted Transcript Deadline set for 3/27/2014. Release of Transcript Restriction set for 5/23/2014. (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/19/2014 | 269 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Trial proceeding held on 2/5/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/19/2014) |
| 02/27/2014 | 270 | MOTION for Acquittal *or, Alternatively*., MOTION for New Trial. Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 02/27/2014) |
| 02/27/2014 | 271 | MEMORANDUM in Support by Mathew Martoma re 270 MOTION for Acquittal *or, Alternatively*. MOTION for New Trial.. (Attachments: # 1 Appendix A, # 2 Appendix B)(Strassberg, Richard) (Entered: 02/27/2014) |
| 03/03/2014 | 272 | SEALED DOCUMENT placed in vault. (mps) (Entered: 03/03/2014) |
| 03/03/2014 | 273 | SEALED DOCUMENT placed in vault. (mps) (Entered: 03/03/2014) |
| 03/04/2014 | 274 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from USA dated 3/4/2014 re: bail modification on consent Document filed by USA. (Ingoglia, Eugene) (Entered: 03/04/2014) |
| 03/05/2014 | 275 | MANDATE of USCA (certified copy) as to Mathew Martoma USCA Case Number 13-4807. Defendant-Appellant Mathew Martoma appeals from an interlocutory order of the United States District Court for the Southern District of New York (Paul G. Gardephe, Judge), dated December 28, 2013, denying Martoma's request that certain motions in limine concerning the admissibility of prior-act evidence be filed under seal and that the courtroom be closed when the motions in limine are discussed. Martoma moves for a stay of the district court's decision pending appeal, and for leave to file his appeal and associated motions under seal. The Government opposes Martoma's motions and moves to dismiss the appeal for want of jurisdiction. For the reasons that follow, the Government's motion is GRANTED, and the appeal is DISMISSED. Martoma's motion to stay is therefore DENIED as moot. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit, Clerk USCA. Issued As Mandate: 03/05/2014. (nd) (Entered: |

| | | 03/05/2014) |
|---|---|---|
| 03/05/2014 | 276 | MEMO ENDORSEMENT as to (12-Cr-973-01) Mathew Martoma on 274 LETTER addressed to Judge Paul G. Gardephe from AUSAs Arlo Devlin-Brown, Eugene Ingoglia, dated March 4, 2014 re: bail modification on consent. The Government writes to respectfully propose a revised bail package for your consideration in the above-captioned matter. In light of the Defendant's conviction and the potential criminal forfeiture of assets used to secure the bond, the parties jointly propose the following bail modifications: 1) Pretrial services reporting should be increased to once weekly; and, 2) The existing PRB should be signed by two additional co-signers. The Government has approved Lizzy Rachel Thomas, the Defendant's mother, and Philip Sanju Martoma, the Defendant's brother, as co-signers. ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 3/5/2014)(bw) (Entered: 03/05/2014) |
| 03/12/2014 | 277 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from USA dated March 12, 2014 re: requested adjustment to briefing schedule Document filed by USA. (Ingoglia, Eugene) (Entered: 03/12/2014) |
| 03/12/2014 | 278 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown and Eugene Ingoglia dated 3/12/14 re: The parties request that the date by which the Government's response must be filed be extended.ENDORSEMENT: SO ORDERED (Defense Replies due by 4/4/2014., Government Responses due by 3/21/2014) (Signed by Judge Paul G. Gardephe on 3/12/2014)(jw) (Entered: 03/13/2014) |
| 03/21/2014 | 279 | MEMORANDUM in Opposition by USA as to Mathew Martoma re 270 MOTION for Acquittal *or, Alternatively*. MOTION for New Trial.. (Devlin-Brown, Arlo) (Entered: 03/21/2014) |
| 03/24/2014 | 280 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 3/21/14 re: Requesting a temporary modification of his terms of release to allow him to travel to see his family living in the Chicago area from May 15, 2014 through May 19, 2014. During this time, Mr. Martoma would only be traveling to Chicago and other immediately surrounding areas located in Illinois to attend a family wedding..ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 3/21/14)(jw) (Entered: 03/24/2014) |
| 03/28/2014 | 281 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 3/26/2014 re: Accordingly, pursuant to Paragraph 1 of the Protective Order, Mr. Martoma, with the consent of the USAO, seeks relief to allow the production of certain documents agreed upon by Mr. Martoma and the USAO, to the Kaplan plaintiffs. It is understood that the Kaplan plaintiffs would be strictly bound to the terms of the Protective Order, consistent with paragraph 3, which provides that recipients of confidential information "shall be subject to the terms of this Order.ENDORSEMENT: The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 3/28/2014)(jw) (Entered: 03/28/2014) |
| 04/03/2014 | 282 | AMENDED MEMORANDUM OF LAW in Opposition by USA as to Mathew Martoma re: 270 MOTION for Acquittal *or, Alternatively*. MOTION for New |

**JA50**

| | | Trial. filed by Mathew Martoma. (Ingoglia, Eugene) (Entered: 04/03/2014) |
|---|---|---|
| 04/04/2014 | 283 | REPLY MEMORANDUM OF LAW in Support as to Mathew Martoma re: 270 MOTION for Acquittal *or, Alternatively*. MOTION for New Trial.. (Strassberg, Richard) (Entered: 04/04/2014) |
| 05/09/2014 | 284 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 5/8/2014 re: We write to request a short extension of time for the submission of our sentencing memorandwn on Mr. Martoma's behalf. As Your Honor is aware, sentencing in this case is currently scheduled for Tuesday, June 10, 2014 at 10:00am. Specifically, we respectfully request an extension of the deadline to file Mr. Martoma's sentencing memorandum to one week from the date that the Initial Presentence Report is served. We have conferred with the Government and they consent to this request. Consistent with Mr. Martoma's requested extension, the Government requests that any response be due two weeks after Mr. Martoma files his memorandum. Mr. Martoma consents to this request..ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 5/8/14)(jw) (Entered: 05/09/2014) |
| 05/21/2014 | 285 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 5/21/14 re: To request a very short extension of the deadline for the submission of our sentencing memorandum on Mr. Martoma's behalf.ENDORSEMENT: The Application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 5/21/14)(jw) (Entered: 05/21/2014) |
| 05/27/2014 | 286 | SENTENCING SUBMISSION by Mathew Martoma. (Attachments: # 1 Ex 1-10, # 2 Ex 11-20, # 3 Ex 21-30, # 4 Ex 31-39, # 5 Ex 40-49, # 6 Ex 50-64, # 7 Ex 65-72a, # 8 Ex 73-89, # 9 Ex 90-99, # 10 Ex 100-105, # 11 Ex 106-114, # 12 Ex 115-116, # 13 Ex 117-125, # 14 Ex 126-145, # 15 Ex 146-149, # 16 Ex 150-165, # 17 Ex 166-177)(Strassberg, Richard) (Entered: 05/27/2014) |
| 05/28/2014 | 287 | SENTENCING SUBMISSION by Mathew Martoma. (Attachments: # 1 Exhibits 1-10, # 2 Exhibits 11-20, # 3 Exhibits 21-30, # 4 Exhibits 31-39, # 5 Exhibits 40-49, # 6 Exhibits 50-64, # 7 Exhibits 65-72a, # 8 Exhibits 73-89, # 9 Exhibits 90-99, # 10 Exhibits 100-105, # 11 Exhibits 106-114, # 12 Exhibits 115-116, # 13 Exhibits 117-125, # 14 Exhibits 126-145, # 15 Exhibits 146-149, # 16 Exhibits 150-165, # 17 Exhibits 166-177)(Strassberg, Richard) (Entered: 05/28/2014) |
| 05/30/2014 | 288 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated May 30, 2014 re: sentencing date Document filed by USA. (Devlin-Brown, Arlo) (Entered: 05/30/2014) |
| 06/06/2014 | 289 | ORDER as to Mathew Martoma ( Sentencing set for 7/28/2014 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) It is hereby ORDERED that the sentencing of Defendant Mathew Martoma presently scheduled for June 10, 2014 will take place on Monday, July 28, 2014 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. (Signed by Judge Paul G. Gardephe on 6/6/2014)(jw) (Entered: 06/06/2014) |
| 06/10/2014 | 290 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated June 10, 2014 re: proposed schedule for |

| | | |
|---|---|---|
| | | submission of Government's sentencing submission Document filed by USA. (Devlin-Brown, Arlo) (Entered: 06/10/2014) |
| 06/11/2014 | 292 | MEMO ENDORSEMENT as to Mathew Martoma on re: 290 LETTER by USA addressed to Judge Paul G. Gardephe from AUSA Arlo Devlin-Brown dated June 10, 2014 re: proposed schedule for submission of Government's sentencing submission. The Government writes to respectfully request an extension of the date by which it must file its sentencing memorandum in the above-referenced matter, to June 27, 2014. ENDORSEMENT: The Application is granted. SO ORDERED: (Signed by Judge Paul G. Gardephe on 6/10/2014)(bw) (Entered: 06/11/2014) |
| 06/27/2014 | 293 | SENTENCING SUBMISSION by USA as to Mathew Martoma. (Ingoglia, Eugene) (Entered: 06/27/2014) |
| 07/23/2014 | 294 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated June 9, 2014 re: adjornment of sentencing date (Strassberg, Richard) (Entered: 07/23/2014) |
| 07/24/2014 | 295 | ORDER as to Mathew Martoma. It is hereby ORDERED that the sentencing of Defendant Mathew Martoma presently scheduled for July 28, 2014 will take place on Monday, September 8, 2014 at 3:00 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. (Signed by Judge Paul G. Gardephe on 7/23/2014)(bw) (Entered: 07/24/2014) |
| 08/04/2014 | 296 | ORDER as to Mathew Martoma. Sentencing in this matter is scheduled for September 8, 2014. In their sentencing submissions, neither the Government nor defense counsel has addressed the appropriate amount of forfeiture. (See Govt. Br. (Dkt. No. 293); Def. Br. (Dkt. No. 287)) The Government has also not responded to Martoma's argument that no fine should be imposed. (See Def. Br. (Dkt. No. 287) at 77-80) Accordingly, it is hereby ORDERED that by August 11, 2014, the Government shall provide a written submission to this Court setting forth the Government's position as to fine and forfeiture. It is further ORDERED that Martoma will provide any written response addressing these issues by August 21, 2014. (Signed by Judge Paul G. Gardephe on 8/1/14)(jw) (Entered: 08/04/2014) |
| 08/11/2014 | 297 | Sentencing Letter by USA as to Mathew Martoma addressed to Hon. Paul G. Gardephe from USA dated August 11, 2014 re: Forfeiture/Fine. (Attachments: # 1 Application for Order of Forfeiture, # 2 Exhibit A to Application, # 3 Exhibit B to Application, # 4 Exhibit C to Application)(Ingoglia, Eugene) (Entered: 08/11/2014) |
| 08/12/2014 | 298 | NOTICE OF ATTORNEY APPEARANCE Christine Ingrid Magdo appearing for USA. (Magdo, Christine) (Entered: 08/12/2014) |
| 08/14/2014 | 299 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated August 14, 2014 re: Supplemental Authority and Argument in Further Support of Mr. Martoma's Renewed Motion for a Judgment of Acquittal or, alternatively, for a New Trial (Attachments: # 1 Exhibit C, # 2 Exhibit D)(Strassberg, Richard) (Entered: 08/14/2014) |
| 08/14/2014 | 300 | DECLARATION of Richard M. Strassberg by Mathew Martoma re: 299 Letter, filed by Mathew Martoma. (Attachments: # 1 Exhibit A, # 2 Exhibit B) |

| | | (Strassberg, Richard) (Entered: 08/14/2014) |
|---|---|---|
| 08/21/2014 | 301 | SUPPLEMENTAL MEMORANDUM OF LAW in Support by Mathew Martoma re: 287 Sentencing Submission, filed by Mathew Martoma . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU, # 48 Exhibit VV, # 49 Exhibit WW, # 50 Exhibit XX)(Strassberg, Richard) (Entered: 08/21/2014) |
| 09/04/2014 | 302 | ORDER as to Mathew Martoma. It is hereby ORDERED that the sentencing of Defendant Mathew Martoma presently scheduled for Monday, September 8, 2014 at 3:00 p.m. in Courtroom 705 will take place in Courtroom 110 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. (Sentencing set for 9/8/2014 at 03:00 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 9/3/2014)(ft) (Entered: 09/04/2014) |
| 09/04/2014 | 303 | MEMORANDUM OPINION & ORDER #104704 as to Mathew Martoma re: 270 MOTION for Acquittal or, Alternatively MOTION for New Trial filed by Mathew Martoma. For the reasons stated above, Martoma's motion for a judgment of acquittal or, alternatively, for a new trial, is denied. Sentencing will proceed as scheduled on September 8, 2014, at 3:00p.m. (Signed by Judge Paul G. Gardephe on 9/4/14)(jw) Modified on 9/11/2014 (ca). (Entered: 09/04/2014) |
| 09/05/2014 | 304 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated September 5, 2014 re: response to the Government's August 11, 2014 submission. (Strassberg, Richard) (Entered: 09/05/2014) |
| 09/05/2014 | 305 | MEMO ENDORSEMENT as to Mathew Martoma on re: 304 Letter filed by Mathew Martoma. Accordingly, Mr. Martoma respectfully submits that the amount subject to forfeiture is limited to $6,505,181.50, the amount that he actually received from his 2008 bonus...ENDORSEMENT..The Government is directed to respond to this letter by 10:00am on September 8, 2014. (Signed by Judge Paul G. Gardephe on 9/5/2014)(jw) (Entered: 09/05/2014) |
| 09/05/2014 | | Set/Reset Deadlines/Hearings as to Mathew Martoma:Government Responses due by 9/8/2014 by 10:00am. (jw) (Entered: 09/05/2014) |
| 09/08/2014 | 306 | MEMORANDUM OPINION & ORDER #104729 as to (12-Cr-973-01) Mathew Martoma. On February 6, 2014 - after a month-long trial - a jury convicted Defendant Mathew Martoma of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and of two substantive counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. The Superseding Indictment charges that between summer 2006 and July 29, 2008, Martoma caused his employer, the hedge fund S.A.C. Capital Advisors, LLC ("SAC Capital"), to trade on the basis of material non-public |

information. (Superseding Indictment (Dkt. No. 61) Paragraphs 1, 8, 14) The evidence at trial showed that Martoma obtained material, non-public information from two doctors - Sidney Gilman and Joel Ross - about the Phase II clinical trial of bapineuzumab, a drug it was thought might be useful in treating Alzheimer's disease. Elan Corporation, plc ("Elan") and Wyeth owned rights to the drug and were responsible for the clinical trial. The charges against Martoma relate to trading in the securities of these companies. Sentencing is scheduled for September 8, 2014. This opinion addresses Martoma's objections to the calculation of gain under U.S.S.G. §§ 2B1.4 and 2B1.1(b) as set forth in the U.S. Probation Office's June 3, 2014 Pre-Sentence Report ("PSR")....[See this Memorandum Opinion & Order]... CONCLUSION: The amount of illicit "gain" attributable to Martoma for purposes of the Sentencing Guidelines is more than $200 million but less than $400 million. Accordingly, a 28-level enhancement under U.S.S.G. §§ 2B1.4 and 2B1.1(b)(1)(O) is appropriate. The Probation Office's Presentence Report properly concludes that the applicable range under the Sentencing Guidelines is 188 to 235 months' imprisonment. See U.S.S.G. Sentencing Table, Ch. 5, Pt. A; (PSR Paragraph 85). SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/5/2014)(bw) Modified on 9/11/2014 (ca). Modified on 9/11/2014 (ca). Modified on 9/17/2014 (ca). (Entered: 09/08/2014)

| Date | Doc | Description |
|---|---|---|
| 09/08/2014 | 307 | Sentencing Letter by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Christine Magdo dated Setepmber 8, 2014 re: Forfeiture of Martoma's bonus. (Devlin-Brown, Arlo) (Entered: 09/08/2014) |
| 09/08/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Sentencing held on 9/8/2014 for Mathew Martoma (1) Count 1s,2s-3s. (dnd) (Entered: 09/09/2014) |
| 09/08/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Sentencing held on 9/8/2014 for Mathew Martoma (1) Count 1s,2s-3s. Sentence held. Defendant Martoma present with attorney Richard Strassberg. AUSA Arlo Devlin-Brown present. Court reporter Vincent Bologna present. See Judgment for terms of sentence. (ajc) (Entered: 09/10/2014) |
| 09/09/2014 | 308 | Letter by Mathew Martoma addressed to Judge Paul Gardephe from David Weisman dated 2/12/14 re: I would ask you to think of the families and the subjects behind the data and consider how Martoma corrupted and used their good deeds. (jw) (Entered: 09/09/2014) |
| 09/09/2014 | 309 | Sentencing Letter by Mathew Martoma addressed to Judge Paul Gardephe dated 5/29/14 re: Defendant's sentencing. (jw) (Entered: 09/09/2014) |
| 09/09/2014 | 310 | Sentencing Letter by Mathew Martoma addressed to Judge Paul Gardephe from Lance M. Bredvold dated 5/31/2014 re: Regarding Martoma sentencing. (jw) (Entered: 09/09/2014) |
| 09/09/2014 | 311 | Sentencing Letter by Mathew Martoma addressed to Judge Paul Gardephe from Georgia and James Demorest dated 6/4/2014 re: Regarding sentencing. (jw) (Entered: 09/09/2014) |
| 09/09/2014 | 312 | Sentencing Letter by Mathew Martoma addressed to Judge Paul Gardephe from Justice For All (JFA America) dated 6/28/14 re: Petition on Behalf of Mathew Martoma's Sentencing. (jw) (Entered: 09/09/2014) |

| 09/09/2014 | [313](313) | Sentencing Letter by Mathew Martoma addressed to Mr. Castellano from Laura Taylor Swain dated 5/27/14 re: I received your letter concerning a claim for losses in connection with United States v_ Matthew Martoma, 12 Cr. 973 (PGG). I am forwarding your letter to Judge Gardephe who presided over that trial, and to the Victim and Witness Services Coordinator at the Office of the United States Attorney for the Southern District of New York (jw) (Entered: 09/09/2014) |
| --- | --- | --- |
| 09/09/2014 | [314](314) | Sentencing Letter by Mathew Martoma addressed to Judge Paul Gardephe from Thomas Koovailoor dated 8/26/14 re: Request to Free Matthew Martoma (jw) (Entered: 09/09/2014) |
| 09/09/2014 | | DISMISSAL OF COUNTS on Government Motion as to Mathew Martoma (1) Count 1,2-3. (dnd) (Entered: 09/09/2014) |
| 09/09/2014 | [315](315) | JUDGMENT as to Mathew Martoma (1), Count(s) 1, 2-3, Dismissed; Count(s) 1s, Imprisonment 5 Years. Count(s) 2s-3s, Imprisonment 9 Years to run concurrently. Supervised Release 3 Years on each of Counts One, Two and Three to run concurrently. The court makes the following recommendations to the Bureau of Prisons: It is recommended that the defendant be housed at the Federal Prison Camp in Miami, Florida. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:before 2 p.m. on 11/10/2014. The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. The defendant shall cooperate in the collection of DNA as directed by the probation officer.The defendant is to pay an assessment fee of $300.00 due immediately. (Signed by Judge Paul G. Gardephe on 9/9/2014)(dnd) (Entered: 09/09/2014) |
| 09/09/2014 | [316](316) | PRELIMINARY ORDER OF FORFEITURE AS TO SPECIFIC PROPERTIES/MONEY JUDGMENT as to Mathew Martoma. For the reasons as set forth in this Order, NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT: As a result of the offenses charged in Counts One through Three of the Indictment, of which the Defendant was found guilty, a money judgment in the amount of $9,380,322 in United States currency (the "Money Judgment") shall be entered against the Defendant... The Clerk of the Court shall forward three certified copies of this Preliminary Order of Forfeiture as to Specific Properties/Money Judgment to Assistant United States Attorney Sharon Cohen Levin, Chief of the Money Laundering and Asset Forfeiture Unit, One St. Andrew's Plaza, New York, New York 10007. SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/8/2014)(dnd) (Entered: 09/09/2014) |
| 09/11/2014 | [317](317) | LETTER concerning USA v. Mathew Martoma addressed to Judge Paul G. Gardephe from William and Marlys Powell dated July 23, 2014 re: Victim Impact Statement - Mathew Martoma Insider Trading Case. (bw) (Entered: 09/11/2014) |
| 09/17/2014 | [318](318) | TRANSCRIPT of Proceedings as to Mathew Martoma re: Sentence held on 9/8/2014 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/14/2014. Redacted Transcript Deadline set for 10/23/2014. Release of Transcript Restriction set for 12/19/2014. (McGuirk, Kelly) (Entered: 09/17/2014) |

| 09/17/2014 | 319 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Mathew Martoma. Notice is hereby given that an official transcript of a Sentence proceeding held on 9/8/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/17/2014) |
|---|---|---|
| 09/18/2014 | 320 | NOTICE OF APPEAL by Mathew Martoma from 315 Judgment. Filing fee $ 505.00, receipt number 465401105454. (tp) (Entered: 09/19/2014) |
| 09/19/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Mathew Martoma to US Court of Appeals re: 320 Notice of Appeal - Final Judgment. (tp) (Entered: 09/19/2014) |
| 09/19/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files *(ONLY)* as to Mathew Martoma re: 320 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. *(APPELLANT'S COUNSEL IS RESPONSIBLE FOR THE PHYSICAL SUPPLEMENTAL INDEX FOR ANY AND ALL NON-ECF DOCUMENTS, ONCE THE CASE IS OPENED IN THE SECOND CIRCUIT)* (tp) (Entered: 09/19/2014) |
| 10/03/2014 | 321 | LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated October 3, 2014 re: request to stay surrender date and grant release pending appeal . Document filed by Mathew Martoma. (Strassberg, Richard) (Entered: 10/03/2014) |
| 10/10/2014 | 322 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MEMORANDUM OF LAW in Opposition by USA as to Mathew Martoma re: 321 LETTER MOTION addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated October 3, 2014 re: request to stay surrender date and grant release pending appeal . filed by Mathew Martoma . (Devlin-Brown, Arlo) Modified on 10/14/2014 (ka). (Entered: 10/10/2014) |
| 10/14/2014 | | **NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Arlo Devlin-Brown as to Mathew Martoma: to RE-FILE Document 322 Memorandum of Law in Opposition. Use the document type Letter found under the document list Other Documents. (ka)** (Entered: 10/14/2014) |
| 10/14/2014 | 323 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown dated October 10, 2014 re: Reponse to Defendant's Letter Seeking Bail Pending Appeal (refiled; prev submitted 10/10/14) Document filed by USA. (Devlin-Brown, Arlo) (Entered: 10/14/2014) |
| 10/14/2014 | 324 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -** PETITION IN RESPONSE TO FORFEITURE ORDER by Mathew Martoma re: 316 Order. (Attachments: # 1 Exhibit A)(Strassberg, Richard) Modified on 10/15/2014 (gp). (Entered: 10/14/2014) |
| 10/15/2014 | | **\*\*\*NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Richard Strassberg as to Mathew Martoma: to RE-FILE Document 324 Petition in Response to** |

| | | |
|---|---|---|
| | | **Forfeiture Order. ERROR(S): The wrong filer was selected. Re-file the Petition and select Rosemary Martoma as the filer. (gp)** (Entered: 10/15/2014) |
| 10/15/2014 | 325 | PETITION IN RESPONSE TO FORFEITURE ORDER by Rosemary Martoma as to Mathew Martoma re: 316 Order,,,. (Attachments: # 1 Exhibit A)(Strassberg, Richard) (Entered: 10/15/2014) |
| 10/21/2014 | 326 | ORDER denying 321 LETTER MOTION motion for bail pending appeal as to Mathew Martoma (1). On February 6, 2014- after a month-long trial- a jury convicted Defendant Mathew Martoma of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and of two substantive counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.P.R.§§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. The Superseding Indictment charges that between summer 2006 and July 29, 2008, Martoma caused his employer, the hedge fund S.A.C. Capital Advisors, LLC ("SAC Capital"), to trade on the basis of material non-public information. The evidence at trial showed that Mmioma obtained material, non-public information from two doctors - Sidney Gilman and Joel Ross - about the Phase II clinical trial of bapineuzumab, a drug it was thought might be useful in treating Alzheimer's disease. Elan Corporation, plc and Wyeth owned rights to the drug and were responsible for the clinical trial. The charges against Martoma relate to trading in the securities of these companies. Because Martoma has not demonstrated that his appeal is likely to raise a substantial question of law or fact, his motion for bail pending appeal, or alternatively for an extension of his surrender date, is denied. (Signed by Judge Paul G. Gardephe on 10/20/14) (jw) (Entered: 10/21/2014) |
| 11/04/2014 | 327 | ORDER of USCA (certified copy) re: 320 Notice of Appeal - Final Judgment USCA Case Number 14-3599. Appellant Mathew Martoma has filed an emergency motion for bail pending appeal, or, in the alternative, to extend his surrender date until his bail motion can be heard and decided by this Court. IT IS HEREBY ORDERED that the motion for bail pending appeal is REFERRED to a three-judge motions panel and shall be heard as soon as possible. The Government's opposition to the bail motion must be filed on or before Friday, November 7, 2014. Appellant's request to extend his November 10, 2014 surrender date is GRANTED until such time as may be set by this Court, or by the District Court on remand from this Court, following a hearing and decision by a panel of this Court assigned to decide Appellant's motion for bail pending appeal. Catherine O'Hagan Wolfe, Clerk USCA. Certified: 11/4/2014. (nd) (Entered: 11/05/2014) |
| 11/12/2014 | 328 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Arlo Devlin-Brown and Eugene Ingoglia dated November 12, 2014 re: Second Circuit Order Denying Bail Pending Appeal Document filed by USA. (Attachments: # 1 Exhibit A)(Devlin-Brown, Arlo) (Entered: 11/12/2014) |
| 11/12/2014 | 329 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard Strassberg dated 11/14/2014 re: Second Circuit Decision on Bail Pending Appeal (Attachments: # 1 Enclosure Letter)(Strassberg, Richard) (Entered: 11/12/2014) |
| 11/12/2014 | 330 | ORDER of USCA (Certified Copy) as to Mathew Martoma re: 320 Notice of Appeal. USCA Case Number 14-3599. Matthew Martoma moves for bail pending appeal. It is hereby ORDERED that Martoma's motion is DENIED, because he |

| | | has failed to show that the appeal "raises a substantial question of law or fact" as required in 18 U.S.C. § 3143(b). Furthermore, as we have completed our review, the previous stay of Appellant's surrender date is VACATED. Catherine O'Hagan Wolfe, Clerk USCA. Certified: 11/12/2014. (nd) (Entered: 11/13/2014) |
|---|---|---|
| 11/13/2014 | 331 | LETTER by USA as to Mathew Martoma addressed to Judge Paul G. Gardephe from Christine Magdo dated November 13, 2014 re: Proposed Briefing Schedule for Third Party Forfeiture Petition of Rosemary Martoma Document filed by USA. (Magdo, Christine) (Entered: 11/13/2014) |
| 11/14/2014 | 332 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Christine J. Magdo dated 11/13/2014 re: The Government writes to propose a briefing schedule in connection with the third-party forfeiture petition (the "Petition") filed by Rosemary Martoma (the "Petitioner") on October 15, 2014. The Government has conferred with counsel for Petitioner, and the parties respectfully request that the Court enter a scheduling order as follows: By January 9, 2015, the Government shall file its motion to dismiss the Petition;By February 27, 2015, Petitioner shall file any opposition to such motion; By March 13, 2015, the Government shall file any reply. ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/14/2014)(dnd) (Entered: 11/14/2014) |
| 11/17/2014 | 333 | LETTER by Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated November 17, 2014 re: the Second Circuit's November 17, 2014 Order (Strassberg, Richard) (Entered: 11/17/2014) |
| 11/17/2014 | 334 | ORDER of USCA (certified copy) re: 320 Notice of Appeal - Final Judgment. USCA Case Number 14-3599. In light of this Courts order of November 12, 2014 denying Martoma's bail motion, it is hereby ORDERED that this case is remanded to the district court forthwith for the setting of a surrender date Catherine O'Hagan Wolfe, Clerk USCA. Certified: 11/17/2014. (nd) (Entered: 11/17/2014) |
| 11/17/2014 | 335 | ORDER as to Mathew Martoma. It is hereby ORDERED that the Defendant is directed to surrender to the institution designated by the Bureau of Prisons by Thursday, November 20, 2014, at 2:00p.m. SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/17/2014)(dnd) (Entered: 11/17/2014) |
| 11/19/2014 | | Payment of Special Assessment from Mathew Martoma in the amount of $300.00. Date Received: 11/5/2014. (cla) (Entered: 11/19/2014) |
| 12/30/2014 | 336 | ENDORSED LETTER as to Mathew Martoma addressed to Judge Paul G. Gardephe from Richard M. Strassberg dated 12/29/14 re: Accordingly, we respectfully request that Your Honor so order this letter directing that Pretrial Services return the passports surrendered as part of Mr. Martoma's bail to the care of Richard Strassberg at the above-referenced address..ENDORSEMENT.. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/30/14)(jw) (Entered: 12/30/2014) |
| 01/09/2015 | 337 | MOTION to Dismiss *Third Party Petition of Rosemary Martoma*. Document filed by USA as to Mathew Martoma. (Magdo, Christine) (Entered: 01/09/2015) |
| 01/09/2015 | 338 | MEMORANDUM in Support by USA as to Mathew Martoma re 337 MOTION to Dismiss *Third Party Petition of Rosemary Martoma*.. (Magdo, Christine) (Entered: 01/09/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/29/2015 15:47:49 | | | |
| **PACER Login:** | ba1608:2948559:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:12-cr-00973-PGG |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :          INDICTMENT

       - v. -                            :

                                   S1 12 Cr. 973 (PGG)

MATHEW MARTOMA,                    :

       Defendant.                       :

- - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: AUG 2 2 2013

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Entities and Individuals

1.  At all relevant times, MATHEW MARTOMA, the defendant, was a portfolio manager specializing in health care sector investments for a division of a privately held group of affiliated hedge funds and associated fund advisers referred to herein as the SAC Hedge Fund.  The SAC Hedge Fund's written policy forbade MARTOMA from trading securities based on material non-public information ("Inside Information"), and specifically warned against obtaining Inside Information from "doctors conducting clinical trials."

2.  At all relevant times, Elan Corporation, plc ("Elan") was a corporation headquartered in Dublin, Ireland. Elan's stock traded on the New York Stock Exchange ("NYSE")

through the issuance of American Depository Receipts (or "ADRs")
under the ticker symbol "ELN."

3.    At all relevant times, Wyeth was a Delaware
corporation headquartered in New Jersey.  Wyeth's common stock
was registered with the U.S. Securities and Exchange Commission
("SEC") and listed on the NYSE under the ticker symbol "WYE."

4.    At all relevant times, Elan and Wyeth were
partners in connection with the phase II clinical trial of an
experimental Alzheimer's disease drug known as bapineuzumab (the
"Drug Trial").

5.    At all relevant times, an individual referred to
as Doctor-1, a co-conspirator not named as a defendant herein,
was an Alzheimer's disease expert who served as a professor of
neurology at a leading medical school.  Doctor-1 also worked as
a paid consultant to Elan and served as the chair of the Safety
Monitoring Committee ("SMC") in connection with the Drug Trial.
Elan expressly forbade members of the SMC from disclosing "any
and all data, safety, efficacy, or otherwise" about the Drug
Trial before the data was released to the public.

6.    At all relevant times, an individual referred to
as Doctor-2, a co-conspirator not named as a defendant herein,
was a medical doctor engaged by Elan as a clinical investigator
for the Drug Trial.  In this capacity, Doctor-2 treated

2

**JA61**

Alzheimer's disease patients with bapineuzumab pursuant to a
confidential protocol developed by Elan.  Doctor-2 then provided
medical data to Elan relating to the mental and physical
condition of the patients after treatment.  At all relevant
times, Elan expressly forbade its clinical investigators from
disclosing information about their work on the Drug Trial to
third parties including, specifically, "hedge fund employees"
and "investors."

7.    At all relevant times, the "Expert Networking
Firm" was a Manhattan-based business that arranged paid
consultations between financial industry clients and experts in
various fields.  The SAC Hedge Fund paid the Expert Networking
Firm substantial fees for access to certain health care experts,
including Doctor-1.  The Expert Networking Firm expressly
advised its experts, including Doctor-1, and employees of its
financial industry clients, including MATHEW MARTOMA, the
defendant, that experts "participating in clinical trials may
not discuss the patient experience or trial results not yet in
the public domain."

### The Insider Trading Scheme

8.    From in or about the summer of 2006 through on or
about July 29, 2008, MATHEW MARTOMA, the defendant, participated

3

in an insider trading scheme centered around obtaining and trading on confidential data about the Drug Trial before it was made public at an Alzheimer's disease conference on July 29, 2008 at approximately 4:00 p.m. (the "Public Announcement").

9.    To effectuate the scheme, MATHEW MARTOMA, the defendant, sought out doctors involved in the Drug Trial in order to obtain confidential information about the ongoing trial.  For example, on or about August 30, 2006, shortly after beginning his employment with the SAC Hedge Fund, Martoma e-mailed the Expert Networking Firm a list of over 20 doctors serving as clinical investigators on the Drug Trial and asked the Expert Networking Firm to attempt to arrange consultations with all of the identified doctors.  An employee of the Expert Networking Firm replied to MARTOMA the next day that the nine clinical investigators who had responded to the Expert Networking Firm's inquiry had all declined the proposed consultation due to a "conflict of interest."  Notwithstanding this impediment, Martoma was ultimately able to arrange – both through the Expert Networking Firm and other channels – paid consultations with multiple doctors with access to confidential information about the Drug Trial, including Doctor-1 and Doctor-2.

10.   In particular, between approximately August 2006

4

and July 2008, MATHEW MARTOMA, the defendant, arranged for approximately 42 consultations with Doctor-1 through the Expert Networking Firm.  During these paid consultations, through an exploitation of MARTOMA's personal and financial relationship with Doctor-1, MARTOMA sought and obtained from Doctor-1 Inside Information about the Drug Trial.  In particular, MARTOMA and Doctor-1 arranged for consultations through the Expert Networking Firm to take place shortly after Elan had presented confidential data to Doctor-1 at SMC meetings.  During the consultations following SMC meetings, Doctor-1 provided MARTOMA with confidential safety data that had been disclosed to members of the SMC by Elan.  Based in part on this Inside Information, MARTOMA bought shares of Elan and Wyeth stock for his own portfolio and recommended that the founder and principal owner of the SAC Hedge Fund (the "SAC Owner") buy additional shares for the SAC Hedge Fund, which the SAC Owner did.

11.  In addition, MATHEW MARTOMA, the defendant, arranged for several paid consultations with Doctor-2 through a financial services firm that provided expert networking services to the SAC Hedge Fund.  In connection with certain of these consultations, Doctor-2 provided confidential information about the Drug Trial and other Alzheimer's disease drug trials to MARTOMA with the expectation that Martoma would assist Doctor-2

5

in obtaining additional clinical trial business.

      12.  In or around early July 2008, Elan and Wyeth formally selected Doctor-1 to present publicly the final results of the Drug Trial. The final results of the Drug Trial were negative, raising significant questions about whether the drug had any meaningful effect on the treatment of Alzheimer's disease. In order to prepare Doctor-1 to make the presentation, during meetings on or about July 15, 2008 and July 16, 2008, Elan provided Doctor-1 with detailed confidential data about the closely-guarded and still-secret results of the Drug Trial.

      13.  Doctor-1 first provided the final results of the Drug Trial to MATHEW MARTOMA, the defendant, shortly after receiving the confidential data from Elan. On the afternoon of July 17, 2008, Doctor-1 received an e-mail from Elan labeled "Confidential, Do Not Distribute," which attached a 24-slide PowerPoint presentation for Doctor-1 to display during the Public Announcement. Doctor-1 and MARTOMA spoke by telephone that same afternoon for approximately one hour and 45 minutes about the confidential data that Doctor-1 had just received from Elan. Later that evening, MARTOMA spoke to Doctor-1 again and arranged to travel to Doctor-1's office in Ann Arbor, Michigan for an in-person meeting. On or about Saturday, July 19, 2008, MARTOMA traveled round-trip by plane from New York City to

Detroit to meet personally with Doctor-1 in his office.

14.     On the morning of Sunday, July 20, 2008, after receiving the negative confidential information about the Drug Trial results from Doctor-1, MATHEW MARTOMA, the defendant, spoke to the SAC Owner and recommended the sale of Elan and Wyeth stock prior to the Public Announcement.  Beginning on or about Monday, July 21, 2008, the SAC Hedge Fund sold virtually all of its approximately $700 million worth of Elan and Wyeth stock prior to the Public Announcement.  In addition, the SAC Hedge Fund engaged in "short sales" and various options trades designed to profit if the price of Elan and Wyeth securities were to fall after the Public Announcement.

15.     Following the Public Announcement, shares of Elan stock lost approximately 42% of their value and shares of Wyeth stock fell approximately 12%.  The SAC Hedge Fund's combined profits and avoided losses through its sale of Elan and Wyeth stock and related options activity between July 21, 2008 and the Public Announcement is estimated to be approximately $276 million.  As a consequence of this illegal scheme, MATHEW MARTOMA, the defendant, received a bonus of approximately $9.3 million.

## Statutory Allegations

16.     From in or about the summer of 2006 through on or

7

about July 29, 2008, in the Southern District of New York and elsewhere, MATHEW MARTOMA, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

17. It was a part and object of the conspiracy that MATHEW MARTOMA, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon the

8

**JA67**

purchaser and seller, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

<b><u>Means And Methods Of The Conspiracy</u></b>

18. Among the means and methods by which the conspirators, including MATHEW MARTOMA, the defendant, would and did carry out the conspiracy were the following:

a. Doctor-1 and Doctor-2 misappropriated and disclosed Inside Information about the Drug Trial in violation of (a) fiduciary and other duties of trust and confidence owed by Doctor-1 and Doctor-2 to Elan, (b) expectations of confidentiality regarding Elan information, and (c) policies of Elan regarding the use and safekeeping of Inside Information.

b. MARTOMA obtained the Inside Information about the Drug Trial from Doctor-1 and Doctor-2 through an exploitation of his personal and financial relationships with Doctor-1 and Doctor-2.

c. MARTOMA used the Inside Information about the Drug Trial to engage in securities transactions, and thereby profited and caused the SAC Hedge Fund to profit from the Inside Information.

<b><u>Overt Acts</u></b>

19. In furtherance of the conspiracy and to effect

9

<b>JA68</b>

the illegal object thereof, the following overt acts, among
others, were committed by MATHEW MARTOMA, the defendant, among
others, in the Southern District of New York and elsewhere:

a.    On or about August 30, 2006, MARTOMA e-
mailed the Manhattan-based Expert Networking Firm to request
consultations with over 20 Drug Trial clinical investigators.

b.    On or about October 9, 2007, MARTOMA spoke
with Doctor-1 through a consultation arranged by the Expert
Networking Firm and obtained confidential safety data about the
Drug Trial.

c.    On or about May 29, 2008, MARTOMA arranged a
future meeting to occur with Doctor-2 on the evening of July 28,
2008, immediately after Doctor-2 was scheduled to be briefed
about the final Drug Trial results and one day in advance of the
Public Announcement.

d.    On or about July 17, 2008, MARTOMA obtained
confidential final results of the Drug Trial from Doctor-1.

e.    On or about July 20, 2008, MARTOMA spoke by
telephone with the SAC Hedge Fund Owner and recommended selling
Elan and Wyeth securities before the Public Announcement.

f.    On or about July 21, 2008, MARTOMA and the
SAC Hedge Fund Owner instructed a SAC Hedge Fund trader to begin
selling the SAC Hedge Fund's entire position in Elan securities,

10

**JA69**

which are traded on the NYSE in Manhattan, New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Securities Fraud - Elan)

The Grand Jury further charges:

20.   The allegations contained in paragraphs 1 through 15, 18, and 19 are repeated and realleged as though fully set forth herein.

21.   In or about July 2008, in the Southern District of New York and elsewhere, MATHEW MARTOMA, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, before Elan and Wyeth

11

publicly disclosed the final results of an Alzheimer's disease drug trial on July 29, 2008, MARTOMA obtained material, nonpublic information about the results and, based in whole or in part on that information, caused the SAC Hedge Fund to sell common stock of Elan, short Elan stock, and enter into options transactions relating to Elan.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2 and Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud - Wyeth)

The Grand Jury further charges:

22.   The allegations contained in paragraphs 1 through 15, 18, and 19 are repeated and realleged as though fully set forth herein.

23.   In or about July 2008, in the Southern District of New York and elsewhere, MATHEW MARTOMA, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to

12

defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices
and courses of business which operated and would operate as a
fraud and deceit upon persons, to wit, before Elan and Wyeth
publicly disclosed the final results of an Alzheimer's disease
drug trial on July 29, 2008, MARTOMA obtained material,
nonpublic information about the results, and based in whole or
in part on that information, caused the SAC Hedge Fund to sell
common stock of Wyeth and short Wyeth stock.

> (Title 15, United States Code, Sections 78j(b) & 78ff;
> Title 17, Code of Federal Regulations, Sections 240.10b-5 &
> 240.10b5-2; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

24.  As a result of committing one or more of the
foregoing conspiracy and securities fraud offenses alleged in
Counts One, Two and Three of this Indictment, MATHEW MARTOMA,
the defendant, shall forfeit to the United States pursuant to
Title 18, United States Code, Section 981(a)(1)(c) and Title 28,
United States Code, Section 2461, all property, real and
personal, that constitutes or is derived from proceeds traceable
to the commission of the securities fraud offenses, including

13

but not limited to a sum of money of at least $9,300,000 in United States currency representing the proceeds obtained as a result of the charged offenses alleged in this Indictment, and all right, title and interest in the following specific property:

    a. the real property and appurtenances, with all improvements and attachments thereon, located at 2464 W. Maya Palm Drive, Boca Raton, Florida, more particularly described as Parcel ID 06-43-47-29-10-005-0020;

    b. up to $3,246,320.62 in funds on deposit in account number 1512369446 at American Express Bank, held in the name of Mathew C. Martoma;

    c. up to $245,000 in funds on deposit in account number 146674626 at ING Direct, held in the name of Rosemary Martoma; and

    d. up to $934,897.77 in funds or other assets in account number 88047594915 at Vanguard, held in the name of Mathew and Rosemary Martoma Foundation.

### Substitute Assets Provision

  25. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due

14

**JA73**

diligence;

        b.  has been transferred or sold to, or deposited with, a third party;

        c.  has been placed beyond the jurisdiction of the court;

        d.  has been substantially diminished in value; or

        e.  has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

        (Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 & 10b5-2.)

Foreperson

PREET BHARARA (MPB)
United States Attorney

15

**JA74**

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MATHEW MARTOMA,

Defendant.

## INDICTMENT

(18 U.S.C. §§ 2, 371; Title 15, United
States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations,
Section 240.10b-5)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

8/12/13

# EXHIBIT A

Steven Cohen                                             May 3, 2012

---

**Page 1**

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

                                        )
In the Matter of:                       )
                                        )
Elan Corporation, plc        )    File No. NY-8152
                                        )
                                        )

WITNESS:     STEVEN COHEN

PAGES:       1-253

PLACE:       Room 425
             Securities and Exchange Commission
             3 World Financial Center
             New York, New York

Date:        May 3, 2012

        The above-entitled matter come on for
investigation at 10:10 a.m.

---

**Page 2**

On behalf of the Securities and Exchange Commission:

CHARLES D. RIELY, ESQ.
AMELIA A. COTTRELL, Assistant Director
SANJAY WADHWA, Associate Regional Director
NEIL HENDELMAN, Staff Accountant
Securities and Exchange Commission
Division of Enforcement
Northeast Regional Office
4th Floor, Suite 400
3 World Financial Center
New York, New York 10281

On behalf of the Witness and S.A.C. Capital Advisors, L.P.:

MARTIN B. KLOTZ, ESQ.
JEANNA COMPOSTI, ESQ.
Willkie Farr & Gallagher, Llp
787 Seventh Avenue
New York, New York 10019
-and-
DANIEL J. KRAMER, ESQ.
Paul, Weiss, Rifkind, Wharton & Garrison, Llp
1285 Avenue of the Americas
New York, New York 10019

---

**Page 3**

1       P R O C E E D I N G S
2           MR. RIELY:  We are on the record May 3, 2012,
3   at 10:10 a.m., New York regional office of the SEC.
4   Whereupon,
5           S T E V E N   C O H E N,
6   having been first duly sworn/affirmed, was examined and
7   testified as follows:
8   EXAMINATION BY
9   MR. RIELY:
10      Q       Will you please state and spell your full
11  name for the record?
12      A       Steven A. Cohen.
13      Q       My name is Charles Riely.  With me are my
14  colleagues, Sanjay Wadhwa, Amelia Cottrell, Neil
15  Hendelman.  We are members of the Division of Enforcement
16  of the United States Securities and Exchange Commission
17  and are officers of the Commission for purposes of this
18  proceeding.
19              This is an investigation by the Securities
20  and Exchange Commission entitled Elan Corporation, plc,
21  File Number NY-8152, to determine whether there have been
22  violations of certain provisions of the federal securities
23  laws.  However, the facts developed in this investigation
24  might constitute violations of other federal or state
25  civil or criminal laws.

---

**Page 4**

1           Prior to the opening of the record you were
2   provided with a copy of the formal order of investigation
3   in this matter.  It will be available for your examination
4   during the course of this proceeding.  Okay?
5       A       Okay.
6       Q       Have you had an opportunity to review the
7   formal order?
8       A       Yes, I have.
9       Q       Prior to the opening of the record you were
10  also provided with a copy of the Commission's Supplemental
11  Information Form 1662.  A copy of that notice has been
12  previously marked as Exhibit Number 1.
13              Have you had the opportunity to read Exhibit
14  number 1?
15      A       Yes, I have.
16      Q       Do you have any questions concerning
17  Exhibit 1?
18      A       No, I don't.
19      Q       Mr. Cohen, do you understand that you are
20  under oath?
21      A       Yes, I do.
22      Q       Do you understand that you are swearing that
23  your answers to my questions are true and correct?
24      A       Yes, I do.
25      Q       If at any time you do not understand a

1 (Pages 1 to 4)

Steven Cohen                                                    May 3, 2012

| Page 21 | Page 23 |
|---|---|

**Page 21**

1    David Munno and Benjamin Slate.
2          Are you familiar with any account you have
3    co-managed with those individuals?
4    A    I don't remember.
5    Q    Is there anything we can do to refresh your
6    recollection?
7    A    I don't know.
8    Q    The last account is FSAE. Do you know what
9    that account refers to?
10   A    No, I don't.
11   Q    Further up on the page is an account
12   referenced as COHE. What is that account?
13   A    That is the account that I run.
14   Q    When you say you run it, what do you mean by
15   that?
16   A    It means that I make the investment decisions
17   in the account.
18   Q    How long have you made the investment
19   decisions in that account?
20   A    For -- I don't know exactly when the account
21   was assigned the acronym COHE, but I believe that is what
22   I described as my account, as the Cohen account. I have
23   run it for a long time. I can't give you an exact time
24   when it was called the Cohen account.
25   Q    Do you believe it has been at least since

**Page 23**

1    A    I don't remember.
2    Q    Did Mr. Holman ever work for you?
3    A    Yes, he did.
4    Q    When was that?
5    A    It was, I believe, in the early 2000's. The
6    exact years I just don't recall.
7    Q    Were you involved in the decision to hire
8    Mr. Holman?
9    A    Probably.
10   Q    Did you interview Mr. Holman before he
11   started at SAC?
12   A    I believe so.
13   Q    How long did he work at SAC?
14   A    I am going to take a guess and say three to
15   five years.
16   Q    When did Mr. Holman leave SAC?
17   A    I believe he left between 2005 and 2007.
18   Q    When Mr. Holman was at SAC, how was his
19   performance?
20   A    His performance in general was pretty good.
21   Q    What do you mean by that?
22   A    It means he was profitable.
23   Q    Since Mr. Holman left SAC have you had any
24   interactions with him?
25   A    Yes, I have.

| Page 22 | Page 24 |
|---|---|

**Page 22**

1    2008?
2    A    Yes, I do.
3    Q    Further down on the page there is reference
4    to GEHC and it references Mathew Martoma?
5    A    Yes.
6    Q    Do you know Mr. Martoma?
7    A    Yes, I do.
8    Q    When did you first hear of Mr. Martoma?
9    A    I believe -- I heard of him when we hired
10   him, or maybe before, when we were thinking about hiring
11   him. I believe it would have been somewhere between 2004
12   or '5 or 2006. Somewhere in there.
13   Q    Were you involved in the decision to hire
14   Mr. Martoma?
15   A    I might have been.
16   Q    What was your involvement?
17   A    I don't remember.
18   Q    Do you recall interviewing Mr. Martoma before
19   he started at SAC?
20   A    I don't remember.
21   Q    You also mentioned Mr. Holman. How long have
22   you known Mr. Holman?
23   A    I have known Wayne Holman probably ten to
24   twelve years.
25   Q    How did you first meet Mr. Holman?

**Page 24**

1    Q    Can you describe that?
2    A    We're good friends. We go to dinner. The
3    wives are friendly. You know, we see each other off and
4    on.
5    Q    Have you heard of a fund called Ridgeback?
6    A    Yes, I have.
7    Q    What is Ridgeback?
8    A    Ridgeback is the hedge fund that Wayne Holman
9    set up. It was his hedge fund.
10   Q    Has SAC ever had an investment in Ridgeback?
11   A    Yes, it has.
12   Q    When was the first time?
13   A    It was after he left. The exact date, I
14   don't remember, but we invested in his new fund.
15   Q    Is SAC still invested in Ridgeback?
16   A    I am not really sure. I know he's liquidated
17   the portfolio. And whether all the positions have been
18   liquidated, I am not really sure. Therefore, it's
19   possible we still have a position, but I believe the vast
20   majority of the positions have been liquidated.
21   Q    Why have the vast majority of the positions
22   been liquidated?
23   A    Because Wayne decided to close down his fund.
24   Q    How much money did SAC invest in Ridgeback?
25   A    It varied.

Diversified Reporting Services
(202) 467-9200

Steven Cohen                                                    May 3, 2012

| Page 29 | Page 31 |
|---|---|

**Page 29**

1  his work. I know he spent a lot of time working on it.
2      Q    At the beginning of 2008 did SAC have an
3  investment in Wyeth?
4      A    I believe so.
5      Q    In the beginning of 2008 were you bullish or
6  bearish on Wyeth?
7      A    I was bullish based on the recommendation of
8  Mat Martoma and Wayne Holman. And there may have been
9  others that were bullish; I just don't remember.
10     Q    Other than Mr. Martoma and Mr. Holman can you
11 remember anybody else being bullish on Wyeth at the
12 beginning of 2008?
13     A    I can't remember. There could have been.
14     Q    What was Mr. Martoma's recommendation
15 concerning Wyeth?
16     A    I believe he was positive on Bapineuzumab and
17 therefore he might have been positive on Wyeth.
18     Q    What was Mr. Holman's recommendation
19 concerning Wyeth?
20     A    He generally thought Wyeth was a good
21 risk/reward.
22     Q    Did you have an understanding as to why that
23 was?
24  ·  A    No. Wayne -- I don't remember other than,
25 you know, I think Wayne's a great investor. I assume he

**Page 30**

1  did good work on the drug Bapineuzumab and thought Wyeth
2  was a reasonable investment.
3      Q    Did he tell you why he believed that Wyeth --
4  did Mr. Holman tell you why he believed that Wyeth was a
5  good investment at the beginning of 2008?
6      MR. KLOTZ: Object to the form.
7      A    Can you repeat the question?
8      Q    Did Mr. Holman tell you why he thought Wyeth
9  was a good investment at the beginning of 2008?
10     MR. KLOTZ: My objection, by the way, is
11 simply to the time frame. I think he can answer it at
12 some point in 2008. If you want to focus on the time
13 frame, I am happy to have you do that.
14     A    I mean, at some point in 2008 -- and I don't
15 remember. I know he recommended that we buy Wyeth for the
16 firm account or that we buy Wyeth.
17     Q    Mr. Cohen, I am handing you a document that
18 has been previously marked as Exhibit 4. I am also
19 providing a copy for counsel. For the record, Exhibit 4
20 is Bates stamped SAC ELAN 726049 through 52.
21     Mr. Cohen, have you seen Exhibit 4 before?
22     A    I might have.
23     Q    Can you identify it?
24     A    Excuse me?
25     Q    Can you identify Exhibit 4?

**Page 31**

1      A    What does that mean?
2      Q    Describe it for the record.
3      A    You want me to describe this document now?
4      Q    Yes.
5      A    Okay. You want me to read it, or just
6  describe it?
7      Q    Is the letter dated November 9, 2007?
8      A    I see that.
9      Q    Let's do it this way: Is it correct that
10 Exhibit 4 is a letter agreement between S.A.C. Capital
11 Advisors and Ridgeback Capital Management?
12     A    Looking at the first page, it appears to be
13 an agreement between S.A.C. Capital and Ridgeback Capital.
14     Q    Did you negotiate this agreement?
15     A    I don't remember.
16     Q    Do you recall, were you involved in the
17 negotiation of this agreement?
18     A    I could have been.
19     MS. COTTRELL: Do you recall there being an
20 agreement with Ridgeback Capital around November 2007?
21     THE WITNESS: I remember that we had an
22 agreement, but I wasn't the person who negotiated. While
23 I was kept up on the agreement, my general counsel was
24 probably the person who worked on this agreement.
25     MS. COTTRELL: Was it your idea to enter into

**Page 32**

1  an agreement with Ridgeback Capital in November of 2007?
2      THE WITNESS: I don't remember.
3      MS. COTTRELL: Did you agree with S.A.C.
4  Capital entering into an agreement with Ridgeback in
5  November of 2007?
6      THE WITNESS: I believe so.
7      Q    Why did you enter into an agreement with
8  Ridgeback in November of 2007?
9      A    Wayne Holman suggested that SAC buy Wyeth
10 based on his recommendation, and so we set up an agreement
11 for this purchase.
12     Now what was the question again?
13     Q    Why did you enter into an agreement with
14 Ridgeback concerning Wyeth in November of 2007?
15     A    It was just a documentation of an agreement
16 that the firm came to with Wayne Holman.
17     Q    What were the terms, what was your
18 understanding of the terms of the agreement with
19 Mr. Holman?
20     A    I don't remember.
21     MS. COTTRELL: In general was your
22 understanding that Mr. Holman would be compensated for any
23 P and L that SAC generated as a result of his
24 recommendations concerning Wyeth?
25     THE WITNESS: I believe so.

8 (Pages 29 to 32)

Steven Cohen                                                    May 3, 2012

## Page 57

1    A    It could be multiple people on.
2    Q    Is it a group call with all the portfolio
3  managers, or is it just a conversation with one portfolio
4  at a time?
5    A    One -- usually one portfolio manager at a
6  time. It could be a portfolio group. It could also be
7  other possibilities.
8    Q    What is the purpose of the Sunday night
9  calls?
10   A    Just generally to get updated on whatever PM
11  or I want to talk to them about.
12   Q    How does it compare to the idea e-mail?
13   A    It's probably -- discussions could be on the
14  ideas on the e-mail. It could be on other thoughts or
15  ideas.
16       MS. COTTRELL: Is each PM required to call
17  you every Sunday?
18       THE WITNESS: No, they are not.
19       MS. COTTRELL: Do you determine which
20  portfolio manager has a call with you on Sunday?
21       THE WITNESS: Sometimes.
22       MS. COTTRELL: When you don't, how does it
23  come about that the portfolio managers and you have a
24  call?
25       THE WITNESS: They might call me, I might

## Page 58

1  call them. It' usually how it works.
2    Q    Of your portfolio managers, what percentage
3  do you talk to on a typical Sunday?
4    A    It varies.
5    Q    What is the range in which it varies?
6    A    Could be very few and it could be many.
7    Q    Could it be as high as 90 percent of your
8  portfolio managers?
9    A    No way.
10   Q    Could it be as high as 50 percent of your
11  portfolio managers?
12   A    No way.
13       MR. KLOTZ: Object to form.
14   Q    What is the highest percentage of your
15  portfolio managers you can recall talking to on a Sunday?
16       MR. KLOTZ: Objection. You have no way of
17  knowing this, but a lot of portfolio managers manage
18  quantitative portfolio so it would be highly unlikely that
19  they would speak. We need to be a little more focused on
20  what the universe is that we are talking about for him to
21  answer meaningfully, I think.
22   Q    Of the portfolio managers that work at SAC,
23  what percentage are managers that work in quantitative
24  funds?
25   A    I'd be guessing. Say 20 percent.

## Page 59

1    Q    So the other approximately 80 percent work on
2  portfolios that they manage with their discretion. Is
3  that correct?
4    A    That's correct.
5    Q    Of that subset, what is the highest percent
6  of that subset of portfolio managers that you have talked
7  to on a Sunday?
8       MR. KLOTZ: Object to the form but go ahead
9  and answer.
10   A    Well, today we have approximately 125
11  portfolio managers, 20 percent quant, let's say. So, say
12  100 portfolio managers around the world.
13       So to answer your question, I would say --
14  and the question is again?
15   Q    The question is -- we started the line of
16  questions with what is the typical range of the number of
17  portfolio managers you talk to on a Sunday.
18   A    That's right.
19   Q    You said sometimes very few. The follow-up
20  question is, what is the top of the range?
21   A    I would say 20 percent.
22   Q    Is the maximum you talk to on a typical
23  Sunday?
24   A    You know, I am guessing.
25   Q    That is your approximation sitting here

## Page 60

1  today?
2    A    That's my best guess.
3       MS. COTTRELL: Did you have the Sunday night
4  calls with portfolio managers in 2008?
5       THE WITNESS: Yes, I did.
6       MS. COTTRELL: Have you had them since 2008
7  to the present?
8       THE WITNESS: Yes, I have.
9    Q    Where are you typically for the Sunday night
10  calls?
11   A    I am typically in front of my screens in one
12  of my homes.
13   Q    We talked before about the Holman account and
14  you referred to the Holman account as a separate account
15  in which you make security trades based on the advice
16  Mr. Holman gave to you. Is that correct?
17   A    That's correct.
18   Q    Does Mr. Holman receive any compensation for
19  the trades placed in the Holman account?
20   A    I believe so.
21   Q    How is that calculated?
22   A    It's a percentage of profits.
23   Q    How long has he received that compensation?
24  Let me rephrase the question.
25       How long has Mr. Holman received a percentage

15  (Pages 57 to 60)

Steven Cohen                                                    May 3, 2012

Page 69

1  exposures I have and whether -- you know, do I want to
2  increase my exposure or decrease my exposure?
3           And there is probably a lot of other things I
4  do.
5           MR. WADHA: And has this evolved in any
6  fashion since 2007 or have you generally continued to do
7  the same things as you would have done back in '07?
8           THE WITNESS: Pretty much similar, yes.
9       Q   We are focused on your position in Wyeth in
10 the beginning of 2008. We have shown you the 13F's which
11 reflect the size of your position. So far you have
12 mentioned Mr. Martoma and Mr. Holman recommended that you
13 buy -- that you be bullish on the security because of
14 Bapineuzumab. Correct?
15      A   Repeat the question?
16      Q   I am just trying to make sure that I
17 understand your testimony so far.
18      A   I just blanked out for a second. Sorry.
19      Q   We have been discussing SAC's position in
20 Wyeth and Elan at the beginning of 2008.
21      A   That's right.
22      Q   We have talked about at least the position in
23 Wyeth was one of the top ten percent biggest positions
24 that SAC had at the beginning of 2008. Is that correct?
25      A   In equities, yes.

Page 70

1       Q   So far your reasons for investing in SAC --
2  investing in Wyeth is Mr. Martoma and Mr. Holman?
3       A   Like I said, yes, and there may have been
4  others.
5       Q   And you said you can't remember others?
6       A   Certainly can't remember. I have other -- I
7  have many healthcare portfolio managers and so they could
8  have contributed to the knowledge pool. But I can't
9  recall who at that time.
10      Q   We're trying to understand all of your
11 reasons for having a bullish position in Elan and Wyeth.
12      A   Okay.
13      Q   For example, the position in Wyeth alone was
14 over $627 million.
15      A   Okay.
16      Q   So what did Mr. Holman and Mr. Martoma tell
17 you that led you to take a bullish position in Elan and
18 Wyeth?
19      A   Well, you know, I think Wayne Holman was
20 recommending Wyeth. And, you know, I consider Wayne one
21 of the great healthcare investors I have ever met and so I
22 have a ton of respect for his work. If he's positive on
23 something and recommends a position -- and he did -- you
24 know, I would be very willing to -- to invest in that.
25           And Mat Martoma had done a lot of work on

Page 71

1  Elan and Bapineuzumab for a long time. So I really
2  considered them experts, you know, what I would consider
3  to be experts in this particular area. And they are both
4  coming at it from different stocks. Well, Martoma liked
5  both names and Wayne liked Wyeth.
6           And so the answer is, they did the work, they
7  were the experts, and I relied on their recommendations.
8       Q   When a portfolio manager gives you a
9  recommendation how do you evaluate whether or not it is a
10 good idea or bad idea?
11      A   It really depends. Sometimes it's based on
12 reading e-mails, sometimes it's based on discussions with
13 the portfolio manager, sometimes it involves discussions
14 with other people in the firm, outside the firm, their
15 views. So it really depends on the particular situation.
16      Q   In late 2007 you entered into a letter
17 agreement with Mr. Holman that contemplated a large
18 investment in Wyeth. Correct?
19      A   That's correct.
20      Q   That agreement was entered into because
21 Mr. Holman recommended to you that you make an investment
22 in Wyeth through S.A.C. Capital. Correct?
23      A   That's correct.
24      Q   When evaluating Mr. Holman's recommendation,
25 what did you do?

Page 72

1       A   Well, I don't remember exactly what I did in
2  this particular case. Certainly I am talking to other
3  portfolio managers at the firm. I certainly could be
4  reading research reports. But like I said before, Wayne
5  Holman is a great healthcare investor and so his
6  recommendations are very important to me.
7       Q   Do you accept every recommendation made by
8  Mr. Holman?
9       A   We don't talk about everything he does.
10      Q   The question is, do you accept every
11 recommendation made by Mr. Holman?
12      A   Sometimes -- the answer is no.
13      Q   In this instance, why did you accept his
14 recommendation to invest in Wyeth?
15      A   Because he felt strongly this was a position
16 that the firm ought to take.
17      Q   It sounded like, when you described your
18 method for evaluating investments, that you independently
19 evaluated ideas and not just relied on a person to tell
20 you whether it was a good idea, a really good idea, or a
21 bad idea.
22           The question is, in this instance why did you
23 follow Mr. Holman's advice concerning Wyeth?
24           MR. KLOTZ: Object to form but go ahead and
25 answer.

18  (Pages 69 to 72)

Steven Cohen                                                     May 3, 2012

| Page 185 | Page 187 |
|---|---|
| 1 given to Mr. Villhauer concerning Wyeth? | 1 THE WITNESS: I don't believe so, but he |
| 2 A I don't believe so at that point. | 2 might have. |
| 3 Q Is Mr. Villhauer Mr. Martoma's trader? | 3 MS. COTTRELL: Do you have a recollection of |
| 4 A No. He is the firm trader. He is in charge | 4 him telling you? |
| 5 of the trading desk. | 5 THE WITNESS: I know he told me that he was |
| 6 Q Why was the trades for Mr. Martoma's account | 6 selling Wyeth, so I am not sure if he told me to sell it |
| 7 placed through Mr. Villhauer? | 7 or I took it on my own volition based on that he was |
| 8 A Because we wanted it executed all -- so he | 8 selling it. |
| 9 could allocate and -- so he could handle it so we weren't | 9 MS. COTTRELL: Aside from kind of the macro |
| 10 competing with each other in trying to get out of the | 10 concerns, did Mr. Holman say anything else about why he |
| 11 name. | 11 was selling Wyeth? |
| 12 MR. KLOTZ: I don't want to interrupt you in | 12 THE WITNESS: I don't believe so. |
| 13 the middle of key events but at some point I think it | 13 MS. COTTRELL: Since Mr. Holman had macro |
| 14 would be time for a break. We have been going for well | 14 concerns, his macro concerns might not have been your |
| 15 over an hour. | 15 macro concerns. Isn't that correct? |
| 16 Q On July 21, 2008 did you make any decisions | 16 THE WITNESS: I can't speak for what his |
| 17 concerning your investment in Wyeth? | 17 macro concerns were. |
| 18 A What was the date? | 18 MS. COTTRELL: So did he give you any reason |
| 19 Q July 21st. | 19 relating to the investment in Wyeth why he was selling |
| 20 A I don't remember. | 20 Wyeth as opposed to kind of macro concerns about the |
| 21 Q At some point prior to July 29, 2008, did you | 21 economy in general? |
| 22 make a decision concerning your investment in Wyeth? | 22 THE WITNESS: He -- I don't remember him |
| 23 A Yes. | 23 telling me specifically why he was selling Wyeth. |
| 24 Q When was that? | 24 MS. COTTRELL: When we were both talking |
| 25 A At some point during that week. | 25 about macro concerns, can you say what you meant by macro |

| Page 186 | Page 188 |
|---|---|
| 1 Q What prompted you to make a decision | 1 concerns? |
| 2 concerning your investment in Wyeth the week of July 21st? | 2 THE WITNESS: Yeah. It was 2008. The |
| 3 A I spoke to Wayne at some point and he was | 3 markets were under pressure. The stocks had outperformed |
| 4 telling me he was selling his Wyeth. | 4 a lot and the markets were under pressure. |
| 5 Q You referenced before a conversation on the | 5 MS. COTTRELL: So Mr. Holman didn't tell you |
| 6 21st. Was that the same conversation in which he said he | 6 anything specific about his views on Wyeth as to why he |
| 7 was selling Wyeth? | 7 sold Wyeth? |
| 8 A I don't believe so. | 8 THE WITNESS: I know we spoke. I just don't |
| 9 Q In the conversation where Mr. Holman | 9 remember the specifics. |
| 10 referenced that he was selling Wyeth, what do you recall | 10 MS. COTTRELL: you don't remember him saying |
| 11 about that conversation? | 11 anything specifically concerning Wyeth? |
| 12 A I don't recall much other than he was telling | 12 THE WITNESS: I don't remember that, no. |
| 13 me he is selling his -- he is selling some Wyeth. | 13 MR. RIELY: Off the record at 4:08. |
| 14 MS. COTTRELL: Did he say why? | 14 (Recess.) |
| 15 THE WITNESS: I don't remember. I know he | 15 MR. RIELY: Back on the record at 4:20. |
| 16 was nervous about the world, the macro picture, but he | 16 Q Mr. Cohen, while we were off the record we |
| 17 didn't give me any specifics. | 17 had no conversations about the substance of this |
| 18 MS. COTTRELL: Did he say anything else to | 18 investigation. Correct? |
| 19 you in that conversation? | 19 A That's correct. |
| 20 THE WITNESS: I don't remember. | 20 Q You referenced before that Mr. Martoma wanted |
| 21 MS. COTTRELL: Did he recommend that you sell | 21 to get out of his position in Elan. Is that correct? |
| 22 Wyeth? | 22 A That's correct. |
| 23 THE WITNESS: I don't believe so. | 23 Q When did he first express that view to you? |
| 24 MS. COTTRELL: Did Mr. Holman ever recommend | 24 A I don't remember. It was definitely after |
| 25 that you sell your Wyeth position? | 25 the first conversation we had that Sunday. |

47 (Pages 185 to 188)

Steven Cohen                                                    May 3, 2012

| Page 225 | Page 227 |
|---|---|
| 1  Martoma an 8 percent bonus on the positions in Elan in the | 1  receive a portion of the profits in Elan in 2008? |
| 2  firm Holman account? | 2  A    I don't remember. |
| 3  A    I don't remember. | 3  Q    Did Mr. Munno or Mr. Slate receive any |
| 4  Q    Did Mr. Holman receive any compensation for | 4  compensation for their investment advice concerning Elan? |
| 5  the positions in Elan held in the firm Holman account? | 5  A    I don't remember. |
| 6  A    I don't remember. | 6  Q    Aside from Mr. Martoma did anybody else |
| 7  Q    Did you review whether Mr. Martoma would | 7  receive a portion of any payout for Wyeth? |
| 8  receive a bonus for 2009 or 2010? | 8  A    What was the question again? |
| 9  A    Excuse me?  Can you say that again? | 9        (Record read.) |
| 10       (Record read.) | 10  A    I don't remember. |
| 11  A    I don't remember. | 11  Q    Did Mr. Munno or Mr. Slate receive any bonus |
| 12       MS. COTTRELL:  Aside from Mr. Martoma did | 12  for their investment advice concerning Wyeth? |
| 13  anybody else receive a bonus based on the Elan trades? | 13  A    I don't remember. |
| 14       THE WITNESS:  I don't remember. | 14  Q    You mentioned that Mr. Holman is currently |
| 15       MR. WADHWA:  Do you remember anything in | 15  working under a consulting agreement? |
| 16  particular that would have caused Mr. Martoma to go from | 16  A    That's correct. |
| 17  receiving $9.38 million in bonus in 2008 to receiving | 17  Q    What led you to enter into a consulting |
| 18  nothing in 2009? | 18  agreement with Mr. Holman? |
| 19       THE WITNESS:  I could speculate but I don't | 19  A    We discussed it and we decided to do it. |
| 20  remember. | 20  Q    Who negotiated the consulting agreement? |
| 21       MR. WADHWA:  Well, let's hear you speculate. | 21  A    I believe, my general counsel. |
| 22       THE WITNESS:  I mean, it looks like there is | 22  Q    Did you participate in the negotiation? |
| 23  nothing there, which probably means he didn't make any | 23  A    Only in setting the amount. |
| 24  money in 2009. | 24  Q    And what was the amount? |
| 25       MR. WADHWA:  The same in 2010? | 25  A    I believe it was $20 million. |

| Page 226 | Page 228 |
|---|---|
| 1       THE WITNESS:  2010 appears that way, yes. | 1  Q    $20 million over what period? |
| 2       MR. WADHWA:  Is there anything about his | 2  A    Over one year. |
| 3  performance, sitting here, that you can remember other | 3  Q    How did you -- who determined that Mr. Holman |
| 4  than fact that he may not have made money?  Is there | 4  would be paid $20 million for one year? |
| 5  anything that you remember as having been disappointed in | 5  A    Wayne and I discussed it.  That's what he |
| 6  vis-a-vis Mr. Martoma? | 6  wanted.  I really didn't want to pay that amount.  I |
| 7       THE WITNESS:  I believe he had a bad position | 7  agreed to it. |
| 8  in a biotech name where he lost a lot of money. | 8  Q    Why did you agree to it? |
| 9       MR. WADHWA:  Do you remember the name? | 9  A    Because I think he's worth it. |
| 10       THE WITNESS:  I believe it was InterMune, | 10  Q    What services does Mr. Holman provide |
| 11  ITMN. | 11  pursuant to the consulting agreement? |
| 12       MS. COTTRELL:  Also looking at Exhibit 39, it | 12  A    He is, you know, recommending stocks for me |
| 13  looks like Mr. Martoma did not receive any attribution | 13  to buy and sell. |
| 14  bonus or firm account bonus before 2008.  Do you see that? | 14  Q    When was the consulting agreement entered |
| 15       THE WITNESS:  I see that. | 15  into? |
| 16       MS. COTTRELL:  Do you have a recollection | 16  A    I believe it was over the last year. |
| 17  that Mr. Martoma didn't have any attributable positions or | 17       (Plaintiff's Exhibit 40, Letter agreement, |
| 18  any positions that you took the ideas for in the COHE | 18       RIDGE 8144 through 8151, was marked for |
| 19  account or the firm account prior to 2008? | 19       identification as of this date.) |
| 20       THE WITNESS:  I just don't remember. | 20  Q    Mr. Cohen, I am handing you Exhibit 40.  For |
| 21       MS. COTTRELL:  Do you have any reason to | 21  the record Exhibit 40 is a document Bates stamped RIDGE |
| 22  doubt that this document isn't accurate? | 22  8144 through 8151.  Have you ever seen this document |
| 23       THE WITNESS:  It probably is true but I | 23  before? |
| 24  didn't prepare the document. | 24  A    No. |
| 25  Q    Aside from Mr. Martoma, did anybody else | 25  Q    For the record Exhibit 40 is a letter |

57 (Pages 225 to 228)

# EXHIBIT A

**Page 1**

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

```
In the Matter of:                    )
                                     )
Elan Corporation, plc        )    File No. NY-8152
                                     )
                                     )
```

WITNESS:    STEVEN COHEN

PAGES:      1-253

PLACE:      Room 425
            Securities and Exchange Commission
            3 World Financial Center
            New York, New York

Date:       May 3, 2012

            The above-entitled matter come on for
investigation at 10:10 a.m.

**Page 2**

On behalf of the Securities and Exchange Commission:

CHARLES D. RIELY, ESQ.
AMELIA A. COTTRELL, Assistant Director
SANJAY WADHWA, Associate Regional Director
NEIL HENDELMAN, Staff Accountant
Securities and Exchange Commission
Division of Enforcement
Northeast Regional Office
4th Floor, Suite 400
3 World Financial Center
New York, New York 10281

On behalf of the Witness and S.A.C. Capital Advisors, L.P.:

MARTIN B. KLOTZ, ESQ.
JEANNA COMPOSTI, ESQ.
Willkie Farr & Gallagher, Llp
787 Seventh Avenue
New York, New York 10019
-and-
DANIEL J. KRAMER, ESQ.
Paul, Weiss, Rifkind, Wharton & Garrison, Llp
1285 Avenue of the Americas
New York, New York 10019

**Page 3**

1          P R O C E E D I N G S
2          MR. RIELY:  We are on the record May 3, 2012,
3   at 10:10 a.m., New York regional office of the SEC.
4   Whereupon,
5          S T E V E N   C O H E N,
6   having been first duly sworn/affirmed, was examined and
7   testified as follows:
8   EXAMINATION BY
9   MR. RIELY:
10      Q      Will you please state and spell your full
11  name for the record?
12      A      Steven A. Cohen.
13      Q      My name is Charles Riely.  With me are my
14  colleagues, Sanjay Wadhwa, Amelia Cottrell, Neil
15  Hendelman.  We are members of the Division of Enforcement
16  of the United States Securities and Exchange Commission
17  and are officers of the Commission for purposes of this
18  proceeding.
19             This is an investigation by the Securities
20  and Exchange Commission entitled Elan Corporation, plc,
21  File Number NY-8152, to determine whether there have been
22  violations of certain provisions of the federal securities
23  laws.  However, the facts developed in this investigation
24  might constitute violations of other federal or state
25  civil or criminal laws.

**Page 4**

1          Prior to the opening of the record you were
2   provided with a copy of the formal order of investigation
3   in this matter.  It will be available for your examination
4   during the course of this proceeding.  Okay?
5      A      Okay.
6      Q      Have you had an opportunity to review the
7   formal order?
8      A      Yes, I have.
9      Q      Prior to the opening of the record you were
10  also provided with a copy of the Commission's Supplemental
11  Information Form 1662.  A copy of that notice has been
12  previously marked as Exhibit Number 1.
13             Have you had the opportunity to read Exhibit
14  number 1?
15      A      Yes, I have.
16      Q      Do you have any questions concerning
17  Exhibit 1?
18      A      No, I don't.
19      Q      Mr. Cohen, do you understand that you are
20  under oath?
21      A      Yes, I do.
22      Q      Do you understand that you are swearing that
23  your answers to my questions are true and correct?
24      A      Yes, I do.
25      Q      If at any time you do not understand a

1 (Pages 1 to 4)



**Page 193**

1 you have an understanding as to what he meant by that?
2 A    No, I didn't.
3 Q    Did you ask him what he meant by that?
4 A    I definitely asked him because he repeated
5 back to me.
6 Q    And you said part of the reason you
7 established a position in your accounts in the first place
8 was because of advice from Mr. Martoma. Correct?
9 A    That's correct.
10 Q    When he switched his advise and told you
11 nothing more than he was uncomfortable, did you seek
12 additional information from him?
13 A    I might have.
14 Q    Do you remember doing that?
15 A    I don't remember but I might have.
16 Q    Do you remember getting any additional
17 information?
18 A    It's certainly possible but I just don't
19 remember.
20     (Plaintiff's Exhibit 36, E-mail chain, SAC
21      ELAN 733567 through 569, was marked for
22      identification as of this date.)
23 Q    Mr. Cohen, I am handing you what has been
24 marked Exhibit 36, a document Bates stamped SAC ELAN
25 733567 through 569, an e-mail chain starting with an

**Page 194**

1 e-mail from Phillip Villhauer to you and others on Sunday,
2 July 27, 2008 at 8:44 a.m.
3     Do you see that?
4 A    Yes, I do.
5 Q    Mr. Villhauer was the head trader that you
6 gave your instructions to about getting out of the Elan
7 position; correct?
8 A    That's correct.
9 Q    If you look at the bottom of the page there
10 is a reference to ELN?
11 A    I see that.
12 Q    Take a moment to review it.
13     (Pause.)
14 A    I see it.
15 Q    The first sentence reads, "We executed a sale
16 of over 10.5 million ELN for COHE, GGEN, GEHC, SELC at an
17 avg price of 34.21."
18     Do you see that first sentence?
19 A    "We executed a sale --" is that the first
20 sentence?
21 Q    Yes.
22 A    Okay.
23 Q    Were these sales done in compliance with an
24 instruction that you gave Mr. Villhauer?
25 A    I believe so.

**Page 195**

1 Q    Were you aware that SAC, through these
2 accounts, had sold 10.5 million Elan the week of
3 July 21st?
4 A    I don't remember the exact amount but that's
5 what it says.
6 Q    And you believe it's accurate?
7 A    It probably is accurate.
8 Q    Then the next clause says, "This was executed
9 quietly and efficiently over a four day period."
10     Do you know what he is referring to when he
11 says "quietly and efficiently"?
12 A    Yes. We executed quietly so that as few
13 people as possible knew that we were selling the stock.
14 Q    Why was that important?
15 A    Well, it was a big position. Ten and a half
16 million shares is a lot of stock to sell. The more people
17 you tell, the more they talk; the more they talk, the more
18 it gets out that you are selling Elan.
19     We were probably a first page holder. Market
20 loves information like that. So, we wanted to do it
21 quietly so we would, you know, execute as efficiently as
22 we could so it didn't get out and people run in front of
23 us or -- so we'd get out at a decent price.
24 Q    When you say "first page holder" what do you
25 mean by that?

**Page 196**

1 A    On Bloomberg it shows up that you might be a
2 holder of Elan. And so if the marketplace finds out, you
3 try to sell it through a broker or sell it through
4 somebody, they might tell somebody, "Hey, Connecticut
5 seller of Elan" and people might surmise who it might be
6 and that cause people to run in front -- they might see
7 our position and say "Oh, they are selling" and create
8 what I call slippage in the execution of the transaction.
9 Q    It refers to the executions being done
10 quietly. What steps did you take to keep the execution of
11 the Elan sales the week of July 21st quiet?
12 A    I didn't do anything.
13 Q    In your instructions to Mr. Villhauer did you
14 communicate to him that you wanted the sales of Elan to be
15 done in a quiet way?
16 A    I gave the order to him and told him I didn't
17 want anybody to know.
18 Q    Why did you tell him you did not want anybody
19 to know?
20 A    Just for the reason I gave you; that I was
21 afraid that it would leak out either in the firm or
22 outside the firm or on Wall Street brokerage desks,
23 trading desks, and that people might run in front of our
24 order, they might tell other people we're selling and, you
25 know, that might create a dislocation in the stock.

49 (Pages 193 to 196)

Page 197

1    Q    So you communicated to Mr. Villhauer that you
2 didn't want anybody else within the firm to know about the
3 sales of the Elan securities?
4    A    That's correct.
5        MS. COTTRELL:  How often do you give such a
6 communication to a trader executing an order?
7        THE WITNESS:  Sometimes.  Not very often.
8        MS. COTTRELL:  Under what circumstances do
9 you do it?
10        THE WITNESS:  Could be any time there is a
11 large position or it could be if I don't want other people
12 to know what I am doing.
13        MS. COTTRELL:  As a general course, do other
14 employees at S.A.C. Capital know when the firm account is
15 trading in or out of a position?
16        THE WITNESS:  They could.
17        MS. COTTRELL:  How could they?
18        THE WITNESS:  Through other traders on the
19 trading desk.  We have systems.  Sometimes they watch what
20 I do.  I have a board that people can see.  There is many
21 ways that people can see what I am doing.
22        MS. COTTRELL:  As to the general course,
23 people aren't prohibited from looking at what you are
24 doing in your accounts?
25        THE WITNESS:  Generally, but not always.

Page 198

1    Q    In the e-mail it refers to sales being done
2 in a four-day period through algos and dark pools.
3        Did you have an understanding what he was
4 referring to when he referred to dark pools?
5    A    I believe, yes; those are electronic places
6 where people transact.
7    Q    Transact securities?
8    A    Transact securities, yes.
9    Q    In executing the securities in a dark pool,
10 in your understanding did that help SAC reduce the
11 visibility of the trade?
12    A    The point of a dark pool is anonymity.
13    Q    It also refers to trades being done through
14 algos.  Do you know what that refers to?
15    A    That is an electronic trade.
16    Q    What were the algos that made executions in
17 Elan the week of July 21st?
18    A    What was the question?
19    Q    What were the algos that did executions of
20 Elan securities sales for SAC the week of July 21st?
21    A    Well, the way I understand algos, that is a
22 term for algorithms.  Those are electronic trading
23 software that allows you to break up your order and
24 transact it any which way you want.
25    Q    During the week of July 21st, did you have

Page 199

1 communications with Mr. Villhauer about the sales of Elan?
2    A    I don't remember but I am sure he kept me up
3 on the sales.
4    Q    How did he keep you up on the sales?
5    A    He could have told me, he could have done it
6 by IM.  Either one.
7    Q    By the end of the week of the 21st, did SAC
8 or CR Intrinsic still hold any position in Elan?
9    A    I don't remember.
10    Q    Who is Edmund Debler?
11    A    He was my healthcare conduit, helped me trade
12 my healthcare portfolio in my account.
13    Q    In 2008 what was Mr. Debler's title?
14    A    I don't know what the title was.
15    Q    During the week of July 21st did you talk to
16 Mr. Debler about Elan?
17    A    I might have.  I don't remember.
18    Q    You discussed earlier that you didn't want
19 people within SAC to know about the sales of Elan.
20 Correct?
21    A    That's correct.
22    Q    Was Mr. Debler one of the people that knew
23 about the sales of Elan?
24    A    He might have been.  He might have.  I don't
25 remember.

Page 200

1        MS. COTTRELL:  Other than Martoma and
2 Villhauer and maybe another trader, who else within SAC
3 knew that you were selling your Elan position that week of
4 July 21st?
5        THE WITNESS:  Could have been risk, could
6 have been management.
7        MS. COTTRELL:  When you say "could have
8 been," do you have a recollection of informing risk or
9 informing management?
10        THE WITNESS:  We have -- they see -- we have
11 minute to minute realtime -- they have access to
12 positions, and certainly if they look at it minute by
13 minute they'd see that perhaps at the end of the day.  So
14 it is very conceivable they would have known.
15        MS. COTTRELL:  Did you have any conversations
16 with anyone from risk or management the week of the 21st
17 about selling your Elan position?
18        THE WITNESS:  I might have.
19        MS. COTTRELL:  Do you recall any?
20        THE WITNESS:  I don't recall.
21        (Plaintiff's Exhibit 37, E-mail, SAC 3349531
22        through 32, was marked for identification as
23        of this date.)
24    Q    I am handing the witness Exhibit 37.  A copy
25 has also been provided to his counsel.  For the record

                    50 (Pages 197 to 200)

## Page 201

1  Exhibit 37 is a document Bates stamped SAC 3349531 through
2  32.
3          Mr. Cohen, do you recognize Exhibit 37?
4      A   I don't recognize it but I see it.
5      Q   Exhibit 37 is an e-mail from you to
6  Mr. Debler on July 27, 2008. Do you see that?
7      A   Yes, I do.
8      Q   It says, "Between you and me, you can't
9  mention to anyone, I am completely out of ELN."
10         Do you see that?
11     A   Yes, I do.
12     Q   What did you mean by "I am completely out of
13 ELN"?
14     A   It appears to mean that I have completely
15 sold out my long position in ELN.
16     Q   What did you mean by "between you and me, you
17 can't mention to anyone"?
18     A   Well, I am not sure. I could surmise. He
19 was on my team, so he is instructed to follow my
20 healthcare names, and I didn't want him worrying about
21 Elan, you know, given the fact that I was out of the name.
22     Q   Why on July 27th, '08 were you telling him
23 not to mention the fact that you were completely out of
24 Elan to anybody else?
25     A   It's hard -- it's possible that, you know, I

## Page 202

1  still owned the Wyeth position or some of it, so I still
2  had potential to transact. And obviously, you know, it
3  was a big position. Once again, I didn't want anybody to
4  know that I was transacting -- potentially transacting a
5  large position.
6      Q   On the week -- we referenced before that the
7  ICAD phase 2 announcement was on July 29, 2008. On the
8  weekend prior to the ICAD announcement did you talk to
9  Mr. Holman?
10     A   I don't remember.
11     Q   On that weekend did you talk to Mr. Martoma?
12     A   I don't remember.
13         MS. COTTRELL: Do you recall speaking to
14 anyone that weekend about Elan or Wyeth?
15         THE WITNESS: I don't remember.
16     Q   Do you know whether or not Mr. Martoma or
17 Mr. Holman attended the ICAD conference in Chicago?
18     A   I don't -- I don't know.
19         MS. COTTRELL: Did you attend the ICAD
20 conference?
21         THE WITNESS: I didn't.
22     Q   On July 28th and July 29th did you make any
23 transactions in Elan securities?
24     A   I might have.
25     Q   Do you recall?

## Page 203

1      A   I know I transacted at some point but -- I
2  definitely transacted. I just don't remember exactly what
3  I did.
4          MS. COTTRELL: Do you recall generally what
5  you did?
6          THE WITNESS: Generally, what I remember was
7  selling Wyeth and then deciding to hedge out my exposure
8  in Wyeth by shorting Elan.
9          MS. COTTRELL: Can you explain that, your
10 thought process in a little more detail?
11         THE WITNESS: Sure. I still had a position
12 in Wyeth. It's conceivable Wayne might have been selling
13 Wyeth because he told me he was and so I didn't want to
14 compete in Wyeth. I knew that I had executed a lot of
15 stock in Elan the previous week.
16         Rather than just selling Wyeth and carrying
17 what I call slippage -- which would have meant could I get
18 out of the amount of stock that I had in Wyeth -- what I
19 decided to do was to sell Wyeth and reduce the amount of
20 overall slippage in the transaction by shorting Elan
21 against it.
22         It was sort of imperfect. I was estimating
23 the ratio that I would need to sell one against the other,
24 but that's what I did.
25         MS. COTTRELL: Did you discuss your strategy,

## Page 204

1  as you just described it, with anyone?
2          THE WITNESS: I might have.
3          MS. COTTRELL: Do you recall discussing it
4  with anyone?
5          THE WITNESS: I don't remember.
6          MS. COTTRELL: Did you discuss it with
7  Martoma?
8          THE WITNESS: I could have.
9          MS. COTTRELL: Do you remember discussing it
10 with Martoma?
11         THE WITNESS: I don't remember.
12         MS. COTTRELL: Did you discuss your strategy
13 with Wayne Holman?
14         THE WITNESS: I might have.
15         MS. COTTRELL: Do you recall discussing it
16 with Wayne Holman?
17         THE WITNESS: I don't.
18         MS. COTTRELL: You said you were estimating
19 the ratio. Did you perform that work yourself?
20         THE WITNESS: I didn't do a lot of work on
21 this.
22         MS. COTTRELL: How did you go about
23 estimating the ratio?
24         THE WITNESS: Basically estimating how
25 much -- if -- where would Elan might go if the news was

51 (Pages 201 to 204)

Page 1

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

```
                              )
In the Matter of:             )
                              )
Elan Corporation, plc         )    File No. NY-8152
                              )
                              )
```

WITNESS:     STEVEN COHEN

PAGES:       1-253

PLACE:       Room 425
             Securities and Exchange Commission
             3 World Financial Center
             New York, New York

Date:        May 3, 2012


          The above-entitled matter come on for

investigation at 10:10 a.m.

Steven Cohen                                                          May 3, 2012

| Page 25 | Page 27 |
|---|---|
| 1   Q    What was the range in which it varied? | 1   A    I was just responding to your question. |
| 2   A    You know, I am really not sure.  My CFO would | 2   Q    So by "bullish," would you agree that that |
| 3  know the total. | 3  means believing that the stock would go up rather than |
| 4   Q    Is it more than $10,000? | 4  down? |
| 5   A    Yes. | 5   A    So what is the question again? |
| 6   Q    What is the approximate amount? | 6   Q    We are trying to define the term "bullish." |
| 7   A    Like I said, you'd have to speak to my CFO. | 7   A    I would expect the stock to go up. |
| 8  The exact amount varied. | 8   Q    If you were bullish? |
| 9   Q    Do you know if it was in the hundreds of | 9   A    That's right. |
| 10  millions? | 10   Q    So the beginning of 2008 you were bullish on |
| 11   A    It could have been. | 11  Elan.  Correct? |
| 12   Q    Do you know if it was over a billion? | 12   A    I am not sure -- I believe so but I can't |
| 13   A    I doubt it. | 13  tell you for certain at what point in 2008. |
| 14        MS. COTTRELL: Did you make the determination | 14   Q    Can you describe why you were bullish on Elan |
| 15  to invest in Ridgeback? | 15  at the beginning of 2008? |
| 16        THE WITNESS: I wasn't the only one who made | 16   A    I believe it was on the recommendation of Mat |
| 17  that decision. | 17  Martoma. |
| 18        MS. COTTRELL: Were you involved in that | 18   Q    Anybody else? |
| 19  decision? | 19   A    Can you rephrase the question again? |
| 20        THE WITNESS: Yes, I was. | 20   Q    The question was -- the first question was |
| 21   Q    Why did you decide to invest in Ridgeback? | 21  why were you bullish in Elan, and your response was on the |
| 22   A    Because I think Wayne is a great investor. | 22  recommendation of Mr. Martoma? |
| 23   Q    You mentioned Mr. Holman's wife.  What is her | 23   A    Right. |
| 24  name? | 24   Q    My follow-up question was, anybody else? |
| 25   A    Wendy Holman. | 25   A    On Elan, no.  You know, there might have been |

| Page 26 | Page 28 |
|---|---|
| 1   Q    Do you have any interactions with Ms. Holman? | 1  others.  You know, a lot of people were following that |
| 2   A    Only socially. | 2  stock so there could have been others. |
| 3   Q    Do you ever discuss security trades with her? | 3   Q    You said that you were bullish on Elan on the |
| 4   A    It's possible I could have. | 4  recommendation of Mr. Martoma.  Did I get that right? |
| 5        MS. COTTRELL: What is Ms. Holman's job? | 5   A    Certainly he was one proponent of it. |
| 6        THE WITNESS: She works at Ziff Investments. | 6   Q    What was Mr. Martoma's advice and |
| 7        MS. COTTRELL: Is she a portfolio manager? | 7  recommendation concerning Elan at the beginning of 2008? |
| 8        THE WITNESS: She might be.  I believe at | 8   A    I don't remember what his recommendation was |
| 9  some point she was. | 9  in the beginning of 2008.  I know in general he was |
| 10   Q    How frequently do you speak to Ms. Holman? | 10  bullish on Elan. |
| 11   A    To? | 11   Q    Why was he bullish? |
| 12   Q    To Ms. Holman. | 12   A    He thought -- can we call the drug "Bap"? |
| 13   A    To Wendy Holman? | 13   Q    Sure. |
| 14   Q    Wendy Holman.  Yes. | 14   A    He generally thought Bap would be a good drug |
| 15   A    Only -- very infrequently.  Usually at social | 15  for Elan so he was positive on it. |
| 16  events. | 16   Q    When you refer to Bap, you are referring to |
| 17   Q    We talked before about Bapineuzumab and Elan. | 17  Bapineuzumab? |
| 18  I would like to focus your attention on the beginning of | 18   A    That's correct. |
| 19  2008.  What was SAC's position in Elan in beginning of | 19   Q    Did you have an understanding as to why he |
| 20  2008? | 20  thought it would be a good drug? |
| 21   A    I don't remember. | 21   A    He generally had done work on it and |
| 22   Q    Do you remember if it was bullish or bearish? | 22  generally thought it was a good investment to make. |
| 23   A    It was bullish. | 23   Q    What did he tell you about the work he had |
| 24   Q    When you say bullish, what are you referring | 24  done? |
| 25  to? | 25   A    Well, he didn't fill me in on the details of |

7  (Pages 25 to 28)

Diversified Reporting Services
(202) 467-9200

JA90

Steven Cohen                                                            May 3, 2012

Page 29

1  his work. I know he spent a lot of time working on it.
2      Q     At the beginning of 2008 did SAC have an
3  investment in Wyeth?
4      A     I believe so.
5      Q     In the beginning of 2008 were you bullish or
6  bearish on Wyeth?
7      A     I was bullish based on the recommendation of
8  Mat Martoma and Wayne Holman. And there may have been
9  others that were bullish; I just don't remember.
10     Q     Other than Mr. Martoma and Mr. Holman can you
11 remember anybody else being bullish on Wyeth at the
12 beginning of 2008?
13     A     I can't remember. There could have been.
14     Q     What was Mr. Martoma's recommendation
15 concerning Wyeth?
16     A     I believe he was positive on Bapineuzumab and
17 therefore he might have been positive on Wyeth.
18     Q     What was Mr. Holman's recommendation
19 concerning Wyeth?
20     A     He generally thought Wyeth was a good
21 risk/reward.
22     Q     Did you have an understanding as to why that
23 was?
24     A     No. Wayne -- I don't remember other than,
25 you know, I think Wayne's a great investor. I assume he

Page 30

1  did good work on the drug Bapineuzumab and thought Wyeth
2  was a reasonable investment.
3      Q     Did he tell you why he believed that Wyeth --
4  did Mr. Holman tell you why he believed that Wyeth was a
5  good investment at the beginning of 2008?
6      MR. KLOTZ: Object to the form.
7      A     Can you repeat the question?
8      Q     Did Mr. Holman tell you why he thought Wyeth
9  was a good investment at the beginning of 2008?
10     MR. KLOTZ: My objection, by the way, is
11 simply to the time frame. I think he can answer it at
12 some point in 2008. If you want to focus on the time
13 frame, I am happy to have you do that.
14     A     I mean, at some point in 2008 -- and I don't
15 remember. I know he recommended that we buy Wyeth for the
16 firm account or that we buy Wyeth.
17     Q     Mr. Cohen, I am handing you a document that
18 has been previously marked as Exhibit 4. I am also
19 providing a copy for counsel. For the record, Exhibit 4
20 is Bates stamped SAC ELAN 726049 through 52.
21     Mr. Cohen, have you seen Exhibit 4 before?
22     A     I might have.
23     Q     Can you identify it?
24     A     Excuse me?
25     Q     Can you identify Exhibit 4?

Page 31

1      A     What does that mean?
2      Q     Describe it for the record.
3      A     You want me to describe this document now?
4      Q     Yes.
5      A     Okay. You want me to read it, or just
6  describe it?
7      Q     Is the letter dated November 9, 2007?
8      A     I see that.
9      Q     Let's do it this way: Is it correct that
10 Exhibit 4 is a letter agreement between S.A.C. Capital
11 Advisors and Ridgeback Capital Management?
12     A     Looking at the first page, it appears to be
13 an agreement between S.A.C. Capital and Ridgeback Capital.
14     Q     Did you negotiate this agreement?
15     A     I don't remember.
16     Q     Do you recall, were you involved in the
17 negotiation of this agreement?
18     A     I could have been.
19     MS. COTTRELL: Do you recall there being an
20 agreement with Ridgeback Capital around November 2007?
21     THE WITNESS: I remember that we had an
22 agreement, but I wasn't the person who negotiated. While
23 I was kept up on the agreement, my general counsel was
24 probably the person who worked on this agreement.
25     MS. COTTRELL: Was it your idea to enter into

Page 32

1  an agreement with Ridgeback Capital in November of 2007?
2      THE WITNESS: I don't remember.
3      MS. COTTRELL: Did you agree with S.A.C.
4  Capital entering into an agreement with Ridgeback in
5  November of 2007?
6      THE WITNESS: I believe so.
7      Q     Why did you enter into an agreement with
8  Ridgeback in November 2007?
9      A     Wayne Holman suggested that SAC buy Wyeth
10 based on his recommendation, and so we set up an agreement
11 for this purchase.
12     Now what was the question again?
13     Q     Why did you enter into an agreement with
14 Ridgeback concerning Wyeth in November of 2007?
15     A     It was just a documentation of an agreement
16 that the firm came to with Wayne Holman.
17     Q     What were the terms, what was your
18 understanding of the terms of the agreement with
19 Mr. Holman?
20     A     I don't remember.
21     MS. COTTRELL: In general was your
22 understanding that Mr. Holman would be compensated for any
23 P and L that SAC generated as a result of his
24 recommendations concerning Wyeth?
25     THE WITNESS: I believe so.

8  (Pages 29 to 32)

Steven Cohen                                                            May 3, 2012

| Page 65 | Page 67 |
|---|---|
| 1   don't have a hundred percent certainty on this. | 1    Q    So your memory is that the position that |
| 2    Q    Sitting here today you don't remember others? | 2   S.A.C. Capital held in Wyeth was recommended by |
| 3    A    There might have been. I just don't | 3   Mr. Martoma and Mr. Holman? |
| 4   remember. | 4    A    They were certainly some of the people who -- |
| 5    Q    Can you identify any others? | 5   can you rephrase the question? |
| 6    A    I can't right now. | 6      MR. RIELY: Can you just repeat the question? |
| 7      MS. COTTRELL: Other than the Holman account | 7      (Record read.) |
| 8   are there any other accounts at SAC that are accounts in | 8      MR. KLOTZ: Object to form but go ahead and |
| 9   the name of non-SAC employees, non-SAC or non-CR | 9   answer. |
| 10   employees? | 10    A    The answer is they recommended a position in |
| 11      THE WITNESS: I mean, there could have been. | 11   Wyeth but there could have been other people also. |
| 12   I just don't remember. | 12      MS. COTTRELL: Did you do any independent |
| 13      MS. COTTRELL: Do you remember any other | 13   research concerning Wyeth the beginning of 2008 or prior |
| 14   accounts at SAC or CR Intrinsic where a non SAC or CR | 14   to that? |
| 15   Intrinsic employee was credited for ideas that they | 15      THE WITNESS: I am not sure what that means. |
| 16   presented to SAC? | 16      MS. COTTRELL: Did you, yourself, do research |
| 17      THE WITNESS: None comes to mind today, but | 17   to study the fundamentals of Wyeth or study Bap or study |
| 18   it's certainly possible that we had an arrangement with | 18   anything else concerning Wyeth before entering into the |
| 19   somebody at some point. I just don't remember. | 19   position? |
| 20    Q    We talked before about your position in Elan | 20      THE WITNESS: I might have read analysts |
| 21   and Wyeth at the beginning of 2008. Was the position in | 21   recommendations in the firm, outside the firm. There may |
| 22   Wyeth one of SAC's biggest positions in the beginning of | 22   have been other things I read. |
| 23   2008? | 23      MS. COTTRELL: Do you recall reading |
| 24    A    It could have been. | 24   anything? |
| 25    Q    Was it within the top ten percent of the | 25      THE WITNESS: I don't recall. |

| Page 66 | Page 68 |
|---|---|
| 1   biggest security positions that SAC had at the beginning | 1      MR. WADHWA: What is your general practice |
| 2   of 2008? | 2   before you put on a trade nowadays? What do you do? |
| 3    A    Yes. But even that, it depends on the | 3      MR. KLOTZ: Object to form. |
| 4   notional value. We had fixed income securities. It could | 4      MR. WADHWA: Before you, hypothetically |
| 5   have been. But in equity securities, yes. | 5   speaking, before you buy shares in a company. |
| 6    Q    In equity securities it was one of the top | 6      THE WITNESS: That is a pretty broad |
| 7   ten percent positions held by S.A.C. Capital at the | 7   question. Can you help me out and narrow it down? |
| 8   beginning of 2008? | 8      MR. WADHWA: No. It is a pretty |
| 9    A    I believe so. | 9   straightforward question. What are the different types of |
| 10    Q    We have tried to cover your reasons for | 10   activities you engage in before you purchase shares in a |
| 11   having this position and I think the reasons you listed so | 11   company? |
| 12   far as advice from Mr. Holman concerning Bap. Other than | 12      MR. KLOTZ: Object to the form. |
| 13   that, any other reasons why SAC had a position in Wyeth in | 13      THE WITNESS: Do you want me to answer? |
| 14   the beginning of 2008? | 14      MR. KLOTZ: Yes, go ahead you can answer. |
| 15    A    Well, certainly, you know, Mat Martoma's view | 15      THE WITNESS: Listen, there are many things |
| 16   on Bap contributed to having a position in Wyeth. And | 16   that I potentially could do. I read a lot. Certainly |
| 17   there may have been other people who had views. | 17   read analyst's reports, read reports from my own people. |
| 18    Q    Other than what we have discussed so far, is | 18   You know, I watch the tape. I watch the markets. I might |
| 19   there any other reason why you held Wyeth at S.A.C. | 19   have a view on the macro. Might have a view on |
| 20   Capital in the beginning of 2008? | 20   particular -- view on a particular country, Europe. Could |
| 21    A    There may have been other reasons. I don't | 21   be the U.S., could be China. |
| 22   remember. | 22      I speak to a lot of people in my firm who |
| 23    Q    Is there anything we can do to refresh your | 23   have different expertise. I might speak to friends, might |
| 24   recollection? | 24   speak to other people in the business. |
| 25    A    I don't know. | 25      I check my portfolio, see what kind of |

17 (Pages 65 to 68)

Steven Cohen                                      May 3, 2012

| Page 69 | Page 71 |
|---|---|

**Page 69**

1 exposures I have and whether -- you know, do I want to
2 increase my exposure or decrease my exposure?
3 And there is probably a lot of other things I
4 do.
5 MR. WADHA: And has this evolved in any
6 fashion since 2007 or have you generally continued to do
7 the same things as you would have done back in '07?
8 THE WITNESS: Pretty much similar, yes.
9 Q We are focused on your position in Wyeth in
10 the beginning of 2008. We have shown you the 13F's which
11 reflect the size of your position. So far you have
12 mentioned Mr. Martoma and Mr. Holman recommended that you
13 buy -- that you be bullish on the security because of
14 Bapineuzumab. Correct?
15 A Repeat the question?
16 Q I am just trying to make sure that I
17 understand your testimony so far.
18 A I just blanked out for a second. Sorry.
19 Q We have been discussing SAC's position in
20 Wyeth and Elan at the beginning of 2008.
21 A That's right.
22 Q We have talked about at least the position in
23 Wyeth was one of the top ten percent biggest positions
24 that SAC had at the beginning of 2008. Is that correct?
25 A In equities, yes.

**Page 70**

1 Q So far your reasons for investing in SAC --
2 investing in Wyeth is Mr. Martoma and Mr. Holman?
3 A Like I said, yes, and there may have been
4 others.
5 Q And you said you can't remember others?
6 A Certainly can't remember. I have other -- I
7 have many healthcare portfolio managers and so they could
8 have contributed to the knowledge pool. But I can't
9 recall who at that time.
10 Q We're trying to understand all of your
11 reasons for having a bullish position in Elan and Wyeth.
12 A Okay.
13 Q For example, the position in Wyeth alone was
14 over $627 million.
15 A Okay.
16 Q So what did Mr. Holman and Mr. Martoma tell
17 you that led you to take a bullish position in Elan and
18 Wyeth?
19 A Well, you know, I think Wayne Holman was
20 recommending Wyeth. And, you know, I consider Wayne one
21 of the great healthcare investors I have ever met and so I
22 have a ton of respect for his work. If he's positive on
23 something and recommends a position -- and he did -- you
24 know, I would be very willing to -- to invest in that.
25 And Mat Martoma had done a lot of work on

**Page 71**

1 Elan and Bapineuzumab for a long time. So I really
2 considered them experts, you know, what I would consider
3 to be experts in this particular area. And they are both
4 coming at it from different stocks. Well, Martoma liked
5 both names and Wayne liked Wyeth.
6 And so the answer is, they did the work, they
7 were the experts, and I relied on their recommendations.
8 Q When a portfolio manager gives you a
9 recommendation how do you evaluate whether or not it is a
10 good idea or bad idea?
11 A It really depends. Sometimes it's based on
12 reading e-mails, sometimes it's based on discussions with
13 the portfolio manager, sometimes it involves discussions
14 with other people in the firm, outside the firm, their
15 views. So it really depends on the particular situation.
16 Q In late 2007 you entered into a letter
17 agreement with Mr. Holman that contemplated a large
18 investment in Wyeth. Correct?
19 A That's correct.
20 Q That agreement was entered into because
21 Mr. Holman recommended to you that you make an investment
22 in Wyeth through S.A.C. Capital. Correct?
23 A That's correct.
24 Q When evaluating Mr. Holman's recommendation,
25 what did you do?

**Page 72**

1 A Well, I don't remember exactly what I did in
2 this particular case. Certainly I am talking to other
3 portfolio managers at the firm. I certainly could be
4 reading research reports. But like I said before, Wayne
5 Holman is a great healthcare investor and so his
6 recommendations are very important to me.
7 Q Do you accept every recommendation made by
8 Mr. Holman?
9 A We don't talk about everything he does.
10 Q The question is, do you accept every
11 recommendation made by Mr. Holman?
12 A Sometimes -- the answer is no.
13 Q In this instance, why did you accept his
14 recommendation to invest in Wyeth?
15 A Because he felt strongly this was a position
16 that the firm ought to take.
17 Q It sounded like, when you described your
18 method for evaluating investments, that you independently
19 evaluated ideas and not just relied on a person to tell
20 you whether it was a good idea, a really good idea, or a
21 bad idea.
22 The question is, in this instance why did you
23 follow Mr. Holman's advice concerning Wyeth?
24 MR. KLOTZ: Object to form but go ahead and
25 answer.

18 (Pages 69 to 72)

Steven Cohen                                                    May 3, 2012

Page 77

1   Typically what portfolio managers and analysts do is
2   they -- they speak to people in the healthcare industry,
3   they talk to other analysts. You know, this is biotech,
4   it's science. It's an area that is not what I traffic in
5   and so I tend to heavily rely on the work that my analysts
6   and PM's do in that particular space.
7        Q      So in the beginning of 2008 it was your
8   understanding that Mr. Martoma believed that Bapineuzumab
9   was going to be a positive drug?
10       A      I believe so.
11       Q      What did he say about Bapineuzumab that led
12  you to believe he thought it was going to be a positive
13  drug?
14       A      He thought -- he thought it was going to be a
15  good drug, he thought the results of the various trials
16  would go well. He thought it could be potentially a major
17  impact to Elan's bottom line.
18       Q      In the beginning of 2008 did he tell you why
19  he thought it was going to be a good drug?
20       A      I knew he was positive on the drug and I know
21  he did work on it. The specifics, I don't remember.
22       Q      You also mentioned that Mr. Martoma thought
23  the trials were going to go well. Correct?
24       A      In general he thought that was the reason to
25  invest in it, that the data that would come out and the

Page 78

1   trials that would come out, he would hope to be positive.
2        Q      What was your understanding as to what
3   Mr. Martoma's view that the clinical trial data was going
4   to be good?
5        A      Can you rephrase the question?
6        Q      Sure. What was your understanding as to why
7   Mr. Martoma thought the clinical trial results for it
8   Bapineuzumab would be positive?
9        A      I think it was based on the work that he did.
10  Like I said, that is not my area of expertise and so I
11  rely on what I would call the experts. And certainly Mat,
12  I believe, was an expert in that area. Wayne Holman was
13  an expert. Obviously, my other healthcare guys did a lot
14  of work, such as David Munno and Ben Slate, and they had
15  their own views.
16       Q      When you refer to Mr. Martoma as an expert
17  in -- what do you mean by that?
18       A      In this case it means someone who understands
19  the science, understands what the company is trying to do.
20  And what I consider an expert may not actually be an
21  expert. But for me, being a layman, he is an expert to
22  me.
23       Q      Did you believe that Mr. Martoma was an
24  expert on the science behind the Bap drug?
25       A      I believe he understood the science behind

Page 79

1   it. I think, you know, whatever that means -- like I
2   said, I am a layman when it comes to biotech. I think he
3   had done a lot of work and seemed to have a good
4   understanding of, you know, the possibilities.
5        Q      What did he tell you about the work we had
6   done on Bapineuzumab in early 2008?
7        A      You know, like I said, I mean, I don't do the
8   work. So basically he writes up his analysis, he might
9   talk to me. I do believe at some point in 2008 the CEO
10  was running around saying the -- you know, it could look
11  like this(indicating), the lines -- whatever "this" meant.
12          You know, so he was basically following it.
13  You know, going to the analyst days, speaking to other
14  healthcare people, analysts, healthcare professionals.
15  And that was his recommendation.
16       Q      Did you believe that Mr. Martoma was capable
17  of understanding the science behind Bapineuzumab?
18       A      You know, that's -- I think whether he
19  actually understood it, it would be hard for me to know
20  because I am not a scientist.
21       Q      Do you believe that Mr. Martoma had more
22  expertise than you in the science of Bapineuzumab?
23       A      Absolutely.
24       Q      What led you to believe that?
25       A      Because that is not my -- I don't do that. I

Page 80

1   am not a healthcare professional. I am a generalist and I
2   spend very little time in that arena.
3          MS. COTTRELL: What percentage of your
4   investments in your account are healthcare investments?
5          MR. KLOTZ: Just to be clear, you are talking
6   about his account, the Cohen account?
7          MS. COTTRELL: The Cohen.
8          THE WITNESS: I would say 15 to 20 percent.
9          MS. COTTRELL: Is that also true for the firm
10  account, to the extent there is a difference between the
11  firm account and Cohen account?
12          THE WITNESS: The firm account probably had
13  more.
14          MS. COTTRELL: Why is that?
15          THE WITNESS: Because, you know, based on the
16  recommendations of people -- you know, I didn't want -- if
17  it was a big position I didn't want my own account to be
18  overweighted with one position. Would be hard to run a
19  portfolio from a volatility standpoint if it was
20  concentrated in one position. So if it was going to be a
21  larger position, I might put the extra position in the
22  firm account.
23          MS. COTTRELL: Did you have any other
24  positions in either the firm account or the Cohen account
25  recommended by Mr. Martoma?

20  (Pages 77 to 80)

Steven Cohen                                                                May 3, 2012

| Page 161 | Page 163 |
|---|---|
| 1  You see that? | 1  Q  Did you take any notes of the conversation? |
| 2  A  Yes, I do. | 2  A  I did not. |
| 3  Q  Do you remember getting that message from | 3  Q  Do you know if anybody else -- do you know if |
| 4  Mr. Martoma? | 4  Mr. Martoma took notes of the conversation? |
| 5  A  I believe so. | 5  A  I don't know. |
| 6  Q  And did you subsequently speak to | 6  Q  After this first conversation with |
| 7  Mr. Martoma? | 7  Mr. Martoma, what did you do next concerning your |
| 8  A  Yes, I did. | 8  investment in Elan and Wyeth? |
| 9  Q  On the Sunday that you received this e-mail | 9  A  Well, it was a Sunday so I really didn't do |
| 10  how many conversations did you have with Mr. Martoma? | 10  anything. |
| 11  A  I don't remember. | 11      MS. COTTRELL:  You said you got together -- |
| 12  Q  Was it one or more than one? | 12  you said "we tried to get a conference call" or something |
| 13  Could have been more than one.  It could have | 13  together.  You recall that? |
| 14  been more than one but I don't remember. | 14      THE WITNESS:  Yes, I do.  At some point on |
| 15  Q  Did you speak to Mr. Martoma on the morning | 15  Sunday -- and I wanted exactly what time or when, |
| 16  of Sunday, July 20, 2008? | 16  I wanted -- I wanted Mat Martoma and Wayne Holman to talk. |
| 17  A  I believe so. | 17  Q  And why did you want them to talk? |
| 18  Q  How long did the conversation last? | 18  A  Because they were the experts in Elan and |
| 19  A  I don't remember. | 19  Wyeth and I wanted to hear them discuss it. |
| 20  Q  In the first conversation who participated in | 20  Q  Prior to the time that Mr. Martoma reached |
| 21  the conversation? | 21  out to you and communicated that he was uncomfortable in |
| 22  A  It was just me and Mat. | 22  the position in Elan, before that had Mr. Holman's views |
| 23  Q  Mr. Martoma was the one who initiated the | 23  on Elan or Wyeth changed? |
| 24  idea to have a conversation? | 24  A  Not that I know of. |
| 25  A  I believe so. | 25  Q  You mentioned that you tried to have a |

| Page 162 | Page 164 |
|---|---|
| 1  Q  What did Mr. Martoma say when you first got | 1  conference call with Mr. Martoma and Mr. Holman.  Did you |
| 2  on the phone with him? | 2  ultimately have a conference call with them on July 20th? |
| 3  A  He called me and he said -- I remember him | 3  A  I don't believe so. |
| 4  saying that he was getting uncomfortable with the Elan | 4  Q  Did you speak to Mr. Holman on July 20th? |
| 5  position. | 5  A  I might have. |
| 6  Q  Did he explain why? | 6      MS. COTTRELL:  Do you recall speaking to |
| 7  A  I must have asked him how come or -- because | 7  Mr. Holman on July 20th? |
| 8  he repeated back to me, "I am just getting uncomfortable | 8      THE WITNESS:  It's possible.  I just don't |
| 9  with the Elan position." | 9  remember. |
| 10  Q  Did he provide any reasons as to why he was | 10      MS. COTTRELL:  You don't recall one way or |
| 11  uncomfortable in the Elan position? | 11  the other whether you spoke to Mr. Holman on July 20th? |
| 12  A  He might have.  I just don't remember. | 12      THE WITNESS:  I am not sure. |
| 13      MS. COTTRELL:  What else do you recall about | 13      MS. COTTRELL:  When you say you are not sure, |
| 14  that conversation? | 14  do you have a general recollection one way or the other? |
| 15      THE WITNESS:  I don't recall really anything | 15      THE WITNESS:  It's possible.  I know I tried |
| 16  else. | 16  to get a conference call together.  I don't think it |
| 17      MS. COTTRELL:  The only thing that you recall | 17  happened on Sunday. |
| 18  is Mr. Martoma saying, "I am getting uncomfortable with | 18  Q  Did it happen in the subsequent day? |
| 19  the Elan position," you said, "What do you mean?" him | 19  A  It happened on Monday. |
| 20  repeating that, and that's it? | 20  Q  What time was the conference call on Monday? |
| 21      THE WITNESS:  That is what I remember, yes. | 21  A  I don't remember. |
| 22  Q  After Mr. Martoma said that he was | 22  Q  Do you remember whether it was before the |
| 23  uncomfortable with the Elan position, what else happened | 23  market opened? |
| 24  in the discussion? | 24  A  I don't remember. |
| 25  A  I don't remember. | 25  Q  Do you remember whether it was after the |

41 (Pages 161 to 164)

Steven Cohen                                                    May 3, 2012

Page 173

1    A    It appears to be one minute if I am looking
2  at it correctly.
3    Q    I am referring to the next call.
4    A    20-minute call?
5    Q    Yes.
6         MR. KRAMER:  Are you making a representation
7  about that call?
8    Q    We know from other records that that call is
9  also from Mr. Martoma.
10        MR. KLOTZ:  That doesn't appear from this
11 document but you are saying you know from other documents
12 that is from Martoma?
13        MR. RIELY:  Yes.
14   Q    Was your call with Mr. Martoma on the morning
15 of July 20th approximately 20 minutes?
16   A    It could have been.
17   Q    Do you remember it being longer than that?
18   A    I don't remember.
19   Q    Do you remember it being shorter than that?
20   A    I don't remember.
21   Q    In the call, other than Mr. Martoma
22 expressing that he was getting uncomfortable with the Elan
23 investment, do you recall anything else?
24   A    I don't.
25   Q    Was there any discussion of Wyeth during the

Page 174

1  call?
2    A    There might have been.
3    Q    What do you recall about that?
4    A    I am just -- it's possible.  I don't recall.
5         MS. COTTRELL:  At this time you had a lot
6  of -- you had a lot of money invested in Elan.  Correct?
7         THE WITNESS:  Yes.
8         MS. COTTRELL:  So when Mr. Martoma, who I
9  think you had described as one of your experts, said that
10 he was getting uncomfortable, you don't recall saying to
11 him, "Why?"
12        THE WITNESS:  I believe I did.
13        MS. COTTRELL:  And you don't recall any
14 substantive response that he had given you?
15        THE WITNESS:  Well, he told me again that he
16 was uncomfortable.
17        MS. COTTRELL:  And anything more substantive
18 than that?
19        THE WITNESS:  He might have.  I just don't
20 remember.
21   Q    Do you recall challenging him?
22   A    Well, I asked him again and that's what he
23 said.  And then I just don't remember the rest of the
24 conversation.
25   Q    You referenced a conversation with

Page 175

1  Mr. Martoma and Mr. Holman on July 21, 2008.
2    A    That's correct.
3    Q    When in the day was that?
4    A    I don't remember.
5         (Plaintiff's Exhibit 35, E-mail, SAC ELAN
6  0581168, was marked for identification as of
7  this date.)
8         MR. RIELY:  I am handing the witness
9  Exhibit 35 and a copy is being provided to his counsel.
10 For the record Exhibit 35 is a document Bates stamped SAC
11 ELAN 0581168, an e-mail from Mr. Martoma to Mr. Cohen,
12 July 21, 8:21 a.m.
13   Q    Do you see that, Mr. Cohen?
14   A    Yes, I do.
15   Q    The e-mail says, "Do you have a moment to
16 speak when you get in?"
17   A    I see that.
18   Q    Do you recall speaking with Mr. Martoma on
19 the morning of July 21, 2008?
20   A    No, I don't.
21   Q    Do you recall receiving this e-mail?
22   A    I don't recall -- I don't remember.
23   Q    You referenced -- at some point you had a
24 conversation with Mr. Holman and Mr. Martoma on July 21st.
25 Correct?

Page 176

1    A    Actually, I don't remember it happening that
2  way.
3    Q    What do you remember?
4    A    I don't remember being on that call.  I
5  remember asking Wayne to speak to Mat.
6    Q    When do you remember asking Mr. Holman to
7  speak to Mr. Martoma?
8    A    It would have been the 20th or the 21st.
9    Q    Do you know if they subsequently spoke?
10   A    I believe they did.
11   Q    How do you know about that?
12   A    Because Wayne reported back to me on the
13 conversation.
14   Q    What did Mr. Martoma report back to you --
15 what did Mr. Holman report back to you about his
16 conversation with Mr. -- let me rephrase the question.
17        After you asked Mr. Holman to speak to
18 Mr. Martoma on July 20th, do you understand that
19 Mr. Holman spoke to Mr. Martoma?
20   A    What date did you say?
21   Q    July 20th.
22   A    I believe it happened on the 21st.
23   Q    Did you have an understanding that
24 Mr. Martoma and Mr. Holman spoke on the 21st?
25   A    Yes, I do.

44  (Pages 173 to 176)

Case 1:13-cr-00973 Document 1-2 Filed 02/12/015 Page 382 Page 101 age 27 of 15

Steven Cohen                                                    May 3, 2012

| Page 177 | Page 179 |
|---|---|

**Page 177**

1  Q    Did Mr. Holman subsequently tell you about
2  that conversation?
3  A    Yes, he did.
4  Q    What did he say?
5  A    He said he spoke to Martoma, that he had
6  specific -- Martoma had reasons why he didn't want to be
7  in Elan anymore. They were, you know, reasons that were
8  normal, typical reasons. I am sort of summarizing because
9  I don't remember exactly what Wayne said to me.
10       Then he said, "Listen, in the end, this data
11 is 50/50. You know, this data is unknowable. It's a
12 50/50 bet."
13 Q    Who said that?
14 A    Wayne Holman.
15 Q    When did you have that conversation with
16 Mr. Holman?
17 A    On the 21st.
18 Q    When on the 21st?
19 A    After he spoke to Martoma. I don't know
20 when.
21 Q    Did you make any decisions concerning your
22 investments in Elan and Wyeth on or about July 21, 2008?
23 A    I believe at some point afterwards I started
24 selling Elan.
25 Q    Why did you start selling Elan?

**Page 178**

1  A    Well, a couple reasons. One, my two experts
2  sounded very different than the way I -- the way they
3  sounded previous. Mat sounded -- said he was very -- he
4  was uncomfortable. Then when talking to Wayne, he
5  described the Bap 2 data as a coin flip, which I was a
6  little surprised at.
7  Q    And you had conversations with Mr. Holman
8  concerning the Bap data prior to July 21, 2008?
9  A    Probably, sure.
10 Q    You said that you were surprised with
11 Mr. Holman's characterization of the Bap data being a coin
12 flip on July 21st?
13 A    That's right.
14 Q    Is that because it was inconsistent with his
15 previous recommendations to you concerning Wyeth and Elan?
16 A    I don't remember exactly what he said to me
17 on the Bap data other than the generally positive. So I
18 was surprised when he said it was 50/50 and that it was a
19 risk/reward bet. That's not what I signed up for.
20 Q    It sounds like you recall having a
21 conversation with Mr. Martoma on July 21, 2008 where he
22 said the news about the Bap data was 50/50 and that the
23 investment in Elan and Wyeth was a risk/reward bet?
24       MR. KRAMER: You said Mr. Martoma. I think
25 you mean Mr. Holman.

**Page 179**

1  Q    It sounds like, from your testimony -- is it
2  correct or not correct that you had a conversation with
3  Mr. Holman where Mr. Holman told you on July 21st that the
4  Bapineuzumab data was a coin flip and that it was a
5  risk/reward call?
6  A    That was what I took out of it. And to
7  repeat -- and then he said, "In the end, the data is
8  unknowable."
9        MS. COTTRELL: Was that a different statement
10 than Mr. Holman had made to you in the past?
11       THE WITNESS: Well, he never said that in
12 that way, so -- but, you know, that's the way Wayne talks,
13 so it's not -- it's not surprising.
14       MS. COTTRELL  is that different from your
15 understanding of the data?
16       THE WITNESS: I didn't have an understanding
17 of the data. I just felt, based on the work that they
18 did, that at least in Wayne's case it would be better than
19 a 50/50 bet.
20       MS. COTTRELL: You had said that Mr. Holman
21 reported back that Mr. Martoma's reasons why he didn't
22 want to be in Elan were kind of normal, typical reasons.
23 What were you referring to?
24       THE WITNESS: I don't remember. I can
25 surmise what some of them could be. I mean --

**Page 180**

1        MR. KLOTZ: Do you want him to do that?
2        MS. COTTRELL: Do you have any recollection
3  of what those reasons were that Mr. Holman told you?
4        THE WITNESS: I don't remember.
5        MS. COTTRELL: Why didn't you participate in
6  the phone call between Martoma and Holman?
7        THE WITNESS: I don't remember.
8  Q    Prior to July 21, 2008 had Mr. Holman ever
9  previously referred to the Bap data as a coin flip?
10 A    I don't believe so.
11 Q    And when you referred before, when
12 referencing your conversation with Martoma, that it's not
13 what you signed up for, what did you mean by that?
14       MR. KRAMER: You said Martoma. I think you
15 mean Holman. Can you reask the question so it is clear?
16 I just want to be sure the transcript is clear.
17 Q    You referenced before, in relation to your
18 conversation with Mr. Holman, that this was not what you
19 signed up for. What did you mean by that?
20 A    I didn't want to make a 50/50 bet. I mean,
21 it's coin flip. You know, it's not what -- I would have
22 hoped the probability was better than 50/50.
23 Q    I am just trying to understand what you meant
24 when you said "not what you signed up for." What are you
25 referring to when you say "signed up for"?

45 (Pages 177 to 180)

Steven Cohen                                                          May 3, 2012

---

Page 181

1    A    You know, I invested money in Elan and Wyeth,
2  significant sums, and it didn't seem like I was making a
3  bet that was a 50/50 bet. I was surprised by that.
4        MS. COTTRELL: Did Mr. Holman talk to you
5  about your investment in Wyeth as opposed to Elan?
6        THE WITNESS: He might have at some point. I
7  don't -- when are we talking about?
8        MS. COTTRELL: On July 21st.
9        THE WITNESS: On July 21st, I don't remember.
10  I believe we were talking about the conversation with
11  Martoma and then he made those comments.
12        MS. COTTRELL: What was Mr. Holman's view on
13  July 21st concerning Wyeth?
14        THE WITNESS: I think he was still positive
15  from a risk/reward perspective.
16        MS. COTTRELL: And do you think that because
17  he told you that?
18        THE WITNESS: It was a 50/50 bet. Wayne
19  tends to be a cautious guy and so he thinks in those
20  terms.
21        MS. COTTRELL: So on July 21st was Mr. Holman
22  still recommending that you hold Wyeth securities?
23        THE WITNESS: I don't remember speaking to
24  him specifically about that.
25    Q    On July 21, 2008, did you make any decisions

---

Page 182

1  as to your investment in Elan?
2    A    I believe at some point after that
3  conversation --
4    Q    Which conversation?
5    A    -- with Wayne Holman, I decided to sell the
6  Elan position.
7    Q    When you say "sell the Elan position," what
8  are you referring to?
9    A    Selling the -- whatever Elan that I owned.
10  And I believe Mat Martoma wanted to sell his Elan.
11    Q    You said you believe that Mr. Martoma wanted
12  to sell his Elan?
13    A    Yes.
14    Q    He sent you an e-mail on the Sunday where he
15  referred to the position that GEHC account in Elan was?
16    A    That's right.
17    Q    What portion of that position did Mr. Martoma
18  want to sell?
19    A    I don't remember.
20    Q    Was it all of it?
21    A    I believe he wanted to get out at some point.
22    Q    Get out of all of Elan?
23    A    I don't remember him saying that exactly but
24  that was the intent.
25    Q    The intent was to get out of Elan. Was there

---

Page 183

1  a date before which there was a plan to get out of Elan?
2    A    He wanted it sold during the week.
3    Q    During the week of July 21st?
4    A    That's right.
5    Q    So in advance of the July 29, 2008
6  announcement about the phase 2 trial results?
7    A    He wanted to be out of the position before
8  the data came out.
9    Q    Other than Mr. Martoma telling you that he
10  was uncomfortable with the Elan position, did he give you
11  any other reasons why he wanted to be out of Elan before
12  the July 29, 2008 announcement concerning the phase 2
13  results?
14    A    He might have. I mean, I do remember him
15  telling me that he came to my side.
16    Q    What do you mean by that?
17    A    I think it was a reference to the Kelly
18  Martin meeting. And I was somewhat skeptical. And he
19  made a comment at some point there saying, you know, "I
20  have come over to your side."
21        MS. COTTRELL: After the Kelly Martin meeting
22  you didn't sell your Elan position. Is that correct?
23        THE WITNESS: That's correct.
24        MR. KLOTZ: Object to the form retroactively.
25        MS. COTTRELL: You know there is no

---

Page 184

1  objections to form in testimony anyway, so --
2        MR. KRAMER: We can't help it.
3    Q    How did Mr. Martoma go about selling his
4  position in Elan from the accounts that he controlled?
5    A    I don't know if he did. I think what we did
6  was instruct Phil Villhauer to liquidate all the stock
7  that was owned by -- in the firm account, in my account
8  and in Mat Martoma's account and let him handle it.
9    Q    When was that instruction given to
10  Mr. Villhauer?
11    A    It was probably given after that phone call
12  with Wayne.
13    Q    On July 21st?
14    A    Probably.
15    Q    What were the instructions that were given to
16  Mr. Villhauer?
17    A    To sell the entire position in those three
18  accounts.
19    Q    Which three accounts?
20    A    GGEN, Cohen and GEHC.
21    Q    And GGEN is the CR Intrinsic account?
22    A    Actually, there might have been other stock.
23  I mentioned ISO. There might have been other places.
24  Generally the position that we owned in Elan.
25    Q    How about Wyeth? Were there any instructions

46 (Pages 181 to 184)

| Page 185 | Page 187 |
|---|---|
| 1 given to Mr. Villhauer concerning Wyeth? | 1    THE WITNESS: I don't believe so, but he |
| 2    A    I don't believe so at that point. | 2 might have. |
| 3    Q    Is Mr. Villhauer Mr. Martoma's trader? | 3    MS. COTTRELL: Do you have a recollection of |
| 4    A    No. He is the firm trader. He is in charge | 4 him telling you? |
| 5 of the trading desk. | 5    THE WITNESS: I know he told me that he was |
| 6    Q    Why was the trades for Mr. Martoma's account | 6 selling Wyeth, so I am not sure if he told me to sell it |
| 7 placed through Mr. Villhauer? | 7 or I took it on my own volition based on that he was |
| 8    A    Because we wanted it executed all -- so he | 8 selling it. |
| 9 could allocate and -- so he could handle it so we weren't | 9    MS. COTTRELL: Aside from kind of the macro |
| 10 competing with each other in trying to get out of the | 10 concerns, did Mr. Holman say anything else about why he |
| 11 name. | 11 was selling Wyeth? |
| 12    MR. KLOTZ: I don't want to interrupt you in | 12    THE WITNESS: I don't believe so. |
| 13 the middle of key events but at some point I think it | 13    MS. COTTRELL: Since Mr. Holman had macro |
| 14 would be time for a break. We have been going for well | 14 concerns, his macro concerns might not have been your |
| 15 over an hour. | 15 macro concerns. Isn't that correct? |
| 16    Q    On July 21, 2008 did you make any decisions | 16    THE WITNESS: I can't speak for what his |
| 17 concerning your investment in Wyeth? | 17 macro concerns were. |
| 18    A    What was the date? | 18    MS. COTTRELL: So did he give you any reason |
| 19    Q    July 21st. | 19 relating to the investment in Wyeth why he was selling |
| 20    A    I don't remember. | 20 Wyeth as opposed to kind of macro concerns about the |
| 21    Q    At some point prior to July 29, 2008, did you | 21 economy in general? |
| 22 make a decision concerning your investment in Wyeth? | 22    THE WITNESS: He -- I don't remember him |
| 23    A    Yes. | 23 telling me specifically why he was selling Wyeth. |
| 24    Q    When was that? | 24    MS. COTTRELL: When we were both talking |
| 25    A    At some point during that week. | 25 about macro concerns, can you say what you meant by macro |

| Page 186 | Page 188 |
|---|---|
| 1    Q    What prompted you to make a decision | 1 concerns? |
| 2 concerning your investment in Wyeth the week of July 21st? | 2    THE WITNESS: Yeah. It was 2008. The |
| 3    A    I spoke to Wayne at some point and he was | 3 markets were under pressure. The stocks had outperformed |
| 4 telling me he was selling his Wyeth. | 4 a lot and the markets were under pressure. |
| 5    Q    You referenced before a conversation on the | 5    MS. COTTRELL: So Mr. Holman didn't tell you |
| 6 21st. Was that the same conversation in which he said he | 6 anything specific about his views on Wyeth as to why he |
| 7 was selling Wyeth? | 7 sold Wyeth? |
| 8    A    I don't believe so. | 8    THE WITNESS: I know we spoke. I just don't |
| 9    Q    In the conversation where Mr. Holman | 9 remember the specifics. |
| 10 referenced that he was selling Wyeth, what do you recall | 10    MS. COTTRELL: you don't remember him saying |
| 11 about that conversation? | 11 anything specifically concerning Wyeth? |
| 12    A    I don't recall much other than he was telling | 12    THE WITNESS: I don't remember that, no. |
| 13 me he is selling his -- he is selling some Wyeth. | 13    MR. RIELY: Off the record at 4:08. |
| 14    MS. COTTRELL: Did he say why? | 14    (Recess.) |
| 15    THE WITNESS: I don't remember. I know he | 15    MR. RIELY: Back on the record at 4:20. |
| 16 was nervous about the world, the macro picture, but he | 16    Q    Mr. Cohen, while we were off the record we |
| 17 didn't give me any specifics. | 17 had no conversations about the substance of this |
| 18    MS. COTTRELL: Did he say anything else to | 18 investigation. Correct? |
| 19 you in that conversation? | 19    A    That's correct. |
| 20    THE WITNESS: I don't remember. | 20    Q    You referenced before that Mr. Martoma wanted |
| 21    MS. COTTRELL: Did he recommend that you sell | 21 to get out of his position in Elan. Is that correct? |
| 22 Wyeth? | 22    A    That's correct. |
| 23    THE WITNESS: I don't believe so. | 23    Q    When did he first express that view to you? |
| 24    MS. COTTRELL: Did Mr. Holman ever recommend | 24    A    I don't remember. It was definitely after |
| 25 that you sell your Wyeth position? | 25 the first conversation we had that Sunday. |

47 (Pages 185 to 188)

Steven Cohen                                                    May 3, 2012

Page 189

1    Q        Referring to the conversation on Sunday,
2    July 20th?
3    A        That's correct.
4    Q        Do you know if he expressed the view that he
5    wanted to get completely out of his position in Elan in
6    that first conversation?
7    A        I don't remember.
8    Q        Did Mr. Martoma express a view about the
9    Wyeth positions in his account?
10   A        I don't remember.
11   Q        Did Mr. Martoma want to get completely out of
12   the Wyeth positions in his accounts?
13   A        I don't remember.
14   Q        On Sunday July 20th did you speak to Dave
15   Munno or Ben Slate?
16   A        I might have.
17   Q        Do you remember talking to them?
18   A        I don't remember.
19   Q        Do you remember talking to Mr. Munno or
20   Mr. Slate prior to making the decision to get out of your
21   position in Elan on July 21st?
22   A        I might have.
23   Q        Do you remember?
24   A        No, I don't.
25   Q        What role did you have in the securities

Page 190

1    trades that were placed in Elan on the week of July 21st?
2    A        Other than instructing my head trader to
3    execute the trades, the answer is very little.
4    Q        What role did you have in executing any
5    trades in Wyeth the week of July 21st?
6    A        I don't remember. Maybe some. But also it
7    could have been done by my head trader or my regular
8    trader for that matter.
9    Q        Who is your regular trader?
10   A        Whoever handled healthcare for me at the
11   time.
12   Q        Do you recall who that was in July 2008?
13   A        No, I don't.
14   MS. COTTRELL: Mr. Cohen, you said that
15   Mr. Martoma, in his conversation with you on July 20th,
16   gave you kind of normal typical reasons of why he didn't
17   want to be in Elan and said that he was 50/50 on Elan now.
18   Is that correct?
19   THE WITNESS: No.
20   MR. KLOTZ: Objection. I think that was
21   Holman.
22   MS. COTTRELL: Mr. Holman reported that
23   Mr. Martoma was 50/50 on Elan?
24   THE WITNESS: No.
25   MS. COTTRELL: What was the reference to

Page 191

1    5050, the coin flip?
2    THE WITNESS: That was Wayne Holman
3    discussing about the Bapineuzumab data.
4    MS. COTTRELL: Did Mr. Martoma have a view
5    about the Bapineuzumab data?
6    THE WITNESS: I don't believe so.
7    MS. COTTRELL: Did you have a view of the
8    Bapineuzumab data the week of July 21st?
9    THE WITNESS: No, I didn't.
10   MS. COTTRELL: If the view of the data was
11   50/50, why did you want to get out of your entire position
12   in Elan?
13   THE WITNESS: Well, a number of reasons.
14   One, Wayne was 50/50; and then Mat Martoma told me he was
15   uncomfortable. So, two experts that were recommending the
16   stock to me had both changed -- in my mind, had changed
17   their mind.
18   MS. COTTRELL: Were there any other reasons
19   why you wanted to be completely out of your position in
20   Elan?
21   THE WITNESS: I think those were the main
22   reasons. There may have been tertiary reasons but I
23   believe those were the main reasons.
24   MS. COTTRELL: Do you recall any tertiary
25   reasons?

Page 192

1    THE WITNESS: Could have been the way the
2    markets were trading. You know, could have been, given it
3    was a 50/50 bet and given that these stocks had
4    outperformed the vast majority of stocks in that period,
5    you know, it felt like a risky position.
6    MS. COTTRELL: You said it could have been
7    either of those things. Do you recall that either of
8    those -- I think you had described them as tertiary
9    reasons -- were reasons that you thought about in terms of
10   getting out of your Elan position the week of July 21st?
11   THE WITNESS: That gets back to the
12   expectational analysis that was discussed previous. Given
13   the fact that it was 50/50 and given the fact -- from
14   Wayne. Given the fact that Mat Martoma was now
15   uncomfortable, I also had, you know, in my head, Munno and
16   Slate who were very negative on the position.
17   I didn't have anybody who wanted to be in the
18   position at that point. And so from a -- from what I
19   perceived would be, you know -- Wayne told me at some
20   point he was selling his Wyeth. So at that point all the
21   proponents who were positive on either Elan or Wyeth were
22   now not, and so I literally had no reason to hold onto the
23   position.
24   Q        You have referenced a few times that
25   Mr. Martoma said that he was uncomfortable with Elan. Did

48  (Pages 189 to 192)

Steven Cohen                                                          May 3, 2012

## Page 193

1   you have an understanding as to what he meant by that?
2      A    No, I didn't.
3      Q    Did you ask him what he meant by that?
4      A    I definitely asked him because he repeated
5   back to me.
6      Q    And you said part of the reason you
7   established a position in your accounts in the first place
8   was because of advice from Mr. Martoma. Correct?
9      A    That's correct.
10     Q    When he switched his advise and told you
11  nothing more than he was uncomfortable, did you seek
12  additional information from him?
13     A    I might have.
14     Q    Do you remember doing that?
15     A    I don't remember but I might have.
16     Q    Do you remember getting any additional
17  information?
18     A    It's certainly possible but I just don't
19  remember.
20          (Plaintiff's Exhibit 36, E-mail chain,SAC
21          ELAN 733567 through 569, was marked for
22          identification as of this date.)
23     Q    Mr. Cohen, I am handing you what has been
24  marked Exhibit 36, a document Bates stamped SAC ELAN
25  733567 through 569, an e-mail chain starting with an

## Page 194

1   e-mail from Phillip Villhauer to you and others on Sunday,
2   July 27, 2008 at 8:44 a.m.
3          Do you see that?
4      A    Yes, I do.
5      Q    Mr. Villhauer was the head trader that you
6   gave your instructions to about getting out of the Elan
7   position; correct?
8      A    That's correct.
9      Q    If you look at the bottom of the page there
10  is a reference to ELN?
11     A    I see that.
12     Q    Take a moment to review it.
13          (Pause.)
14     A    I see it.
15     Q    The first sentence reads, "We executed a sale
16  of over 10.5 million ELN for COHE, GGEN, GEHC, SELC at an
17  avg price of 34.21."
18          Do you see that first sentence?
19     A    "We executed a sale --" is that the first
20  sentence?
21     Q    Yes.
22     A    Okay.
23     Q    Were these sales done in compliance with an
24  instruction that you gave Mr. Villhauer?
25     A    I believe so.

## Page 195

1      Q    Were you aware that SAC, through these
2   accounts, had sold 10.5 million Elan the week of
3   July 21st?
4      A    I don't remember the exact amount but that's
5   what it says.
6      Q    And you believe it's accurate?
7      A    It probably is accurate.
8      Q    Then the next clause says, "This was executed
9   quietly and efficiently over a four day period."
10          Do you know what he is referring to when he
11  says "quietly and efficiently"?
12     A    Yes. We executed quietly so that as few
13  people as possible knew that we were selling the stock.
14     Q    Why was that important?
15     A    Well, it was a big position. Ten and a half
16  million shares is a lot of stock to sell. The more people
17  you tell, the more they talk; the more they talk, the more
18  it gets out that you are selling Elan.
19          We were probably a first page holder. Market
20  loves information like that. So, we wanted to do it
21  quietly so we would, you know, execute as efficiently as
22  we could so it didn't get out and people run in front of
23  us or -- so we'd get out at a decent price.
24     Q    When you say "first page holder" what do you
25  mean by that?

## Page 196

1      A    On Bloomberg it shows up that you might be a
2   holder of Elan. And so if the marketplace finds out, you
3   try to sell it through a broker or sell it through
4   somebody, they might tell somebody, "Hey, Connecticut
5   seller of Elan" and people might surmise who it might be
6   and that cause people to run in front -- they might see
7   our position and say "Oh, they are selling" and create
8   what I call slippage in the execution of the transaction.
9      Q    It refers to the executions being done
10  quietly. What steps did you take to keep the execution of
11  the Elan sales the week of July 21st quiet?
12     A    I didn't do anything.
13     Q    In your instructions to Mr. Villhauer did you
14  communicate to him that you wanted the sales of Elan to be
15  done in a quiet way?
16     A    I gave the order to him and told him I didn't
17  want anybody to know.
18     Q    Why did you tell him you did not want anybody
19  to know?
20     A    Just for the reason I gave you; that I was
21  afraid that it would leak out either in the firm or
22  outside the firm or on Wall Street brokerage desks,
23  trading desks, and that people might run in front of our
24  order, they might tell other people we're selling and, you
25  know, that might create a dislocation in the stock.

49 (Pages 193 to 196)

|  | Page 201 |
|---|---|
| 1 | Exhibit 37 is a document Bates stamped SAC 3349531 through |
| 2 | 32. |
| 3 | Mr. Cohen, do you recognize Exhibit 37? |
| 4 | A    I don't recognize it but I see it. |
| 5 | Q    Exhibit 37 is an e-mail from you to |
| 6 | Mr. Debler on July 27, 2008. Do you see that? |
| 7 | A    Yes, I do. |
| 8 | Q    It says, "Between you and me, you can't |
| 9 | mention to anyone, I am completely out of ELN." |
| 10 | Do you see that? |
| 11 | A    Yes, I do. |
| 12 | Q    What did you mean by "I am completely out of |
| 13 | ELN"? |
| 14 | A    It appears to mean that I have completely |
| 15 | sold out my long position in ELN. |
| 16 | Q    What did you mean by "between you and me, you |
| 17 | can't mention to anyone"? |
| 18 | A    Well, I am not sure. I could surmise. He |
| 19 | was on my team, so he is instructed to follow my |
| 20 | healthcare names, and I didn't want him worrying about |
| 21 | Elan, you know, given the fact that I was out of the name. |
| 22 | Q    Why on July 27th, '08 were you telling him |
| 23 | not to mention the fact that you were completely out of |
| 24 | Elan to anybody else? |
| 25 | A    It's hard -- it's possible that, you know, I |

|  | Page 202 |
|---|---|
| 1 | still owned the Wyeth position or some of it, so I still |
| 2 | had potential to transact. And obviously, you know, it |
| 3 | was a big position. Once again, I didn't want anybody to |
| 4 | know that I was transacting -- potentially transacting a |
| 5 | large position. |
| 6 | Q    On the week -- we referenced before that the |
| 7 | ICAD phase 2 announcement was on July 29, 2008. On the |
| 8 | weekend prior to the ICAD announcement did you talk to |
| 9 | Mr. Holman? |
| 10 | A    I don't remember. |
| 11 | Q    On that weekend did you talk to Mr. Martoma? |
| 12 | A    I don't remember. |
| 13 | MS. COTTRELL: Do you recall speaking to |
| 14 | anyone that weekend about Elan or Wyeth? |
| 15 | THE WITNESS: I don't remember. |
| 16 | Q    Do you know whether or not Mr. Martoma or |
| 17 | Mr. Holman attended the ICAD conference in Chicago? |
| 18 | A    I don't -- I don't know. |
| 19 | MS. COTTRELL: Did you attend the ICAD |
| 20 | conference? |
| 21 | THE WITNESS: I didn't. |
| 22 | Q    On July 28th and July 29th did you make any |
| 23 | transactions in Elan securities? |
| 24 | A    I might have. |
| 25 | Q    Do you recall? |

|  | Page 203 |
|---|---|
| 1 | A    I know I transacted at some point but -- I |
| 2 | definitely transacted. I just don't remember exactly what |
| 3 | I did. |
| 4 | MS. COTTRELL: Do you recall generally what |
| 5 | you did? |
| 6 | THE WITNESS: Generally, what I remember was |
| 7 | selling Wyeth and then deciding to hedge out my exposure |
| 8 | in Wyeth by shorting Elan. |
| 9 | MS. COTTRELL: Can you explain that, your |
| 10 | thought process in a little more detail? |
| 11 | THE WITNESS: Sure. I still had a position |
| 12 | in Wyeth. It's conceivable Wayne might have been selling |
| 13 | Wyeth because he told me he was and so I didn't want to |
| 14 | compete in Wyeth. I knew that I had executed a lot of |
| 15 | stock in Elan the previous week. |
| 16 | Rather than just selling Wyeth and carrying |
| 17 | what I call slippage -- which would have meant could I get |
| 18 | out of the amount of stock that I had in Wyeth -- what I |
| 19 | decided to do was to sell Wyeth and reduce the amount of |
| 20 | overall slippage in the transaction by shorting Elan |
| 21 | against it. |
| 22 | It was sort of imperfect. I was estimating |
| 23 | the ratio that I would need to sell one against the other, |
| 24 | but that's what I did. |
| 25 | MS. COTTRELL: Did you discuss your strategy, |

|  | Page 204 |
|---|---|
| 1 | as you just described it, with anyone? |
| 2 | THE WITNESS: I might have. |
| 3 | MS. COTTRELL: Do you recall discussing it |
| 4 | with anyone? |
| 5 | THE WITNESS: I don't remember. |
| 6 | MS. COTTRELL: Did you discuss it with |
| 7 | Martoma? |
| 8 | THE WITNESS: I could have. |
| 9 | MS. COTTRELL: Do you remember discussing it |
| 10 | with Martoma? |
| 11 | THE WITNESS: I don't remember. |
| 12 | MS. COTTRELL: Did you discuss your strategy |
| 13 | with Wayne Holman? |
| 14 | THE WITNESS: I might have. |
| 15 | MS. COTTRELL: Do you recall discussing it |
| 16 | with Wayne Holman? |
| 17 | THE WITNESS: I don't. |
| 18 | MS. COTTRELL: You said you were estimating |
| 19 | the ratio. Did you perform that work yourself? |
| 20 | THE WITNESS: I didn't do a lot of work on |
| 21 | this. |
| 22 | MS. COTTRELL: How did you go about |
| 23 | estimating the ratio? |
| 24 | THE WITNESS: Basically estimating how |
| 25 | much -- if -- where would Elan might go if the news was |

Diversified Reporting Services
(202) 467-9200

**JA102**

| Page 209 | Page 211 |
|---|---|
| 1 done?<br>2    A   No, I am not.<br>3    Q   Who would know how that was done?<br>4    A   Phillip Villhauer.<br>5    Q   The trades on the 20th reference a series of<br>6 short sales done by Mr. Martoma?<br>7        MR. KLOTZ: Mr. Riely, I have to tell you, I<br>8 believe that that is inaccurate. I am reasonably<br>9 confident there were no short sales in Mr. Martoma's<br>10 account of Elan. I believe there were some sales but I<br>11 believe the short sales were not in the GEHC account.<br>12        With that, you are welcome to ask him<br>13 questions and he can answer. I think there is a<br>14 significant material inaccuracy in your summary.<br>15        MR. RIELY: The summary was created using<br>16 information provided by SAC.<br>17        MR. KLOTZ: I understand, but I think you got<br>18 something wrong.<br>19    Q   Did you speak to Mr. Martoma on July 28th?<br>20    A   I don't remember.<br>21    Q   Did Mr. Martoma talk to you about the<br>22 possibility of taking a short position in Elan prior to<br>23 the announcement?<br>24    A   I don't remember.<br>25        MS. COTTRELL: Did you talk to Mr. Martoma | 1    Q   Do you remember speaking to Mr. Martoma on<br>2 the morning of July 28th?<br>3    A   No, I don't.<br>4    Q   It also refers to a 3:04 p.m. conversation<br>5 with Mr. Martoma's number that lasted six minutes. Do you<br>6 see that?<br>7    A   Yes, I do.<br>8    Q   Do you remember speaking to Mr. Martoma on<br>9 the afternoon of July 28th?<br>10    A   No, I don't.<br>11    Q   Turning your attention to calls on the next<br>12 page, for July 29th, do you recognize the number<br>13 (646)675-7404?<br>14    A   I don't, until you told me what it was today.<br>15    Q   Do you recall speaking to Mr. Martoma on<br>16 either July 28th or July 29th?<br>17    A   I don't remember.<br>18        MS. COTTRELL: Do you recall speaking to<br>19 Mr. Martoma while he was in Chicago at the ICAD<br>20 conference?<br>21        THE WITNESS: I don't recall.<br>22        MS. COTTRELL: Do you recall speaking to<br>23 anyone who was at the ICAD conference?<br>24        THE WITNESS: I don't remember.<br>25    Q   Are you aware whether or not Mr. Martoma put |
| **Page 210** | **Page 212** |
| 1 about not selling all of his Wyeth position in order to<br>2 reduce slippage?<br>3        THE WITNESS: I don't remember having that<br>4 conversation.<br>5        MS. COTTRELL: Do you know whether<br>6 Mr. Martoma sold his entire Wyeth position?<br>7        THE WITNESS: I have no idea.<br>8    Q   The summary also refers to transactions done<br>9 by Will Hoh. Who is Will Hoh?<br>10    A   He was another portfolio manager at SAC.<br>11    Q   Were you aware at the time that he was making<br>12 transactions?<br>13    A   He might have been. I have no idea.<br>14    Q   Were you aware that he was making<br>15 transactions in Elan?<br>16    A   I don't remember .<br>17    Q   If you go back to Exhibit 34?<br>18    A   Okay.<br>19    Q   Go to the page marked SAC COHEN 3765, the<br>20 bottom, calls on July 28th.<br>21    A   Okay.<br>22    Q   There are one call from Mr. Martoma's number,<br>23 (203) 979-7824 on July 28th at 8:34 a.m. for four minutes.<br>24 Do you see that?<br>25    A   I do. | 1 on an option position in Elan securities on July 28th and<br>2 July 29th?<br>3    A   I don't remember.<br>4        MS. COTTRELL: Is the options strategy that<br>5 you described earlier something that you would tell your<br>6 portfolio manager in a general case?<br>7        THE WITNESS: I don't understand the<br>8 question.<br>9        MS. COTTRELL: If you had developed an<br>10 options strategy for trading in your account, is that<br>11 something that you would tell a portfolio manager who you<br>12 had been working with on a position?<br>13        THE WITNESS: I might.<br>14        MS. COTTRELL: Have you in the past?<br>15        THE WITNESS: Yes.<br>16        MS. COTTRELL: And have there been situations<br>17 when you haven't told the portfolio manager of your<br>18 options strategy?<br>19        THE WITNESS: Sure.<br>20        MS. COTTRELL: Do you have any recollection<br>21 in this case whether or not you told Mr. Martoma about<br>22 your options strategy concerning Wyeth and Elan?<br>23        THE WITNESS: I don't remember.<br>24    Q   Aside from the trades that SAC placed between<br>25 July 21st and July 29th, are you aware of any other trades |

53 (Pages 209 to 212)

# Oral Decision by Judge Rakoff
## in *Whitman*
## (filed December 20, 2013)
## (2302-2313)

# In The Matter Of:

*UNITED STATES OF AMERICA v*
*DOUG WHITMAN*

---

*August 14, 2012*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File C8EeWHIF.txt

**Min-U-Script® with Word Index**

| C8EEWHI6 | Whitman - direct | Page 2302 |
|---|---|---|

1   you, dude.  All three never called you back.  He's caught you.
2       Are you referring to being caught by law enforcement
3   or some other thing?
4   A.  No, Jeff Palmer.
5   Q.  Jeff Palmer, okay.  Now, let's go to the next page.
6       THE COURT: Counsel, bear in mind we have to stop in
7   two minutes.
8       MR. ANDERSON: Okay, your Honor.  I have -- your
9   Honor, this call is complete.  I believe one more call is
10  complete.  Just a little bit of clean-up, then I'll be done.
11      THE COURT: We never ask the jury to sit beyond 5:00.
12      MR. ANDERSON: Understood.  I just wanted the Court to
13  know what I had remaining of my direct examination.
14      THE COURT: All right.  Very good.
15      All right.  Then why don't we excuse the jury now.
16  So, ladies and gentlemen, tomorrow we're only going to sit
17  until 4:00.  So you'll be here at 9:00, and I may even be here
18  at 9:00.
19      So we'll try to start at 9:00 tomorrow.  See you then.
20      (Continued on next page)
21
22
23
24
25

| C8EEWHI6 | Whitman - direct | Page 2303 |
|---|---|---|

1       (In open court; jury not present)
2       THE COURT: Mr. Whitman, you may step down.
3       Please be seated.
4       So, Mr. Anderson, give me what will now be a binding
5   estimate of how long it will take for those few items you just
6   mentioned.
7       MR. ANDERSON: Yes, your Honor.  I would estimate a
8   half hour, your Honor.
9       THE COURT: All right.  You'll be held to a half hour.
10      Now, clearly the government's cross will go a
11  substantial amount of time.  And I'm not going to require at
12  this point a binding representation from the government any
13  more than I did from the defense at a comparable point.
14      But do you want to give me a ballpark?
15      MR. LAVIGNE: I don't want to go more than three
16  hours, Judge, and I hope I'll be less than that.
17      THE COURT: Okay.  So then we have Mr. Ader.  There is
18  going to be some redirect probably, then we have Mr. Ader, is
19  that right?  That's the next witness?
20      MR. ANDERSON: Yes, your Honor.
21      THE COURT: All right.
22      MR. ANDERSON: Sorry, your Honor.  If I can confer
23  just one moment.
24      (Continued on next page)
25

| C8E8WHI7 | | Page 2304 |
|---|---|---|

1       MR. ANDERSON: Thank you, your Honor.
2       Our best estimate, Leo Chocron, Jason Ader, Mike
3   Mayer, and then we have the continuing discussion with
4   government about the agent and guidance stipulations.  And then
5   the Sunil Bhalla deposition transcript.
6       THE COURT: I am going to rule on that right now.
7       So it's Mr. Chocron after Mr. Whitman, and then
8   Mr. Ader, and then Mr. Mayer.
9       MR. ANDERSON: Yes, your Honor.
10      THE COURT: And then whatever falls into that present
11  uncertain category of agent testimony, and there may be some
12  rebuttal of the same sort, if I recall correctly.
13      MR. LAVIGNE: Yes.  I think I will confer with my
14  colleagues tonight, and we can let the Court know tomorrow
15  morning.
16      THE COURT: We need to get that either agreed to on
17  both sides or disagreed to so that I can rule because we are
18  running out of time.
19      MR. BERENSON: Your Honor, in that regard, I think
20  there is one ripe issue for the Court's decision.  I have asked
21  my colleague, Mr. Mann, to come in and address your Honor on
22  that if you want to hear it.
23      THE COURT: Maybe but not till I finish my laundry
24  list.
25      With respect to Mr. Mayer, I have further considered,

| C8E8WHI7 | | Page 2305 |
|---|---|---|

1   and I adhere to my preliminary view that he cannot testify on
2   Google other than the chart summary chart that was agreed to by
3   both sides, as reflected on the transcript.  With respect to
4   Polycom, I think his testimony is going to be somewhat
5   restricted, but I will give you the details of that tomorrow.
6   I do not, therefore, anticipate that his direct will take more
7   than about a half hour.
8       With respect to the deposition excerpts from
9   Mr. Bhalla, I have received memoranda from both sides, which I
10  have read and carefully considered.  The defense seeks to put
11  in some testimony from Mr. Bhalla that he gave at an SEC
12  deposition in 2011 in which he denied passing information.  The
13  parties are agreed that in order for this to come in under Rule
14  804(b)(1) as exceptions to the hearsay rule, the defense must
15  show by a preponderance of the evidence that:  (1) the witness
16  is unavailable; (2) that the party against whom the testimony
17  is offered is the same as in the prior proceeding; and (3) that
18  the party had the same motive and opportunity to examine the
19  witness in the prior proceeding.
20      The defense has satisfied the first of those
21  requirements that the witness is unavailable since it has been
22  represented that he will take the Fifth.  But the Court
23  concludes that the defense has not satisfied the second
24  requirement that the party against whom the testimony is
25  offered is the same as in the prior proceeding.

---

C8E8WHI7                                                    Page 2306

1    Clearly, in a superficial way, the SEC and the U.S.
2  Attorney's Office are different parties, but there are
3  occasions when they are properly treated as the same party or
4  as joint agents of one another, but I do not see that this is
5  such a case. I take the liberty of referring to my own recent
6  decision in United States v. Gupta, the decision I rendered on
7  March 26, 2012, where I held that the two parties were involved
8  in a joint investigation and had mutual obligations, where they
9  were conducting an investigation at which something like 44
10 depositions were jointly conducted.
11    This is not remotely that situation. There is no
12 suggestion that the U.S. Attorney's Office had any role in the
13 conduct of Bhalla's deposition and no one from the U.S.
14 Attorney's Office was present.
15    As I also point out in the Gupta case, this issue has
16 to be evaluated from the standpoint of what relief is being
17 sought. So in the Gupta case, the question was whether the
18 U.S. Attorney's Office had an obligation to obtain from the SEC
19 Brady material arising from the joint investigation that was
20 contained in SEC notes but not in U.S. Attorney's notes, and I
21 held that it did.
22    Here, the question is, in effect, who is taking the
23 deposition and what the parties argued at the proceeding and it
24 wasn't the U.S. Attorney's Office at all.
25    Alternatively, or additionally, I find that the

---

C8E8WHI7                                                    Page 2307

1  defense has not carried its burden with respect to the third
2  requirement that the party had the same motive and opportunity
3  to examine the witness in the prior proceeding. When someone
4  takes a deposition in a civil case, or for administrative
5  investigatory purposes or the like, one frequently has no
6  motive other than to freeze the witness in whatever his or her
7  story is. The criminal equivalent is the grand jury. Here, in
8  the civil context, it is a discovery device. You want to know
9  what they are going to say. You're not necessarily going to
10 undertake to cross-examine them, or if you do, it may be at a
11 very superficial level because that would not serve your
12 purposes. It is a very different situation from the kind of
13 examination that one would undertake if either it were a trial
14 or if one had reason to believe that it might be used at a
15 trial.
16    Furthermore, the SEC is looking at this from a
17 standpoint of satisfying a preponderance standard and the Court
18 can take judicial notice of the fact that the SEC settles the
19 vast, vast, vast majority of its civil proceedings.
20    So the motivation and the intensity of the examination
21 is wholly different from what would be the case in the U.S.
22 Attorney's Office or if its agent were undertaking the
23 examination.
24    So the Bhalla deposition proffer is denied.
25    MR. ANDERSON: Is the Court inclined to hear any

---

C8E8WHI7                                                    Page 2308

1  argument on that point?
2    THE COURT: I received a lengthy brief from the
3  defense. I received a brief from the U.S. Attorney's Office.
4  And I am concerned over the last few days, it seems that every
5  time I make a ruling, that's just a prelude to the three or
6  four times one party or another asks to reargue the matter.
7  Nevertheless, go ahead.
8    MR. ANDERSON: I will be very brief, your Honor.
9    I would just point out a couple of facts that are
10 relevant to the government's papers and to which I would like
11 to respond.
12    On page 6 of the government brief, the government
13 argues that the SEC did not have the benefit of the evidence in
14 the criminal investigation. On that point, I would just like
15 to note that the SEC provided Roomy Khan, as the Court will
16 remember, with the 302s from the criminal investigation to
17 prepare her for her deposition.
18    THE COURT: That point, both the government's
19 statement that you referred to and your response, played no
20 role in my ruling a minute ago, but it does remind me that we
21 are supposed to hear from the SEC.
22    Is Mr. McGrath here? There he is. That will teach
23 you to be here in court. Where do we stand, Mr. McGrath, on
24 the undertaking you so kindly undertook
25    MR. McGRATH: Well, your Honor, I think you asked me

---

C8E8WHI7                                                    Page 2309

1  to follow up on Wednesday evening. Thursday, around lunchtime,
2  I sent an e-mail to counsel for both sides apprising them of
3  our understanding of what was given to Ms. Khan, which was
4  essentially that all of the 302s that were provided to her were
5  marked as Exhibit 19 to her deposition. So counsel for both
6  sides got that e-mail Thursday.
7    THE COURT: Thank you very much. I appreciate that.
8  Go ahead.
9    MR. ANDERSON: I would also point out that during the
10 deposition of Sunil Bhalla, he was cross-examined on a call
11 that was recorded in the course of the criminal investigation.
12    And then just the third and final point I will make
13 and then I will submit, your Honor, is that the SEC staff
14 attorney, who at one point was leading the SEC's investigation,
15 then also led the criminal investigation of Mr. Whitman for, to
16 my understanding, at least two years.
17    THE COURT: I don't understand the relevance of the
18 latter point. Both those points are points that I considered
19 because they were referred to in the papers. It did not appear
20 to me from a review of the transcript that the recording, the
21 use of the recording in the deposition was conducted with
22 anything like the intensity that would have been made it
23 appropriate to meet the third element that we referred to.
24    But, more importantly, with respect to your third
25 point, what does it matter that an SEC person subsequently

---

---

C8E8WHI7                                                          Page 2310

1  became part of the prosecution team?  That happens all the
2  time, and the reason it happens all the time is because the SEC
3  person has some learning, some knowledge, that it's useful to
4  what is then a criminal investigation, and also, he is sworn in
5  as a special assistant typically so he can have access to the
6  grand jury, which means he is thereafter barred from talking to
7  the SEC.  So he, in effect, changes his role.  It's also done,
8  to be perfectly candid, so that the SEC can get some credit.
9      But what does that matter when it occurred subsequent
10  to the deposition, right?
11      MR. ANDERSON: Only, to invoke your Honor's
12  formulation, that there are occasions in which the two agencies
13  are properly treated as joint agents of one another.
14      So those are the factors, as well as those in our
15  papers, that I would point out to the Court, and on that basis
16  submit it, your Honor.
17      THE COURT: Obviously, you have preserved all your
18  arguments for appeal, and I appreciate your bringing it to my
19  attention.
20      All right.  Now, we are going to have a charging
21  conference, but I have to take another matter that will take
22  about a half hour.
23      I'm sorry.  We will take first the matter that
24  involved Mr. Mann.
25      MR. BERENSON: While Mr. Mann approaches, I just

---

C8E8WHI7                                                          Page 2311

1  wanted to go back to Mr. Mayer for one second with respect to
2  the time estimate.  I wanted to remind the Court that he is
3  also serving as our summary witness, and while the true expert
4  portions of his testimony may not last more than about a half
5  hour, I do think he will be on the stand longer than 30
6  minutes, and I didn't want the Court to harbor a
7  misunderstanding about the overall scope or duration of his
8  testimony.
9      THE COURT: Let me put it to you this way, and I very
10  much appreciate your bringing that to my attention.
11      I thought that it would be helpful to counsel, because
12  I can see that we are not going to finish tomorrow, to finish
13  by the close of the morning session on Thursday so that you all
14  could have a full opportunity to prepare your summations, and I
15  would let you go Thursday afternoon, and we would have
16  summations Friday morning and then my charge early Friday
17  afternoon and give it to the jury for deliberations.  And I
18  thought that would be in keeping with my well-known reputation
19  of being a nice guy.  But if you want to go into Thursday
20  afternoon, you're taking time away from your own preparation
21  for summations.  It's really in some ways your choice.
22      MR. BERENSON: OK.  That's fine, your Honor.  We
23  appreciate it.  We think your estimate of summations on Friday
24  and having it to the jury on that day is realistic.  If we are
25  able to reach stipulations with the government on the agent

---

C8E8WHI7                                                          Page 2312

1  testimony, I think everything after Mr. Whitman's testimony is
2  unlikely to take more than a day and probably substantially
3  less.  Mr. Ader and Mr. Chocron are very short witnesses.  So I
4  don't think there is anything wrong with the overall schedule.
5  I will have my foot firmly on the accelerator with Mr. Mayer,
6  and we will wrap him up as quickly as we can.
7      THE COURT: Let me hear what Mr. Mann is here for.
8      MR. MANN: Good afternoon, your Honor.  Michael Mann
9  for Douglas Whitman.
10      I have been working with Ms. Berman to try and come to
11  an agreement on the various stipulations to avoid having a long
12  line of FBI agents outside the courtroom coming up for five
13  days of testimony one at a time concerning each of the
14  government's cooperators and the many 302s and various notes of
15  interviews that have been taken over the years for each of
16  them.  We have been working well together, and we just are
17  looking for some guidance from the Court as to what is
18  permissible in these stipulations.  The government has taken
19  the position that if a witness simply does not recall a
20  statement to the FBI, that that would be not necessarily
21  grounds to impeach them upon, and I think that some guidance
22  there would help the parties resolve this issue.
23      THE COURT: The most I can tell you is you're probably
24  much, much too young to have ever seen any Gilbert and Sullivan
25  operetta, let alone their very best, which is called Trial by

---

C8E8WHI7                                                          Page 2313

1  Jury.  But in Trial by Jury, every time the judge, who is of
2  course rightly the hero of that operetta, is asked for
3  guidance, he gives them guidance that is of no use whatsoever.
4  So with that prelude, let me give you some guidance.
5      Normally, an inability to recall would not open the
6  door to the statement of the FBI agent.  But there are times
7  where the failure to recall when compared with what the
8  statement was, assuming the FBI agent would say that the
9  statement had been made, would be so glaring that a reasonable
10  juror could infer that that statement that the witness didn't
11  remember was a lie.
12      So, for example, if a witness said to an FBI agent,
13  Gee, I don't remember the exact information I passed on to Mr.
14  Whitman on such and such occasion, and he is asked here in
15  court, Did you tell the agent that you didn't remember the
16  specific information you passed on, and he said, I don't
17  remember whether I said that to the agent, that would not, in
18  the Court's view, open the door.  But if the witness said to
19  the FBI agent, I am sure that I did not pass on any information
20  to Mr. Whitman prior to date X, and he is asked on
21  cross-examination, Didn't you tell the FBI agent that you were
22  quite sure that you didn't pass any information on to Mr.
23  Whitman before date X, and the witness says, I don't remember
24  whether I said that or not, that would be a much more glaring
25  kind of failure of recollection and might open the door.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MATHEW MARTOMA,

          Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/6/2014

**ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The Government alleges, inter alia, that between 2006 and July 2008, Martoma traded on the basis of material, non-public information, and caused his hedge fund employer – SAC Capital – to trade on the basis of material non-public information. The material non-public information was allegedly supplied by two doctors – Dr. Sidney Gilman and Dr. Joel Ross – who were participants in a clinical trial of a drug for possible use in treating Alzheimer's disease. Both doctors have entered into cooperation agreements with the Government and are expected testify at trial.

       This Order resolves the last outstanding issue with respect to the Defendant's motion to compel the production of any Brady and Giglio material that might be contained in communications between the United States Attorney's Office ("USAO") or the Securities and Exchange Commission ("SEC") and counsel for Dr. Gilman or counsel for Dr. Ross (Dkt. No. 149) – namely, whether the USAO's Brady and Giglio obligations extend to communications

between the SEC and Dr. Gilman's counsel, or the SEC and Dr. Ross's counsel, that are in the

sole possession of the SEC.

## BACKGROUND[1]

On December 26, 2013, the Defendant – alleging that the USAO's "Brady and

Giglio disclosures remain incomplete" – moved to compel the USAO to produce any such

material that might be contained in communications between the USAO or the SEC and counsel

for Dr. Gilman or counsel for Dr. Ross. (Dkt. No. 149; Def. Br. (Dkt. No. 150) at 3) The

Defendant contended that he is entitled to "statements reflecting discussions [between the USAO

or the SEC and] counsel for Drs. Gilman or Ross (i) concerning their clients' and/or Mr.

Martoma's innocence, (ii) that are inconsistent with [the doctors'] current statements, or (iii)

concerning potential criminal charges." (Def. Br. (Dkt. No. 150) at 2)

In opposing this motion, the USAO argued, inter alia, that it does not have "an

obligation to produce [any communications] in the SEC's custody that are not in the possession

of the USAO." (Govt. Br. (Dkt. No. 174) at 6)

In a January 4, 2014 Order, this Court found that the Defendant had not

demonstrated that the Government had withheld Brady or Giglio material contained in

communications from the doctors' counsel to the USAO:

> Here, the Defendant is already aware that Dr. Gilman and Dr. Ross previously provided
> exculpatory statements that are inconsistent with their anticipated testimony at trial. The
> USAO has disclosed FBI 302 reports and notes reflecting these prior statements, as well
> as its own statements to Dr. Gilman's counsel that it did not believe Dr. Gilman's denials.
> The USAO has represented that it is "not aware of any statements made by the attorneys
> for Dr. Gilman and Dr. Ross that are materially different than the statements reflecting
> initial denials already produced to the defense." (Govt. Br. (Dkt. No. 174) at 5) The fact
> that Dr. Gilman's or Dr. Ross's attorneys may have reiterated their clients' denials at the
> time that they were made does not add anything meaningful to the cross-examination
> material already available to the defense on this point. Accordingly, the Defendant has

---

[1] Familiarity with this Court's prior orders is presumed.

2

**JA110**

not demonstrated that the Government has withheld <u>Brady</u> or <u>Giglio</u> material contained in communications from the doctors' counsel to the USAO, and the Defendant's motion to compel will be denied to the extent that it is addressed to such material.

(January 4, 2014 Order at 6)  The Court made no finding as to communications between the SEC and counsel for the doctors.

In the January 4, 2014 Order, the Court also ruled that the Defendant was entitled to disclosure of any statements by the USAO to the doctors or their counsel that either (1) threatened criminal prosecution of the doctors if they did not implicate Martoma; or (2) promised a non-prosecution agreement to the doctors if they implicated Martoma, and ordered such statements – to the extent they exist – to be produced forthwith.  (<u>Id.</u> at 7)

This Court's January 4, 2014 Order does not resolve the issue of whether the USAO's <u>Brady</u> and <u>Giglio</u> obligations extend to communications between the SEC and the doctors' counsel that are in the sole possession of the SEC.  Finding that resolution of this issue turns on whether the USAO and the SEC were engaged in a joint investigation of Martoma, <u>see</u> <u>United States v. Gupta</u>, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012), and that the Court lacked sufficient information to determine whether the two agencies had conducted a joint investigation, this Court directed the parties to submit affidavits addressing this issue by 5:00 p.m. on January 5, 2014.

The Court has reviewed both parties' submissions, and concludes for the reasons stated below that the USAO and the SEC conducted a joint investigation of the Defendant.

## DISCUSSION

"<u>Brady</u> and its progeny require the Government to disclose material information that is 'favorable to the accused, either because it is exculpatory, or because it is impeaching.'"

3

**JA111**

United States v. Rodriguez, 496 F.3d 221, 225 (2d Cir. 2007) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

The USAO's obligation to produce Brady and Giglio material that is in the sole possession of the SEC turns on whether the USAO and the SEC were engaged in a joint investigation of Martoma. See Gupta, 848 F. Supp. 2d at 493 ("[A]ny argument that the Government's duty [under Brady and its progeny] does not extend [to certain materials] . . . merely because another agency, not the USAO, is in actual possession of the documents created or obtained as part of the joint investigation is both 'hypertechnical and unrealistic.'") (quoting United States v. Shakur, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982)). "The inquiry is not whether the United States Attorney's Office physically possesses the discovery material; the inquiry is the extent to which there was a 'joint investigation' with another agency." United States v. Upton, 856 F. Supp. 727, 750 (E.D.N.Y. 1994); see Gupta, 848 F. Supp. 2d at 493 ("Where the USAO conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for Brady evidence.") (citing Upton, 856 F. Supp. at 749-50).

Courts in this District apply this "joint investigation" analysis in assessing the USAO's obligations with respect to Brady and Giglio material held by the SEC. See Gupta, 848 F. Supp. 2d at 493-95 (finding that the Government had an obligation to review SEC interview notes and memoranda for Brady material, where the SEC and USAO conducted a "joint investigation" by jointly conducting 44 witness interviews); United States v. Rigas, No. 02-CR-1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), aff'd, 583 F.3d 108 (2d Cir. 2009) (finding that the USAO was not obligated to produce interview notes held by the SEC

4

**JA112**

where there was no joint investigation between the USAO and the SEC).[2] In particular, courts look to whether "the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions." Gupta, 848 F. Supp. 2d at 494. "Assessing whether a joint investigation occurred is a fact-specific inquiry that is best approached on a case-by-case basis," United States v. Ferguson, 478 F. Supp. 2d 220, 238 (D. Conn. 2007), and involves consideration of the "degree of cooperation between agencies," id., such as their coordination in conducting witness interviews and otherwise investigating the facts of the case. See Gupta, 848 F. Supp. 2d at 495.

The record now before the Court demonstrates that the USAO and the SEC did, in fact, conduct a joint investigation of the Defendant. "At various times in connection [with] the criminal investigation into SAC Capital transactions in Elan and Wyeth securities, representatives of the U.S. Attorney's Office conferred with the SEC about the SEC's parallel investigation." (Jan. 3, 2014 Devlin-Brown Decl. (Dkt. No. 177) ¶ 4) These communications began shortly after the USAO commenced its investigation of potential insider trading in Elan and Wyeth securities at SAC Capital in July 2011. (Jan. 5, 2014 Devlin-Brown Decl. (Dkt. No. 179) ¶ 2) At that time, the USAO and SEC were both conducting "parallel investigations" of "Martoma's potential involvement in insider trading in Elan and Wyeth." (Id. ¶ 3) During the investigation of Martoma's conduct, the SEC and the USAO jointly conducted twenty interviews

---

[2] Relying on United States v. Rigas, 583 F.3d 108, 126 (2d Cir. 2009), the USAO asserts that "the Second Circuit has rejected the contention that the USAO has an obligation to produce documents in the SEC's custody that are not in the possession of the USAO." (Govt. Br. (Dkt. No. 174) at 6) This argument mischaracterizes the holding of Rigas. In Rigas, the Second Circuit affirmed the district court's finding that "the United States Attorney's Office was not in possession of notes from SEC interviews . . . and did not have an obligation to disclose what they did not possess." Rigas, 583 F.3d at 126. That ruling was premised, however, on the district court's finding that the notes were not in the USAO's "possession, custody, or control" because "there was no joint investigation with the SEC." United States v. Rigas, No. 02-CR-1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008).

of twelve witnesses. (See Strassberg Decl. (Dkt. No. 180) ¶ 12; see also 3501-11; 3501-16;
3501-19; 3501-25; 3501-27; 3501-29; 3502-3; 3502-5; 3502-8; 3503-9; 3503-1; 3504-1; 3505-2;
3510-5; 3512-1; 3514-3; 3510-10)  Six of these interviews were of Dr. Gilman, and three were of
Dr. Ross. (See Strassberg Decl. (Dkt. No. 180) ¶¶ 13, 16; see also 3501-11; 3501-16; 3501-19;
3501-25; 3501-27; 3501-29; 3502-3; 3502-5; 3502-8)  The SEC also provided the USAO with
documents it obtained during its investigation (Jan. 5, 2014 Devlin-Brown Decl. (Dkt. No. 179)
¶ 3), including all documents that it received from SAC. (Strassberg Decl. (Dkt. No. 180) ¶ 34)

The SEC and the USAO also coordinated their efforts in conducting depositions
of SAC Capital and its employees. In particular, the SEC informed the USAO in advance that it
would be deposing Steven A. Cohen – the founder and principal of SAC Capital – on May 3,
2012. (Jan. 3, 2014 Devlin-Brown Decl. (Dkt. No. 177) ¶ 3)  Four days prior to the Cohen
deposition – on April 30, 2012 – the Assistant U.S. Attorney ("AUSA") handling the Martoma
investigation met with SEC representatives "to discuss evidence obtained through [their] parallel
investigations, including evidence relating to Steve Cohen and others." (Id. ¶ 4)  Although no
employee of the USAO was present for Cohen's deposition, the AUSA received a phone call
during a break in the deposition with an "update as to the testimony thus far," and "received a
further update after the deposition concluded and prior to an interview that the U.S. Attorney's
Office conducted the following day (without SEC participation) of a former SAC Capital
employee for which knowledge of Mr. Cohen's testimony was relevant." (Id. ¶ 6)

Clearly, "the agencies [were] engaged in joint fact-gathering, even if they [were]
making separate investigatory or charging decisions." Gupta, 848 F. Supp. 2d at 494. Indeed,
the criminal complaint against Martoma expressly acknowledges the SEC's participation in this
fact-gathering, stating that it is based, in part, on "information received from the Securities &

6

**JA114**

Exchange Commission." (Cmplt. (12 Mag. 2985) ¶¶ 7, 36)  Accordingly, the Court finds that the

USAO and the SEC conducted a joint investigation of the Defendant, and therefore the USAO's

obligation to produce communications in accordance with this Court's January 4, 2014 order

extends to documents in the sole possession of the SEC.

## CONCLUSION

The USAO will produce to Defendant any communication between the SEC and

counsel for Dr. Gilman or counsel for Dr. Ross in which a doctor's counsel makes statements

that are materially different from the denials of culpability already produced to Defendant.  The

USAO's obligation to produce such communications is extended to communications that are in

the sole possession of the SEC.

The USAO will also produce to Defendant communications from the SEC to the

doctors' counsel, or to Dr. Gilman or Dr. Ross directly, that (1) threaten criminal prosecution of

either doctor if he does not implicate Martoma; or (2) promise a non-prosecution agreement to

either doctor if he implicates Martoma.  The USAO's obligation to produce such

communications is extended to communications that are in the sole possession of the SEC.

Dated: New York, New York
        January 5, 2014

SO ORDERED.

Paul G. Gardephe
United States District Judge

7

JA115

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -against-

MATHEW MARTOMA,

          Defendant.

12 Cr. 973 (PGG)

## JURY QUESTIONNAIRE

January 7, 2014

**JUROR NAME:** KATHY KASWELL

**JUROR NUMBER:** 45

**JUROR NAME:** Kathy Kaswell

**JUROR NUMBER:** 45

## TO THE PROSPECTIVE JUROR:

The purpose of this questionnaire is to provide information to the judge, the prosecutors, the defense attorneys, and the Defendant to assist them in determining whether you can be a fair and impartial juror in this case. You must give true and complete answers to every question.

Do not discuss the questions or answers with anyone, including your fellow prospective jurors. It is extremely important that your answers be your own answers and not influenced by those around you. During the jury selection process, it is critically important that you not read anything about the case, that you not discuss it with anyone, that you not let anyone talk to you about the case, and that you do not do any research about the case on the Internet or anywhere else. If you are selected for the jury, I will have more instructions for you later on this topic.

If you wish your answers to remain confidential and that they not go beyond the judge, counsel, and the Defendant – because the answers will subject you to embarrassment – please so indicate at the end of the questionnaire.

Please enter your name and juror number on the front page of the questionnaire and at the top of each page.

## INTRODUCTION

### NATURE OF CASE:

We are choosing jurors for a criminal case that involves allegations of securities fraud and insider trading.

The Defendant, Mathew Martoma, was a portfolio manager at CR Intrinsic Investors, LLC, an investment firm. CR Intrinsic Investors is affiliated with another investment firm, SAC Capital. The owner of SAC Capital is Steven A. Cohen.

The Government claims that Mr. Martoma engaged in insider trading by improperly obtaining material, non-public information about the results of a certain clinical trial involving a possible Alzheimer's drug, and causing CR Intrinsic Investors and SAC Capital to buy and sell stock in the two companies that owned rights to the drug, on the basis of the material, non-public information.

The Indictment contains three charges or "counts" against Mr. Martoma. Count One charges Mr. Martoma with conspiring – that is, agreeing with others – to violate certain federal statutes and regulations that make it unlawful to commit securities fraud through insider trading. Specifically, Count One charges that Mr. Martoma received material, non-public

**JUROR NAME:** Kandy Kaswell

**JUROR NUMBER:**

information from two doctors about the results of a clinical trial involving a drug that might be effective for treating Alzheimer's disease. The drug was being developed by two companies, Elan Corporation, plc (which I will refer to as "Elan") and Wyeth. The Government claims that Mr. Martoma agreed with others to use the information improperly obtained from the two doctors in the buying and selling of Elan and Wyeth stock. Counts Two and Three of the Indictment charge that Mr. Martoma actually committed securities fraud by causing CR Intrinsic Investors, LLC, and SAC Capital to trade in Wyeth and Elan stock on the basis of material, non-public information.

Mr. Martoma has pleaded not guilty to these charges. He denies that he conspired or agreed with anyone to violate the securities laws, and he further denies that he ever committed securities fraud through insider trading.

Mr. Martoma is presumed innocent, and before he can be found guilty on any charge, the jury must conclude that the Government has proven each element of that crime beyond a reasonable doubt.

This questionnaire asks whether you have read, seen, or heard anything about Mr. Martoma, CR Intrinsic Investors, SAC Capital, Steven A. Cohen, or the insider trading charges against Mr. Martoma, and whether you will follow the Court's instruction to decide this case based solely on the evidence that will be presented here in court.

It is vitally important that the jury's verdict be based solely on the evidence received in the courtroom, and not on what might have been written or said in the press about Mr. Martoma, SAC Capital, or Steven Cohen. Nothing that has been said or written in the press about Mr. Martoma, SAC Capital, or Steven Cohen matters at all for purposes of this trial. In our country, we don't try people in the press. Instead, we rely on people like you to listen carefully to the evidence presented in the courtroom and the judge's instructions on the law, and then come to a verdict based solely on that evidence and that law.

Please print your answers to the following questions in black ink. Where indicated, please check the space for "Yes" or "No" and, as requested, furnish answers, explanations or details in the space provided. If you don't understand any question, please write, "I don't understand." Use the back of the page if necessary to complete your answers.

Thank you for your service. Once you complete the questionnaire, you are free to leave for the day. You must report again tomorrow at 9:30 a.m.

**JUROR NAME:** KATHY KASWELL

**JUROR NUMBER:** 45

**QUESTIONS**

1. This trial is expected to last for approximately three and a half weeks. Is there anything that would prevent you from serving as a juror for that period of time? _X_Yes ___ No

   If yes: Please explain what would prevent you from serving as a juror for that period of time.

   I Am very happy to serve But I can't be Away from my work. I Am global group President For the Jones Inc. We have been recently sold And must Attend meetings. I have the company + executives counting on me to help in all the decision making →

2. Have you heard, read, or seen anything – whether from newspapers, television, radio, the internet, friends, family, or any other source – regarding Mathew Martoma and the insider trading charges pending against him? ___ Yes _X_ No

   Also, I have Business travel already planned ←

   If yes: What generally have you heard, read, or seen and what is the source of your information?

   _____
   _____
   _____
   _____

3. Based on what you have read, seen, or heard about this case, would you be able to follow the Court's instruction to put that information out of your mind and decide this case based solely on the evidence presented at trial? _X_ Yes ___ No

   If no, please explain:

   _____
   _____
   _____
   _____
   _____

over

Ques. Continue

I Am At a High level of stress being away from the office And do not feel after 3 weeks away from the office that I can give my 100% attention to the case.

**JUROR NAME:** Kathy Kaswell

**JUROR NUMBER:** 45

4. Have you heard, read, or seen anything – whether from newspapers, television, radio, the internet, friends, family, or any other source – regarding CR Intrinsic Investors, SAC Capital, or SAC Capital's owner Steven A. Cohen? ___ Yes ✗ No

If yes: What generally have you heard, read, or seen, and where did you get your information?

_____
_____
_____
_____

5. Based on what you what you have read, seen, or heard about CR Intrinsic Investors, SAC Capital, or Steven A. Cohen, would you be able to follow the Court's instruction to put that information out of your mind and decide this case based solely on the evidence presented at trial? ✗ Yes ___ No

If no, please explain:

_____
_____
_____
_____

6. This case involves the buying and selling of hundreds of millions of dollars worth of stock in two large companies, the operations of a large investment firm – SAC Capital – and allegations of insider trading. Is there anything about this subject matter that would make it difficult for you to sit as a fair and impartial juror in this case? ___ Yes ✗ No

If yes, please explain:

_____
_____
_____
_____

**JUROR NAME:** Kathy Kaswell
**JUROR NUMBER:** 45

7.  The Defendant and some of the witnesses who may testify in this case are of Indian or South Asian extraction. Have you, either through any experience you have had or anything you may have seen or read, developed any bias or prejudice, in favor of or against, people with this type of background, such that it would be difficult for you to sit as a fair and impartial juror in this case? ___ Yes ✗ No

    If yes, please explain:

    _____
    _____
    _____
    _____
    _____

8.  If you are chosen to serve as a juror on this case, the Court will order you not to read, listen, or watch any accounts of this case reported by television, radio, or other news media, or to search the Internet for information about the subject matter of this trial. Will you have any difficulty following this order? ___ Yes ✗ No

    If yes, please explain: *But will be difficult*

    _____
    _____
    _____
    _____
    _____

9.  Do you request that the Court maintain your answers to this questionnaire as confidential? ___ (Yes) ✗ No

**JUROR NAME:** KANdy KASwell

**JUROR NUMBER:** _____

**DECLARATION:**

I, KATHy KAswen declare under penalty of perjury that the foregoing answers set
(Print Name)

forth in this Jury Questionnaire are true and correct to the best of my knowledge and belief. I

have not discussed my answers with others, or received assistance in completing the

questionnaire.

Signed this ___7th___ day of January, 2014

_____
(Signature)

**Voir Dire Transcript Excerpts**

**(January 8, 2014)**

**(92, 96, 149-54, 158-59, 173-74, 242-48, 259-61, 274-76)**

```
E18dmarvd2                    Voir Dire
 1             THE COURT:  All right.  Thank you.
 2             Anyone else in the fourth row?  Is that Ms. Mitchell?
 3             JUROR:  Yes.  Good morning.  I have a son and a future
 4   daughter-in-law.  My son is presently a litigation attorney in
 5   New York and also some in Connecticut and in Washington, and my
 6   future daughter-in-law is a mortgage attorney.
 7             THE COURT:  All right.  Now your son, do you know what
 8   area of practice he's in?
 9             JUROR:  He does some international law, some product
10   liability.  I don't know all of it.  He doesn't really discuss
11   it with me.
12             THE COURT:  Is he a litigator, do you know?
13             JUROR:  Yes.
14             THE COURT:  He is.  All right.  Anything about the
15   fact that your son and future daughter-in-law are lawyers,
16   anything about the conversations you may have had with them,
17   about their work, which gives you any concern about whether you
18   could be fair and impartial in this type of case?
19             JUROR:  No.  I don't think so.  It's just my
20   understanding of the whole situation that will be a problem for
21   me.  Just to understand, you know, the evidence and I would
22   have a -- I really don't understand it so I would have to
23   really, you know, be explained.  It has to really be explained.
24             THE COURT:  Do you mean as to the law?
25             JUROR:  Yes.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

96
E18dmarvd2                    Voir Dire

1          JUROR:  I issue all of the debt securities for the
2    firm that I work for.  I work for Citigroup.  So I issue all
3    debt on their behalf.  That is my job.
4          THE COURT:  All right.  So understanding what the
5    issues are in this case, is there anything about your
6    interactions with the lawyers that you have described, or the
7    nature of your own duties, which makes you concerned about
8    whether you could be fair and impartial here?
9          JUROR:  No.
10          THE COURT:  All right.  Thank you.
11          Anyone else?  Mr. Lindsey.
12          JUROR:  Yes, your Honor.  I am a civil litigator here
13    in the city.  There is nothing about my practice that I think
14    would impact my ability to act as a juror in this case.
15          THE COURT:  What types of cases do you typically do?
16          JUROR:  Predominantly international arbitration but
17    also representing and suing sovereign governments.
18          THE COURT:  All right.  So I take it from what you've
19    said, there is nothing about your practice which makes you
20    concerned that you couldn't be fair and impartial here?
21          JUROR:  That is correct, your Honor.
22          THE COURT:  All right.  Thank you.
23          Anyone else?  Ms. Fratto?
24          JUROR:  Yes, Judge.  I am also an attorney.  I am a
25    white collar litigator here in New York City.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

**JA126**

149

E18dmarvd4                    Voir Dire
 1              JUROR:  An hour would be cool.  OK.
 2              THE COURT:  OK.  I appreciate it.
 3              JUROR:  OK.  Good enough.  Thank you.
 4              (In open court)
 5              THE COURT:  All right.  Counsel, remain.
 6              (At the sidebar with Juror No. 2)
 7              THE COURT:  This is Juror No. 2.
 8              JUROR:  I am an asthma patient.  Here is the
 9      medication that I am taking.  That is no problem because if I
10      do these, I am better.  But I am taking three inhalers.  So I
11      don't know if I can be very long here.
12              THE COURT:  So you suffer from asthma?
13              JUROR:  Yes.  And I have high blood pressure.  I have
14      an asthma attack, sometimes it will attack me.
15              THE COURT:  OK.  How often do you have to use the
16      inhalers?
17              JUROR:  Twice a day.
18              THE COURT:  Twice a day?
19              JUROR:  Right.  I will use this four basically.
20              THE COURT:  OK.  So your concern is that you might
21      suffer an attack here in the courtroom?
22              JUROR:  Yeah.  Not that I cannot -- or if it happens
23      at night, I might not come the next day.  If I have an asthma
24      attack all night, then I cannot come the next day.
25              THE COURT:  I see.  How often does that happen that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

**JA127**

E18dmarvd4                Voir Dire
1   you have an asthma attack that debilitates you the next day?
2           JUROR:  Because of the cold weather, I would say I
3   have too much cough.  It reflects the cough here.
4           THE COURT:  So how often does that happen?
5           JUROR:  I have suffered from asthma 45 years now.
6           THE COURT:  My question to you is this.  Assume the
7   trial takes three and a half weeks, which is what they have
8   estimated, and we are in the wintertime.  So can you help me
9   understand, give me some sense of what the likelihood is that
10  you would have an attack such that you couldn't come to court
11  during that period of time.
12          JUROR:  I am not sure, but if it takes place, I cannot
13  sleep the whole night.
14          THE COURT:  I understand that might happen.  I am just
15  trying to get some sense of whether it is likely to happen.
16          JUROR:  Yes.  Because of this weather, I am a little
17  sick now here.
18          THE COURT:  Because of the air?
19          JUROR:  Because I have bronchial asthma, that is the
20  problem.  Because of this weather -- by the way, I come in from
21  Westchester here.  I don't know if I can make it for three or
22  four weeks.
23          THE COURT:  Right.
24          JUROR:  Then one more thing I have to tell you.
25          THE COURT:  Go ahead.
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

151
E18dmarvd4                    Voir Dire
1            JUROR:  My parents are in India.  My parents', mother
2    and sister -- my mother and father, they are 95 years old
3    father.  They are both sick.  They have nobody in India.  They
4    are all here.  Now, my father is in the hospital.  If an
5    emergency comes, I have to go.  So you will allow me to go,
6    otherwise I cannot --
7            THE COURT:  Let me say a couple of things about that.
8    There may be other people here who have elderly parents, who
9    have a child.  We understand that.  And there are situations
10   where jurors are unable to continue because they have a parent
11   that is in the hospital or they get sick.  Just like you are
12   talking about.
13           JUROR:  Yes.
14           THE COURT:  And in those circumstances we have to
15   excuse the juror.
16           JUROR:  Yes.
17           THE COURT:  So I understand that you have this issue
18   with your parents and that you suffer from asthma.
19           JUROR:  Yes.
20           THE COURT:  And that either one of those problems
21   could lead to your inability to continue.
22           JUROR:  Yes.
23           THE COURT:  I understand that.
24           JUROR:  Yes.
25           THE COURT:  And what I am telling you is if those
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

JA129

                                                                      152
        E18dmarvd4                    Voir Dire
1    problems come up, you will be excused.
2                JUROR:  OK.
3                THE COURT:  OK?
4                JUROR:  OK.  And, of course, I filled out the form.  I
5    am babysitting my granddaughter.
6                THE COURT:  Right.  I saw that.  Tell me about that.
7                JUROR:  She is a one-and-a-half year old.  I am
8    holding the baby during the daytime.  For two weeks I can
9    manage it, but I don't know how for more than a period of -- it
10   is very difficult to manage.
11               THE COURT:  Who is taking care of the baby now?
12               JUROR:  I am babysitting.  I took the time from my job
13   and I am doing the babysitting.
14               THE COURT:  Right.  So my question is you are here
15   today.  So who is taking care of the baby?
16               JUROR:  Yeah.  My daughter-in-law's mother is taking
17   care of her.  Sometimes she is also not available.
18               THE COURT:  Well, let me say this to you.  Jury
19   service is obviously inconvenient.  People have different
20   problems.  I mean, I have people on the jury here who have
21   young children.  I have people traveling from Rockland County.
22   I have people that are self-employed that are going to lose
23   money if they are here.  It's inconvenient and burdensome for
24   everybody, although in different ways.
25               The problem is if I excuse everyone for whom it is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

153

E18dmarvd4                    Voir Dire
1    inconvenient, we are not going to have a jury.
2                JUROR:  I know.
3                THE COURT:  That is the problem.
4                JUROR:  Yeah.  I know.
5                THE COURT:  I would like to but I can't because it's
6    inconvenient for everybody.  The problems are different.  Your
7    problem is you are the babysitter for a year-and-a-half old --
8    is it grandson?
9                JUROR:  Granddaughter.
10               THE COURT:  Granddaughter.  But for someone else, it
11   is the mother of a young child or it is a guy who is
12   self-employed who is not going to have any income.  It's
13   inconvenient.  It is a burden.  And I wish that I could resolve
14   all of the burdens.  It's one of the things that we ask
15   citizens to do.  We can't -- our justice system can't function
16   if we don't have people who are willing to sit as jurors.  That
17   is the issue.
18               JUROR:  I know this.
19               THE COURT:  So what I am going to ask you to do is
20   continue with us.
21               JUROR:  Yes.
22               THE COURT:  If your health makes it impossible for
23   you --
24               JUROR:  Yes.
25               THE COURT:  -- I will excuse you.  If your parents in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

**JA131**

154

```
E18dmarvd4                    Voir Dire
1    India need you, I will excuse you.
2              JUROR:  Yes.
3              THE COURT:  OK?
4              JUROR:  OK.
5              THE COURT:  All right.  Thank you.
6              JUROR:  OK.  Thank you.
7              (In open court)
8              THE COURT:  Does anyone have any difficulty
9    understanding or reading English such that it would be
10   difficult for them to follow the evidence in the case?
11             I'm now going to turn to individual questions.  I have
12   a few questions that I am going to pose to each of you,
13   beginning with Mr. Lentz, Juror No. 1.  Again, I'm not doing
14   this for purposes of prying into your lives, your personal
15   lives.  These questions are necessary to help the lawyers pick
16   a jury that will be fair and impartial and that they believe
17   will be fair and impartial.
18             I am going to ask each of you some basic background
19   questions such as the county in which you live, how long you
20   lived there, your age, how far you went in school, whether you
21   are employed and, if so, what you do, if you live with anyone,
22   and, if so, how they're employed, and some questions about what
23   you like to do in your spare time, your leisure time.
24             So beginning with you, Mr. Lentz, could you tell us
25   your county of residence?
```

158
E18dmarvd4                    Voir Dire
1    read?
2            JUROR:  I read a lot of newspapers, The Times, Daily
3    News, sports magazines, Sports Illustrated, a lot of news
4    websites.
5            THE COURT:  All right.  Any websites or Web blogs that
6    you commonly read?
7            JUROR:  Mostly political ones from Politicker and
8    Capital New York, Political Wire, The Fix, Washington Post,
9    sports websites.
10           THE COURT:  All right.  Any favorite television shows?
11           JUROR:  Good Wife.
12           THE COURT:  All right.  And that's always the most
13   interesting question.
14           And how do you spend your free time?  How do you like
15   to spend your leisure time?
16           JUROR:  In the summer, playing golf.  That is not an
17   option this time of year.  Tennis, bridge, reading, movies,
18   theater.
19           THE COURT:  All right.  Thank you very much.
20           All right.  Mr. James.
21           JUROR:  Yes.
22           THE COURT:  Could you tell me your county of
23   residence?
24           JUROR:  Westchester.
25           THE COURT:  All right.  How long have you lived there?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

**JA133**

159
E18dmarvd4                    Voir Dire
1                 JUROR:  31 years.
2                 THE COURT:  All right.  And how old are you?
3                 JUROR:  64.
4                 THE COURT:  And your education?
5                 JUROR:  I have a master's degree from India.
6                 THE COURT:  OK.  Was that in any particular subject,
7    your master's degree?
8                 JUROR:  Accounting.
9                 THE COURT:  And are you currently employed?
10                JUROR:  No.
11                THE COURT:  And what did you last do when you were
12   employed?
13                JUROR:  Two years before I retired.
14                THE COURT:  OK.  And what did you do?
15                JUROR:  Accounting.
16                THE COURT:  Accounting.  Do you live with anyone?
17                JUROR:  Yeah.  My wife and two kids.
18                THE COURT:  All right.  Does your wife work outside
19   the home?
20                JUROR:  Yeah.
21                THE COURT:  What does she do?
22                JUROR:  She is a tax auditor, new York State tax
23   auditor.
24                THE COURT:  I see.  Any grown children that work
25   outside the home?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

173

E18dmarvd4                    Voir Dire
1            JUROR:  Mostly comedies like the Big Bang Theory and
2   How I Met Your Mother.
3            THE COURT:  OK.  And how do you like to spend your
4   free time?
5            JUROR:  Either relaxing in front of the television or
6   just hanging with my family, whatever they want to do, and also
7   gardening.
8            THE COURT:  All right.  Thank you very much.
9            Ms. Guerra.
10           JUROR:  Hello.
11           THE COURT:  Did I pronounce that right?
12           JUROR:  What did you say again?
13           THE COURT:  I'm not going to say it again.  I said
14  Guerra.
15           JUROR:  Yeah, Guerra.
16           THE COURT:  Your county of residence?
17           JUROR:  Bronx, New York.
18           THE COURT:  How long have you lived there?
19           JUROR:  My whole life, 25 years.
20           THE COURT:  OK.  And your education?
21           JUROR:  I study at City Tech in Brooklyn.
22           THE COURT:  OK.  Are you currently employed?
23           JUROR:  Yes.
24           THE COURT:  What do you do?
25           JUROR:  Two retail stores.  American Eagle Outfitters
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

**JA135**

```
E18dmarvd4                    Voir Dire
```

1    and Sephora.
2              THE COURT:  All right.  Do you live with anyone?
3              JUROR:  Yes.  My mom.
4              THE COURT:  And does she work outside the home?
5              JUROR:  No.  She is a stay at home.
6              THE COURT:  Ever served on a grand jury?
7              JUROR:  No.
8              THE COURT:  Trial jury?
9              JUROR:  No.
10             THE COURT:  Magazines, newspapers and books you like
11   to read?
12             JUROR:  I don't read anything or watch TV.
13             THE COURT:  All right.  Websites, Web blogs that you
14   frequent?
15             JUROR:  Netflix and maybe Instagram sometimes.
16             THE COURT:  OK.  Television shows that you commonly
17   watch?
18             JUROR:  Friends and How I Met Your Mother.
19             THE COURT:  OK.  And how do you like to spend your
20   free time?
21             JUROR:  Photography, yoga, Netflix.
22             THE COURT:  All right.  Thank you very much.
23             Mr. Zamora.
24             JUROR:  Yes.
25             THE COURT:  Your county of residence?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

242
E18QmarVD5                    Voir Dire
1   Illustrated.
2           THE COURT:  Any websites or web blogs that you
3   commonly frequent?
4           JUROR:  New York Times and ESPN.
5           THE COURT:  Favorite television shows.
6           JUROR:  Last vote for Homeland, and I also like
7   Boardwalk and King of Thrones.
8           THE COURT:  How do you like to spend your free time?
9           JUROR:  With my family as much as possible.
10          THE COURT:  Thank you very much.
11          Ladies and gentlemen, let me raise one other issue
12  with you.  As you all know, one of the questions on the
13  questionnaire was whether jury service of as much as three and
14  a half weeks, whether that would impose a burden on you.  I am
15  happy to hear at this point up here at the bench from anyone
16  who feels that jury service of this period would impose an
17  extraordinary burden on them of some sort.
18          I do want to make one comment, which is jury service
19  is one of our obligations as citizens.  I can't tell you how
20  critically important it is.  And I tell you that not to
21  dissuade for whom jury service would just be an extraordinary
22  burden, but I say it to underline and emphasize the
23  significance of what it is that we are engaged in here.  So,
24  with that, I will hear from anyone at the bench who wants to
25  talk to me about the challenges they would face if selected to
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

**JA137**

243

E18QmarVD5                    Voir Dire

1  serve on this jury.
2              Mr. Lentz.
3              (At the side bar)
4              JUROR:  So, obviously, I got called to serve and I had
5  to postpone till January because of my work schedule, which was
6  better.  But we have a small press operation at NYU.  We have a
7  tremendous amount of press attention and burden on us.  I was
8  up till 11:00 last night dealing with press stuff.  My boss
9  wanted me to come in today, and I couldn't do that.  I'm happy
10 to serve the two weeks I did, but to serve what would turn out
11 to be a month or more would be a burden not only myself but at
12 work.  I scheduled this to be here to have my jury duty at a
13 time when there were no classes so it would be less demands on
14 us, so I could be back by the time classes started, which is in
15 a couple of weeks.  There is already some great pressures on us
16 during this time unexpected, and it would be very difficult
17 both on myself and on my colleagues if I was required to serve
18 into mid February.
19             THE COURT:  Let me say, first of all, I don't have any
20 reason to believe that the trial is going to be going on in mid
21 February or anything like mid February.  I have reviewed
22 repeatedly with the lawyers their best estimate of how long it
23 is going to take, and their estimate could be high, it could be
24 low, but it's -- that's where it is going to come in.  So we
25 are now at January 8.  So we are not going to be on trial in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA138**

E18QmarVD5                    Voir Dire
1   this case in mid February, I can tell you that.  But the
2   estimate they have given me is three and a half weeks.  So that
3   is what we are dealing with.  You know, jury service is
4   inconvenient for lots of people.
5             JUROR:  I know, and I'm going to -- that's why I was
6   here for two weeks, and if it goes a little longer than that, I
7   understand that, but it's this week, and then we're talking
8   about three more weeks, and that's -- it's a burden on a small
9   office and on my colleagues already, and that's something we
10  deal with, but to do it for basically a month, it would be a
11  hardship.
12            THE COURT:  The problem is that the problems are
13  different, but there are many people that have problems.  I
14  have young mothers that have young children.  I have a fellow
15  who suffers from various health conditions and for whom service
16  is difficult.  I have many self-employed people who are not
17  going to get paid for their time here.  So that is what I am
18  dealing with.  I am dealing with people that have lots of
19  problems.
20            JUROR:  Right.
21            THE COURT:  The problem is if I excuse everyone that
22  has a problem, we are not going to wind up with a jury of
23  peers.  We are going to wind up with a different kind of jury,
24  which is not what the defendant is entitled to.  I understand
25  what you have said and that you sort of signed up for two
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E18QmarVD5                     Voir Dire

1    weeks, I get that; but the reality is there are some trials
2    that last for longer than two weeks.  We need a jury that is
3    somewhat representative of the community; not just people who
4    are retired and unemployed.
5            So as painful as it is for me to say this to you, I am
6    going to need you to stay at least through the selection
7    process.  You may not be selected; but if you are selected, I
8    will ask you to serve for those three and a half weeks.  All
9    right?
10           JUROR:  OK.
11           THE COURT:  All right.
12           JUROR:  Thank you.
13           THE COURT:  I will hear from anyone else that wants to
14   approach.  Let me just get my list.
15           Mr. Gill.
16           JUROR:  I am currently apace to be in financial
17   planning, and I end this course next semester next Thursday.
18   On the 22nd they start the last class, which will be for seven
19   weeks and two days a week from 6:00 to 9:30 in the evening.  I
20   don't think I'll be able to keep up with the class.  This trial
21   will take up at least three out of the seven weeks, and I'm not
22   sure how I can keep up with it.  It requires an enormous amount
23   of work and reading.  They're very intensive classes.  This is
24   for the CFP exam.  So that's all I'm saying.  I don't think I
25   can -- I just don't think I can do it.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E18QmarVD5                    Voir Dire
1               THE COURT:  When do the classes start up?
2               JUROR:  The 22nd of January.
3               THE COURT:  So what the lawyers have told me is that I
4    think the trial is going to go about three and a half weeks.
5    Today is the 8th of January.  So we are looking at early
6    February.  That's what we're looking at.
7               JUROR:  When it would be over?
8               THE COURT:  Yes.
9               JUROR:  When will the -- when will the trial start?
10              THE COURT:  It's going to start immediately.
11              JUROR:  Immediately.
12              THE COURT:  It's going to start -- I mean, I would
13   have started today if we were able to complete the jury
14   selection.  Obviously, we're getting very close to the end of
15   jury selection.  So we will begin with opening statements
16   tomorrow morning.  That is where we are at.  As I told a couple
17   of people already, there's lots of people that have problems.
18   The problems are different, but they are problems nonetheless.
19   I have young mothers with young children.  I have people taking
20   care of elderly parents.  I have people that have health
21   problems.  I have people that have very compelling work issues.
22   I have more than one person that has an educational issue like
23   you.  The problem is that if I excuse everyone that has a good
24   excuse like you do, I wind up with a jury that is not
25   representative of the community.  And the defendant is entitled

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E18QmarVD5                    Voir Dire
1   to a jury that is made up of people who are representative of
2   the community and not just simply, you know, the unemployed,
3   the retired and so forth.
4          Most of the people here are active.  They have active
5   lives.  They're actively engaged in all kinds of things, and,
6   not surprisingly, to ask them to sit for three and a half weeks
7   is a huge burden.  Many of them have raised issues with me
8   about that.  But the problem is that if you, as I said, excuse
9   everyone who has a conflict, you wind up with not a
10  representative jury.
11         There is going to be some conflict with your class.  I
12  don't think it is going to be a three or a
13  three-and-a-half-week conflict because I think we will be over
14  sooner than you think we are going to be over.  I think we are
15  looking at early February.  So I would ask you to stick with
16  us.  You may not be chosen, in which case --
17         JUROR:  I understand that.
18         THE COURT:  -- it may not be a problem; but you may be
19  chosen.
20         JUROR:  Right.  That's what I'm thinking about.
21         THE COURT:  Right.  You may be chosen.
22         JUROR:  There is no time during the day to do
23  anything.  I mean, if you have an intense course, you can't do
24  anything during the day.  There's nothing you can do here.  You
25  sit here all day.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E18QmarVD5                    Voir Dire
1              THE COURT:  Right.
2              JUROR:  Then you travel an hour and a half, two hours
3    to get home.
4              THE COURT:  Where do you live?
5              JUROR:  Northern Westchester County, and the classes
6    are in White Plains, so that's all that's going through my
7    head.  I understand what your situation is, and I get what
8    you're saying, and I don't object to serving.  It's just that
9    I -- these are very intensive classes.  I don't know, maybe it
10   will end soon enough, like you say.
11             THE COURT:  I think it will end soon enough so that
12   it's going to overlap a little bit.  I don't think it is going
13   to overlap for a lengthy period of time.
14             JUROR:  OK.  Thanks.
15             THE COURT:  All right.
16             MR. STRASSBERG:  So I would just ask your Honor to
17   point out in response to the questions or these issues that
18   come up that it's both the defendant's right but also the
19   government's right to have the jury be representative.  I don't
20   want them to feel like it's a burden that we are imposing upon
21   them as opposed to a burden that we all share, both sides
22   share.
23             THE COURT:  All right.
24             MR. STRASSBERG:  Thank you.
25             THE COURT:  Anyone else?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

259

E18dmarvd6                    Voir Dire

1              THE COURT:  How long have you been doing this?
2              JUROR:  Eight years.
3              THE COURT:  All right.  I will excuse you.
4              JUROR:  Thank you.  I appreciate it.
5              (In open court)
6              THE COURT:  All right.  Anyone else?
7              (At the sidebar)
8              THE COURT:  Bohr.  He is Juror No. 17.
9              Hi.
10             JUROR:  I am the supervisor of fiscal services for a
11   school district.  And ever since the Roslyn mess on Long
12   Island, the governor's office has mandated that the school
13   district issue monthly financial statements on a timely basis.
14   And, quite frankly, I've got a report that is due the 16th for
15   December, and that is probably not going to get done even if I
16   am not on this trial.  It might be a little late.
17             But nobody does my work when I am not there.  I mean,
18   I stopped in the office yesterday after I got out of here and
19   had like 800 e-mails, maybe several phone calls to answer.  So
20   it's been -- again, if we don't do reports on a timely basis,
21   the comptroller's office have the auditors coming in and will
22   probably point that out, and once that gets to the public and
23   the press and the perception is that the school district is
24   mismanaged, it is a big mess.  And our superintendent would not
25   like that at all or our Board of Education.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

**JA144**

260
E18dmarvd6              Voir Dire
1            THE COURT:  Let me say this.  Jury service,
2    particularly of this length three-and-a-half weeks, presents
3    issues for lots of people.  The issues are different, but there
4    are issues for lots of people.  I have self-employed people
5    that aren't going to get paid for three and a half weeks.  I've
6    got mothers with young children.  I've got people that have to
7    take care of elderly relatives.  I've got folks with health
8    problems for whom jury service is a burden.  There are many
9    people that have completely legitimate problems.  Yours is one
10   of them.  But I have to differentiate from those that are
11   extraordinary and those that are more of your ilk.  If somebody
12   tells me I can't survive because I am not going to have any
13   income for the next three and a half weeks, I am not going to
14   be able to pay my rent, it is a problem.
15           JUROR:  It is a problem.
16           THE COURT:  I am not minimizing your issues and your
17   problems and the problems that it may present for the school
18   district in any way, but it is not the kind of excuse I can
19   accept to excuse you from service on this case.  It is not
20   extraordinary enough.  It is not compelling enough.  You may
21   not be chosen, but if you are chosen I am going to ask you to
22   serve.
23           JUROR:  OK.  If it drags out, quite frankly, I would
24   worry about the job more than the ability to concentrate on the
25   case, I think.
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

261

E18dmarvd6                    Voir Dire
1               THE COURT:  I am going to ask you to serve.
2               JUROR:  You do what you got to do as well.  All right.
3      So I got to sit?
4               (In open court)
5               THE COURT:  Who is next?  Ms. Colucci.
6               (At the sidebar)
7               THE COURT:  How are you?
8               JUROR:  Good.
9               Two things.  As I indicated in the questionnaire, I am
10     a single mom of an 8-year-old going into third grade, and in my
11     school district they don't provide morning care.  So, actually,
12     these two weeks that are allotted for jury duty, it is going to
13     be difficult for me to get someone to take him to school in the
14     morning.  Right now I asked a neighbor to do that.
15              THE COURT:  Where are you coming in from?
16              JUROR:  Mamaroneck.  Today it took me like two hours
17     to get here, and I can't drop him off and be here for the time
18     needed.
19              In addition to that, I am a contractor at my job.  So
20     I am not allotted any time or I will be allowed to take any
21     time off to get paid for anything.  So anything else outside
22     the two weeks would become a hardship for me if this goes past
23     that.
24              THE COURT:  It is going to go -- the lawyers have told
25     me they think this case is going to last three-and-a-half
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E18dmarvd6                    Voir Dire
1          THE COURT:  So there is no way this is cancelable?
2          JUROR:  No.
3          THE COURT:  No?
4          JUROR:  Not without a loss of -- at this point, it is
5     probably going to be in the $4,500 of loss because they won't
6     give us back 75 percent of what we put down.
7          THE COURT:  All right.  I will excuse you.
8          JUROR:  Thank you.
9          (In open court)
10         THE COURT:  Is it Ms. Kaswell?  Yes.  Juror No. 31.
11         (At the sidebar)
12         THE COURT:  Hi.
13         JUROR:  Your Honor, I'm happy to serve.  However,
14    three-and-a-half weeks would be very, very challenging for me.
15    I work for a public company.  It was on sale for, you know,
16    since June.  Finally was bought over by an equity partner
17    Sycamore at the end of December.  They are now there in there
18    this week.  The CEO of A Billion Plus, the executives, and
19    especially with that restructure, I am sitting here with a
20    whole lot of stress and anxiety.  And I have to tell you, I
21    feel that I wouldn't be able to focus on the defendant and the
22    government and what the Court needs.  For me, I won't be able
23    to do this.
24         I just like -- you know, I mean, look at me now.  Like
25    I am on a high level because I am involved with what is going
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

275

E18dmarvd6                    Voir Dire

1   on with the sale of the company.  There is restructuring of the
2   company and there is a thousand people relying on me.  And this
3   is not a store -- I mean, I had thought by September -- it is
4   like post September, and I had my service this week.
5   Otherwise, I probably would have waited until the sale of the
6   company.  But it's -- the level is -- I'm the one that is
7   making decisions with the equity partners now.  And I
8   understand, I'm happy to serve.  I mean, I did it in the grand
9   jury for a month.  It is going to be very, very hard.
10          THE COURT:  The problem is I have people who won't get
11  paid for the three-and-a-half weeks who have to survive on
12  their weekly income and they are not going to get paid during
13  their time they are here.  I have mothers that are taking care
14  of young children, and I have people that have responsibilities
15  for elderly relatives.  I've got people with health problems.
16  And then I have people that have conflicting, important job
17  responsibilities like yours.
18          JUROR:  Well, if the decisions are made on a thousand
19  people, and I am worried the decisions will be made, then these
20  are people that need their jobs.  So every time I go into one
21  of those meetings -- like today, I have one at 5 o'clock.  I
22  can fight for them and fight for their livelihood.  We all know
23  what goes on in those companies.
24          I am happy to come back and serve.
25          THE COURT:  I can't excuse you.  I can't excuse you.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

**JA148**

276

E18dmarvd6                    Voir Dire
 1    I need to have a jury that is somewhat representative of the
 2    community, and I have to limit excuses to --
 3            JUROR:  I understand.
 4            THE COURT:  -- people who are not going to have enough
 5    to pay their rent because they are not going to get paid or
 6    they have children they've got to pick up and there is no one
 7    else to do it or there is an elderly relative who needs an
 8    operation or they have prepaid tickets to someplace else.
 9            JUROR:  Your Honor, I understand.  I really do.
10            THE COURT:  I'm sorry but I can't excuse you.
11            JUROR:  I feel sorry for everybody, but there is
12    decisions that have to be made to our employees who could lose
13    their jobs, too, because someone else makes a decision at the
14    company.
15            THE COURT:  I can't excuse you.
16            JUROR:  Thank you.
17            THE COURT:  Sorry.
18            (In open court)
19            THE COURT:  Ms. Culp.
20            (At the sidebar)
21            JUROR:  Hello.
22            THE COURT:  Hi.  How are you?
23            JUROR:  Good.  So my semester starts on the 21st of
24    January and I'm teaching.  And if this trial is going to last
25    two-and-a-half weeks, that would take -- my classes are Monday
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**JA149**

# Voir Dire Transcript Excerpts
# (January 9, 2014)
# (343-47, 350, 353-61)

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 9, 2014

| E19dmarvd1 | Voir Dire | Page 340 |

1 exact same statute 10b-5; it's securities fraud. They'll see
2 it in the indictment, and they'll see it, in Mr. Bohr's case,
3 in the complaint of which he's a class member.
4     Second, as a factual matter in this case, one of the
5 government's opening slides shows the dramatic drop in the
6 stock price. It shows Elan dropping 44 percent. It shows
7 Wyeth dropping 11 percent. That's right in their opening.
8 This case does involve disclosures, and there will be extensive
9 testimony about disclosures both on June 17 in a particular
10 press release, on July 17 and on July 29. So, disclosures will
11 play a key role, and the impact of those disclosures on stock
12 price will play a key role. Those are all significant to both
13 Mr. Bohr's situation and Ms. Gravenese's situation.
14     I also point out that Mr. Devlin-Brown during the plea
15 of SAC Capital made a point that the companies, Elan and Wyeth,
16 were victims as a result of conduct that is at issue in this
17 case. So, I think Mr. Strassberg suggested perhaps -- this is
18 not an instance where the government is going to agree -- this
19 is a victimless crime, Mr. Bohr who himself is involved in a
20 securities class action.
21     And more to the point on Mr. Bohr, he is in a
22 securities class action involving a drug trial, a clinical drug
23 trial that he suggests that the drug was either -- its
24 prospects were inflated or whatever, and that he personally
25 lost money after this drug apparently did not come to fruition.

| E19dmarvd1 | Voir Dire | Page 341 |

1 So that is extremely similar to the drug at issue here,
2 bapineuzumab, which has the same course where there were great
3 hopes for the drug and then when it came out that the drug
4 apparently may not have been as effective as had hoped, the
5 price of the stock fell dramatically. That is essentially the
6 exact claims in Mr. Bohr's case. Again, he indicated that as a
7 result of that drug failing, and he thinks the prospects of
8 that drug were inflated, he personally lost money.
9     THE COURT: I need it quiet in here. Go ahead.
10     MR. BRACERAS: So, your Honor, we think both jurors
11 Ronald Bohr, and No. 11, Ms. Gravenese, should be struck for
12 cause. I would say though that the argument is stronger for
13 Mr. Bohr because of the fact that he personally lost money
14 where a drug trial was at issue and apparently was inflated in
15 value.
16     THE COURT: All right. I'm overruling both as to
17 Gravenese and Mr. Bohr.
18     Starting with Ms. Gravenese, I guess the first point I
19 make is that this is her niece and her niece's mother-in-law
20 that we're talking about. These aren't even direct immediate
21 family members.
22     Number two, I discussed with her at length, both today
23 and yesterday, this thought that she had in her head, which
24 came into her head about what the effect might have been on her
25 relatives 401K's due to the drop in price of the Wyeth stock,

| E19dmarvd1 | Voir Dire | Page 342 |

1 and we explored that. We explored it at length yesterday. We
2 explored it at length today.
3     She understands that there is going to be testimony
4 about that subject, and she understands that even though her
5 niece and her niece's mother-in-law might have suffered some
6 loss in their 401K's to the extent they invested in Wyeth stock
7 as Wyeth employees, she understands that she has to put that
8 aside in deciding this case, and I asked her repeatedly if she
9 could do that, and she told me that she could without
10 hesitation, and I accept her representation.
11     With respect to Mr. Bohr, I guess the first thing I'd
12 say about Mr. Bohr is that he is a sophisticated man. He is
13 65-years-old. He has a very responsible position. He is the
14 supervisor of financial services for a school district. He's
15 also a treasurer of the school district. He's held the
16 position for 22 years. It is correct that he is a plaintiff in
17 a securities fraud class action. He told us he lost money as a
18 result of a failure on -- an alleged failure on the part of the
19 company to make disclosures about some aspect of the drug. So
20 it is true, I suppose, that both in his class action and in
21 this case there are allegations that the price of stock dropped
22 or was inflated as a result of the true nature of the drug not
23 having been publicly known. I suppose the cases are comparable
24 to that extent; but other than that, there is no connection,
25 really.

| E19dmarvd1 | Voir Dire | Page 343 |

1     The point of the lawsuit -- the class action against
2 Dendreon, as I understand it, or, more importantly, as Mr. Bohr
3 understands it, is that Dendreon did not disclose information
4 it had about either the safety or efficacy of a particular
5 drug, and as a result, its stock price was inflated. That's
6 the allegation as Mr. Bohr explained it to us.
7     It is clear to me that Mr. Bohr understands that the
8 issues here are very different, and that instead of, for
9 example, Wyeth or Elan withholding information from the public,
10 the allegation here is that the defendant traded on material
11 non-public information involving a clinical trial that he
12 allegedly gained knowledge of improperly from two doctors who
13 were involved in the study.
14     I have no doubt that Mr. Bohr understands the
15 difference between the two, and, most importantly, when I
16 questioned him about whether he could set aside his involvement
17 in the securities fraud class action against Dendreon
18 Corporation and decide the case based solely on the evidence
19 here, he assured me he could.
20     I believe that he thought about that conscientiously
21 and told us that he would be able to do that. I believe him.
22 And for that reason, I am overruling the request that he be
23 excused for cause.
24     MR. DEVLIN-BROWN: Your Honor, we have one request for
25 cause, and that's Juror No. 2, Ittan James. The request is for

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 9, 2014

| E19dmarvd1 | Voir Dire | Page 344 |
|---|---|---|

1 two reasons. But the most serious of those is, we believe, the
2 record suggests that he has been dishonest with the Court. Let
3 me be specific. On page 152 of the transcript beginning at
4 line 11 -- before I read the lines, if you recall when your
5 Honor --
6       THE COURT: What's the page?
7       MR. DEVLIN-BROWN: 152/line 11.
8       THE COURT: I'm with you.
9       MR. DEVLIN-BROWN: So, if you recall one of several
10 excuses he presented as to why he could not sit was
11 babysitting, and the Court asked: "Who is taking care of the
12 baby now?" And he responded: "I am babysitting. I took the
13 time from my job and I'm doing the babysitting."
14       When it came to individual voir dire, if you go to
15 page 159 of the transcript, beginning at line 9, the Court
16 asks: "Are you currently employed?" The same juror says:
17 "No." And the Court then asks: "What did you last do when you
18 were employed?" And the juror answers: "Two years before I
19 retired." That makes it sound like he's actually been retired
20 for two years, which is certainly inconsistent with his
21 representation that he had taken time off his job to engage in
22 babysitting. There is another issue as well which I can go
23 into --
24       THE COURT: Let me address this one. I have to say
25 that that's not my take on what he said. I didn't think that

| E19dmarvd1 | Voir Dire | Page 345 |
|---|---|---|

1 he was telling us on page 152 that he was still working and
2 that he had taken time off from his job to be doing the
3 babysitting. I actually thought he was doing the babysitting
4 all the time. I mean, on his questionnaire he indicated that
5 he might have a problem serving because he was babysitting. He
6 didn't say he was going to have a problem because he was
7 working. He told us he was going to have a problem because he
8 was babysitting. So I just didn't understand it that way.
9       It's kind of obvious also both from the transcript and
10 from our interaction with Mr. James that his facility with
11 English, at least spoken English, is not entirely a hundred
12 percent. He could make himself understood, I'm confident he
13 understood me, but sometimes his words did not come out in
14 exactly the right way. To the extent there is any ambiguity on
15 that, I think it's just a language issue. I don't believe that
16 he was misrepresenting.
17       MR. DEVLIN-BROWN: OK. The second issue I will just
18 provide an overview of, and then only if your Honor wants will
19 I go through examples. But it relates to that which is, I
20 think, the only possible explanation for the discrepancy other
21 than being honest is a lack of understanding of the questions,
22 and there are repeated examples in both your own questioning of
23 him at the sidebar and in the questioning of him on the panel
24 in which it seems clear that he doesn't understand pretty
25 clear, simple questions and that gives us concern about his

| E19dmarvd1 | Voir Dire | Page 346 |
|---|---|---|

1 ability to comprehend the evidence and pay attention as a
2 juror.
3       THE COURT: Well, I must say -- and I'm happy to look
4 at your examples -- I will tell you that having spoken with the
5 man face-to-face on the issue whether his problem is with his
6 parents or his babysitting responsibilities would make it
7 extremely difficult for him to sit, I don't remember feeling
8 like I was having any difficulty communicating with him.
9       I accept your point that his English is not perfect,
10 and that's reflected in the transcript, but did I feel like he
11 was having trouble understanding me and did I feel like I was
12 having trouble understanding him? No.
13       I actually thought we communicated pretty effectively.
14 He raised these issues with me. We had a conversation about
15 the fact that his parents in India were ill, and it might be
16 necessary for him to return to India to deal with their
17 problems. And we also discussed the fact that now he's been
18 doing the babysitting, and I must say, I didn't feel like I was
19 having difficulty communicating with him on these subjects. I
20 understood his problems as he explained them to me, and I
21 believe that he understood me when I was communicating with him
22 and telling him why I didn't feel his excuses justified my
23 excusing him.
24       So that is my observation. I'm happy to look at
25 specific examples if you want to show me, but I wanted you to

| E19dmarvd1 | Voir Dire | Page 347 |
|---|---|---|

1 know that that is my recollection of my conversation with him,
2 and I came away from that encounter feeling confident that I
3 understood what his problems were and that he understood also
4 why I was ruling the way I did. I explained to him why I
5 couldn't excuse him, and I saw recognition in his eyes; that he
6 understood why I couldn't do it. But, anyway, like I said, I'm
7 happy to look at examples.
8       MR. DEVLIN-BROWN: I don't think it's worth doing
9 that. It's your Honor's view, I think, that controls in a for
10 cause situation and I don't think it's warranted to go through
11 various examples. The government has a different take on it.
12       THE COURT: OK.
13       MR. STRASSBERG: Your Honor, the only other one which
14 is not -- it's more of the hardship issue, which I know your
15 Honor has sort of dealt with juror Von Hassel. She is the
16 juror with the Friday childcare situation. I know your Honor
17 has been very sympathetic to people with childcare situations.
18 She only has a one-day, not five-day-a-week childcare
19 situation. She seems like a perfectly very nice woman, but my
20 sense was she was a little emotional up here about the concern
21 on the child coverage.
22       Since we are sitting full days Friday, that's the
23 plan, I do worry that that is going to be a distraction and a
24 burden for her. So it's not the typical cause challenge, but
25 it is something I thought we should raise because we are in a

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 9, 2014

E19dmarvd1          Voir Dire          Page 348

1  situation where we sort of don't want jurors with real reasons
2  for distraction being forced to try to sit here and listen to
3  the evidence when they're focused on their children and not
4  able to do so. At least I was concerned. I thought she was
5  trying very hard to be a good citizen, but I was concerned that
6  in trying to do that she was really putting herself in a very
7  difficult spot.
8        THE COURT: She was the one whose husband works on
9  commission?
10       MR. STRASSBERG: Right.
11       THE COURT: And she explained to us that her husband
12  was -- it was necessary for him to take care of the kids now
13  because they're sick, and so his business was going to be
14  harmed to that extent.
15       But in contrast to certain other jurors who told me
16  they didn't have any family assistance, no one they could turn
17  to to deal with, for example, dropping off their child at
18  school or picking them up, in contrast to those, I felt that
19  Ms. Von Hassel does have resources available to her: Her
20  husband in the first instance. Obviously, she works four days
21  a week so, she has childcare. We know that because for four
22  days a week somebody other than her husband or her is taking
23  care of the kid.
24       And I questioned her about it. It's clear to me she
25  understands the seriousness of the duties that we're asking her

E19dmarvd1          Voir Dire          Page 349

1  to assume. She understands why it's important. She is an
2  educated person that I think would bring a lot to the jury, and
3  in the final analysis when I asked her whether she was willing
4  to serve, she told me that she was. And for that reason, I'm
5  not going to excuse her.
6        So how long will you need to put your lists together?
7  Because we are at 12:24 now.
8        MR. STRASSBERG: Ten, 15 minutes, your Honor.
9        THE COURT: I'll be in the robing room. Mr. Ruocco
10  will bring them in as soon as you are done with them, and then
11  I'll probably bring you in the robing room to go through the
12  list with you and take stock of where we are.
13       MR. BRACERAS: Thank you, your Honor.
14       (Recess)
15       (Continued on next page)
16
17
18
19
20
21
22
23
24
25

E19dmarvd3          Voir Dire          Page 350

1        (In open court)
2        THE CLERK: Can we have counsel and the court
3  reporter?
4        (In the robing room)
5        THE COURT: All right. I'll begin with the government
6  strikes. The government struck Juror No. 2, Ittan James.
7        The government struck Earle McCoy, and Mr. McCoy was
8  struck by the defense as well. So there was overlap.
9        The government struck Sharla Brewer.
10       MR. STRASSBERG: Number 23?
11       THE COURT: Yes.
12       The reason why I am not using the numbers is you've
13  got the numbers wrong. I can give you the correct numbers but
14  they don't match up. That is why I am using names. It is
15  understandable because as we lost jurors.
16       In any event, Charlotte Brewer was number 23. She was
17  struck by the government.
18       Cathryn Williams, who was Juror No. 28, was struck by
19  the government.
20       Eric Pierot, who was No. 41, was struck by the
21  government.
22       And Jin Xiu Chen, Juror No. 44, was struck by the
23  government.
24       With respect to defense strikes, Juror No. 1, Philip
25  Lentz, was struck by the defense.

E19dmarvd3          Voir Dire          Page 351

1        Mr. Stuart Brickman, Juror No. 8, was struck by the
2  defense.
3        Raul Zamora, Juror No. 10, was struck by the defense.
4        Donna Gravenese, Juror No. 11, was struck by the
5  defense.
6        Teresa Williams, Juror No. 15, was struck by the
7  defense.
8        Ronald Bohr, Juror No. 17, was struck by the defense.
9        As I already said, Juror No. 20 was struck by both
10  sides. He was Earle McCoy.
11       Mr. Henderson, Juror No. 26, was struck by the
12  defense.
13       Sonia Peralta, Juror No. 30, was struck by the
14  defense.
15       And Donna Brown, Juror No. 42, was struck by the
16  defense.
17       So what that means is that the jury will consist of
18  the following:
19       Lida Panitpong, who was Juror No. 4, will be Juror No.
20  1 for purposes of the jury.
21       Thomas Gill, who was Juror No. 5, will become Juror
22  No. 2.
23       Lisa Braun, who was Juror No. 6, will become Juror No.
24  3.
25       Raisa Guerra, who was Juror No. 9, will become Juror

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 9, 2014

E19dmarvd3          Voir Dire                    Page 352

1   No. 4.
2       Darryl Keys, who was Juror No. 12, will become Juror
3   No. 5.
4       Thomas Drysdale, who was Juror No. 13, will become
5   Juror No. 6.
6       Jeanette Barkan, who was Juror No. 14, will become
7   Juror No. 7.
8       Hanna McKean, who had been Juror No. 21, will become
9   Juror No. 8.
10      Kathleen Kaswell, who was Juror No. 31, will become
11  Juror No. 9.
12      Adrian Truini, who had been Juror No. 38, will become
13  Juror No. 10.
14      Ebenhaezer Lubbe, who was Juror No. 40, will become
15  Juror No. 11.
16      And Theresa Whitton, who was Juror No. 43, will become
17  Juror No. 12.
18      Now, that leaves us with seven panel members, and you
19  each have the right to two peremptory challenges with respect
20  to the alternate jurors.
21      Mr. Strassberg.
22      MR. STRASSBERG: Your Honor, I don't want to
23  interrupt, but I think there is an application we should make
24  for the record. Probably best to make it here in the robing
25  room, if your Honor is agreeable, and that would be a Batson

E19dmarvd3          Voir Dire                    Page 353

1   challenge to the strike of the one prospective juror of Indian
2   descent. That is Juror No. 2.
3       We had spoken about it on the record. I know the
4   government articulated certain non-race reasons. However,
5   those reasons ring hollow given that they were focused on his
6   veracity and his education. And his education, he has
7   indicated he has a Master's of Accounting. And as your Honor
8   indicated, as we experienced, we thought he was doing exactly
9   what all of the jurors who came up did, which was try to
10  explain in a courtroom their situations, and in his case in
11  particular medical situations, as honestly and accurately as he
12  could.
13      And so for the record, because that was the only
14  individual at least of obvious Indian descent that was on the
15  panel, we do make the Batson challenge.
16      THE COURT: All right. I will hear from the
17  government on the subject.
18      MR. DEVLIN-BROWN: First of all, I don't believe we
19  actually said anything about his education, and that was not a
20  ground that we sought to strike him on.
21      We essentially have three reasons for striking this
22  individual. First, he clearly does not want to be on this
23  jury. He volunteered that even before your Honor was asking
24  hardship questions because it came up with his asthma problem
25  initially as a reason not to sit on the jury and then segued

E19dmarvd3          Voir Dire                    Page 354

1   into the babysitting issue. Obviously, there are a lot of
2   people who don't want to be on the jury, and there certainly
3   are some others who were not excused when they asked to be
4   excused.
5       But in observing him, he doesn't really seem to
6   interact with other jurors. He seems to be slumping in his
7   seat most of the time the last two days. So it looks like he
8   particularly doesn't want to be here. He also doesn't look
9   particularly engaged with his fellow jurors, which is always a
10  sign of concern for the government.
11      The second reason is we do have concerns about his
12  veracity. I don't need to necessarily read the same pages of
13  the transcript that I read before unless your Honor wants me to
14  in connection with the for cause challenge. I understand your
15  Honor has a different interpretation, that he was not being
16  dishonest, but I think that's subject to different readings.
17  And we don't want to take the risk and think it is unclear
18  whether he was saying he was taking some time away from the job
19  to engage in babysitting, which is, frankly, the plain reading
20  of what he said with his quote, "I took the time from my job
21  and I'm doing the babysitting," but it's possible that he did
22  mean something more along the lines of his job was babysitting
23  and jury duty was interfering with that.
24      But even if that is the case, that gets to our third
25  reason, and that is that there clearly is a comprehension

E19dmarvd3          Voir Dire                    Page 355

1   problem perhaps not to the level where the Court would want to
2   strike him for cause but certainly at the level where the
3   government would have very real concerns about his ability to
4   understand this case. That has nothing to do with his
5   accounting background, which is, frankly, something, you know,
6   we like about him. But I can go through, and I think I
7   probably should, several examples where he clearly
8   misunderstands the question or the only other explanation is he
9   is being evasive about his answer. But I think most of them
10  are misunderstanding.
11      The first of these is on pages 149 to 150 of the
12  transcript. Starting at line 25 on page 149, the Court says:
13  "How often does that happen that you have an asthma attack that
14  debilitates you the next day?" The juror responds: "Because
15  of the cold weather, I would say I have too much cough. It
16  reflects the cough here."
17      So your Honor then repeats the question because he
18  does not answer the question. Your Honor says, on line 4 of
19  page 150: "So how often does that happen?" He responds, line
20  5: "I have suffered from asthma 45 years now."
21      So perhaps it is just misunderstanding the question,
22  but it doesn't seem like a level of understanding that is
23  sufficient to comprehend the case, as far as the government is
24  concerned.
25      The next examples are in his voir dire when your Honor

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 9, 2014

E19dmarvd3      Voir Dire      Page 356

1 went through and asked everyone the individual questions.
2 That's page 159, lines 11 and 12. The Court asks: "And what
3 did you last do when you were employed?" And his response is:
4 "Two years before I retired," which suggests he misunderstood
5 the question as when were you last employed.
6      The next example is on page 60, beginning at line 2,
7 with respect to children, the Court asks, "What do they do?"
8 And the juror responds: "Yeah, two." And the court says,
9 "Two?" The juror repeats, "Yeah." The Court asks again, "What
10 do they do?" The juror responds, "Three. One is married. I
11 have three kids. My elder one is married, and he has two kids.
12 Another one are twins. They also work."
13      So that suggests again misunderstanding of the
14 question.
15      The final example in what was a very short, you know,
16 discussion of the individual questions is at page 161. The
17 Court asks, "Any websites or Web blogs that you look at? Do
18 you go on the Internet looking at websites?" And he responds,
19 "Yeah. I have some small stories, that is all."
20      The government actually heard him answering he had
21 small stocks but perhaps he did mean small stories.
22      THE COURT: I heard it as stocks also. I heard it as
23 stocks.
24      MR. DEVLIN-BROWN: But in any event, it is not an
25 answer to what websites do you look at. So I think in very

E19dmarvd3      Voir Dire      Page 357

1 short voir dire, the juror exhibited a high level of
2 misunderstanding of the Court's questions, and we have real
3 concern about his ability to understand the evidence that is
4 going to be presented and, given his desire not to be here, his
5 willingness to engage with other jurors on the evidence.
6      So that is the basis for the government's strike.
7      THE COURT: All right. Anything else you want to say,
8 Mr. Strassberg?
9      MR. STRASSBERG: No, your Honor.
10      THE COURT: All right. So let me say that I am
11 overruling the Batson challenge. As an initial matter, of
12 course there is no pattern here because Mr. Strassberg has only
13 challenged or raise a concern about the strike of one juror.
14      Now, having said that, at least to my observation,
15 Mr. James is the only one of Indian extraction that was in the
16 panel. So I have thought about whether the government's stated
17 reasons for why they struck Mr. James are legitimate. And let
18 me make some observations.
19      I do agree with the government that it was obvious
20 that Mr. James does not want to be on the jury. It's also a
21 fair comment that there are many other people that don't want
22 to be on the jury either, some of whom were excused and some of
23 whom were not. And each lawyer has to make a calculation of
24 whether it is appropriate to leave somebody on the jury who has
25 expressed a desire not to be there. Sometimes the calculus is

E19dmarvd3      Voir Dire      Page 358

1 even though the person has expressed a desire not to be there,
2 they will still do their duty. Sometimes the calculus is if I
3 leave this person on the jury, they will not do their duty,
4 which means they will not pay attention and they will not be
5 engaged.
6      And so each lawyer has to make their own decision
7 about which camp the prospective juror falls. And different
8 decisions were made here. The lawyers struck some people who
9 said they didn't want to be on the jury or made it clear they
10 didn't want to be on the jury, and then as to a couple of
11 others they chose to leave the person on.
12      But I say all of this to point out, it's not
13 irrelevant. It is not an irrelevant concern that someone makes
14 it clear that they don't want to be on the jury and comes up
15 with a series of reasons why they can't be on the jury. And
16 Mr. James falls into that camp. He went through a lot -- at
17 least four reasons why he didn't want to be on the jury, or why
18 it would be difficult for him to be on the jury. And these
19 ranged from his asthma condition, and I remember him showing me
20 various inhalers that he uses to deal with his asthma
21 condition. He then pointed out that he lives in Westchester
22 and it's difficult for him, given his asthma condition, to be
23 traveling back and forth and it would be difficult for him to
24 do that in this cold weather for three to four weeks.
25      He also pointed out the babysitting problem and that

E19dmarvd3      Voir Dire      Page 359

1 he has become responsible for babysitting since his retirement
2 and that that presented a problem. And then I believe he also
3 mentioned that he has parents in India who are sickly and that
4 it was possible that he might have to go back to India to deal
5 with the medical problems that his elderly parents are
6 currently suffering. And it was in that context that I told
7 him that if that became necessary, if he told me there was a
8 crisis in India with his parents, I would excuse him and allow
9 him to leave the jury. And I think it was really on the basis
10 of that assurance that I was able to persuade him to stay with
11 us.
12      I have observed that he does slump in his chair. It's
13 not entirely clear to me whether he is slumping in his chair
14 because he is not interested or simply it is a posture problem
15 or something else. It is hard to discern the reasons for that,
16 but that's definitely true.
17      It's also true that he has been keeping to himself.
18 There are other jurors certainly that are more engaged with
19 their colleagues.
20      On the veracity issue, as I indicated at sidebar, I
21 did not believe that Mr. James was lying to me. I did feel
22 that his incorrect answers at various points were related more
23 to a comprehension issue rather than to deceit.
24      On the comprehension issue, there is no question, as I
25 said at the bench, that his English is somewhat broken. It

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 9, 2014

E19dmarvd3      Voir Dire      Page 360

1 also was clear to me, as I said at the bench, that when I
2 engaged him, we were able to understand each other, which is
3 what I said at the bench. I pursued his questions -- I mean, I
4 pursued his answers to the extent they weren't responsive. I
5 repeated the question or I gave a more focused question. Then
6 ultimately I thought we were able to get to a mutual
7 understanding.
8      Of course, at a trial that exchange doesn't take
9 place. The lawyers make statements, the witness gives
10 testimony, and the juror doesn't have an opportunity to
11 interact with either the lawyer or the witness, nor does the
12 lawyer or witness have an opportunity to interact and engage
13 with the juror in the fashion in which I engaged with
14 Mr. James. So I do regard that as a legitimate concern raised
15 by the government, because while I was able to get where I
16 needed to get to with Mr. James through a back-and-forth
17 exchange with him, it is true at trial that that back-and-forth
18 exchange would not take place, and so there might be issues
19 about whether Mr. James was understanding everything that was
20 going on and we wouldn't have the opportunity to question him
21 periodically to make sure he knew what was going on or that he
22 was understanding the testimony as well as the lawyers'
23 arguments.
24      So for all these reasons, I do think that the
25 government has presented legitimate reasons for why it struck

E19dmarvd3      Voir Dire      Page 361

1 Mr. James, and I overrule the Batson challenge as to him.
2      Any other applications before we address the future?
3      MR. STRASSBERG: Not from the defendant.
4      THE COURT: All right. So let's turn to the future.
5 We have seven left. And what I would propose is that
6 we go through the exercise of peremptory challenges as to those
7 seven and we make do with that.
8      The alternative is I bring in one person -- well, it
9 would probably be more than one person because given the
10 attrition rate here, I would have to bring in a number of
11 people in order to be sure that we would get somebody who was
12 willing to sit and didn't have such strong feelings about
13 security fraud that they wanted to be excused. So it is going
14 to significantly delay the proceedings. I am happy to hear
15 from anyone if that is how they want to proceed, but I would
16 suggest that we choose alternates from the seven that we have.
17      MR. STRASSBERG: Let me give you my initial reaction,
18 your Honor, if I may. The first is that given the press issues
19 that we're anticipating, I haven't been outside to know if it
20 has already begun but my guess is it has because I see a flock
21 of reporters perhaps just waiting for openings but perhaps
22 because news is starting to hit, so I worry. I think, if I am
23 understanding your Honor, if we go with the seven, then we will
24 have three alternates, as opposed to four. And I am worried
25 that we may regret that if in fact we wind up having these

E19dmarvd3      Voir Dire      Page 362

1 issues with people who are exposed to news reports that will
2 call into question whether they should continue as jurors, and
3 then we will need the alternate that we are picking now to
4 preserve the trial itself.
5      THE COURT: Let me make a couple of comment.
6      First of all, I will tell you that my initial
7 inclination was to go with three. And then I thought about all
8 the sickness and illness that we've all experienced, and then I
9 became concerned that we could have a problem with more than
10 one juror getting sick, either the flu or something else. And
11 it was for that reason that I decided, well, maybe we should go
12 with four.
13      To your point, it is, of course, possible that,
14 depending on how the strikes are exercised, that there might be
15 overlap. There was one juror overlap here. If there was
16 overlap, we would indeed have the four. Not that I am
17 suggesting that there is going to be overlap but there might
18 be. I suspect there might be.
19      If there was overlap, then of course we would have the
20 four because it would only actually be three people that were
21 excused.
22      So that's what I have to offer. There will be
23 significant delay associated with bringing in some number of
24 added people to question because I will have to go through the
25 whole process again, to state the obvious. But I'll do that.

E19dmarvd3      Voir Dire      Page 363

1 I'll do that if it is necessary.
2      But on the other hand, I'm sure everyone would
3 actually like to get started with the proceedings. And if we
4 could do that at no risk to putting together a fair and
5 impartial jury, then that would be my present preference. But
6 I will be guided by what the lawyers think.
7      MR. BRACERAS: Your Honor, I don't know if it is a
8 compromise solution or not, but maybe we can go through the
9 exercise with the alternates without making it known, of
10 course. Then we could see if there is any overlap. And if
11 there is not overlap and this presents an issue, then maybe you
12 will give us an opportunity to discuss it with our client and
13 then we could reconvene, so to speak.
14      THE COURT: All right.
15      MR. BRACERAS: But maybe we would see if there is an
16 issue first. And then provided that both parties would have
17 the right essentially if we do call in another round of three
18 or four or five jurors to try to get enough qualified for the
19 alternates, provided that we have the right that we would be
20 deferring strikes to the alternates, then we are not wedded to
21 the strikes that we make now.
22      THE COURT: I guess that is the issue, because we have
23 to be clear on what the ground rules are.
24      MR. BRACERAS: Correct.
25      THE COURT: So I don't know that I am comfortable with

JA156

# Transcript Excerpts

# (January 10, 2014)
# (42-43, 60, 77-78, 82-90, 109, 113-14, 116, 123-26, 133, 138)

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

Page 41

1 and it was a 250 patient or so drug trial.

2     The evidence is going to show that Mathew Martoma was

3 very persistent. He was also able to find a doctor who had far

4 more secret information about this drug trial and who, just

5 like Dr. Ross, was willing to break his confidentiality

6 agreements and share that information with Mathew Martoma. And

7 who is this second doctor? It's Dr. Sidney Gilman. That was

8 the doctor that I mentioned at the start of the opening, the

9 doctor who eventually, two weeks before the full results of

10 this drug trial were going to be announced, shared his

11 confidential presentation with Mathew Martoma.

12     Now, you will learn that Dr. Gilman played an

13 important role on the drug trial. He was the chairperson of

14 what was known as the Safety Monitoring Committee or SMC. So,

15 what is a safety monitoring committee? Well, experimental

16 medicine like this -- and this was very cutting edge stuff --

17 these are untested, but by definition they're being tested

18 right there, and they can be dangerous. In fact, an earlier

19 version of this drug bapineuzumab, they had to stop the

20 clinical trial in the middle because it was causing serious

21 brain damage to people taking it. So it was the job of this

22 safety monitoring committee to make sure that patients were not

23 being harmed by a medicine that was designed to help them. And

24 to do their job, you will learn, the safety monitoring

25 committee would get updates regularly as to whether anyone was

Page 42

1 experiencing serious side effects with the drugs. They would

2 get detailed safety information relating to these 250 patients.

3 This was detailed safety information that very few other people

4 had, not principal investigators like Dr. Ross, and not even

5 most people at Elan and Wyeth.

6     Well, just like Dr. Ross, Dr. Gilman had a legal

7 agreement with Elan and with Wyeth to keep the confidential

8 information he was learning through the safety monitoring

9 committee secret. And just like Dr. Ross, Dr. Gilman broke

10 that promise of confidentiality in paid consultations with

11 Mathew Martoma; but just like with Dr. Ross, it wasn't about

12 the hourly fee for Dr. Gilman either. You will hear that

13 Dr. Gilman consulted with all kinds of people in the hedge fund

14 industry, and you will also hear that, frankly, he sometimes

15 crossed the line and shared little bits that he shouldn't have

16 with some of those other people.

17     But you will hear that his relationship with Mathew

18 Martoma was different. He began to view Mathew Martoma as a

19 friend. He got to take a real liking to him. And this may

20 seem like an odd coupling at first. You'll learn that

21 Dr. Gilman was a professor -- he was then in his mid

22 seventies -- at the University of Michigan, and Mathew Martoma,

23 of course, was a much younger hedge fund trader out in

24 Connecticut. But what you will learn is that Mathew Martoma

25 was very flattering to Dr. Gilman. Mathew Martoma came across

Page 43

1 as a very smart, curious person who asked really intelligent

2 questions of Dr. Gilman about the drug trial. Perhaps it was

3 vanity, but Dr. Gilman, flattered by that, began sharing with

4 Mathew Martoma and teaching this eager pupil everything that

5 Dr. Gilman knew about what Mathew Martoma was asking. What

6 Mathew Martoma was asking about was this confidential drug

7 trial that Dr. Gilman chaired the safety monitoring committee

8 for.

9     So, in a matter of time at Mathew Martoma's urging and

10 encouragement, Dr. Gilman began telling Mathew Martoma

11 virtually everything he was learning from the safety monitoring

12 committee. You will learn that Mathew Martoma used this expert

13 network, this matchmaker or middle man GLG that I mentioned

14 before, you will hear that he used that company GLG to arrange

15 over 40 paid consultations with Dr. Gilman between 2006 and

16 2008; and that paid Dr. Gilman, by the way, around $70,000.

17     Indeed, you will hear evidence that to cover up what

18 they were doing, at times Mathew Martoma would tell GLG that

19 the consultation with Dr. Gilman was about a different

20 Alzheimer's disease drug, not the bapineuzumab, or tell them

21 that it was even about a different disease.

22     You will also see important evidence about the timing

23 of the SMC meetings, the safety monitoring committee meetings,

24 and Mathew Martoma's consultations with Dr. Gilman. You will

25 see, and we will put it on the screen, that the safety

Page 44

1 monitoring committee met five times between when Mathew Martoma

2 started at SAC -- that's July 2006 -- and when the drug trial

3 results were announced. You will see evidence that Mathew

4 Martoma scheduled a consultation with Dr. Gilman to occur right

5 after each and every one of these meetings.

6     So there was a November 21, 2006 meeting of the safety

7 monitoring committee where Dr. Gilman received confidential

8 safety data from Elan and Wyeth, and the very next day,

9 November 22, Mathew Martoma had a paid consultation with

10 Dr. Gilman.

11     February 8, 2007 another safety monitoring committee

12 meeting. The very next day, February 9, a consultation with

13 Mathew Martoma.

14     October 9, 2007, a 10:00 a.m. safety monitoring

15 committee meeting, and Mathew Martoma consults with Dr. Gilman

16 the same day at 4:00 p.m.

17     And I won't even read the last two because you can see

18 them yourself and you can see the pattern.

19     Now, the evidence, ladies and gentlemen, is going to

20 show that these consultations, these pattern of them matching

21 after safety monitoring committee meetings, that was not a

22 coincidence. You will see clear evidence that Mathew Martoma

23 and Dr. Gilman planned to make sure that their consultations

24 would take place after Dr. Gilman had gotten fresh confidential

25 information from a safety monitoring committee meeting.

UNITED STATES OF AMERICA v
MATHEW MARTOMA                                                              January 10, 2014

| E1admar2 | Opening - Mr. Devlin-Brown | Page 57 |

1  when Mathew Martoma heard about the PowerPoint presentation on
2  the phone from Dr. Gilman and then got a chance to see it in
3  person, the evidence will show that he knew these results would
4  not be good. And you'll hear a lot of evidence about reasons
5  why it would not be good during this trial. I'll give you an
6  overview or preview of just one of them now.
7         You'll learn that one thing that people look for when
8  they're trying to evaluate whether a drug trial is successful
9  or not, whether a drug is likely to work or not, is called a
10  dose effect, or dose response. All that means is if you see
11  that there's some relationship between how much of the stuff
12  you take and what it does for you, that tends to show that what
13  you're taking is doing something.
14        I'll give you a simple example. If you take a half of
15  a -- if you have a headache and you take half a Tylenol, it may
16  do nothing for you. If you take one Tylenol, it does a little
17  bit more for you. You take two, it does even better. At some
18  point, you know, maybe you are taking three or four, it doesn't
19  make you any better than two, and at some point you take too
20  many and it can cause actually serious damage. So that's a
21  dose effect, a dose response.
22        You will see that the evidence for bapineuzumab, it
23  didn't show anything like that. It showed essentially random
24  information as to people, how much of this bapineuzumab they
25  took and how much better, if at all, they got with Alzheimer's

| E1admar2 | Opening - Mr. Devlin-Brown | Page 58 |

1  disease. And you'll hear evidence that that was a red flag
2  that perhaps even the positive stuff that Elan and Wyeth had
3  found, maybe that was just random because people didn't exhibit
4  this dose response. You will hear a lot more about that later
5  but that was just a preview.
6         So I want to be clear about one other thing, ladies
7  and gentlemen. When I say that Mathew Martoma knew the results
8  would not be good, I don't mean to say that the results would
9  not be good from the perspective of a scientist. Scientists, I
10  think you'll hear, because some of them will testify, tend to
11  be optimistic people, and they will tell you that the drug had
12  some promising things that made people think that perhaps
13  people were on the right track and maybe it wouldn't be Elan
14  and Wyeth, but some day some company was going to figure this
15  out and be able to bring the drug to market. So that is maybe
16  a scientific perspective on optimism, that maybe someday you
17  are on the right track and you will get there.
18        I don't mean to say the results are bad that way, but
19  from an investors perspective, ladies and gentlemen, that some
20  company someday will come up with something, that is not the
21  investor perspective. The investors want to know, you'll
22  learn, whether this drug is likely to be sold by the companies
23  that they own stock in and make money for those companies, and
24  from that perspective Mathew Martoma knew that these results
25  were bad for the stock prices of Elan and Wyeth, that the

| E1admar2 | Opening - Mr. Devlin-Brown | Page 59 |

1  results were nowhere near what investors were expecting them to
2  be.
3         So as Mathew Martoma flew home from Michigan, SAC, as
4  I mentioned, owned approximately $700 million worth of Elan and
5  Wyeth stock. Mathew Martoma owned $100 million, about, in his
6  own portfolio, the pot of money he got to manage. And the rest
7  of it was owned by SAC Capital's -- was controlled by SAC
8  Capital's owner, Steve Cohen, who had bought Elan and Wyeth
9  largely based on Mathew Martoma's positive recommendation and
10  Mathew Martoma's positive statements about the drug trial
11  results in the past. So if the stock price of Elan and Wyeth
12  fell once investors heard the same news that Dr. Gilman had
13  provided Mathew Martoma before the public announcement, well,
14  Mathew Martoma could lose millions and his boss could lose
15  millions. Millions on a stock that Mathew Martoma had been
16  recommending for years that his boss buy.
17        So, ladies and gentlemen, Mathew Martoma had a phone
18  call to make, and you'll learn that he made that call. On
19  Sunday, July 20th, the next day, before 8 a.m., Mathew Martoma
20  sent an e-mail to Steve Cohen, which you'll see. It said just
21  what's on the screen there. Is there a good time to catch up
22  with you this morning? It's important.
23        Less than an hour later, the phone records show, the
24  two men spoke for about 20 minute; Mathew Martoma and Steve
25  Cohen spoke for about 20 minutes. And a little later Mathew

| E1admar2 | Opening - Mr. Devlin-Brown | Page 60 |

1  Martoma emailed Steve Cohen a list of Elan and Wyeth stock that
2  was in two portfolios Mathew Martoma often traded in.
3         Well, the next day was Monday, the stock market was
4  open, and Mathew Martoma went to work. And Mathew Martoma and
5  SAC Capital started selling Elan and Wyeth. In the seven
6  trading days before the results would be announced to the
7  world, Mathew Martoma sold all of the $100 million of Elan and
8  Wyeth that was in his portfolio. And Mr. Cohen sold all of the
9  Elan and Wyeth stock that Mathew Martoma had been recommending
10  that he buy.
11        SAC Capital also shorted Elan and Wyeth stock, which
12  is basically a stock trade that will profit if the price of the
13  stock falls. And they bought what are called some options that
14  essentially are other things you can buy and trade in to bet
15  that a stock price will go up or go down, and they bought
16  options predicting the prices to go down.
17        You will also learn that while SAC Capital, of course,
18  is a large hedge fund and they buy and sell positions all the
19  time, you'll learn that this position was sold in a very
20  peculiar way. It was sold in a way to keep it secret not just
21  from other hedge funds but even within the hedge fund so only a
22  few people knew about it. They used special accounts to mask
23  what they were doing, and you'll hear more detail about that.
24        And so that takes us back to where I started the
25  opening, that packed convention hall where Dr. Gilman was about

SOUTHERN DISTRICT REPORTERS

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

E1admar2          Opening - Mr. Strassberg          Page 77

1  as a portfolio manager.
2       But you're also going to learn that any trading
3  decision that impacted the firm as a whole, such as the
4  decision to sell all of the Elan and Wyeth stock that happened
5  in the summer of 2008, that still had to be run by Steven
6  Cohen, the head of SAC Capital. And you'll learn that Steven
7  Cohen was a tremendously experienced investor with his own
8  definite and definitive views about when to buy and especially
9  when to sell different stocks.
10      And you're also going to learn that Mr. Cohen
11 surrounded himself with smart analysts and portfolio managers
12 who gave him advice about what investments to make and what
13 investments to get out of. And you're going to hear that
14 decisions impacting the firm as a whole, SAC Capital as a
15 whole, were Steven Cohen's decision to make.
16      In fact, you're also going to hear that Mr. Cohen had
17 an agreement with a former SAC healthcare specialist -- and
18 there were many SAC healthcare specialists, people who
19 specialized in healthcare investments at the firm. And you're
20 going to hear that Mr. Cohen, he had an agreement with one of
21 them, the one that he thought was the best healthcare investor
22 he had ever met, and this person's name was Wayne Holman,
23 H-o-l-m-a-n.
24      And you're going to hear that Mr. Holman, who had
25 recently -- who had left SAC Capital and set up his own firm,

E1admar2          Opening - Mr. Strassberg          Page 78

1  had a special agreement with Mr. Cohen to advise him on one
2  healthcare stock in particular -- Wyeth -- one of the two
3  stocks that is at issue in this case, and that Mr. Cohen
4  primarily took direction about the Wyeth investment from
5  Mr. Holman. Something you never heard of in the prosecutors'
6  opening statement.
7       Now, let me take a moment to talk about what research
8  analysts and portfolio managers do. In some ways the words
9  sort of define themselves. As a research analyst or a
10 portfolio manager, your job is to research the investments that
11 you are thinking about recommending and to analyze is this
12 investment going to be a good one, is this going to be one that
13 we think will make money. But make money not just for us and
14 for our firm, because the firm actually has money from other
15 people that is being invested. And so the job of a portfolio
16 manager and research analyst is to do all the hard work
17 necessary to leave no stone unturned to try and understand
18 whether an investment is going to be a good investment, an
19 investment that's worthwhile to recommend for someone else's
20 money. And no one would want some investment professional to
21 recommend that your money gets put into an investment that they
22 haven't done the full research on, that they haven't fully
23 vetted, that they're guessing about.
24      So it's very important that research analysts and
25 portfolio managers do incredibly deep research about the

E1admar2          Opening - Mr. Strassberg          Page 79

1  investments that they are considering. And you will hear that
2  that is exactly what Mathew did throughout his time at SAC
3  Capital and his time at Sirios, too. And what you're also
4  going to learn, that speaking to experts, doctors in the field
5  who understand the science behind the drugs, who understand the
6  nuances of what is being tested in the drug trials themselves,
7  that is what is expected of research analysts and portfolio
8  managers. That is what happens throughout the industry. There
9  were companies -- they mentioned this company, GOG. There are
10 companies, many of them, that are set up just to allow that to
11 happen. And it happened all the time. It was standard
12 practice. It was, in fact, demanded of people who were going
13 to be research analysts or portfolio managers in the healthcare
14 space. That was their job. That wasn't a crime.
15      So when the prosecutor talks to you about edge or
16 illegal edge, what they say there, that is just not something
17 sinister. You're going to hear that the term "edge" was a term
18 that was used all the time at SAC Capital. And the term meant
19 trying to work harder and do your job better than the next guy.
20 Trying to understand the investment as best as you can possibly
21 understand it. What you were supposed to do -- what, frankly,
22 anyone who is responsible for investing someone else's money
23 should be doing -- in order to do their job correctly.
24      Nothing wrong with it. Nothing sinister about it.
25 Nothing criminal about it.

E1admar2          Opening - Mr. Strassberg          Page 80

1       Here, again, the proof is not going to support the
2  allegations that you've just heard from the prosecutor.
3       Now, what kind of information do research analysts and
4  portfolio managers seek? Well, as I mentioned, they really
5  want as much data as they can get about whether the potential
6  investment may work. And you are going to hear a lot in this
7  trial about supposed confidential information. But don't be
8  confused. Just because something is labeled as confidential
9  doesn't mean that it is important to investors. It doesn't
10 mean that it matters, and it doesn't mean that it's material.
11      Now, the Judge, Judge Gardephe, is going to instruct
12 you on the law at the end of the case. For now, what's
13 important to remember is to keep in mind that just because
14 someone says the information is confidential, it doesn't mean
15 that it can support an insider trading charge. In fact, it
16 doesn't even mean that it's not nonpublic. It doesn't even
17 mean that it actually is confidential information. Because
18 information that could have a label "confidential" at one point
19 in time, if it is then disclosed to the public is no longer
20 confidential information and can no longer support a charge of
21 insider trading. We are going to come back to this as we go
22 through the timeline about this case.
23      You're also going to learn that information can be
24 public when it's made available to the public even if everyone
25 doesn't know about it.

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

1    So now let's turn to July of 2008, when the
2 prosecution claims that the actual insider trading occurred in
3 this case. Let's talk about what the evidence will show
4 happened then.
5    So on July 18th, SAC Capital's total position in Elan
6 was about 10 million shares. That included the one portfolio
7 that Mathew managed and all the other portfolios in the firm.
8    Now, the prosecutor wants you to think that there's
9 something wrong with the fact that SAC Capital sold its entire
10 position before the ICAD conference at the end of July. But
11 what the evidence is going to show to you is that that is what
12 hedge funds do. They take big positions to sell big positions,
13 often around events.
14    This is not like you or I or perhaps even a mutual
15 fund that might invest in a stock, might invest in IBM, and
16 then hold it, pass it on to our children, our grandchildren.
17 This is a hedge fund that they make money by taking big
18 positions and by selling big positions.
19    So when you see that they sold the big position around
20 the July timeframe, that is simply what it is that they do.
21 That's their business model.
22    And let's just take a look in the same July -- excuse
23 me, the same 2008 timeframe at a number of other instances
24 where they had taken large positions only to reverse course and
25 sell off those positions in a very short period of time. So

1 you can see, this is about a position in GE stock. GE stock.
2 Over $500 million worth of GE stock sold off in a very brief
3 period of time in the fall of 2008.
4    Let's take a look at the next example. Similarly,
5 Yahoo! stock. This is in the spring of 2008. Almost $400
6 million sold off again in a very brief period of time.
7    Let's look at another example. Anheuser-Busch, over
8 $600 million of stock sold off in a very brief period of time.
9 In fact, the same period of time as what we will see for Elan.
10    Let's put Elan up on the board, too.
11    So the point here is only that the fact that they had
12 a large position and they sold a large position is not proof of
13 anything other than the fact that that's what a hedge fund
14 does. It takes large positions and it sells large positions.
15    And the evidence is going to show you that there were
16 so many reasons to sell Elan and Wyeth stock in the summer --
17 in July particularly -- of 2008 that it was really only -- the
18 only sensible decision for SAC Capital to make. So let's take
19 a look at some of those decisions -- some of those reasons.
20 Excuse me.
21    First you'll see that, as we just talked about, SAC's
22 business model was to take and sell large positions, just as
23 we've seen they were doing throughout 2008.
24    But, second, do you remember back five-and-a-half
25 years ago now? The summer of 2008, the United States was

1 facing the beginning of that global economic crisis that
2 resulted in the biggest recession we've had really since the
3 Great Depression. And you're going to learn that in the spring
4 and summer of 2008, SAC was deeply concerned about the economy.
5 Bear Stearns, a big well known firm, had just collapsed and
6 failed. Lehman Brothers was to follow in the fall. And the
7 senior management of SAC Capital was very concerned about the
8 risks that the firm had at that time. And they met with Mathew
9 in May and June to discuss those concerns.
10    And you'll hear that Mathew was also spoken to by
11 people at Risk Management, the people who are really kind of
12 the firm's auditors, and they were also concerned about the
13 risk with these large positions.
14    The Elan investment had been very profitable. If SAC
15 sold Elan, Mathew would be one of the few portfolio managers
16 who was going to be successful in 2008, at least as it stood in
17 that midyear timeframe. But if they rolled the dice and held
18 onto the investment and Elan crashed like the rest of the
19 market was starting to, they could lose all of that profit.
20    So let's take a look at the next reason why it made
21 sense to sell. Elan's stock had increased in price. The
22 evidence is going to show you that the market for Elan was in
23 fact overheated. Now, what does it mean to say that the market
24 was overheated? You're going to hear that during this time
25 period, when the market for all stocks was cratering, was

1 starting to collapse, Elan was the one bright spot. It was
2 rising against the trend. And because it was rising, too many
3 investors were getting involved in it and the price was getting
4 too hot; it was started to overvalue the company.
5    In fact, you're going to see that the S&P 500 during
6 this period of time declined close to 8 percent, and that's the
7 period of time from May to July. And you're going to learn
8 that in June of 2008, Elan released the preliminary results of
9 this Phase II trial of bapineuzumab.
10    Now, the prosecutor referenced this issue as a teaser.
11 But you are going to learn, the evidence will show you, that
12 the actual results, the results they claim were this big
13 secret, were released in a press release to the world on
14 June 17th of 2008. And they didn't just talk about one small
15 group of people; they talked about the whole trial. They
16 actually announced the results, that they hadn't found
17 statistical significance with the trial that they had been
18 hoping to find. But because their trial was really about
19 safety, they had done subgroup analysis. I won't get into
20 details too much on the opening. But what they had announced
21 to the public was that they had statistically significant
22 findings that for people, for big groups of people who didn't
23 have a particular gene, bapineuzumab showed positive results on
24 treating Alzheimer's. And those results were all disclosed to
25 the public. And they also disclosed safety results, safety

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

| | | |
|---|---|---|
| E1admar2 | Opening - Mr. Strassberg | Page 85 |

1 findings, to the public. All of that happened in June.
2     You'll hear that they also said, we'll give you more
3 details about these results in July. But it will be a part of
4 the story -- really a central part of the story about the
5 disclosures that they made on June 17th of 2008.
6     And if we take a look at the entire chronology of the
7 investment in Elan and not just a few days at the end but just
8 look at the whole story, we are going to see why it makes so
9 much sense to sell Elan in July of 2008, before that
10 conference, that ICAD conference, because let's look what
11 happened to the price.
12     So we start in January of 2007, and you'll see then
13 the price is trading below $15. Earlier it had been trading
14 even lower.
15     What are you going to see from the evidence happens in
16 July of 2007? You're going to see that Elan announces
17 publicly, to the world, that it believes it will proceed with
18 Phase III. In other words, to move from the Phase II trial,
19 which is really about does the drug hurt people, to a Phase III
20 trial, where you will have thousands of people taking the drug
21 to see will the drug actually work and help cure and treat
22 Alzheimer's disease. And they announce in January, as the
23 safety trial, the Phase II trial is going on, that we will move
24 to the Phase III trial, the big, big trial, only if the Phase
25 II results are spectacular, strong, very meaningful.

| | | |
|---|---|---|
| E1admar2 | Opening - Mr. Strassberg | Page 86 |

1     So then we'll go ahead and we'll see the price stays
2 around that $15 area until May of 2007, when they announce they
3 are moving to Phase III, publicly announced, known to anyone
4 who is following the news about the company. And then you see
5 the price starts to rise. The price starts to go up. The
6 price starts to go up.
7     And then you are going to see what happens, which is
8 that they announce those results on June 17th of 2008, the
9 results that Mathew was suggesting made Elan a good investment,
10 hoping that those results would actually be positive. And they
11 announce, while they didn't find statistical significance
12 overall, they found really positive news about a lot of people
13 who could be helped by this drug, and, in response, the price
14 of the stocks soared. So from June 17th to the beginning of
15 July, July 10th, you'll see that Elan's stock price rose more
16 than 36 percent.
17     It rose more than 36 percent in the face of all of the
18 economic problems the whole country was facing. At the same
19 type the S & P was diving down 8 percent, at the same time
20 investors were starting to flee from investments, elan was
21 shooting up.
22     SAC's plan was always to sell Elan. It was never to
23 hold Elan forever. It was always to sell it once the price got
24 to a point where it made sense to do so. And the runup in
25 price from January of '07 to July '08 made this time the

| | | |
|---|---|---|
| E1admar2 | Opening - Mr. Strassberg | Page 87 |

1 perfect time to sell.
2     You'll also hear that outside analysts were advising
3 that Elan's stock should be sold at this time.
4     Now, for the reasons I talked about with respect to
5 the price movement and the economic concerns and other reasons,
6 analysts who had a different opinion about all sorts of
7 investments, including Elan and Wyeth, had different opinions
8 that they were expressing throughout this timeframe that we're
9 looking at. But in July of 2008, a number of analysts started
10 to come out with strong recommendations to sell Elan. We'll
11 see some of these. They were worried about uncertainty about
12 the final results, but also about little immediate upside, even
13 if the results were good, and potential downside, given the
14 economic uncertainties.
15     So you'll see, on July 11th, Brean Murray, an analyst
16 available to the public, initiated coverage about Elan with a
17 new recommendation to sell. You'll see that they talked about
18 the risks outweighing the benefits. And that they thought the
19 stock runup was unwarranted, that stock runup we just looked
20 at.
21     And also on July 11th, Piper Jaffray, another analyst
22 company, they downgraded this stock. They had been neutral,
23 saying hold. And now they said sell. And you'll see that.
24 They are discouraged by a laundry list of concerns. And they
25 viewed the recent stock appreciation as unwarranted; in other

| | | |
|---|---|---|
| E1admar2 | Opening - Mr. Strassberg | Page 88 |

1 words, time to sell now.
2     You'll also see another report -- this is one from
3 Canaccord Adams -- on July 17th of 2008, again reiterating
4 their sell recommendation right in the middle of July 2008.
5     You will also hear about the next reason that it made
6 sense to sell, which is that SAC's own healthcare specialists
7 were recommending to Mr. Cohen that he sell the stock, that he
8 get out now. They feared that the stock price would begin to
9 come down after that ICAD conference, and they thought the
10 prudent move was to get out of the stock now. And they were
11 making their views known throughout SAC Capital and to
12 Mr. Cohen.
13     Sixth, you'll hear that scientists were publicly
14 questioning the science behind bapineuzumab. In June and July,
15 you will learn that there had been a substantial discussion in
16 the investor community about whether the science behind bappy,
17 this drug, actually worked, because there had been another drug
18 that was based on similar science that had just failed. And
19 then, on July 17th, this day that seems to keep coming back
20 into this case, you'll learn that a prestigious medical journal
21 called the Lancet -- L-a-n-c-e-t -- published an article that
22 questioned whether the theory -- the scientific theory behind
23 bapineuzumab -- actually would help patients with Alzheimer's
24 at all.
25     And you're going to learn about another reason why it

SOUTHERN DISTRICT REPORTERS

JA162

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

| E1admar2 | Opening - Mr. Strassberg | Page 89 |
|---|---|---|

1 made sense to sell in July of 2008, and that's that Elan's only
2 other drug was in jeopardy.  Now, Elan was developing
3 bapineuzumab, but it really only had one other drug that it was
4 selling to patients and to the market, and that was a drug
5 called Tysabri, T-y-s-a-b-r-i.  And Tysabri was a drug to treat
6 multiple sclerosis, not Alzheimer's.  But the thing is Tysabri
7 had a known side effect; it was called PML.  And, in essence,
8 it was like a virus that would attack the brain and, it could
9 be very, very serious.  It could even be fatal.
10         And so in 2005 there had been some cases of PML
11 connected to Tysabri, and the Food and Drug Administration, the
12 FDA, had taken Tysabri off the market.  And when they did that,
13 Elan's stock plummeted.  It fell 75 -- close to 75 percent.
14 And then in 2006 the FDA allowed Tysabri to go back on the
15 market, and there had been no cases of PML from that point
16 forward.  But what was happening in June and July of 2008 was
17 that the rumors were starting to circulate that there may be
18 cases of Tysabri PML connected to Elan's only drug that was
19 being sold, and investors were worried that if those rumors
20 proved to be true, Elan's stock would crater, it would fall
21 tremendously, just like it had in 2005.
22         And so, finally, you'll see that there was simply way
23 more risk than upside to holding the stock and the sale would
24 lock in profits.
25         So in July 2008, when the rest of the market was

| E1admar2 | Opening - Mr. Strassberg | Page 90 |
|---|---|---|

1 beginning to crash in this worst economic crisis that we've had
2 in our lifetime, the sale of Elan allowed SAC Capital to lock
3 in profits, to make sure that they eliminated risk.  In a bad
4 year, it was a tremendous success.  And personally, for a young
5 father with three young kids, locking in profits was the
6 opportunity to secure his and his family's future.  It was the
7 smart, conservative things to do.
8         The point here is the evidence is going to show you
9 that there was all of these factors all coming together in a
10 perfect storm against holding Elan through that conference,
11 that it was now time to sell that investment, just as they had
12 always contemplated doing.
13         Now, let's turn to the prosecutor's case.
14         Now, the prosecution alleges that Mathew recommended
15 that SAC sell Elan and Wyeth based on inside information that
16 he had gotten from Dr. Gilman and Dr. Ross.  But you will not
17 see any hard evidence -- again, there will be no wiretaps,
18 there will be no taped conversation, there will be no emails
19 saying sell the stock -- nothing, no hard evidence at all.  And
20 you are going to see that the testimony of Dr. Gilman will give
21 you many, many reasons to doubt the story that he is telling.
22         The prosecution seeks you -- seeks to have you convict
23 based simply on the testimony, testimony that is based on
24 faulty memory, testimony that is based on inconsistencies, and
25 testimony that won't add up with the evidence that you're going

| E1admar2 | Opening - Mr. Strassberg | Page 91 |
|---|---|---|

1 to see at this trial.  Because the fact that Dr. Gilman has a
2 memory that's faulty and has changed his story again and again
3 is going to give you people reasonable doubt about the story the
4 prosecution wants you to find beyond a reasonable doubt.
5         Now, you've heard me talk about reasonable doubt a few
6 times.  So let me take a moment and talk about what that term
7 means.  Judge Gardephe referenced it earlier and will explain
8 it to you in detail, and he is the -- he is the only law on
9 what the law means.  But let's take a moment to talk about this
10 because it is a vitally important principle.
11         The burden of proof "beyond a reasonable doubt," it is
12 the highest burden that exists in the law.  As to each and
13 every one of the charges, the prosecution must prove the
14 elements -- every element -- beyond a reasonable doubt.  And
15 that highest burden, the highest one we have, it exists to
16 prevent innocent people from being convicted based on
17 speculation, based on conjecture, based on a rush to judgment.
18 With the consequences so great in a criminal case, the law
19 demands that each and every element be proven beyond a
20 reasonable doubt.
21         Now, as Judge Gardephe explained to you earlier, the
22 defendant has no burden to prove anything to you.  We have no
23 burden to makes any objections, to make any arguments, to call
24 any witnesses, to do anything, and that's because in our law we
25 have a presumption of innocence.  Mathew is presumed innocent

| E1admar2 | Opening - Mr. Strassberg | Page 92 |
|---|---|---|

1 unless and until the government can prove beyond a reasonable
2 doubt that he committed these crimes.  And the burden of proof
3 and the presumption of innocence are really the bedrock
4 principles of our system of government, our system of justice.
5 They protect all of us -- you and me and Mr. Martoma and
6 everyone in this courtroom and, frankly, everyone in this
7 country -- from unjust prosecutions.
8         Ladies and gentlemen, they are the principles that
9 will determine Mathew Martoma's life, because the stakes here
10 could not be higher.  And the evidence will show, when you look
11 at the testimony from these witnesses, that there is reasonable
12 doubt everywhere that you turn.  So let's look closely at what
13 the evidence will show you about Dr. Gilman's story.
14         Now, first, as I mentioned, you're going to see that
15 you can't trust his story broadly because of the deal that he's
16 gotten and the bias that that deal gives him.  But you'll also
17 learn that the story is at odds with what he told at the time,
18 and it's at odds with what he said when he was first approached
19 by the prosecutors.
20         But you'll hear also that this deal ensures that he
21 never has to face any jail, any consequences with the criminal
22 justice system as a result of his own misconduct, as a result
23 of the things that he did that he should not have done.
24         And you'll learn that he's the one -- he's the one --
25 who had the obligation to keep information confidential, not

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

E1aQmar3          Jandovitz - direct          Page 109

1    Intrinsic.
2    Q.  What does being a trader involve?
3    A.  It involves buying and selling stocks throughout the course
4      of the day.
5    Q.  Did your job involve making investment decisions about
6      which stocks to buy or sell?
7    A.  It did not.
8    Q.  What do you mean then you were trading stocks?
9    A.  I was instructed by an analyst and a portfolio manager what
10     stocks to buy and sell.
11   Q.  So your job was just then implementing those instructions;
12     is that right?
13   A.  Correct.
14   Q.  So SAC Capital is where you say you worked, right, sir?
15   A.  That is correct.
16   Q.  What is SAC Capital?
17   A.  It's Steven A. Cohen's hedge fund.
18   Q.  What's a hedge fund?
19   A.  A hedge fund is a private investment firm that can both buy
20     stocks with anticipation of them going up in price as well as
21     betting -- shorting stocks and selling stocks, betting that
22     they will go down in value; whereas a mutual fund, you buy
23     stocks expecting that they are going to go up in value.
24   Q.  I will ask you about a couple of those concepts.  Where do
25     hedge funds get money to be buying and selling stocks?

E1aQmar3          Jandovitz - direct          Page 110

1    A.  High-net-worth individuals.  In the case of SAC, it was
2      pension funds, high-net-worth individuals, Steven Cohen's own
3      personal money.
4    Q.  And you said you may be betting the stocks go up or down.
5      Is that right?
6    A.  That is correct.
7    Q.  How do you make trades based on a prediction that stocks
8      will go up?
9    A.  Analysis.
10   Q.  If you believe a stock is going to go up and you want to
11     profit from this, what would you do as a trader?
12   A.  You would accumulate or buy a stock.
13   Q.  What if you believed the price of a stock is going to go
14     down and you want to profit from that, what can you do?
15   A.  You would get a locate or a borrowed stock from a brokerage
16     firm and sell short the stock anticipating that the stock will
17     go down in price.
18   Q.  That concept you just described is known as selling short.
19     Is that right?
20   A.  That is correct.
21   Q.  It involves borrowing a stock?
22   A.  Correct.
23   Q.  Do you actually like go somewhere and get the stock and
24     then give it back when you're done?
25   A.  The common term is borrowing, but you -- there is something

E1aQmar3          Jandovitz - direct          Page 111

1    called a stock loan desk at various brokerage firms and you
2    "secure borrow" from said firms and then you sell short the
3    stock.
4    Q.  Do people just refer to it as shorting a stock?
5    A.  That is correct.
6    Q.  If you do you short a stock I believe you said that's --
7      that profits -- the stock price goes down?
8    A.  Correct.  So if you -- if a stock is trading at $50 and you
9      think it's worth $40, you short the stock betting that the
10     stock will go down in value.
11   Q.  So, I want to ask you a little bit more about SAC Capital.
12     Where was SAC Capital's office?
13   A.  We had offices throughout the world, but our headquarters
14     were in Stamford, Connecticut.
15   Q.  When you say throughout the world, other continents?
16   A.  We had offices in London, Hong Kong.  We had a fairly
17     sizable office in New York City, but our main headquarters
18     where Steve worked and most of senior management was located in
19     Stamford, Connecticut.
20   Q.  This Steve you're referring to there?
21   A.  Steven Cohen.
22   Q.  Where did you work most of the time?
23   A.  A hundred percent of the time to start, the first few years
24     I was in Stamford, Connecticut.  Over my five plus years at the
25     firm, over the last few years I split my time between New York

E1aQmar3          Jandovitz - direct          Page 112

1    City and Stamford, Connecticut.
2    Q.  Let's stick with -- well, let me ask you the 2006 to 2008
3      time range.  Where were you working during that time period?
4    A.  90 percent of the time I was in Stamford, Connecticut.
5    Q.  Can you describe what the space was like around you where
6      you were working?
7    A.  It was a space probably three or four times the size of
8      this room.
9    Q.  Did you have an individual office within that space?
10   A.  I did not.  I sat with approximately 30 other traders on
11     what was called the execution desk.
12   Q.  Was there a name for this whole space that was three times
13     the size of the courtroom?
14   A.  A trading floor.
15   Q.  How many people approximately worked at SAC cap in
16     Stamford?
17   A.  I think when I was there, there were approximately 800
18     employees and probably half of which, 3- or 400 at least worked
19     in Stamford, Connecticut.
20   Q.  So when you were a trader at SAC Capital, were you trading
21     for everyone at the firm or any particular individual or
22     individuals?
23   A.  I traded for three portfolio managers.
24   Q.  For what, sir?
25   A.  Three portfolio managers.

UNITED STATES OF AMERICA v
MATHEW MARTOMA                                                    January 10, 2014

| E1aQmar3 | Jandovitz - direct | Page 113 |
|---|---|---|

1  Q. If you look around the courtroom, do you recognize any of
2   the portfolio managers that you traded for at the time?
3  A. Yes.
4  Q. Who do you recognize?
5  A. Mat Martoma.
6  Q. Would you just describe what he's wearing and where he's
7   sitting?
8  A. Mat is wearing a dark-colored suit a white shirt and a tie.
9  Q. Is that sufficient? You mentioned that you traded stocks
10  for portfolio managers. Is that right?
11  A. That is correct.
12  Q. What was a portfolio manager's role at SAC Capital as you
13  understood it?
14  A. A portfolio manager's role was to do analysis and research
15  on individual stocks in the sector he was assigned to and make
16  calls or predictions based upon this research as to whether or
17  not the stocks would rally in price or decline in price.
18  Q. You mentioned sectors. What do you mean by sectors?
19  A. There are various sectors of the economy. Like -- we
20  concentrate on the healthcare sector, so companies like Pfizer,
21  Bristol Myers, Merck, are well-known pharmaceutical companies,
22  and we traded their stocks.
23  Q. Did Mr. Martoma have a portfolio at any point at
24  SAC Capital?
25  A. He did.

| E1aQmar3 | Jandovitz - direct | Page 114 |
|---|---|---|

1  Q. What sector was that portfolio specialized in?
2  A. Originally it was European pharma.
3  Q. Pharma means what?
4  A. Pharmacy, so drug companies.
5  Q. Did that change?
6  A. No.
7  Q. So the whole time it was European pharma?
8  A. His role evolved over his time there. Besides European
9   pharma, he invested in a variety of stocks, orthopedic device
10  manufacturers, biotechnology stocks.
11  Q. And you mentioned that you had a few other portfolio
12  managers that you traded for. Is that right?
13  A. That is correct.
14  Q. Were they healthcare focused portfolios as well?
15  A. That is correct.
16  Q. So, did you spend most of your time trading healthcare
17  stocks then?
18  A. Almost a hundred percent of my time.
19  Q. Like technology stocks, would you trade those ordinarily?
20  A. I did not trade technology stocks as my primary
21  responsibility at SAC.
22  Q. So, the term portfolio manager, what is the portfolio?
23  A. A portfolio of stocks. So when you invest in a mutual
24  fund, said mutual fund manager is going to either be a
25  generalist or concentrates on sectors. He may concentrate on

| E1aQmar3 | Jandovitz - direct | Page 115 |
|---|---|---|

1  the bank sector and bank stocks or all economy industry stocks
2  or health stocks. So it's a number of -- it's comprised of a
3  number of companies that represent the portfolio in aggregate.
4  So, the portfolio -- a portfolio consists of ten stocks, 20
5  stocks, 30 stocks, 50 stocks, a hundred stocks.
6  Q. Are portfolio managers at SAC given any particular amount
7  of funds to invest?
8  A. There's a set amount of funds that are designated for them
9  to invest.
10  Q. In 2008, do you recall how much approximately Mathew
11  Martoma had to invest?
12  A. It was roughly around $500 million.
13  Q. 5 what?
14  A. $500 million.
15  Q. Within the amount of money that is given to a portfolio
16  manager to invest, what sort of trading -- what sort of
17  authority, as far as you understood it, did portfolio managers
18  have in terms of what investments to make with the money?
19  A. They had a significant degree of autonomy, but there was a
20  risk management team that could control the bets we could make
21  in individual stocks as well as our overall portfolio.
22  Q. In your experience at SAC Capital, were portfolio managers
23  generally assisted by other people?
24  A. They were assisted by analysts who helped them do the
25  analysis as well as traders like me.

| E1aQmar3 | Jandovitz - direct | Page 116 |
|---|---|---|

1  Q. What was Steve Cohen's role at SAC Capital?
2  A. Steve was the head of the firm, and Steve managed -- Steve
3  Cohen managed the largest -- managed and traded the largest
4  portfolio at the firm.
5  Q. Was there any system in place at SAC Capital through which
6  portfolio managers could recommend trading ideas to Steven
7  Cohen for his portfolio?
8  A. That is correct, there were weekly write-ups that were
9  composed and sent to Steve on Sundays apprising Steve of
10  portfolio positions as well as the ideas they had both long and
11  short in the portfolio as well as conviction in the ideas.
12  Q. Could portfolio managers receive bonuses based on
13  profitable trades Steve Cohen would make in response to ideas
14  submitted to him?
15  A. Yes.
16  Q. Now, did you trade healthcare stocks for Steve Cohen
17  generally?
18  A. Initially I would help out SAC's portfolio -- excuse me --
19  trader. If he had to use the men's room, I would cover for
20  him. I traded for Steve very infrequently to start. That
21  evolved to almost no trading for Steve over the course of my
22  last few years at SAC.
23  Q. Did Steve Cohen have traders that worked directly for him?
24  A. Yes, he did.
25  Q. Did he have a head trader?

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 10, 2014

E1aQmar3          Jandovitz - direct          Page 121

1  A.  Probably 200 times a day.
2  Q.  Did it enable you to see what Mat Martoma had in his
3    portfolio in realtime?
4  A.  That is correct.
5  Q.  You mentioned also emails; that you would learn something
6    about what was in his portfolio from emails?
7  A.  The analysts/portfolio managers would send weekly writeups
8    to Steve Cohen on the weekend highlighting their top ideas in
9    their portfolio as well as conviction rankings on their ideas.
10 Q.  If Mathew Martoma wanted to trade a particular security,
11   how would he communicate that to you?
12 A.  There were mainly three mediums of communication:  Email,
13   instant message or communicated over the phone.
14 Q.  So, I want to walk through different ways you could execute
15   a trade if you were given a trade by Mathew Martoma.  Let's say
16   you're given an order to buy 500 shares of IBM.  What were your
17   options for trying to do that?
18 A.  Well, I would be interacting with the various brokers and
19   traders at the banks.  So I may receive an instant message from
20   a trader at Goldman Sachs saying I have -- you sent 500 shares
21   of IBM to the trader at Goldman, and they have 500 of IBM to
22   sell.  I'm a buyer, I would pick up the phone saying I want to
23   buy 500 shares of IBM stock.  There's something where I could
24   execute the trade myself, it was called an ECN, it was an
25   electronic communications network.  I could manually purchase

E1aQmar3          Jandovitz - direct          Page 122

1    the stock that way.
2         There was also an anonymous system, a crossing network
3    which matches two buyers and sellers anonymously, so you would
4    put your order in that anonymous crossing network, but you
5    couldn't see -- in this case the 500 shares of IBM I'd put it
6    in the crossing network, it was anonymous though, I couldn't
7    see who the seller was, and you'd either be matched on the
8    order or you could execute the order or it was not matched and
9    you weren't executed.
10 Q.  Was there a term used to describe these anonymous networks?
11 A.  Crossing networks dark pools.
12 Q.  What was the second thing you said?
13 A.  Dark pools.
14 Q.  Was it ever the case when trading where you would get an
15   order from one portfolio manager to buy 500 shares of IBM and
16   would see that someone else somewhere within SAC was trying to
17   sell 500 shares from IBM?
18 A.  That's correct.
19 Q.  How common was that?
20 A.  Excuse me?
21 Q.  How common was that?
22 A.  It would occur multiple times throughout the course of the
23   day.
24 Q.  Was it permitted at SAC for one portfolio manager to be
25   buying IBM and another portfolio manager selling IBM at the

E1aQmar3          Jandovitz - direct          Page 123

1    same time?
2  A.  That is correct.
3  Q.  So, other than your working relationship with Mr. Martoma,
4    were you friends with him?
5  A.  We were friendly.  I wouldn't say we were friends, but we
6    had a cordial relationship.
7  Q.  Did you have ever have any work disputes or other problems
8    of note with him?
9  A.  No.
10 Q.  So I want to ask you about a company called Elan
11   Pharmaceuticals.  Have you heard of that?
12 A.  Yes.
13 Q.  What kind of company is Elan?
14 A.  It's an Irish drug manufacturer.
15 Q.  Does it have any offices in the United States, do you know?
16 A.  I don't know if it has offices in the United States.
17 Q.  Is its stock traded in the United States?
18 A.  It's traded in the United States.  Its symbol is ELN.  It's
19   called an ADR.  It's an American depository receipt.  So it
20   trades locally in Ireland, and the US-based version, again, is
21   called an ADR, an American depository receipt.  It trades
22   locally.  In this case Elan trades on the New York Stock
23   Exchange.
24 Q.  You could buy and sell these ADRs for Elan on the New York
25   Stock Exchange?

E1aQmar3          Jandovitz - direct          Page 124

1  A.  That is correct.
2  Q.  So after Mat Martoma started at SAC, did there come a point
3    where he purchased or directed you to purchase Elan stock in
4    his portfolio?
5  A.  Yes.
6  Q.  When approximately was that in relation to when he started?
7  A.  Shortly after he began his tenure at SAC.
8  Q.  Did he tell you anything when he started buying Elan stock
9    about why he liked the stock?
10 A.  He indicated that there was a trial that was to -- there
11   was a drug that Elan was working on with Wyeth that would be a
12   treatment for Alzheimer's disease.
13 Q.  Do you know the name of the drug?
14 A.  Yes.  Bapineuzumab.
15 Q.  Did Mathew Martoma when you started buying Elan stock for
16   him convey any view to you about the prospects for this drug
17   trial?
18 A.  He was positive on the drug and the upcoming trial.
19   Upcoming, I mean a trial that was going to take a few years,
20   not a few months.
21 Q.  He started buying, you say, shortly after he joined
22   SAC Capital?
23 A.  As far as I recall, yes.
24 Q.  Do you know when the trial ended, the bapineuzumab trial?
25 A.  The main phase two trial results were at that time

UNITED STATES OF AMERICA v
MATHEW MARTOMA                                                    January 10, 2014

| E1aQmar3 | Jandovitz - direct | Page 125 |
|---|---|---|

1  anticipated sometime in -- now I'm talking 2006. The phase two
2  trial was to be announced in 2008, and then the phase three
3  trial at some point at a later date.
4  Q. So you mentioned just a minute ago a company called Wyeth.
5  What is Wyeth?
6  A. Wyeth is an American pharmaceutical company that was
7  actually recently acquired last year too by another U.S. based
8  drug manufacturer, but it was -- to answer your question, it
9  was US-based pharmaceutical company.
10 Q. Did that company trade on the New York Stock Exchange?
11 A. It did. Its symbol was WYE.
12 Q. Did there come a point when Mathew Martoma acquired Elan
13 stock in his portfolio -- I'm sorry -- Wyeth stock in his
14 portfolio?
15 A. Wyeth, yes.
16 Q. Was that before or after when he started buying Elan stock?
17 A. According to my recollection, it was around the same time
18 that we started to acquire stock in Elan.
19 Q. Did Mathew Martoma tell you anything about his view on
20 Wyeth stock?
21 A. He informed me that both Wyeth and Elan had a co-promoter
22 they were collaborating on the development of this drug, and he
23 had a positive view of the prospects for the stock of Wyeth, as
24 well as Elan.
25 Q. How would you compare Elan and Wyeth in terms of their

| E1aQmar3 | Jandovitz - direct | Page 126 |
|---|---|---|

1  size?
2  A. Wyeth is a much larger drug manufacturer, more products on
3  the market, a much more diversified revenue stream. Elan is a
4  smaller drug company. At that time a lot of the prospects for
5  the stock price of Elan were predicated on the success or
6  failure of this drug bapineuzumab.
7  Q. At the time did you believe that Wyeth's prospects would be
8  affected as much as Elan's with respect to the results of the
9  drug trial of bapineuzumab?
10 A. It would be affected, but not to the same degree as the
11 stock price of Elan.
12 Q. Do you know whether or not Mr. Martoma did any sort of
13 research with regard to bapineuzumab?
14 A. Yes.
15 Q. What research did he do?
16 A. Well, he would talk to analysts at banks and also banks
17 throughout the course of the day. These banks would organize
18 calls with various doctors that were thought leaders or
19 specialists in various fields, as well as there would be
20 doctors calls set up by various research groups or boutique
21 research firms that didn't necessarily have banking
22 capabilities.
23 Q. Are you familiar with a firm called GLG?
24 A. Yes. The acronym stands for Gerson Lehrman Group.
25 Q. Is that one of these research firms you mentioned?

| E1aQmar3 | Jandovitz - direct | Page 127 |
|---|---|---|

1  A. I believe so, yes.
2  Q. Do you know what GLG did?
3  A. They provided access to, again, key thought leaders in
4  various industries.
5  Q. Do you know if Mat Martoma used GLG services?
6  A. According to my recollection, yes, but we used a variety of
7  services and service providers.
8  Q. Do you know whether Mr. Martoma talked to any doctors with
9  respect to the bapineuzumab trial?
10 A. He would mention doctors' names, yes.
11 Q. Any of them stick with you?
12 A. If you mentioned a couple names, I might recall them.
13 Q. But you don't independently sitting here today remember
14 names of particular doctors he told you back then?
15 A. No.
16 Q. How do you know he had these calls with doctors?
17 A. I would IM or call him, and he'd say "I'm on a call. What
18 do you need?" I mean, he would communicate that via instant
19 message or email saying, "I'm on a doctor's call. I can't
20 talk. Is it important?" or "what do you need?"
21 Q. While you were at CR Intrinsic, did you have any
22 understanding as to what the policy was at the firm with
23 respect to insider trading?
24 A. Yes. It was not allowed.
25 Q. Were you required from time to time to attend compliance

| E1aQmar3 | Jandovitz - direct | Page 128 |
|---|---|---|

1  trainings that dealt with insider trading?
2  A. That is correct. The compliance training was mandatory and
3  it was either biannual or annual.
4  Q. All right. If you look on your screen, I'd like to show
5  you what's been marked for identification as Government Exhibit
6  587.
7       MR. DEVLIN-BROWN: Your Honor, if I may approach and
8  leave the witness hard copies of this and some other exhibits?
9       THE COURT: Yes.
10      MR. DEVLIN-BROWN: I apologize, your Honor. We just
11 need the switch so we can show it only to the court and the
12 witness.
13      THE COURT: Can you do that, Mr. Ruocco?
14 Q. I'm showing you what's been marked for identification as
15 Government Exhibit 587. Do you recognize that?
16 A. I do.
17 Q. What is it generally?
18 A. It's a sign-in sheet for an annual compliance training
19 meeting that SAC required us to attend.
20      MR. DEVLIN-BROWN: The government offers 587.
21      THE COURT: Any objection?
22      MR. BRACERAS: No objection, your Honor.
23      THE COURT: Government Exhibit 587 is received.
24      (Government's Exhibit 587 received in evidence)
25      MR. DEVLIN-BROWN: May I publish it, your Honor?

UNITED STATES OF AMERICA v
MATHEW MARTOMA                                                      January 10, 2014

E1aQmar3          Jandovitz - direct          Page 133

1    where --
2    Q.  What --
3    A.  Say the market rallied very strongly for a couple weeks and
4    the stock price -- the price of the stock rallied in
5    conjunction with the market.  Say we were long 2 million
6    shares, we may sell 2,000 shares just to reduce our exposure.
7    Conversely, if we went through a period of overall weakness in
8    the general market, and we had the ability to add to the
9    position, in this case being Elan, then if we were, say, opened
10   owned a million and a half shares, we may in a period of a
11   market weakness or the course of a couple days or couple weeks
12   buy quarter of a million or half million shares.
13   Q.  You mentioned earlier that one thing that portfolio
14   managers could do at SAC Capital was recommend trading ideas to
15   Mr. Cohen.  Is that right?
16   A.  That is correct.
17   Q.  Do you know whether Mr. Martoma recommended any Elan to
18   Mr. Cohen?
19   A.  Yes.
20   Q.  What about Wyeth, do you know whether Mr. Martoma
21   recommended Wyeth to Mr. Cohen?
22   A.  I believe he did as well, yes.
23   Q.  How do you know that?
24   A.  From the weekly writeups that were sent over the weekend.
25   Q.  Do you know whether or not Mr. Cohen bought shares of Elan

E1aQmar3          Jandovitz - direct          Page 134

1    or Wyeth based on or following a recommendation from Mat
2    Martoma?
3         MR. BRACERAS: Objection.
4         THE COURT: Would you lay a foundation?
5    Q.  Did you have any ability to see with panorama or any other
6    tool whether Mr. Cohen was buying or selling securities based
7    on recommendations from Mr. Martoma?
8         MR. BRACERAS: Objection.
9         THE COURT: Overruled.
10   A.  Occasionally Mat Martoma, the portfolio manager, as well as
11   other portfolio managers would come over to Steve throughout
12   the course of the day or maybe call Steve on the phone.  There
13   was a live microphone, and, yes, I had heard Mat Martoma
14   recommend Elan to Steve.  Again, this would happen 30, 40 or 50
15   times throughout the course of the day by various portfolio
16   managers who worked at SAC and reported to Steve Cohen.
17   Q.  Just to make sure I understand you correctly, the 50 times
18   a day, that's different portfolio managers recommends --
19   A.  Various portfolio managers that worked at SAC and reported
20   to Steven Cohen.
21   Q.  I don't think we understand yet though whether you know --
22   whether there was a way for you to determine whether Mr. Cohen
23   was, in fact, buying or selling a stock based on a
24   recommendation from Mathew Martoma?
25   A.  I could hear Steven Cohen giving orders.  I didn't know if

E1aQmar3          Jandovitz - direct          Page 135

1    there was a 1-to-100 percent correlation between advice given
2    by portfolio managers and Steve's buy-and-sell decisions.
3    Q.  Did you ever receive reports with respect to whether
4    positions in the Mathew Martoma portfolio were also positions
5    in Mr. Cohen's portfolio?
6    A.  There was a term where portfolio managers were tagged or
7    attached to positions in the Cohen portfolio.
8    Q.  What does tagging mean?
9    A.  Tagging means if you, portfolio manager A, let's call him,
10   recommends a stock to Steve and Steve decides to buy the stock,
11   then part of your year-end performance in analysis of your
12   profit and loss, you will be held responsible for that
13   recommendation you give to Steve Cohen.
14   Q.  Was there a way for you to determine whether stocks
15   recommended by Mathew Martoma were tagged to Mathew Martoma if
16   Mr. Cohen traded?
17   A.  I didn't know the exact formulaic expression for that, but
18   there was tagging.
19   Q.  Do you have any basis for knowing whether Mr. Cohen traded
20   on Elan and Wyeth following a recommendation from Mathew
21   Martoma?
22        MR. BRACERAS: Objection.
23        THE COURT: I want you to elicit from the witness
24   whether -- you've asked this question, but I don't think we
25   have an answer yet -- whether from the computer, whatever the

E1aQmar3          Jandovitz - direct          Page 136

1    computer devices were, whether the witness could tell whether
2    Mr. Cohen had accepted a recommendation of any particular
3    portfolio manager with respect to any particular stock.
4    Q.  Did you hear the Court's question?
5    A.  Yes, I heard your inquiry, your Honor.  There was no exact
6    way to determine that from electronic device, but I can tell
7    you that Steve Cohen held Mat Martoma and his views on Elan and
8    Wyeth in high regard.
9    Q.  Mr. Jandovitz, do you recall when Elan and Wyeth announced
10   the results of the bapineuzumab trial?
11   A.  Full phase two results were announced from the trial after
12   the market closed on July 29, 2008.
13   Q.  Do you recall what position Mathew Martoma's portfolio had
14   in the Elan or Wyeth in late June of 2008?
15   A.  We owned both the shares of Elan and Wyeth stock.
16   Q.  Do you recall whether Mr. Martoma was recommending to
17   Mr. Cohen to buy more -- withdrawn.  Do you recall whether
18   Mr. Martoma was still recommending Elan and Wyeth stock to
19   Mr. Cohen in late June 2008?
20   A.  As far as I recall, Mat was -- Mat Martoma was still
21   bullish on the prospects for the drug trial and the eventual
22   outcome for the prices of both Elan and Wyeth stock.
23   Q.  If we could show you on the screen, Mr. Jandovitz, what's
24   been marked for identification as Government Exhibit 305.  Or
25   you could take it in a folder.  They should be in numerical

UNITED STATES OF AMERICA v
MATHEW MARTOMA                                                    January 10, 2014

| E1aQmar3 | Jandovitz - direct | Page 137 |

1    order.
2    A. I have it in front of me.
3    Q. Take a look at it, sir, and let us know if you recognize
4    it.
5    A. I do recognize the email.
6    Q. What is it?
7    A. It's a weekly update that was sent on June 29, 2008 to
8    Steve's Ideas which represented --
9    Q. Let me just ask you, you do recognize this document?
10   A. I do.
11   Q. What sort of format is it in? What kind of document is it?
12   A. It's an email.
13   Q. Did you receive the email according to what's on there?
14   A. I did.
15           MR. DEVLIN-BROWN: The government offers 305 into
16   evidence.
17           MR. BRACERAS: No objection.
18           THE COURT: Government Exhibit 305 is received in
19   evidence.
20           (Government's Exhibit 305 received in evidence)
21           MR. DEVLIN-BROWN: If we could publish that, your
22   Honor?
23           THE COURT: Yes.
24   Q. If we could zoom in, Ms. Hernandez, on -- let's just do the
25   very top box of the email for now.

| E1aQmar3 | Jandovitz - direct | Page 138 |

1           Let's start at the top. It says it's from Martoma Mat
2    to Steve's Ideas. Do you know what Steve's Ideas means?
3    A. Steve Cohen had multiple inboxes to help him
4    compartmentalize his work. Steve's Ideas represented ideas
5    that various portfolio managers would submit to Steven Cohen.
6    Q. On the Bcc line, I see your name listed. Is that right?
7    A. That is correct. I was blind carbon copies on this email.
8    Q. And the Lyndon, Katie that is after that, is that the
9    analyst that you had previously testified that Mr. Martoma
10   hired?
11   A. That is correct, Katie was the analyst that worked on our
12   team.
13   Q. So, if you could look at the subject -- actually, look
14   below the subject line, the first line in the text, it says,
15   "6/29/08, GEHC weekly." What is GEHC?
16   A. GEHC was Mat Martoma's portfolio.
17   Q. Do you know what the GEHC weekly was?
18   A. Weekly writeup of ideas and current thoughts of various
19   portfolios managers in this case. In this case Mat Martoma
20   would send Steve on the weekend.
21   Q. Under that it says positions: Longs. What does long refer
22   to there?
23   A. Longs is the equivalent of stocks that we own. Where
24   you're a long stock, you own the stock.
25   Q. If you expressed your position as long -- withdrawn. The

| E1aQmar3 | Jandovitz - direct | Page 139 |

1    next column or row below that says ticker. It says: ELN.
2    What does the ELN refer to?
3    A. Elan Pharmaceuticals.
4    Q. Ticker means?
5    A. Ticker, the symbol on which it trades on the New York Stock
6    Exchange, under the symbol ELN.
7    Q. It says target price. Below that it's written $40 to $50.
8    What does the target price refer to?
9    A. The ultimate fair value, what the analyst or portfolio
10   manager deemed as the fair value for the price of the stock.
11   Q. Fair value -- OK. Right below it, it says conviction and
12   then there's a colon, number 9. What does the conviction row
13   mean?
14   A. Your conviction on a scale of one to ten, how strongly do
15   you believe in this idea or position.
16   Q. And --
17   A. One meaning obviously weakest. Ten, most conviction.
18   Q. Do you recall ever seeing any tens in the GEHC weekly?
19   A. To my recollection, no.
20   Q. Do you recall seeing all that many nines in the GEHC
21   weekly?
22   A. I recall seeing more sevens, eights, nines than any tens.
23   Q. This shows Elan as a nine. Do you recall any other
24   positions that you saw designated at any point as nines in
25   Mathew Martoma's portfolio?

| E1aQmar3 | Jandovitz - direct | Page 140 |

1    A. There may have been. I don't recall.
2    Q. The next row says timing, 2008. What does that mean?
3    A. The timing of the event. So oftentimes you -- there is an
4    event which is the catalyst which determines the value -- the
5    fair value or what we believe the stock was worth. In this
6    case, the event was the results of the phase two trial.
7    Q. If you look below under updates, number one, it says, "GS
8    adds to conviction buy list with a 45 TP." What is GS?
9    A. GS represents Goldman Sachs. A conviction buy list is
10   their highest conviction ideas.
11   Q. $45 TP means what?
12   A. 45 target price. So most analysts, they assess the value
13   of a company and they assign a price target. Not all, but
14   most, assign a price target to a stock based upon their
15   recommendation.
16   Q. So we can turn to the row below that says upcoming
17   catalysts. What are catalysts?
18   A. A catalyst is a driver. You're asking me to define
19   catalyst or -- in this case, cat -- in the case of investing,
20   there are catalysts which enable you to arrive at your price
21   target. Oftentimes those catalysts are earnings when companies
22   announce their quarterly earnings, and that gives an indication
23   of how well the company is doing vis-a-vis what the analysts
24   are thinking. In this case, the catalyst was not earnings.
25   The catalyst was a -- this announcement.

# Transcript Excerpts
# (January 14, 2014)
# (506)

UNITED STATES OF AMERICA v
MATHEW MARTOMA

January 14, 2014

E1edmar2        Berkowitz - cross        Page 505

1    designed or intended to hold on to stocks forever, are they?
2    A. It is a shorter term holding period at certain hedge funds.
3    Q. It is not one of those situations where -- we keep talking
4    about IBM, but it is not one of those situations where they are
5    going to buy IBM and hold onto it for 30 years to hand down to
6    the grandchildren?
7    A. It is a shorter term focus at many hedge funds.
8    Q. The idea is when a hedge fund goes and invests or buys a
9    stock, it is immediately looking to exit that stock to make the
10   greatest profit?
11   A. Yes, for the most part.
12   Q. And it's true that SAC would invest in some companies in
13   large amounts and sometimes hold onto those shares for a while,
14   correct?
15   A. Sure.
16   Q. But it was also routine practice for SAC to build very
17   large positions, hundreds of millions of dollars, and then exit
18   or sell those positions very rapidly, wasn't it?
19   A. Yes.
20   Q. That was routine at SAC?
21   A. It happens.
22   Q. I think you mentioned in July of 2008 SAC was managing
23   perhaps more than $8 billion of outside money, correct?
24   A. Yes.
25   Q. And that would be money of high net worth investors but

E1edmar2        Berkowitz - cross        Page 506

1    also institutional money?
2    A. Yes.
3    Q. And you would agree with me, Mr. Berkowitz, that the job of
4    a portfolio manager was to do the hard work, the research
5    necessary to find the best investments for those investors?
6    A. The portfolio managers and the research analysts.
7    Q. And the portfolio managers and the research analysts were,
8    as we saw, paid a lot of money in part to do all of the deep
9    research to find the best investments for the investors, isn't
10   that right?
11   A. Yes.
12   Q. And you were aware at SAC that part of the research
13   involved contacting experts, correct?
14   A. Yes.
15   Q. In fact, SAC had a contract with a firm called GLG, isn't
16   that right?
17   A. Yes.
18   Q. And the purpose of GLG was to facilitate your research
19   analysts and portfolio managers to contact experts that could
20   help advise them on investments for the investors?
21   A. Yes.
22   Q. And you maintained contracts with that expert network and
23   facilitated its portfolio managers and research analysts to
24   take advantage of those expert networks, didn't it?
25   A. We maintained contracts, yes.

E1edmar2        Berkowitz - cross        Page 507

1    Q. I believe during your direct examination you were asked
2    several questions about the Holman account, correct?
3    A. Could you repeat that?
4    Q. During your direct examination you were asked several
5    questions about the Holman account.
6    A. Yes.
7    Q. You understood that Wayne Holman wasn't an employee of the
8    company, correct?
9    A. He used to be an employee. He was an employee until, I
10   think, March of 2006.
11   Q. But he still had a relationship with SAC, didn't he?
12   A. Yes.
13        MR. BRACERAS: Mr. McLeod, if we could pull up Defense
14   285, please?
15   Q. Mr. Berkowitz, we're showing you what's been marked as
16   Defense 285, for identification.
17        Could you tell us what Defense 285 is, please?
18   A. Yes. This was an agreement between SAC and Ridgeback
19   Capital Management regarding the investment advice on a single
20   security in 2007 and 2008.
21   Q. And if you flip to the last page of Defense 285,
22   Mr. Berkowitz, you will see that Mr. Holman signed on behalf of
23   Ridgeback Capital?
24   A. Yes.
25   Q. And SAC's general counsel signed on behalf of SAC?

E1edmar2        Berkowitz - cross        Page 508

1    A. Yes.
2    Q. And this contract is dated November 9, 2007?
3    A. Yes.
4    Q. And the single stock as to which Ridgeback was giving
5    advice was Wyeth?
6    A. Correct.
7    Q. And this is a contract that you reviewed before coming to
8    court today?
9    A. Yes.
10   Q. And this is a contract that's kept in the ordinary course
11   of business at SAC?
12   A. Yes.
13        MR. BRACERAS: Your Honor, the defense offers 285.
14        MR. INGOGLIA: No objection.
15        THE COURT: 285 is received.
16        (Defendant's Exhibit 285 received in evidence)
17        MR. BRACERAS: It we can publish that, your Honor?
18        THE COURT: You may.
19   BY MR. BRACERAS:
20   Q. Mr. Berkowitz, I think you said that this was a contract
21   with Mr. Holman's firm Ridgeback Capital and SAC concerning
22   advice in a single stock, correct?
23   A. Yes.
24   Q. And that stock was Wyeth?
25   A. Correct.

# Transcript Excerpts
# (January 15, 2014)
# (778-79)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 15, 2014

E1fQmar4                                    Page 776

1   A. Maybe a conference call.
2   Q. OK, we'll use that, conference call. And you agree that
3     when you're consulting on a conference call where any number of
4     people can dial in, you usually don't know how many people are
5     actually dialed in, do you?
6   A. No.
7   Q. In fact, dozens, or even hundreds, of people can dial in to
8     listen to you talk about a drug; isn't that right?
9   A. I don't know what the limit is.
10  Q. But it can be a large number of people, correct?
11  A. I don't know.
12  Q. Well, you know there's a dialing number set up for a
13    reason, right?
14  A. I don't know the limit. I never asked, and I was never
15    informed.
16  Q. But you know it's more than one, correct?
17  A. Sometimes.
18  Q. I mean, I'm not trying to quibble with you, but there's a
19    reason why there's a dialing number as opposed to just a direct
20    call, right?
21  A. Yes, often more than one.
22  Q. There's a dialing number so that more than one person can
23    dial in to hear what you have to say?
24  A. Yes.
25  Q. This is something that you've actually done before?

E1fQmar4                                    Page 777

1   A. I believe I may have done that once before, yes.
2   Q. You knew that when you said something on a conference call,
3     that it would be public, correct?
4   A. Yes.
5   Q. Now, Dr. Ross, isn't it true that when you were consulting
6     for Piper Jaffray, you said that you believe that you could
7     detect a noticeable difference in approximately half your
8     patients assuming they were receiving the drug bapineuzumab?
9   A. I can't recall.
10  Q. But that's what you believed at the time, isn't it?
11  A. I believe -- can you say what you said I believed was
12    again?
13  Q. That you believe that you can detect a noticeable
14    difference in approximately half your patients assuming they
15    were receiving the drug?
16  A. I don't recall saying it.
17  Q. But that's what you believed at the time?
18       THE COURT: What time?
19       MR. BRACERAS: April 2008.
20  A. I can't recall that date with any certainty.
21  Q. But do you recall what you believed -- without regard to
22    that specific date, just at that time frame, spring of 2008, do
23    you recall believing that you can detect a noticeable
24    difference in approximately half your patients assuming they
25    were receiving the drug?

E1fQmar4                                    Page 778

1   A. No, I don't recall saying that.
2   Q. I'm sorry. I am not asking if you recall saying it. I'm
3     asking if you recall believing that at the time.
4   A. I can only recall believing that patients, some of my
5     patients had benefit.
6   Q. Well, do you recall when you were retained by Piper Jaffray
7     saying that there were reports of patients experiencing
8     symptomatic and asymptomatic vasogenic edema in the ongoing
9     bapineuzumab Phase II trials? Do you recall saying that?
10  A. I do not.
11  Q. Do you recall believing that at the time in April 2008?
12  A. Yes.
13  Q. Let me also ask you, Doctor, do you recall saying to Piper
14    Jaffray that you believed that in some patients the effects
15    waned, decreased; and in order to maintain the response, more
16    frequent dosing might be considered?
17  A. Don't recall.
18  Q. But do you recall believing that at that time?
19  A. I don't recall believing it at that time.
20  Q. You just don't recall one way or the other?
21  A. Correct.
22  Q. Now, you testified on direct about HCRC?
23  A. Yes.
24  Q. HCRC was that consulting firm that set up some of your
25    engagements?

E1fQmar4                                    Page 779

1   A. Yes.
2   Q. They didn't set up all of your engagements, but certain of
3     your engagements were facilitated by HCRC?
4   A. Yes.
5   Q. Also, do you recall some of those deposit slips that you
6     saw?
7   A. Yes.
8   Q. Just to get it straight, HCRC actually paid you, right?
9   A. Yes.
10  Q. Mr. Martoma never paid you directly, did he?
11  A. No.
12  Q. Mr. Martoma never gave you any cash at all, did he?
13  A. Any what?
14  Q. Any cash.
15  A. Any cash, no.
16  Q. He never gave you any money or any gifts, did he?
17  A. No.
18  Q. Do you also recall with HCRC, do you recall a gentleman by
19    the name of Mr. McNeil?
20  A. No.
21  Q. Do you recall Mr. McNeil or other folks from HCRC
22    chaperoning your consultations with Mr. Martoma?
23       MR. INGOGLIA: Objection.
24       THE COURT: Grounds?
25       MR. INGOGLIA: Form.

# Transcript Excerpts
# (January 17, 2014)
# (1236-40)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 17, 2014

E1hdmar4     Gilman - direct     Page 1236

1 A. I think he was the person I consulted with the most, yes.
2 Q. Did you enjoy consulting with him more than other hedge
3    fund clients?
4 A. I enjoyed other consultations as well, but I enjoyed
5    speaking with him, yes.
6 Q. At about the same level as other hedge funds' clients?
7       MR. STRASSBERG: Objection, your Honor.
8       THE COURT: Sustained.
9 Q. Was there anything that stood out in your consultations
10    with Mr. Martoma?
11 A. Well, yes. He wanted, as I got -- as I had more and more
12    interactions with him, he said he wanted to be friends. He
13    seemed to want to be closer than I thought a client should be
14    to a consultant. He said that to me several times. And
15    initially I resisted that overture.
16 Q. Do you know what he -- did you know what he did for a
17    living while you were consulting with him?
18 A. Yes, I did.
19 Q. What did he do?
20 A. Well, he said, he told me he was a fund manager for his
21    company.
22       (Continued on next page)
23
24
25

E1hQmar5     Gilman - direct     Page 1237

1 Q. Did you understand at that time what the role of a fund
2    manager for his company was?
3 A. Well, I'm an academic person. I don't know much about
4    finance, frankly, but, yes, I understand these people buy and
5    sell securities.
6 Q. What did you understand securities to mean?
7 A. Security means stocks and bonds.
8 Q. Did you have any understanding about the reason he was
9    consulting with you?
10 A. Yes, I assume that it was to understand more about the
11    pharmaceuticals he was talking to me about so that he could
12    make decisions about purchasing or selling.
13 Q. You testified a moment ago that you believed he wanted to
14    become your friend; is that right?
15 A. That's what he told me.
16 Q. Well, did your relationship change at all from a purely
17    business relationship?
18 A. Well, he wanted to meet at national meetings; for example,
19    the American Academy of Neurology. I think that was the main
20    one. I don't remember whether he ever went to the American
21    Neurological Association meeting. Those were the two main ones
22    where there were clinical topics discussed. But he did want to
23    meet there, have a cup of coffee and chat, and we did. I did
24    succumbed to that request. He told me about his family, about
25    his wife, about having children in fairly rapid succession, and

E1hQmar5     Gilman - direct     Page 1238

1    told me about his parents emigrating from India.
2 Q. What did you talk to him about in your own life?
3 A. Not much.
4 Q. Let me show you what's been marked for identification as
5    Government Exhibit 207, please. If you could take a look at
6    that and let us know if you recognize it?
7 A. Yes.
8 Q. What is it generally?
9 A. It is an email from me to Mr. Martoma's secretary.
10       MR. DEVLIN-BROWN: The government offers 207.
11       MR. STRASSBERG: No objection, your Honor.
12       THE COURT: Government Exhibit 207 is received.
13       (Government's Exhibit 207 received in evidence)
14       MR. DEVLIN-BROWN: May we publish it, your Honor?
15       THE COURT: Yes.
16 Q. If we could start at the bottom of the page, Ms. Hernandez,
17    with the bottom email.
18       Dr. Gilman, this appears to be from someone name
19    Stephanie Reisenman. Do you know who she is?
20 A. She was Mr. Martoma's secretary at the time.
21 Q. The email reads: "I am writing to confirm the Gerson
22    Lehrman Group consultation that you have scheduled with Mathew
23    Martoma for August 22 at 1:00 p.m. eastern. The topic of the
24    call is an overview of novel therapies for Parkinson's
25    disease."

E1hQmar5     Gilman - direct     Page 1239

1       My first question, Dr. Gilman, is did you consult with
2    him on diseases other than Alzheimer's disease?
3 A. Oh, yes.
4 Q. If we could zoom out now, please, and look at the response
5    at the top of the email.
6       Now, my first question, actually, is the email below
7    it looked like it was from Stephanie Reisenman and your
8    response is to Stephanie Zalazny. Is that the same person?
9 A. I think so, yes.
10 Q. And you write: "Thanks for this. The call is on my
11    calendar, and I promise that I will not re-duplicate my
12    behavior when I was in Istanbul and completely overlooked the
13    commitment. I want to commend you again on your persistence in
14    finding me then. I still have a red face."
15       What are you referring to there about not
16    re-duplicating your behavior when you were in Istanbul?
17 A. Mr. Martoma had set up a telephone consultation for a time
18    when I was aboard attending a movement sort of meeting. I had
19    gone to Istanbul with my wife for a week. It's a fascinating
20    city where we'd never been before. She stayed -- she seldom
21    travels with me because of her work. She stayed a week and
22    then departed, and I was left to attend my meeting. I totally
23    forgot the meeting with Mr. Martoma, and he called me
24    persistently in the hotel. They initially denied that I was
25    there. He finally located me in a -- in an area of the hotel,

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 17, 2014

| E1hQmar5 | Gilman - direct | Page 1240 |
|---|---|---|

1   kind of a lobby-type area where I was located reading, and the
2   people there told me I had a call. It was Mr. Martoma
3   reminding me we'd had a consultation. I was -- he had been on
4   the telephone for the better part of an hour, he said, trying
5   to find me and he said he was worried about me. I was in a
6   foreign country, and he couldn't find me, I was reading. It
7   was touching that he tried so hard to find me, he was worried
8   about me when I forgot about the consultation. I found it very
9   touching.
10  Q. You can take that off the screen, Ms. Hernandez.
11       You had mentioned earlier that you had submitted
12  certain information to the Gerson Lehrman Group about drug
13  trials and other work you were involved in; is that right?
14  A. Yes.
15  Q. Did you identify yourself to the Gerson Lehrman Group as a
16  member of the safety monitoring committee for the bapineuzumab
17  trial?
18  A. Yes, I did.
19  Q. Did you consult with Mr. Martoma through the Gerson Lehrman
20  Group about the bapineuzumab trial?
21  A. Yes, I did.
22  Q. Did there come a point when he asked you about any
23  confidential information from the trial?
24  A. Yes.
25  Q. Do you recall when that was in relation to when you started

| E1hQmar5 | Gilman - direct | Page 1241 |
|---|---|---|

1   consulting?
2   A. I don't recall precisely, but it was sometime in the fall
3   of 2006, I believe, fall of 2006.
4   Q. Do you recall how he initially asked you for confidential
5   information about the drug trial?
6   A. I think the first time may have been a little earlier than
7   I just said, but it was a message about vasogenic edema. He
8   was referring to Phase I of the bapineuzumab trial, I think,
9   but I wasn't sure whether it was about something else, but it
10  was a kind of subtle way to find out about vasogenic edema. It
11  should have triggered --
12  Q. Did you provide confidential information to Mr. Martoma
13  about the drug trial?
14  A. I did not at that point, but I -- I didn't quite recognize
15  it for what I think it was, which was an attempt to find
16  confidential information.
17  Q. Did you ever provide him with confidential information?
18  A. Yes, later I did.
19  Q. How did it come about? What was the first confidential
20  information you remember providing?
21  A. This came about by his persistently questioning me about
22  one might expect to see as a side effect of treating --
23  treatment with bapineuzumab. And I gave him theoretical
24  responses at first, but he persisted in wanting to know what
25  really happened, and I finally slipped out what actually

| E1hQmar5 | Gilman - direct | Page 1242 |
|---|---|---|

1   happened. That's how it started.
2   Q. And what did you tell him?
3   A. I told him that with multiple antibodies, one might expect
4   to see some non-specific effects primarily on joints, so that
5   low back pain or headache or joint pain or other kinds of
6   rheumatological consequences may occur, and he wanted to know
7   whether they did occur in fact, and I let slip that, yes, they
8   did, and then --
9   Q. Did you continue sharing confidential information about the
10  drug trial thereafter?
11  A. Then I started sharing information about the drug trial
12  thereafter.
13  Q. Were those just slips too?
14       MR. STRASSBERG: Your Honor, can we get a time frame
15  as to when this supposedly happened?
16       THE COURT: Yes. Could you give us a time frame or
17  elicit a time frame from the witness, please?
18  Q. Do you recall precisely when it was that you first began
19  sharing confidential information with Mr. Martoma about the
20  drug trial?
21  A. Not precisely. It was approximately in the fall to winter
22  of 2006-7, but I can't be more specific than that, I'm sorry.
23  Q. Are you confident in your memory on the timing?
24  A. I'm approximately -- I'm giving you an approximation. I
25  know it happened, but I can't tell you exactly when.

| E1hQmar5 | Gilman - direct | Page 1243 |
|---|---|---|

1   Q. So, once you began sharing confidential information with
2   Mr. Martoma about the drug trial, did that continue?
3   A. Yes.
4   Q. I think you had described what you initially told him as a
5   slip, is that correct, Dr. Gilman?
6   A. Yes.
7   Q. What about as you continued to provide him with
8   confidential information?
9   A. At the end, I gave him more specific data as he requested.
10  Q. Did you believe you were permitted to give him that data at
11  the time?
12  A. I didn't -- no, I did not.
13  Q. Did you give it to him accidentally?
14  A. Excuse me?
15  Q. Did you give it to him accidentally?
16  A. No -- at first I did, but then later as time went on, I
17  gave it to him intentionally.
18       MR. DEVLIN-BROWN: If I could have just one moment,
19  your Honor.
20       THE COURT: Yes.
21       (Pause)
22  Q. Do you recall any particular subjects that Mr. Martoma was
23  interested in with respect to the drug trial?
24  A. He asked whether Mr. Martoma was interested in particular
25  subjects, and my response was, yes, he was particularly

JA176

**Transcript Excerpts**

**(January 22, 2014)**

**(1488, 1537-39)**

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 22, 2014

| E1mQmar1 | Gilman - direct | Page 1487 |
|---|---|---|

1  you receive other documents from Elan that were password
2  protected?
3  A. Yes.
4  Q. How certain are you that the document you remember emailing
5  him was the ICAD presentation?
6  A. I'm not absolutely certain.
7  Q. What is your best recollection as to when you sent him the
8  ICAD presentation?
9  A. I'm not certain of the time I sent him the document.
10  Q. What is your best recollection?
11      MR. STRASSBERG: Objection, your Honor.
12      THE COURT: Overruled.
13      MR. STRASSBERG: Asked and answered.
14  A. My best recollection was the 17th of July.
15  Q. How confident -- are you confident that it was the 17th of
16  July?
17  A. I'm not.
18      MR. STRASSBERG: Objection, your Honor. I'll withdraw
19  the objection.
20      THE COURT: You may answer.
21  A. I'm not very confident of that.
22  Q. Are you confident it was before the ICAD presentation?
23  A. I'm reasonably confident but not certain.
24  Q. So, Dr. Gilman, after the lunch with Mr. Martoma on July 30
25  of 2008, did you hear from him again the rest of the summer?

| E1mQmar1 | Gilman - direct | Page 1488 |
|---|---|---|

1  A. I don't recall hearing from him again for the rest of the
2  summer.
3  Q. Were you surprised by that at the time?
4  A. Yes, I was surprised by that.
5  Q. Why?
6  A. Well, I thought we were friends, and I thought he would be
7  in touch just to say hello.
8  Q. Did there come a point where you reached out to him?
9  A. Yes.
10  Q. I'd like to show what's been marked for identification as
11  Government Exhibit 235. Do you recognize this document,
12  Dr. Gilman?
13  A. Yes, sir.
14  Q. What is it generally?
15  A. It's a message from me to him saying I haven't heard from
16  you for awhile.
17  Q. Doctor, don't read it. Do you recognize it generally?
18  A. Yes, I do.
19      MR. DEVLIN-BROWN: The government offers 235.
20      MR. STRASSBERG: No objection.
21      THE COURT: Government Exhibit 235 is received.
22      (Government's Exhibit 235 received in evidence)
23      MR. DEVLIN-BROWN: May we publish it with the Court's
24  permission?
25      THE COURT: You may.

| E1mQmar1 | Gilman - direct | Page 1489 |
|---|---|---|

1  Q. So, Dr. Gilman, what's the date of this email from yourself
2  to Mr. Martoma?
3  A. September 26, 2008.
4  Q. Do you want to look a little more closely at the date line
5  or we could make it bigger?
6  A. September 28, 2008, 12:02 p.m.
7  Q. And the subject?
8  A. "How are you?"
9  Q. So the email reads, "Hi Mat. I haven't heard from you in
10  awhile and hope that is all well with you and your family. I
11  hope that you have not been too terribly set back by the great
12  turmoil in the markets."
13      Let me stop there. What's the great turmoil in the
14  markets you're referring to?
15  A. Well, 2008 was a very difficult time for investment people.
16  The market was roiling. I think that's the right word.
17  Q. Was what-ing?
18  A. Roiling. Roiling. Is that right?
19  Q. I don't know.
20  A. That's not what I do. I have my own way of roiling in
21  government grants, but it was a tough time for the economy.
22  Q. Then you write, "Plus the disappointing drop in Elan stock
23  after the combined effect of investor disappointment, short
24  selling of the stock and the two additional cases of PML on
25  Tysabri."

| E1mQmar1 | Gilman - direct | Page 1490 |
|---|---|---|

1      What are you referring to by two additional cases of
2  PML on Tysabri?
3  A. Tysabri is a medication for the treatment of multiple
4  sclerosis, and Tysabri was the most -- was and is the most
5  effective medication to treat multiple sclerosis. Tysabri
6  prevents the development of new lesions of multiple sclerosis
7  by stopping the inflammatory response. However, it is so
8  effective in preventing certain kinds of cells from entering
9  the brain; namely, T-cells, that it allows viruses to enter the
10  brain and that allows certain viruses, the JC virus to enter
11  the brain and cause a terrible disease, an incurable disease,
12  at that time incurable.
13      (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 22, 2014

| E1mQmar3 | Gilman - cross | Page 1535 |
|---|---|---|

1  A. Was that a question?
2  Q. It certainly was, Dr. Gilman.
3  A. I didn't know that it was announced during the ICAD
4   meeting.
5  Q. Well, fair to say, I think you were asked on your direct
6   whether in fact you knew it happened after, and I think you
7   said you didn't recall. Do you have any recollection of when
8   the Tysabri PML cases came to light?
9  A. Would you repeat the last three words you said?
10 Q. Do you have any recollection of when the PML cases linked
11  to Tysabri came to light?
12 A. No.
13 Q. Are you aware that Tysabri was taken off the market back in
14  2005 of cases of PML?
15 A. Yes.
16 Q. And you know that it was put on the market again in around
17  2006 or so but was being monitored very closely for PML, right?
18 A. Yes.
19 Q. Let me ask you a little bit different question. Are you
20  aware that prior to ICAD, there were rumors that there may be
21  new cases of PML linked to Tysabri?
22 A. I didn't know about those rumors.
23 Q. Am I correct, Dr. Gilman, that you did not own any
24  pharmaceutical stocks?
25 A. That's correct.

| E1mQmar3 | Gilman - cross | Page 1537 |
|---|---|---|

1  A. He did.
2  Q. Fair to say he was trying to do a lot of hard work to
3   understand the science as best he could, right?
4  A. It appeared to me that he was doing that.
5  Q. Fair to say also, because you never talked with Mathew
6   about stocks, you never talked with him about whether he owned
7   through his company any Elan stock or any Wyeth stock, right?
8  A. I never asked him that. He never offered that information.
9  Q. So, he never mentioned to you and you never asked him about
10  it, right?
11 A. That's right.
12 Q. Is it fair to say also that you never had any discussions
13  with him about what he did with any of the information that you
14  discussed with him?
15 A. That's right.
16 Q. Now, am I also right, Dr. Gilman, that aside from the fees
17  that you made from GLG for your consultations, you never got a
18  penny extra from Mr. Martoma, correct?
19 A. That's correct.
20 Q. So Mathew never secretly gave you a dime to encourage you
21  to give him any improper information, right?
22 A. That's correct.
23 Q. And that would be the case no matter how I asked the
24  question. In other words, there's not some other way that he
25  gave you anything under the table to cause you to do anything

| E1mQmar3 | Gilman - cross | Page 1536 |
|---|---|---|

1  Q. And you don't own the stock of Elan, correct?
2  A. Correct.
3  Q. Or the stock of Wyeth?
4  A. Correct.
5  Q. Correct? And it's fair to say that other than that
6   July 30th conversation you talked to us about on direct, you
7   never talked to Mat about stocks, correct?
8  A. That's correct.
9  Q. And you never received any stock tips from him, correct?
10 A. That's right.
11 Q. And that was the same generally with your other
12  consultations with people in the investment community, correct?
13 A. That's right.
14 Q. You talked to them about science, right?
15 A. That's all I talked to them about, yes.
16 Q. And sometimes very complicated science behind diseases like
17  Alzheimer's and multiple sclerosis and Parkinson's disease and
18  the like, right?
19 A. Yes.
20 Q. And you did the same with Mathew, correct?
21 A. Yes, I talked to him about the science.
22 Q. In fact, I think you talked to us about how you considered
23  him a real student of science, right?
24 A. I did.
25 Q. And that he asked a lot of penetrating questions, correct?

| E1mQmar3 | Gilman - cross | Page 1538 |
|---|---|---|

1   in his favor, was there?
2  A. That's correct.
3  Q. So, no bags of cash, correct?
4  A. That's right.
5  Q. No secret accounts, correct?
6  A. That's correct.
7  Q. You never asked for anything like that, correct,
8   Dr. Gilman?
9  A. That's correct.
10 Q. And he never offered anything like that, correct?
11 A. Correct.
12 Q. And he never even gave you anything of value as a gift,
13  correct?
14 A. Would you say that again? You're slurring your words. I
15  can't quite hear you.
16 Q. If I'm going too fast, I'll try to slow down a little bit.
17 A. Could you slow down a little bit, please?
18 Q. So he never gave -- excuse me, what I think my question
19  was -- he never gave anything of value to you in the form of a
20  gift, right?
21 A. No.
22 Q. And he never gave anything of value to your wife or someone
23  else on your behalf, right?
24 A. No.
25 Q. And the only financial benefit that you received was the

Southern District Court Reporters

JA179

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 22, 2014

| E1mQmar3 | Gilman - cross | Page 1539 |
|---|---|---|

1    consulting fees that you got through GLG, correct?
2  A.  Yes.
3  Q.  Am I right, Dr. Gilman, that GLG did not monitor the
4    consultations that you had with any of your clients, correct?
5  A.  That's right.
6  Q.  Were you aware that it was in fact GLG policy not to attend
7    the consultations, whether on the phone or in person?
8  A.  That's right.
9  Q.  And you were paid by GLG as long as the consultations
10    occurred, right?
11  A.  Would you say that again, please?
12  Q.  Sure.  You were paid by GLG as long as the consultations
13    occurred, right?
14  A.  Do you mean each consultation, the duration of it or any
15    consultation?  I'm not sure what you're asking me.
16  Q.  I just mean in general, Dr. Gilman, that you were paid by
17    GLG as long as you had the consultation, correct?
18  A.  As long as you had the consultation.  Do you mean the
19    duration of each consultation or as long as there's any
20    consultation at all?  What are you asking?
21  Q.  I'm just trying to understand if the way it worked was that
22    GLG would pay you when you had consultation through GLG?
23  A.  Yes.
24  Q.  Isn't that how it worked?
25  A.  Yes.

| E1mQmar3 | Gilman - cross | Page 1540 |
|---|---|---|

1  Q.  And fair to say that GLG -- it was your understanding,
2    Dr. Gilman, that GLG would not have paid you any money if they
3    knew that you were intentionally sharing information that you
4    weren't supposed to?
5  A.  I was violating their rules.
6  Q.  That would have been a violation of their guidelines,
7    right?
8  A.  Yes.
9  Q.  But as long as you set up a consultation through GLG, GLG
10    would pay you for that consultation assuming the consultation
11    happened, right?
12  A.  No.  I didn't set up the consultation.  The client would do
13    that.
14  Q.  I see.  So would it be right to say, Dr. Gilman, that as
15    long as you accepted the consultation that a client set up, GLG
16    would pay you, right?
17  A.  Yes, provided the consultation took place.
18  Q.  In fact, GLG sometimes charged the clients and paid you
19    even if the consultation didn't take place if it had been set
20    up.  Isn't that right?
21  A.  I'm not sure what your point is here.  The consultation had
22    to have taken place.
23  Q.  Weren't there times, Dr. Gilman, where a client canceled at
24    the last minute and then GLG still charged the client and you
25    still got paid because it had been a last minute cancellation?

| E1mQmar3 | Gilman - cross | Page 1541 |
|---|---|---|

1  A.  No.  I don't believe so.
2  Q.  Let's talk a little about your background.
3  A.  I don't think this ever happened, but I don't believe I
4    would be paid, or at least I would not accept payment -- I
5    don't recall this ever happening, so I think this is a moot
6    point.
7  Q.  Dr. Gilman, we are going to move on, but I just want to
8    make sure I understood what you just said.  I think you said
9    that you would not accept payment in that circumstance; is that
10    right, Dr. Gilman?
11  A.  I'll withdraw that.  I don't know what I would do or would
12    not do in that circumstance.  I can't remember it ever
13    happening, so I'm not sure what I would do.
14  Q.  So, now I'd like to talk a little bit about your
15    background, sir, OK?  Am I right that you were consulting all
16    the way back in 1989 for a company called Regeneron
17    Pharmaceuticals; isn't that right?
18  A.  Yes.
19  Q.  And that's a pharmaceutical company, right?
20  A.  Yes.
21  Q.  That made and sold drugs, correct?
22  A.  Yes.
23  Q.  And fair to say that was about 25 years ago?
24  A.  Yes.
25  Q.  So, it would be fair to say that you have roughly 25 years

| E1mQmar3 | Gilman - cross | Page 1542 |
|---|---|---|

1    or perhaps more of experience in consulting, right?
2  A.  Yes.
3  Q.  Am I correct that you served as a consultant for
4    approximately 19 different companies, including pharmaceutical
5    companies and investment companies and research and consulting
6    companies; is that right?
7  A.  That's approximately right.
8  Q.  In addition to these consultations, you testified that you
9    started consulting with the Gerson Lehrman Group or GLG around
10    2001, right?
11  A.  Yes, about then.
12  Q.  Dr. Gilman, why don't we pull up Government Exhibit 600
13    that has been admitted.  If I might approach, your Honor?
14        THE COURT:  Yes.
15        MR. STRASSBERG:  It may help to have the hard copy.
16  Q.  So I am going to give you this binder, Dr. Gilman, which is
17    Government Exhibit 600 so you can flip through it.  This is the
18    log of your consultations at GLG starting in 2006.  Dr. Gilman,
19    as you flip through it, are you aware, Dr. Gilman, that you had
20    over 400 consultations as reflected in this log with over 300
21    different clients?
22  A.  That's possible.
23  Q.  Fair to say you can see there's a lot of entries in the
24    log, right?
25  A.  Yes.

# Transcript Excerpts

# (January 23, 2014)

# (1770-71)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 23, 2014

E1ndmar5      Gilman - cross      Page 1770

1 Q. And it's fair to say that in the entire interview or --
2 let's call it an interview. In the entire interview that
3 happened between the FBI agents and you, they never mentioned
4 any other client but Mathew Martoma, correct?
5 A. I believe that's correct.
6 Q. It was the only name that they targeted to you in that
7 interview, correct?
8 A. Yes.
9 Q. Now, your next contact with the prosecutors happened in
10 February of 2012. Do you remember that?
11 A. Can I go back to the previous question because I didn't
12 quite answer it fully?
13 Q. No, Dr. Gilman. I would ask -- and, your Honor, I would
14 ask that Dr. Gilman answer the questions that I am asking.
15      You will have an opportunity to answer fully any
16 questions you want to have asked from Mr. Devlin-Brown.
17      THE COURT: Just give me one moment.
18      THE WITNESS: Please ask your question again, then.
19      THE COURT: Well, my question to you, Dr. Gilman: Was
20 your answer less than complete, the one to Mr. Strassberg's
21 questions?
22      THE WITNESS: Yes.
23      THE COURT: All right. Then you may do whatever is
24 necessary to answer his question.
25      THE WITNESS: The current or the immediate proceeding?

E1ndmar5      Gilman - cross      Page 1771

1      THE COURT: I understood you to say that there was a
2 question Mr. Strassberg asked you to which you did not give a
3 complete response.
4      THE WITNESS: Yes.
5      THE COURT: You may add whatever is necessary to
6 completely answer Mr. Strassberg's question.
7      THE WITNESS: Thank you, sir. That's what I wanted to
8 do.
9 A. The agent also mentioned that I am only a grain of sand, as
10 is Mr. Martoma. They are really after a man named Steven A.
11 Cohen.
12 Q. And, Dr. Gilman, did you come to learn that Steven A. Cohen
13 was the owner of Mr. Martoma's company, SAC Capital?
14 A. Later, yes, I learned that.
15 Q. And fair to say, Dr. Gilman, other than mentioning
16 Mr. Cohen as the ultimate target that they were after, they
17 didn't mention any other name to you other than Mathew Martoma,
18 correct?
19 A. That's right.
20 Q. And fair to say also, Dr. Gilman, that many of the names
21 we've looked at over the course of our examination yesterday
22 and today of your other GLG clients, like Mr. Shen and
23 Mr. Wong, are people that worked at firms that are not SAC
24 Capital, correct?
25 A. Correct.

E1ndmar5      Gilman - cross      Page 1772

1 Q. Now, Dr. Gilman, your next contact with the prosecutor
2 happened in February of 2012; do you remember that?
3 A. Yes.
4 Q. And by this time you had hired a lawyer, right?
5 A. Yes.
6 Q. It was a criminal defense specialist, right?
7 A. Yes.
8 Q. In fact, it was a lawyer who charged over a thousand
9 dollars an hour, correct?
10 A. Yes.
11 Q. And it wasn't just one lawyer but really a whole team of
12 lawyers from his firm, correct?
13 A. Yes.
14 Q. At least three partners at the firm that you worked with,
15 correct?
16 A. Yes.
17 Q. And a number of junior associates there as well?
18 A. Yes.
19 Q. And fair to say that you and your lawyers went through your
20 calendar entries and the documents that you had before you met
21 with the prosecutors?
22 A. Yes.
23 Q. And after you had done that review, you and your lawyers
24 decided to go back and speak in a more formal way with the
25 prosecutors, correct?

E1ndmar5      Gilman - cross      Page 1773

1 A. Yes.
2 Q. And fair to say that your lawyers set up a meeting with the
3 prosecutors that was called a proffer meeting?
4 A. Yes.
5 Q. And do you understand that that proffer meeting is called a
6 proffer meeting because it happens pursuant to a proffer
7 agreement?
8 A. Yes.
9 Q. And, Dr. Gilman, did you understand, also, that according
10 to the proffer agreement that you signed with the prosecutors,
11 you could say anything that you wanted to in this session and
12 the prosecutors could not use it directly against you in any
13 case that they wanted to bring against you? Did you understand
14 that?
15 A. Yes.
16 Q. But they could use whatever you said against -- to build a
17 case against Mathew Martoma, correct?
18      MR. DEVLIN-BROWN: Objection.
19      THE COURT: Sustained.
20 Q. Well, you understood, Dr. Gilman, did you not, that they
21 could use the things that you said to try to build a case
22 against Mr. Martoma, correct?
23 A. I did not understand that.
24 Q. Well, didn't you understand that they could use the things
25 you said to try to build a case against Mr. Cohen?

GOODWIN | PROCTER

Richard M. Strassberg
212.813.8859
rstrassberg@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
The New York Times Building
620 Eighth Avenue
New York, NY 10018
T: 212.813.8800
F: 212.355.3333

January 23, 2014

**BY ECF AND HAND DELIVERY**

Honorable Paul G. Gardephe
United States District Court for the
   Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 1007

Re:    ***United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y.)**

Dear Judge Gardephe:

    We write on behalf of Mathew Martoma in response to the Government's letter motion to preclude expert testimony that Mr. Martoma will offer from Professor Paul Gompers and Dr. Thomas Wisniewski ("Gov't Letter Mot."). (Dkt. No. 216.) Specifically, the Government requests that this Court (1) preclude certain portions or all of Professor Gompers's testimony or, alternatively, compel additional disclosures and (2) preclude certain portions of Dr. Wisniewski's testimony. Mr. Martoma, however, has satisfied the requirements of Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 702 with respect to both Professor Gompers and Dr. Wisniewski. The Government's motion attempts to prevent Mr. Martoma from putting on a defense in his own case. It should be denied, and Mr. Martoma should be allowed to introduce the testimony of both experts.

**I.    Professor Gompers Should Be Allowed to Offer His Expert Opinions.**

    **A.    Professor Gompers Is Plainly Qualified as an Expert.**

    Professor Gompers is the Eugene Holman Professor of Business Administration and Faculty Chair of the M.B.A. Elective Curriculum at the Harvard Business School. He teaches Ph.D., M.B.A., and Executive Education courses and conducts research in corporate finance, the behavior of institutional investors, the structure and governance of public and private companies, the valuation of companies, and entrepreneurial finance and management (including the venture capital industry, young start-ups, and high growth-potential firms). His teaching and research focus on (among other things) the valuation of pharmaceutical and biotech companies such as Elan and Wyeth and the practices of

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 2

institutional investors, including hedge funds.  In addition to his teaching responsibilities, Professor Gompers is a Research Associate at the National Bureau of Economic Research, the largest (and arguably most prestigious) economic "think tank" in the United States.

Professor Gompers also has written numerous case studies and technical notes and published numerous articles in peer-reviewed finance and economics journals on valuation, venture capital and private equity industries, and entrepreneurial finance.  Professor Gompers is the coauthor of three books: The Venture Capital Cycle (editions 1 and 2) published by MIT Press, The Money of Invention published by Harvard Business School Press, and Entrepreneurial Finance: A Casebook published by John Wiley & Sons, Inc.  Many of these case studies, notes, research articles, and books have directly examined the valuation of pharmaceutical and biotech companies such as Elan and Wyeth and the practices of institutional investors such as hedge funds, including:

- Institutional Investors and Equity Prices, *Quarterly Journal of Economics*, 114, 229-60 (2001) (with Andrew Metrick)

- Who Underreacts to Cash Flow News?,  *Journal of Financial Economics*, 66, 409-62 (2002) (with Randy Cohen and Tuomo Vuolteenaho)

- Large Blocks of Stock:  Prevalence, Size, and Measurement, *Journal of Corporate Finance*, 12 594-618 (June 2006) (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick)

- Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies, *Journal of Finance*, 52, 1791-1821 (Dec. 1997) (with Alon Brav).

In addition, Professor Gompers is an Associate Editor for *Small Business Economics*, *Journal of Private Equity*, *Journal of Finance*, *Journal of Financial Economics*, *Journal of Economic Literature*, and *Journal of Economics and Management Strategy*.

Professor Gompers has consulted for many private equity and venture capital firms, including firms such as Bessemer Venture Partners and E.M. Warburg, Pincus, both of which invest substantially in pharmaceutical and biotech companies.  Professor Gompers serves on the boards of many private equity and venture capital firms, including firms such as Evergreen Partners, Khosla Ventures, Knightsbridge Investment Advisers, and Spur Capital Partners that invest (directly or indirectly) in pharmaceutical and biotech companies.

Professor Gompers has served as an expert in many legal matters, testifying at trial at least 12 times and in deposition approximately 25 times – including 7 pharmaceutical and biotech cases. Specifically, he has served as an expert on (*inter alia*) the valuation of public and private companies,

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 3

factors affecting public company securities prices, the efficiency of securities markets, and the custom and practice of institutional investors. He has testified about the valuation of pharmaceutical and biotech companies and the practices of institutional investors such as hedge funds in 9 cases, including:

- *In re Northfield Laboratories, Inc. Securities Litigation*, United States District Court for the Northern District of Illinois, Case No. 06 C 1493.
- *In Re Pfizer Inc. Securities Litigation, Henry A. McKinnell, John L. LaMattina, Karen L. Katen, Joseph M. Feczko, and Gail Cawkwell*, United States District Court for the Southern District of New York, Case No. 04 Civ. 9866.
- *In Re Schering-Plough Corporation Securities Litigation*, United States District Court of New Jersey, Case No. 01-829 (KSH).
- *In Re Bristol-Myers Squibb Securities Litigation*, United States District Court of New Jersey Case No. 00-1990 (SRC).
- *Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al.*, United States District Court for the District of Minnesota, Case No. 08-6324 PAM/AJB.
- *In Re Merck & Co., Inc. Securities Litigation*, United States District Court for the District of New Jersey, Case No. 3:05-CV-01151-SRC-MF and No. 3:05-CV-02367-SRC-MF.
- *Securities and Exchange Commission v. BioPure Corporation et al.*, United States District Court for the District of Massachusetts, Case No. 05-CV-11853.
- *Global GT LP, et al. v. Golden Telecom, Inc., Court of Chancery of the State of Delaware*, Case No. 3698-VCS.
- *IBEW Local 90 Pension Fund v. Deutsche Bank AG et al.*, United States District Court for the Southern District of New York, Case No. 1:11-cv-04209-KBF.

Professor Gompers's *curriculum vitae* is attached as Appendix A.

**B.      Mr. Martoma's Expert Disclosure for Professor Gompers Is Sufficient.**

The Government argues that Mr. Martoma does not sufficiently disclose the bases and reasons for Professor Gompers's opinions. (Gov't Letter Mot. at 3-4) The Government is wrong. To the extent that Professor Gompers relies on his education and professional experience, Mr. Martoma has provided his *curriculum vitae*, which details his education, training, and experience. That is an acceptable basis for expert testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999) ("Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993))); *United States v. Jackson*, 51 F.3d 646, 650-51 (7th Cir. 1995) (finding Rule 16 disclosures to be sufficient where they stated that opinions would be based "on [the experts'] years of training and experience" in the field); *United States v. Rogers*, No. 05-292 (RWR), 2006 WL 5249745, at *3 (D.D.C. July 17, 2006) ("A party sufficiently states an expert's basis for his testimony by noting the expert's education, training and experience and

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 4

attaching a resume."). In addition, Mr. Martoma has identified 169 exhibits (DX 1-122, 124, 138-141, 165, 196-208, 210-226, 236, 244-245, 247, 251-252, 254, 261-262, and 273-274) that serve as bases for Professor Gompers's opinion, as well as SAC trading records and stock price data that are in the Government's possession and/or publicly available. This is more than sufficient disclosure.

The Government seems to suggest that Mr. Martoma should expressly associate particular documents or bases with particular opinions (Gov't Letter Mot. at 3-4), but nothing in Rule 16 requires such disclosure. Rule 16 "requires only a summary of an expert's testimony, bases and reasons, and not every detail." *United States v. Cerna*, No. CR 08-0730 (WHA), 2010 WL 2347406, at *2 n.1 (N.D. Cal. June 8, 2010).[1] Indeed, courts have upheld expert disclosures with far less information on an expert's bases and reasons than Mr. Martoma's disclosure.[2] *E.g.*, *United States v. Lesniewski,* No. 11 CR 1091, 2013 WL 3776235, at *13 (S.D.N.Y. July 12, 2013) (allowing expert testimony where the disclosure stated that the expert "was expected to offer opinions based on his training and experience and his review of certain records in the case" and included the expert's *curriculum vitae*).[3]

Nevertheless, Mr. Martoma hereby provides additional disclosure in response to the Government's request to avoid further debate on the issue. Professor Gompers will offer the following opinions with the following bases:

---

[1] *Accord United States v. Nacchio*, 519 F.3d 1140, 1152 (10th Cir. 2008), *vacated in part on other grounds*, 555 F.3d 1234 (10th Cir. 2009) (noting that the expert disclosure requirements of Federal Rule of Criminal Procedure 16 are lenient compared to the more extensive disclosure required by Federal Rule of Civil Procedure 26 which, unlike Rule 16, requires disclosure of "all summary or supporting exhibits" on which the expert will rely), *vacated in part on other grounds on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009); *United States v. McCluskey*, No. CR 10-2734 (JCH), 2013 WL 3766686, at *3 (D.N.M. June 20, 2013) ("Detailed, extensive discussion is not required in the Rule 16 summary: Although the summary required by Rule 16 provides the defense with some notice, the requirement of setting forth "the bases and reasons for" the witnesses' opinions does not track the methodological factors set forth by the *Daubert* Court.'" (quoting Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert *Test*, 78 Minn. L. Rev. 1345, 1360 (1994))).

[2] The cases cited by the Government (*see* Gov't Letter Mot. at 4) are not to the contrary. Both *United States* v. *Sturman*, No. 96 Cr. 318, 1998 WL 126066 (S.D.N.Y. Mar. 20, 1998), and *United States* v. *Jasper*, No. 00 Cr. 825, 2003 WL 223212 (S.D.N.Y. Jan. 31, 2003), directed supplementation of disclosures providing far less detail than Mr. Martoma's. In *Jasper*, the defendant had provided **no disclosure of the content of the expert's opinions at all**, 2003 WL 223212, at *2 ("Thus far, [Defense counsel] has not produced a summary of [expert's] prospective testimony, or any other discovery materials that he intends to use at trial."), and in *Sturman* the disclosure merely stated that the bases of the expert's opinions "will include, but not be limited to" examinations, conversations, and other unspecified records. 1998 WL 126066, at *1.

[3] *See also United States v. Duvall*, 272 F.3d 825, 828 n.1 (7th Cir. 2001) (concluding that a Rule 16 disclosure stating that the expert's testimony would be "based on his education, training and experience" and attaching a copy of his resume "conforms to the minimum that we have found adequate"); *Jackson*, 51 F.3d at 650-51 (finding Rule 16 disclosures to be sufficient where they stated that opinions would be based "on [the experts'] years of training and experience" in the field); *Rogers*, 2006 WL 5249745, at *3 ("A party sufficiently states an expert's basis for his testimony by noting the expert's education, training and experience and attaching a resume.").

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 5

- There was no pattern of trading in Elan and Wyeth securities around SMC meetings by SAC or Mr. Martoma from 2006 through 2008. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on the Government's criminal complaint and indictments (which identify the timing of the SMC meetings) and SAC's holdings data for Elan and Wyeth.

- The market for Elan securities was "overheated." More specifically, in the weeks following the June 17, 2008 press release announcing the Phase II bapi trial results, most of the potential value of bapi as a blockbuster drug was already incorporated into the price of Elan securities. As a result, there was little additional upside for Elan securities and considerable downside risk if the market's blockbuster expectations were not met. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on analysts' forecasts for bapi from analyst reports concerning Elan, market and industry data, stock price data for Elan, and other publicly available data from the Federal Reserve, Ibbotson, Alcra, and S&P Capital IQ.

- SAC had a net long position in Wyeth immediately prior to the presentation of the Phase II bapi trial results at ICAD (in connection with a large swap contract), and SAC's short positions in Elan and Wyeth securities in July 2008 are consistent with a strategy of hedging SAC's long position in Wyeth securities. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on SAC's holdings data for Elan and Wyeth and SAC's swap agreements involving Wyeth.

- It was not uncommon for SAC to sell large positions in a short period of time. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on SAC's holdings and trading data.

- The manner in which SAC sold Elan and Wyeth securities between July 21, 2008, and July 29, 2008 – specifically, its use of "dark pools" and algorithms -- was consistent with industry standards. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on public press and Securities & Exchange Commission ("SEC") speeches and press releases.

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 6

     The Government argues at length that the deposition testimony of Steven Cohen before the SEC is not a proper basis for Professor Gompers's opinions. (Gov't Letter Mot. at 4-6.)  As the Second Circuit has made clear, depositions are a proper basis for expert testimony.  *Castaldi v. Land Rover N. Am., Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009) ("There is no question that an expert witness of the type employed by Land Rover may rely on deposition testimony in forming an opinion."); *accord Rodriguez v. Athenium House Corp.*, No. 11 CIV. 5534 (LTS) (KNF), 2013 WL 796321, at *1, *3 (S.D.N.Y. Mar. 5, 2013) ("In his expert report, [the expert] relies upon several sources of information, including the ***deposition testimony*** of multiple witnesses, building records, and observations and measurements made during two visits to the scene of the accident, in determining why the bulletin board fell from the wall. . . .  The Court therefore declines to find that [the expert] has based his conclusions on insufficient data or unreliable methods." (emphasis added)); *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003) ("[The expert's] opinion does not rely solely on any assumptions based on the recall notice.  He reviewed ***witness depositions***, medical records, and scientific literature in forming his expert opinion in this case. . . .  Because the record shows that [the expert's] opinion is based on more than his consideration of timing, [the defendant's] argument that [the expert's] opinion is speculative has no merit." (emphasis added)).[4]

     The Government has focused disproportionately on Mr. Cohen's SEC deposition testimony.  As Mr. Martoma already explained to the Government (and as the disclosures above demonstrate), Professor Gompers does not rely on the SEC deposition testimony of Mr. Cohen (or anyone else) in reaching the conclusion that SAC's short sales of Elan and Wyeth securities in July 2008 are consistent with a strategy of hedging SAC's long position in Wyeth securities.  Rather, Professor Gompers relies on his analysis of SAC's transaction documents and trading data.  Professor Gompers will explain to the jury what an equity swap is, how SAC's equity swaps involving Wyeth worked, why those equity swaps constituted a long position in Wyeth, and why SAC's short positions in Elan and Wyeth are consistent with hedging its long position in Wyeth.  These points involve complex financial and economic concepts that require an expert to analyze SAC's swap agreements and trading data and explain to the jury what those records show.  Professor Gompers does all of that without relying on Mr. Cohen's testimony.  Prior references to Mr. Cohen's testimony regarding Mr. Cohen's intent to hedge the Wyeth swap were intended to show simply that Professor Gompers's conclusion was consistent with Mr. Cohen's stated "hedging" goal.  Professor Gompers's conclusion, however, remains the same even without Mr. Cohen's

---

[4] Indeed, the cases cited by the Government  do not stand for that proposition.  The Government cites language out of context to imply that use of deposition testimony by expert witnesses is never permissible.  That is false and contrary to Federal Rule of Evidence 703.  (*See* Gov't Letter Mot. at 4.)  *See In re Blech Sec. Litig.*, 94 CIV. 7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (holding that an expert cannot testify as a percipient witness, without bringing to bear his scientific expertise, regarding facts learned from reading a deposition transcript); *Pretter v. Metro N. Commuter R.R. Co.,* No. 00 Civ. 4366(JSR), 2002 WL 31163876, at *2 (S.D.N.Y. Sept. 30, 2002) (same); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), *abrogated by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011) (excluding an expert opinion that was "permeated with inadmissible legal opinions and conclusions directed at telling the jury what result to reach" and, therefore, threatened "to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence").

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 7

testimony. Since Professor Gompers does not need Mr. Cohen's testimony to form his opinions as to the hedge, and given the Government's objection, Mr. Martoma hereby withdraws Mr. Cohen's SEC testimony as a basis for Professor Gompers's opinions and agrees not to elicit any testimony from Professor Gompers regarding Mr. Cohen's deposition.

## C.    Professor Gompers Should Not Be Precluded from Offering His Expert Testimony.

The Government seeks to preclude Mr. Martoma from offering expert testimony by objecting to virtually all of Professor Gompers's conclusions. The Government, however, provides no basis for this Court to exclude any of those conclusions.

As an initial matter, the Government misstates the standard for the admissibility of expert testimony under Federal Rule of Evidence 702 and *Daubert*. The Government argues that Professor Gompers's opinions are inadmissible because they require knowledge of SAC and/or involve questions of fact. (Gov't Letter Mot. at 8-10.) But expert testimony is admissible if it explains evidence that is otherwise difficult to understand and/or "beyond the ken of the average juror." *United States v. Paige*, 335 F. App'x 98, 100 (2d Cir. 2009); *accord United States v. Lombardozzi*, No. S1 02 CR. 273 (PKL), 2003 WL 1907965, at *2 (S.D.N.Y. Apr. 17, 2003). As the Second Circuit has explained, one purpose of expert testimony is to discuss facts in order to share specialized insight or identify which facts are most significant, based on the expert's knowledge and experience. *See, e.g.*, *Paige*, 335 F. App'x at 100 (admitting as appropriate expert testimony an opinion that "was not limited to abstract propositions but actually analyzed the evidence in light of those propositions"); *United States v. Mulder*, 273 F.3d 91, 101-02 (2d Cir. 2001) (allowing expert testimony that explains the facts outlining a labor organization's history and tactics when that organization's workings "[we]re not well known or commonly understood" by the jury). As the Second Circuit has also made clear, experts may "provid[e] the groundwork in the form of an opinion to enable the jury to make its own informed determination" about the facts in the case. *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Professor Gompers's opinions are quintessential subjects of expert testimony. Such testimony is admissible, and Professor Gompers should be allowed to testify about his opinions in this case.

### 1.    Professor Gompers Should Be Allowed to Testify That There Was No Pattern of Trading in Elan and Wyeth Securities around SMC Meetings by SAC or Mr. Martoma from 2006 through 2008.

The Government argues that "this is not appropriate expert testimony" because "[t]here is no specialized knowledge required to determine associations between the timing of meetings and trades," as evidenced by the fact that "Mr. Strassberg made this argument, complete with summary chart, during his opening." (Gov't Letter Mot. at 6.) That argument makes no sense. Mr. Strassberg made those statements about the trading in Elan and Wyeth securities around SMC Meetings precisely because Mr. Martoma expected to introduce such evidence through his witnesses, including Professor Gompers.

JA189

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 8

Presumably, the Government would object – indeed, it has already objected – if the Defense simply offered evidence without a witness.[5]

The Government also argues that "[t]he relationship between the dates of SMC meetings and SAC's trades in Elan and Wyeth can be . . . offered through a summary chart, without being parroted through the mouth of an expert."  (Gov't Letter Mot. at 7.)  "In securities cases, federal courts have admitted expert testimony to assist the trier of fact in understanding trading patterns."  *S.E.C. v. U.S. Envtl., Inc.*, No. 94 CV 6608 (PKL) (AJP), 2002 WL 31323832, at *2-3 (S.D.N.Y. Oct. 16, 2002); *accord United States v. Russo*, 74 F.3d 1383, 1388, 1394-95 (2d Cir. 1996) (noting that expert's trial testimony included discussion of "trading patterns, using charts and lists of stock movement").  Professor Gompers's testimony that there was no pattern of trading in Elan and Wyeth securities around SMC meetings by SAC or Mr. Martoma from 2006 through 2008 is exactly the sort of expert testimony that federal courts routinely admit in securities cases.  *See, e.g., S.E.C. v. Lorin*, 877 F. Supp. 192, 197 (S.D.N.Y. 1995), *vacated in part on different grounds*, 76 F.3d 458 (2d Cir. 1996) (referring to expert testimony regarding price quotes with respect to relevant trades); *see also Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 178 (S.D.N.Y. 2008) (noting that courts frequently permit "expert testimony to assist the trier of fact in understanding trading patterns"); *U.S. Envtl.*, 2002 WL 31323832, at *4 ("[C]ontrary to the defendants' argument, the conclusions [the expert] arrives at from analyzing the trading records, depositions and other documents are not ones upon which a lay person could readily hypothesize."); Trial Transcript at 4692, 4700-4703, *United States v. Rajaratnam*, 802 F. Supp. 2d 491 (S.D.N.Y. April 14, 2011) (No. 09 Cr. 1184) (permitting an expert to describe and analyze the defendant's trades).

> **2.  Professor Gompers Should Be Allowed to Testify That Most of the Potential Value of Bapi as a Blockbuster Drug Was Already Incorporated into the Price of Elan Securities Following the June 17, 2008 Press Release.**

The Government argues: "The issue at trial is what Martoma thought of the Elan and Wyeth stocks, and what information that he had, informed that opinion.  Whether some un-named third-party might or might not have thought that the Elan and Wyeth stocks were overheated, overvalued, or had little upside, is not relevant."  (Gov't Letter Mot. at 7.)  Not so.

---

[5] The Government similarly argues that "[t]he relationship between the dates of SMC meetings and SAC's trades in Elan and Wyeth can be argued by defense in closing."  (Gov't Letter Mot. at 7.)  That presents the same problem.  Mr. Martoma intends to make arguments in closing about the trading in Elan and Wyeth securities around SMC Meetings by pointing, as he must, to evidence that has been introduced to support those arguments.  Once again, the expert analysis and testimony of Professor Gompers is a large part of that evidence.  The Government cannot use anticipated closing arguments about Professor Gompers's testimony as a reason to preclude Mr. Martoma from offering the very testimony that would support them.

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 9

The Government has charged Mr. Martoma with trading based on inside information. In his defense, Mr. Martoma should be able to meet that charge by offering evidence of alternative explanations for sales of Elan and Wyeth and to put SAC's sales into context by proffering evidence concerning the then-current state of the market for the relevant securities. That evidence may be circumstantial, including other reasons that the jury may infer influenced his trading. The Government apparently made a strategic decision not to offer evidence on whether the market for Elan was overheated, and it can always argue that SAC and Mr. Martoma sold Elan and Wyeth securities for another reason (as it already has). But Mr. Martoma is entitled to put on his own case, including evidence of other reasons to sell. Professor Gompers's testimony – which involves an analysis of the price and value of Elan securities, including (among other things) an event study, and explains what it means for a market to be overheated – is indisputably the stuff of expert testimony. Courts routinely allow such expert testimony in securities cases. *See, e.g.*, *Russo*, 74 F.3d at 1395 ("[W]e have noted that '[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.'" (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *United States v. Schiff*, 602 F.3d 152, 171-72 (3d Cir. 2010) ("[C]ourts often turn to economic experts to determine whether a particular announcement had an appreciable effect on the stock price." (internal quotation marks omitted)); *Nacchio*, 519 F.3d at 1155 ("An economic expert is permitted not only to tell the jury that an economic concept is an issue but to analyze the concept and offer informed opinions. In other words, expert testimony may assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context. That is why expert economic testimony is routine when a materiality determination requires the jury to decide the effect of information on the market." (citation and internal quotation marks omitted)). This Court should do the same.

Moreover, there can be no real dispute that Professor Gompers's testimony is relevant. Professor Gompers concludes that most of the potential value of bapi as a blockbuster drug was already incorporated into the price of Elan securities following the June 17, 2008, press release announcing the Phase II bapi trial results based on (1) analysts' forecasts for bapi from analyst reports concerning Elan, (2) market and industry data, (3) stock price data for Elan and industry competitors, and (4) other publicly available data from the Federal Reserve, Ibbotson, Alacra, and S&P Capital IQ. Those are the very sorts of materials (and, in many cases, the exact same materials) that were analyzed by Mr. Martoma in making his investment decisions in Elan (and Wyeth) securities, as the evidence in this case shows. Indeed, the documents and testimony demonstrate that Mr. Martoma was in fact considering publicly available materials speaking to the precise issue that is the subject of Professor Gompers's testimony – *i.e.*, the state of the market for Elan securities and the relative upside and downside risk for those securities – in the period leading up to SAC's trades in Elan and Wyeth in July 2008. For example:

- On July 11, 2008, Mr. Martoma received a Brean Murray Carret & Co. analyst report stating: "Despite revenue and expense estimates that we view as generous, we believe the

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 10

existing business lines, even if they can continue the strong growth we project, are far from sufficient to support Elan's market value. Therefore, given our projected clinical failure for bapineuzumab, **we view Elan's market value as inflated**." (DX 9 at 12-13 (emphasis added).)

- On July 11, 2008, Mr. Martoma received a Piper Jaffray & Co. analyst report stating: "***We view the recent stock appreciation as unwarranted*** based on the available data and high risks associated with any drug in development for Alzheimer's." (DX 113 at 1 (emphasis added).)

- On July 17, 2008, Mr. Martoma received a Canaccord Adams analyst report stating that "Elan has risen 38.5% over one month on top-line Phase 2 results for bapineuzumab in Alzheimer's disease (AD). . . . While we believe that bapineuzumab will be the first disease modifying AD therapy to reach the market, ***the US$10-15 billion in sales the market expects is not an achievable target, in our view***. We believe that the market dynamics combined with the number of other products currently in development will create a strong competitive environment, limiting bapineuzumab's potential to US$6 billion in global sales." (DX 12 at 1 (emphasis added).)

- On July 17, 2008, Mr. Martoma received a Caris & Company analyst report stating: "At its current price, ***we believe ELN is factoring in 2015 bapineuzumab sales of more than $23B, implying the drug becomes the largest pharmaceutical product ever, by far***. This is a key risk to owning ELN, especially given the early-stage nature of the results and that the valuation is being supported by a partially disclosed Phase II sub-analysis." (DX 13 at 1 (emphasis added).)

- On July 22, 2008, Mr. Jandovitz (Mr. Martoma's trader) sent Mr. Martoma an instant message about Elan stating: "mkt horrible, ***stock has had huge run***[.]" (DX 310 (emphasis added); *see also* Trial Transcript at 208:2-4, *United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y.) ("Tr.")).

- On July 22, 2008, Mr. Jandovitz sent Mr. Martoma an e-mail about Wyeth stating: "Profit taking in front of qtr, blah blah blah. ***Profit taking in front of icad.***" (DX 369 (emphasis added); *see also* Tr. at 241:9-21.)

- On July 25, 2008, Mr. Martoma sent an instant message to Mr. Jandovitz stating: "***seems like we should be selling down our long biotechs.***" Mr. Jandovitz replied: "Y, agree." (DX 324 (emphasis added); *see also* Tr. at 242:3-25.)

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 11

Indeed, even the Government admits that, "if the defense wants to offer evidence that Martoma thought the stock was overheated, or discussed such an issue with someone at SAC at the time, such evidence would be relevant because it would go to the defendant's state of mind at the time." (Gov't Letter Mot. at 7 n.3.) Professor Gompers's testimony, which concerns those very issues, is just as relevant.

The Government also argues that whether the drug approval process is challenging "is irrelevant" because (1) "[t]his generalization provides no insight into the drug at issue in this case, much less what Martoma thought about bapineuzumab at the time he made his trades"; (2) Professor Gompers "does not seem, from the face of the defense disclosures, to be qualified to give expert testimony on the subject of drug trials and their success rates"; and (3) SAC's trading records and Mr. Martoma's exhibits do not provide a basis for Professor Gompers's opinion. (Gov't Letter Mot. at 8.) That, too, is wrong.

Professor Gompers will offer expert testimony on the *narrow* point that blockbuster status was necessary to support bapi's valuation and Elan's stock price, but, even given Dr. Gilman's optimism about bapi *and* the approval of Phase III trials for bapi, blockbuster status for any drug at bapi's stage of development was a remote possibility. Professor Gompers also will testify that Elan's stock price following the June 17, 2008, press release supported projected peak sales of bapi of over $7.4 billion per year, which would have made it the second highest selling drug in the United States at the time. Contrary to the Government's claims, the challenging nature of the drug approval process is directly relevant to the valuation of drugs in development and production such as bapi, as well as the valuation and stock price of the pharmaceutical and biotech companies that are developing and manufacturing those drugs such as Elan. In other words, the key to valuing Elan is valuing the drug pipeline of that company (including bapi), and the key to valuing the drug pipeline is valuing the likelihood of success of the drugs in the pipeline (including bapi). Accordingly, a key question for anyone evaluating a position in Elan or Wyeth on the eve of ICAD would be whether the then-current valuation of the securities already accounted for anticipated blockbuster sales.

Professor Gompers has extensive experience with the drug approval process as part of his experience valuing pharmaceutical and biotech companies and consequently is more than qualified to provide expert testimony on the subject of drug trials and their success rates, which have been a subject of his professional experience, academic research, and prior expert testimony.[6] That experience and research – not SAC's trading records or Mr. Martoma's exhibits – provide the basis for Professor Gompers's opinion. Professor Gompers should be permitted to testify about the drug approval process and the hurdles to blockbuster status as they relate to the valuation of bapi and the stock price of Elan.

---

[6] For example, he has written the following case studies: "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297-095; "Elliot Lebowitz." Harvard Business School Case 297-04; "Genset Initial Public Offering (A)." Harvard Business School Case 297-06; "Genset Initial Public Offering (B)." Harvard Business School Case 297-097; "Genset: 1989." Harvard Business School Case 298-070. He has also testified in seven cases concerning pharmaceutical and biotech companies. (*See supra* at 3.)

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 12

> **3.** **Professor Gompers Should Be Allowed to Testify That SAC Had a Net Long Position in Wyeth Immediately Prior to the ICAD Presentation, and SAC's Short Sales Are Consistent with a Strategy of Hedging That Long Position.**

The Government argues that "Prof. Gompers should not be permitted to provide expert testimony that goes to the reasons behind the Wyeth trades at issue in the case" because "[t]he facts surrounding the trading at SAC, and the reasons for such trading, are factual issues in the case." (Gov't Letter Mot. at 9.) That is wrong as a matter of fact and law. Professor Gompers will not testify as to why SAC engaged in certain trades. Rather, he will testify as to the net economic effect of the trades at issue which (not coincidentally) is consistent with a hedge. In other words, Professor Gompers will not testify that SAC did in fact short Elan and Wyeth in order to hedge its long Wyeth position, but rather that SAC's trades as a whole had the economic effect of, and were consistent with, a hedge. Since the Government argues that the Elan and Wyeth short sales in isolation are evidence of malfeasance tending to inculpate Mr. Martoma, Mr. Martoma must be permitted simply to point to the whole picture, which tends to counter that argument. Expert testimony that discusses facts in order to share specialized insight or identifies which facts are most significant, based on the expert's knowledge and experience, is admissible. *See, e.g.*, *Paige*, 335 F. App'x at 100 (admitting as appropriate expert testimony an opinion that "was not limited to abstract propositions but actually analyzed the evidence in light of those propositions"); *Mulder*, 273 F.3d 91, 101-02 (2d Cir. 2001) (allowing expert testimony that explains the facts outlining an organization's history and tactics when that organization's workings "[we]re not well known or commonly understood" by the jury). That is precisely the testimony that Professor Gompers will offer.

Moreover, Professor Gompers's conclusions are based on his analysis of SAC's trading records surrounding ICAD. Those trading records show that SAC had engaged in equity swaps with respect to Wyeth and short sales with respect to both Elan and Wyeth. These are the very sort of complicated financial concepts that require explanation for the jury and are properly the subject of expert testimony. *See, e.g.*, *Russo*, 74 F.3d at 1395 ("[W]e have noted that '[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.'" (quoting *Bilzerian*, 926 F.2d at 1294)).[7] That is all the more true given that the Government has raised the issue of SAC's short sales of Elan securities. (Tr. at 60:11-16 ("SAC Capital also shorted Elan and Wyeth stock, which is basically a stock trade that will profit if the price of the stock falls.").)

Further, since the Government already has argued that the Elan short sales evidence Mr. Martoma's guilt, Mr. Martoma must be allowed to offer evidence of alternative explanations for SAC's trading in his defense, such as the explanation that SAC's short sales are consistent with a

---

[7] *Accord In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *41 (N.D. Ohio June 4, 2010) (permitting expert testimony to decipher "complicated" "documents and articles" and to explain to the jury the logical inferences warranted by such documents).

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 13

strategy of hedging its long position in Wyeth. (*See supra* at 6-7.) Indeed, even the Government admits that Professor Gompers may testify about the concept of hedging. (Gov't Letter Mot. at 9.) Courts hearing securities cases frequently admit this type of "expert testimony to assist the trier of fact in understanding trading patterns, securities industry regulations, and complicated terms and concepts inherent in the practice of the securities industry." *Highland*, 551 F. Supp. 2d at 178.[8]

In fact, in recently admitting similar testimony from Professor Gompers, the District of Connecticut held that "testimony will be admitted if it helps the fact finder 'understand the facts already in the record, even if all it does is put those facts in context.'" *In re Xerox Corp. Sec. Litig.*, No. 3:99 CV 02374 (AWT), 2009 WL 8556135, at *3 (D. Conn. Apr. 22, 2009) (quoting *United States v. Schiff*, 538 F. Supp. 2d 818, 844 n.26 (D.N.J. 2008)). As that court noted: "Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts." *Id.* (quoting *United States v. Duncan*, 42 F.3d 97, 1010 (2d Cir. 1994)). For the same reasons, this Court should allow Professor Gompers to offer his opinions about SAC's trading around the ICAD presentation.

> **4.    Professor Gompers Should Be Allowed to Testify That SAC Commonly Sold Large Positions in a Short Period of Time.**

The Government has "question[ed] the relevance of certain other trades at SAC not involving Martoma, and argu[ed] that the defense should not be able to characterize SAC's business model without an opportunity for the Government to offer other evidence concerning inappropriate trading that happened at SAC." (Gov't Letter Mot. at 8.) The Government is wrong on both points.

As an initial matter, "the Government does not dispute that a summary witness could potentially synthesize SAC trading data to show SAC's positions in securities at particular times." (Gov't Letter Mot. at 9.) That is essentially all that Professor Gompers would do on this point. As a result, there may be no dispute between the parties.

To the extent that the Government continues to object to such testimony on relevance grounds, the Government has no basis. The Government has focused in its press release announcing the charges, its Superseding Indictment, and its opening statement on the fact that SAC completely reversed a large position in Elan and Wyeth securities in a very short period of time, suggesting that this quick reversal of position is so unusual that it is itself probative of Mr. Martoma's guilt. (Tr. at 60:3-10 ("In the seven trading days before the results would be announced to the world, Mathew Martoma sold all of the $100

---

[8] *See also United States v. Valle*, No. 12 CR. 847 (PGG), 2013 WL 440687, at *7 (S.D.N.Y. Feb. 2, 2013) (Gardephe, J.) (admitting expert testimony and noting that, "although some jurors may have familiarity with Internet messaging, it is unlikely that the average juror is familiar with the role-playing activity that [the expert] was prepared to explain in the specific context of sexually oriented conversations in cyberspace" (quoting *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008)).

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 14

million of Elan and Wyeth that was in his portfolio.  And Mr. Cohen sold all of the Elan and Wyeth stock that Mathew Martoma had been recommending that he buy.").)[9]  Professor Gompers's testimony that SAC commonly sold large positions in a short period of time is therefore directly relevant to the Government's allegation that, based on inside information, SAC sold its approximately $700 million position in Elan and Wyeth securities over the span of seven trading days.  (Superseding Indictment ¶ 14.)  Based on the speed with which SAC adjusted its position in Elan and Wyeth securities, the Government would have the jury infer that SAC was trading on inside information.  Professor Gompers's testimony will demonstrate that Elan and Wyeth were not the only examples of such reversals by SAC but rather that there were a number of other examples in 2008 for which there have been no allegations of insider trading.  This is not some form of "cherry-picking" by Professor Gompers.  The Government has held up Elan and Wyeth to the jury as a sufficiently unique instance of SAC reversing a large position in a very short period of time as to constitute evidence of insider trading.  Professor Gompers will simply present other examples where SAC did so, thereby meeting the Government's argument head on and disproving the inference that the Government would have the jury draw.  That is the very definition of relevant evidence.  *See, e.g.*, *S.E.C. v. Moran*, 922 F. Supp. 867, 892-93 (S.D.N.Y. 1996) (finding that the defendant's history of purchasing large quantities of other stocks weighed against a finding of insider trading because "the amount of purchases were not aberrational to [the defendant's] style of investing in securities"); *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (finding admissible "probative rebuttal evidence countering the [opposing party's] evidence").

In this respect, Professor Gompers's testimony does not open the door to "other evidence concerning inappropriate trading that happened at SAC."  (Gov't Letter Mot. at 8.)  Professor Gompers will not offer testimony that any trade at SAC was or was not appropriate; he will testify only to the very narrow point that, contrary to the Government's implication, there are several other instances where SAC reversed large positions in a very short period of time.  There is also no factual connection between Professor Gompers's testimony and insider trading at SAC because it is undisputed that the examples that Professor Gompers will discuss have not been the subject of insider trading charges.  And it would be  plainly unfair for the Government to be permitted to argue Mr. Martoma's guilt from an inarguably false premise (that the Elan and Wyeth trades were uniquely large and rapid), but Mr. Martoma not to be permitted simply to counter that premise by pointing to relevant counter-examples.  "Indeed, the Government agrees with the defendant that the guilty pleas of others at SAC Capital (or the entity itself) have no relevance under the law as to the guilt or innocence of the defendant.  And the Government

---

[9] *See also United States v. Mathew Martoma – Prepared Remarks for U.S. Attorney Preet Bharara* (Nov. 20, 2012), available at http://www.justice.gov/usao/nys/pressconference/martoma/remarks.pdf , at 1("[I]n a matter of just days, [Mr. Martoma] caused the hedge fund not only to dump its shares but also to short the two drug stocks in advance of the negative drug trial becoming public.");  Superseding Indictment (ECF No. 61) ¶ 14.

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 15

commits that it will not seek to offer evidence of the SAC Guilty Pleas as evidence that Martoma too committed insider trading."[10]  Yet that is exactly what the Government now proposes to do.

### 5.  Professor Gompers Should Be Allowed to Testify That SAC's Use of "Dark Pools" and Algorithms to Sell Elan and Wyeth Securities Was Consistent with Industry Standards.

The Government concedes that Professor Gompers may testify "about the meaning of things such as hedging, dark pools and algorithmic trading" but objects to his opinion that the "use of dark pools and algorithmic trading" was "routine in the industry in 2008" because "it is not clear from the disclosed materials what methodology he has used to come to that conclusion or what the bases are for that opinion."  (Gov't Mot. at 9 (internal quotation marks omitted).)  The Government's argument is a makeweight.

Dark pools and algorithmic trading are precisely the type of complicated financial concepts that require explanation for the jury and are properly the subject of expert testimony.  (*See supra* at 12-13.)  The Government agrees that Professor Gompers may testify about the concepts.  (Gov't Mot. at 9.)  There should be no doubt that Professor Gompers may also testify that the manner in which SAC sold Elan and Wyeth securities between July 21, 2008, and July 29, 2008 – including specifically its use of dark pools and algorithms -- was consistent with industry standards.   Industry standards are an extraordinarily commonplace subject of expert testimony.  That is because, "without industry context, the jury may have no understanding of the importance, or lack of importance" of particular documents or actions in the case.  *Highland*, 551 F. Supp. 2d at 180, 185 ("[Securities] [i]ndustry custom and practice is relevant to the issues remaining in this case.  Therefore, this testimony is admissible and helpful to the jury.").[11]

With respect to the securities business, the  Second Circuit has conclusively resolved this issue in Mr. Martoma's favor:  "Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs:  to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."  *Marx & Co. v. Diners' Club, Inc.*, 550 F. 2d 505, 508 (2d Cir. 1977) (citing 7 *Wigmore on Evidence* § 1949, at 66 (3d ed. 1940)).  In fact, courts in this District have allowed expert testimony specifically on a hedge fund's characteristics, including its "investment strategy, objectives, risk factors, etc."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 461-62 (S.D.N.Y. 2010).  Expert testimony is of particular

---

[10] Government's Memorandum in Opposition to the Defendant's Fourth Motion *in Limine* to Exclude Evidence of Other SAC Actions, Settlements and Plea Agreements (ECF No. 141) at 1.

[11] *Accord In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) ("[An expert] can testify as to what ordinary broker activity entails and as to the customs and practices of the industry.").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 16

importance in this instance, where the Government has implied that these practices are somehow nefarious, yet now resists the introduction of expert testimony explaining that they are commonplace and have well-known legitimate purposes.

Moreover, this letter brief addresses the Government's stated concern that the bases for Professor Gompers's opinion are unclear. Those bases are Professor Gompers's education and professional experience, academic research and literature, public press, and SEC speeches and press releases. Those materials are plainly sufficient support for Professor Gompers's opinion. *See, e.g.*, *S.E.C. v. Badian*, 822 F. Supp. 2d 352, 363 (S.D.N.Y. 2011) *amended on reconsideration in part,* No. 06 CIV. 2621 LTS, 2012 WL 2354458 (S.D.N.Y. June 20, 2012) (holding that business school professors who taught classes, conducted research, and wrote papers regarding financial markets had the requisite "knowledge, skill and experience in finance" to "make them more than qualified to opine on the securities and issues involved"); *Blech*, 2003 WL 1610775, at *19-*20, *25, *27 (holding that an expert was qualified to give economic testimony on the securities trades at issue based on his "extensive background as a financial economist and 22 years of experience as a consultant and expert witness" and that another expert was also qualified to testify on securities trading based on his experience as a "professor at the University of Chicago, who has written and lectured on economic issues").

## II.     Mr. Martoma Should Be Allowed to Offer the Expert Testimony of Dr. Wisniewski.

Seemingly as an afterthought, the Government argues that Dr. Wisniewski should not be able to offer certain of his opinions. The Government does not dispute that Mr. Martoma has satisfied the requirements of Rule 16 with respect to Dr. Wisniewski's testimony. The Government also does not take issue with Dr. Wisniewski's qualifications or methodology. Instead, the Government objects to aspects of Dr. Wisniewski's testimony on relevance grounds. Specifically, the Government argues that Dr. Wisniewski's expert opinions on the following three subjects are irrelevant: (1) the meaningfulness of the information and differences between the Phase II bapi results disclosed in the June 17, 2008, press release and in the draft (and final) ICAD presentations; (2) the role of the SMC in the drug testing approval process and clinical trials, including the drug testing approval process for bapi and the Phase I, Phase II, and Phase III clinical trials; and (3) the responsibility of doctors participating in clinical trials to maintain the confidentiality of clinical trial results. (Gov't Letter Mot. at 9-10.)

Once again, the Government misunderstands the standard for the admissibility of expert testimony under Rule 702 and *Daubert*. The Government argues that Dr. Wisniewski's opinions are inadmissible because they involve questions of fact and go to an ultimate issue in the case. (Gov't Letter Mot. at 9.) Experts may offer opinions that concern the facts of the case. (*See supra* at 7.) They may also offer opinions that go to an ultimate issue. Indeed, the text of Federal Rule of Evidence 704, the advisory committee's note to that Rule, and courts in this District all agree that such testimony is permissible. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); Fed. R. Evid. 704 advisory committee's note ("[T]he so-called 'ultimate issue' rule is

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 17

specifically abolished by the instant rule."); *Lombardozzi*, 2003 WL 1907965, at *2 ("[E]xpert testimony is not excludable merely because it encompasses an ultimate issue of fact to be decided by the jury.").[12] An expert may properly give testimony that is relevant to, and encompasses ultimate issues in, the case; he simply cannot explain to the jury the legal standard applicable to the ultimate issues or offer flat legal conclusions by stating the legal significance of a certain fact. *Russo*, 74 F.3d at 1395 (admitting testimony that "focused solely on factual conclusions and did not involve any legal characterizations" where the expert "gave no opinion as to whether the appellants had violated the securities laws and did not make any statements about their intent; he simply described certain stock transactions and his opinion of their effect on the market").[13] Dr. Wisniewski's testimony is admissible, and he should be allowed to testify about his opinions in this case.

A.    **Dr. Wisniewski Should Be Allowed to Testify about the Meaningfulness of the Information in, and Differences between, the Disclosures of the Phase II Bapi Trial Results.**

The Government argues that "Dr. Wisniewski's opinion on whether information was 'meaningful' is irrelevant – the real question is whether the information was meaningful to investors" and "Dr. Wisniewski is not qualified to testify on this subject." (Gov't Letter Mot. at 10.) Not so. Dr. Wisniewski's testimony is clearly relevant to whether Mr. Martoma obtained and traded on material, non-public information concerning the Phase II bapi trial results – the Government's central allegation in this case.

The Government has charged Mr. Martoma with obtaining material, non-public information when he received SMC data and the draft ICAD presentation from Dr. Gilman. Therefore, whether the SMC data and the draft ICAD presentation contained material, non-public information is directly relevant to the charges against Mr. Martoma. That question can only be answered by determining whether the information in the SMC data and the draft ICAD presentation altered the total mix of information available. *See U.S. v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) (citing *U. S. v. Cusimano*, 123 F.3d 83, 88 (2d Cir. 1997)). The SMC data and the draft ICAD presentation are rife with specialized medical terminology and statistical information. "[E]xpert analysis is necessary to help the jury understand the evidence" when the "documents [the expert] would review at trial are complicated, and the inferences that may be drawn from them are not simple." *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 194 (S.D.N.Y. 2009) (allowing an expert "to interpret [published clinical trial] data

---

[12] Experts may not offer opinions that go to an ultimate issue if that testimony relates to a mental state or condition that constitutes an element of the crime charged or of a defense, which is plainly not the case here. Fed. R. Evid. 704(b).

[13] *Accord Duncan*, 42 F.3d at 102-03 (holding that expert could properly answer questions about whether a tax return was "false" or whether he believed there had been "money laundering," because "although the answer sought is a factual conclusion, it does not simply tell the jury what decision to make"); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763 (RMB) (JCF), 2006 WL 2136249, at *16 (S.D.N.Y. Aug. 1, 2006) (experts may properly "discuss[ ] the conduct that is the basis for such a legal conclusion" and "point to factors" tending to show that conclusion).

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 18

as it relates to the efficacy and safety of Fosamax treatment"); *In re Pfizer Inc. Sec. Litig.*, 04 Civ. 9866 (LTS) (JLC), 2010 WL 1047618, at \*3 (S.D.N.Y. Mar. 22, 2010) (holding that each plaintiff expert's "opinion regarding the interpretation of clinical trials and/or analysis and interpretation of data" was proper); *accord In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.,* No. 09-MD-02100 (DRH), 2011 WL 6302573, at \*5-\*8 (S.D. Ill. Dec. 16, 2011) (allowing an expert to testify about the "degree of efficacy, if any, demonstrated by the clinical studies"). The SMC data and the draft ICAD presentation are just the sort of complicated documents about which expert testimony is particularly helpful.

Moreover, the Government has opened the door to Dr. Wisniewski's expert testimony through the testimony that it has elicited from Dr. Ross and Dr. Gilman. The Government has made the placebo group decline and dose response reflected in the Phase II bapi trial results a focus of its case. Tr. at 704:6-706:23, 1420:1-1424:122, 1426:25-1427:9, 1439:5-11. In fact, the Government has specifically asked Dr. Ross and Dr. Gilman – whom the Government has described as "hav[ing] expertise in Alzheimer's Disease and bapineuzumab" that "informed their actions and views at the time of events"[14] – about placebo group declines and dose response in connection with (1) the June 17, 2008, press release, (2) the draft (and final) ICAD presentation, and (3) the differences between the two documents. Tr. at 704:6-706:23, 1420:1-1424:122, 1426:25-1427:9, 1439:5-11. Dr. Wisniewski should be allowed to offer his expert opinions about those same documents – including on the topics of placebo group declines and dose response – to rebut Dr. Ross's and Dr. Gilman's testimony. *See United States v. Wilson*, No. 04 Cr. 1016 (NGG), 2013 WL 1338710, at \*3 (E.D.N.Y. April 1, 2013) (warning that the Government would be permitted to introduce an expert to rebut evidence that the defendant submitsthrough lay witnesses or documentary evidence, so that the jury will not be "left with a lopsided view of the facts").

**B.      Dr. Wisniewski Should Be Allowed to Testify about the Role of the SMC in the Drug Testing Approval Process and Clinical Trials, Including the Drug Testing Approval Process and Clinical Trials for Bapi.**

The Government argues that "[s]uch testimony is merely factual evidence coming from a witness with no firsthand knowledge" and that "Dr. Wisniewksi should not be permitted to testify on such factual matters that do not call for an expert's opinion." (Gov't Letter Mot. at 9.) Again, experts may offer opinions that concern the facts of the case. (*See supra* at 7.) Moreover, the role of an SMC, the drug testing approval process, and clinical trials are all clearly proper subjects of expert testimony, as courts have held time and again. *See Fosamax*, 645 F. Supp. 2d at 191 (admitting an expert's testimony about "general FDA regulatory requirements and procedures" because "[a] lay jury cannot be expected to understand the complex regulatory framework . . . in the pharmaceutical industry" and, therefore, the expert's assessment and understanding "will be helpful to the jury"); *Lyman v. Pfizer, Inc.*, No. 09 Civ.

---

[14] (E-mail dated December 18, 2013, from AUSA Arlo Devlin-Brown to Richard Strassberg.)

# GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 19

262, 2012 WL 2971550, at *6-*7 (D. Vt. July 20, 2012) (permitting an expert to testify about evidence relating to drug approval process because her knowledge would be helpful to the jury).[15]

C.    **Dr. Wisniewski Should Be Allowed to Testify about the Responsibility of Doctors Participating in Clinical Trials to Maintain the Confidentiality of Clinical Trial Results.**

The Government argues that "the responsibilities of doctors writ large are not relevant to this trial" and that "[t]he only relevant duties of confidentiality are those owed by Dr. Ross and Dr. Gilman to Elan and Wyeth," which "are questions of fact going to an ultimate issue that are properly evaluated through witness testimony and related documentary evidence." (Gov't Letter Mot. at 9.) Once again, experts may offer opinions that relate to the facts or a supposed ultimate issue in the case. (*See supra* at 7, 16-17.) The responsibilities of doctors in clinical trials – including the responsibilities of Dr. Ross and Dr. Gilman in the Phase II bapi trial – are exactly the sort of industry custom and practice about which courts routinely allow experts to testify. (*See supra* at 15-16.) Accordingly, this Court should allow Dr. Wisniewski to testify on this subject.

*        *        *

For the foregoing reasons, Mr. Martoma respectfully requests that this Court deny the Government's motion for additional expert disclosure and to preclude certain expert testimony and allow Mr. Martoma to introduce the expert testimony of both Professor Gompers and Dr. Wisniewski.

Respectfully submitted,

/s/ Richard M. Strassberg

Richard M. Strassberg

---

[15] *Accord Hanrahan v. Wyeth, Inc.*, No. 04 Civ. 01255 (ERW), 2012 WL 2395881, at *8-*9 (E.D. Mo. June 25, 2012) (holding that experts' testimony to "explain complex, technical subjects to the jury, including the process of drug development [and] the procedures involved in FDA approval" would be reliable and helpful to the jury); *Lemons v. Novartis Pharm. Corp.*, 849 F. Supp. 2d 608, 614 (W.D.N.C. 2012) (finding that an expert with "significant experience with the FDA and its regulatory requirements and procedures" was permitted to testify about the "new drug approval" process, among other things, as this "testimony will be helpful to the jury").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 20


cc:    Arlo Devlin-Brown (by e-mail)
       Eugene Ingoglia (by e-mail)
       Roberto Braceras (by e-mail)

# Exhibit A

# Paul A. Gompers

Baker Library 263
Graduate School of Business Administration
Harvard University
Boston, MA 02163

(617) 495-6297 (ph)
(617) 496-8443 (fax)
pgompers@hbs.edu
http://www.people.hbs.edu/pgompers

## ACADEMIC POSITIONS

| | | |
|---|---|---|
| 2000–present | HARVARD BUSINESS SCHOOL | BOSTON, MA |
| | Eugene Holman Professor of Business Administration. Research interests include venture capital, entrepreneurial finance, optimal security design, dynamic capital structure, long-run performance of firms, and sources of financing for start-up businesses. | |
| 1998–2000 | HARVARD BUSINESS SCHOOL | BOSTON, MA |
| | Associate Professor of Business Administration. | |
| 1995–1998 | HARVARD BUSINESS SCHOOL | BOSTON, MA |
| | Assistant Professor of Business Administration. | |
| 1993–1995 | UNIVERSITY OF CHICAGO | CHICAGO, IL |
| | Assistant Professor of Finance and Policy at the Graduate School of Business. Created new course on the financing of start-up companies. | |
| 1995–present | NATIONAL BUREAU OF ECONOMIC RESEARCH | CAMBRIDGE, MA |
| | Research Associate. Appointed as an NBER affiliate in corporate finance. | |

## EDUCATION

| | | |
|---|---|---|
| 1989–1993 | HARVARD UNIVERSITY | CAMBRIDGE, MA |
| | Received Ph.D. in Business Economics, June 1993. | |
| 1987–1989 | OXFORD UNIVERSITY | OXFORD, UK |
| | Graduated *summa cum laude* with a M.Sc. in economics, July 1989. | |
| 1982–1987 | HARVARD COLLEGE | CAMBRIDGE, MA |
| | Graduated *summa cum laude* with an A.B. in biology. | |

**PUBLICATIONS**

**Books**

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) First Edition.

The Money of Invention, (Harvard Business School Press, Boston) November 2001. (Joint with Josh Lerner.)

Entrepreneurial Finance: A Casebook, (John Wiley, New York) December 2001. (Joint with William Sahlman.)

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) Second Edition. 2004.

**Articles in Refereed Journals**

"Optimal Investment, Monitoring, and the Staging of Venture Capital," *Journal of Finance* 50, 1461-1489. December 1995. Reprinted in Michael Wright and Ken Robbie, editors, Venture Capital (International Library of Management) (Aldershot: Dartmouth Publishing, 1997).

"Grandstanding in the Venture Capital Industry," *Journal of Financial Economics* 42, 133–156. July 1996.

"The Rise and Fall of Venture Capital," Business and Economic History 23, 1–24. Winter 1994. Awarded Newcomen Prize essay for best paper in business history.

"The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements," *Journal of Law and Economics* 39, 463–498. October 1996. (with Josh Lerner.)

"Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies." *Journal of Finance* 52, 1791–1821. December 1997. (with Alon Brav.) Awarded the Smith-Breeden Distinguished Paper Award.

"Venture Capital Growing Pains: Should the Market Diet?" *Journal of Banking and Finance* 22, 1089–1104. August 1998.

"An Analysis of Compensation in the US Venture Capital Partnership," *Journal of Financial Economics* 51, 3–44. January 1999. (with Josh Lerner.)

"Venture Capital Distributions: Short-Run and Long-Run Reactions," *Journal of Finance* 53, 2161–2184. December 1998. (with Josh Lerner.)

"Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital," *Journal of Law and Economics* 42, 1-28. April 1999. (with Josh Lerner.)

"What Drives Venture Capital Fundraising?" *Brookings Proceedings on Microeconomic Activity*, 149-192. August 1998. (with Josh Lerner.)

"Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations," *Journal of Financial Economics* 55, 281-325. February 2000. (with Josh Lerner.)

"Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56, 209–250. May 2000. (with Alon Brav and Chris Geczy.)

"Institutional Investors and Equity Prices," *Quarterly Journal of Economics* 114, 229–260. 2001. (with Andrew Metrick.)

"The Venture Capital Revolution," *Journal of Economic Perspectives* 15, 145–168. Spring 2001. (with Josh Lerner.)

"Who Underreacts to Cash Flow News?" *Journal of Financial Economics* 66, 409–462. 2002. (with Randy Cohen and Tuomo Vuolteenaho.)

"The Role of Lock-ups in Initial Public Offerings Provisions," *Review of Financial Studies* 16, 1–29. Spring 2003. (with Alon Brav.)

"Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118, 107-156. February 2003. (with Joy Ishii and Andrew Metrick.)

"The Really Long-Run Performance of Initial Public Offerings: Evidence from the Pre-Nasdaq Period, 1933–1972," *Journal of Finance* 56, 1355–1392.  August 2003.  (with Josh Lerner.)

"The Determinants of Board Structure and Function in Entrepreneurial Firms," *Journal of Law and Economics* 46, 569–598.  October 2003.  (with Malcolm Baker.)

"Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999," *Journal of Finance* 60, 577-614.  April 2005.  (with Josh Lerner and David Scharfstein.)

"Large Blocks of Stock: Prevalence, Size, and Measurement," *Journal of Corporate Finance* 12, 594-618.  June 2006.  (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick.)

"Venture Capital Investment Cycles: The Impact of Public Markets," *Journal of Financial Economics*, 1–23.  2008.  (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Specialization and Success: Evidence from Venture Capital," *Journal of Economic and Management Strategy* 18, 817–845.  2009.  (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Extreme Governance: An Analysis of Dual-Class Firms in the United States," *Review of Financial Studies* 23, 1051–1088.  2010. (with Joy Ishii and Andrew Metrick.)

"Performance Persistence in Entrepreneurship and Venture Capital," *Journal of Financial Economics* 96, 18–32.  2010.  (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Buy Local?  The Geography of Successful Venture Capital Expansion," *Journal of Urban Economics* 67, 90–102.  2010.  (with Henry Chen, Anna Kovner, and Josh Lerner.)

**Other Articles**

"Venture Capital and the Creation of Public Companies: Do Venture Capitalists Really Bring More than Money?" *Journal of Private Equity* 1, 15-32.  Fall 1997.  (with Josh Lerner.)

 "Risk and Reward in Private Equity Investments: The Challenge of Performance Assessment," *Journal of Private Equity* 1, 5-12.  Winter 1997.  (with Josh Lerner.)

"Resource Allocation, Incentives, and Control: The Importance of Venture Capital in Financing Entrepreneurial Firms," *Entrepreneurship, SMEs, and the Macroeconomy* (Cambridge University Press, Cambridge), 206-238.  February 1997.

"Venture Capital," *The Handbook of Technology Management* (Richard Dorf, Editor-in-Chief). January 1997.  (with Josh Lerner.)

"Venture Capital," *The Handbook of Modern Corporate Finance* (Dennis Logue, Editor).  April 1998.  (with Josh Lerner.)

"The Determinants of Corporate Venture Capital Success: Organizational Structure, Incentives, and Complementarities," NBER Conference Volume on Concentrated Corporate Ownership, 17-54.  September 1998.

"Capital Formation and Investment in Venture Markets: An Assessment of Market Imperfections," *The Economic Evaluation of Technological Change* (Richard Spivack, Editor).  June 1998.

"Corporations and the Financing of Innovation: The Corporate Venturing Experience," *The Atlanta Federal Reserve Bank Conference Volume*, 1-17.  2002.

"Venture Capital and Private Equity," *The Handbook of Corporate Finance* (Espen Eckbo, Editor) (North-Holland Press, New York).  2002.

"Short-Term America Revisited?  Boom and Bust in the Venture Capital Industry and the Impact on Innovation," *Innovation Policy and the Economy* 3, 1-28.  March 2002.  (with Josh Lerner.)

**Working Papers**

"The Cost of Friendship," May 2012 (with Yuhai Xuan and Mukharlyamov.)

"To Err is Human, To Forgive is a Mistake: Evidence from Venture Capital Hiring," May 2012 (with Yuhai Xuan and Mukharlyamov.)

"Bridge Building in Venture Capital: Evidence from Acquisitions of Venture Capital-backed Companies," December 2011.  Revise and resubmit at *Review of Financial Studies* (with Yuhai Xuan.)

"Reputation and Contractual Flexibility: Evidence from Venture Capital Distribution Pricing Policies," August 2011. (with Timothy Dore and Andrew Metrick.)

"Why Experienced Venture Capitalists Leave Money on the Table: Evidence from Initial Public Offerings," July 2009. (with Alon Brav and Tim Dore.)

"Skill vs. Luck in Venture Capital: Evidence from Serial Entrepreneurs," December 2007. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Institutions, Capital Constraints and Entrepreneurial Firm Dynamics: Evidence from Europe," November 2006. (with Mihir Desai and Josh Lerner.)

"The Role of Venture Capitalists in the Acquisition of Private Companies," October 2005. (with Yuhai Xian.)

"Ownership and Control in Entrepreneurial Firms: An Examination of Convertible Securities in Venture Capital Investment," January 2000.

"An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms," May 2000. (with Malcolm Baker.)

## Opinion — Editorials

"This Tax Cut Will Pay Dividends," *Wall Street Journal,* August 13, 2002. (with Andrew Metrick and Jeremy Siegel.)

## Projects in Process

- "The Evolution of Ownership and Control in Entrepreneurial Firms." (with Malcolm Baker.)
- "Dual Class IPOs." (with Malcolm Baker.)
- "Pre-public Financing in Entrepreneurial Ventures."
- "Institutional Ownership and Corporate Governance." (with Andrew Metrick and Joy Ishii.)
- "The Dynamics of Global Entrepreneurship." (with Mihir Desai and Josh Lerner.)
- "The Determinants of Venture Capital Acquisitions." (with Yuhai Xuan.)
- "The Determinants of Entrepreneurial Success." (with Anna Kovner, Josh Lerner, and David Scharfstein.)
- "Risk and Return in Private Equity." (with Leslie Jeng, Josh Lerner, and Andrew Metrick.)

# COURSE MATERIALS

## Cases

- "The Advent Israel Venture Capital Program." Harvard Business School Case 298–072.
- "ALWAYSi." Harvard Business School Case 201–075.
- "APV Technology Partners II, L.P." Harvard Business School Case 298–048.
- "Bang Networks, Inc." Harvard Business School Case 201–074.
- "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297–095.
- "Cachet Technologies." Harvard Business School Case 200–031.
- "Cambridge Technology Partners: 1991 Start Up." Harvard Business School Case 298–044.
- "Cambridge Technology Partners: Corporate Venturing (August 1996)." Harvard Business School Case 297–033.
- "Car Wash Partners, Inc." Harvard Business School Case 299–034.
- "Charles River Velocity." Harvard Business School Case 201–092.
- "Charter Communication Bankruptcy." Harvard Business School Case 211-035.
- "Dell Ventures." Harvard Business School Case 200–062.
- "Digital Everywhere, Inc." Harvard Business School Case 298–099.
- "edocs, Inc. (A)." Harvard Business School Case 200–015.
- "edocs, Inc. (B-1): Kevin Laracey." Harvard Business School Case 200–020.
- "edocs, Inc. (B-2): Jonathon Guerster." Harvard Business School Case 200–021.

- "Efficient Market Services: August 1993 (A)." Harvard Business School Case 298–009.
- "Efficient Market Services: August 1993 (B1), EMS Management." Harvard Business School Case 298–010.
- "Efficient Market Services: August 1993 (B2), Comdisco Ventures." Harvard Business School Case 298–011.
- "Elliot Lebowitz." Harvard Business School Case 297–094.
- "Endeca: New Growth Opportunities." Harvard Business School Case 206–401.
- "First Mark Capital." Harvard Business School Case 212-041.
- "Fitzpatrick Hotel Group (A)." Harvard Business School Case 298–002.
- "Fitzpatrick Hotel Group (B1): Niall Carroll." Harvard Business School Case 298–003.
- "Fitzpatrick Hotel Group (B2): Paddy Fitzpatrick." Harvard Business School Case 298–004.
- "Founders Fund." Harvard Business School Case 211-040.
- "Genset Initial Public Offering (A)." Harvard Business School Case 297–096.
- "Genset Initial Public Offering (B)." Harvard Business School Case 297–097.
- "Genset: 1989." Harvard Business School Case 298–070.
- "Global Digital Utilities Corp." Harvard Business School Case 297–065.
- "Honest Tea." Harvard Business School Case 201–076.
- "Hudson Manufacturing." Harvard Business School Case 203–064.
- "Knightsbridge Advisers, Inc." Harvard Business School Case 296–054.
- "Knoll Furniture: Going Public." Harvard Business School Case 202–114.
- "MSE, Inc. Privatization: August 1997." Harvard Business School Case 298–135.
- "MSE, Inc. Privatization: August 1997 (Abridged)." Harvard Business School Case 298–136.
- "New Oriental." Harvard Business School Case.
- "New York Bagel: Hungary, April 1994." Harvard Business School Case 297–078.
- "NSK Software Technologies Ltd." Harvard Business School Case 298–071.
- "Ocular." Harvard Business School Case 202–118.
- "Pet Doctors: 1999." Harvard Business School Case 200–016.
- "The Prague Post." Harvard Business School Case 299–033.
- "Sarvega." Harvard Business School Case 204–137.
- "Shenzhen Capital Group." Harvard Business School Case 211-029.
- "Sky Air, Inc." Harvard Business School Case 297–110.
- "Torrent Systems." Harvard Business School Case 298–084.
- "Tutor Time (A)." Harvard Business School Case 297–064.
- "Tutor Time (B)." Harvard Business School Case 297–074.
- "Venture Capital in Ireland: Getting Their ACT Together." Harvard Business School Case 298–001.
- "Vueling Airlines." Harvard Business School Case.
- "Xedia and Silicon Valley Bank (A)." Harvard Business School Case 298–119.
- "Xedia and Silicon Valley Bank (B1): The Bank's Perspective." Harvard Business School Case 298–120.
- "Xedia and Silicon Valley Bank (B2): The Company's Perspective." Harvard Business School Case 298–121.
- "Xedia and Silicon Valley Bank (C): The Final Agreement." Harvard Business School Case 298–122.
- "ZEFER: November 1998." Harvard Business School Case 299–032.

**Teaching Notes**
- "Advent Israel Venture Capital Program TN." Harvard Business School Teaching Note 299–054.
- "APV Technology Partners II, L.P. TN." Harvard Business School Teaching Note 299–053.
- "Beta Golf." Harvard Business School Teaching Note 202–062.
- "BioTransplant Inc.: Initial Public Offering, January 1996 TN." Harvard Business School Teaching Note 299–055.

- "Cachet Technologies." Harvard Business School Teaching Note 202–068.
- "Cambridge Technology Partners —1991 Start Up TN." Harvard Business School Teaching Note 299–057.
- "Cambridge Technology Partners: Corporate Venturing (August 1996) TN." Harvard Business School Teaching Note 299–056.
- "Carlton Polish Co." Harvard Business School Teaching Note 202–076.
- "Car Wash Partners, Inc. TN." Harvard Business School Teaching Note 299–058.
- "Contracting and Control in Venture Capital." Harvard Business School Note 298–067.
- "Dell Ventures." Harvard Business School Teaching Note 202–072.
- "Digital Everywhere, Inc. TN." Harvard Business School Teaching Note 299–059.
- "edocs, Inc. Series." Harvard Business School Teaching Note 202–064.
- "Elliot Lebowitz TN." Harvard Business School Teaching Note 299–060.
- "Emergence of Silicon Wadi." Harvard Business School Note 204–156.
- "Fenchel Lampshade Company." Harvard Business School Teaching Note 202–063.
- "Efficient Market Services: August 1993 Series TN." Harvard Business School Teaching Note 299–061.
- "Fitzpatrick Hotel Group Series TN." Harvard Business School Teaching Note 299–062.
- "Genset: 1989 TN." Harvard Business School Teaching Note 299–063.
- "Genset Initial Public Offering (A) & (B) TN." Harvard Business School Teaching Note 299–064.
- "Global Digital Utilities Corporation TN." Harvard Business School Teaching Note 299–065.
- "HIMSCORP, Inc." Harvard Business School Teaching Note 202–073.
- "Honest Tea." Harvard Business School Teaching Note 202–069.
- "Introduction to Entrepreneurial Finance." Harvard Business School Note 298–061.
- "Knightsbridge Advisers, Inc. TN." Harvard Business School Teaching Note 299–066.
- "Knot, The." Harvard Business School Teaching Note 202–070.
- "MSE, Inc. Privatization: August 1997 & MSE, Inc. Privatization: August 1997 (Abridged) TN." Harvard Business School Teaching Note 299–067.
- "Nantucket Nectars." Harvard Business School Teaching Note 202–074.
- "New York Bagel: Hungary, April 1994 TN." Harvard Business School Teaching Note 299–068.
- "A Note on Angel Financing." Harvard Business School Note 298–083.
- "A Note on Franchising." Harvard Business School Note 297–108.
- "A Note on Government Sources of Financing for Small Businesses." Harvard Business School Note 298–015.
- "Note on Strategic Alliances, A." Harvard Business School Note 298–047.
- "A Note on the Internet." Harvard Business School Note 297–109.
- "A Note on the Venture Capital Industry." Harvard Business School Note 295–065.
- "A Note on Valuation in Entrepreneurial Ventures." Harvard Business School Note 298–082.
- "NSK Software Technologies Ltd. TN." Harvard Business School Teaching Note 299–069.
- "Parenting Magazine TN." Harvard Business School Teaching Note 202–065.
- "Penelope's Personal Pocket Phones TN." Harvard Business School Teaching Note 299–070.
- "Prague Post, The TN." Harvard Business School Teaching Note 299–071.
- "Record Masters." Harvard Business School Teaching Note 202–075.
- "Penelope's Personal Pocket Phones." Harvard Business School Case 299–004.
- "Sky Air, Inc. TN." Harvard Business School Teaching Note 299–072.
- "Torrent Systems TN." Harvard Business School Teaching Note 299–073.
- "Tutor Time (A) TN." Harvard Business School Teaching Note 299–074.
- "Tutor Time (B) TN." Harvard Business School Teaching Note 299–078.
- "Venture Capital in Ireland: Getting Their ACT Together TN." Harvard Business School Teaching Note 299–075.
- "Xedia and Silicon Valley Bank Series TN." Harvard Business School Teaching Note 299–076.
- "ZEFER: November 1998 TN." Harvard Business School Teaching Note 299–077.

## SEMINARS AND CONFERENCE PRESENTATIONS — Academic

American Economic Association:  Annual Meeting, January 1995, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

American Finance Association:  Annual Meeting, January 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

American Finance Association:  Annual Meeting, January 1996, "Myth or Reality?  The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

American Finance Association:  Annual Meeting, January 1999, "What Drives Venture Capital Fundraising."

American Finance Association:  Annual Meeting, January 2000, "An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms."

American Finance Association:  Annual Meeting, January 2004, "Incentives vs. Control: An Analysis of U.S. Dual-class companies."

American Law and Economics Association:  Annual Meeting, May 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Association of Financial Economists:  Annual Meeting, January 2001, "The Determinants of Board Structure and Function in Entrepreneurial Firms."

Association of Financial Economists:  Annual Meeting, January 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Arizona State University School of Business:  Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Boston University:  Finance Seminar, December 1996, "Myth or Reality?  The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Brookings Institute:  Microeconomic Conference, June 1998, "What Drives Venture Fundraising?"

Business and Economic History:  Annual Meeting, March 1994, "The Rise and Fall of Venture Capital."

Center for Research on Security Prices:  Biannual Meeting, March 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Center for Research on Security Prices:  Biannual Meeting, November 1994, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Center for Economic and Policy Research:  European Finance Conference on Financing Innovation, November 1998, "What Drives Venture Capital Fundraising?"

Columbia Law School:  Law and Economics Seminar, November 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Columbia Law School:  Law and Economics Seminar, November 1995, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Columbia Law School:  Financing Innovation Conference, December 1997, "An Analysis of Covenants in Venture Capital Investments."

Columbia University School of Business:  Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Copenhagen Business School:  Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."

Cornell Business School:  Finance Seminar, October 2001, "Corporate Governance and Equity Prices."

Federal Reserve Bank of Chicago:  January 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Duke University Fuqua Business School:  Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Georgetown Law School:  April 2003, "Corporate Governance and Equity Prices."

Harvard Business School:  Business History Seminar, December 2000, "The History of Silicon Valley."

Harvard Business School:  Entrepreneurship Conference, December 2000, "The Really Long-run Performance of Initial Public Offerings."

Harvard Business School:  Financial Decision and Control Workshop, July 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Harvard Business School:  Financial Decision and Control Workshop, July 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Harvard Business School:  Financial Decision and Control Workshop, July 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard Business School:  Financial Decision and Control Workshop, July 1998, "How are Large Institutions Different From Other Investors?  Why Do These Differences Matter for Equity Prices and Returns?"

Harvard Business School:  Finance Seminar, February 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Harvard Business School:  Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Harvard Business School:  Finance Seminar, October 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Harvard Business School:  Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School: Finance Seminar, October 2011, "The Cost of Friendship."

Harvard Business School:  Organizations and Markets Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School:  Finance Seminar, November 2000, "The Venture Capital Revolution."

Harvard Business School:  Finance Seminar, March 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Harvard Business School:  Finance Seminar, December 2008, "Bridge Building in Venture Capital: Evidence from Acquisitions."

Harvard Business School: Organizational Behavior Seminar, February 2012, "The Role of Social Ties in Venture Capital."

Harvard University Department of Economics:  Workshop, December 1992, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Harvard University Department of Economics:  Organizations Workshop, December 1996, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard University Department of Economics:  Organizations Workshop, December 2002, "Entrepreneurial Spawning."

Harvard University Department of Economics:  Organizations Workshop, December 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else?  An Analysis of the Stock Ownership of Large Institutions."

Harvard University Department of Economics:  Organizations Workshop, September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."

Hebrew University School of Business:  Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Hebrew University School of Business:  Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

London School of Economics:  Venture Capital Conference, October 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely Held Firms."

Massachusetts Institute of Technology:  Organizations Workshop, March 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Massachusetts Institute of Technology and Harvard University:  Public Finance Workshop, March 1998, "What Drives Venture Fundraising?"

National Bureau of Economic Research:  Corporate Finance Group, April 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

National Bureau of Economic Research:  Summer Institute, July 1994, "An Analysis of Compensation in the U.S. Venture Partnership Agreement."

National Bureau of Economic Research:  Summer Institute, July 1995, "Myth or Reality?  The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

National Bureau of Economic Research:  Summer Institute, July 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

National Bureau of Economic Research:  Finance Series, December 1997, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else?  An Analysis of the Stock Ownership of Large Institutions."

National Bureau of Economic Research:  Finance Series, November 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."

National Bureau of Economic Research:  Summer Institute, July 2001, "Corporate Governance and Equity Prices."

New York Federal Reserve Bank:  May 2000, "The Determinants of Board Structure and Function in Entrepreneurial Firms."

New York University, Stern School of Business:  Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

New York University, Stern School of Business:  Finance Seminar, February 1999, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."

New York University, Stern School of Business:  Finance Seminar, October 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Northwestern University, Kellogg Business School:  Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Northwestern University, Kellogg Business School:  Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."

Norwegian School of Management:  Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."

Ohio State University:  Finance Seminar, October 1998, "How You Get There Matters: The Path Dependency of Corporate Governance in Closely Held Firms."

Oxford University:  Graduate Student Seminar, May 1989.

Oxford University:  Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."

Queens University (Kingston, Ontario) School of Business:  Finance Seminar, November 1996, "Myth or Reality?  The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Rutgers University:  Finance Seminar, October 1997, "Money Chasing Deals?  The Impact of Fund Inflows on Private Equity Valuations."

Stanford University Graduate School of Business:  Strategy Workshop, January 1993, "Grandstanding in the Venture Capital Industry."

Stanford University Graduate School of Business:  Center for Economic and Political Research, March 1997, "The Valuation of Private Equity Investments."

Stockholm Business School:  September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."

Tel Aviv University School of Business:  Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Tel Aviv University School of Business:  Finance Seminar, March 1995, "Venture Capital Distributions:

Short-Run and Long-Run Reactions."

University of Arizona School of Business:  Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

University of California at Berkeley, Haas School of Business:  Finance Seminar, April 1993, "Grandstanding in the Venture Capital Industry."

University of California at Los Angeles:  Finance Seminar, May 1997, "The Valuation of Private Equity Investments."

University of California at Los Angeles:  Behavioral Finance Conference, April 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else?  An Analysis of the Stock Ownership of Large Institutions."

University of Chicago Graduate School of Business:  Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

University of Chicago Graduate School of Business:  Information and Uncertainty Seminar, April 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

University of Chicago Graduate School of Business:  Finance Seminar, May 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

University of Chicago Economics Department:  Economic and Legal Organization Workshop, February 1994, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

University of Chicago Economics Department:  Economic and Legal Organization Workshop, October 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

University of Georgia School of Business:  Finance Seminar, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

University of Illinois School of Business:  Finance Seminar, October 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

University of Michigan School of Business:  Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

University of North Carolina School of Business:  Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

University of Pennsylvania Wharton School:  Finance Workshop, March 1998, "Money Chasing Deals?  The Impact of Venture Inflows of Private Equity Prices."

University of Rochester Simon School of Business:  Finance Seminar, December 1996, "Myth or Reality?  The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

University of Rochester Simon School of Business:  Organizations Seminar, February 1993, "Grandstanding in the Venture Capital Industry."

Virginia Tech University School of Business:  Finance Seminar, October 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

World Bank:  Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Western Finance Association:  Annual Meeting, June 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Western Finance Association:  Annual Meeting, June 1995, "The Long-run Underperformance of Seasoned Equity Offerings Revisited."

Western Finance Association:  Annual Meeting, June 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Western Finance Association:  Annual Meeting, June 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities:  Evidence from Venture Capital."

Western Finance Association: Annual Meeting, June 1998, "How are Large Institutions Different from Other Investors? Why These Differences Matter for Equity Prices and Returns?"

Yale University, School of Management: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

## SPEECHES AND CONFERENCE PRESENTATIONS — Practitioner

Advanced Technology Program, National Institute for Standards and Technology and NBER Conference on Financing Innovation, June 1998.

Amsterdam Institute of Finance, October 1994, "Venture Capital and the Finance of Emerging Companies."

American Friends of the Technion, October 1998, "The Development of High Technology and Venture Capital in Israel."

AT&T Small Business Conference, April 1994, "Venture Capital: The Road Ahead."

Center for Economic Policy Research, Venture Capital Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Deloitte and Touche, May 2003, "Entrepreneurial Leadership."

Ernst and Young Silicon Valley Venture Capital Conference, 2002, "The Future of Venture Capital."

Ernst and Young Buyout Roundtable, 2002, "Corporate Governance and Private Equity."

Harvard Business School Venture Capital Conference, December 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies" and "Venture Capital Distributions: Short-run and Long-run Reactions."

Harvard Business School Alumni Series, May 2000 and May 2003, "The Future of Private Equity."

Harvard Business School European Conference, June 2003, "European Private Equity."

Harvard Business School Global Alumni Conference, June 1998, "Consolidation Buy-outs."

Harvard Business School Global Alumni Conference, May 2001, "Venture Capital 2001: Boom or Bust?"

Harvard Business School Global Alumni Venture Capital Conference, May 2012, "New Venture Capital Models"

Hambrecht and Quist, Post-Venture Forum, March 1999, "Venture and Post-Venture Opportunities: Insights from Research."

Institutional Limited Partner's Association, September 1997, "Risk and Return in Private Equity."

Institutional Limited Partner's Association, April 2002, "New Tools for Assessing Private Equity Valuation and Asset Allocation."

International Business Forum, June 1999, "Venture Capitalists and the Public Markets."

Investors' Press Alpha Roundtable, October 1996, "The Future of Private Equity."

Israel Business Forum, March 1994.

Israeli Venture Capital and High Technology Conference, 2002, "The Future of Venture Capital and Its Implication for Israel."

Japanese Private Equity Forum, July 1997, "Corporations and Venture Capital: Old and New Challenges."

Latin American Chamber of Commerce, February 1995, "Capital for Entrepreneurial Companies: A Look Ahead."

Massachusetts Public Pension Fund Investment Forum, October 1998, "Venture Capital: Investing in Start-up and Newly Public Firms."

National Venture Capital Association, March 2003, "The Future of Venture Capital."

Nova Pharmaceuticals, September 2009, "Venture Capital after the Downturn."

OPAL Institutional Investors Conference, December 2000, "The Future of Private Equity."

Rocky Mountain Venture Capital Association, March 2003, "Venture Capital: Challenges and Opportunities."

Russell Capital Private Equity Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Russell Capital Private Equity Conference, November 1998, "Advent Israel Venture Capital Program."
Salomon Smith Barney Private Equity Conference, March 2000, "The Future of Private Equity."
Salomon Smith Barney Consulting Group, March 2001, "Risk and Return in Private Equity."
Samsung Venture Capital Group, October 1997, "Corporations and Venture Capital: Old and New Challenges."
Silicon Valley Bank, May 2003, "Venture Capital: Challenges and Opportunity."
SuperReturn Conference US, May 2009, "Insights from Private Equity Academic Research at the Harvard Business School."
University of Chicago Business Forum, May 1995, "The Next Ten Years in Venture Capital." (Organized and moderated panel.)
Venture Economics Venture Forum, November 1994, "The Venture Cycle." (Keynote Address.)
Venture Economics Venture Forum, November 1994, Panelist for IPO performance issues.
Venture Economics Venture Forum, November 1996, Plenary session speaker on venture capital returns.
VentureOne / Ernst and Young Venture Capital Conference, July 2002, "The Future of Venture Capital."
VentureOne / Ernst and Young Venture Capital Conference, July 2003, "The Future of European Venture Capital."
Young Presidents' Organization Conference, November 1998, "Entrepreneurial Opportunities in Crisis Situations."
In addition, made presentations of research findings for several institutional investors and investment managers who contributed data for the project on interactions between venture organizations and institutional investors.

## TEACHING

### University of Chicago
Developed and taught course "Entrepreneurial Finance and Management," a second-year MBA elective, 1993–1995.

### Harvard Business School
Taught "First-Year Finance," in Required Curriculum, 1995–1997.
Taught "Entrepreneurial Finance," in Elective Curriculum, 1997–2003.
Taught "The Entrepreneurial Manager," in Required Curriculum, 2003–2008.
Taught "Venture Capital and Private Equity," in Elective Curriculum, 2009–2012.
Course Head for "The Entrepreneurial Manager" in Required Curriculum 2005–2008.
Co-developed and co-taught Ph.D. course "Empirical Topics in Corporate Finance," 1999–2012.  (with Josh Lerner.)
Co-developed and partially taught three-day executive courses on venture capital and private equity: "Conflict and Evolution in Private Equity" (1996), "Corporate Venture Capital: The Third Wave" (1997), "The Internationalization of Private Equity" (1998), "Structuring Effective Private Equity Organizations" (1999, 2000), "Optimizing Corporate Investments" (2000), "Doing Private Equity Deals" (2001, 2003), "Private Equity in a Downturn" (2002), "Private Equity Deals" (2004), "Private Equity and Corporate Governance" (2005), "Venture Capital and Private Equity" (2006), "Internationalization of Private Equity" (2007), "Private Equity and Venture Capital" (2008), and "Private Equity after the Downturn" (2009), "Venture Capital and Private Equity" (2010-2011). (all with Josh Lerner.)
Co-developed and taught "Economics of Markets," in Elective Curriculum, 1997.
Partially taught in a variety of programs including:
General Management Program / START, August 1996.
HBS / CIEBA Pension Workshop, April 1996.
YPO Conference, February 1997, February 2003, February 2006, February 2008.
Strategic Finance for Small Business, February 1998, March 1999, March 2000.

Entrepreneur's Toolkit, June 1997, June 1998, June 1999.

## PROFESSIONAL SERVICE AND EXPERIENCE

| | | |
|---|---|---|
| 1985–1986 | BAYER CHEMICAL CO. | LEVERKUSEN, GERMANY |

Researcher. Performed biochemical analysis on locust flight muscle metabolism.

1997–present     Associate Editor for *Small Business Economics*.

1997–present     Associate Editor for *Journal of Private Equity*.

1997–present     Associate Editor for *Journal of Finance*.

1997–present     Western Finance Association Meetings Program Committee.

1998     Program Committee, *Journal of Financial Economics* conference on research methodologies in finance.

2006–present     Associate Editor for *Journal of Economic Literature*.

2010–present     Associate Editor for *Journal of Economics and Management Strategy*.


Referee for the *Journal of Financial Economics*, *Journal of Finance*, *Journal of Political Economy*, *Quarterly Journal of Economics*, *Rand Journal of Economics*, *Review of Financial Studies*, *American Economic Review*, *Journal of Public Economics*, *Journal of Corporate Finance*, *Journal of Small Business Management*, *Economic Letter*, *Small Business Economics*, *Journal of Business Venturing*, *Journal of Small Business Finance*, *Journal of Business*, *Journal of Law*, *Economics*, *and Organizations*, and *Journal of Law and Economics*.

Reviewer for reports and proposals for the National Science Foundation.

Reviewer for reports and proposals for the Securities and Exchange Commission.

## COMMUNITY SERVICE

Vice President, Treasurer, and Executive Board Member, Harvard Hillel (1995–present).
Board Member, Anshe Shalom B'nei Israel Congregation (1993–1995).
Young Israel of Brookline, Internet Advisory Board (2000–2001).
Ivy League Eikeden Committee (1997–present)
Technion Institute of Management: Boston Advisory Board (2000).
Board Member, Camp Yavneh (2007–present).

## CONSULTING PROJECTS

Apax Venture Partners, 2003.
Battery Venture Partners, 2001.
Bessemer Venture Partners, 1998.
Deloitte and Touche, 2003.
Department of Energy, Idaho Falls National Laboratory, 1994–1995.
Department of Energy, Savannah River National Laboratory, 1995–1997.

Department of Energy, Butte, Montana National Laboratory, 1997–1998.
E.M. Warburg, Pincus, 1997.
Ernst and Young, 2002.
GTCR Golder Rauner, 1999.
Jerusalem Venture Partners, 2001.
Montana Science and Engineering, Inc., 1997.
Patricoff & Co., 1995.
Phillip's Petroleum, 1998, 2000, 2001, 2002.
PriceWaterhouse Coopers, 2001.
RogersCasey Investment Advisors, 1994.
Salomon Smith Barney, 1999–2003.
Thermo Electron Corporation, 1994–1997.
VentureOne, 1995.


**BOARDS OF DIRECTORS AND ADVISORY BOARDS**

Evergreen Partners, 2005–2009.
Gemini Venture Capital, 2003–2009.
Highland Capital Consumer Fund, 2007–2012.
Khosla Ventures, 2009.
Knightsbridge Investment Advisers, 1995–2012.
Mercanteo, 1999.
New Capital Partners, 2000–2001.
Onpoint, 2003–2012.
OnTheFrontier.com, 2000–2001.
Spur Capital Partners, 2002–2012.
Triple Point Capital, 2003.
ZEFER, 1998.

**GRANTS AND AWARDS**

National Science Foundation Grant, 1994–1997, "Financing New Business Formation."
National Science Foundation Grant, 2002–2005, "Corporate Governance and Firm Performance."
National Institute of Standards and Technology, Advanced Technology Program, 1996–1997, "Venture
        Capital and the Financing of Emerging Technologies."
Newcomen Business History Paper Prize, 1994.
American Association of Individual Investors Award for Best Paper on Investments, at the Western Finance
        Association Meeting, 1998.
Smith Breeden Distinguished Paper Prize, 1998.
MBA Class of 1961 Fellow, 1997–1998.


**ATHLETICS**

Alternate on the 1988 Olympic team in the marathon. Finished fourth in the Olympic trials. Qualified for
        1984, 1988, 1992 Olympic marathon trials. Cross-Country All-American. Academic All-American.
        Set World Junior Record in the marathon (1983). Bronze medalist in 1985 World University Games
        in Japan (marathon). Qualified for two US cross-country teams and competed in the World
        Championships. Set Harvard Records in the 5,000 and 10,000 meters. Triathlon Age Group All-
        American 2007, 2009. Competed in ITU Age Group World Championships (2007). Competed in

Ironman 70.3 World Championship (2007). Competed in Ironman World Championships in Kailua Kona (2009, 2010).

# Transcript Excerpts
# (January 24, 2014)
# (1818-44, 1917-18)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

E1oQmar1      Gilman - cross      Page 1818

1 A. Well, it says focus --
2      THE COURT: No, don't read it.
3      THE WITNESS: Excuse me.
4      THE COURT: Just read it to yourself and then let
5 Mr. Strassberg know whether it refreshes your recollection.
6 A. It does -- it does.
7 Q. Let me ask you a question that will be a little bit
8 modified, OK, Dr. Gilman? Is it fair to say that to start this
9 meeting, the prosecutors told you that they wanted you to focus
10 on your interactions with Mathew Martoma?
11 A. It says focus on, but there's no word exclusive in it.
12 Q. Would it be fair to say that that focus was consistent with
13 what Agent Kang had told you when he followed you to your
14 office and had that session with you in September 1 of 2011,
15 that his focus was not on you or even on Mr. Martoma, but was
16 on Mr. Cohen?
17      MR. DEVLIN-BROWN: Objection.
18      THE COURT: Sustained.
19 Q. Dr. Gilman, let's talk about that proffer session on
20 August 17 of 2012, OK? Do you recall in that session that you
21 told the prosecutors that when you went to San Francisco to see
22 the unblinded efficacy results of the bapineuzumab Phase II
23 trial, you were not intending to share those results with
24 Mathew. Do you remember saying that?
25 A. I denied -- would you say that again?

E1oQmar1      Gilman - cross      Page 1819

1 Q. Sure. Let me try again, OK? Do you remember telling them
2 that back on July 15, OK, so when you first went to San
3 Francisco to see the efficacy results --
4 A. Yes.
5 Q. -- it was not your intention to share them with Mathew or
6 with anybody, right, when you first went out. Do you remember
7 saying that?
8 A. Yes.
9 Q. And that was true, right?
10 A. Yes.
11 Q. Now, you also said in that August 2012 session that on
12 July 17, you did share some of those results with Mathew,
13 correct?
14 A. Yes.
15 Q. And you said you also sent Mathew on July 17 the ICAD
16 PowerPoint that had been sent to you earlier that day. Do you
17 remember telling the prosecutors that?
18 A. Yes, that was my recollection at the time. Yes.
19 Q. You told the prosecutors that you talked in that
20 conversation on the 17th with Mr. Martoma about the ICAD
21 PowerPoint presentation, right?
22 A. Yes.
23 Q. Now, at the same meeting, this August 17, 2012 meeting, the
24 prosecution asked you again about that calendar entry about
25 meeting with Mathew on July 19 of 2008. Remember that?

E1oQmar1      Gilman - cross      Page 1820

1 A. Yes.
2 Q. I think we had talked yesterday, they had asked you about
3 that in February. Do you remember?
4 A. Yes.
5 Q. And they showed you the calendar entry at this meeting in
6 August?
7 A. Yes.
8 Q. And even after seeing the calendar entry, you told them
9 that you didn't have any memory of that meeting taking place,
10 right?
11 A. Yes.
12 Q. And that was true, correct?
13 A. Yes.
14 Q. And that was true back in February when you told them that
15 too then, right?
16 A. Yes.
17 Q. Is it fair to say, Dr. Gilman, that it is uncommon for an
18 investment professional to visit you in Ann Arbor on a
19 Saturday?
20 A. Yes.
21 Q. And also fair to say that Mr. Martoma had never been to the
22 University of Michigan campus where you worked, as far as you
23 know, before?
24 A. As far as I know, he had never been there before.
25 Q. Dr. Gilman, do you recall also that at the end of this

E1oQmar1      Gilman - cross      Page 1821

1 meeting on August 17, 2012, the prosecutors gave you back your
2 computer?
3 A. You're switching topics now. At the end of what?
4 Q. Sure. That's OK, I'll repeat it. Anything you're not
5 quite sure you understand, you just let me know.
6      So, at the end of that meeting, so now it's August 17,
7 2012. Yes, so now we're going -- you're right, we're trying to
8 go in different time frames, but I want you now to be on
9 August 17, 2012, your proffer meeting. At the end of that
10 meeting, do you recall that the FBI gave you back the computer
11 that you had given them the day before?
12 A. I don't recall that, but perhaps.
13 Q. Let's try to see if we can help your recollection. If we
14 can put up Defense Exhibit 3501-16 at page 5.
15      Again, Dr. Gilman, if you could just read this to
16 yourself and then see if that helps your recollection that at
17 the end of this meeting, your laptop was returned to you?
18 A. All right. Thank you.
19 Q. Do you remember now that it was returned to you at end of
20 the meeting?
21 A. I don't remember it, but this document --
22      THE COURT: No, this question is, do you remember?
23 A. I do not remember.
24 Q. Fair enough, Dr. Gilman. Do you remember it was returned
25 to you at some point?

     **Southern District Court Reporters**     

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

| E1oQmar1 | Gilman - cross | Page 1822 |
|---|---|---|

1  A.  Yes.
2  Q.  And it was some point around that time even if you can't
3  remember it was at the meeting itself, right?
4  A.  Yes.
5  Q.  And you understood that the FBI had made a full copy of
6  that laptop, right, that's why you had given it to them, right?
7  A.  That was my understanding.
8  Q.  Now, Dr. Gilman, you next met with the prosecutors on
9  September 14 of 2012.  Do you remember that?
10 A.  What happened on September 14?  I'm sorry, say that again?
11 Q.  Sure.  You had another one of these proffer sessions,
12 another meeting with the prosecutors on September 14 of 2012.
13 A.  Yes.
14 Q.  About three weeks or a month after the August 17 meeting,
15 right?
16 A.  Yes.
17 Q.  And do you remember you spent hours with the prosecutors in
18 this meeting on September 14 of 2012?
19 A.  Yes.
20 Q.  And they showed you various documents.  Do you remember
21 that?
22 A.  Not distinctly, no.
23 Q.  No, I understand, and I'm not at this point trying to ask
24 you about specific documents, but do you remember that they
25 showed you various documents as the session went on?

| E1oQmar1 | Gilman - cross | Page 1823 |
|---|---|---|

1  A.  Yes.
2  Q.  Again, I'm going to want to try to focus you on what you
3  said in this session on September 14 of 2012 with the
4  prosecutors, OK?  OK?
5  A.  Yes.
6  Q.  Fair to say you were doing this agreement pursuant to that
7  proffer agreement that we looked at a few minutes ago, right?
8  A.  Yes.
9  Q.  And at this time, you did not have your non-prosecution
10 agreement yet, right?
11 A.  That's correct.
12 Q.  Now, in this meeting, you discussed with the prosecutors
13 your interactions with Mathew, correct?
14 A.  Yes.
15 Q.  And you told the prosecutors about the first time that you
16 could recall meeting with Mathew in New York at the SAC's
17 offices.  Do you remember that?
18 A.  Yes, it was CR Intrinsic's office, actually, to be precise.
19 Q.  That was that meeting in October of 2006 that you've
20 testified about, right?
21 A.  Yes.
22 Q.  And you talked to the prosecutors about how you remembered
23 that meeting in October of 2006 in CR Intrinsic's offices in
24 New York; is that right?
25 A.  Yes.

| E1oQmar1 | Gilman - cross | Page 1824 |
|---|---|---|

1  Q.  And did you know at the time you were talking to the
2  prosecutors -- now this is, again, September 2012 -- did you
3  know that CR Intrinsic was a division, part of SAC Capital?
4  Did you know that by that time?
5  A.  Oh, I don't recall whether I knew that at the time or not.
6  I probably did by then.  I don't specifically recall whether I
7  knew it.
8  Q.  OK.  In your session in September, you told the prosecutors
9  that you believed that Mathew was gracious and friendly in your
10 meeting with him, right?
11 A.  Yes.
12 Q.  And you remembered the fact that he had provided lunch for
13 you in the meeting, correct?
14 A.  Yes.
15 Q.  And you were clear that you didn't provide any confidential
16 information to Mathew in this first meeting the first time you
17 met him, right?
18 A.  That's right.
19 Q.  Once again in this meeting, the prosecutors spent time with
20 you about that calendar entry on July 19 that reflected that
21 Mathew was going to meet you in your office in Michigan.  Do
22 you remember that?
23 A.  I don't specifically remember it being raised during that
24 meeting, but it could well have because I was asked multiple
25 times about that meeting.

| E1oQmar1 | Gilman - cross | Page 1825 |
|---|---|---|

1  Q.  So let me direct your attention to Defense Exhibit 3501-20
2  at page 10.  Again, we will do the same exercise.  Mr. McLeod,
3  if you could highlight the relevant section here.
4       And then I am going to ask you, Dr. Gilman, if after
5  reading that it helps your recollection that in fact you were
6  asked about the calendar entry and the Michigan meeting again
7  in September.  I know this is a little hard to read, so take
8  your time with it, Dr. Gilman.
9  A.  Yes, I've read it.
10 Q.  So, does that help refresh you, Dr. Gilman, that you were
11 asked about the calendar entry for the Michigan meeting in the
12 September 14, 2012 proffer session?
13 A.  Yes.
14 Q.  And you told them that you had still had no memory of that
15 meeting, right?
16 A.  Yes.
17 Q.  And that was a true statement at the time, right?
18 A.  Yes.
19 Q.  And you met again with the prosecutors on October 26 of
20 2012.  Do you remember that?
21 A.  Yes.
22 Q.  This was another one of those proffer sessions again,
23 right?
24 A.  Yes.
25 Q.  And, again, you didn't have a non-prosecution agreement in

**Southern District Court Reporters**

**JA221**

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

E1oQmar1                    Gilman - cross                    Page 1826

1  place yet at this time, right?
2  A. That's right.
3  Q. Is it fair to say that you answered all the questions that
4    the prosecutors asked you in this meeting?
5  A. I believe I did.
6  Q. Fair to say also that as of October 26 of 2012, you still
7    had no memory of ever meeting Mathew in your office in
8    Michigan?
9  A. Yes.
10 Q. Now, on November 15 of 2012, you entered into that
11   non-prosecution agreement that we've looked at in court
12   yesterday. Do you remember that?
13 A. Yes.
14 Q. But even after your non-prosecution agreement, you
15   continued to have interview sessions with the government,
16   right?
17 A. Yes.
18 Q. But now these sessions were not covered by the proffer
19   agreement any more; they were covered by the non-prosecution
20   agreement, right?
21 A. Yes.
22 Q. And as you mentioned, one of the things you were obligated
23   to do under the non-prosecution agreement was come and meet
24   with the prosecutors whenever they summoned you to do so,
25   right?

E1oQmar1                    Gilman - cross                    Page 1827

1  A. Yes.
2  Q. And that's one of your obligations that remains on you now
3    even as we sit here today, right?
4  A. You're speaking too fast, and I can't understand you.
5    You're too far away from the microphone, I think.
6  Q. I'll try again.
7  A. Please.
8  Q. And that is one of the obligations that you still have
9    pursuant to your non-prosecution agreement, right?
10 A. Yes.
11 Q. Now, do you recall that you met again with the prosecutors
12   on February 28 of 2013?
13 A. I don't specifically remember that date, but that sounds
14   likely.
15 Q. Let me show you a document, and see if it will help you
16   with the date. Mr. McLeod, if you could show Defense Exhibit
17   3501-25 at page 1.
18     Do you see, Dr. Gilman -- after you've had a chance to
19   see this, does that help refresh your memory that you met again
20   with the prosecutors on February 28 of 2013 now?
21 A. Yes. Thank you.
22 Q. Do you remember, again, focusing now on February 28 of
23   2013, which is a little less than a year ago, I guess, do you
24   remember that again you discussed that first meeting with
25   Mathew in October 2006?

E1oQmar1                    Gilman - cross                    Page 1828

1  A. Yes.
2  Q. And by this time your first meeting in October 2006 had
3    happened almost -- well, I guess it was six and a half years
4    before, right?
5  A. Yes.
6  Q. After you discussed that October meeting, the prosecutors
7    talked to you again about this Michigan calendar entry about
8    the trip to meet with Mathew Martoma on July 19 in your office.
9    Do you remember that?
10 A. Yes.
11 Q. Once again, you said that you had no recollection of that
12   meeting with Mathew, right?
13 A. Yes.
14 Q. And the prosecutors asked you some detailed questions in
15   that meeting about your office. Isn't that right?
16 A. I think so. I don't specifically recall. Can you refresh
17   my memory?
18 Q. Well, let me -- I will in a minute, but let me ask you a
19   different question, Dr. Gilman, and see if this helps.
20     Do you remember that they asked you questions about
21   how you could gain access to your office?
22 A. Yes.
23 Q. And they asked you questions about how you commuted to your
24   office?
25 A. How I what?

E1oQmar1                    Gilman - cross                    Page 1829

1  Q. Commuted, how you got to your office?
2  A. Yes.
3  Q. That you drove to your office and the like?
4  A. Yes.
5  Q. And they asked you where you parked?
6  A. Yes.
7  Q. And they asked you about how someone would enter your
8    office on the weekends?
9  A. Yes.
10 Q. Do you remember that? And they talked about how a visitor
11   could possibly get into your office, right?
12 A. Yes.
13 Q. Your office building, I guess it would be?
14 A. Yes.
15 Q. And you explained that from your office, you cannot see the
16   street outside. Do you remember that?
17 A. I -- that sounds familiar, yes.
18 Q. And you also said that there was no buzzer outside the door
19   for someone to buzz you when they were outside the door, right?
20 A. That's right.
21 Q. And is it fair to say that you understood they were trying
22   to develop evidence with respect to this issue of whether you
23   had met with Mathew on July 19 of 2008?
24 A. I thought they were trying to help me remember. I thought
25   they were trying to help --

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

| E1oQmar1 | Gilman - cross | Page 1830 |
|---|---|---|

1 Q. So you understood, Dr. Gilman, that these questions were
2 designed to see if you could remember what you hadn't been able
3 to remember up until we were at February 28 of 2013, right?
4 A. I had no memory of the day until that time.
5 Q. And the prosecutors, in addition to asking you questions,
6 were also showing you documents, right?
7 A. Yes.
8 Q. Now, do you recall, Dr. Gilman, that by this time,
9 February 28 of 2013, you were aware that the prosecutors had
10 not been able to locate any email that would show you sending
11 the ICAD PowerPoint presentation to Mathew on July 17?
12 A. I heard nothing about that, sir.
13 Q. Well, did your own lawyer -- well, talking broadly,
14 Dr. Gilman, is it not fair to say that it was your
15 understanding that there had not been -- excuse me. Let me
16 frame it again.
17 Is it not true that by February 28 of 2013,
18 Dr. Gilman, you understood that no one had been able to find
19 any email sent from you to Mathew Martoma attaching the ICAD
20 PowerPoint presentation?
21 A. Sir, I cannot discuss what transpired between myself and my
22 attorneys. That's privileged.
23 Q. So, you're making a distinction here between what you may
24 have understood from conversations with your attorneys and what
25 you understood from conversations, say, with the prosecutors,

| E1oQmar1 | Gilman - cross | Page 1831 |
|---|---|---|

1 is that right? Is that the distinction you're making? I just
2 want to make sure I understand.
3 A. It is.
4 Q. Let me ask it a different way, Dr. Gilman; perhaps in a way
5 that won't cause any concern about your attorney
6 communications.
7 Is it fair to say that in all of your sessions with
8 the prosecutors, they never showed you any email that was from
9 you to Mr. Martoma attaching the ICAD PowerPoint presentation.
10 Is that fair to say?
11 A. That's correct.
12 Q. Do you remember -- now, again, I'm at February 28 of 2013,
13 in that session, Dr. Gilman. Do you remember that they asked
14 you in that session detailed questions about your computers.
15 Do you remember that?
16 A. About my computers. I don't recall such questions now.
17 Q. OK. Well, let's take a look at Defense Exhibit 3501-25 at
18 page 9, and we'll see if that can help you, Dr. Gilman.
19 A. You mean the change of computers?
20 Q. But my question to you, Dr. Gilman, is just a little
21 different. If you've had a chance to look at this. My
22 question only was, does this help you remember that they asked
23 you questions about your computers?
24 A. Oh, yes, they did. Yes.
25 Q. And you talked to them about your computers and your laptop

| E1oQmar1 | Gilman - cross | Page 1832 |
|---|---|---|

1 and the like at the University of Michigan, right?
2 A. Yes.
3 Q. One of the things they asked you about was whether you had
4 deleted anything from your laptop before you had given it to
5 the FBI. Do you remember that?
6 A. Yes.
7 Q. And you explained to them that you had not done that,
8 right?
9 A. That's right, yes.
10 Q. Now, do you recall, Dr. Gilman, that you met again with the
11 prosecutors on the very next day? That was March 1 of 2013.
12 A. I don't specifically remember it, but that's fine.
13 Q. Let's take a look at Defense Exhibit 3501-27. Again, just
14 if we look at the top and see if that helps you with respect to
15 the date, Dr. Gilman.
16 A. Yes. Thank you.
17 Q. Right. Do you remember, Dr. Gilman, that in this March 1,
18 2013 session with the prosecutors, that calendar entry about
19 July 19 came up again, right?
20 A. Yes.
21 Q. And the prosecutors were asking you more questions to try
22 to see if they could get you to remember anything about a
23 meeting with Mathew in Michigan, right?
24 A. I take issue with the word get me to remember. That sounds
25 coercive. There is no coercion involved.

| E1oQmar1 | Gilman - cross | Page 1833 |
|---|---|---|

1 Q. Well, would it be fair to say they were asking you
2 questions, a lot of questions about this topic, right?
3 A. I was being asked questions. Nobody was forcing me to do
4 anything. I take issue with your choice of words, sir.
5 Q. I didn't suggest coercion, Dr. Gilman, so I'm fine with
6 your phrasing of it. They were asking you questions about --
7 A. They were asking me questions, yes.
8 Q. And I think you said a few minutes ago that you understood
9 they were trying to help you remember, right?
10 A. Yes.
11 Q. Do you remember in this session that, again, the session
12 started out in the morning. Do you remember that, the session
13 on March 1, 2013?
14 A. Tell me again.
15 Q. It started in the morning; it was a long session you had
16 with the prosecutors?
17 A. Yes.
18 Q. And in the morning, you told them again you had no memory
19 of this meeting with Mathew in Michigan, correct?
20 A. Perhaps. Is that documented somewhere?
21 THE COURT: The question is whether you remember it.
22 THE WITNESS: I do not remember that, no, and I'm --
23 Q. Let me direct your attention, Mr. McLeod, to Defense
24 Exhibit 3501-27 at page 3. If you could highlight the relevant
25 language. That's not the relevant language. It's in paragraph

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

| E1oQmar1 | Gilman - cross | Page 1834 |
|---|---|---|

1 four, Mr. McLeod. No, that's not the relevant language.
2 Mr. McLeod. "Gilman did not." If you can find that. Thank
3 you.
4     So take your time, Dr. Gilman. We've showed you a lot
5 other clips, but this is the actual clip we were looking for on
6 page 3. Do you see that, does that help refresh your
7 recollection that --
8 A. No. No. This is about canceling a meeting --
9     THE COURT: No, the question is, does it refresh your
10 recollection? Just a yes or no.
11 Q. Mr. McLeod, if you could highlight only the first sentence
12 please so we are not looking at things that are not relevant to
13 this question. Just take a look at that, Dr. Gilman.
14 A. This helps me recollect that meeting, but not what you --
15 Q. Right. So just, again, in this March 1 meeting at this
16 time, the beginning of the meeting, do you remember you still
17 didn't remember anything about whether you met with Mr. Martoma
18 on July 19 of 2008?
19 A. All right. This doesn't give a time zone for when this
20 discussion took place though. You were talking about the
21 morning.
22 Q. Yes, I was.
23 A. And I don't see a time zone here.
24 Q. So, fair to say you can't remember when, but you do
25 remember it happened at some point in that meeting?

| E1oQmar1 | Gilman - cross | Page 1835 |
|---|---|---|

1 A. Yes.
2 Q. And you did tell the prosecutors though that you remembered
3 that Mathew had told you that he was planning to be in Ann
4 Arbor on Saturday for a different reason, correct?
5 A. Yes.
6 Q. I think you testified he told you that his -- he had an
7 uncle who had died, and he was planning to come up to Ann Arbor
8 to pay respects, right?
9 A. Yes.
10 Q. In fact, he had told you he had been so busy, he missed the
11 funeral, correct?
12 A. That's what he told me, correct.
13 Q. Do you remember also, Dr. Gilman, that he told you the
14 uncle had suffered from lymphoma?
15 A. No, he didn't tell me that.
16 Q. So, you didn't know what the cause of the uncle's death
17 was?
18 A. No, I did not know.
19 Q. Do you remember during this session that there came a point
20 where you guys took a lunch break?
21 A. I'm sorry, would you say that again?
22 Q. Sure. Let me be more specific, OK, Dr. Gilman. So, do you
23 remember during the March 1, 2013 session, that there was a
24 point where you took a lunch break in the session?
25 A. Well, I don't remember but seems natural.

| E1oQmar1 | Gilman - cross | Page 1836 |
|---|---|---|

1 Q. Let me show you again Defense Exhibit 3501-27 at page 4,
2 and, again, Mr. McLeod, if you could just highlight what's
3 noted on the top of the outline page relating to that issue.
4 You see the place where it says "note" at the top of the page.
5 Really, it's just the first clause there, Dr. Gilman.
6 A. Yes.
7 Q. Not so much about the second part, but the first part
8 there, to see if that helps refresh your --
9 A. Yes, there was a lunch break. Yes.
10 Q. Now, Dr. Gilman, do you -- stay with me, OK? So, on
11 March 1 of 2013, do you remember anything that happened at this
12 lunch break?
13 A. No.
14 Q. Do you remember where you went for lunch?
15 A. No.
16 Q. Do you remember who you went to lunch with?
17 A. No.
18 Q. Did the prosecutors sit with you for lunch? Did you all
19 eat lunch together?
20 A. No, I don't remember, sir.
21 Q. Do you recall which attorneys, your own attorneys you were
22 with during this March 1 session?
23 A. I do not recall, sir.
24 Q. Would it be fair to say, Dr. Gilman, that given all the
25 times the prosecutors had questioned you about the trip to

| E1oQmar1 | Gilman - cross | Page 1837 |
|---|---|---|

1 Michigan on July 19 of 2008, you knew that they viewed that
2 trip as important?
3 A. They knew what?
4 Q. That you knew the prosecutors viewed that calendar entry
5 that said Mathew had made a trip to Michigan on July 19 as
6 important? Would it be fair, would you agree with me that you
7 knew the prosecutors believed that was important?
8 A. Would you say that entire pair of sentences again slowly?
9 Q. I will. So, Dr. Gilman, would it be fair to say that given
10 all the times the prosecutors had asked you about that July 19
11 calendar entry about a meeting with Mathew --
12 A. Yes.
13 Q. -- in Michigan, that you knew, understood that the
14 prosecutors believed that that was an important issue?
15 A. I didn't know what the prosecutors knew or thought, dreamed
16 or had in mind. I had no way to read their thoughts, sir.
17 Q. OK. So, you didn't know, fair to say then, Dr. Gilman?
18 All you did know was that they kept asking you about it?
19 A. Yes, that's all I knew.
20 Q. Now, is there anything else that you can remember for us
21 about this lunch break that happened on the March 1, 2013
22 meeting?
23 A. I'm sorry, but I've had so many meetings with so many
24 people that I do not recall that specific lunch break.
25 Q. Do you recall then, Dr. Gilman, that after the lunch break,

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

1  you went back to the meeting and you told the prosecutors that
2  you had a vague recollection of going out of your office
3  building and finding Mathew on the street outside your office.
4  Do you recall telling them that after the lunch break?
5  A. That was, in fact, the first recollection I had, and I
6  don't recall exactly when that occurred, but --
7  Q. So, fair to say you can't place it after the lunch break or
8  before; is that right?
9  A. I can't place exactly when it happened.
10  Q. But you do remember that that was the first recollection
11  that you had about seeing Mathew in Michigan, right?
12  A. Yes.
13  Q. But even then, you did not recall any other details --
14  A. That's right.
15  Q.  -- about the meeting with Mathew in Michigan, right?
16  A. That's right.
17  Q. Now, do you recall, Dr. Gilman, that you had another
18  session with the prosecutors on April 4 of 2013?
19  A. I don't specifically recall that session.
20  Q. Can we show Defense Exhibit 3501-29, and, again, just
21  highlight the date, and see if that helps your recollection,
22  Dr. Gilman.
23  A. Yes, all right.
24  Q. So, fair to say, Dr. Gilman, that you met again with the
25  prosecutors on April 4 of 2013?

1  A. Yes.
2  Q. And fair to say in that session that the prosecutors again
3  asked you many questions about your memory of meeting Mathew in
4  Michigan, right?
5  A. Yes.
6  Q. Fair to say still at this time you didn't have any
7  details -- excuse me. Fair to say that still at this time on
8  April 4th, you didn't recall any of the details of the meeting,
9  right?
10  A. That's probably true. I don't specifically remember what I
11  said or recalled on April 4.
12  Q. Do you remember that on April 4, Dr. Gilman, that the
13  prosecutors asked you a number of questions about how you share
14  information with people in general? Do you remember that?
15  A. How I share information in general?
16  Q. Yes, in general.
17  A. In general, I don't understand the question.
18  Q. Well, let me rephrase it. I guess that was too broad. Do
19  you recall that they asked you how you like to review documents
20  yourself?
21  A. Please repeat.
22  Q. Do you recall that the prosecutors in this April 4, 2013
23  session asked you how you like to review documents yourself?
24  A. Review documents?
25  Q. Yes.

1  A. I don't recall that question.
2  Q. OK. Let's take a look at Defense Exhibit 3501-29 at page
3  2. Take a look at that, Dr. Gilman. In fact, you can read
4  that whole paragraph that is there; that might help.
5  A. Thank you. That refreshes my memory.
6  Q. So, do you remember they asked you how you like to review
7  documents?
8  A. Yes.
9  Q. And you told them how you like to review them
10  electronically or on a computer, right?
11  A. Yes.
12  Q. And they also asked you about how you might share documents
13  with people, right? Do you remember that?
14  A. Yes.
15  Q. And you told them that sometimes you would use a jump drive
16  to give a person an electronic copy of a document, right?
17  A. Yes.
18  Q. And the prosecutors were asking you questions about how you
19  reviewed documents and how you shared documents, right,
20  Dr. Gilman?
21  A. Yes.
22  Q. Is it fair to say that from your prior answers, that you
23  don't know the reason behind why they were asking you the
24  questions; you just know they were asking you, right?
25  A. I didn't know the reason behind why they were asking me

1  these questions.
2  Q. Now, let's move forward to October 22 of 2013. You had
3  another one of these interview sessions with the government on
4  that day. Isn't that right, Dr. Gilman?
5  A. Yes, maybe. I might ask you again for evidence of that.
6  Q. Mr. McLeod, if we could show Dr. Gilman Defense Exhibit
7  3501-33?
8  A. Thank you.
9  Q. Fair to say, Dr. Gilman, that the issue of your meeting
10  with Mathew in Michigan came up again at this session. Do you
11  recall that?
12  A. I don't specifically recall it. What specifically are you
13  interested in?
14  Q. Really, I am just asking if you recall at this session on
15  October 22 of 2013 that the prosecutors asked you again about
16  your memory of meeting Mathew in Michigan?
17  A. I don't -- I don't recall any specific recollection I gave
18  the prosecutors at that time, but I do recall that slowly over
19  time I had increased numbers of recollections about the 19th.
20  I can't give you the sequence, but there is no sudden recall
21  about what I disclosed.
22  Q. Are you done?
23  A. It occurred slowly.
24  Q. I don't want to cut you off. Let's go to -- I want you to
25  try to stay with me, if you can, on this October 22, 2013

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                            January 24, 2014

| E1oQmar1 | Gilman - cross | Page 1842 |
|---|---|---|

1   meeting though, OK?
2   A.  All right.
3   Q.  That was only about three months ago, right?
4   A.  Yes.
5   Q.  So, Mr. McLeod, if you could put up for Dr. Gilman -- well,
6   let me ask you first, Dr. Gilman, and then see if we need to
7   help at all with anything.
8        Isn't it a fact, Dr. Gilman, that in this October 22,
9   2013 meeting in response to the prosecutors' questions, you
10  told them again that you didn't remember reviewing the
11  PowerPoint slide with Mathew at your office, but you presumed
12  that you had reviewed them?  Do you recall saying that?
13  A.  That I presumed what?
14  Q.  You presumed that you had reviewed them with Mathew at your
15  office.  Do you remember saying that?
16  A.  I -- I don't recall saying that, no.
17  Q.  OK.  I understand.  So, Mr. McLeod, if you could put up for
18  Dr. Gilman, Defense Exhibit 3501-33 at pages 5 to 6.  If you
19  can just get the part that we are talking about here.  If you
20  can highlight that part, Mr. McLeod, so we can direct
21  Dr. Gilman to the right part.  It's the last sentence in what
22  you've highlighted.
23       Does that help you recall, Dr. Gilman, that you told
24  the prosecutors you presumed that you and Mr. Martoma had
25  reviewed the PowerPoint slide deck for ICAD at this meeting?

| E1oQmar1 | Gilman - cross | Page 1843 |
|---|---|---|

1   A.  Yes.  However, this also contains information that had come
2   back to me in the interim between the two meetings in which I
3   recalled more specific details about his visit which are
4   documented here.  These memories came back slowly.
5        THE COURT:  Dr. Gilman.
6        THE WITNESS:  Yes, sir.
7        THE COURT:  No question pending.
8        Go ahead, Mr. Strassberg.
9        THE WITNESS:  Yes, sir.
10       MR. STRASSBERG:  Thank you, Judge.
11  Q.  You testified on direct with the prosecutor asking you
12  questions that the memories that you shared with this jury on
13  direct about that meeting in Michigan had come back to you only
14  as recently as about two weeks ago, right, the full memories?
15  A.  Sir, if that's a question for me, I was responding to the
16  question from Mr. Devlin-Brown, and his question permitted me
17  only a single answer quickly, and I could not give him the
18  detail that I should have been able to give him.  It was not as
19  if everything appeared all at once.  It occurred slowly, the
20  memory returned very slowly.  I hope that clarifies the
21  situation.
22  Q.  But would it be fair to say this, Dr. Gilman, that however
23  it developed slowly over time, some of what you testified to in
24  response to Mr. Devlin-Brown's questions were things that you
25  remembered only two weeks ago, right?

| E1oQmar1 | Gilman - cross | Page 1844 |
|---|---|---|

1   A.  The most recent piece of the memory was a couple of weeks
2   ago.
3   Q.  OK.
4   A.  But it was an evolutionary process.
5   Q.  Now, it's fair to say, Dr. Gilman, that the things you have
6   said -- well, let me frame it this way:  You have had other
7   changes in the things you've told the prosecutors from what
8   you've testified about at trial.  Isn't that right?
9   A.  Excuse me?  I don't understand your question.
10  Q.  Well, putting aside the Michigan trip which we have been
11  talking about now for the better part of an hour --
12  A.  Yes.
13  Q.  -- isn't it right that you have changed other things about
14  what you've testified to to this jury during your sessions with
15  the prosecutors?
16  A.  I'm not sure what you're talking about, sir.
17  Q.  Well, let's look at Government Exhibit 224-A that's been
18  admitted into evidence.  You discussed this exhibit on your
19  direct examination.  Do you remember that?  The question is
20  only if you remember this document?
21  A.  Yes.
22  Q.  Mr. McLeod, you can go to the part that Mr. Martoma -- the
23  email that starts at the bottom of the page, please.
24       In this email, Dr. Gilman, Mr. Martoma asks you if you
25  know of any Phase III trials in Alzheimer's that have had

| E1oQmar1 | Gilman - cross | Page 1845 |
|---|---|---|

1   multiple dose groups aside from the ongoing trial of
2   bapineuzumab.  Do you see that?
3   A.  Yes.
4   Q.  So, it's fair to say he's asking you for information about
5   trials that do not involve bapineuzumab in this question,
6   right?
7   A.  Yes.
8   Q.  If we go to the first paragraph of your response, you
9   respond to him by providing him information about a number of
10  different other drugs, right?
11  A.  Yes.
12  Q.  And you didn't have confidential information -- well, you
13  were not part of an SMC for any of these other drugs, right,
14  Dr. Gilman?
15  A.  That's right.
16  Q.  So you were providing him information here that you
17  understood was proper to provide, right?
18  A.  It was public information.
19  Q.  Now, in the second paragraph of this email, you provided
20  Mr. Martoma with information about dropout rates.  Do you
21  recall that?
22  A.  Yes, sir, I do.
23  Q.  And you recall we had a lot of testimony in your
24  questioning by the prosecutors about how the dropout numbers,
25  there'd been an error and that it was fixed.  Remember that?

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

E1odmar4          Gilman - redirect          Page 1914

1  Q. And the "to" line is to Allison Hulme?
2  A. Yes.
3  Q. And what is the date of this email?
4  A. August 26, 2008.
5  Q. And you write: "Dear Allison, I am writing to request
6   permission to show the slides I presented at the ICAD meeting
7   to a neuroscience interest group at the annual meeting of the
8   Institute of Medicine (IOM), National Academy of Sciences."
9  Q. Dr. Gilman, by the time of this email, had you already
10  presented the slides at ICAD?
11 A. Yes, sir.
12 Q. Why were you asking for permission to distribute them at
13  this other conference?
14 A. I remember the Institute of Medicine, National Academy of
15  Sciences, there is a subgroup of neurosciences in that
16  institute, and I thought that this presentation would be of
17  interest to them.
18 Q. Did you feel you needed to ask for permission?
19 A. Yes, I did feel I needed to ask permission.
20 Q. Why?
21 A. Because this was material that had not yet been published.
22         MR. DEVLIN-BROWN: We could take that off the screen,
23  please.
24 Q. Could I show you Government Exhibit 59, for identification,
25  please.

E1odmar4          Gilman - redirect          Page 1915

1        (Pause)
2         MR. DEVLIN-BROWN: And if we could zoom maybe from the
3  header about two-thirds of the way down the document, that
4  would be great.
5  Q. Do you recognize Government Exhibit 59, Dr. Gilman?
6  A. Yes, sir.
7  Q. What is it, just generally?
8  A. This is an email from me to Anita Kawatra.
9         MR. DEVLIN-BROWN: The government offers 59.
10        MR. STRASSBERG: No objection, your Honor.
11        THE COURT: Government Exhibit 59 is received.
12        (Government's Exhibit 59 received in evidence)
13        MR. DEVLIN-BROWN: May we publish it, your Honor?
14        THE COURT: Yes.
15        MR. DEVLIN-BROWN: So perhaps we could just zoom on
16  the bottom email.
17 Q. So, Dr. Gilman, is this from yourself to Anita Kawatra and
18  Dale Schenk and Martin Koller?
19 A. Yes.
20 Q. So you write: "Tomorrow I will give the Distinguished
21  University Professor lecture, and I had originally considered
22  going into depth about both AN1792 and AAB-001. To this end, I
23  was considering asking you all what I can say publicly."
24        Why were you sending this message relating to what you
25  can say publicly to Anita Kawatra, Dale Schenk and Martin

E1odmar4          Gilman - redirect          Page 1916

1   Koller?
2  A. I was asking their permission because the material had not
3   yet been published.
4  Q. Did you ever ask anyone from Elan, Dr. Gilman, whether you
5   could have permission to share the ICAD presentation in advance
6   with Mr. Martoma?
7  A. No. I had not.
8         MR. DEVLIN-BROWN: We could take those off the screen,
9   please.
10 Q. Dr. Gilman, do you recall having some questions on
11  cross-examination about consultations you did with other
12  individuals in the period between when you were unblinded to
13  the results and the announcement of the results at ICAD?
14 A. Yes.
15 Q. I believe you testified -- do you recall when your were
16  unblinded?
17 A. Yes.
18 Q. When?
19 A. Well, I was unblinded on the 15th and 16th of July 2008.
20        MR. DEVLIN-BROWN: Ms. Hernandez, with the Court's
21  permission, could we publish Government Exhibit 600?
22        THE COURT: Yes.
23        MR. DEVLIN-BROWN: And is this sorted by consultation
24  date, Ms. Hernandez?
25        And could we scroll down until we find July 15, 2008.

E1odmar4          Gilman - redirect          Page 1917

1  Q. So let me ask you, Dr. Gilman, how many consultations you
2   see on Exhibit 600 between July 15 of 2008 and July 29th?
3         So far on the screen, there is a July 17, 2008, with
4   Rod Wong; a July 18, 2008 with Kumar Husam Nazer; July 21, 2008
5   with Rene Shen; and July 24, 2008 with Rod Wong; and a July 25,
6   2008 with Rod Wong; and a July 25, 2008 with Brian Grossman.
7         Dr. Gilman, as you were -- we could take that off the
8   screen for a moment.
9         Dr. Gilman, as you were preparing to deliver your
10  presentation at ICAD, did you know whether there was much
11  investor interest in the drug?
12 A. Yes. I suspected there was a great deal of investor
13  interest in the drug.
14 Q. Well, did you know that one way or the other based on
15  consultations?
16 A. Not based on consultations, but I suspected there was a
17  great deal of interest in the drug because it had been widely
18  known as an exciting potential drug for Alzheimer's Disease.
19 Q. Did you see Mr. Martoma's name anywhere on the list for
20  consultations between July 15, 2008 and July 29, 2008?
21 A. No.
22 Q. Did you talk to Mat Martoma between that period about the
23  drug?
24 A. Yes.
25 Q. Did you report to GLG any phone calls with Mr. Martoma on

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 24, 2014

| E1odmar4 | Gilman - redirect | Page 1918 |

1 July 17, 2008?
2 A. I didn't. No, I did not.
3 Q. What about the meeting you testified to on July 19, 2008,
4 in your office?
5 A. I did not report that to GLG.
6 Q. Did you ask Mr. Martoma to report it to GLG?
7 A. I did not.
8 Q. Why not?
9 A. Because it would be tantamount to confessing that I was
10 feeding -- giving him inside information.
11 Q. Now, you did have some consultations, we just saw, with
12 Mr. Wong and Mr. Shen. Did you see those?
13 A. Yes.
14 Q. Do you recall on cross-examination being asked questions
15 about various articles you had sent, or slides from AN1792 you
16 had sent to Mr. Shen and Mr. Wong?
17 A. Yes.
18 Q. Was -- and you remember -- do you remember, it was like
19 several different articles and slides that were shown to you on
20 cross-examination?
21 A. Yes.
22 Q. Were any of those confidential materials?
23 A. No.
24 Q. Can you describe -- well, let me show you, if we could,
25 what is Defense Exhibit 874, please.

| E1odmar4 | Gilman - redirect | Page 1919 |

1 And if we could just zoom in on the text,
2 Ms. Hernandez.
3 (Pause)
4 Do you recall, Dr. Gilman, seeing this article, dated
5 on the bottom July 19, 2008, from the Lancet and I think the
6 second article from the Lancet as well?
7 A. Yes, sir.
8 Q. Do you remember what these articles were about, or would
9 you like to look at them a little bit? I just wanted to ask
10 you a general question about them.
11 A. Well, I remember them reasonably well.
12 Q. Were those articles in your view useful for someone who did
13 not know the results of the Phase II trial but was trying to
14 look at what was reported to make a best assessment?
15 A. I felt they were useful -- did give a useful perspective.
16 Q. And Mr. Strassberg didn't show you any emails of you
17 sending these articles to Mr. Martoma, did he?
18 MR. STRASSBERG: Objection, your Honor.
19 A. No, I don't believe so.
20 THE COURT: Overruled.
21 Q. Did these articles affect your view at all?
22 A. I'm sorry. Did they what?
23 Q. Did they affect your view at all as to the prospects for
24 bapineuzumab?
25 A. No, they did not.

| E1odmar4 | Gilman - redirect | Page 1920 |

1 Q. I think you were asked -- well, were you asked on
2 cross-examination whether you had provided this Lancet
3 article -- sorry, talked about the Lancet article with
4 Mr. Martoma?
5 A. I was asked about whether I had discussed the Lancet
6 article with Mr. Martoma.
7 Q. And do you recall answering that you had?
8 A. Now we're talking about the Lancet article of the 17th of
9 April, or are we talking about -- there are several Lancet
10 articles.
11 Q. The Lancet article in July 2008.
12 A. In July? I'm sorry, I am not sure whether that was the one
13 discussed with Mr. Martoma or not.
14 Q. That was actually going to be my question. Do you
15 recall -- do you recall any particular occasion or meeting
16 where you were discussing Lancet articles with Mr. Martoma?
17 A. I'm sorry, I don't.
18 MR. DEVLIN-BROWN: OK. We can take that off the
19 screen, then, Ms. Hernandez.
20 Q. Do you recall being asked on cross-examination some
21 questions about whether it was Mr. Martoma or whether it was
22 Mr. Martoma's secretary who tracked you down in Istanbul?
23 A. Yes, I remember the question.
24 Q. And do you recall being asked whether your testimony that
25 Mr. Martoma told you that he had tracked you down was

| E1odmar4 | Gilman - redirect | Page 1921 |

1 consistent with the emails that showed you were in touch with
2 his secretary?
3 A. Yes, I remember the question.
4 Q. Did you have any understanding as to who Mr. Martoma's
5 secretary took actions on behalf of -- on whose behalf
6 Mr. Martoma's secretary took actions?
7 A. Mr. Martoma's secretary took action on behalf of
8 Mr. Martoma.
9 Q. And did you in fact speak to Mr. Martoma himself at some
10 point then?
11 A. I did.
12 Q. And what did he tell you when he spoke to you?
13 A. He told me he tracked me down.
14 Q. Do you recall on cross-examination being asked some
15 questions about an ICAD abstract for a study that Dr. Lon
16 Schneider did about placebos?
17 A. Yes.
18 Q. On direct examination -- well, on direct examination, you
19 had testified that at the ICAD conference there was a Q & A
20 session in which people asked questions about whether the
21 placebo group was a concern?
22 MR. STRASSBERG: Objection, your Honor.
23 THE COURT: Just give me a moment.
24 MR. STRASSBERG: It is a scope objection.
25 MR. DEVLIN-BROWN: I can ask it a different way to

GOODWIN | PROCTER

Richard M. Strassberg
212.813.8859
rstrassberg@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
The New York Times Building
620 Eighth Avenue
New York, NY 10018
T: 212.813.8800
F: 212.355.3333

January 26, 2014

**VIA ECF AND FACSIMILE**

Honorable Paul G. Gardephe
United States District Court for the
    Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 1007

Re:    ***United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y.)**

Dear Judge Gardephe:

We write on behalf of Mathew Martoma in further response to this Court's questions concerning Professor Gompers's expert opinion that the market for Elan securities was "overheated" in June and July 2008. Professor Gompers's testimony both (1) provides circumstantial evidence of Mr. Martoma's state of mind in June and July 2008, and (2) supports Mr. Martoma's defense that there was no material, non-public information about the Phase II bapi trial results disclosed at ICAD (*i.e.*, all such information had already been disclosed in the June 17, 2008, press release).[1] Professor Gompers's analysis would be helpful to the jury, and he should be allowed to testify about his expert opinion.

**I.    Professor Gompers's Testimony Provides Circumstantial Evidence of Mr. Martoma's State of Mind in June and July 2008.**

Although the Government has questioned the utility of expert testimony to reflect upon Mr. Martoma's state of mind, Professor Gompers's analysis would, in fact, be helpful to the jury. As Professor Gompers will explain, the market for Elan securities was overheated in June and July 2008. That fact is circumstantial evidence from which the jury may infer Mr. Martoma's state of mind when SAC sold its Elan (and Wyeth) securities and the reason for those sales. Indeed, such circumstantial evidence is especially persuasive in this case because Professor Gompers based his determination on materials that ***Mr. Martoma himself was in fact analyzing*** in making investment decisions about Elan

---

[1]    As this Court recognized, Professor Gompers's testimony may also be necessary to explain to the jury the terms in the analyst reports that Mr. Martoma received and reviewed. (Tr. 1994:15-17.)

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 26, 2014
Page 2

(and Wyeth) securities, including (1) analysts' forecasts for bapi from analyst reports concerning Elan; (2) market and industry data; and (3) stock price data for Elan and industry competitors. Professor Gompers's testimony will put all of those materials into context for the jury and "provid[e] the groundwork in the form of an opinion to enable the jury to make its own informed determination" about the facts in the case, including the reasons for SAC's sales of Elan (and Wyeth) securities. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

That Professor Gompers conducted his analysis after the fact – as is true of all expert analyses – is no reason to exclude it. Courts have allowed expert testimony based on such retrospective analyses as circumstantial evidence of state of mind in many different contexts. *See, e.g.*, *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 186-87 (2d Cir. 2011) (expert testimony on a company's leave policy was circumstantial evidence of "an employer's wrongful intent"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 539 (E.D.N.Y. 2012) (admitting expert testimony on foreign banking laws and practices as "probative, but not determinative of the Bank's state of mind" and "relevant to what the Bank was aware of and could be expected to believe during the relevant time period").[2] This Court should allow Professor Gompers to testify that the market was overheated because it is circumstantial evidence of Mr. Martoma's state of mind.

II.     **Professor Gompers's Testimony Supports Mr. Martoma's Defense That There Was No Material, Non-public Information about the Phase II Bapi Trial Results Disclosed at ICAD.**

In its opening, the Government argued: "So Dr. Gilman took the stage and he presented the results [of the Phase II bapi trial]. The results were not good. Certainly not [as] the stock market saw it. The stock of one of the two pharmaceutical companies that developed this drug, a company called Elan, it fell over 40 percent in the next 24 hours after the announcement." (Tr. 32:3-8.) The Government assumes that the information disclosed at ICAD was material because the price of Elan securities declined by over 40 percent. Professor Gompers's analysis is directly relevant to that issue because it shows that the price of Elan securities was inflated by about 40 percent *prior to ICAD* – *i.e.*, approximately the same amount that it declined – after incorporating most of the potential value of bapi as a blockbuster drug. Put another way, the price pre-ICAD already had captured all the potential of a "blockbuster" drug; as many analysts had come to determine, the stock had only one way to go. This analysis supports Mr. Martoma's defense that there was no material, non-public information about the Phase II bapi trial results disclosed at ICAD (*i.e.*, all such information had already been disclosed in the June 17, 2008, press release) but rather that the price of Elan securities declined because the market for

---

[2]     *Accord United States v. Thao Bee Yang*, No. 08-CR-324, 2008 WL 4560633, at *1 (E.D. Wis. Oct. 8, 2008) (expert testimony on the failure rate of automobile accessories was circumstantial evidence of a defendant's intent to commit the crime of odometer tampering); *S.E.C. v. Snyder*, No. H-03-046658, 2006 WL 1806164, at *3, *7 (S.D. Tex. June 29, 2006) (expert testimony from a certified public accountant and certified fraud examiner was circumstantial evidence of the defendant's scienter in submitting materially misleading SEC filings); *Lewis v. Booz-Allen & Hamilton, Inc.*, 150 F. Supp. 2d 81, 95 (D.D.C. 2001) ("[C]ircumstantial evidence, including the statistical evidence provided by the plaintiff's expert, . . . would allow an inference of discriminatory intent on the defendant's part.").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 26, 2014
Page 3

Elan had been overheated and the securities price had been far higher than the value of Elan could support.

As this Court recognized, it is "common" for experts to testify about issues that are related to materiality (Tr. 1990:25-1991:9.) *Accord United States v. Levis*, 488 F. App'x 481, 484 (2d Cir. 2012) (holding that the district court committed reversible error by excluding "lay and expert testimony" that "could have raised doubts as to materiality"); *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("stock movement is a factor the jury may consider relevant" in determining materiality); *accord United States v. Nacchio*, 519 F.3d 1140, 1155 (10th Cir. 2008) ("An economic expert is permitted not only to tell the jury that an economic concept is an issue but to analyze the concept and offer informed opinions. In other words, expert testimony may assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context. That is why expert economic testimony is routine when a materiality determination requires the jury to decide the effect of information on the market." (citation and internal quotation marks omitted)), *vacated in part on other grounds on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009). Professor Gompers's analysis about the market for Elan securities relates to issues of materiality, and this Court should allow him to offer his expert opinion to the jury.

*        *        *

For the foregoing reasons and those offered previously, Mr. Martoma respectfully requests that this Court allow Professor Gompers to offer his expert opinion that the market for Elan securities was overheated in June and July 2008.

Respectfully submitted,

Richard M. Strassberg

cc:    Arlo Devlin-Brown (by e-mail)
       Eugene Ingoglia (by e-mail)
       Roberto Braceras (by e-mail)

# Transcript Excerpts

# (January 27, 2014)

# (2186-89)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 27, 2014

| E1rdmar5 | Kehoe - redirect | Page 2184 |

1   refreshed her because there were a number of documents that
2   show she had seen these reports even though they were not
3   e-mailed to her. This was just a little different. So at
4   least it struck me, as she spoke on it, that she was just
5   assuming it must have been, which, again, I think if the
6   government is agreeable, we are agreeable that they all would
7   come in for the good or for the bad. Both sides would use
8   them. I think we don't want to just agree to them if the
9   government is not agreeing to them.
10      THE COURT: I do want to make one point, which is I
11  remember more than once that Mr. Strassberg showed her
12  something and when she couldn't say that she had seen it, he
13  then moved on and went on to the next exhibit. So I think in
14  terms of the defense examination of this witness, when they
15  didn't have an email that showed she got it and if she said I
16  don't remember seeing this, he didn't offer that point, he
17  moved on to something -- he moved on to the next exhibit. So I
18  think, as a matter of fairness, if you don't have an email
19  linking her to this and if she can't say that she saw it, I
20  don't think it should be introduced.
21      MR. DEVLIN-BROWN: My recollection is those other
22  exhibits that Mr. Strassberg moved on from are exhibits that
23  there was no foundation at all that she would have seen the
24  analyst reports.
25      THE COURT: What foundation do we have here?

| E1rdmar5 | Kehoe - redirect | Page 2185 |

1       MR. DEVLIN-BROWN: That she said -- she testified she
2   and Mr. Martoma would try to get their hands on all available
3   analyst reports and that she's probably seen those analyst
4   reports.
5       THE COURT: Well, you are welcome to explore with her
6   whether she saw this or probably saw it, and we will see what
7   she says.
8       MR. DEVLIN-BROWN: OK.
9       THE COURT: If she says she probably saw it, then
10  that's consistent with what's happened in the past and that's
11  fine. If she says I have no idea, then I think you have to
12  move on.
13      MR. DEVLIN-BROWN: OK.
14      MR. STRASSBERG: Thank you, you Judge.
15      (Continued on next page)
16
17
18
19
20
21
22
23
24
25

| E1rdmar5 | Kehoe - redirect | Page 2186 |

1       (In open court)
2   BY MR. DEVLIN-BROWN:
3   Q. So, Ms. Lyndon, this has probably been up on the screen the
4   whole time we have been talking, but was Credit Suisse, do you
5   recall them as an analyst firm that reported or that covered
6   Elan?
7   A. Yes.
8   Q. Did you generally review Credit Suisse reports or receive
9   them in any way with respect to Elan?
10  A. Yes.
11      MR. DEVLIN-BROWN: The government offers 494A.
12      MR. STRASSBERG: No objection, your Honor.
13      THE COURT: All right. Government Exhibit 494A is
14  received.
15      (Government's Exhibit 494A received in evidence)
16      MR. DEVLIN-BROWN: May we publish that, please, Mr.
17  Hattendorf?
18      THE COURT: Yes.
19      MR. DEVLIN-BROWN: If we could zoom in on actually the
20  bottom bullet here.
21  Q. Would you mind reading that, Ms. Lyndon, from the Credit
22  Suisse analyst report?
23  A. "We believe that the full Phase II AAB-001 data presented
24  at ICAD will likely strongly support the headline data reports,
25  and will likely provide good affirmation as to why Elan

| E1rdmar5 | Kehoe - redirect | Page 2187 |

1   progressed early in Phase III trials in both ApoE4 noncarrier
2   and carrier cohorts. We look to fully appraise the detailed
3   data set before raising our risk adjustment on AAB-001, which
4   is currently 50 percent."
5       MR. DEVLIN-BROWN: We zoom out, please,
6   Mr. Hattendorf.
7       THE COURT: Could you establish the date of this
8   report?
9       MR. DEVLIN-BROWN: Yes.
10  Q. What is the date of this report on the top right of the
11  exhibit?
12  A. July 22nd.
13      MR. DEVLIN-BROWN: We could zoom out, please.
14      Let me show you one other document marked for
15  identification as 495A.
16      (Pause)
17  Q. Do you recognize 495A, Ms. Lyndon?
18  A. I mean, I recognize it. It is a research report from
19  Goldman Sachs.
20  Q. Do you recall that Goldman Sachs was one of the firms
21  covering Elan?
22  A. Yeah. I think they were.
23      MR. DEVLIN-BROWN: Hold on one moment, your Honor, if
24  you don't mind.
25      (Pause)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 27, 2014

E1rdmar5      Kehoe - redirect      Page 2188

1       MR. DEVLIN-BROWN: If we can take this off the screen
2 and publish 1129, Defense Exhibit 1129, in evidence?
3       THE COURT: Yes.
4       MR. DEVLIN-BROWN: If we could zoom in just on the --
5 yeah, first half or so of the document.
6 Q. Do you recall seeing this document on cross-examination
7 which had lists of various analyst reports that Mat Martoma was
8 updating folks on in the GEHC weekly?
9 A. Yes.
10 Q. Do you see item number 2 below?
11 A. I do.
12 Q. It says, "GS equity reiterates conviction buy on Elan ahead
13 of data release."
14 A. I see that.
15 Q. Does that refresh your recollection as to whether the
16 Goldman reports were ones that you would typically see with
17 respect to --
18 A. No, I said that they were.
19 Q. Oh, they were?
20 A. Yes.
21       MR. DEVLIN-BROWN: The government offers 495A.
22       MR. STRASSBERG: No objection, your Honor.
23       THE COURT: Government Exhibit 495A is received.
24       (Government's Exhibit 495A received in evidence)
25       MR. DEVLIN-BROWN: If we could just zoom in on the top

E1rdmar5      Kehoe - redirect      Page 2189

1 half or so. including the date, please, Mr. Hattendorf.
2 Q. So what is the date of this analyst report, Ms. Lyndon?
3 A. June 23rd.
4 Q. And it says, "Action buy, return potential 37 percent."
5 A. It does.
6 Q. Could we -- could I ask you to read under "Source of
7 opportunity," start with the sentence starting "Further."
8 A. "Further, as bapineuzumab is effective in treating
9 Alzheimer's Disease, it could also be effective in
10 pre-Alzheimer's Disease conditions, providing an entry into the
11 prophylactic market."
12 Q. And then it goes on: "In that scenario, our forecasts
13 would be far too conservative."
14      What do you understand that to mean, "too
15 conservative?"
16 A. Meaning that if it were effective in that market, that they
17 would further reach their price target.
18       MR. DEVLIN-BROWN: We could take that off the screen,
19 Mr. Hattendorf.
20 Q. Is this generally consistent with your experience that with
21 respect to various stocks, some analysts might be saying buy
22 and some might be saying sell?
23 A. It is.
24 Q. In the conversation you had with Mr. Martoma after the ICAD
25 announcement, did he identify any analyst report as a reason

E1rdmar5      Kehoe - redirect      Page 2190

1 for selling Elan prior to the ICAD announcement?
2 A. I don't recall him doing that. I don't think so.
3 Q. And in the weeks -- the two weeks leading up to the
4 announcement, do you recall him identifying any particular
5 analyst report as being a reason to sell Elan before the
6 announcement?
7 A. No.
8 Q. If you recall on cross-examination, you went through a
9 couple of these analyst reports in some detail. Do you
10 remember?
11 A. Yes.
12 Q. Do analyst reports sometimes make predictions about what a
13 company is likely to do in the future or current things that
14 are going on at the company?
15 A. Yes.
16 Q. In your experience -- well, do they all make the same
17 predictions or do the predictions vary?
18 A. They tend to vary.
19 Q. How reliable are the predictions, in your experience,
20 compared to statements by the companies themselves as to what
21 they're actually doing?
22       MR. STRASSBERG: Your Honor, I would object to the
23 form of the question.
24       THE COURT: Sustained.
25 Q. Do you find these predictions to be reliable?

E1rdmar5      Kehoe - redirect      Page 2191

1 A. Some are more reliable than others.
2       MR. DEVLIN-BROWN: Just one moment, your Honor.
3       (Pause)
4       No further questions.
5       THE COURT: Any recross?
6       MR. STRASSBERG: Your Honor, very, very briefly.
7 RECROSS-EXAMINATION
8 BY MR. STRASSBERG:
9 Q. We are almost going to get you back.
10      I want to put up on screen, with Mr. McLeod's help,
11 once he has the little control device there, what has been
12 admitted into evidence as Government Exhibit 19A. This has
13 been admitted into evidence in this trial as the final ICAD
14 presentation.
15      And I want to direct your attention to page 22, or the
16 last page, with Mr. McLeod's help.
17      If you remember, on redirect, Mr. -- well, the
18 prosecutor just asked you about Dr. Porsteinsson and whether
19 you knew if he had any connection to the bapineuzumab Phase II
20 trial, or otherwise, to the company. Do you remember those
21 questions?
22 A. I do.
23 Q. Can you read for us the title that is on the
24 acknowledgments page of the ICAD final presentation, where it
25 says -- well, if Mr. -- under "Acknowledgments," could you read

**Transcript Excerpts**

**(January 28, 2014)**

**(2272-74, 2286-88, 2290-91, 2310-12, 2344-45)**

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 28, 2014

E1sdmar2          Villhauer - direct          Page 2269

1   there.
2       Do you recognize this document?
3   A. I do.
4   Q. What is it? Without reading it to me, can you just tell me
5   what kind of a document it is?
6   A. This is an email from myself to Doug Schiff, who at that
7   time was execution trader, giving him an update of what he
8   should be doing for the day.
9       MR. INGOGLIA: The government offers Government
10  Exhibit 492.
11      MR. BRACERAS: No objection.
12      THE COURT: Government Exhibit 492 is received.
13      (Government's Exhibit 492 received in evidence)
14      MR. INGOGLIA: Your Honor, may we publish it?
15      THE COURT: You may.
16      MR. INGOGLIA: Mr. Hattendorf, could you make that a
17  little larger for us so the jury can see it? Thank you.
18  BY MR. INGOGLIA:
19  Q. Mr. Villhauer, what is the date of this email?
20  A. The date is July 21, 2008.
21  Q. Do you remember, were you in the office on July 21, 2008?
22  A. I don't remember, but looking back, I was heading out to
23  some broker votes in New York City. Broker votes are the
24  execution traders visiting sell side brokers -- Goldman Sachs,
25  Morgan Stanley -- and we periodically had quarterly visits to

E1sdmar2          Villhauer - direct          Page 2270

1   them to give them updates.
2   Q. So you were visiting in Manhattan to do that?
3   A. Yes, I believe so.
4   Q. Going down toward the bottom of the email -- I'm sorry. We
5   don't have to go to the bottom. If we just go to the top.
6       Who is the "he" that you guys are talking about, you
7   and Mr. Schiff are talking about?
8   A. The he is Steve Cohen.
9   Q. So the "He's fine" is Steve Cohen?
10  A. Yes.
11  Q. And also "so he'll probably blow around 11:00"?
12  A. Yes.
13  Q. I want to direct your attention to -- I'm sorry. Go all
14  the way to the bottom. Could we go all the way to the bottom,
15  Mr. Hattendorf.
16      Do you see the sentence that starts with the word
17  "Steve"?
18  A. Yes.
19  Q. Could you just read that to us, the first two sentences?
20  A. Sure.
21      "Steve sent me an email asking how much Elan quant
22  owned. I sent him an email back. 988,000. We are vwaping 20
23  percent of Smollers account."
24  Q. So "Steve" is Steve Cohen?
25  A. Yes.

E1sdmar2          Villhauer - direct          Page 2271

1   Q. And what is the reference to "ELN"?
2   A. ELN is the stock Elan.
3   Q. And does that trade on an exchange?
4   A. Yes.
5   Q. Which exchange?
6   A. New York. At the time I believe it was New York.
7   Q. Where is the New York Stock Exchange, what county?
8   A. New York City, Manhattan.
9   Q. What is the reference to "quant"?
10  A. So quant, we had some programs back then that were
11  automated to essentially mirror some other accounts. So when a
12  certain amount of the PMs put on names, quant would mirror
13  those accounts and try to optimize the portfolios.
14  Q. Did that account have another name? Was it known by other
15  names?
16  A. Yes. It was known as SELC, S-E-L-C.
17  Q. And what is the reference to 988k?
18  A. 988k is the amount of shares that the account owned.
19  Q. The Elan shares?
20  A. The Elan shares.
21  Q. That the SELC account had?
22  A. Yes.
23  Q. What did you mean when you said, "We are vwaping
24  20 percent?"
25      First of all, are you still talking about the SELC

E1sdmar2          Villhauer - direct          Page 2272

1   account at that point?
2   A. No. This is -- vwaping 20 percent, Smollers account --
3   Smoller was a portfolio manager that had left the firm, and I
4   think at that time we were liquidating his account so we were
5   trying to reduce the account by 20 percent of the day until it
6   was completely liquid.
7   Q. So to help us understand, because I think we'll see it
8   again, what does vwaping mean?
9   A. Vwaping is volume weighted average price, and essentially
10  what you're trying to do is take accumulation of all the shares
11  traded that day and get that average price based on what you're
12  doing.
13  Q. Prior to this exchange with Mr. Schiff, had you spoken to
14  Mr. Cohen?
15  A. In reference to that morning?
16  Q. Yeah, that morning of July 21st.
17  A. I believe I did, yes.
18  Q. And did you take any action after speaking with
19  Mr. Cohen --
20  A. Yes.
21  Q. -- with respect to Elan?
22  A. Yes. So Steve wanted to start selling some Elan and he
23  wanted to put it in an account that was not as visible as the
24  other accounts the firm had. So I was trying to set up some
25  accounts that the visibility was limited on and subsequently

JA236

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 28, 2014

E1sdmar2          Villhauer - direct          Page 2273

1  sell some Elan.
2      THE COURT: Could you explain what you mean by
3  "visibility?"
4      THE WITNESS: Sure. The way SAC set up, each account
5  has an acronym and there is reports generated. And what
6  happens is that over the years a lot of people had a lot of
7  visibility to a lot of accounts. And I think Steve felt at
8  that time, with the market coming in and chaos creating in the
9  financial markets, that there was just too much visibility
10  going on in these accounts. So what he wanted to do is figure
11  out who is could actually see us trading in this account.
12  BY MR. INGOGLIA:
13  Q. When you are talking about visibility in the context you
14  just described it, certainly in the context of accounts within
15  the firm, is the visibility you are referring to within the
16  firm itself?
17  A. Yes.
18  Q. So what did you do to find accounts that were less visible?
19  A. I made a call to operations, and asked them, you know, can
20  we find the visibility of accounts that don't have as many eyes
21  looking at these.
22  Q. Would those be -- and did those end up being firm accounts?
23  A. Yes. So operations came back and they were specifically
24  firm accounts, FSAC and, I believe, FINT.
25  Q. And do you know what those accounts had been used for

E1sdmar2          Villhauer - direct          Page 2274

1  before that, before this date where you called down to
2  operations?
3  A. It seems like they were used to for other circumstances
4  also with limited visibility. I think what we did, or what I
5  did was make sure that the visibility this time around was
6  actually less than what they were used for in the past.
7  Q. How did you find out what the visibility was associated
8  with those accounts?
9  A. Operations has a mapping system that shows who has access
10  to those accounts.
11  Q. OK. So after you identified those accounts, what did you
12  do next?
13  A. Well, the accounts were identified. I believe they weren't
14  actually completely set up until the end of the day. But I
15  left for the day, and I told Doug Schiff to, you know, start
16  talking to Steve and understand what he wants to do with Elan.
17  Q. And, in general, did you have an understanding -- not in
18  detail, but again, did you have an understanding of what Steve
19  wanted to do with Elan?
20  A. Generally he said he wanted to start selling some.
21  Q. Were there -- in these accounts you got from operations,
22  was there already Elan stock in those accounts?
23  A. Not that I am aware of.
24  Q. Where what the Elan position prior to July 21st or on
25  July 21, 2008?

E1sdmar2          Villhauer - direct          Page 2275

1  A. The Elan positions were in the portfolio-managed account.
2  So in that case they were in COHE; Mat's account, which I
3  believe is GEHC; and the other firm account, which was GGEN.
4  Q. But the sales were going to happen in these firm accounts,
5  different accounts?
6  A. Yes.
7  Q. Do you recall whether you checked in with Mr. Schiff during
8  the course of the day?
9  A. I do. Looking back, I know I did.
10  Q. I want to direct your attention to what's been marked for
11  identification as Government Exhibit 438A.
12      My question to you is just going to be, do you
13  recognize this document?
14  A. I do.
15  Q. What is it? Is this an email?
16  A. Yes. It's an email from me to Mat at 4:33 on Monday,
17  July 21st, with my cellphone on it.
18      MR. INGOGLIA: The government offers Government
19  Exhibit 438A.
20      MR. BRACERAS: No objection.
21      THE COURT: Government Exhibit 438A is received.
22      (Government's Exhibit 438A received in evidence)
23      MR. BRACERAS: Your Honor, I suggest before this is
24  published, though, that we might want to redact that phone
25  number.

E1sdmar2          Villhauer - direct          Page 2276

1      MR. INGOGLIA: Before you publish it:
2  Q. Is that still an active number?
3  A. It is.
4      MR. INGOGLIA: Mr. Hattendorf, can we knock out --
5  there you go.
6      Your Honor, may we publish it now in redacted form?
7      THE COURT: Yes.
8      MR. INGOGLIA: Mr. Hattendorf, could we see the full
9  message? I think if you go down a little bit more than you
10  have it there when you publish it.
11      (Pause)
12  Q. Mr. Villhauer, what is the date of this email?
13  A. July 21, 2008.
14  Q. At the bottom is that a message from Mr. Martoma to you?
15  A. Yes.
16  Q. And what time did Mr. Martoma send that message to you?
17  A. A little before 4:30 p.m.
18  Q. It is harder to see now that we are looking at it redacted,
19  but did you respond by giving him your phone number?
20  A. It looks like I did, yes.
21  Q. Do you remember whether you spoke with him or not?
22  A. I don't.
23  Q. I want to direct your attention to what's been marked for
24  identification as Government Exhibit 431. And my question is
25  going to be, do you recognize this document?

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 28, 2014

E1sdmar2          Villhauer - direct          Page 2285

1  A.  Correct.  That goes back to the volume weighted average
2  price over the day.
3  Q.  What is the 1.5 in reference to?
4  A.  1.5 million.
5  Q.  Does that mean that you will be selling using volume
6  weighted average price?
7  A.  Yes.
8  Q.  1.5 million, if you can?
9  A.  If I can.
10  Q.  And when you say after that, "Will also show you any
11  naturals," what is that in reference to?
12  A.  The naturals would be referencing blocks upstairs with
13  brokerage houses that potentially have the other side of the
14  flow.
15  Q.  Explain why that would be significant to know in the
16  context of why you are selling Elan shares.
17  A.  Well, with any stock the process we use is two-fold.  We
18  either use electronics, which are sourcing the market in dark
19  pools, and the other side is actually finding bigger blocks
20  upstairs that are being shopped to us by the brokerage houses.
21  Q.  And when you say find bigger blocks, you mean there's
22  somebody who is willing to buy a certain amount?
23  A.  Or sell.
24  Q.  Or sell?
25  A.  Depending on what you are doing, yes.

E1sdmar2          Villhauer - direct          Page 2286

1  Q.  In that case, how would you communicate with the people
2  who -- how would you communicate with the person who has
3  indicated interest in selling or buying a big block?
4  A.  We had an electronic system come into us, two-fold.  One
5  was internal, which was set up on our front end trading system,
6  and the other one was from Bloomberg.  And from there we would
7  actually see people put advertisements in of what they wanted
8  to do.  And then from there it would reference the sell side
9  accounts, and we could actually then make the call upstairs to
10  the sell side accounts, which are the Goldman Sachs, J.P.
11  Morgans of the world and see exactly what they are doing.
12  Q.  At this point you are telling them you'll let Steve Cohen
13  know if you see any naturals like that, any block interest?
14  A.  Yes.
15  Q.  Does that mean that you are not doing that with respect to
16  your vwaping, your executing those a different way?
17  A.  So the vwaper are essentially done through algorithms and
18  it is electronic, and visibility on those is very, very
19  limited.
20  Q.  Could you explain a little bit how algorithms work?
21  A.  Sure.  So what is the best way to explain this for you
22  guys?  So algorithms are just electronic automation that
23  sources liquidity.  And it's done through very advanced trading
24  models that actually find the transactions and break it up at
25  an optimal point to sell those shares or buy those shares.

E1sdmar2          Villhauer - direct          Page 2287

1       So it's figuring out a way, based on historics, based
2  on volume that's currently trading, what's the optimal
3  situation to start trading stock and how much you should trade
4  at that specific time.
5  Q.  You said that was much less visible?
6  A.  Yes.
7  Q.  When you are using visibility in that context, are you
8  talking about within the firm now or are you talking about
9  outside the firm, outside of SAC?
10  A.  I am talking about both.
11  Q.  OK.  So what is the universe of people outside the firm for
12  who your trading sometimes could be more or less visible when
13  you are worrying about visibility?
14  A.  The universe is any brokerage that we would do business
15  with.  At that time I believe we had north of 400 brokerage
16  accounts open.
17  Q.  At the time you were selling Elan this week during
18  July 2008, were you worried both about external and internal
19  visibility?
20  A.  We were.  And it goes two-fold.  So we were worried about
21  the internal visibility simply because of the amount of people
22  that had access to the accounts and the size of our position.
23  And the external visibility, at that time there were algos that
24  were very unique and hiding the flow that was coming through,
25  but there were also algos that would actually send messages

E1sdmar2          Villhauer - direct          Page 2288

1  back up to the sell side desks and show them that, hey, there
2  is someone in the algos and potentially sell that, too.
3       THE COURT:  Algos is an abbreviation for algorithms?
4       THE WITNESS:  For algorithms, yes.
5  Q.  You were trying to limit the degree to which externally
6  other banks would see what you were doing?
7  A.  I was, because at that time, as much as we were worried
8  about the visibility internally, there was certainly a chance
9  that people in our firm could call those banks and ask them
10  what we're doing, or what that bank is doing with a specific
11  stock, and that bank or broker would probably tell them it's
12  you guys buying or selling.
13  Q.  Taking a step back.  I am going to walk through this a
14  little bit more day by day.  But taking a step back, about how
15  many shares of Elan were sold during the week of July 2008,
16  approximately?
17  A.  A little under 10 million.
18       THE COURT:  The week of what?
19       MR. INGOGLIA:  July -- starting July 21, 2008, that
20  week.
21       MR. BRACERAS:  Your Honor, could we just have clarity
22  out of -- sold out of what accounts?
23       THE COURT:  Yes.
24       MR. INGOGLIA:  Sure.
25  Q.  Do you know what the breakdown is?

JA238

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 28, 2014

| E1sdmar2 | Villhauer - direct | Page 2289 |
|---|---|---|

1 A. I don't have the breakdown.
2 Q. Were the sales done in the firm accounts that you mentioned
3 before?
4 A. They were.
5 Q. Were the sales associated with in some way the accounts
6 that had the long position in Elan?
7 A. They were.
8 Q. After the sales were done in the firm accounts, did there
9 come a time when the sales were transferred to the accounts
10 that had the long positions?
11 A. Yes.
12 Q. Was that on or about July 30th?
13 A. Best guess, yes.
14 Q. Is there an operations code that allows transfers from one
15 firms -- from one account to another within the firm?
16 A. Sure. It's called -- it's our acronym, it is internal. It
17 is called 9979, which is essentially an internal transfer code.
18 Q. But at the time we are looking at right now, which is
19 July 22nd with respect to this exhibit, these sales are taking
20 place in the two firm accounts that you mentioned; is that
21 right.
22 A. Yes.
23 Q. So throughout -- directing your attention to the line that
24 says -- that starts at 8:43:49, do you see where -- is that you
25 talking?

| E1sdmar2 | Villhauer - direct | Page 2290 |
|---|---|---|

1 A. Yes.
2 Q. Or you chatting?
3 A. Yes.
4 Q. And you said, "Sold additional 200k in dark pools at
5 35.03."
6 So this might be a time to explain what a dark pool
7 is. Can you do that for us?
8 A. Sure. It's -- essentially, it's off-exchange liquidity
9 pools that are for institutional investors. They're matching
10 up buyers and sellers anonymously on size and price. So no one
11 has the visibility of truly how many shares are for sale or how
12 many shares are being bought in there. It is a random match,
13 an anonymous match.
14 So in this case, at 8:43, it looks like I sold 200,000
15 shares in dark pools at an average price of 35.03, which gives
16 us a total of 275, because I sold 75 eight minutes prior.
17 Q. Got it. And there is nothing -- despite the fact that it
18 is called a dark pool, there is nothing nefarious about a dark
19 pool?
20 A. Absolutely nothing.
21 Q. Dark, is that in reference to the amount of visibility,
22 essentially?
23 A. Correct. So dark was named after lit. So the lit markets
24 are where shares that seem more visible and you have an
25 understanding what's out there, and that's the exchanges, and

| E1sdmar2 | Villhauer - direct | Page 2291 |
|---|---|---|

1 the dark is the anonymous pool. So that was the name that came
2 out for that.
3 Q. Directing your attention to the line that begins at
4 8:50:48. Is that almost getting closers to 9 o'clock?
5 A. Yes.
6 Q. What are you indicating here?
7 A. It looks like I gave Steve an update. "400,000 at 34.97,
8 all dark pools." So my guess would be that I sold him an
9 additional 125,000 shares to get him to 400.
10 Q. Do you remember whether you spoke to Mr. Cohen in the
11 morning of this day?
12 A. I probably -- yeah, I mean, most likely did. He is in
13 almost every day and we are there so.
14 Q. You are -- do you remember being in the office on Tuesday
15 July 22nd?
16 A. I don't, but based on this instant message I most likely
17 was.
18 Q. Could you be doing this instant message from someplace
19 else?
20 A. Highly unlikely.
21 Q. Do you have a recollection of talking to Mr. Cohen, or do
22 you just think that would be normal?
23 A. It's every day all day.
24 Q. OK. When you first talked to Mr. Cohen about when you
25 received the direction to start selling, did he tell you what

| E1sdmar2 | Villhauer - direct | Page 2292 |
|---|---|---|

1 his investment rationale was?
2 A. He did not.
3 Q. It looks like I'm going to skip some of these, but it looks
4 like you are updating him fairly regularly throughout the
5 morning. Is that fair?
6 A. Is the last line on this 9:28?
7 Q. We will see.
8 MR. INGOGLIA: Mr. Hattendorf, does it go any further
9 there? Why don't we look toward the end, because there are
10 some terms I think you could help us understand.
11 Q. Starting at 9:11:04, do you see that one? It is a message
12 to you, it looks like, from Mr. Cohen. Did I read it right?
13 A. You did.
14 Q. It says, "JPM buying 10m August 40 calls."
15 Can you translate that for us?
16 A. Sure. So it looks likes J.P. Morgan had a buy order of
17 10,000 August 40 Elan calls.
18 Q. What are August 40 calls?
19 A. It's an option to buy stock at a future date.
20 Q. And why -- what did you do after you saw --
21 A. Just -- the 10,000 represents 10,000 contracts. So that
22 would be roughly -- would be the equivalent of a million
23 shares.
24 Q. OK. You just wrote back "Y."
25 A. Yes.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                     January 28, 2014

| E1sdmar2 | Villhauer - cross | Page 2309 |
|---|---|---|

1  A. I can't really say. I don't think it was -- you know, if I
2    had to guess, it wasn't a good relationship.
3  Q. It was not a good relationship?
4  A. Not a good relationship.
5  Q. Do you recall Mr. Munno and Mr. Slate being very critical
6    of Mr. Martoma's position with regard to Elan?
7  A. Amongst other positions, too, yes.
8  Q. And do you recall there being some type of internal
9    competition among portfolio managers and analysts at SAC?
10 A. I do. My viewpoint might be different. I think the
11   internal composition, or competition that I saw was that when
12   Mat Grossman had left in 2007, there was no one really
13   inheriting the GGEN account, which was central book. So I
14   think they were all vying for that coveted role of inheriting
15   that centralized book. So Steve Cohen's centralized book was
16   COHE and an equivalent book on the Intrinsic side was GGEN.
17 Q. So, Mr. Villhauer, perhaps another way to put it, it was
18   not uncommon at SAC for different portfolio managers to take
19   different positions in the same stock, correct?
20 A. Not uncommon at all.
21 Q. So one portfolio manager could, you know, want to go long
22   one stock while another portfolio manager wants to short the
23   same stock?
24 A. Correct. I would say every single day there is an
25   occurrence of that.

| E1sdmar2 | Villhauer - cross | Page 2310 |
|---|---|---|

1  Q. And are you familiar with the concept of slippage?
2  A. I am.
3  Q. Could you explain for the jury what slippage means and why
4    it is a concern?
5  A. Slippage is measured by a benchmark, and the benchmark is
6    when you start trading the stock and what kind of impact you
7    put on the stock once you start trading it. So,
8    hypothetically, if a stock was trading at $36 even and you sold
9    a million shares at 36, slippage would essentially be zero.
10   That is a good thing.
11       Other metrics that are weighed in slippage are market
12   impact. So what I do mean by that? So you might want to be
13   more aggressive selling a stock knowing that the market is
14   coming in faster than you would hope and you might have to be
15   more aggressive, and you might be aggressive thinking that you
16   have an investment process and thesis in place and the stock
17   has hit a level where it is not going to go any higher than you
18   think so you want to start making some sales.
19 Q. Fair to say, Mr. Villhauer, to try to bring it down even
20   another level, that one of the reasons why Mr. Cohen and SAC
21   were concerned about the visibility of these trades was that
22   they didn't want anyone in the market to start selling Elan and
23   Wyeth before SAC had an opportunity to do so?
24       MR. INGOGLIA: Objection.
25       THE COURT: Sustained.

| E1sdmar2 | Villhauer - cross | Page 2311 |
|---|---|---|

1    BY MR. BRACERAS:
2  Q. Fair to say, Mr. Villhauer, that one of the concerns of
3    slippage is that if other firms learned SAC was selling stock,
4    that they could get out in front and sell the stock before SAC?
5  A. Correct.
6  Q. And, in effect, what would happen is if information got out
7    that SAC was selling a large block of stock, others in the
8    market could sell it before SAC had an opportunity to do so;
9    isn't that right?
10 A. That is right.
11 Q. And if others in the market sold the stock before SAC had a
12   chance to do so, it would send the price down, isn't that
13   right?
14 A. That is right.
15 Q. And if it sent the price down, then obviously SAC would be
16   losing money when it tried to sell the same stock?
17 A. Correct.
18 Q. And those are the simple reasons why Mr. Cohen wanted to
19   keep the trades with a lower visibility, isn't that right?
20       MR. INGOGLIA: Objection.
21       THE COURT: Sustained.
22 Q. Well, those are the reasons why, as a trader, you would
23   want to keep your trading strategy confidential, isn't that
24   right?
25 A. That's right.

| E1sdmar2 | Villhauer - cross | Page 2312 |
|---|---|---|

1  Q. Because you want to avoid that type of slippage, which
2    means the slippage in the price, isn't that right?
3       MR. INGOGLIA: Objection. Is he asking Mr. Villhauer?
4    If he is, I have no objection. If he is asking about a
5    hypothetical trader --
6       THE COURT: All right. Could you rephrase the
7    question.
8  Q. When you are making trades, Mr. Villhauer, and you decide
9    to use either dark pools or firm accounts, you do so to prevent
10   slippage; that's part of your testimony, isn't that right?
11 A. Yes.
12 Q. And when you say slippage, what you mean is you want to
13   sell the stock before others in the market know that you're
14   selling the stock?
15 A. That's part of it, and the other part would be I want to
16   sell the stock without it going down.
17 Q. Without the price decreasing?
18 A. Correct.
19 Q. Mr. Villhauer, fair to say that 2008 -- and I think you
20   already referenced this a little bit in your direct
21   examination -- was a volatile year for the stock market?
22 A. It was.
23 Q. And isn't it true that in 2008 SAC was more reluctant to
24   hold on to long positions for long time periods?
25 A. Certain parts of 2008, yes.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 28, 2014

| E1sQmar3 | Barnacle - direct | Page 2341 |
|---|---|---|

1  specific portfolio codes that traded in Elan during this time
2  period. If you look at the bars, it's a color-coded chart.
3      So, the blue on the left side, the very first bar on
4  7/2/2006 is in that blue shade, that represents share position
5  in portfolio code GEHC. And then red would be GGEN. Screen
6  COHE. And the purplish color is FSAC, which is a trade --
7  sorry -- position on December 2007.
8  Q. Directing your attention to the date 7/2006, what does it
9  mean that that bar is below the zero line?
10  A. That means that that trader code was short shares. So they
11  were short a certain number of shares below zero.
12  Q. Directing your attention, as an example, to the column to
13  the right, the column to the right of that labeled 8/2006?
14  A. Yes, sir.
15  Q. What's a monthly closing share position?
16  A. Perhaps if I could explain the left side of the chart.
17  Q. That would be a good idea.
18  A. This is the number of shares that are either held or are
19  short at the end of each business month. So, if the column
20  goes from negative one million shares up to 12 million shares
21  and then you see a zero, meaning if -- if the position is a
22  zero, it's blank, which you see all the way on the right,
23  there's no shares held at the end of that month.
24      So, on the bottom of the graph, the dates are the
25  corresponding dates, it's just monthly, it's a monthly chart.

| E1sQmar3 | Barnacle - direct | Page 2342 |
|---|---|---|

1  So starting in July of 2006, it ends in July of 2008, and it's
2  each month.
3      So this would be -- this chart reflects the number of
4  shares, as I said earlier, either short or long the closing of
5  the month. So the question you asked for 8 -- which would be
6  August 2006, these two portfolio codes are long, meaning they
7  own approximately 3 million shares at the end of the month of
8  August 2006.
9  Q. Am I right that this chart wouldn't reflect the daily or
10  even weekly fluctuations; it just shows where they landed at
11  the end of the month?
12  A. That's exactly right.
13  Q. And looking from the left to the right, are we going
14  forward in time as we go to the right?
15  A. Yes, sir.
16  Q. What's the highest position? What's the month in which the
17  combined positions get the highest?
18  A. It is March 2008.
19  Q. How many shares roughly?
20  A. 11.7 million roughly.
21  Q. Then I am right that between May 2008 and June 2008 the
22  position grows?
23  A. Well, from may 2008 to June 2008, the position grows.
24  Q. And then why isn't there anything listed for July 2008?
25  A. There are -- on the last business day of July, there is no

| E1sQmar3 | Barnacle - direct | Page 2343 |
|---|---|---|

1  shares left. They're sold. They're flat. There are no shares
2  in the account -- I'm sorry, in these four accounts.
3  Q. I want to direct your attention to what's been marked for
4  identification as Government Exhibit 1252. Is this one of the
5  charts you prepared?
6  A. Yes, sir.
7      MR. INGOGLIA: The government offers Government
8  Exhibit 1252.
9      MR. BRACERAS: No further objection.
10      THE COURT: Government Exhibit 1252 is received.
11      (Government's Exhibit 1252 received in evidence)
12      MR. INGOGLIA: May we publish, your Honor?
13      THE COURT: Yes.
14  Q. Agent Barnacle, what's the title of this chart 1252?
15  A. Title is SAC Capital advisors monthly closing share
16  positions in Wyeth September 2007 through July 2008.
17  Q. What's underneath that? What is that a reference to, the
18  four character codes?
19  A. The five portfolio codes are -- the charts are consistent,
20  so these are the trader codes or the portfolio manager codes
21  that we saw earlier. And, once again, it's color-coded. The
22  colors aren't as discernible in this chart clearly as I look at
23  it today on this monitor, but you see the five codes and then
24  the corresponding colors are in the bar graph.
25  Q. Directing your attention to July 2008 all the way on the

| E1sQmar3 | Barnacle - direct | Page 2344 |
|---|---|---|

1  right, what is indicated by the fact that it's below the zero
2  mark?
3  A. The chart is saying that on the last day of the month, this
4  trader code or portfolio code is short approximately 8 million
5  shares.
6  Q. On the last day of July?
7  A. Yes, so the last day of July 2008.
8  Q. Agent Barnacle, we looked at Elan and we looked at Wyeth.
9  Did you prepare another version of the Wyeth chart?
10  A. Yes.
11  Q. I'd like to show you what's been marked for identification
12  as Government Exhibit 1253. Did you prepare this?
13  A. Yes, this is one of the charts prepared.
14      MR. INGOGLIA: The government offers Government
15  Exhibit 1253.
16      MR. BRACERAS: No further objection.
17      THE COURT: Government Exhibit 1253 is received.
18      (Government's Exhibit 1253 received in evidence)
19      MR. INGOGLIA: May we publish?
20      THE COURT: Yes.
21  Q. So what's the difference between 1253 that we're looking at
22  now and 1252 that we were looking at a moment ago?
23  A. The title is the same. If you look on the portfolio
24  manager codes, the color coding on this chart, you'll see the
25  baby blue, the lightest blue, if you will, color on the right

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 28, 2014

E1sQmar3                Barnacle - direct                Page 2345

1  side, it says FSAB swap, and that color is then put into the
2  chart, and it's showing a corresponding swap position of Wyeth
3  shares. And at the high point the position is 12 million
4  shares long in Wyeth.
5       So then the chart and the bar graphs starting in
6  February of 2008, you see the first of the swap positions is
7  initiated and then that swap position grows. And I don't
8  remember the exact date, but in the spring of 2008 the position
9  grows to 12 million shares in the swap. And then the
10 corresponding long shares decrease. So they're not holding the
11 common stock of Wyeth any more in these portfolio codes.
12      MR. INGOGLIA: Your Honor, I'll be guided by you as to
13 when the good time to break is.
14      THE COURT: Ladies and gentlemen, we are going to take
15 our luncheon recess now. I am going to ask you to return at
16 2:15. Don't discuss the case. Keep an open mind because there
17 is more evidence. Don't read, listen to or look at anything
18 about the case. We will see you at 2:15. Thank you very much.
19      (Jury and witness recessed)
20      (Continued on next page)
21
22
23
24
25

E1sQmar3                Barnacle - direct                Page 2346

1       (Jury not present)
2       THE COURT: What's the afternoon going to look like?
3  How much more do you have, Mr. Ingoglia?
4       MR. INGOGLIA: I think it will be about 30 minutes to
5  go through the charts. It might be less.
6       MR. BRACERAS: Your Honor, just a small point on these
7  charts. I didn't want to raise it during that, but I think
8  some of these charts where it's talking about Wyeth sales where
9  they don't mention the swap, if we could just have some legend,
10 I think we talked about having that, and, again, they don't
11 have to do it over lunch, but if we could have it before they
12 go back to the jury.
13      MR. INGOGLIA: My thought on that is with respect to
14 the profit and loss, we agreed to do that. With respect to the
15 others, we just showed him one that had it and one that didn't
16 have it. I don't think it makes sense to add to the one that
17 doesn't have the reference that it's not there.
18      THE COURT: I don't have the charts in front of me
19 now. Are they in the exhibits that have been provided? If
20 they're not, maybe someone can give me a set and I'll look at
21 them over lunch.
22      MR. INGOGLIA: They should be in your exhibits, but
23 I'll hand up another one.
24      THE COURT: Thank you. I will look at the charts and
25 we'll have another conversation. I assume there will be

E1sQmar3                Barnacle - direct                Page 2347

1  cross-examination of the agent.
2       MR. BRACERAS: Very minor, your Honor.
3       THE COURT: Does the government have any additional
4  evidence?
5       MR. DEVLIN-BROWN: There are a handful of additional
6  exhibits to which there is no objection. There is also a
7  handful where there is an objection. And what I thought might
8  be efficient is if we sort of put those in order. We don't
9  need the jury here. We could do it either before the jury
10 returns or whenever and go through those.
11      THE COURT: Why don't we meet at 2:00 to talk about
12 whatever the exhibits are that are in dispute.
13      MR. DEVLIN-BROWN: Then I think that's essentially it.
14      THE COURT: Then I assume there will be motions?
15      MR. STRASSBERG: Yes, your Honor, we do anticipate
16 making a motion. I'm not sure how your Honor wants to handle
17 that. I imagine it's going to be a generalized motion.
18      THE COURT: That sounds appropriate. Then you will be
19 prepared to proceed with the defense case.
20      MR. STRASSBERG: Then we are prepared to proceed.
21      THE COURT: Anything else we need to talk about?
22      MR. STRASSBERG: Not from the defense, Judge.
23      MR. INGOGLIA: No, Judge.
24      THE COURT: Thank you.
25      (Luncheon recess)

E1sdmar4                                                 Page 2348

1           A F T E R N O O N   S E S S I O N
2                    2:11 p.m.
3       (Jury not present)
4       THE COURT: All right. Are there issues we need to
5  take up?
6       MR. DEVLIN-BROWN: Your Honor, there is about eight or
7  so exhibits, or categories of exhibits that we still have
8  objections from the defense to. How do you want to proceed on
9  that?
10      THE COURT: I guess you should hand up copies.
11      MR. DEVLIN-BROWN: OK.
12      THE COURT: While you are pulling those, let me say
13 that with respect to the charts that we were talking about just
14 before the break, it does seem to me that with respect to the
15 Wyeth charts that do not reflect the swap, there should be a
16 legend on the chart indicating that it doesn't reflect the
17 swap.
18      There are two Wyeth charts that have exactly the same
19 heading; specifically, "SAC Capital Advisors Monthly Closing
20 Share Positions in Wyeth September 2007 through July 2008."
21 One reflects the swap, the other does not. With the one that
22 does not, there should be a legend on it saying that it does
23 not reflect the Wyeth swap.
24      I don't know if there are other charts that suffer
25 from that same problem, but if there are, there should just be

**Transcript Excerpts**

**(January 29, 2014)**

**(2587-91, 2609, 2639-40)**

UNITED STATES OF AMERICA v.
MATHEW MARTOMA
January 29, 2014

| E1tQmar4 | Gompers - direct | Page 2584 |
| --- | --- | --- |

1   price and the number of shares outstanding because eventually
2   he will have to divide the total value of Elan by the
3   473 million shares outstanding.
4   Q.  Could you explain the area there where it talks about the
5   bapineuzumab or bapi sales projections?
6   A.  Sure.  So, the first line you see here on the projections
7   are just what the Cowen analyst has projected for revenue for
8   bapi over the next 12 years through 2020.  What you can see is
9   he assumes or projects that bapi will be introduced in the
10  market in 2011 with a billion dollars of sales and then will
11  grow by 2015 to 7 and a half billion of sales and then
12  ultimately from there grow at that nine percent number that we
13  talked about earlier in the assumptions.
14        If you go to the next line, he makes the adjustment
15  that because this is a joint project with Wyeth, that
16  50 percent of those revenues flow down to Elan, and so
17  basically that next line is just half of the line above it.
18  Q.  How do these sales projections fit into the discounted cash
19  flow analysis?
20  A.  Well, they're the starting point.  What you need to do from
21  these revenues are take out all the expenses associated with
22  the running of a pharmaceutical company, the running of a
23  biotechnology company to get down to what the earnings and cash
24  flow are.
25  Q.  Are the projected costs or expenses listed in this sheet

| E1tQmar4 | Gompers - direct | Page 2585 |
| --- | --- | --- |

1   somewhere?
2   A.  Sure.  It's sort of small, but if you go down, what he does
3   below these revenue numbers is project out some other revenues
4   for Elan.  But then under that middle box where he has total
5   revenues, you see a line which is labeled cost of goods.  And
6   all that is is how much does it take to make your drugs.
7         And so from the revenue number, you subtract off that
8   cost of goods to get a gross profit number.  So what is the
9   contribution margin, how much money are you making from selling
10  the drugs.
11        But from that, you have to take off some additional
12  expenses because you have overhead.  When you run a business,
13  you have office staff, you have sales and marketing people out
14  there trying to get doctors and patients to use your drug.  And
15  so that next line here is what's called SG, and it just stands
16  for sales general and administrative, and that's your overhead.
17        So, the overhead to run a business are all included
18  there, and so to project out what the overhead is going to be
19  for the next 12 years as well.
20  Q.  How do these expenses fit into the discounted cash flow
21  analysis?
22  A.  These expenses all have to be subtracted from that gross
23  profit number, so it's revenues minus all of your expenses, not
24  just what it costs you to make the drug but everything else
25  necessary to run a business to ultimately get down to your

| E1tQmar4 | Gompers - direct | Page 2586 |
| --- | --- | --- |

1   income and your cash flow numbers.
2   Q.  I think you mentioned the discount rate.  But what discount
3   rate did he use?
4   A.  He assumed a discount rate of ten percent.
5   Q.  Is that a reasonable discount rate?
6   A.  It's a reasonable discount rate.  It may be a little low
7   given that this is a young company not making a lot of money.
8   It's in a high-risk development industry, but ten percent is at
9   least a reasonable starting point for a discount rate.
10  Q.  How does that discount rate fit into the discounted cash
11  flow analysis?
12  A.  So, what you do is on the very bottom here after you take
13  out all the expenses, you get to this bottom line number which
14  is free cash flow.
15  Q.  Maybe we could highlight that, Mr. McLeod?
16  A.  So what you do is take that ten percent and discount every
17  one of these years back to the present, or, in this case, 2008.
18  And if you actually do that, you go -- if you go to the output
19  table at the top, what you will find is that all of those
20  numbers lead to a value of $16 and a half billion.  So those
21  cash flows, his cash flow projections discounted at ten percent
22  give you that value.
23  Q.  And that $16.5 billion, that would be the value, I take it,
24  of Elan?
25  A.  Exactly.  The total value of Elan.  And if you convert it

| E1tQmar4 | Gompers - direct | Page 2587 |
| --- | --- | --- |

1   on a per share basis, it's roughly $35 a share, $34.93.
2   Q.  If we could turn back to page 2 of this report.  Just
3   highlight that same paragraph we were looking at.
4         So, in the first sentence where it says: "We estimate
5   that Elan's current 16 billion plus valuation," is that where
6   they got the 16 billion valuation?
7   A.  Yes.  So, the 16 billion here ties back to the Exhibit on
8   page 11 of the report.
9   Q.  If you read into the -- well, if you follow that sentence,
10  it says, "implies approximately $7 to $8 billion plus in
11  bapineuzumab sales by 2015."  Why is that?  Why does the
12  16 billion valuation imply $7 to $8 billion in bapineuzumab
13  sales in 2015?
14  A.  So, when you do a discounted cash flow, you don't discount
15  the sort of best-case or worst-case scenario.  You discount
16  what you expect to happen, what's going to happen?  And so what
17  this means is you have to be nearly a hundred percent certain
18  that you're going to get $7 to $8 billion of bapi sales in
19  order to back into that $16 billion.  So there is no
20  probability adjustment that you don't hit that.  It's sort of
21  that's what you're expecting to hit.
22  Q.  OK.  And how does $7 to $8 billion of sales compare with
23  other drugs in the market at that time?
24  A.  It would be an absolute blockbuster.  So I -- if it was
25  between 7 and 8 billion, it would be the second best-selling

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 29, 2014

| E1tQmar4 | Gompers - direct | Page 2588 |
|---|---|---|

1  drug in the world. Lipitor would be number one at 13 and a
2  half billion. But if it were to achieve 7 to 8 billion, it
3  would be the second best-selling drug in the world.
4  Q. If you look lower down that same paragraph, Mr. McLeod, it
5  says "And Phase III data are more than two years away so a risk
6  adjustment is warranted."
7      What does that mean, and why is a risk adjustment
8  warranted?
9  A. Well, because it's not certain that bapi would be approved.
10  So, there are multiple stages a drug guess through. If you
11  look at drugs that get to Phase III, only about 64 percent end
12  up being approved. So, what the analyst is saying here is
13  that, you know, really you need to make some adjustment to this
14  because there is at least some reasonable probability that bapi
15  isn't going to be approved and successful on the market.
16  Q. Thank you Professor Gompers.
17      If we just highlight the last sentence of this page,
18  starting with the "with bapineuzumab."
19      Could you read that beginning with "with"?
20  A. "With bapi Phase III data two plus years away following the
21  Phase II data presentation, we believe Elan shares have little
22  near-term upside potential regardless of the strength of the
23  data presentation."
24  Q. And the date of this report is July 21, 2008; is that
25  right?

| E1tQmar4 | Gompers - direct | Page 2589 |
|---|---|---|

1  A. That is correct.
2  Q. You see that at the bottom of the page there?
3  A. Yes.
4  Q. Why would Elan shares of little near-term upside potential
5  regardless of the strength of the data presentation?
6      MR. INGOGLIA: Objection.
7      THE COURT: What are your grounds?
8      MR. INGOGLIA: He's explaining the terms in the
9  analysis.
10      THE COURT: You are going to have to lay a foundation
11  for him to testify on this point.
12  Q. Well, did you review this analyst report, Professor
13  Gompers?
14  A. I did.
15  Q. Do you understand that this analysis is based on the
16  discounted cash flow analysis that you were just describing?
17  A. I do.
18  Q. Did you in reviewing this understand the analysis that the
19  Cowen analysts did on that discounted cash flow analysis?
20  A. Yes.
21  Q. Do you understand what Cowen is basing this explanation
22  here on?
23  A. I do.
24      THE COURT: So the question has to be what is his
25  understanding of why the Cowen analyst believes that there is

| E1tQmar4 | Gompers - direct | Page 2590 |
|---|---|---|

1  little near-term upside potential to the shares.
2      MR. BRACERAS: Thank you, your Honor. I don't think I
3  could ask it any better.
4  A. It's my understanding that through this analysis, one of
5  the things that the analyst says throughout the report is that
6  baked into the price is this expectation of blockbuster status
7  already, and, you know, no matter what happens with the next
8  presentation of Phase II data, the stock price can't go up
9  because you're already expecting it to be a $7 to $8 billion
10  drug and you're not going to get any new information about it
11  for at least two years until the Phase III results come in.
12  Q. Just a couple more questions on this report, Professor. If
13  we turn to page 9 of the report, and highlight the section Elan
14  shares.
15      If you could just read the header of that section,
16  Professor Gompers.
17  A. "Elan shares already reflect $7 to $8 billion sales
18  potential."
19  Q. If you could read the last sentence beginning with "our
20  valuation"?
21  A. "Our valuation sensitivity analysis matrix (see results
22  below), which is based on an abbreviated discounted cash flow
23  analysis through 2015 using various bapi sales projections and
24  discount rates (holding all other estimates constant), yields
25  upside to the current Elan share price greater than $35 only if

| E1tQmar4 | Gompers - direct | Page 2591 |
|---|---|---|

1  we assume that bapi sales reach $10 to $12 billion in 2015."
2  Q. What is your understanding of a sensitivity analysis
3  matrix?
4  A. A sensitivity analysis just shows how the value of
5  something changes if we change a set of assumptions. In this
6  case -- I can't even see it.
7  Q. If we could, Mr. McLeod, highlight the box on the next
8  page, the graph which is the sensitivity analysis? Thank you.
9  A. So, in this case what the Cowen analyst is doing is across
10  the horizontal axis, if you go from left to right, he is
11  changing his assumption about what sales in 2015 for bapi would
12  look like. And on the vertical axis starting at 8 going down
13  to 12, he's varying his assumption about the discount rate.
14  And each of these numbers represents for that pair of
15  assumptions what the implied share price of Elan is.
16  Q. That's implied share price based on the presumed number of
17  sales of bapineuzumab?
18  A. That's correct. It's the discounted cash flow analysis.
19  So a discounted cash flow analysis with this level of sales in
20  2015 and this discount rate gives -- gives you this for a share
21  price.
22  Q. What in your opinion is a reasonable discount rate?
23  A. Again, I think as a starting point, ten percent. I think
24  one might argue higher, but if we start at ten percent, it is a
25  reasonable place to start.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 29, 2014

| E1tdmar5 | Gompers - direct | Page 2608 |
|---|---|---|

1　through Elan, it only held a position in the stock and it
2　actually had a short position. So it had shorted $150 million
3　worth of Elan stock --
4　Q. What do you mean by a short position?
5　A. Well, short is when you sort of sell the stock and you'll
6　cover it later. So you make money on a short position when the
7　stock price goes down, and you lose money on the stock -- on a
8　short position if the stock price goes up.
9　　　And so they had a short position in Elan of
10　$150 million. Their Wyeth stock position was a short position
11　of about $148 million. But they held what we call in finance a
12　long exposure of $541 million in Wyeth through what's called an
13　equity swap.
14　Q. And can you explain for us, what is an equity swap?
15　A. An equity swap is just a contract between two parties --
16　typically, it is between, say, an investor and an investment
17　bank -- in which the investor agrees to pay interest to the
18　investment bank. And the investment bank, on the other side,
19　typically pays whether or not the stock goes up or down -- or
20　it pays the appreciation of the shares. So if the shares of
21　Wyeth go up, then the investment bank has to send money to SAC.
22　If the shares go down, then actually SAC has to write a check
23　for the value that those shares go down. So it's a way to gain
24　exposure to the stock without having to write an upfront
25　investment and spending all that 541 million to hold that

| E1tdmar5 | Gompers - direct | Page 2609 |
|---|---|---|

1　position.
2　Q. And it sound like you had an opportunity to review the
3　actual equity swap in this case?
4　A. Well, there are 12 equity swaps. So Wyeth had entered an
5　equity swap agreement with three different banks.
6　Q. Do you mean SAC?
7　A. SAC, excuse me. SAC had entered into a Wyeth equity swap
8　with three indifferent investment banks for 12 million shares.
9　Q. Do you recall what those counterparties were?
10　A. Merrill Lynch, UBS and Morgan Stanley.
11　Q. I think you mentioned that SAC was short a certain amount
12　of Wyeth, and what was the value of the amount that it was
13　short?
14　A. 148.9 million.
15　Q. Put you on the spot here: What is the total net position
16　of SAC in Wyeth at this point?
17　A. It's long by just -- just north of $390 million. So the
18　way to do it is you subtract 148.9 from the 541.3.
19　Q. And given these investments, would SAC have lost money on
20　its Wyeth holdings if the Wyeth stock price declined on
21　July 29th?
22　A. Yes, it would.
23　Q. Are you familiar with the term hedging?
24　A. I am.
25　Q. And what does -- what is a hedge? What does that mean?

| E1tdmar5 | Gompers - direct | Page 2610 |
|---|---|---|

1　A. A hedge is when an investor tries to mitigate a potential
2　loss. So you enter into an investment that moves in an
3　opposite direction of some other investment you're holding.
4　　　So a hedging strategy, there are a number of ways to
5　engage in a hedge, but what you try to do is to say I have an
6　exposure over here, I would like to limit my losses, and so you
7　enter into an investment on the other side that on average will
8　move in the opposite direction from your other investment.
9　Q. Can you hedge one stock against an entirely different
10　stock?
11　A. It's not a perfect hedge but it certainly is done.
12　　　MR. BRACERAS: Can keep that up, Mr. McLeod.
13　Q. And how could SAC have hedged its long exposure in Wyeth?
14　A. Well, I understand that during June and July of 2008, the
15　news that was -- the most significant news coming out about
16　both Wyeth and Elan related to bapi. And so, on average, news
17　about bapi would tend to move Elan and Wyeth in the same
18　direction. So if you wanted to hedge your position in one of
19　those, you would tend to take an opposite position in the other
20　one.
21　Q. If we could now show Professor Gompers Defense Exhibit
22　1404, just for identification, please.
23　　　Professor Gompers, did you have an opportunity or,
24　rather, are you familiar with Defense Exhibit 1404?
25　A. I am.

| E1tdmar5 | Gompers - direct | Page 2611 |
|---|---|---|

1　Q. And did you have a role in preparing this exhibit?
2　A. I did. It wasn't as flashy and colorful but, yes, I did
3　prepare these numbers and the analysis.
4　Q. And this is based on the trading data that was provided to
5　you?
6　A. Absolutely, yes.
7　　　MR. BRACERAS: Your Honor, the defense offers Exhibit
8　1404.
9　　　MR. INGOGLIA: Your Honor, we have an objection.
10　May we approach?
11　THE COURT: Yes.
12　(Continued on next page)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 29, 2014

---

 1 Q. So, to the extent you have been explaining what a hedge is
 2   today, to be clear, you are not saying you have some personal
 3   knowledge as to whether the sales in this case were put on as a
 4   kind of hedging strategy?
 5 A. That would be correct.
 6 Q. Can we look at Defense Exhibit 1404? Mr. McLeod, if you
 7   can help. Thank you. Appreciate it.
 8       If you will beg my indulgence, I am not going to be
 9   able to tell you what color any of these things are. If we
10   look at the graph all the way to the left.
11 A. Yes.
12 Q. That has 541.3?
13 A. Yes.
14 Q. Am I right that that number represents the Wyeth swap?
15 A. That is correct.
16 Q. Isn't it true that the Wyeth swap was entered into several
17   months before July 29, 2008?
18 A. Between the end of February and the beginning of March of
19   2008, yes.
20 Q. But the numbers on this graph don't reflect the price of
21   Wyeth at that time when the contracts were entered into?
22 A. That is correct.
23 Q. They just reflect whatever the value happened to be on the
24   29th?
25 A. Correct.

---

 1 Q. Did you choose the date the 29th or did someone suggest
 2   that date to you?
 3 A. The date was suggested to me. It was a day in which there
 4   was a significant stock price decline due to announcements for
 5   both Wyeth and Elan.
 6 Q. But was it the decline that made you choose the date or did
 7   someone say do an analysis as of this date?
 8 A. I was asked to look at change in value on these dates.
 9 Q. Got it. You were retained by the defense in this case; is
10   that right?
11 A. That is correct.
12 Q. And you are going to get paid ultimately for your work in
13   connection with your testimony?
14 A. I certainly assume so.
15 Q. And depending on how long the cross lasts, that will be
16   somewhere in the neighborhood of $70,000; is that right?
17 A. That sounds right, yes.
18 Q. Does that include costs that go to this Doar Company that I
19   see on the bottom of Defense Exhibit 1404?
20 A. Would that 70,000 include that? No, it would only be my
21   own personal expenses. So, whoever created this exhibit would
22   be paid separately.
23 Q. Got it. Doar, the people who did the graphics, that wasn't
24   related to you. Somebody else took care of that?
25 A. That is correct.

---

 1 Q. And you don't have to pay for that, I guess. It doesn't
 2   come out of your end?
 3 A. No.
 4 Q. Do you recall Mr. Braceras asking you some questions about
 5   the challenges involved in getting out of a swap position?
 6 A. Yes.
 7 Q. A swap position isn't -- you can't trade it on an exchange,
 8   right? You have to negotiate with a counterparty?
 9 A. That is correct.
10 Q. Would those challenges be more acute if the party that was
11   looking to unwind the position had concerns about transparency,
12   about wanting to minimize their transparency in the market or
13   their visibility in the market?
14 A. I don't quite understand the position. So this is a
15   negotiation with the banks on the other side of the
16   transaction.
17 Q. Right, Merrill Lynch, Morgan Stanley and UBS, right?
18 A. Yes.
19 Q. In order to unwind it, somebody at SAC would have to talk
20   to somebody at each of those banks; is that right?
21 A. That is correct.
22 Q. And they'd have to say, we want to get out early? I'm
23   paraphrasing, but in substance.
24 A. They'd have to say we want to get out of the equity swap,
25   yes.

---

 1 Q. Are those banks broker dealers?
 2 A. Yes.
 3 Q. Do broker dealers have reporting obligations with respect
 4   to suspicious transactions?
 5       MR. BRACERAS: Objection, your Honor.
 6       THE COURT: Sustained.
 7 A. Ah --
 8       THE COURT: Sustained.
 9 Q. Let's look at the middle column. Actually, let's take
10   1404. You were asked some question about analyst reports?
11 A. Yes.
12 Q. Mr. Braceras asked you about two in particular. Did you
13   see any other analyst reports other than those two in the
14   course of preparing for your testimony?
15 A. I read every single analyst report in June and July for
16   Elan.
17 Q. Some of those analyst reports for July were positive on
18   Elan; they were bullish on Elan?
19 A. Yes, some were bullish, so if you look across all the
20   analysts, approximately -- approximately one-third had buy
21   recommendations and two-thirds had either neutral or sell
22   recommendations.
23 Q. For the month of July?
24 A. That's correct.
25 Q. So, there are some that said buy or overperform or the

---

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 29, 2014

E1tQmar6        Gompers - cross        Page 2640

1   like, right?  You're saying that there were more that were
2   negative in July.  Is it also true that in June there were
3   analyst reports with recommendations to sell the month earlier?
4   A.  There were, but they were more temperate.  So if you look
5   at target price, for example, the target price was actually
6   above the stock -- the median target price for analyst was
7   immediately above the stock price in June, and then subsequent
8   to the Phase II announcement, actually the stock price went
9   well above where the target price was for the median analyst.
10  Q.  So, there were some that were negative --
11  A.  Yes, there were a range of opinions, but one of the things
12  which was interesting is that for the typical stock, the vast
13  majority of analysts typically have buy recommendations.  So
14  for a typical stock, roughly two-thirds of the analysts will
15  issue buy recommendations; they're in the business of selling
16  stocks.  But, here it was -- especially in July.
17  Q.  Professor Gompers, I know that --
18        MR. BRACERAS: Your Honor, can Professor Gompers
19  finish his answer?
20        MR. INGOGLIA: I think it was more of a filibuster.  I
21  hadn't even asked a question.
22        THE COURT: I think it had gone beyond the question.
23        MR. BRACERAS: He is a professor from Harvard.
24        MR. INGOGLIA: I understand.  All I was going to say
25  was we're not in class, if you could just answer my questions,

E1tQmar6        Gompers - cross        Page 2641

1   that would be fine.
2   A.  Sure.
3   Q.  By the way, do you have any idea if Mr. Martoma had
4   anything to do with the Wyeth swap?
5   A.  I -- it's my understanding that he didn't, but I don't have
6   direct knowledge of that.
7   Q.  Just to clarify something that I think -- I hope got
8   cleared up by Mr. Braceras' questions, this snapshot in time in
9   Exhibit 1404 means that SAC didn't have to write a check that
10  day, right, of that $64 million?
11  A.  That is correct.  It's much like if your stock goes down,
12  you don't write a check for that.  So it's just a change in the
13  value of the equity swap.
14        MR. INGOGLIA: Your Honor, may I have one moment?
15        THE COURT: Yes.
16        (Pause)
17  Q.  Professor Gompers, I'm going to put up on the screen
18  something that has been marked for identification as Government
19  Exhibit 1371.  And my question is just going to be do you
20  recognize this?
21  A.  It's an analyst report for Elan.
22        MR. INGOGLIA: The government offers Government
23  Exhibit 1371?
24        MR. BRACERAS: Your Honor, could we be heard?
25        THE COURT: Yes.

E1tQmar6        Gompers - cross        Page 2642

1        (At the side bar)
2        MR. BRACERAS: So, your Honor, I'm not sure if we have
3   an objection to this, but this is the point on this.  It's sort
4   of a goose-for-the-gander-type thing, is that we've only
5   been -- the government has only allowed us to put into evidence
6   analyst's reports that we have been able to show have gone to
7   Mr. Martoma.  Now, there is no evidence that this went to
8   Mr. Martoma.  So we are happy to reach an agreement where we
9   can put in all these analyst's reports and we put in this
10  analyst report, but, unless there is evidence of this going to
11  Mr. Martoma, we don't think that -- we object.
12        MR. INGOGLIA: I don't have the document in front of
13  me, but I think you guys may remember it if I describe it.
14  There is a document that Mr. Martoma got that was an update and
15  it described a series of analyst reports, and I know that this
16  firm was in the description, but I haven't gone back now to
17  check to see whether this specific report is the one that they
18  were talking about.  But do you remember that kind of form
19  where they describe multiple reports and we've allowed -- on
20  our side we've allowed the equivalent of those to come in.  So
21  that's my thinking.
22        MR. STRASSBERG: I think there are many reports from
23  the same company.  I do recall Mr. Ingoglia is referring to,
24  but I don't know whether it's this report or a different report
25  that would have been from this company.  There is a reference

E1tQmar6        Gompers - cross        Page 2643

1   to this company.  I would guess it was earlier, but I can't say
2   that, your Honor, without looking back.
3        MR. INGOGLIA: Maybe what we can do is since we're not
4   in front of the jury, I don't have to go through it with the
5   witness.  If we can go collectively, we can continue to find
6   analysts' reports that either side can show would have come
7   across the radar of Mr. Martoma that we won't make the other
8   call a witness to put it in.  We will mutually agree it can
9   come into evidence.
10        MR. BRACERAS: If you can do it outside this witness.
11  If there is proof this went to Mr. Martoma, then we'll agree.
12        MR. INGOGLIA: Then we'd have a different view.
13        THE COURT: All right.
14        MR. INGOGLIA: Then I won't show it to the witness at
15  this time.
16        (Continued on next page)

JA248

# Transcript Excerpts
# (January 30, 2014)
# (2842)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

January 30, 2014

E1udmar6        Schwartz- direct        Page 2840

1  consultant to many investors during that same time period.
2  And, again, I computed the number of consultations, the number
3  of events that occurred.
4  Q. And how does this one differ from 1500?
5  A. Well, one of them is the number of unique investors, so
6  each person counts once. In the other one it's the number of
7  consultation and other kinds of events, so the number of times
8  that he talked to someone.
9        MR. BRACERAS: Mr. McLeod, perhaps we could go to
10  Defense Exhibit 1504.
11  Q. What does this reflect, Ms. Schwartz?
12  A. This is an analysis of the log of activity and identifies
13  the number of consultations that Mr. Martoma had with different
14  experts in the period July 2006 through July 2008, and there
15  were 353 consultations.
16  Q. And these aren't all the different -- with different
17  experts; these are just a number of consultations, correct?
18  A. That's right.
19        MR. BRACERAS: And then if we could move to Defense
20  Exhibit 1505, please?
21  Q. And what does this reflect, Ms. Schwartz?
22  A. Similarly, this is a computation of the number of different
23  experts that Mr. Martoma spoke to in the period July 2006
24  through July 2008. And it indicates that he spoke to 224
25  different experts based on those records.

E1udmar6        Schwartz- direct        Page 2841

1  Q. And some of these experts he may have spoken to on multiple
2  occasions?
3  A. That's right.
4  Q. OK. If we could move to Defense Exhibit 1508, please.
5        What does this reflect, Ms. Schwartz?
6  A. This is an illustration of some of the phone records that I
7  looked at, and it identifies a number of instances where there
8  were weekend calls between Mr. Martoma and Mr. Cohen in the
9  period from April to September 2008.
10  Q. And what does it show on the left-hand side, on the Y axis
11  there?
12  A. Well, each of these bars represents the length of the call.
13  So each bar is a day. And the bar height is the length of the
14  call or calls, if there are a couple on a date.
15        MR. BRACERAS: Thank you. Mr. McLeod, maybe Defense
16  Exhibit 1510.
17  Q. What does this chart represent, Ms. Schwartz?
18  A. This is a chart that summarizes some instances that were
19  identified in the phone records of certain telephone
20  communications between Mr. Martoma and Dr. Gilman in
21  April 2009. And we identified three calls which are listed
22  here, two of which were on April 17th and one of which was on
23  April 29th.
24        MR. BRACERAS: Thank you. Mr. McLeod, if we can go to
25  Defense Exhibit 1512.

E1udmar6        Schwartz- direct        Page 2842

1  Q. What does this reflect, Ms. Schwartz?
2  A. This is a graphical depiction of the S&P 500 index, which
3  is an index of stocks, and it shows the index value between
4  May 2008 and July 29, 2008.
5  Q. And what is the percentage drop over the course of these
6  four months, or three months, I'm sorry?
7  A. Well, the percentage drop that's calculated here is from
8  the period June 16th to July 10th, which is a period within
9  that timeframe. And I calculated that there was a 7.8 percent
10  drop in the index during that timeframe.
11  Q. If we can move to Defense Exhibit 1513.
12        What does this reflect?
13  A. This is a graphical depiction of the stock prices for Elan
14  stock, and it reflects the change between January 2007 and
15  July 29, 2008.
16  Q. And what are the dates of the percent increase on the right
17  side there, if you recall?
18  A. The dates are the period June 16, 2008 to July 10, 2008,
19  and during that period the share price had a 36 percent
20  increase.
21  Q. Thank you, Ms. Schwartz.
22        MR. BRACERAS: Mr. McLeod, if we could go to Defense
23  Exhibit 1432.
24  Q. Now, Ms. Schwartz, I understand you did not prepare this
25  chart, correct?

E1udmar6        Schwartz- direct        Page 2843

1  A. That's right.
2  Q. You see the header of this is, "Elan Common Stock
3  Holdings"?
4  A. Mm-hmm.
5  Q. And you see, this will reflect the stock trading in Elan
6  with certain of the SMC consultation dates indicated in the
7  dotted line?
8  A. Yes. I see what it reflects.
9  Q. And then if we move to Defense Exhibit 1433.
10        And you'll see the title of this document is "Elan
11  Common Stock Holdings." Again, this shows the stock trading
12  activity, or lack thereof, on the dates surrounding the
13  November 22, 2006 SMC consultation?
14  A. Yes.
15        MR. BRACERAS: Then if we could go to Defense Exhibit
16  1433.
17        Go to the next one.
18        Thanks, Mr. McLeod. 1434.
19  Q. And this, likewise, shows the stock trading activity, or
20  lack thereof, around the SMC consultation date of February 9,
21  2007.
22        Do you see that, Ms. Schwartz?
23  A. I see that.
24  Q. Do you see the number of shares on the left is about 6
25  million?

**Transcript Excerpts**

**(February 3, 2014)**

**(2935, 2950, 2973-74, 2976, 2981-83, 2989, 3027-28, 3027-29, 3099-3107, 3134-35)**

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                                    **February 3, 2014**

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2935 |

1 Early Saturday morning, Martoma flew to Detroit and he took a
2 cab to the University of Michigan campus where he met with
3 Dr. Gilman and they went over the PowerPoint slides of the
4 secret results in person. He flew back to New York the same
5 day.
6       The very next day, Sunday, he reached out to the hedge
7 fund owner, Steven Cohen, to set up a time to speak with him
8 about something Martoma described as important. And the very
9 next morning, July 21, Monday, on the basis of the information
10 that Martoma had learned from Dr. Gilman, the hedge fund began
11 quietly liquidating its positions in Elan ahead of the public
12 announcement of the results, secretly.
13      Hardly anyone at SAC had any idea that the Elan
14 position was being sold off -- not Martoma's execution trader,
15 not Martoma's research analyst, not even Steven Cohen's close
16 associate at the fund, Chandler Bocklage. The fund sold off
17 the shares, and then they shorted the shares doubling down on
18 the bet in a secret manner that you heard no one at SAC could
19 remember ever being employed for any other transaction using
20 firm accounts to do the sales, and then only after the public
21 announcement was made, then transferring the sales back into
22 the accounts where the purchases had been made including Mathew
23 Martoma's account.
24      For Mr. Martoma, that was more than $50 million in
25 profits and losses avoided for Elan and more than another ten

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2936 |

1 million for Wyeth, just in that GEHC account, the account that
2 he alone was responsible for in 2008. For the hedge fund,
3 those sales, short sales, options trading led, to profits and
4 avoided losses of more than $218 million related to Elan and
5 more than another $56 million related to Wyeth, roughly
6 $275 million in all.
7       And Mathew Martoma back then at the time wasn't shy
8 about taking credit for his role. He wasn't saying back then
9 that he was merely an idea generator; not at the time. If you
10 look at Government Exhibit 550, in September 2008 after the
11 events of this case, you saw that Mr. Martoma emailed Steven
12 Cohen, and he sent what Mr. Martoma called his best estimate of
13 his own performance that year and said he looked forward to
14 hearing what Mr. Cohen thought was an appropriate payout range
15 for Mr. Martoma. And Mr. Martoma attached to his email a
16 little chart showing his own estimate at the time of his
17 performance for 2008. Mr. Martoma's estimate totals
18 $212.6 million. He takes credit for performance in the GEHC
19 account, the GGEN account, the COHE account, and other accounts
20 in which the Elan short sales took place. That's Mr. Martoma
21 in his own words at the time taking full credit for the profits
22 not just in his own account, but in GGEN, in COHE, as well as
23 the others in which they sold Elan shares short. And Martoma
24 did get compensated, well compensated, to the tune of
25 $9.3 million bonus which credited Martoma for his profitable

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2937 |

1 trades and his profitable recommended trades related both to
2 Elan and the Wyeth positions.
3       Ladies and gentlemen of the jury, the evidence is now
4 in, and we submit that what you have seen and heard is an
5 avalanche of evidence that shows beyond a doubt that Martoma
6 intentionally agreed with others to get secret valuable
7 information from doctors who were strictly forbidden from
8 sharing those secrets about the ongoing drug trial; and that
9 Martoma then used this information for his financial benefit
10 and caused trades to be made upon that important secret
11 information. The evidence in this case leads to one, and only
12 one conclusion: That Mathew Martoma is guilty as charged.
13      This summation is my chance to discuss the evidence
14 that you've heard, that you've been so carefully following
15 during the three weeks or so that we have been here. You may
16 recall that my colleague, Mr. Devlin-Brown, told you in his
17 opening that the evidence would come in in bits and pieces, and
18 it did. It didn't come in chronologically. So this is my
19 chance to go over the evidence with you together and talk with
20 you about how the pieces fit together.
21      So, to start, let me give you an overview of what I am
22 planning to do in this summation. First, I am going to talk to
23 you about the evidence of how Martoma hatched this scheme back
24 in 2006, and how over time, he corrupted Dr. Ross and
25 Dr. Gilman and got them to agree to give him secret inside

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2938 |

1 information.
2       Second, I am going to talk about the critical six
3 weeks between the June 17, 2008 press release that Elan issued,
4 that top-line summary press release, and the July 29, 2008
5 public announcement of the full detailed results at ICAD in
6 Chicago. I'm going to talk to you about how you know that
7 Mr. Martoma was acting on inside information about the drug
8 trial when he and his hedge fund in that week leading up to the
9 public announcement sold all of their more than ten million
10 shares of Elan stock and sold about 8 million shares of Wyeth
11 stock and then sold short Elan and Wyeth shares right before
12 the public announcement.
13      Third, I'm going to talk about a couple issues that
14 the defense has raised during this trial, and why in the end
15 those issues are nothing more than a distraction from the
16 central issues of the case.
17      And, finally, I am going to talk very briefly about
18 the charges and touch on some of the legal requirements. So
19 let's talk first about the conspiracy between Martoma and
20 Dr. Ross and Dr. Gilman, and how it developed. Let's start at
21 the beginning.
22      You may recall that at the beginning of the trial, you
23 heard from representatives of Elan, Ms. Hulme and Ms. Liu, and
24 later you heard from Dr. McRae of Pfizer, which now owns Wyeth,
25 and they told you how Elan and Wyeth had partnered to conduct

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2947 |
|---|---|---|

1 obligations to help Martoma with his investing business at his
2 hedge fund, and you know that Martoma's top two investment
3 ideas were Elan and Wyeth, the companies testing bapineuzumab.
4     That same month that Martoma reached out to
5 Dr. Gilman, which is August 2006, he tried to schedule
6 consultations through GLG with another group of doctors, the
7 principal investigators for that same drug trial, as you can
8 see in Government Exhibit 262. So, on August 30, 2006, the
9 date of this email message, Martoma has been at his new job for
10 about a month, but he's already focused like a laser on who he
11 specifically wants to talk with. Not, by the way, doctors
12 who are very experienced or doctors who are very knowledgeable
13 or highly rated -- not them; doctors who specifically have some
14 connection to the Phase II drug trial of bapineuzumab.
15     What does it say next to the name of all these
16 doctors. Principal investigators. So, Martoma knows exactly
17 who he is looking for. Why does he want to talk to them? He
18 wants to talk to them about bapineuzumab. Why this group in
19 particular? Because this group knows inside information about
20 the drug trial that nobody else knows. And Martoma wasn't just
21 mildly interested in this. Look at what he wrote to the GLG
22 representative. "If they aren't in your database, can we
23 recruit?" Martoma through GLG tried to hire them. Most of
24 them, it appears, didn't bite.
25     Look at top of Government Exhibit 262. "The principal

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2948 |
|---|---|---|

1 investors have declined the invitation to meet because of a
2 conflict of interest" because they're working on the
3 bapineuzumab study. But Martoma didn't give up. The list
4 shows 22 doctors. And in the end Martoma got one whose name
5 was on this list to talk with him about the details of the drug
6 trials.
7     So let's look at this list again more carefully, and
8 we'll stop at New Jersey, the Memory Enhancement Center of
9 America, Dr. Joel Ross. Dr. Ross was a principal investigator
10 on the Phase II drug trial for bapineuzumab, and Martoma jumped
11 at the chance to speak with him at the rate of roughly $1,500
12 an hour, although, as you heard, sometimes more. So Government
13 Exhibit 321 in this email, they ask if he has an interest in
14 speaking with Dr. Ross as he was on the list of the AAB-001
15 investigators that Mat sent. Kristin Powell asks if he's
16 interested, and he says, yes, please schedule for next week.
17     What do you remember about Dr. Ross? One thing that
18 you remember about him is Dr. Ross very badly wanted contacts
19 who might be able to refer business to him, in particular to
20 this new clinic he was starting up, Iberica, as a new Phase I
21 clinic. Dr. Ross told Martoma right off the bat that he was
22 looking for that help from the very beginning. You could see
23 that in Government Exhibit 342, which is October, and you see
24 here Dr. Ross saying he's opening the clinic and he wants to
25 network.

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2949 |
|---|---|---|

1     As you heard and as you saw in the emails and the
2 communications, Dr. Ross kept up asking Martoma about this
3 throughout their relationship. He didn't just mention it once.
4 He, frankly, wouldn't let it go. So you recall Government
5 Exhibit 980. That's the grand opening of Iberica that Dr. Ross
6 invited Mr. Martoma to and Mr. Martoma attended, and, in
7 particular, you'll remember Government Exhibit 366, which is
8 later in which he again asks for help, and then said he'd be
9 happy to return the courtesy in other ways. Dr. Ross told you
10 what he meant by that; that he was going to return the favor,
11 he was going to return the favor by giving inside information
12 to Martoma.
13     So that is how Martoma identified and sought out
14 Dr. Ross who soon thereafter did begin giving Martoma
15 confidential information about the drug trial. He also
16 consulted with Dr. Gilman, you heard, at about a rate of a
17 thousand dollars an hour. And he became Dr. Gilman's most
18 frequent consult. You may remember Government Exhibit 603
19 which shows all the different people that Dr. Gilman consulted
20 with, and that big arrow in the middle is Mr. Martoma.
21     As I mentioned earlier, Dr. Gilman was the head of the
22 safety monitoring committee, the very committee that would be
23 the first to hear about any serious problems with the drug.
24 You actually can't get on a Phase II drug trial a better source
25 of inside information than the chair of a safety monitoring

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2950 |
|---|---|---|

1 committee if he or she is willing to divulge that information
2 and break his or her promise to keep it secret.
3     Before Elan would decide to report anything publicly
4 about a safety problem, the safety monitoring committee and its
5 chairman would hear about it first. So Martoma began working
6 hard to convince Dr. Gilman that the two were friends, and he
7 began asking Dr. Gilman for confidential information about the
8 drug trial.
9     And you heard that after refusing at first, Dr. Gilman
10 did start to share the safety data. Why did Dr. Gilman do
11 that? Well, you heard some reasons. In part, because
12 Dr. Gilman thought that they were becoming friends; that
13 Martoma cared about him. In part, the consultations were
14 paying and frequent. In part, for Dr. Gilman he was flattered.
15 You heard that to Dr. Gilman, Martoma was like the students he
16 wished he had. And to some extent, he reminded him of his own
17 son whom he had lost.
18     As for Martoma, well Martoma had found his canary in
19 the coal mine, his early-warning system, secret information of
20 enormous value to Martoma that was not available to investors
21 who were playing by the rules. If something went wrong with
22 the safety of the drug, Dr. Gilman would tell Martoma during
23 those consultation calls -- and we'll talk about those in a
24 minute -- that Martoma arranged with Gilman and to which Gilman
25 had agreed. Martoma would know the bad safety news the same or

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

| E23Qmar1 | Summation - Mr. Ingoglia | Page 2971 |
|---|---|---|

1 flight, the Delta record confirms this, that he got on, and
2 Mr. Manhan told you, remember he said it left a little late,
3 and he flies back to New York.
4 Then, if you look at Government Exhibit 1401 and 1402,
5 you will see that Mathew Martoma's phone starts hitting off
6 cell towers near JFK Airport around 6:20, 6:30, including one
7 at 6:38 and Rosemary Martoma's phone hits off cell towers
8 moving south toward the JFK Airport vicinity from 6:15-ish to
9 about 6:38. So she's picking him up at the airport.
10 Now, ask yourself this: Why would Mathew Martoma fly
11 round trip in a single day to visit Dr. Gilman in person at a
12 time when Dr. Gilman had the secret efficacy results; when
13 Mr. Martoma had dinner plans in New York that night with
14 someone named Nick Savone at restaurant Polpo. What
15 explanation is there for why Mr. Martoma so urgently flew to
16 Detroit that Saturday to meet with Dr. Gilman? There is only
17 one explanation: Martoma flew to Michigan to see the final
18 secret slides with Dr. Gilman again in person, and he wanted to
19 see them badly. That's the only explanation that fits with the
20 evidence and with your common sense.
21 Now, you've seen the slides that Dr. Gilman had in
22 Government Exhibit 11-A. Take a look.
23 (Continued on next page)
24
25

| E23dmar2 | Summation - Mr. Ingoglia | Page 2972 |
|---|---|---|

1 MR. INGOGLIA: Martoma knew that those slides, or
2 something very similar, would be delivered to a crowd of
3 anxious investors in ten day's time. Stock market analysts had
4 been feverishly speculating as to just how good the data would
5 be. Mr. Martoma had to make a decision involving millions of
6 dollars -- hundreds of millions of dollars worth of stock and
7 millions of shares of stock. Some of it in his own account,
8 but even more of it in the account of his boss. Of course he
9 wanted to take another look. Of course he wanted to make sure
10 that he had understood everything, that everything he had
11 jotted down on his notes he had gotten right. Of course.
12 You know how else you know that Martoma went over the
13 secret results with Dr. Gilman that Saturday in Ann Arbor?
14 Because of what Martoma does when he gets back. So let's go to
15 Sunday, July 20th.
16 The next day, Sunday, July 20th, Mathew Martoma
17 reaches out to the owner of the firm, Steve Cohen -- this is
18 Government Exhibit 459 -- "Is there a good time to catch up
19 with you this morning? It's important." Steve Cohen, to whom
20 Martoma had been recommending Elan and Wyeth for well more than
21 a year, to whom he had recently repeated his enthusiasm for
22 holding the Elan position: Government Exhibit 291; that's less
23 than a week earlier. Government Exhibit 451. Government
24 Exhibit 452. June and July emails where he's reiterating his
25 conviction that Elan is a winner.

| E23dmar2 | Summation - Mr. Ingoglia | Page 2973 |
|---|---|---|

1 In fact, in Government Exhibit 451 he says, "I think
2 the stock breaks $40 on the ICAD data." So Steve Cohen, who
3 had been following Martoma's advice and purchased millions of
4 shares of Elan and Wyeth in his own and other firm accounts, he
5 gets this message from Martoma on a Sunday. And you see in
6 Government Exhibit 459 Mr. Cohen gives Martoma his phone number
7 to call him.
8 And then you see, in Government Exhibit 1215, that
9 Martoma and Steve Cohen then talk for 20 minutes on July 20,
10 2008.
11 What do they talk about? Well, they talked about Elan
12 and Wyeth. How do you know that's what they talked about?
13 Because of Government Exhibit 460. Right after the phone call
14 Martoma emails Cohen and he lists the total number of Elan and
15 Wyeth shares in his GEHC account and in the GGEN account.
16 Let's go to July 21, 2008. This is Monday. And you
17 remember -- yo uall remember now what happened on Monday. A
18 select group of people at the firm, a handful, knew that the
19 firm began to sell its entire 10-and-a-half million position,
20 share position, in Elan. And over four days they sold it all.
21 Not using Martoma's regular trader Tim Jandovitz, and not even
22 selling out of the accounts that held the giant Elan positions.
23 Instead, as you heard, Steve Cohen directed Phil Villhauer, the
24 execution trader, to sell everything quietly, through dark
25 pools and algorithmic trading, in firm accounts that Villhauer

| E23dmar2 | Summation - Mr. Ingoglia | Page 2974 |
|---|---|---|

1 had to call down to operations to have someone dust off
2 secretly. Mat Martoma, of course, was in on the secret. Let's
3 see how it happens.
4 Government Exhibit 461, early in the morning Monday
5 Martoma reaches out to Steve Cohen. Government Exhibit 492,
6 Phil Villhauer, the execution trader -- remember, he told you
7 that he had identified those firm accounts that they were going
8 to do the sales in. And he also told you -- in this email he's
9 communicating with Doug Schiff, who works for him, and you
10 recall that Villhauer told you he was in Manhattan that day and
11 Schiff is covering for him in the office. And so this email
12 back and forth about Elan and about Mr. Cohen is Government
13 Exhibit 492.
14 So they start to sell. On the 21st they sell
15 one-and-a-half million shares of Elan. And Martoma's checking
16 in on the progress. In Government Exhibit 438A, Martoma
17 reaches out after the trading day to Mr. Villhauer saying he
18 wants to chat briefly. And in Government Exhibit 431, about an
19 hour later, Villhauer responds by email.
20 So let's look at Government Exhibit 431. He lists in
21 the email how much Elan they sold that day. And if you add it
22 up, it adds up to about one-and-a-half million shares. And he
23 lists the accounts with which the sale is associated. Right?
24 So you recognize those four letter codes: COHE is Steve
25 Cohen's account. SELC is that SELC account, GGEN and GEHC.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 3, 2014

| E23dmar2 | Summation - Mr. Ingoglia | Page 2975 |

1 GEHC is Mr. Martoma's account. And, of course, the sales
2 aren't actually happening in those accounts. Mr. Villhauer
3 told you that. The sales are happening in some firm accounts
4 that nobody can see. But they are associated with these
5 accounts, and that's how you know that the sales tie back.
6 Right? So he's saying here's what we sold and here's what
7 ultimately we are going to attribute it to.
8     What else does he say in this email? After he gives
9 him the average price, Mr. Villhauer says, "Obviously, no one
10 knows except me, you and Steve." Steve Cohen, Phil Villhauer,
11 and Mathew Martoma.
12     Is there any question that Mathew Martoma is
13 involved -- intimately involved in the sale of Elan at this
14 point? Of course not.
15     Let's go to July 22nd. So the selling continues on
16 July 22nd. And if we look at Government Exhibit 431, we look
17 at the rest of this email, here the next day is Mr. Martoma
18 responding to Mr. Villhauer. And he asks, "Thanks -- are you
19 handling both or just one for us?" And we asked Mr. Villhauer
20 about this and he didn't remember what the reference was to,
21 the "both," right. Although you could infer that the "both"
22 refers to Elan and Wyeth. But whatever that refers to, how
23 about the "us"? Who is the us? He's selling for us. He's
24 selling for Mr. Martoma and Mr. Cohen.
25     Let's go to Government Exhibit 432. And you recall

| E23dmar2 | Summation - Mr. Ingoglia | Page 2976 |

1 there is a series of emails like this in which Mr. Villhauer --
2 I'm sorry chats, IM exchanges in which Mr. Villhauer updates
3 Mr. Cohen on the sales of Elan through the dark pools. So
4 Government Exhibit 462, the selling continues. And Government
5 Exhibit 434, Mr. Martoma checks in in the afternoon with
6 Mr. Villhauer.
7     And at this point in time Mr. Villhauer says to
8 Mr. Martoma you might want to give Mr. Cohen a push because
9 he's temporarily stopped selling. And we don't know whether
10 Mr. Martoma gives Mr. Cohen a push or not but we know they keep
11 selling.
12     So if we continue to the 23rd and we look at
13 Government Exhibit 464, we see that Mr. Martoma and Mr. Cohen
14 are still coordinating. And we know from Mr. Villhauer's
15 testimony that the selling of Elan in the firm accounts is
16 continuing.
17     So let's skip ahead to Sunday, July 27th, and on that
18 day, in Government Exhibit 436, Mr. Villhauer, looking back on
19 the week, gives an update to Mr. Cohen about what they did.
20 And you see with respect to Elan, he says we executed a sale of
21 over 10.5 million Elan for COHE, GGEN, GEHC, SELC at an average
22 price of 34.21. "This was executed quietly and efficiently
23 over a four-day period thousand algos and dark pools and booked
24 into two firm accounts that have very limited viewing access."
25     By the end of the week the firm had liquidated all of

| E23dmar2 | Summation - Mr. Ingoglia | Page 2977 |

1 its Elan shares that it had accumulated over the previous year
2 and a half.
3     The next Monday is July 28th, so the next day.
4 Monday, July 28th is the night that Elan is revealing the final
5 results of the study of bapineuzumab to the principal
6 investigators. Dr. Ross attended the presentation. Before it
7 started Dr. Ross signed yet another confidentiality agreement
8 from Elan, Government Exhibit 21. This one's about the final
9 efficacy results that are about to be presented to the
10 principal investigators. And so let's take a quick moment and
11 think about that for a second.
12     Elan clearly thought there was a difference between
13 the press release and the ICAD presentation. Otherwise why are
14 they reminding -- after the press release why are they
15 reminding the principal investigators about their
16 confidentiality obligations? Right? If these two things are
17 the same, then there is no need for a reminder. But,
18 obviously, Elan thinks they are different.
19     So Dr. Ross listened to the results, and he described
20 the reaction in the room as somber. He asks Reisa Sperling, he
21 told you, another principal investigator, to clarify for him
22 some of the statistics that they were hearing, and she told him
23 it meant that the drug was a failure.
24     Ross left the meeting, went down to the lobby where he
25 and Martoma had agreed to meet, and Martoma did meet Dr. Ross

| E23dmar2 | Summation - Mr. Ingoglia | Page 2978 |

1 as planned in the lobby of the McCormick Hotel. And Ross told
2 him the bad news and also told him that Ross himself still felt
3 optimistic about the drug itself. And recall Martoma asked
4 Ross a bunch of questions about that. How could you think
5 that, given the results? Martoma mentioned the P values. And
6 he asked detailed questions that left Dr. Ross feeling like
7 Martoma had been in Elan's presentation with him. "It was like
8 he was in the room with me." And that's because Martoma
9 already knew the answers from Dr. Gilman.
10     So let's go to July 29th.
11     The next day during market hours SAC shorts Elan and
12 Wyeth even more. They double down on their bet that Elan-Wyeth
13 shares are going to fall in price. And later that day
14 Dr. Gilman takes the stage around the scheduled time of 4:15
15 Central time, 5:15 Eastern Time. And as Dr. Gilman began
16 giving his presentation, different audience members had
17 different reactions. Keith Lyndon, Martoma's research analyst,
18 thinking they still had a huge long position in Elan, was
19 worried. Jandovitz, the trader for Martoma, similarly
20 deceived, back in Connecticut, was worried, too.
21     But the reaction of investors was swift and it was
22 decidedly negative. Look at the after-market trading data, and
23 that's Government Exhibit 1263. So after-market trading is
24 exactly what it sounds like, trading after the market has
25 closed for the day. And this is trading in Elan for July 29.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

**February 3, 2014**

| E23dmar2 | Summation - Mr. Ingoglia | Page 2979 |
|---|---|---|

1 And the times going across the bottom are in military time, but
2 if you turn your head you can see that around the time -- we
3 don't know exactly when Dr. Gilman begins to speak, it is
4 scheduled for 5:15 Eastern, but around that time the stock
5 starts going down dramatically it continues into the evening
6 and it just tanks.
7     Whatever doctors might have thought about their hopes
8 for the drug's long-term prospects, investors were having a
9 very different reaction. They were dumping Elan in droves, and
10 the stock price was tanking. Elan is no longer a bet that
11 investors are willing to make, not at $35 a share, and so they
12 sold.
13     In fact, if you look at Government Exhibits 1262 and
14 1264, you'll see how sharply the price of both Elan and Wyeth
15 fell in the day immediately following the announcement. So
16 this is tracking the -- from the 29th, if you look all the way
17 at the right, sort of the point on the top, to the 30th, close
18 on the 30th, it drops about 42 percent for Elan. And if you
19 look at Wyeth, which is 1262, that drop is about 11 percent for
20 Wyeth. And this is on a day when the stock market, as measured
21 by the S&P 500 index, was up, and that's Government Exhibit
22 1265. The stock market is up; elan and Wyeth are down
23 dramatically.
24     So let's take a minute and look back at what the firm
25 did with respect to the Elan and Wyeth shares net. Let's look

| E23dmar2 | Summation - Mr. Ingoglia | Page 2980 |
|---|---|---|

1 at Government Exhibit 1258. All right. So this is SAC's daily
2 net closing positions in Elan for that week starting on the
3 17th and leading up to the 30th. All right? And you can see,
4 this is combining all the different accounts, just so you get a
5 sense of what their overall position looks like. And you can
6 see it starts out more than 10 million shares on the 17th, and
7 it works its way down during the week until by the 24th -- this
8 is the day, you remember, Agent Barnacle told you there is a
9 small green line there, they are not quite flat -- it is about
10 1100 shares on the 24th. On the 25th they are flat, they are
11 out. And then they short it on the 28th on the 29th, which are
12 that Monday and Tuesday, the following Monday and Tuesday.
13     And if you look at 1261, this shows the same thing for
14 Wyeth. This includes the swap. OK? So the swap adds another
15 12 million or so shares. And on the 17th, the 18th, the 21st,
16 it starts to work its way down until by the time you get to the
17 30th you see they've sold more than 8 million shares that week.
18     If you had been working at SAC at the time you
19 wouldn't have seen this, right, because all those sales are
20 happening in firm accounts that people who log into Panorama
21 can't see, but this is what's actually happening.
22     As we showed you in the beginning, this massive
23 selloff before the announcement on the 29th at ICAD led to
24 profits and avoided losses of roughly 275 million for the hedge
25 fund, and that includes about 60 million in Martoma's personal

| E23dmar2 | Summation - Mr. Ingoglia | Page 2981 |
|---|---|---|

1 GEHC account, the one that he has sole responsibility for
2 trading.
3     And on July 30th, so after the ICAD announcement, the
4 firm transfers those sales that are in the firm accounts back
5 to the original accounts where the purchases had been made.
6 And you recall Katie Lyndon talking about that when she was
7 looking at her Panorama screen and it was confusing to her.
8 She saw what looked like losses flowing out of the account and
9 she couldn't make sense of it. That's what's happening. They
10 are transferring the sales from the firm accounts back into the
11 accounts where the purchases had been made.
12     It's worth talking about for a minute how
13 extraordinary all this was. It wasn't just the massive and
14 sudden about-face by Martoma changing his position on stocks he
15 had championed -- he had long championed, over the opposition
16 of others, and which he had been championing during that very
17 week of July 13th until he had his long call with Dr. Gilman.
18 And it wasn't just a massive sell-off, although the timing of
19 the sell-off was notable. As Mr. Jandovitz once described it,
20 that was the stuff, he said, that legends of made of. And it
21 wasn't just the use of dark pools and algorithmic trading, most
22 of the SAC witnesses who testified told you that itself wasn't
23 so unusual. What was unprecedented was the selling off of the
24 position in a way that was completely secret to everyone else
25 at the firm.

| E23dmar2 | Summation - Mr. Ingoglia | Page 2982 |
|---|---|---|

1     Mr. Villhauer told you maybe 15 people out of the
2 900-some-odd employees had any idea of any aspect of it.
3 Mr. Bocklage,, a 12-year SAC veteran who worked very closely
4 with Mr. Cohen, said even he didn't know they were selling off
5 the position. He had no idea, even though he and Mr. Cohen
6 consult regularly. And Mr. Bocklage and Mr. Villhauer, they
7 each said they had never seen anything like it in the history
8 of SAC, cannot remember ever seeing another occasion in which a
9 large position accumulated in certain accounts was then
10 liquidated by sales in firm accounts and hidden from everyone
11 else in the firm. Mr. Bocklage couldn't recall another time
12 when something significant happened with the COHE account that
13 he didn't know about. And you could see that at his transcript
14 on 2566.
15     So let's take a step back and talk about that. Why
16 the secrecy? What you've heard is that the firm is worried
17 about slippage, that is, they were worried that if people
18 noticed they were selling a large amount of Elan stock, others
19 would try and sell in front of them and that would hurt the
20 price, the price would go down. And the witnesses, like
21 Mr. Villhauer, said that slippage was a concern that day and
22 it's also a concern every day. But that explanation only takes
23 you so far because they are always worried about slippage, and
24 they are, as the defense pointed out, sometimes selling large
25 quantities of stock. So what other reason might they have?

**JA256**

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                    **February 3, 2014**

| E23dmar2 | Summation - Mr. Ingoglia | Page 2983 |
|---|---|---|

1      Well, it was widely known that Elan was going to be
2 presenting the full results on July 29th. What would people
3 think outside the firm if they saw SAC unloading a massive
4 position of Elan in the days leading up to the conference?
5 Might that have caused some people to ask questions that they
6 didn't want asked? How about the completely unprecedented
7 secrecy within the firm itself? The trader for Martoma doesn't
8 know they are doing it. The research analyst for Martoma
9 doesn't know they are doing it. They each come to work the day
10 after ICAD thinking they are going to be fired because, as
11 Mr. Jandovitz told you, Steve Cohen doesn't like to lose money.
12      So hardly anyone within the firm knows. What's the
13 explanation for that? And don't tell me it's competition among
14 portfolio managers. Competition among portfolio managers
15 didn't just emerge this week. Right? That's something that
16 was not uncommon at SAC. So why just this one trade done so
17 secretly? Doesn't it seem that the select few who knew about
18 it really didn't want to have to answer any questions about the
19 reasons for the sudden change?
20      In fact, Mathew Martoma himself showed a curious
21 reluctance to explain why he had suddenly reversed his position
22 on Elan and Wyeth. Remember, Tim Jandovitz and Kate Lyndon
23 separately asked Martoma later, after the fact -- the secret
24 trading is all done and revealed -- they asked him, why did you
25 change your mind? Why did you do a 180-degree turn and abandon

| E23dmar2 | Summation - Mr. Ingoglia | Page 2984 |
|---|---|---|

1 that position that you championed for more than a year and a
2 half?
3      Well, Mathew Martoma didn't give any explanation of
4 the sort you heard from Mr. Strassberg in his opening. Mathew
5 Martoma didn't say, oh, you know, turbulent market conditions;
6 I decided to sell. He didn't say I read that bad analyst
7 report you sent me. Martoma just said, I looked over my notes.
8      So think about that. If Mr. Martoma had decided to
9 change his mind for some of the reasonable sounding
10 explanations that Mr. Strassberg has offered after the fact,
11 wouldn't it have been perfectly natural for Mr. Martoma to
12 mention such a reason to Ms. Lyndon or to Mr. Jandovitz, when
13 they asked him. There's no secret anymore. The sales were
14 done. The positions were transferred back to Mr. Martoma's
15 account and the other accounts in which they were made. So if
16 one of those reasonable sounding explanations you heard from
17 Mr. Strassberg really was the reason Mr. Martoma decided to
18 suddenly change his mind, and it wasn't that he just had spoken
19 to Dr. Gilman who had the secret results, why wouldn't he have
20 just said so? Wouldn't that have been the natural thing for
21 him to do if he didn't have something to hide?
22      What you saw during this case, ladies and gentlemen,
23 what the evidence showed, was insider trading, pure and simple.
24 Martoma and SAC benefited from secret information that other
25 investors had no access to and that Martoma never should have

| E23dmar2 | Summation - Mr. Ingoglia | Page 2985 |
|---|---|---|

1 had or saw in the first place. It's called insider trading.
2 It's a serious crime.
3      In a little while, in a very little while,
4 Mr. Strassberg is going to get a chance to talk with you. And
5 I expect it will be the kind of well-prepared, eloquent
6 presentation that you have heard from the defense throughout
7 this trial. So just like you have been paying attention
8 throughout this trial and to what the government said this
9 morning, pay close attention to the arguments you hear and
10 whether they match up with the facts that you have seen and as
11 you know them to have taken place. And think about whether
12 those arguments go to the heart of the case or are simply
13 distractions. Look at the evidence carefully, and weigh those
14 arguments in light of what you know happened here.
15      I want to address very briefly just two of the
16 arguments you might hear before I finish, and one has to do
17 with Tysabri.
18      So you heard some information about a different Elan
19 drug called Tysabri, and at some point there were serious side
20 effects related to Tysabri and it was called PML and it was a
21 very serious side effect. This Tysabri issue is a distraction.
22 The issue with Tysabri happened after the stock drop on
23 July 29th, after the public announcement about bapineuzumab.
24 So I want to quickly look at the evidence now so you are not
25 confused by any arguments about this.

| E23dmar2 | Summation - Mr. Ingoglia | Page 2986 |
|---|---|---|

1      So the ICAD presentation about bapineuzumab is
2 July 29, 2008. By the end of the 30th, the price of Elan has
3 tanked and dropped 42 percent. And, remember, it started
4 falling in the late afternoon the day before, while Dr. Gilman
5 was talking.
6      So Elan makes an announcement about a problem with
7 Tysabri later, on July 31st. And here's the announcement, it's
8 Government Exhibit 99. After the Elan announcement about
9 Tysabri and the problems that they had with Tysabri -- this is
10 after Elan's price, stock price falls again. And if you look
11 at Government Exhibit 1270, you can see, this is an expanded
12 chart, similar to the one you saw before, and you can see the
13 first big drop. That's the one right after the ICAD
14 presentation on the 29th, and then there is relatively no news
15 the next day and so it's mostly flat. And then on the 31st
16 there's the announcement about Tysabri and it drops again.
17      All right? So that first circle, that's where it ends
18 up after the bapi bad news, and the second circle, that's where
19 it ends up after the Tysabri news. So what does that tell you
20 about this whole Tysabri argument? It's a mirage. It's a
21 smokescreen. It is an after-the-fact excuse. It doesn't stand
22 up to scrutiny.
23      By the way, this bad news about Tysabri is actually an
24 example of the kind of bad news Mat Martoma was worried about
25 concerning bapineuzumab. That's why he was talking to

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                    **February 3, 2014**

| E23dmar2 | Summation - Mr. Ingoglia | Page 2987 |
|---|---|---|

1 Dr. Gilman. It is this kind of unexpected bad news that causes
2 the stock price to drop. That's what he was worried about.
3 That's why he wanted to talk to Dr. Gilman about what was
4 happening in those Safety Monitoring Committee meetings.
5     All right. Enough of Tysabri. You also heard during
6 the course of the trial a suggestion from the defense that
7 certain medical professionals viewed the data and the results
8 of the Phase II drug trial as positive, and that at least one
9 medical professional hired by the defense to testify for
10 Mr. Martoma believed that there were no meaningful differences
11 between the four-page press release and the 27-page ICAD
12 PowerPoint presentation. So this is an argument you should
13 speedily and resoundingly reject.
14     Judge Gardephe is going to instruct you on the law,
15 and let me say it's what Judge Gardephe says on the law that
16 governs, not what any of the lawyers say. But what I expect he
17 will say is that information is material if a reasonable
18 investor would have considered it significant in making a
19 decision about buying or selling stock.
20     And if you saw -- and you saw, you did see in this
21 trial that investors and doctors considered that question very
22 differently, looked at the data very differently. How do you
23 know that investors looked at data differently than doctors and
24 viewed the ICAD data much more negatively than doctors did?
25 First, you had the after-market trading, right? That speaks

| E23dmar2 | Summation - Mr. Ingoglia | Page 2988 |
|---|---|---|

1 very clearly. The stock drops like a rock right when the
2 presentation is being made. I expect the Judge will instruct
3 you that among the things you can consider is any movement in
4 the stock price of Elan and Wyeth's stock after the ICAD
5 presentation in determining whether the information presented
6 at ICAD on the 29th was material to investors. And the
7 after-market trading is shouting to you on that point.
8     The investors -- what did the investors think of that
9 detailed data? They hated it. They hated it like the plague,
10 and they wanted to get rid of their Elan stock as soon as they
11 could once they heard it.
12     The next day trading shows the same thing. And,
13 remember, the stock price of Elan and Wyeth after the June
14 press release, it went up. So the stock price went up after
15 the June press release, but after the full data is presented on
16 July 29th it tanks. So what does that tell you? It tells you
17 that investors thought the information in the press release was
18 very different than the information presented at ICAD.
19     How else do you know what investors thought about the
20 detailed data that was presented at ICAD? Well, you've heard
21 one witness who worked as an analyst for a hedge fund
22 researching stocks and making suggestions to his own hedge
23 fund, including about Elan. You recall Mr. Shen, the defense
24 witness. You may recall, he sort of slouched in his chair
25 answering questions about the notes he took when he used to

| E23dmar2 | Summation - Mr. Ingoglia | Page 2989 |
|---|---|---|

1 work for Tokum Capital. And he attended the ICAD presentation,
2 and the next day he sent an email to an e-mail distribution
3 group at Tokum called Trading, and he described the detailed
4 data in his own words, "Data is a disaster." And that was his
5 take. And he testified further about it.
6     He said the data was much worse than he expected. It
7 was as bad as it could have been, to the point where he was
8 shocked. He pointed out particular issues: No dose response.
9 Most striking was that the placebo group in noncarriers was
10 particularly low. Some of the issues you heard about during
11 the course of the trial. He said it almost appeared that the
12 data was random data.
13     How else do you know that investors viewed the data in
14 the press release and the data from the ICAD presentation
15 differently? From the analyst reports that you saw. You
16 recall that during the defense case, the defense read portions
17 of certain selected analyst reports. And some of the analyst
18 reports were good and some of the analyst reports were bad, but
19 let's look at some of those reports that show that investors
20 wanted to receive the details of the data that they did not see
21 in the press release.
22     And just to pick one, Defense Exhibit 9, looking at
23 page 8. "We have only preliminary Top-line data at this
24 point" -- this is before July 29th. "We note the complete
25 absence of any numerical data in Elan's Phase II press release.

| E23dmar2 | Summation - Mr. Ingoglia | Page 2990 |
|---|---|---|

1 The press release lacks P value, treatment deltas, and anything
2 else that would allow an investor to understand if favorable
3 risk/benefit really exists."
4     That's what analysts were saying at the time. They're
5 saying I didn't get enough information from the press release.
6 I need to see more to assess the risk. Investors noticed the
7 lack of data in the press release. Some were optimistic, some
8 were pessimistic, but they all wanted to see the detailed data.
9 I won't read the others right here. If you want to look at it
10 yourself, page 1 of Defense Exhibit 1144A has got the same kind
11 of thing. And a positive report, like Government Exhibit 1372,
12 similarly notices there no P value. There is no treatment
13 effect size. We need more data.
14     The bottom line is whatever doctors thought, investors
15 did not see the press release and the ICAD presentation as
16 being remotely similar. And if you didn't have all these
17 reasons that we just talked about, you know that already from
18 your common sense. And I'll give you an example.
19     If you were a student and you were told you passed
20 your exam but the grades are going to be posted next month,
21 that would be encouraging news. But you'd still want to know
22 what the grade was. You'd still want to know whether it was an
23 A or a D. And depending on what that was, when you heard it
24 later, you might end up being disappointed.
25     Let me just say a few words about the cooperating

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                                February 3, 2014

| E23Qmar3 | Summation - Mr. Strassberg | Page 3027 |
|---|---|---|

1 stock being bought, not just randomly, but connected to the SMC
2 meetings?  You're not because it's not true.  You don't see
3 purchases because what they were discussing, what Dr. Gilman
4 was discussing was what was public and allowed to be discussed.
5 Gosh, we're going to talk about it.  You know, it's coming.
6 Vasogenic edema.  We spent a lot of time with it, but we're
7 going to talk about that again.  It was OK to discuss.  It was
8 public.  It was not material, non-public information.
9        So what else is undisputed?  It's undisputed that
10 Mathew worked under Matt Grossman, that portfolio manager who
11 ran CR Intrinsic until he left at the end of '07.  And that he
12 only became a portfolio manager in charge of his own account,
13 that GEHC, account at the start of 2008.
14        Now, this is going to get interesting here, I think.
15 What we are going to see is that all the evidence that we have
16 all sat through that the prosecution put into this trial about
17 the other accounts -- the COHE account, the SELC account, the
18 GGEN account, the FSAC account, the FSAB account, FSAE account,
19 the FINT account, it goes on.  Right?  all that evidence about
20 how the stock was sold in the firm accounts, all of that is
21 irrelevant to Mathew.  It's only about Mr. Cohen.  But
22 Mr. Cohen is not here.  Mr. Cohen is not on trial.  Steven
23 Cohen is not even alleged to be a co-conspirator; not alleged
24 to be part of the case at all by the prosecutors.
25        And the facts were undisputed that Cohen was the boss.

| E23Qmar3 | Summation - Mr. Strassberg | Page 3028 |
|---|---|---|

1 He was the boss; he ran the show.  He controlled what happened
2 at the firm, but, more specifically, he controlled what
3 happened in the firm accounts.  Everyone who testified, every
4 one of the SAC witnesses told you the same thing.  And it's
5 undisputed that Cohen wanted to make sure the trades got the
6 best price and that SAC was not hurt by slippage.  Do you
7 recall slippage?  All the trading witnesses talked about it.
8 It's when people hear you are selling a big position over a
9 number of days, and they try to sell in front of you before you
10 could finish, and that drives the price down and makes you lose
11 money or not make as much money.
12        But we know a few additional things about Mr. Cohen,
13 and these are not in dispute either:  That he surrounded
14 himself with very bright analysts including a whole bunch of
15 healthcare analysts; and that he solicited advice from all of
16 them; that on Wyeth he even had a special contract with Wayne
17 Holman, that healthcare specialist, to get Holman's advice
18 about where to invest and when to invest and when to sell Wyeth
19 securities.  And he had people like his healthcare trading
20 specialist, Mr. Bocklage, told you, that this was a guy named
21 Edmund Debler telling him he should sell Elan stock right
22 before ICAD -- you are going to see this in Defense Exhibit
23 1424 -- thinking there is going to be a selloff after ICAD.
24        Let's take a moment and talk about what I think is
25 interesting about the testimony that some of the Elan and Wyeth

| E23Qmar3 | Summation - Mr. Strassberg | Page 3029 |
|---|---|---|

1 sales were done through some of the firm accounts.
2 Mr. Ingoglia highlighted this a couple times in the closing.
3 Remember, the idea that only 15 or so people had visibility
4 into what happened?  Not including compliance and all the back
5 office people, but much smaller than was normal, right?  And
6 the prosecution wants you to think, hey, that means something
7 fishy is going on with Mathew; that he would know something
8 fishy is up about these trades.  But, again, the proof is
9 undisputed that Mr. Cohen is the one who decided how the
10 trading was going to be done in the firm accounts, right?  It
11 was Mr. Villhauer, one of the main traders, that was his
12 testimony.  Then it was Mr. Miller, the other trader, who did
13 the Wyeth, and you'll see some of this on the screen.  Then it
14 was Mr. Cohen's instant messages with the traders,
15 Mr. Villhauer, Mr. Schiff, another trader.  Again, these are
16 all Mr. Cohen's personal traders, the ones that work for him,
17 and they're the ones that do all the trading in the firm
18 accounts.
19        But here is what we haven't reviewed in really detail
20 before, although we've touched on it, but we haven't reviewed
21 it in detail until now.  That's what happened in the GEHC
22 account that Mathew controlled.  Because when you look at that,
23 you're going to see that the trades were done openly, visibly,
24 just in the routine course of business.  No attempt to hide it.
25 No hiding it from anybody.  Mathew is not Steven Cohen.  Steven

| E23Qmar3 | Summation - Mr. Strassberg | Page 3030 |
|---|---|---|

1 Cohen is not here.  What did Mathew do?  He just did the
2 trades.  Just as he would have done any other trades.  Let's
3 look at the trading positions.
4        Before ICAD, Mathew had sold more than half of his
5 Elan position, a million shares.  He starts out with one
6 million 730 some odd, and on the 28th he sells a million openly
7 in the GEHC account.  It's Government Exhibit 560.  That's the
8 position run, and then 564 shows you the trades.  Just done
9 right out there in the open.  Nothing hidden about it.  And
10 when you look at Wyeth, we see the same thing.  He sold
11 1,050,000 shares, every share of stock he had in Wyeth, he sold
12 openly through the GEHC account.  Nothing about firm accounts,
13 nothing about limited visibility; completely open and routine.
14 If you add those numbers up, people that can do math quickly,
15 you'll see it comes to exactly 1,050,000 shares.
16        Now, Mr. Jandovitz, Mathew's trader, he didn't recall
17 all of these sales.  He said he might have done them, but he
18 didn't remember, but he does thousands of sales all the time.
19 And the records show you, the trading records show you, that he
20 did it as well as other traders executing these sales.  And
21 there were other documents that showed this too.  This is
22 Defense Exhibit 378 where you see a particular day where a
23 bunch of Wyeth and Elan are being sold, openly in the GEHC
24 account shared among risk people, among Katie Lyndon and the
25 like.

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                    February 3, 2014

| E23Qmar5 | Summation - Mr. Strassberg | Page 3099 |
| --- | --- | --- |

1    Remember, SAC's business model was to take and sell
2 large positions. The evidence has established this really,
3 again, is not in dispute. Recall the testimony of almost every
4 SAC witness; they were in the business of taking large
5 positions to sell large positions. We're going to put up some
6 of the testimony. This is Mr. Berkowitz. We have the same
7 from Mr. Bocklage. We have the same from Mr. Villhauer. You
8 also heard it was very common for them to trade around
9 catalysts, around events like the ICAD conference. That was
10 the nature of their business. They took large positions to
11 sell large positions. They didn't want to hold them forever.
12 It was all about getting out at the right time.
13    So, again, the fact that SAC sold a lot of Elan and
14 Wyeth stock around the time of the ICAD conference is not
15 unusual, it's not suspicious. It's how they did business.
16 It's not proof of insider trading. It's not proof of what
17 Gilman said.
18    So, number two, the U.S. was facing a global economic
19 crisis. Now, we've seen this through the evidence as well,
20 right? Bear Stearns had just gone out of business. Lehman
21 Brothers was about to follow. There were rumors right at the
22 time that Lehman Brothers might fold right then; that might
23 have precipitated the collapse right then in mid-July.
24 Remember, the general counsel of SAC, Mr. Nussbaum, he
25 testified it was a period of extreme anxiety July 2008; that it

| E23Qmar5 | Summation - Mr. Strassberg | Page 3100 |
| --- | --- | --- |

1 was unprecedented.
2    The prosecutor mentions, well, Bear Stearns failed in
3 March, maybe should have been concerned about this in March.
4 We're not saying you weren't concerned in March, but we will
5 get to the price movement, about how the price move only
6 happens in June and July. There are some other things that
7 only happen in June and July too, actually only in July, which
8 is this emergency SEC order; remember that? Unprecedented.
9 July 15th, the Securities and Exchange Commission, the
10 regulator of the securities market issues this emergency order.
11 It talks about panic selling. It talks about the prices of
12 securities may artificially and unnecessarily may decline well
13 below the price level that would have resulted from normal
14 price discovery. Pretty scary stuff here if you're an
15 investment professional if you have a large investment on the
16 line.
17    Recall what Mr. Nussbaum said. This order came out on
18 July 15, but he and the legal people at SAC, they worked
19 through it and they tried to understand what it meant for SAC.
20 Then, on the evening after the close of business on Friday, the
21 18th, they sent that memo explaining this order and what it
22 means and all of these dire consequences to the portfolio
23 managers, to Mathew. He would have gotten that. He would have
24 seen that issue of the SEC order and the concern about panic
25 and prices collapsing on the 18th of July. It doesn't take a

| E23Qmar5 | Summation - Mr. Strassberg | Page 3101 |
| --- | --- | --- |

1 lot to imagine that that could be a substantial reason you'd
2 think I'd better reduce the position I have. Let me get out.
3 Let me not take the risk that exactly what
4 happened, Lehman Brothers collapses and then the market falls.
5 Remember, Mr. Nussbaum says there's a rumor right at this time,
6 and it's why the SEC put the order out; that SAC is no longer
7 going to do business with Lehman and Lehman might fail. All
8 happening right at this time.
9    You know, at the same time though, in addition to the
10 SEC, Mr. Cohen is sending around emails to his portfolio
11 managers noting how volatile and risky the market is and how he
12 believed the markets were likely to go down farther. You see
13 this again on an email in July 15. And you can see him
14 forwarding -- Mat forwards this to his -- a different email, he
15 forwards this to his trader Jandovitz and talks about Steven
16 Cohen's concerns about the market this time in July. We can
17 see, if you remember, some emails from Mr. Jandovitz, the
18 trader, who would provide advice to Mathew about the market
19 again suggesting that the market was in turmoil then,
20 referencing Bear Stearns, one more shoe to drop. The market
21 may go lower.
22    Take a look at Government Exhibit 504, a big puke is
23 coming. This is a crash bet. Stocks are down. All of this
24 happening in the days leading up to the beginning of the sales.
25 All of it proof to support independent reasons for why you

| E23Qmar5 | Summation - Mr. Strassberg | Page 3102 |
| --- | --- | --- |

1 would sell the stock. Email from Ben Dunn, the risk guy, again
2 advising about the risk. A tough environment. Institutions
3 most likely going to cash, now, meaning they're going to take
4 their stock positions, sell them and hold the money in cash.
5    But let's go to a point that we've alluded to a couple
6 times already because it's a crucial point here as to what
7 happens in July. And that's that Elan stock had increased in
8 price. We've talked to you and you've seen now how the
9 evidence is in the record that the market for Elan stock was
10 overheated.
11    As Professor Gompers testified, many analysts at the
12 time were writing reports saying they believed the stock price
13 of Elan was too high regardless of what happened at ICAD. He
14 reviewed two reports with you: 9-A and 20-A. You can see this
15 9-A is from July 11. 20-A is from later in July. They talk
16 about these exact things. Professor Gompers explained the
17 report showed you the market was already valuing Elan as if
18 bapineuzumab was a blockbuster drug like the drug Lipitor, just
19 below the drug Lipitor, the best-selling drug in the whole
20 world. And that suggested that really there was only one way
21 for Elan stock price to go, and that's down. That's because
22 the market is overheated. The expectations are too high. That
23 has nothing to do with material, non-public information.
24    The evidence confirmed that that's what Mat believed
25 too. Because, remember, his analyst Katie Lyndon's email from

JA260

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                                          February 3, 2014

| E23Qmar5 | Summation - Mr. Strassberg | Page 3103 |
|---|---|---|

1 July 30? The expectations are really high to the point where
2 they were pretty impossible to meet. And Mathew responds to
3 that and says, yes, yup, he agrees. Mr. McLeod, jumped ahead
4 and showing you the slide where the S&P is declining. Yes,
5 there are little bumps up. The government focuses on that last
6 day when it goes up, but look at the trend throughout this time
7 period, it goes down and continues to go down. Again, let's
8 look at that slide we saw on opening about what's happening to
9 the price.
10      Do you remember this? The price is below 15. Then
11 they announce we'll go to Phase III if the Phase II results are
12 spectacular. So the price moves up. It's in the low 20s and
13 it like stays around that area 25 maybe to June 17. Then after
14 those top-line results here comes the hype, here comes the
15 overheating, 36 percent going up. It peaks on July 10.
16 July 10. Now, it starts to come back down. What does that
17 suggest to someone who's worried about the market, who's
18 worried about the SEC order, who's worried about all of these
19 potential risks? That it's time to get out now.
20      Recall Katie Lyndon's testimony, his research analyst,
21 when she was being examined by the prosecutor, she explained
22 that Mathew had told her in the spring at this time, right,
23 that he was thinking about selling the position just before
24 ICAD if the price increased enough in order to limit the risk.
25 Right? He liked the position. He liked bapineuzumab, yes.

| E23Qmar5 | Summation - Mr. Strassberg | Page 3104 |
|---|---|---|

1 And he especially liked it when it was down at 20 or down at
2 15, but it had just soared up, soared up almost to $40, just
3 below that. And now it was already starting to come down.
4 That would be the time to sell. That testimony right there
5 establishes reasonable doubt.
6      So, let's go through our other points quickly.
7 Outside analysts were advising investors to sell. It's true,
8 there were a lot of analysts' reports. We've seen a lot of
9 them saying sell,, sell all in this late June, early July
10 period. There were some analysts who thought the opposite;
11 thought you should buy. But what did Professor Gompers tell
12 us, remember? He reviewed all of these analyst reports, and
13 the typical cases, you'd have about two-thirds saying buy and
14 about one saying sell on any stock that people were covering,
15 but here it was the opposite. Two-thirds were saying sell at
16 this time. Sell. The stock is too hot. It's too overheated.
17 Again, makes sense you would sell. And SAC healthcare
18 specialists were recommending that Mr. Cohen sell.
19      Again, we saw this briefly earlier. If we can get to
20 that, Mr. McLeod. You can just take your time and look at
21 analyst reports that are up on the screen. These are all
22 instances they're saying sell. Talked about some of them in
23 opening. We looked at them together through the presentation.
24 July, sell. OK.
25      Now, let's go to our next bullet point, Mr. McLeod,

| E23Qmar5 | Summation - Mr. Strassberg | Page 3105 |
|---|---|---|

1 which is that healthcare specialists were recommending that
2 Mr. Cohen sell. We saw this briefly earlier in our testimony,
3 so we don't have to spend too much time on it, but if you could
4 put up DX-1424, you will see the counterpart to Bocklage,
5 Mr. Debler was saying, sell, I think the price is going to come
6 down after of ICAD regardless of the results. Sell. We also
7 heard about Munno and Slate, these other healthcare
8 specialists, and they were saying very vocally to Mr. Cohen,
9 sell. Don't be in that Elan position.
10      If we turn to our next point, number six, the
11 scientists were publicly questioning the science behind
12 bapineuzumab. Do you remember that there was that Lancet
13 article, the question that came out July 17 right at this time
14 frame? Dr. Gilman even talked to you about how interesting
15 this article was and how it was the subject of discussion with
16 all of his clients. He said how he talked about it with
17 Mr. Martoma, with Mathew. Later, he says "I'm not sure I
18 talked about that one as opposed to another one." But you can
19 see as he talked about it, this was a key article that people
20 were talking about because it suggested that maybe that
21 beta-amyloid theory was not going to work to help actually be a
22 cure for Alzheimer's. It also referred to that other drug,
23 that Flurizan drug, and you'll see documents in evidence that
24 showed Flurizan trial had just failed, and that was a trial
25 again based on the beta-amyloid theory. So right at this time

| E23Qmar5 | Summation - Mr. Strassberg | Page 3106 |
|---|---|---|

1 we're seeing drugs based on this science not working, another
2 reason to sell. Elan's other drug was in jeopardy. That's
3 number seven.
4      Now, the prosecutor in their closing say, well, that
5 risk of PML didn't come out until the 31st. That's right, we
6 put that evidence in before you, if you remember. We put in
7 the document that showed it came out on the 31st, the Biogen
8 public announcement. That's not the point. The point is that
9 the rumors existed at the time that it was likely to happen.
10 And these rumors were reflected in analyst's report after
11 analyst's report saying that, hey, we think there are a likely
12 unconfirmed cases of PML. You will see it here in the Summer
13 Street research report. They are in a number of research
14 reports that were out there at the time. PML keeps us
15 cautious. We have found two cases of PML and seven cases of
16 death of patients who are on Tysabri. Again, speculation has
17 been swirling. We all know what happened. In fact, the
18 government showed you the chart. When the PML was confirmed,
19 the price dropped. The point is that you knew this might be a
20 danger and you knew it then at this time another reason to
21 sell.
22      So, the final point, a sale would lock in profits,
23 right? When the rest of the market was in all this turmoil,
24 why take the risk of holding on to that position? When you
25 know a sale is going to lock in your profits, it's going to

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                    February 3, 2014

| E23Qmar5 | Summation - Mr. Strassberg | Page 3107 |
|---|---|---|

1 protect you as a young portfolio manager with three small kids,
2 it's going to ensure that you're having a good year, why would
3 you take that risk? All of these reasons are all independent
4 of anything having to do with inside information. They all
5 point together to a perfect storm of reasons why you would
6 sell. It makes sense.
7        Now, when the Judge gives you his charge, he will
8 describe for you the burden of proof beyond a reasonable doubt
9 that the prosecution must satisfy, and, of course, his words
10 and his charge govern on everything that is the law as always.
11 We talked about it a little bit in our opening. I've been
12 talking about it throughout the closing. The burden of proof
13 beyond a reasonable doubt is the highest standard imposed by
14 law. As to each and every one of the charges the prosecution
15 must prove each element beyond a reasonable doubt. The highest
16 burden exists to ensure that a conviction is not based on
17 coincidence or speculation or guesswork or a rush to judgment.
18 With the consequences so grave, the law demands that the
19 prosecution put in proof to satisfy you beyond a reasonable
20 doubt.
21        When you think of suspicions as being down here, and
22 then this preponderance standard to think for venue, you know,
23 kind of more likely than not; but beyond a reasonable doubt is
24 up here. Now, it's not no doubt; that would be up there
25 somewhere. And the law doesn't require no doubt, but no doubt

| E23Qmar5 | Summation - Mr. Strassberg | Page 3108 |
|---|---|---|

1 means that you saw it yourself. How else would you have no
2 doubt, right? The law requires beyond a reasonable doubt.
3        Now, so what is beyond a reasonable doubt? Judge
4 Gardephe will define it for you. And, of course, as I
5 mentioned before, his instruction will govern, but I believe he
6 will explain it to you that simply it is a doubt founded in
7 reason, as opposed to a doubt based on speculation, emotion,
8 sympathy or prejudice.
9        Every one of the inconsistencies that we have now
10 discussed with you in our closing from Dr. Gilman gives you a
11 reasonable doubt. All you need is one. All you need is one
12 and your duty under your oath as jurors says you must acquit.
13 You must find the prosecution has not met its burden. Here you
14 have dozens and dozens. Here, everywhere you turn, you have
15 another one. I submit to you, you cannot find that this
16 standard has been met by the prosecution in this case. There
17 is no way we have proof beyond a reasonable doubt.
18        So, listen, I know you've heard quite a bit of
19 argument from me. The prosecution gets to go again at the end,
20 and I appreciate your attention throughout, and I'm coming to
21 the end now.
22        I know that we -- Mr. Braceras and I -- have tried to
23 do our best in presenting Mr. Martoma's defense to you.
24 Listen, I like to believe that we are good lawyers. And I know
25 that we work hard, as hard as we can to do our best to make

| E23Qmar5 | Summation - Mr. Strassberg | Page 3109 |
|---|---|---|

1 sure you see the full context of the evidence. Listen, nothing
2 less would be fair to Mathew and nothing less would be fair to
3 you because so much is at stake. Mathew's life is on the line.
4 The outcome of a conviction in terms of punishment is not for
5 you. It's for the judge, but we all know that a conviction of
6 a federal offense of insider trading is deadly, deadly serious.
7 And we submit that no one, least of all Mathew, should be
8 convicted based on the evidence that we have seen presented to
9 you in this courtroom, based on the evolving memory, the
10 inconsistent memory of Dr. Gilman. The prosecution has asked
11 you to do just that. But I ask you to stand up and to do
12 justice. I ask you to tell them no, not in this courtroom, not
13 while you are the jurors.
14        Now, I have been with Mathew helping to defend against
15 these unfair charges for the last year, and the responsibility
16 that I have is great because his life has been in my hand. But
17 when I'm done speaking, I'm going to put his life in your
18 hands. You are jurors who are charged with making sure the
19 system works, who are charged with making sure the prosecution
20 proves the case beyond a reasonable doubt; that the prosecution
21 carries its burden, that highest burden we have before anyone,
22 anyone is convicted of a crime. You are all selected by us
23 because we believe in you, in your ability to do that, to do
24 what is so vital, to hold the government to its burden of
25 proof.

| E23Qmar5 | Summation - Mr. Strassberg | Page 3110 |
|---|---|---|

1        The prosecution gets to speak to you because they have
2 that burden of proof again. I don't. But I ask you to
3 remember what I said and what I might say in response to the
4 arguments that they are going to make to you. Keep in mind the
5 inconsistencies that we have seen at the beginning, the end
6 and the middle about everything that matters relating to
7 Dr. Gilman's testimony. Keep in mind how his evolving memory
8 means you can't have confidence. You can't have proof beyond a
9 reasonable doubt found here. And nothing in the evidence,
10 aside from his uncorroborated testimony, sheds any light on
11 what was said on the 17th or the 19th. Ask yourself, aren't
12 they just asking you to speculate? And, please remember,
13 speculation is not allowed under your oaths as jurors.
14        And please, please, keep this in mind: Dr. Gilman
15 admits his memory is evolving. He just came up with the story
16 about reviewing the slides with Mathew two weeks before he
17 testified. If two weeks from now he comes up and his memory
18 evolves again in a different way, and he says, oh, I reviewed
19 the slides -- maybe he says this, I reviewed the slides on
20 July 30 in that meeting I had with Mathew on the GLG log after
21 ICAD, after anything mattered. If he says that because his
22 memory evolves to that, and you convict today, then you will
23 have committed an injustice. Mathew's life, his family's hopes
24 will be forever altered. I submit that you cannot do that and
25 be consistent with your oaths as jurors.

JA262

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                        February 3, 2014

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3131 |
| --- | --- | --- |

1 moment, Mr. Hattendorf? Just zoom in on the top.
2      You know from the other evidence the pattern. When
3 Dr. Gilman gets materials, he talks to Mathew Martoma and
4 shares them. So the other evidence shows you what happens
5 there.
6      Let's now go to the July 19th meeting. Well, you know
7 that meeting occurred, ladies and gentlemen, from all of the
8 other evidence. Dr. Gilman makes an entry in his calendar
9 saying Mat Martoma will have an appointment with him in his
10 office on July 19th. And he makes that appointment while he is
11 on the phone or hanging up the phone with Mr. Martoma on
12 July 17th.
13      And then the same day, July 17th, Mathew Martoma books
14 last-minute, round-trip tickets to Detroit, which I'm sure is a
15 lovely place, but it is still a last-minute, round-trip ticket
16 on July 19, 2008, leaving him little more than four hours
17 before he would have to get back to the airport. And you've
18 seen the card entry records and you've seen the taxi records.
19      And by the way, one thing Mr. Strassberg said is just
20 wrong. He said, well, the card access records don't prove
21 anything because it doesn't show Dr. Gilman leaving the front
22 door to let Mathew Martoma in. Dr. Gilman's testimony was
23 simply that he let Mathew Martoma in, and you don't need a card
24 swipe to go out of the building. So everything there matches
25 that Mathew Martoma flew to Detroit, flew to Ann Arbor to see

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3132 |
| --- | --- | --- |

1 Dr. Gilman in his office.
2      Think about it this way. If Dr. Gilman had not taken
3 the stand, had not testified, and all you had was a couple of
4 people making an appointment for a meeting, puts it in the
5 calendar, the other persons buys last-minute plane tickets that
6 day, flies out there, you would conclude that the meeting
7 occurred. Dr. Gilman, yes, his memory is limited, but you are
8 not relying on that alone. I submit that he's only telling you
9 what you can already tell from the existing evidence.
10      Now, Mr. Strassberg says none of this is hard
11 evidence, and he refers to recorded calls and wiretaps and
12 things of that nature. Well, listen to Judge Gardephe's
13 instructions on hard evidence. You will be waiting a while
14 because there won't be any instruction on hard evidence. There
15 is no such thing as hard evidence or soft evidence. There is
16 direct and circumstantial evidence, which Judge Gardephe will
17 explain. And I expect he is going to say essentially that the
18 law makes no distinction between direct and circumstantial
19 evidence.
20      Ladies and gentlemen, Mr. Martoma, through all of this
21 circumstantial evidence, has been caught with his hand deep
22 inside the cookie jar, and defense counsel wants you to think
23 that maybe he was just putting the cookie back. No, he was
24 doing what the circumstantial evidence strongly suggested he
25 was doing.

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3133 |
| --- | --- | --- |

1      Very quickly on Dr. Ross. Defense counsel said a lot
2 of things about Dr. Ross, but one thing he didn't address is
3 this. The evidence is clear that Mathew Martoma and Dr. Ross
4 make an appointment to meet right when Dr. Ross learns that he
5 is going to go to an investigator's dinner and get the secret
6 information on July 28, 2008. And they make an appointment to
7 meet right after that.
8      And for all the stuff about Dr. Ross being some kind
9 of smooth operator, you know, jacking up his rate to $5,000 and
10 all of that stuff, again, does that make it more likely or less
11 likely to you that the very purpose of that meeting was exactly
12 as Dr. Ross testified, which was when he got out of that
13 meeting he was going to go tell Mathew Martoma what he had
14 learned about the secret data?
15      And the testimony from Dr. Ross, by the way, was not
16 just, as presented to you in the last summation, that Mathew
17 Martoma said some things that made clear to him the new
18 science. No. Dr. Ross' testimony was Mathew Martoma was
19 saying things about P values, statistical significance value,
20 stuff that was not in the press release. He was saying
21 detailed things that made it seem to Dr. Ross that he had been
22 in the room right there with them. So that, ladies and
23 gentlemen, is strong corroboration that Mathew Martoma had
24 gotten the secret information from Dr. Gilman.
25      Of course he's going to go see Dr. Ross, anyway. I

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3134 |
| --- | --- | --- |

1 mean, you are going to get additional reaction, and Dr. Ross
2 was there with a bunch of other investigators. But he doesn't
3 learn all that much from it, because Dr. Ross is not as
4 immersed in it as Mathew Martoma happens to be. Mathew
5 Martoma, it seems, was disappointed by them.
6      So I am going to move on from the cooperating
7 witnesses to the second topic, which is other things that the
8 defense has challenged in the government's case. And, again, I
9 am not going to go through everything. I am really going to
10 focus just on a couple of things.
11      Number one is you heard a lot of argument about how
12 the company Elan said at various points certain things about
13 vasogenic edema publicly, about how the dropout rate wasn't all
14 that significant ultimately, about how the data lock other
15 people talked about, too. All of that -- maybe we are in
16 agreement on this. But all of that is totally irrelevant.
17 Nobody is on trial here, nobody is on trial for getting an
18 additional detail about vasogenic edema that was one degree
19 beyond what the company had said publicly. There is no
20 relevance to the data lock as being an offense that Mr. Martoma
21 is charged with.
22      Now, why did we talk about those things you might then
23 say? Well, why we talked about them, why we brought out
24 evidence is because it showed the corrupt relationship. It
25 showed that Dr. Gilman and Dr. Ross were giving Mathew Martoma

UNITED STATES OF AMERICA v.
MATHEW MARTOMA                                                    February 3, 2014

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3135 |
|---|---|---|

1 whatever they had access to. And Mathew Martoma got some
2 benefit from that, especially the positive safety news, the
3 whole canary in the coal mine bit. But the real benefit was
4 that he got these doctors to a point where when they had
5 something really good, like the actual results, that's when he
6 could make the big money. So that's what that was about.
7        And when the Judge explains the charges, by the way,
8 the charges are selling Elan and Wyeth in July 2008, the sales
9 that occur when he is charged with getting the PowerPoint
10 presentation, and then there is a conspiracy charge for the
11 period leading up to that.
12        So the next argument, and I won't spend a lot of time
13 on this one, but the next argument is that the PowerPoint
14 presentation was not material, it was not materially different
15 than the press release that Elan had already issued. Ladies
16 and gentlemen, you can look at these two things; they are in
17 evidence. One of these documents has zero numbers; the other
18 has a lot of numbers. That's one thing that will tell you that
19 it was material.
20        Number two. You know how else it is material? The
21 evidence is strong, investors were dying to know the details,
22 including, including the same negative analysts that
23 Mr. Strassberg talks about in other contexts.
24        Could we go back to the slides? And I think we have
25 Government Exhibit 1373 on the slide. This is Caris, one of

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3136 |
|---|---|---|

1 the negative analyst firms. By the way, they are negative in
2 June as well. So I guess there was a big reason to sell in
3 June if you were a big follower of this analyst. But, yeah,
4 this is a very negative report.
5        But what does it say about the data? What does it say
6 about the data? It says, in the second bullet, "Full Phase II
7 data at ICAD may shed light on missing pieces."
8        Let's go to the next one. This is Canaccord, another
9 negative analyst report, a June 17th opinion. And they write,
10 in the highlighted part -- well, the title is, "Full Phase II
11 results still required," which I think suggests that they want
12 a little more than the press release, even if they are
13 negative. And it is highlighted: "We believe that full Phase
14 II results are still required to fully assess how efficacious
15 the product is in ApoE4 noncarrier" -- I am not going to keep
16 reading these words any more. But you see, they want to know
17 what the actual data is.
18        And just one more really quickly, Defense Exhibit 20A,
19 which is an email. This is one of these negative July 21, 2008
20 reports. And, again, this is questions that Cowan, this
21 negative analyst, wants to know about the data.
22        The bottom line, ladies and gentlemen, is none of
23 these stock market analysts, positive or negative, said you
24 might as well skip out on the Gilman presentation this year and
25 watch reruns at home, you've got it from the press release.

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3137 |
|---|---|---|

1 Everyone wanted to know what is in the actual data.
2        And what did they do? I'm not going to put up the
3 chart again; we have put it up several times. But what did
4 they do? As Dr. Gilman starts speaking, they start selling
5 this stuff off. They start selling it off quickly. By the
6 next day, Elan is 40 percent lower. There is no question that
7 investors both wanted to know what the data was and found it
8 very significant.
9        You know, there is something strange about defense
10 counsel's argument that Mathew Martoma wouldn't have
11 appreciated that himself. Because Mathew Martoma, the evidence
12 has shown, is one of the most sophisticated hedge fund
13 investors. He works at a very sophisticated place. He does a
14 lot of legitimate research as well. So the defense argument is
15 that when Mathew Martoma got the secret data from Dr. Gilman,
16 he wouldn't have realized what every other investor was going
17 to realize when they heard the data at the ICAD presentation.
18        He even said this in his opening, that Mathew Martoma,
19 if he got the information from Dr. Gilman, would have wanted to
20 buy more or hold. Of course not. Mr. Martoma, the evidence
21 has shown, is one of the most sophisticated people, and he
22 would have immediately seen the weaknesses in the data.
23        Oh, and by the way, we don't need to get into the
24 details about whether there were weaknesses in the data and how
25 big or not they were. This wasn't -- Dr. Gilman himself was,

| E23dmar6 | Rebuttal - Mr. Devlin-Brown | Page 3138 |
|---|---|---|

1 of course, very positive. But let me show you just Government
2 Exhibit 13, if we could, Mr. Hattendorf, and just blow up the
3 second paragraph there.
4        So I promise I'm not going to show you curves and
5 things like that. But the significance of this, ladies and
6 gentlemen, is this is something Dr. Gilman wrote at the time
7 before he is testifying, before he has any kind of
8 nonprosecution agreement. And what does he call the falloff
9 between the placebo group and the carrier group that we've
10 talked so much about, what does he call it? He says, it's
11 startlingly low. So there were weaknesses and the data could
12 have been better.
13        But I don't want to spend much time on the doctors
14 because the doctors are really not all that relevant.
15 Dr. Gilman testified in his hundreds of consults, hundreds of
16 consults, no investor had ever said to him so is this a buy or
17 a sell on the stock.
18        And, remember Katie Lyndon, who had, you know, 20 or
19 30 a week, I believe her testimony was. She looked perplexed
20 when I asked her the question, because it sounded like a very
21 dumb question, of, you know, in your calls with these experts,
22 how often do you ask for recommendations on buying and selling
23 stocks. And she looked at me like I had two heads because the
24 investors are the ones that make the decisions.
25        You know, the defendant's own Professor -- their

# Transcript Excerpts
# (February 4, 2014)
# (3191, 3220)

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 4, 2014

| E24dmar2 | Charge | Page 3189 |
|---|---|---|

1 not necessarily non-public simply because there has been no
2 formal announcement or because only a few people have been made
3 aware of it.
4     On the other hand, the confirmation by an insider of
5 unconfirmed facts or rumors -- even if reported in a newspaper
6 or analyst report -- may itself be inside information. A tip
7 from an insider that is more reliable and specific than
8 unconfirmed facts or public rumors is non-public information
9 despite the existence of such rumors in the media or investment
10 community.
11     The government must also prove, beyond a reasonable
12 doubt, that the information Dr. Gilman or Dr. Ross disclosed
13 was "material" at the time it was disclosed.
14     "Material" information is information that a
15 reasonable investor would have considered significant in
16 deciding whether to buy, sell, or hold securities, and at what
17 price to buy or sell securities. Put another way, there must
18 be a substantial likelihood that the information at issue would
19 have been viewed by the reasonable investor as having
20 significantly altered the total mix of information then
21 available. In determining whether the information Dr. Gilman
22 and Dr. Ross allegedly provided to Mr. Martoma prior to the
23 July 29, 2008 ICAD conference was material, you may consider --
24 among other things -- evidence of movement in the price of Elan
25 or Wyeth stock after the presentation of data concerning the

| E24dmar2 | Charge | Page 3190 |
|---|---|---|

1 Phase II bapineuzumab clinical trial was made at the ICAD
2 conference, and other evidence as to whether this information
3 was known to market participants or was substantially the same
4 as information previously announced.
5     You have heard testimony in this case about how
6 certain medical professionals -- including Dr. Gilman,
7 Dr. Ross, and Dr. Wisniewski -- viewed the data and results of
8 the Phase II clinical trial of bapineuzumab that were presented
9 at the ICAD conference. I want to caution you that in
10 determining whether the information Dr. Ross or Dr. Gilman
11 allegedly disclosed to Mr. Martoma was "material," you must
12 consider this issue from the perspective of a reasonable
13 investor -- not from the perspective of members of the medical
14 community.
15     Your consideration of the element of materiality must
16 be based on the facts existing at the time the trades alleged
17 by the government were made. Materiality cannot be judged by
18 hindsight.
19     You should also be aware that confidential information
20 is not necessarily the same as material, non-public
21 information. Information may be confidential that is neither
22 material nor non-public. Evidence that Dr. Gilman and Dr. Ross
23 violated confidentiality agreements does not alone establish
24 that they disclosed material, non-public information. The
25 government must prove beyond a reasonable doubt that Dr. Gilman

| E24dmar2 | Charge | Page 3191 |
|---|---|---|

1 and Dr. Ross disclosed material, non-public information -- not
2 simply confidential information.
3     If you find that Dr. Gilman or Dr. Ross disclosed
4 material, non-public information to Mr. Martoma, you must then
5 determine whether the government proved beyond a reasonable
6 doubt that Dr. Gilman or Dr. Ross received or anticipated
7 receiving some personal benefit, direct or indirect, from
8 disclosing the material, non-public information at issue.
9     The benefit may, but need not be, financial or
10 tangible in nature; it could include obtaining some future
11 advantage, developing or maintaining a business contact or a
12 friendship, or enhancing the tipper's reputation.
13     A finding as to benefit should be based on all the
14 objective facts and inferences presented in the case. You may
15 find that Dr. Gilman or Dr. Ross received a direct or indirect
16 personal benefit from providing inside information to
17 Mr. Martoma if you find that Dr. Gilman or Dr. Ross gave the
18 information to Mr. Martoma with the intention of benefiting
19 themselves in some manner, or with the intention of conferring
20 a benefit on Mr. Martoma, or as a gift with the goal of
21 maintaining or developing a personal friendship or a useful
22 networking contact.
23     The government must also prove beyond a reasonable
24 doubt that Mr. Martoma knew that the material non-public
25 information that was disclosed by Dr. Gilman and Dr. Ross was

| E24dmar2 | Charge | Page 3192 |
|---|---|---|

1 disclosed in breach of a duty of trust and confidence and in
2 change for a personal benefit. The mere receipt of material,
3 non-public information by Mr. Martoma, and even trading on that
4 information, is not sufficient; Mr. Martoma must have known
5 that Dr. Gilman or Dr. Ross disclosed the information in
6 violation of a duty of confidentiality and that it was
7 disclosed in exchange for a personal benefit.
8     In order to find that Mr. Martoma engaged in insider
9 trading, you must also find that he purchased or sold stock, or
10 caused the purchase or sale of stock, using material,
11 non-public information that had been disclosed by Dr. Gilman and
12 Dr. Ross. A person uses material, non-public information in
13 connection with a sale or purchase of a stock where that
14 information is a factor, however small, in his decision to
15 purchase or sell the stock, or cause the purchase or sale of
16 stock.
17     If you find that Mr. Martoma used material, non-public
18 information that he knew was disclosed by Dr. Gilman or
19 Dr. Ross in breach of a duty of trust and confidence, and in
20 exchange for a personal benefit, you must then determine
21 whether the device, scheme or artifice to defrayed was "in
22 connection with" the purchase or sale of the security specified
23 in the count you are considering. The "in connection with"
24 element is satisfied if you find there was some nexus or
25 relation between the allegedly fraudulent conduct and the

    **Southern District Court Reporters**     **(11) Pages 3189 - 3192**

**JA266**

UNITED STATES OF AMERICA v.
MATHEW MARTOMA

February 4, 2014

| E24dmar2 | Charge | Page 3217 |
|---|---|---|

1    (In open court)
2    THE COURT: Ladies and gentlemen, before you retire to
3  the jury room, I have the unpleasant task of excusing Alternate
4  Jurors No. 2, No. 3, No. 4, Mr. Linkmans, Mr. Lindsey,
5  Ms. Supplee. You have each been very attentive and very
6  patient and dedicated in your service, and I want you to
7  understand how much we all appreciate it. I am sorry that you
8  will miss the experience of deliberating with the jury, but the
9  law in this case provides for a jury of twelve.
10    I have one final instruction to the alternate jurors.
11  I must ask you to abide by the rules of conduct until the jury
12  reaches a verdict. That is because in the event that someone
13  on the jury cannot continue during deliberations, it may be
14  necessary for you to rejoin the jury. Accordingly, until the
15  jury reaches a verdict, you may not discuss the case with
16  anyone. You may not read anything in the newspapers, over the
17  Internet, or anywhere else about the case. You may not listen
18  to or watch any reporting about the case on TV or over the
19  radio. If you would like to be advised of the outcome of the
20  trial, please let us know and we will contact you as soon as
21  there is a verdict.
22    Before the rest of the jury retires into the jury
23  room, I must ask the alternate jurors -- Mr. Linkmans,
24  Mr. Lindsey, Ms. Supplee -- if you would please retrieve your
25  belongings that might have been left in the jury room. I also

| E24dmar2 | Charge | Page 3218 |
|---|---|---|

1  want to express my appreciation to each of you as you leave.
2  So I will shake your hand as you go out the door.
3    (Pause)
4    (The alternate jurors were excused)
5    THE COURT: Mr. Ruocco, would you please swear in the
6  marshal.
7    THE CLERK: Yes.
8    (The marshal was sworn)
9    THE COURT: Members of the jury, you may now retire
10  and begin your deliberations. Thank you very much.
11    THE CLERK: All rise.
12    (Time noted at 11:55 a.m., the jury began
13  deliberations)
14    (Jury not present)
15    THE COURT: Please be seated.
16    So the lawyers are free to remain in the courtroom or
17  elsewhere, as long as we can reach you. The jury will receive
18  its lunch at 12:30. So you can assume that from 12:30 to 1:30
19  you are free to get lunch.
20    Generally, I keep juries until 5 o'clock. If they
21  want to stay later, if they think that that would be
22  productive, I permit that. But absent a contrary request from
23  them, it would be my intention to excuse them at 5 o'clock.
24    Anything else we should discuss before we adjourn?
25    MR. DEVLIN-BROWN: Just as to the exhibits. Once we

| E24dmar2 | | Page 3219 |
|---|---|---|

1  have satisfied ourselves, should we provide them to your deputy
2  to bring back?
3    THE COURT: Yes. And I have the revised verdict sheet
4  with the changes that you asked for this morning, and I have
5  the redacted form of the Indictment I received from the
6  parties. So those two items will go back into the jury room
7  along with the exhibits as soon as you have given the binders
8  to Mr. Ruocco.
9    MR. DEVLIN-BROWN: Thank you, Judge.
10    THE CLERK: All rise.
11    (Adjourned awaiting jury verdict)
12    (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

| E24Qmar3 | | Page 3220 |
|---|---|---|

1    (At 3:50 p.m. a note was received from the jury)
2    (Jury not present)
3    THE COURT: I have received a note from the jury which
4  I am marking as Court Exhibit 1.
5    It reads as follows: For the Judge. Re: jury charge
6  page 27, element four. Does the term "a personal benefit"
7  include the consultation fee paid through GLG?
8    It's dated February 3, 2014. The time is listed as
9  3:50 p.m. It's signed by the foreperson.
10    So the page that is cited by the jury is part of the
11  summary that goes from pages 26 to 27 that lists the elements
12  that the government must prove to establish one of the
13  substantive offenses, and element number four, which is the one
14  they reference reads: That the government must prove beyond a
15  reasonable doubt "that Mr. Martoma knew that the information he
16  obtained had been disclosed in breach of a duty owed by
17  Dr. Gilman or Dr. Ross to Elan or Wyeth and in exchange for a
18  personal benefit to Dr. Gilman or Dr. Ross."
19    Does anyone wish me to read the question again or do
20  you have it?
21    MR. DEVLIN-BROWN: No.
22    THE COURT: I will obviously hear from the parties,
23  but my inclination would be to direct their attention to pages
24  30 to 31 where the jury instructions define the nature of the
25  benefit that the government must prove beyond a reasonable

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

　　　　　-against-

MATHEW MARTOMA,

　　　　　　　Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/6/14__

12 Cr. 973 (PGG)

**VERDICT FORM**

**COUNT ONE**

1. Conspiracy to commit securities fraud.

　　　　✓ Guilty

　　　　_____ Not Guilty

**COUNT TWO**

2. Securities fraud regarding Elan stock in July 2008.

　　　　✓ Guilty

　　　　_____ Not Guilty

**COUNT THREE**

3. Securities fraud regarding Wyeth stock in July 2008.

　　　　✓ Guilty

　　　　_____ Not Guilty

**Please sign and date the form and tell the Marshal that the jury has reached a verdict.**

Dated: February 6, 2014

　　　　　　　　　_____
　　　　　　　　　Signature of Foreperson

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2015, an electronic copy of the foregoing Joint Appendix was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement