

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 17, 2017

By CM/ECF

Catherine O'Hagan Wolfe, Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      Re:    United States v. Mathew Martoma
             Docket No. 14-3599
             Argued October 28, 2015, before Katzmann, Ch. J., Pooler, Chin, CJJ.

Dear Ms. Wolfe:

      The Government writes in response to appellant Mathew Martoma's January 6, 2017 letter ("Martoma Ltr."). Martoma concedes that a tipper can receive a personal benefit by gifting confidential information to a trading friend or relative, even if there is no pecuniary exchange. Martoma now argues, however, that the tipper and tippee must have a "meaningfully close personal relationship" for there to be such a gift. (Martoma Ltr. 1). This argument is foreclosed by *Salman* v. *United States*, 137 S. Ct. 420 (2016), and the cases that preceded it. But even if there were such a requirement, the result here is the same, as Gilman both received a pecuniary benefit and had a "meaningfully close personal relationship" with Martoma. This Court should deny Martoma's request to limit liability for insider trading in a way that is contrary to both the Supreme Court's holding in *Salman* and the enforcement of the securities laws.

I.     MARTOMA'S "MEAINGFULLY CLOSE PERSONAL RELATIONSHIP" LIMITATION IS INCONSISTENT WITH *SALMAN*

      In *United States* v. *Newman*, 773 F.3d 438, 452 (2d Cir. 2014), a panel of this Court held that, "[t]o the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades resemble trading by the insider himself followed by a gift of the profits to the recipient,'" "such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Id.* at 452 (quoting *Dirks* v. *SEC*, 463 U.S. 646, 664 (1983)). The Supreme Court abrogated this ruling in *Salman*, however, finding it "inconsistent with *Dirks*." 137 S. Ct. at 428. Martoma now claims that although *Salman* overruled *Newman*'s requirement of a pecuniary exchange, *Newman* nonetheless still prohibits a jury from inferring that a tipper is receiving a personal benefit by gifting information to a tippee unless the tipper has a "meaningfully close personal relationship" with the tippee.

As an initial matter, it is by no means obvious that the language on which Martoma relies was even meant to limit the types of friendships that can give rise to an inference of gifting, and thus receipt of a personal benefit, under *Dirks*. *Newman* does not say that the inference of gifting is permissible only where there is a "meaningfully close personal *friendship*." It instead uses the phrase "meaningfully close personal relationship" as a surrogate for *Dirks*' reference to "trading relative[s] or friend[s]," 463 U.S. 664.

Nonetheless, to the extent *Newman*'s language was intended to require more than mere friendship, such a rule would be inconsistent with the Supreme Court's reasoning in *Salman*. *Salman* plainly reaffirms the law on the nature of personal benefit as it existed before *Newman*. The Court did not undertake any analysis of the strength of the relationship between Maher and Michael Kara, the initial tipper and tippee in *Salman* (nor was the trial jury instructed on this point), and instead focused solely on the analogy to gift-giving in *Dirks*. In so doing, the Court held that "when a tipper gives inside information to 'a trading relative or friend,' the jury can infer that the tipper meant to provide the equivalent of a cash gift." *Id.* at 428. "In such situations, the tipper benefits personally because giving a gift of [] information is the same thing as trading by the tipper followed by a gift of the proceeds." *Id.* Notably, the Court did *not* say that "the jury can infer that the tipper meant to provide the equivalent of a cash gift" only in circumstances where the tipper has a "meaningfully close personal relationship" with the tippee.

This is critical. If the Supreme Court believed that an investigation into whether a friend or family relationship was "meaningfully close" was required, it would have engaged in that analysis when considering the familial relationship in *Salman*. After all, it is beyond dispute that some familial relationships are significantly "closer" than others. For example, a father and son who speak every day about personal matters are likely "closer" than second cousins who see each other once every few years at family reunions. By Martoma's own logic, there is no reason why gifting to a friend requires such an inquiry when gifting to a family member does not. And yet Martoma must concede that the Supreme Court did not analyze whether the relationship between tipper and tippee was "meaningfully close" in *Salman*. (Martoma Ltr. 6). That is because such an analysis is not required by *Dirks*, which created a bright line rule that tipping to a friend or family member is sufficient to establish personal benefit. *See* Donna M. Nagy, *Beyond* Dirks: *Gratuitous Tipping and Insider Trading*, 42 J. Corp. L. 1, 22 (2016) ("*Dirks* did not limit its 'gifting' theory to disclosures that were made only in the context of a "meaningfully close personal relationship.").

Limiting the inference of gift-giving to "meaningfully close personal relationships," moreover, would be inconsistent with *Dirks*' rationale. The point of the personal benefit requirement, as *Salman* held, is to separate disclosures of confidential information that occur for authorized, corporate purposes from those that occur for personal ones. Citing *Dirks*, the Court in *Salman* explained that "'insiders [are] forbidden' both 'from personally using undisclosed corporate information to their advantage' and from 'giv[ing] such information to an outsider for the same improper purpose of exploiting the information for their personal gain.'" *Id.* (quoting 463 U.S. at 659); *see also United States* v. *Whitman*, 904 F. Supp. 2d 363, 370-71 (S.D.N.Y. 2012) (noting that "the purpose of a prosecution premised, as here, on a *Dirks* approach is to protect shareholders against self-dealing by an insider who exploits for his own gain the duty of confidentiality he owes to his company and its shareholders.") (Rakoff, J.). The breach of the

duty to refrain from "personally using undisclosed corporate information" is what constitutes fraud and thus gives rise to liability for insider trading—and a breach of that duty occurs whether the insider trades for himself or tips information so that a friend can trade.

Indeed, Martoma makes no effort whatsoever to tie his test to any doctrinal rationale. Instead, he claims that liability for insider trading should be limited because it is otherwise too broad. (Martoma Ltr. 9). But the personal benefit concept was always meant to be broad. *See, e.g.*, *United States* v. *Jiau*, 734 F.3d 147, 153 (2d Cir. 2013); *SEC* v. *Obus*, 693 F.3d 276, 292 (2d Cir. 2012); *United States* v. *Evans*, 486 F.3d 315, 321 (7th Cir. 2007). And for good reason: insider-trading prohibitions have long been recognized as necessary to protect the integrity of U.S. capital markets. *See United States* v. *O'Hagan*, 521 U.S. 642, 658-59 (1997) (noting that "investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law"). Martoma's claim that this Court should legalize tipping some friends but not others would create a straightforward loophole in the enforcement of insider trading laws, and it would do so despite the fact that other elements of insider trading liability—like the requirement that a tip be in anticipation of trading by the tippee and that the insider act willfully, *see Salman*, 137 S. Ct. at 428—guard against overbroad enforcement. It is, in other words, a solution in search of a problem.[1]

At bottom, Martoma's additional limitation on *Dirks* would set this Court apart from every other Circuit. No other court has adopted the rule Martoma proposes, and several have disclaimed any significance to the strength of the relationship between the tipper and tippee. *See, e.g.*, *SEC* v. *Maio*, 51 F.3d 623, 632 (7th Cir. 1995) ("Absent some legitimate reason for [the insider's] disclosure . . . the inference that [the] disclosure was an improper gift of confidential corporate information is unassailable."). This Court should decline Martoma's invitation to again impose limitations on *Dirks* that are not present in that opinion and that are inconsistent with the effective enforcement of the securities laws.

## II. MARTOMA'S VAGUENESS ARGUMENT IS MERITLESS

Unable to find a basis in *Dirks* or *Salman* for his "meaningfully close personal relationship" standard, Martoma claims that its absence would make the "crime of insider trading unconstitutionally vague." (Martoma Ltr. 9). "[A] generic 'friendship' test," he says, "would be both far too expansive and far too imprecise to satisfy due process." (*Id.* at 10). But this argument misstates the standard in *Dirks*. *Dirks* does not create a "'friendship' test." It refers to "a trading relative or friend" only in the context of determining whether a tip resembles a "gift of

---

[1] The limit Martoma proposes is also contrary to Congress' intent. Congress has passed multiple pieces of legislation impliedly approving the rule in *Dirks*. It has twice amended Section 10(b) without modifying its standard since *Dirks* was decided, *see* 114 Stat. 2763A-454 (2000); 124 Stat. 1761 (2010), and it has enacted other legislation expanding its protections, *see, e.g.*, Insider Trading and Securities Fraud Enforcement Act of 1988 ("ITSFEA"), Pub. L. No. 100-704, 102 Stat. 4677. The House Report accompanying enactment of ITSFEA states that it was "not intended to alter in any respect . . . the underlying standards for tipper and tippee liability" that are "set forth in . . . *Dirks*." H.R. Rep. No. 910, 100th Cong., 2d Sess. 9, at 19 (1988); *see also id.* at 11 ("The legal principles governing insider trading cases are well-established and widely-known.").

confidential information" to another person, thus giving rise to an inference of a personal benefit. 463 U.S. at 664. That someone is a "friend" is relevant to that question, as people rarely give such gifts to strangers; but the ultimate test (and the question the jury was instructed to answer here) is whether the insider benefitted by gifting confidential information.

Moreover, the Supreme Court in *Salman* has already rejected the same vagueness challenge raised by Martoma. Salman argued in his brief that the "line between a 'friend' and an acquaintance" was so "indeterminate" that "ascertaining whether conduct falls within the statute's prohibited scope 'devolv[es] into guesswork.'" (Pet. Br., *Salman* v. *United States*, No. 15-628, at 43 (quoting *Johnson* v. *United States*, 135 S. Ct. 2551, 2559 (2015)). The Supreme Court squarely rejected the argument, holding that that *Dirks*' "gift-giving standard" created a "simple and clear 'guiding principle' for determining tippee liability." 137 S. Ct. at 428 (quoting *Dirks*, 463 U.S. at 664). And while the Court admitted "that in some factual circumstances assessing liability for gift-giving will be difficult," it held that the presence of such difficulty "cannot render 'shapeless' a federal criminal prohibition, for even clear rules 'produce close cases.'" *Id.* (quoting *Johnson*, 135 S. Ct. at 2560); *see also United States* v. *Williams*, 553 U.S. 285, 306 (2008) ("Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt.").

That holding controls here. Juries are well-situated to determine whether information was given as a gift, and they are equally able to make the commonsense determination of whether two individuals are friends. *See Birzon* v. *King*, 469 F.2d 1241 (2d Cir. 1972) (holding "that the word 'associate' in [a] parole condition is not unconstitutionally vague"); *see also Sproles* v. *Binford*, 286 U.S. 374, 393 (1932) ("The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding."). And Martoma's standard is in any event no clearer: determining whether "high school classmates who reconnected on social media" are "friends" (Martoma Ltr. 10), for example, is no more or less difficult than determining whether such individuals have a "meaningfully close personal relationship."

Martoma's argument is accordingly less about vagueness and more a claim that *Dirks* is just "too expansive." (Martoma Ltr. 10). But it is simply not the case that "any" tipper-tippee friendship suffices to impose criminal liability. (*Id.*). The Government must prove that "the tipper expected that the information being disclosed would be used in securities trading," which cabins the "expansive" liability Martoma fears. *Salman*, 137 S. Ct. at 427; *see, e.g.*, *United States* v. *Gansman*, 657 F.3d 85, 92 (2d Cir. 2011) ("[T]he government must prove" that "the tipper conveyed material nonpublic information to his 'tippee' with the understanding that it would be used for securities trading."). Where a tipper discloses inside information to a mere acquaintance or distant relative, it less likely that the government would be able to show that the tipper intended the information to be used for trading. In this case, Gilman knew that Martoma was using the information he provided to buy or sell stocks (Tr. 1236-37, 1369-70), and the jury was instructed that "the law prohibits" a person who has inside information about securities from "giving that information to others *so that they can trade in such securities* on the basis of that information." Tr. 3182-83 (emphasis added).

In any event, a test is not vague simply because it is "expansive" (Martoma Ltr. 10); what matters is that people have fair notice of what is being criminalized. *See Williams*, 553 U.S. at 304. As multiple Justices noted during argument in *Salman*, the public has fair notice of what trading is prohibited based on three decades of judicial application of *Dirks*. Ironically, it is Martoma who would upset those expectations. (*See* Oct. 5, 2016 Oral Argument Tr. 21, *Salman* v. *United States*, No. 15-628) ("You're asking us to cut back significantly from something that we said several decades ago, something that Congress has shown no indication that it's unhappy with … [a]nd you're asking us essentially to change the rules in a way that threatens [market] integrity.") (Kagan, J.); *see also id.* (*Newman* "is really more likely to change the law that people have come to rely upon than it is to keep to it") (Breyer, J.)).[2]

### III. MARTOMA'S CONVICTION SHOULD BE AFFIRMED EVEN IF A MEANINGFULLY CLOSE PERSONAL RELATIONSHIP IS REQUIRED

Finally, even if a "meaningfully close" friendship was required, Martoma's conviction should still be affirmed. First, both Gilman and Ross plainly received a pecuniary benefit, which is an independent basis to affirm Martoma's conviction. Second, the relationship between Martoma and Gilman qualifies as a "meaningfully close personal relationship" under any reasonable interpretation. Third, Martoma cannot show that the District Court committed plain error that would excuse his failure to have raised the arguments he now presses before this Court.

#### A. Gilman and Ross Both Received Pecuniary Benefits for Tipping Martoma

Both Gilman and Ross received pecuniary benefits in exchange for the information they tipped to Martoma. Martoma never mentions the name Ross in his letter brief, but the evidence at trial established that Ross leaked the confidential bapineuzumab results on which Martoma traded in exchange for pecuniary benefits. Ross was billing $1,500 an hour as a consultant to Martoma, and Martoma had promised to help refer business contacts to a testing clinic that Ross had helped open and from which Ross was receiving a salary. (Tr. 555-56, 622-27, 630, 642-45, 684-86; *see also* Gov't Ltr. 7-8 & n.5). Even leaving aside Gilman, this relationship provides an independent basis to affirm Martoma's conviction.

Martoma's relationship with Gilman, moreover, was similarly illicit. Martoma claims that Gilman "admitted at trial that he was never compensated for revealing the data on which Martoma [] traded." (Martoma Ltr. 11). This is a debater's point, and not a good one: while Gilman did not submit a bill for the precise meeting during which he tipped Martoma, the meeting occurred in the context of a lucrative consulting arrangement that was paying him thousands of dollars. And the reason he did not submit a bill for the meeting at issue was that doing so "would [have] be[en] tantamount to confessing that [he] was feeding … [Martoma] inside information." (Tr. 1918; *see also* Gov't Ltr. 8-9).

Martoma claims that "the government's financial benefit theory still could not save the conviction it procured, as the jury instructions . . . permitted the jury to find a personal benefit

---

[2] Martoma also clearly understood his conduct to be prohibited, as he booked his travel to get the bapineuzumab results from Gilman using his wife's credit card, and used a taxi driver's phone to contact Gilman during that trip, in order to avoid creating a paper trail. (*See* Gov't Br. 17-20).

*either* based on a 'financial' benefit theory *or* based on the kind of vague 'friendship' theory that *Newman* rejected." (Martoma Ltr. 11). This argument misstates both the relevant legal standard, which, as discussed below, is plain error (*see* Gov't Br. 23-30), as well as the instruction that was actually given. The jury was not given a "kind of vague 'friendship'" instruction or told that Gilman received a personal benefit to the extent he was merely friends with Martoma. It was instructed that Gilman or Ross could have received a personal benefit to the extent they tipped Martoma in a manner akin to giving him "a gift with the goal of maintaining or developing a personal friendship or useful networking contact." (Tr. 3191). This language directly mirrors what the Supreme Court said in *Dirks*, *see* 463 U.S. at 664 (holding that the jury may infer that a tipper receives a personal benefit if he "makes a gift of confidential information to a trading relative or friend"), and is substantively identical to the instruction that the Supreme Court approved in *Salman*. (Gov't Ltr. 2, 9-10).[3]

### B. Gilman and Martoma Had a "Meaningfully Close Personal Relationship"

Martoma claims that he and Gilman "were not even friends, let alone meaningfully close ones." (Martoma Ltr. 7). This argument is meritless. The District Court found that Gilman and Martoma "had developed a real friendship" during the course of their two-year consulting relationship. (SPA39). This finding is both supported by the record and entitled to deference on appeal. *See United States* v. *Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006); *United States* v. *Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). As the Government explained in its January 6, 2017 letter brief, Martoma intentionally fostered a close relationship with Gilman to get confidential information from him. (*See* Tr. 1236 (testimony from Gilman that Martoma told him he "wanted to be friends" and "closer" than just colleagues); *see also* Gov't Ltr. 5-6 (discussing evidence of relationship)). Martoma's efforts proved successful, in part because, as Gilman explained, Martoma "reminded [him] of [his] first son," who had "committed suicide." (Tr. 1893). That Martoma reminded Gilman of his deceased child injects an element of intimacy into their relationship that, in the context of the other evidence regarding their relationship, plainly makes it "meaningful," "close," and "personal," however defined.[4]

### C. Martoma Cannot Show Plain Error in His Unchallenged Jury Instructions

Finally, the question before this Court is not whether the word "friend" as used in *Dirks* requires additional elucidation. The questions before this Court are (1) whether there was sufficient evidence for the jury to have found guilt based on the instructions it received (which

---

[3] Martoma attempts to undermine the "gift" theory by claiming that "[i]t is inconceivable that Gilman would have offered Martoma gifts or financial support in lieu of inside information." (Martoma Ltr. 8). This argument misstates that *Dirks* test. Gilman obviously could not have made the multimillion dollar trades that Martoma made so as to gift him the profits. But what Gilman could do was give Martoma information. The point in *Dirks* is that a gift of information "resemble[s]" a gift of profits, so that the two should be treated equally. 443 U.S. at 664. *Dirks* does not raise the counterfactual question of whether the tipper would have in fact provided a monetary gift to the tippee.

[4] That Martoma may not have actually felt close to Gilman is irrelevant, since the question is Gilman's purpose in tipping Martoma. *See Dirks*, 463 U.S. at 663-64.

there obviously was); and (2) whether Judge Gardephe committed plain error by failing to instruct the jury that, in order for the inference of a gift to be appropriate under *Dirks*, there must be a "meaningfully close personal relationship." Martoma cannot come close to making a showing of plain error, which is likely why he never mentions the standard.

In order to show plain error, Martoma must show that the jury instructions were not only erroneous, but that "the error is clear or obvious, rather than subject to reasonable dispute;" that "the error affected [his] substantial rights;" and that "the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States* v. *Marcus*, 560 U.S. 258, 262 (2010). To affect his "substantial rights," moreover, "an error must be 'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial." *Id.* (quoting *United States* v. *Olano*, 507 U.S. 725, 734-35 (1993)). Martoma cannot make this showing. As discussed, it is by no means "clear or obvious" that the language on which Martoma relies survives *Salman*. *Id.*; *see also United States* v. *Bastian*, 770 F.3d 212, 223 (2d Cir. 2014) ("We typically do not find plain error 'where the operative legal question is unsettled.'") (quoting *United States* v. *Whab*, 355 F.3d 155, 158 (2d Cir. 2004)); *id.* at 223 (this Court "cannot fault the district court for failing to parse . . . novel distinctions"); *United States* v. *Riley*, 2015 WL 891675, at *5 (S.D.N.Y. Mar. 3, 2015) (Caproni, J.) (declining to find plain error in an analogous instruction even before *Salman*). Nor is there a reasonable probability that the outcome of Martoma's trial would have been different had the jury been instructed as Martoma now claims is required, as Gilman and Ross both received pecuniary benefits (a separate basis for liability), and Gilman thought he had a meaningfully close relationship with Martoma. The alleged error accordingly does not affect Martoma's substantial rights.

## CONCLUSION

Martoma cultivated sources of inside information through lucrative consulting arrangements and friendships, and he then used the illicit tips he received to make hundreds of millions of dollars of riskless trades. He preyed in particular on an elderly doctor who saw in him an image of his lost son. Any rule that legalizes Martoma's conduct—or that would allow insiders to tip some friends but not others—will be exploited and will jeopardize the enforcement of the securities laws. The rule that Martoma proposes provides no basis to reverse his conviction and is foreclosed by the Supreme Court's decision in *Salman*. The Government respectfully submits that Martoma's conviction should be affirmed.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: /s/ Robert Allen
    Robert Allen
    Margaret Garnett
    Assistant United States Attorneys
    Tel: (212) 637-2216/2520

CC: Counsel of Record (by CM/ECF)